# No. 25-4121

# United States Court of Appeals
### *for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

MARTIQUE CABRAL VANDERPOOL,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

# JOINT APPENDIX
# VOLUME 1 OF 6 (PAGES 1-478)

STUART A. BERMAN
LERCH, EARLY &
  BREWER, CHARTERED
760 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
(301) 657-0729

*Counsel for Appellant*

HARMEET DHILLON
MICHAEL E. GATES
BARBARA A. SCHWABAUER
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
Post Office Box 14403
Washington, DC 20044
(202) 305-3034

*Counsel for Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • [812795]

# TABLE OF CONTENTS

**Page**

**VOLUME 1 OF 6**

District Court Docket Sheet ................................................................ JA1

Indictment
     filed July 6, 2023 ................................................................ JA16

Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants
     filed August 18, 2023 ................................................................ JA19

     Exhibit A:  Initial Prince George's County Warrant
          dated December 2, 2019 ................................................................ JA37

     Exhibit B:  Prince George's County Warrant-Samsung Galaxy S III
          dated January 17, 2020 ................................................................ JA43

     Exhibit C:  Federal Search Warrant
          dated June 23, 2020 ................................................................ JA49

     Proposed Order ................................................................ JA71

Defendant's Motion to Dismiss for Preindictment Delay
     filed August 18, 2023 ................................................................ JA72

Government's Response in Opposition to Defendant's Motion to Suppress
Evidence Seized Pursuant to Search Warrants
     filed September 8, 2023 ................................................................ JA82

     Exhibit 1: Federal Warrant
          dated June 23, 2020 ................................................................ JA113

     Exhibit 2:  State Warrant
          dated December 2, 2019 ................................................................ JA135

     Exhibit 3:  State Warrant
          dated January 17, 2020 ................................................................ JA146

Government's Response in Opposition to Defendant's Motion to Dismiss for
Preindictment Delay
     filed September 8, 2023 ................................................................ JA188

Defendant's Reply to Government's Response to Motion to Suppress Evidence
        filed November 20, 2023 ........................................................................ JA207

Government's [Proposed] Surreply Regarding Defendant's Motion to Suppress
Evidence Seized Pursuant to Search Warrants
        filed January 26, 2024.......................................................................... JA237

Transcript of Motions Hearing before
The Honorable Deborah L. Boardman
        on February 12, 2024........................................................................... JA251

Defendant's Exhibit List
        filed February 12, 2024 ....................................................................... JA386

Government's Exhibit List
        filed February 12, 2024 ....................................................................... JA388

Government's Motion *in Limine* to Preclude the Defendant from Introducing
Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding
the Scope of the Rule of Completeness
        filed June 26, 2024.............................................................................. JA389

Government's Motion *in Limine* to Preclude Reference to the Existence and
Outcome of Prior State Trial
        filed June 26, 2024.............................................................................. JA403

Government's Motion *in Limine* to Preclude Any Reference to the Civil Suit
Filed by R.S. Against the Defendant, Unless and Until R.S. Testifies
        filed June 26, 2024.............................................................................. JA412

Government's Motion *in Limine* to Preclude Reference to the Dismissed Civil
Rights Indictment
        filed June 26, 2024.............................................................................. JA417

Proposed Order Re:  Government's Motion *in Limine* to Preclude Introduction
of Self-Serving Hearsay
        filed June 28, 2024.............................................................................. JA423

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to the Prior State Trial
        filed June 28, 2024.............................................................................. JA424

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to the Civil Suit (Unless Victim Testifies)
  filed June 28, 2024 ................................................................................... JA425

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to Dismissed Indictment
  filed June 28, 2024 ................................................................................... JA426

Government's Motion *in Limine* to Exclude Inadmissible and Irrelevant Evidence
Re:  R.S.'s Character
  filed June 28, 2024 ................................................................................... JA427

Defendant's Omnibus Response to Government's Motions *in Limine*
  filed July 22, 2024 ................................................................................... JA438

Government's Response to Defendant's Omnibus Motions *in Limine*
  filed July 29, 2024 ................................................................................... JA448

Government's Reply to Defendant's Omnibus Response to Government's
Motions *in Limine*
  filed July 29, 2024 ................................................................................... JA460

Defendant's Memorandum in Support of Motion to Impeach Sergeant Gill
  filed October 18, 2024 ............................................................................. JA467

Government's Opposition to Defendant's Motion to Impeach a Government
Witness
  filed October 19, 2024 ............................................................................. JA472

Defendant's Notice of Objection
  filed October 21, 2024 ............................................................................. JA477

**VOLUME 2 OF 6**

Transcript of Bench Trial, Volume 1, before
The Honorable Deborah L. Boardman
     on October 22, 2024 ........................................................................ JA479

Testimony of Mark Zimmerman:

Direct Examination by the Government (Ms. Allison) .......................... JA511
Cross-Examination by Defense (Mr. Zampogna) .................................. JA582
Redirect Examination by the Government (Ms. Allison)....................... JA616
Recross-Examination by Defense (Mr. Zampogna)............................... JA622

Testimony of Brendan Gill:

Direct Examination by the Government (Ms. Bernstein)........................ JA624
Cross-Examination by Defense (Mr. Zampogna) .................................. JA673
Redirect Examination by the Government (Ms. Bernstein)................... JA701
Recross-Examination by Defense (Mr. Zampogna)............................... JA704

Testimony of Doniese Collins:

Direct Examination by the Government (Ms. Bernstein)........................ JA710

Transcript of Bench Trial, Volume 2, before
The Honorable Deborah L. Boardman
     on October 23, 2024 ........................................................................ JA726

Testimony of Doniese Collins:

Continued Direct Examination by the Government (Ms. Bernstein)..... JA734
Cross-Examination by Defense (Mr. Bluestone)................................... JA759
Redirect Examination by the Government (Ms. Bernstein)................... JA771

Testimony of Lyla Zeidan:

Direct Examination by the Government (Ms. Allison) .......................... JA778
Cross-Examination by Defense (Mr. Bluestone)................................... JA800
Redirect Examination by Government (Ms. Allison) ............................ JA810
Recross-Examination by Defense (Mr. Bluestone)............................... JA814

Testimony of Elizabeth Hung:

Direct Examination by the Government (Ms. Bernstein)........................ JA815
Cross-Examination by Defense (Mr. Zampogna) .................................. JA851
Redirect Examination by the Government (Ms. Bernstein)................... JA878
Recross-Examination by Defense (Mr. Zampogna)............................... JA894

Defendant's Notice of Requested Instructions
    filed October 23, 2024 ..................................................................... JA909

Transcript of Bench Trial, Volume 3, before
The Honorable Deborah L. Boardman
    on October 24, 2024 ....................................................................... JA910

Transcript of Bench Trial, Volume 4, Verdict, before
The Honorable Deborah L. Boardman
    on October 30, 2024 ....................................................................... JA939

## VOLUME 3 OF 6

Government's Admitted Trial Exhibits:

1.    Incident Report [Certified Copy] ................................................ JA960

2.    RS Traffic Summons.................................................................... JA966

3.    RS Criminal Citation ................................................................... JA968

4.    (A-H)  Photographs of Station .................................................... JA969

5.    (A-D)  Photographs of Dupree's Car .......................................... JA977

6.    (A-B)  Photographs of Vanderpool's Car ................................... JA980

7.    Vanderpool Time Sheets ............................................................. JA982

8.    CAD Report.................................................................................. JA986

10.   Vanderpool Phone Extraction Audio Files ................................. JA989

11.   Vanderpool Phone Extraction Messages to and from
      Dupree 9/17 ................................................................................. JA993

12. Vanderpool Phone Extraction Messages to and from Dupree 10/6 ...................................................................... JA1030

13. PGCPD Chief Referral Letter [Redacted].............................. JA1037

14. FHPD General Order 2-2 Oath of Office................................ JA1038

15. FHPD General Order 5-8 Mobile Video Recording ................ JA1039

16. FHPD General Order 5-12 Incident Reporting ....................... JA1044

17. FHPD General Order 5-14 Traffic Law Enforcement .............. JA1051

18. FHPD General Order 5-15 Traffic Law Enforcement Methods .............................................................................. JA1065

19. FHPD General Order 5-38 Prisoner Searches and Transportation ..................................................................... JA1075

20. FHPD General Order 5-50 Towing of Motor Vehicles ............ JA1096

21. FHPD General Order 8-1 Conduct of Members of the Department ......................................................................... JA1101

22. RMS Audit for RS Report [Certified Copy] ........................... JA1115

23. RMS Audit of Vanderpool Logons, 8.7.18-9.28.19................. JA1131

24. MPCTC Police Training Records (Excerpts)........................... JA1132

25. NoVa Academy Diploma ..................................................... JA1135

26. WMATA Comparative Compliance Diploma .......................... JA1137

27. Metro Transit Rules of Arrest and Arrest Procedures Lesson Plan .................................................................................. JA1138

28. Laws of Arrest Lesson Plan .................................................. JA1149

29. Laws of Arrest PowerPoint (Excerpts) .................................. JA1166

30. WMATA Training Ethics Essay ............................................ JA1167

31. NVCJ Sex Crimes PowerPoint (Excerpts)............................. JA1168

32. NVCJ Constitutional Law and Civil Liability Lesson Plan ........ JA1169

33. NVCJ Constitutional Law and Civil Liability PowerPoint (Excerpts) .................................................................................. JA1195

41. (A-D) Tow Lot Photographs ..................................................... JA1200

42. C.C. Traffic Ticket [Redacted] .................................................. JA1204

43. Map: Tino's to Addison/Sheriff's to FHPD ............................. JA1205

44. Vanderpool Phone Extraction Timeline 9.6-9.7 ....................... JA1206

116. Nnamani CAD ........................................................................... JA1214

117. Audit Log Booking 143908-19-0002936 .................................. JA1216

118. Audit Log Impound 42865-19-0002936 ................................... JA1222

119. Timesheets 01.15.2019 .............................................................. JA1228

Defendant's Admitted Trial Exhibits:

1. RMS User Manual ..................................................................... JA1230

2. FHPD General Order 6-5: Uniform Crime Reporting (UCR) ... JA1303

3. Fairmount Heights Police Calendar – September 2019 ............. JA1305

4. Police Report – Travis Nnamani ............................................... JA1306

5. RMS Audit – Travis Nnamani ................................................... JA1312

6. Photograph of FHPD Desktop Monitor ..................................... JA1318

7. Photograph of FHPD Entry Door ............................................. JA1319

8. Photographs of FHPD Station 9/6/2019 .................................... JA1320

9. FHPD General Order 7-1: Computer Use and Security ............. JA1329

10. FHPD Time Sheets – 1/12/2019-1/25/2020 .............................. JA1333

11. Letters Re: Suspension .............................................................. JA1335

**VOLUME 4 OF 6**

Regular Sentencing Order
        filed October 30, 2024 ............................................................... JA1337

Verdict
        filed October 31, 2024 ............................................................... JA1340

Defendant's Motion for Arrest of Judgment or, in the Alternative, Motion for
Judgment of Acquittal and New Trial
        filed December 9, 2024 .............................................................. JA1341

        Exhibit A:  State Warrant
                dated December 2, 2019 .................................................. JA1377

        Exhibit B:  State Warrant
                dated January 17, 2020 ................................................... JA1383

Government's Response to Defendant's Motion for Arrest of Judgment or,
in the Alternative, Motion for Judgment of Acquittal and New Trial
        filed December 23, 2024 ............................................................ JA1389

Defendant's Reply in Support of Omnibus Post Trial Motions
        filed January 8, 2025 ................................................................. JA1404

Memorandum Opinion Denying Defendant's Post Trial Motions
        filed February 5, 2025 ............................................................... JA1419

Defendant's Sentencing Memorandum
        filed February 6, 2025 ............................................................... JA1435

        Attachment:  Letter in Support ............................................... JA1464

Government's Response to Defendant's Sentencing Memorandum
        filed February 13, 2025 ............................................................. JA1493

Transcript of Sentencing Hearing before
The Honorable Deborah L. Boardman
        on February 20, 2025 ................................................................ JA1509

Judgment in a Criminal Case
        filed February 21, 2025 ............................................................. JA1619

Defendant's Notice of Appeal
     filed March 3, 2025................................................................JA1624

Order Granting Consent Motion to Partially Unseal Documents
     filed May 15, 2025..............................................................JA1628

**VOLUME 5 OF 6 (UNDER SEAL)**

Defendant's Objections to Draft Presentence Investigation Report
     filed December 23, 2024 ......................................................JA1629

**VOLUME 6 OF 6 (MEDIA)**[1]

    Government's Media Exhibits:

9.     Dispatch Recording ...................................................JA1637

9A.    Dispatch Recording [Demonstrative].........................JA1638

34A.  9.8.19 WA0003 Excerpt 1 (Vanderpool to Washington)
     With Captions [Demonstrative] ................................JA1639

35.    9.8.19 WA0003 Excerpt 2 (Vanderpool to Washington)...........JA1640

35A.  9.8.19 WA0003 Excerpt 2 (Vanderpool to Washington)
     With Captions [Demonstrative] ................................JA1641

36.    9-9-19 WA0002 (Washington to Vanderpool) ...........JA1642

36A.  9-9-19 WA0002 (Washington to Vanderpool) With Captions
     [Demonstrative]........................................................JA1643

37.    9-9-19 WA0003 (Washington to Vanderpool) ...........JA1644

37A.  9-9-19 WA0003 (Washington to Vanderpool) With Captions
     [Demonstrative]........................................................JA1645

---

[1] Exhibits are in .mp4, .ogg, and .wav file format. A virus detection program, VIPRE Endpoint Security Version 13.1.8510, was run on the electronic files and no virus was detected.

38.  9-9-19 WA0004 (Vanderpool to Washington) .......................... JA1646

38A. 9-9-19 WA0004 (Vanderpool to Washington) With Captions
[Demonstrative] .................................................................... JA1647

39.  9-9-19 WA0005 (Washington to Vanderpool) .......................... JA1648

39A. 9-9-19 WA0005 (Washington to Vanderpool) With Captions
[Demonstrative] .................................................................... JA1649

40.  9-9-19 WA0006 (Vanderpool to Washington) .......................... JA1650

40A. 9-9-19 WA0006 (Vanderpool to Washington) With Captions
[Demonstrative] .................................................................... JA1651

**U.S. District Court**
**District of Maryland (Greenbelt)**
**CRIMINAL DOCKET FOR CASE #: 8:23-cr-00234-DLB-1**

Case title: USA v. Vanderpool

Date Filed: 07/06/2023

Date Terminated: 02/21/2025

Assigned to: Judge Deborah L. Boardman

Appeals court case number:
25-4121 Fourth Circuit Court of Appeals

**Defendant (1)**

**Martique Cabral Vanderpool**
*TERMINATED: 02/21/2025*

represented by **Christopher Adam Zampogna**
Zampogna PC
2101 L St NW
Suite 300
Washington, DC 20037
202-223-6635
Fax: 202-803-7988
Email: caz@zampognalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stuart A Berman**
Lerch Early & Brewer LLC
7600 Wisconsin Avenue
Suite 700
Bethesda, MD 20814
13016570729
Fax: 13013471538
Email: saberman@lerchearly.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abraham Bluestone**
Zampogna, P.C.
2101 L St NW
Ste 300
Washington, DC 20037
202-223-6635
Email: ab@zampognalaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Amy Steffan Fitzgibbons**
Office of the Federal Public Defender
6411 Ivy Lane Ste 710
Greenbelt, MD 20770
13013440660
Fax: 13013440019
Email: amy_fitzgibbons@fd.org
*TERMINATED: 03/19/2024*
*Designation: Public Defender or Community Defender Appointment*

**Douglas Ryan Miller**

JA1

Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
301−344−0600
Fax: 301−344−0019
Email: Douglas_Miller@fd.org
*TERMINATED: 03/19/2024*
*Designation: Public Defender or Community*
*Defender Appointment*

**Ellie Marranzini**
Office of the Federal Public Defender
6411 Ivy Lane Ste 710
Greenbelt, MD 20770
3013440600
Fax: 3013440019
Email: ellie_marranzini@fd.org
*TERMINATED: 03/19/2024*
*Designation: Public Defender or Community*
*Defender Appointment*

**Ned Smock**
Office of the Federal Public Defender
100 South Charles St.
Tower II − 9th Floor
Baltimore, MD 21201
4109623962
Fax: 4109620872
Email: ned_smock@fd.org
*TERMINATED: 03/19/2024*
*Designation: Public Defender or Community*
*Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1519 FALSIFICATION OF RECORD (1) | PROBATION for a term of 3 years as to Count 1 of the Indictment; ASSESSMENT $100 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| USA | represented by | **Barbara S. Bernstein** |
|---|---|---|
| | | US DOJ/CRT |
| | | 150 M Street, NE |
| | | Ste 7th Floor |
| | | Washington, DC 20002 |

JA2

202–353–0032
Fax: 202–514–8336
Email: bobbi.bernstein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Tara Knoll Allison**
DOJ–Crt
Civil Rights Division
150 M St NE
Washington, DC 20002
412–779–8970
Email: tara.allison@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Hutson**
950 Pennsylvania Avenue
Washington, DC 20530
202–532–5578
Email: Elizabeth.Hutson@usdoj.gov
*TERMINATED: 02/16/2024*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/06/2023 | 1 | INDICTMENT as to Martique Cabral Vanderpool (1) count(s) 1. (dg3s, Deputy Clerk) (Entered: 07/07/2023) |
| 07/07/2023 | 3 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Anne Hutson appearing for USA.(Hutson, Elizabeth) (Entered: 07/07/2023) |
| 07/12/2023 | | Telephone Conference re: status as to Martique Cabral Vanderpool held on 7/12/2023 before Judge Deborah L. Boardman. (rc2s, Deputy Clerk) (Entered: 07/12/2023) |
| 07/12/2023 | 4 | NOTICE OF ATTORNEY APPEARANCE: Amy Steffan Fitzgibbons as Public Defender appearing for Martique Cabral Vanderpool(Fitzgibbons, Amy) (Entered: 07/12/2023) |
| 07/12/2023 | 5 | SCHEDULING ORDER as to Martique Cabral Vanderpool. Signed by Judge Deborah L. Boardman on 7/12/2023. (dg3s, Deputy Clerk) (Entered: 07/12/2023) |
| 07/12/2023 | 6 | Initial Appearance (Defendant informed of Rights) and Arraignment Hearing as to Martique Cabral Vanderpool (1) held on 7/12/2023; Plea entered of NOT GUILTY as to count 1 of the Indictment before Magistrate Judge Ajmel Ahsen Quereshi. (FTR– Maria Diaz 2A) (mtds, Deputy Clerk) (Entered: 07/12/2023) |
| 07/12/2023 | 7 | CJA 23 Financial Affidavit by Martique Cabral Vanderpool. (mtds, Deputy Clerk) (Entered: 07/12/2023) |
| 07/12/2023 | 8 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Martique Cabral Vanderpool Signed by Magistrate Judge Ajmel Ahsen Quereshi on 7/12/2023. (mtds, Deputy Clerk) (Entered: 07/12/2023) |
| 07/12/2023 | 9 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Martique Cabral Vanderpool Signed by Magistrate Judge Ajmel Ahsen Quereshi on 7/12/2023. (mtds, Deputy Clerk) (Entered: 07/12/2023) |
| 07/13/2023 | 10 | NOTICE OF ATTORNEY APPEARANCE: Ellie Marranzini as Public Defender appearing for Martique Cabral Vanderpool(Marranzini, Ellie) (Entered: 07/13/2023) |
| 08/15/2023 | 11 | Consent MOTION for Protective Order by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Attachment Protective Order)(Hutson, Elizabeth) (Entered: 08/15/2023) |

JA3

| | | |
|---|---|---|
| 08/16/2023 | 12 | ORDER granting 11 Consent MOTION for Protective Order as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 8/16/2023. (mg3s, Deputy Clerk) (Entered: 08/16/2023) |
| 08/18/2023 | 13 | MOTION to Suppress *Evidence Obtained by Search Warrant* by Martique Cabral Vanderpool. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 08/18/2023) |
| 08/18/2023 | 14 | MOTION to Dismiss *for Preindictment Delay* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 08/18/2023) |
| 08/23/2023 | 15 | NOTICE OF ATTORNEY APPEARANCE Barbara S. Bernstein appearing for USA.(Bernstein, Barbara) (Entered: 08/23/2023) |
| 08/23/2023 | 16 | Consent MOTION JUROR QUESTIONNAIRE AND FOR ATTORNEY−CONDUCTED VOIR DIRE by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Exhibit Jury Questionnaire)(Hutson, Elizabeth) (Entered: 08/23/2023) |
| 08/30/2023 | | Telephone Conference re: motions as to Martique Cabral Vanderpool held on 8/30/2023 before Judge Deborah L. Boardman. (rc2s, Deputy Clerk) (Entered: 08/31/2023) |
| 09/08/2023 | 17 | RESPONSE in Opposition by USA as to Martique Cabral Vanderpool re 13 MOTION to Suppress *Evidence Obtained by Search Warrant* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Hutson, Elizabeth) (Entered: 09/08/2023) |
| 09/08/2023 | 18 | MOTION to Modify Conditions of Release *Related to Travel* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 09/08/2023) |
| 09/08/2023 | 19 | RESPONSE in Opposition by USA as to Martique Cabral Vanderpool re 14 MOTION to Dismiss *for Preindictment Delay* (Attachments: # 1 Exhibit Exhibit 1 (placeholder for sealed exhibit))(Bernstein, Barbara) (Entered: 09/08/2023) |
| 09/08/2023 | 20 | MOTION to Seal by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order (to seal Ex. 1))(Bernstein, Barbara) (Entered: 09/08/2023) |
| 09/08/2023 | 21 | **SEALED DOCUMENT** (Bernstein, Barbara) Modified on 2/12/2024 (mg3s, Deputy Clerk). (Entered: 09/08/2023) |
| 09/08/2023 | 22 | Paperless ORDER granting 18 Motion to Modify Conditions of Release as to Martique Cabral Vanderpool. Signed by Magistrate Judge Ajmel Ahsen Quereshi on 9/8/2023. (Quereshi, Ajmel) (Entered: 09/08/2023) |
| 09/14/2023 | 23 | MOTION to Exclude *Time Under the Speedy Trial Act* by USA as to Martique Cabral Vanderpool. (Hutson, Elizabeth) (Entered: 09/14/2023) |
| 09/18/2023 | 24 | ORDER granting 23 MOTION to Exclude Time Under the Speedy Trial Act as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 9/18/2023. (bw5s, Deputy Clerk) (Entered: 09/18/2023) |
| 09/19/2023 | 25 | MOTION to Continue *Motions Hearing and Trial* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Fitzgibbons, Amy) (Entered: 09/19/2023) |
| 09/20/2023 | 26 | PAPERLESS ORDER granting 25 Motion to Continue as to Martique Cabral Vanderpool (1). A status conference is scheduled for October 17, 2023 at 11:30 a.m. to set new hearing and trial dates. Signed by Judge Deborah L. Boardman on 9/20/2023. (lmys, Chambers) (Entered: 09/20/2023) |
| 10/04/2023 | 27 | NOTICE OF ATTORNEY APPEARANCE: Ned Smock as Public Defender appearing for Martique Cabral Vanderpool(Smock, Ned) (Entered: 10/04/2023) |
| 10/17/2023 | | Telephone Conference re: scheduling as to Martique Cabral Vanderpool held on 10/17/2023 before Judge Deborah L. Boardman. (rc2s, Deputy Clerk) (Entered: 10/24/2023) |
| 10/24/2023 | 28 | AMENDED SCHEDULING ORDER as to Martique Cabral Vanderpool. Signed by Judge Deborah L. Boardman on 10/24/2023. (bw5s, Deputy Clerk) (Entered: 10/24/2023) |

JA4

| | | |
|---|---|---|
| 10/24/2023 | 29 | PAPERLESS ORDER as to Martique Cabral Vanderpool: Trial will begin on Tuesday, June 4, 2024 instead of June 3, 2024 and will conclude by Friday, June 7, 2024. Signed by Judge Deborah L. Boardman on 10/24/2023. (lmys, Chambers) (Entered: 10/24/2023) |
| 11/13/2023 | 30 | Consent MOTION to Continue *Reply Deadline* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Marranzini, Ellie) (Entered: 11/13/2023) |
| 11/13/2023 | 31 | PAPERLESS ORDER granting 30 Motion to Continue as to Martique Cabral Vanderpool (1). TheDefendant's deadline for filing replies to pretrial motions is November 20, 2023. Signed by Judge Deborah L. Boardman on 11/13/2023. (lmys, Chambers) (Entered: 11/13/2023) |
| 11/20/2023 | 32 | REPLY TO RESPONSE to Motion by Martique Cabral Vanderpool re 13 MOTION to Suppress *Evidence Obtained by Search Warrant* (Marranzini, Ellie) (Entered: 11/20/2023) |
| 11/20/2023 | 33 | MOTION for Leave to File Excess Pages by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Marranzini, Ellie) (Entered: 11/20/2023) |
| 12/14/2023 | 34 | PAPERLESS ORDER granting 33 Motion for Leave to File Excess Pages as to Martique Cabral Vanderpool (1) as unopposed. Signed by Judge Deborah L. Boardman on 12/14/2023. (lmys, Chambers) (Entered: 12/14/2023) |
| 01/19/2024 | 35 | −SEALED− Request for Rule 17 Subpoena by Martique Cabral Vanderpool (Attachments: # 1 Text of Proposed Order, # 2 Attachment, # 3 Attachment, # 4 Attachment, # 5 Attachment, # 6 Attachment, # 7 Attachment, # 8 Attachment)(Marranzini, Ellie) (Entered: 01/19/2024) |
| 01/22/2024 | 36 | Joint Correspondence re: Motions Hearing (Marranzini, Ellie) (Entered: 01/22/2024) |
| 01/23/2024 | 37 | PAPERLESS ORDER approving the parties' plans 36 for the hearing on February 8, 2024. The Court will first hear argument from both sides on the Motion to Dismiss, ECF 14. The Court will then hear argument from both sides on the Motion to Suppress, ECF 13, beginning with the defendant's request for a Franks hearing. The parties should be prepared to address the Joint Motion for a Questionnaire, ECF 16. Signed by Judge Deborah L. Boardman on 1/23/2024. (mm10s, Chambers) (Entered: 01/23/2024) |
| 01/26/2024 | 39 | Consent MOTION for Leave to File *Surreply to Defendants Reply to Governments Response to Motion to Suppress Evidence* by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Proposed Surreply)(Hutson, Elizabeth) (Entered: 01/26/2024) |
| 01/26/2024 | 40 | PAPERLESS ORDER granting 39 Motion for Leave to File Surreply. Signed by Judge Deborah L. Boardman on 1/26/2024. (mm10s, Chambers) (Entered: 01/26/2024) |
| 01/26/2024 | 41 | LETTER ORDER directing United States to file supplemental briefing on Mr. Vanderpool's motion to suppress ECF No. 13 by February 2, 2024 as to Martique Cabral Vanderpool. Signed by Judge Deborah L. Boardman on 1/26/2024. (bw5s, Deputy Clerk) (Entered: 01/26/2024) |
| 01/26/2024 | 44 | SURREPLY by USA re 13 MOTION to Suppress *Evidence Obtained by Search Warrant* (bw5s, Deputy Clerk) (Entered: 01/30/2024) |
| 01/29/2024 | 42 | Consent MOTION for Protective Order *(Confidential LEO Information)* by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 01/29/2024) |
| 01/29/2024 | 43 | PROTECTIVE ORDER GOVERNING LAW ENFORCEMENT DISCIPLINARY INFORMATION as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 1/29/2024. (bw5s, Deputy Clerk) (Entered: 01/29/2024) |
| 02/02/2024 | 45 | NOTICE OF ATTORNEY APPEARANCE Tara Knoll Allison appearing for USA.(Allison, Tara) (Entered: 02/02/2024) |
| 02/02/2024 | 46 | Supplement to *Court's letter−order (ECF 41)* (Attachments: # 1 Attachment (Bloomingdale Affidavit))(Bernstein, Barbara) (Entered: 02/02/2024) |

| | | |
|---|---|---|
| 02/05/2024 | 47 | Joint MOTION for Protective Order *Permitting Disclosure of Third-party's Phone* by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Attachment)(Allison, Tara) (Entered: 02/05/2024) |
| 02/05/2024 | 48 | −SEALED− MOTION to Seal by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Attachment)(Allison, Tara) (Entered: 02/05/2024) |
| 02/05/2024 | 49 | RESPONSE re 46 Supplement. (Marranzini, Ellie) (Entered: 02/05/2024) |
| 02/07/2024 | 50 | −SEALED− Request for Rule 17 Subpoena by Martique Cabral Vanderpool (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Marranzini, Ellie) (Entered: 02/07/2024) |
| 02/11/2024 | 52 | **PROPOSED SEALED DOCUMENT** (Marranzini, Ellie) (Entered: 02/11/2024) |
| 02/11/2024 | 53 | MOTION to Seal by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Marranzini, Ellie) (Entered: 02/11/2024) |
| 02/11/2024 | 54 | MOTION for Leave to File *Affidavit* by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Attachment)(Allison, Tara) (Entered: 02/11/2024) |
| 02/12/2024 | 55 | PAPERLESS ORDER granting 48 Motion to Seal as to Martique Cabral Vanderpool (1). ECF 48−1 is sealed. Signed by Judge Deborah L. Boardman on 2/12/2024. (lmys, Chambers) (Entered: 02/12/2024) |
| 02/12/2024 | 56 | ORDER granting 47 Joint MOTION for Protective Order Permitting Disclosure of Third−party's Phone as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 2/12/2024. (mg3s, Deputy Clerk) (Entered: 02/12/2024) |
| 02/12/2024 | 57 | ORDER granting 20 Motion to Seal as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 2/12/2024. (mg3s, Deputy Clerk) (Entered: 02/12/2024) |
| 02/12/2024 | 58 | Motion Hearing as to Martique Cabral Vanderpool held on 2/12/2024 re 13 MOTION to Suppress *Evidence Obtained by Search Warrant*, 14 MOTION to Dismiss *for Preindictment Delay*, and 16 Consent MOTION JUROR QUESTIONNAIRE AND FOR ATTORNEY−CONDUCTED VOIR DIRE before Judge Deborah L. Boardman. (Court Reporter: Kathy Cortopassi − 4A) (dg3s, Deputy Clerk) (Entered: 02/12/2024) |
| 02/12/2024 | 59 | DEFENDANT'S EXHIBIT LIST by Martique Cabral Vanderpool (dg3s, Deputy Clerk) (Entered: 02/12/2024) |
| 02/12/2024 | 60 | GOVERNMENT'S EXHIBIT LIST by USA as to Martique Cabral Vanderpool (dg3s, Deputy Clerk) (Entered: 02/12/2024) |
| 02/12/2024 | 61 | Stipulation re: Return of Exhibits to Counsel (dg3s, Deputy Clerk) (Entered: 02/12/2024) |
| 02/12/2024 | 62 | [FILED IN ERROR PER COUNSEL] **PROPOSED SEALED DOCUMENT** (Allison, Tara) Modified on 2/16/2024 (bw5s, Deputy Clerk). (Entered: 02/12/2024) |
| 02/12/2024 | 63 | ORDER Setting Conditions of Release as to Martique Cabral Vanderpool. Signed by Magistrate Judge Ajmel Ahsen Quereshi on 3/1/2023. (bw5s, Deputy Clerk) (Entered: 02/13/2024) |
| 02/15/2024 | 64 | NOTICE OF ATTORNEY APPEARANCE: Douglas Ryan Miller as Public Defender appearing for Martique Cabral Vanderpool(Miller, Douglas) (Entered: 02/15/2024) |
| 02/15/2024 | 65 | MOTION to Withdraw as Attorney by Elizabeth Hutson by USA as to Martique Cabral Vanderpool. (Hutson, Elizabeth) (Entered: 02/15/2024) |
| 02/15/2024 | 66 | PAPERLESS ORDER granting 54 Motion for Leave to File as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 2/15/2024. (lmys, Chambers) (Entered: 02/15/2024) |
| 02/15/2024 | 67 | PAPERLESS ORDER granting 53 Motion to Seal the document at 62 as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 2/15/2024. (lmys, Chambers) (Entered: 02/15/2024) |

| | | |
|---|---|---|
| 02/15/2024 | 68 | PAPERLESS ORDER as to Martique Cabral Vanderpool amending 67 to state that 53 is granted as to the document at 52 . Signed by Judge Deborah L. Boardman on 2/15/2024. (lmys, Chambers) (Entered: 02/15/2024) |
| 02/16/2024 | 69 | QC NOTICE: 62 Proposed Sealed Document filed by USA was filed incorrectly. **Motion to seal is required before filing the proposed sealed document. Your motion for leave to file the document has been granted, but for it to be sealed, a motion is required.* (bw5s, Deputy Clerk) (Entered: 02/16/2024) |
| 02/16/2024 | 70 | ORDER granting 65 Motion to Withdraw as Attorney. Elizabeth Anne Hutson withdrawn from case as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 2/16/2024. (bw5s, Deputy Clerk) (Entered: 02/16/2024) |
| 02/16/2024 | 71 | AFFIDAVIT by USA as to Martique Cabral Vanderpool 54 MOTION for Leave to File *Affidavit* filed by USA, 66 Order on Motion for Leave to File (Allison, Tara) (Entered: 02/16/2024) |
| 02/16/2024 | 72 | Joint MOTION to Continue *motions deadline (and propose schedule)* by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 02/16/2024) |
| 02/16/2024 | 73 | PAPERLESS ORDER granting 16 Consent Motion for Juror Questionnaire and for Attorney–Conducted Voir Dire. With the consent of the parties, the Court will use the questionnaire circulated at the February 12, 2024 hearing. Signed by Judge Deborah L. Boardman on 2/16/2024. (mm10s, Chambers) (Entered: 02/16/2024) |
| 02/20/2024 | 74 | PAPERLESS ORDER granting 72 Motion to Continue as to Martique Cabral Vanderpool (1) as follows: April 15, 2024 is the deadline for expert witness disclosures; April 22, 2024 is the deadline for motions in limine and 404(b) notice; April 29, 2024 is the deadline for responses; May 6, 2024 is the deadline for jury instructions, verdict form, and proposed voir dire; May 17, 2024 is the deadline for Jencks; May 20, 2024 is the date of the final pretrial conference; and trial begins Tuesday, June 4, 2024. **Trial must begin on TUESDAY, JUNE 4, 2024 to accommodate the special jury pool . Signed by Judge Deborah L. Boardman on 2/20/2024. (lmys, Chambers) (Entered: 02/20/2024)** |
| 03/05/2024 | 75 | MOTION to Vacate *Scheduling Order* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Marranzini, Ellie) (Entered: 03/05/2024) |
| 03/05/2024 | 76 | PAPERLESS ORDER denying without prejudice 75 Mr. Vanderpool's motion to vacate the scheduling order at 74 . If Mr. Vanderpool retains counsel and that counsel enters an appearance on his behalf and requests a reasonable modification to the scheduling order, the Court will consider it. If new counsel has not entered an appearance by March 19, 2024, Mr. Vanderpool must submit a status report by that date on his efforts to retain counsel. Signed by Judge Deborah L. Boardman on 3/5/2024. (mm10s, Chambers) (Entered: 03/05/2024) |
| 03/15/2024 | 77 | NOTICE OF ATTORNEY APPEARANCE: Christopher Adam Zampogna as Retained Counsel appearing for Martique Cabral Vanderpool(Zampogna, Christopher) (Entered: 03/15/2024) |
| 03/15/2024 | 78 | MOTION to Withdraw as Attorney by Federal Public Defender by Martique Cabral Vanderpool. (Marranzini, Ellie) (Entered: 03/15/2024) |
| 03/17/2024 | 79 | Joint Request for Conference (Bernstein, Barbara) (Entered: 03/17/2024) |
| 03/18/2024 | 80 | QC NOTICE: 78 Motion to Withdraw as Attorney filed by Martique Cabral Vanderpool was filed incorrectly. **The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 78 .* (bw5s, Deputy Clerk) (Entered: 03/18/2024) |
| 03/19/2024 | 81 | NOTICE re 78 MOTION to Withdraw as Attorney by Federal Public Defender *(Proposed Order)* (Miller, Douglas) (Entered: 03/19/2024) |
| 03/19/2024 | 82 | ORDER granting 78 Motion to Withdraw as Attorney. Douglas Ryan Miller; Ned Smock; Amy Steffan Fitzgibbons and Ellie Marranzini withdrawn from case as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 3/19/2024. (bw5s, Deputy Clerk) (Entered: 03/19/2024) |

| | | |
|---|---|---|
| 03/28/2024 | 83 | Joint Request for Scheduling (Bernstein, Barbara) (Entered: 03/28/2024) |
| 04/02/2024 | 84 | MARGINAL ORDER approving 83 Joint Request for Scheduling as to Martique Cabral Vanderpool. Signed by Judge Deborah L. Boardman on 4/2/2024. (bw5s, Deputy Clerk) (Entered: 04/02/2024) |
| 06/25/2024 | 85 | NOTICE OF ATTORNEY APPEARANCE: Abraham Bluestone as Retained Counsel appearing for Martique Cabral Vanderpool(Bluestone, Abraham) (Entered: 06/25/2024) |
| 06/26/2024 | 86 | MOTION in Limine *to Preclude Introduction of Self-Serving Hearsay* by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 06/26/2024) |
| 06/26/2024 | 87 | MOTION in Limine *to preclude reference to state trial* by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 06/26/2024) |
| 06/26/2024 | 88 | MOTION in Limine *to exclude reference to civil suit (unless victim testifies)* by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 06/26/2024) |
| 06/26/2024 | 89 | MOTION in Limine *to Exclude Reference to Dismissed Indictment* by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 06/26/2024) |
| 06/27/2024 | 90 | QC NOTICE: 87 Motion in Limine filed by USA, 89 Motion in Limine filed by USA, 86 Motion in Limine filed by USA, 88 Motion in Limine filed by USA was filed incorrectly. <br> ***The following attachments or exhibits are missing – Text of Proposed Order. Pursuant to Local Rule 105.1, all Motions must be accompanied with a proposed order. To correct this problem, file Text of Proposed Order using the event Notice (Other) and link Text of Proposed Order to the motions accordingly.* (bw5s, Deputy Clerk) (Entered: 06/27/2024) |
| 06/28/2024 | 91 | Supplement to 86 MOTION in Limine *to Preclude Introduction of Self-Serving Hearsay* filed by USA *Text of Proposed Order* (Allison, Tara) (Entered: 06/28/2024) |
| 06/28/2024 | 92 | Supplement to 87 MOTION in Limine *to preclude reference to state trial* filed by USA *Text of Proposed Order* (Allison, Tara) (Entered: 06/28/2024) |
| 06/28/2024 | 93 | Supplement to 88 MOTION in Limine *to exclude reference to civil suit (unless victim testifies)* filed by USA *Text of Proposed Order* (Allison, Tara) (Entered: 06/28/2024) |
| 06/28/2024 | 94 | Supplement to 89 MOTION in Limine *to Exclude Reference to Dismissed Indictment* filed by USA *Text of Proposed Order* (Allison, Tara) (Entered: 06/28/2024) |
| 06/28/2024 | 95 | MOTION in Limine *to Exclude Inadmissible and Irrelevant Evidence Regarding R.S.'s Character* by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Allison, Tara) (Entered: 06/28/2024) |
| 07/03/2024 | 96 | Consent MOTION for Extension of Time to File *Vanderpool's Motions in Limine* by Martique Cabral Vanderpool. (Zampogna, Christopher) (Entered: 07/03/2024) |
| 07/03/2024 | 97 | PAPERLESS ORDER granting 96 Motion for Extension of Time to File as to Martique Cabral Vanderpool (1). Vanderpool shall file his Motions in Limine by July 15, 2024, and the Government shall respond to Vanderpool's Motions in Limine byJuly 29, 2024. Signed by Judge Deborah L. Boardman on 7/3/2024. (lmys, Chambers) (Entered: 07/03/2024) |
| 07/15/2024 | 98 | MOTION in Limine by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order Proposed Order)(Zampogna, Christopher) (Entered: 07/15/2024) |
| 07/22/2024 | 99 | MEMORANDUM in Opposition by Martique Cabral Vanderpool re 95 MOTION in Limine *to Exclude Inadmissible and Irrelevant Evidence Regarding R.S.'s Character*, 87 MOTION in Limine *to preclude reference to state trial*, 89 MOTION in Limine *to Exclude Reference to Dismissed Indictment*, 86 MOTION in Limine *to Preclude Introduction of Self-Serving Hearsay*, 88 MOTION in Limine *to exclude reference to civil suit (unless victim testifies)* (Zampogna, Christopher) (Entered: 07/22/2024) |
| 07/29/2024 | 100 | RESPONSE to Motion by USA as to Martique Cabral Vanderpool re 98 MOTION in Limine *(Omnibus)* (Allison, Tara) (Entered: 07/29/2024) |

JA8

| 07/29/2024 | 101 | REPLY TO RESPONSE to Motion by USA as to Martique Cabral Vanderpool re 95 MOTION in Limine *to Exclude Inadmissible and Irrelevant Evidence Regarding R.S.'s Character*, 87 MOTION in Limine *to preclude reference to state trial*, 89 MOTION in Limine *to Exclude Reference to Dismissed Indictment*, 86 MOTION in Limine *to Preclude Introduction of Self-Serving Hearsay*, 88 MOTION in Limine *to exclude reference to civil suit (unless victim testifies)* (Allison, Tara) (Entered: 07/29/2024) |
|---|---|---|
| 09/04/2024 | 102 | Proposed VERDICT (Attachments: # 1 Attachment A (Government's Proposed Verdict Form), # 2 Attachment B (Defense Proposed Verdict Form))(Bernstein, Barbara) (Entered: 09/04/2024) |
| 09/04/2024 | 103 | Proposed Jury Instructions by USA as to Martique Cabral Vanderpool (Bernstein, Barbara) (Entered: 09/04/2024) |
| 09/09/2024 | 104 | Proposed Voir Dire by USA as to Martique Cabral Vanderpool (Allison, Tara) (Entered: 09/09/2024) |
| 09/09/2024 | 105 | Proposed Voir Dire by Martique Cabral Vanderpool (Zampogna, Christopher) (Entered: 09/09/2024) |
| 09/10/2024 | 106 | NOTICE re 98 MOTION in Limine *Notice of Error* (Zampogna, Christopher) (Entered: 09/10/2024) |
| 09/17/2024 | 107 | Correspondence re: Joint Update for Pretrial Conference (Bernstein, Barbara) (Entered: 09/17/2024) |
| 09/18/2024 | 108 | Pretrial Conference as to Martique Cabral Vanderpool held on 9/18/2024 before Judge Deborah L. Boardman.(Court Reporter: Renee Ewing – 4A) (bus, Deputy Clerk) (Entered: 09/18/2024) |
| 09/19/2024 | 109 | NOTICE *Regarding Jury Instructions* (Attachments: # 1 Exhibit Exhibit 1 – Jury Instructions from U.S. v. Underwood)(Zampogna, Christopher) (Entered: 09/19/2024) |
| 09/19/2024 | 110 | PAPERLESS ORDER granting in part and reserving in part 86 Motion in Limine to Preclude the Defendant from Introducing Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding the Scope of the Rule of Completeness; granting 87 Motion in Limine to Preclude Reference to the Existence and Outcome of Prior State Trial; granting in part and reserving in part 88 Motion in Limine to Preclude Any Reference to the Civil Suit Filed by R.S., Unless and Until R.S. Testifies; granting 89 Motion in Limine to Preclude Reference to the Dismissed Civil Rights Indictment; granting 95 Motion in Limine to Exclude Inadmissible and Irrelevant Evidence Regarding R.S.s Character; and granting in part and denying in part 98 Omnibus Motion in Limine, for the reasons stated on the record at yesterday's pretrial conference. The defense will provide its expert disclosure to the government by 6:00 p.m., September 19, 2024. The government will file any objections to the expert disclosure by September 23, 2024. By September 30, 2024, the government will identify for the Court and the defense the excerpts of Mr. Vanderpool's testimony from the state trial and the WhatsApp messages it plans to introduce, and by October 7, 2024, the parties will submit a joint submission identifying their agreement and objections to these evidentiary disclosures. By September 30, 2024, the parties will submit any objections to the Court's proposed voir dire. By October 11, 2024, the parties will submit a joint sealed submission regarding the juror questionnaires. Signed by Judge Deborah L. Boardman on 9/19/2024. (sb5s, Chambers) (Entered: 09/19/2024) |
| 09/20/2024 | 111 | LETTER ORDER regarding Voir Dire as to Martique Cabral Vanderpool. Signed by Judge Deborah L. Boardman on 9/20/2024. (Attachments: # 1 Voir Dire) (bw5s, Deputy Clerk) (Entered: 09/20/2024) |
| 09/23/2024 | 112 | MOTION Government's Objections to Defendant's Expert Notice by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Attachment A (redacted incident report), # 2 Attachment B (initial notice), # 3 Attachment C (supplemental notice), # 4 Attachment D (5.17.23 Clark transcript), # 5 Attachment E (5.18.23 Clark transcript))(Allison, Tara) (Entered: 09/23/2024) |
| 09/30/2024 | 113 | PAPERLESS ORDER directing the defense to file any response to 112 Governments Objections to Defendants Proposed Expert Witness by September 30, 2024. The government may file a reply by October 7, 2024. The Court scheduled a pretrial conference for October 16, 2024 at 2pm, where the parties may discuss any remaining |

| | | |
|---|---|---|
| | | issues. Signed by Judge Deborah L. Boardman on 9/30/2024. (sb5s, Chambers) (Entered: 09/30/2024) |
| 09/30/2024 | 114 | NOTICE by USA re 111 Order *Government's Objections to (and Recommendations for) Voir Dire* (Allison, Tara) (Entered: 09/30/2024) |
| 09/30/2024 | 115 | NOTICE re 111 Order *Vanderpool's Objections to Court's Proposed Voir Dire* (Zampogna, Christopher) (Entered: 09/30/2024) |
| 09/30/2024 | 116 | MEMORANDUM in Opposition by Martique Cabral Vanderpool re 112 MOTION Government's Objections to Defendant's Expert Notice (Zampogna, Christopher) (Entered: 09/30/2024) |
| 10/07/2024 | 117 | MOTION for Clarification of Pretrial Ruling by USA as to Martique Cabral Vanderpool. (Bernstein, Barbara) (Entered: 10/07/2024) |
| 10/07/2024 | 118 | REPLY TO RESPONSE to Motion by USA as to Martique Cabral Vanderpool re 112 MOTION Government's Objections to Defendant's Expert Notice (Allison, Tara) (Entered: 10/07/2024) |
| 10/07/2024 | 119 | STATUS REPORT *(Joint) re: Rule of Completeness* by USA as to Martique Cabral Vanderpool (Attachments: # 1 Attachment A (WhatsApp Transcripts))(Bernstein, Barbara) (Entered: 10/07/2024) |
| 10/10/2024 | 120 | Correspondence re: Remaining Issues for Trial (Bernstein, Barbara) (Entered: 10/10/2024) |
| 10/10/2024 | 121 | RESPONSE in Opposition by Martique Cabral Vanderpool re 117 MOTION for Clarification of Pretrial Ruling (Zampogna, Christopher) (Entered: 10/10/2024) |
| 10/11/2024 | 122 | Consent MOTION for Extension of Time to File *to File Sealed Joint Submission* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order Proposed Order)(Zampogna, Christopher) (Entered: 10/11/2024) |
| 10/11/2024 | 123 | NOTICE *of Withdrawal of Expert Designation* (Zampogna, Christopher) (Entered: 10/11/2024) |
| 10/11/2024 | 124 | MOTION Nonjury Trial by Martique Cabral Vanderpool. (Attachments: # 1 Exhibit Exhibit A − Signed Waiver, # 2 Text of Proposed Order Proposed Order)(Zampogna, Christopher) (Entered: 10/11/2024) |
| 10/11/2024 | 125 | PAPERLESS ORDER granting 122 consent motion for extension of time. The parties may file by 5 p.m. on October 15, 2024 their sealed joint submission regarding the exclusion of jurors for cause. By noon on October 14, 2024, the government must file a reply to Mr. Vanderpool's opposition 121 to the government's motion for a clarification 117 . Mr. Vanderpool must be present for the hearing at 9:30 a.m. on October 15, 2024. He should be prepared to answer the Court's questions about his apparent decision to waive his Sixth Amendment right to trial by jury and his notice of withdrawal of his expert witness. Signed by Judge Deborah L. Boardman on 10/11/2024. (sb5s, Chambers) (Entered: 10/11/2024) |
| 10/14/2024 | 126 | REPLY TO RESPONSE to Motion by USA as to Martique Cabral Vanderpool re 117 MOTION for Clarification of Pretrial Ruling (Bernstein, Barbara) (Entered: 10/14/2024) |
| 10/15/2024 | 127 | Pretrial Conference as to Martique Cabral Vanderpool held on 10/15/2024 and continued to 10/17/2024 before Judge Deborah L. Boardman. (Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/15/2024) |
| 10/16/2024 | 128 | NOTICE *of Objections to Government's Exhibit List* (Zampogna, Christopher) (Entered: 10/16/2024) |
| 10/17/2024 | 129 | PAPERLESS ORDER granting 124 motion for nonjury trial for the reasons stated on the record. The bench trial will commence on 10/22/2024. Signed by Judge Deborah L. Boardman on 10/17/2024. (sb5s, Chambers) (Entered: 10/17/2024) |
| 10/17/2024 | 130 | PAPERLESS ORDER granting 117 motion for clarification of pretrial ruling for the reasons stated on the record. Signed by Judge Deborah L. Boardman on 10/17/2024. (sb5s, Chambers) (Entered: 10/17/2024) |

| | | |
|---|---|---|
| 10/17/2024 | 131 | PAPERLESS ORDER denying as moot 112 government's objections to defendant's expert notice in light of 123 notice of withdrawal of expert designation. Signed by Judge Deborah L. Boardman on 10/17/2024. (sb5s, Chambers) (Entered: 10/17/2024) |
| 10/17/2024 | 132 | Continuation of Pretrial Conference as to Martique Cabral Vanderpool held on 10/17/2024 before Judge Deborah L. Boardman. (Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/17/2024) |
| 10/18/2024 | 133 | NOTICE *of Memorandum in Support of Oral Motion to Impeach* (Zampogna, Christopher) (Entered: 10/18/2024) |
| 10/19/2024 | 134 | RESPONSE re 133 Notice (Other) *in opposition to defense request to impeach witness* by USA (Bernstein, Barbara) Modified on 10/21/2024 (bw5s). (Entered: 10/19/2024) |
| 10/21/2024 | 135 | NOTICE *of Objection* (Zampogna, Christopher) (Entered: 10/21/2024) |
| 10/22/2024 | 136 | Bench Trial held on 10/22/2024 before Judge Deborah L. Boardman. (Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/22/2024) |
| 10/23/2024 | 137 | NOTICE *of Requested Instruction* (Zampogna, Christopher) (Entered: 10/23/2024) |
| 10/23/2024 | 138 | Bench Trial held on 10/23/2024 before Judge Deborah L. Boardman. (Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/23/2024) |
| 10/24/2024 | 139 | Bench Trial held on 10/24/2024 before Judge Deborah L. Boardman.(Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/24/2024) |
| 10/24/2024 | 140 | GOVERNMENT'S EXHIBIT LIST by USA as to Martique Cabral Vanderpool. (mtds, Deputy Clerk) (Entered: 10/24/2024) |
| 10/24/2024 | 141 | DEFENDANT'S EXHIBIT LIST by Martique Cabral Vanderpool. (mtds, Deputy Clerk) (Entered: 10/24/2024) |
| 10/24/2024 | 142 | Stipulation re: Return of Exhibits to Counsel. (mtds, Deputy Clerk) (Entered: 10/24/2024) |
| 10/30/2024 | 143 | Bench Trial – Day 4 – held and completed on 10/30/2024 before Judge Deborah L. Boardman.(Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/30/2024) |
| 10/30/2024 | 144 | Sentencing Order as to Martique Cabral Vanderpool Signed by Judge Deborah L. Boardman on 10/30/2024. (mtds, Deputy Clerk) (Entered: 10/30/2024) |
| 10/31/2024 | 145 | VERDICT as to Martique Cabral Vanderpool (1) Guilty on Count 1. (bw5s, Deputy Clerk) (Entered: 10/31/2024) |
| 11/06/2024 | 146 | NOTICE *of Objection* (Zampogna, Christopher) (Entered: 11/06/2024) |
| 11/11/2024 | 147 | NOTICE by USA re 146 Notice (Other) *Response to Notice of Objection* (Bernstein, Barbara) (Entered: 11/11/2024) |
| 11/27/2024 | 148 | MOTION for Extension of Time to File *Post–Trial Motions* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order Proposed Order)(Zampogna, Christopher) (Entered: 11/27/2024) |
| 11/27/2024 | 149 | PAPERLESS ORDER granting 148 Motion for Extension of Time to File as to Martique Cabral Vanderpool (1). Vanderpool must submit any post–trial motions under Federal Rules of Criminal Procedure 29, 33, and 34 by December 9, 2024, and the Government's responses are due by December 23, 2024. Signed by Judge Deborah L. Boardman on 11/27/2024. (lmys, Chambers) (Entered: 11/27/2024) |
| 11/27/2024 | 150 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Martique Cabral Vanderpool held on 10/22/24, before Judge Deborah L. Boardman. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 247. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/18/2024. Redacted Transcript Deadline set for 12/30/2024. Release of Transcript Restriction set for 2/25/2025. (Entered: 11/27/2024) |

| | | |
|---|---|---|
| 11/27/2024 | 151 | Sealed Document (Entered: 11/27/2024) |
| 12/01/2024 | 152 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Martique Cabral Vanderpool held on 10/23/24, before Judge Deborah L. Boardman. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 183. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/23/2024. Redacted Transcript Deadline set for 1/2/2025. Release of Transcript Restriction set for 3/3/2025. (Entered: 12/01/2024) |
| 12/01/2024 | 153 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Martique Cabral Vanderpool held on 10/24/24, before Judge Deborah L. Boardman. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 29. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/23/2024. Redacted Transcript Deadline set for 1/2/2025. Release of Transcript Restriction set for 3/3/2025. (Entered: 12/01/2024) |
| 12/01/2024 | 154 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Martique Cabral Vanderpool held on 10/30/24, before Judge Deborah L. Boardman. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 21. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/23/2024. Redacted Transcript Deadline set for 1/2/2025. Release of Transcript Restriction set for 3/3/2025. (Entered: 12/01/2024) |
| 12/09/2024 | 155 | MOTION for Leave to File Excess Pages by Martique Cabral Vanderpool. (Zampogna, Christopher) (Entered: 12/09/2024) |
| 12/09/2024 | 156 | MOTION for Judgment of Acquittal , MOTION for New Trial , MOTION Arrest of Judgment by Martique Cabral Vanderpool. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Zampogna, Christopher) (Entered: 12/09/2024) |
| 12/23/2024 | 157 | −SEALED− OBJECTION TO PRESENTENCE INVESTIGATION REPORT by Martique Cabral Vanderpool (Zampogna, Christopher) (Entered: 12/23/2024) |
| 12/23/2024 | 158 | RESPONSE re 156 MOTION for Judgment of Acquittal MOTION for New Trial MOTION Arrest of Judgment filed by USA. (Bernstein, Barbara) (Entered: 12/23/2024) |
| 12/26/2024 | 159 | Consent MOTION for Extension of Time to File Response/Reply as to 158 Response by Martique Cabral Vanderpool. (Zampogna, Christopher) (Entered: 12/26/2024) |
| 12/27/2024 | 160 | PAPERLESS ORDER granting 159 Motion for Extension of Time to File Response/Reply as to Martique Cabral Vanderpool (1). The defendant's reply to 156 is due January 8, 2025. Signed by Judge Deborah L. Boardman on 12/27/2024. (lmys, Chambers) (Entered: 12/27/2024) |
| 12/27/2024 | 161 | [FILED IN ERROR] QC NOTICE: 157 Objection to Presentence Investigation Report filed by Martique Cabral Vanderpool was filed incorrectly. **Unless there is already a Protective Order or an Order to Seal which allows a specific document to be filed under seal, a separate Motion to Seal the document must be filed. Please file a Motion to Seal ECF No. 157 . (bw5s, Deputy Clerk) Modified on 12/27/2024 (bw5s). (Entered: 12/27/2024) |
| 01/08/2025 | 163 | REPLY TO RESPONSE to Motion by Martique Cabral Vanderpool re 156 MOTION for Judgment of Acquittal MOTION for New Trial MOTION Arrest of Judgment (Zampogna, Christopher) (Entered: 01/08/2025) |
| 01/22/2025 | 164 | Consent MOTION for Leave to File Surreply (to Motion for Acquittal or New Trial) by USA as to Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order (Proposed Order), # 2 Attachment (Proposed Surreply))(Bernstein, Barbara) (Entered: 01/22/2025) |

JA12

| | | |
|---|---|---|
| 02/05/2025 | 165 | MEMORANDUM OPINION as to Martique Cabral Vanderpool. Signed by Judge Deborah L. Boardman on 2/5/2025. (bw5s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | 166 | ORDER denying 156 MOTION for Judgment of Acquittal, MOTION for New Trial, MOTION Arrest of Judgment; granting 155 MOTION for Leave to File Excess Pages; granting 164 Consent MOTION for Leave to File Surreply (to Motion for Acquittal or New Trial) as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 2/5/2025. (bw5s, Deputy Clerk) (Entered: 02/05/2025) |
| 02/06/2025 | 167 | NOTICE *of Witnesses for Sentencing Hearing Pursuant to October 30, 2024 Sentencing Order* (Zampogna, Christopher) (Entered: 02/06/2025) |
| 02/06/2025 | 168 | SENTENCING MEMORANDUM by Martique Cabral Vanderpool (Attachments: # 1 Exhibit Exhibit 1 – Letters in Support)(Zampogna, Christopher) (Entered: 02/06/2025) |
| 02/07/2025 | 169 | NOTICE by USA *of Possible Witnesses for Sentencing Hearing* (Allison, Tara) (Entered: 02/07/2025) |
| 02/11/2025 | 170 | NOTICE *of Supplement to Sentencing Memorandum* (Zampogna, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | | Telephone Conference as to Martique Cabral Vanderpool held on 2/11/2025 before Judge Deborah L. Boardman. (rc2s, Deputy Clerk) (Entered: 02/12/2025) |
| 02/13/2025 | 171 | RESPONSE re 168 Sentencing Memorandum filed by USA. (Bernstein, Barbara) (Entered: 02/13/2025) |
| 02/17/2025 | 172 | MOTION to Seal by USA as to Martique Cabral Vanderpool. (Allison, Tara) (Entered: 02/17/2025) |
| 02/17/2025 | 173 | **PROPOSED SEALED DOCUMENT** (Allison, Tara) (Entered: 02/17/2025) |
| 02/17/2025 | 174 | **PROPOSED SEALED DOCUMENT** (Allison, Tara) (Entered: 02/17/2025) |
| 02/18/2025 | 175 | QC NOTICE: 172 Motion to Seal filed by USA was filed incompletely. **The following attachments or exhibits are missing – Text of Proposed Order. To correct this problem, file Text of Proposed Order using the event Notice (Other) and link Text of Proposed Order to 172 Motion to Seal. (bw5s, Deputy Clerk) (Entered: 02/18/2025)* |
| 02/19/2025 | 176 | NOTICE by USA re 172 MOTION to Seal *(Text of Proposed Order)* (Allison, Tara) (Entered: 02/19/2025) |
| 02/19/2025 | 177 | EXCERPT: NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Martique Cabral Vanderpool held on 10/15/24, before Judge Deborah L. Boardman. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 4. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/12/2025. Redacted Transcript Deadline set for 3/24/2025. Release of Transcript Restriction set for 5/20/2025. (Entered: 02/19/2025) |
| 02/20/2025 | 178 | Sentencing as to Martique Cabral Vanderpool held on 2/20/2025 before Judge Deborah L. Boardman.(Court Reporter: Patricia Klepp – 4A) (hcs, Deputy Clerk) (Entered: 02/20/2025) |
| 02/21/2025 | 179 | JUDGMENT as to Martique Cabral Vanderpool (1), Count(s) 1, PROBATION for a term of 3 years as to Count 1 of the Indictment; ASSESSMENT $100. Signed by Judge Deborah L. Boardman on 2/21/2025. (bw5s, Deputy Clerk) (Entered: 02/21/2025) |
| 03/03/2025 | 181 | NOTICE OF APPEAL by Martique Cabral Vanderpool re 179 Judgment – Fee Status: Federal Public Defender. (slss, Deputy Clerk) (Entered: 03/04/2025) |
| 03/04/2025 | 182 | Transmission of Notice of Appeal and Docket Sheet as to Martique Cabral Vanderpool to US Court of Appeals re 181 Notice of Appeal – Final Judgment. (Attachments: # 1 Motion for IFP)(slss, Deputy Clerk) (Entered: 03/04/2025) |

JA13

| | | |
|---|---|---|
| 03/06/2025 | 183 | USCA Case Number 25−4121 as to Martique Cabral Vanderpool for 181 Notice of Appeal − Final Judgment filed by Martique Cabral Vanderpool − Case Manager − Sheila Lopez−Fetty. (slss, Deputy Clerk) (Entered: 03/06/2025) |
| 03/10/2025 | 184 | Sealed Document (Entered: 03/10/2025) |
| 03/10/2025 | 185 | EXCERPT: NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Martique Cabral Vanderpool held on 2/20/25, before Judge Deborah L. Boardman. Court Reporter/Transcriber PatriciaKlepp, Telephone number 3013443228. Total number of pages filed: 6. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/31/2025. Redacted Transcript Deadline set for 4/10/2025. Release of Transcript Restriction set for 6/9/2025. Modified on 3/10/2025 (pk4). (Entered: 03/10/2025) |
| 03/12/2025 | 186 | ORDER of USCA (certified copy) Appointing Stuart Berman as counsel as to Martique Cabral Vanderpool re 181 Notice of Appeal − Final Judgment. (Attachments: # 1 Counsel Notice)(slss, Deputy Clerk) (Entered: 03/13/2025) |
| 03/17/2025 | 187 | MOTION for Modification and Clarification of Probation by Martique Cabral Vanderpool. (Attachments: # 1 Exhibit 1)(bw5s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 188 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Martique Cabral Vanderpool for dates of 2/12/24 before Judge Boardman, re 181 Notice of Appeal − Final Judgment Court Reporter/Transcriber Kathy Cortopassi, Telephone number 302−255−0524. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? − Y. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025. (Entered: 03/18/2025) |
| 03/26/2025 | 189 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Martique Cabral Vanderpool for proceedings held on Sentencing− 02/20/25 before Judge Judge Boardman, re 181 Notice of Appeal − Final Judgment − Transcript due by 5/2/2025. (Court Reporter: Patricia Klepp) (Attachments: # 1 Transcript Order)(slss, Deputy Clerk) (Entered: 03/26/2025) |
| 04/07/2025 | 190 | ORDER denying 187 MOTION for Modification and Clarification of Probation as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 4/7/2025. (c/m 04/07/2025 − bw5s, Deputy Clerk) (Entered: 04/07/2025) |
| 04/08/2025 | 191 | ORDER of USCA (certified copy) Granting the motion to withdraw from further representation on appeal as to Martique Cabral Vanderpool re 181 Notice of Appeal − Final Judgment. (slss, Deputy Clerk) (Entered: 04/08/2025) |
| 05/01/2025 | 192 | Sealed Document (Entered: 05/01/2025) |
| 05/01/2025 | 193 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Martique Cabral Vanderpool for dates of 2/20/25 before Judge Deborah L. Boardman, re 181 Notice of Appeal − Final Judgment Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? − Y. Redaction Request due 5/22/2025. Redacted Transcript Deadline set for 6/2/2025. Release of Transcript Restriction set for 7/30/2025. (Entered: 05/01/2025) |
| 05/13/2025 | 194 | Consent MOTION Partially Unseal Documents re 17 Response in Opposition, 13 MOTION to Suppress *Evidence Obtained by Search Warrant* by Martique Cabral Vanderpool. (Attachments: # 1 Text of Proposed Order)(Berman, Stuart) (Entered: 05/13/2025) |
| 05/15/2025 | 195 | ORDER granting 194 Consent MOTION Partially Unseal Documents as to Martique Cabral Vanderpool (1). Signed by Judge Deborah L. Boardman on 5/15/2025. (c/em |

| | | Mr. Berman 05/15/2025 – bw5s, Deputy Clerk) (Entered: 05/15/2025) |



JUL **0 6** 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BY _____ DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** 23-cr-00234-DLB |
| | * | |
| **MARTIQUE CABRAL** | * | **(Falsification of Record, 18 U.S.C.** |
| **VANDERPOOL,** | * | **§ 1519)** |
| | * | |
| **Defendant** | * | |
| | * | |
| | * | |
| | * | |

\*\*\*\*\*\*\*

## INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNT ONE
### Falsification of Record

*Introductory Allegations:*

1.     At all times relevant to this indictment, defendant **MARTIQUE CABRAL**

**VANDERPOOL ("VANDERPOOL")** was employed as a police officer with the Fairmount

Heights Police Department in Fairmount Heights, Maryland.

2.     On or about September 6, 2019, **VANDERPOOL** arrested Victim 1, a 19-year-

old female, following a traffic stop in the District of Maryland.  **VANDERPOOL** and another

officer known to the Grand Jury transported Victim 1 in handcuffs to an abandoned police

station.  At the station, **VANDERPOOL** engaged in sexual intercourse with Victim 1.

*The Charged Conduct:*

**JA16**

3.     On or about September 7, 2019, in the District of Maryland, the defendant,

**MARTIQUE CABRAL VANDERPOOL,**

acting in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, knowingly falsified and made false entries in a record and document (a Fairmount Heights Police Department Incident Report), with the intent to impede, obstruct, and influence the investigation and proper administration of that matter. Specifically, the defendant wrote a false and misleading Incident Report, intended to cover up the fact that he had sex with a woman in his custody (which, if known, could be investigated as a potential federal criminal civil rights violation, within the jurisdiction of the FBI, which is an agency of the United States). In this Incident Report, the defendant:

(1) omitted that he and another officer known to the Grand Jury took the handcuffed victim to an abandoned police station on September 6, 2019;

(2) omitted the fact that he had sex with Victim 1 on September 6, 2019;

(3) omitted that he and another officer known to the Grand Jury caused the vehicle that Victim 1 was driving to be towed from the scene of the traffic stop, and falsely stated that the registered owner picked up the vehicle (thereby falsely implying that the owner had picked up the vehicle from the scene of the traffic stop),

(4) omitted that he procured the release of the vehicle to Victim 1 from the towing company without Victim 1 having to pay the release fee.

The report was false and misleading because, as **VANDERPOOL** then well knew: (1) he and another officer known to the Grand Jury took Victim 1 back to the abandoned police station in handcuffs following the traffic stop; (2) he had sex with Victim 1 on September 6, 2019; (3) he and another officer known to the Grand Jury caused a towing company to tow the vehicle from the scene of the traffic stop, and Victim 1, not the registered owner, later retrieved the vehicle from the towing

2

**JA17**

lot; and (4) he procured the release of the vehicle to Victim 1 from the towing company without

Victim 1 having to pay the release fee.

All in violation of Title 18, United States Code, Section 1519.

Kristin M. Clarke
Assistant Attorney General
Civil Rights Division

A TRUE BILL:

**SIGNATURE REDACTED**

7.6.23
Date

3

JA18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. DLB-23-00234** |
| **v.** | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**DEFENDANT'S MOTION TO SUPRESS EVIDENCE
SEIZED PURSUANT TO SEARCH WARRANTS**

Martique Cabral Vanderpool, the Defendant, through undersigned counsel, pursuant to Federal Rule of Criminal Procedure 12(b)(3), respectfully moves this Honorable Court to suppress any evidence seized in violation of the Fourth Amendment to the United States Constitution.  Both state and federal law enforcement obtained search warrants that violated the Fourth Amendment and evidence seized as a result must be suppressed.

**Background**

On December 3, 2019, Mr. Vanderpool was arrested and initially charged with several offenses in Prince George's County District Court based on a traffic stop that occurred on September 6, 2019.  On that evening, Mr. Vanderpool and a second officer stopped a speeding car.  The car's driver (R.S.) told the officers that she did not have a valid license but had been issued a permit.  She was asked to step out of the vehicle and was acting erratically.  The officers called for a tow truck to tow the car.  R.S. was transported back to the station where she had sex with Mr. Vanderpool.  Although R.S. reported the encounter to her mother, she did not

1

JA19

immediately report the incident to the police.  It is unclear whether an anonymous tip was placed with the Fairmont Heights Police regarding the stop or the other involved officer reported the interaction.

On January 17, 2023, Prince George's Circuit, sitting as a jury, acquitted Mr. Vanderpool of the most serious state charges.  **Mr. Vanderpool was acquitted of all charges involving nonconsensual assault, including second degree rape and second degree assault.**  Mr. Vanderpool was convicted of a single misdemeanor count of sexual act with a person in custody, in violation of Maryland Code, Crim. Law § 3-314(e).  The misdemeanor count carries a statutory maximum penalty of three years.  Maryland Code, Crim. Law § 3-314(f).  At sentencing on February 14, 2023, the Circuit Court Judge sentenced him to time served, specifically directing that he was released from state custody.

On September 24, 2021, Mr. Vanderpool had his initial appearance in United States District Court on the Indictment alleging that he violated 18 U.S.C. § 242. (21-00354-DLB).  The federal charge was based on the same conduct for which Mr. Vanderpool was acquitted in the state.  On March 29, 2023, Magistrate Judge Quereshi released Mr. Vanderpool on conditions, including location monitoring.  On July 17, 2023, the Court dismissed the original indictment, without prejudice, upon the joint motion of the parties.

On July 6, 2023, the grand jury indicted Mr. Vanderpool on a single-count of falsification of a record in violation of 18 U.S.C. §1519, alleging that he omitted four facts with the intent to impede or obstruct a potential federal civil rights investigation.  The Court set a motions hearing date of September 27, 2023.  Although the alleged civil rights violation was dismissed, the Government intends to rely on evidence seized as a result of the search warrants, most

JA20

significantly, the Government intends to introduce WhatsApp messages seized from one of Mr. Vanderpool's phones.[1]

## I.       The Initial Prince George's County Warrant (December 2, 2019-Exhibit A)

On December 2, 2019, state law enforcement applied to the Prince George's County Circuit Court for a warrant to search Mr. Vanderpool's residence citing Maryland Code §3-304 (Second Degree Rape) and, describing ten categories of items to be seized, including ***any and all*** electronic devices and ***any and all*** electronic media.  The warrant lacked probable cause and materially omitted significant facts.  This state warrant also failed to identify with particularity the items to be seized and was overbroad based on the limited facts offered supporting probable cause.  Based on the material omissions described below, the Court must conduct a *Franks* hearing.  *United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990).  The Court cannot extend the Government the benefit of the good faith exception when law enforcement misled the Circuit Court.  *United States v. Leon*, 468 U.S. 897, 923 (1984).  Even in the absence of the material omissions, the Government cannot avail itself of the good faith exception because of the warrant's facial deficiencies in both probable cause and particularity, a reasonable officer would not have presumed it to be valid.  *Id.*  Considering the totality of the circumstances, Prince George's County pursued the investigation of this case without regard for the Fourth Amendment.  They offered a pretextual reason for entering Mr. Vanderpool's residence and then conducted a wide ranging search.  The actions of Prince George's County in this case warrant a blanket suppression of evidence.  *United States v. Uzenski*, 434 F.3d 690 (4th Cir. 2006).

---

[1] If the Court declines to suppress the evidence, the defense alternatively contends that the messages are not relevant in this case, and, if relevant, would fail the FRE 403 balancing test and intends to file corresponding motion in limine moving for their exclusion.

JA21

**A.      The Warrant is Facially Deficient Because it is Not Supported by Probable Cause, is Overbroad, and Fails to Describe with Particularity the Items to be Seized.**

The *Illinois v. Gates* standard requires the Court to consider whether given the totality of the circumstances is there "a fair probability that the contraband or evidence of a crime will be found in a particular place." 462 U.S. 213, 238 (1983).  On review the Court determines whether there is a substantial evidence in the record supporting the Circuit Court's issuance of the warrant. *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).  In this case, Prince George's County law enforcement sought entry to Mr. Vanderpool's residence to search for three items of an alleged assault that occurred at the Fairmont Heights Police Station; non-distinctive clothing, condoms, and photos of R.S. taken during the traffic stop.  Prince George's County sought the warrant three months after the alleged assault, which is relevant both to staleness and the lack of detail in the warrant.

The warrant fails to establish that the items sought, clothing and condoms, are likely to be present in the home, three months after the alleged assault, and how such non-distinctive evidence constitutes evidence of the crime.  *See, United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) ("[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. . .Rather we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized").  Law enforcement also attempted to support the warrant by pointing to the existence of **a single photograph** taken during the traffic stop.  This fact does not create a fair probability that evidence of a crime will be located in the house, nor does it support the breadth of the materials authorized for search and seizure.

4

JA22

The warrant authorizes the seizure of broad categories of items without establishing probable cause to believe that such items are contraband or evidence of a crime. If a warrant permits police to search in places, or seize items, for which there is no probable cause, it is impermissibly "overbroad." *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018); *see United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) ("The Fourth Amendment requires that a warrant be no broader than the probable cause on which it is based.").

The warrant was facially overbroad because it allowed for the seizure of broad categories of items without ANY limitation or connection to the facts offered in support of probable cause. There are five categories of items that the warrant identifies as subject to seizure without qualification or limitation:

- Any and all electronic media capable of retaining digital image or video files, to include, but not limited to, tablets, computers, "smart" cell phones, USB storage devices such as flash drives or external hard drives, "SD" cards, memory cards, "smart" picture frames.

- Any and all video graphics media, including, but not limited to digital video recorders (DVR) and digital video files,

- Any and all electronic devices with data transmission, internet access, or cloud storage capabilities to include, but not limited to, computers, tablets, cell phones, "smart" devices.

- Any and all diaries, journals, ledgers, memorandums, or notations of evidentiary value.

- Any documents, mail matter, of <u>Martique Vanderpool</u>.

The Fourth Amendment's requirement of particularity is closely related to probable cause; "a search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization." *United States v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017). For this reason, "a valid warrant must particularly describe the place to be searched, and the persons or things to be seized," *id.*, and it must "limit[] the authorization to search to the specific areas and things for

5

JA23

which there is probable cause to search," *Horton v. California*, 496 U.S. 128, 139 n.10 (1990). This "particularity requirement protects against a general, exploratory rummaging in a person's belongings, to the extent that a valid warrant leaves nothing to the discretion of the officers performing the search." *Kimble*, 855 F.3d at 610. The Supreme Court has put it this way: "Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase." *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987). The warrant is also defective because it failed to describe with particularity the items to be seized. The warrant provides no parameters on the discretion of law enforcement, they were permitted to seize all items falling with the broad categories described above without limitation.

Standing alone, the warrant should provide cause for concern. As detailed below, law enforcement acted reckless, at a minimum, materially omitting information from the application and using the warrant as a subterfuge for a general search of Mr. Vanderpool's residence.

**B.     The Court Should Direct a *Franks* Hearing Based on the Officer's Material Omissions.**

The Defense is entitled to a *Franks* hearing with respect to this warrant because (1) information was omitted "with the intent to mislead the magistrate or. . .with reckless disregard of whether it would make the affidavit misleading."; and (2) that inclusion of the omitted information in the affidavit was material to probable cause. *United States v. Colkley*, 899 F.2d 297, 301-302 (4ᵗʰ Cir. 1990).

First, the affiant failed to disclose that law enforcement was in possession of the photograph taken during the traffic stop; the same photograph the affiant purportedly required a warrant to search the residence to seize.

6

JA24

Second, the affiant failed to disclose that in interviews with R.S., there was no indication of any additional photographs taken.

Third, the affiant failed to disclose that the officers stopped R.S. for speeding.

Law enforcement searched Mr. Vanderpool's work files and located the incident report that he completed for this traffic stop, which included a photograph of R.S. At the time of the affidavit, Prince George's County officers had formally interviewed R.S. on two occasions; 10/3/2019 and 11/13/2019. During the second interview, the officers showed her the incident report picture. However, officers did not ask, nor did she volunteer that other pictures were taken either at the scene or later at the station.

Law enforcement needed a hook to enter Mr. Vanderpool's house and engage in the wide-ranging search and seizure of every device and item of media. Law enforcement's reliance on the photograph is the critical and, only fact, contained in the affidavit that justified the seizure of electronic devices and media. Consequently, facts related to the photograph and the absence of facts related to the phone and additional pictures were material to the probable cause determination.

The affiant also omitted a third fact, the basis for the initial stop. R.S. was stopped for speeding, which she acknowledges in her second interview with the detectives, and is supported by the second officer's interview. In omitting the basis for the stop, the affiant left the magistrate with the impression that the officers lacked a basis for the stop.

JA25

### C.    The Good Faith Exception is Not Available to the Government.

The Government has argued that it is entitled to rely on the good faith exception. However, if the Court finds material omissions and a corresponding lack of probable cause, the Government cannot rely on *Leon*, 468 U.S. at 923; *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993). Here, law enforcement omitted critical facts relevant to an assessment of probable cause including the failure of its investigation to establish that pictures beyond the one already in their possession, had been taken. If reference to the photograph is removed from the affidavit, there is no probable cause for the wide-ranging search of electronic devices and media.

In the absence of a *Franks* violation, law enforcement cannot reasonably rely on a search warrant when: (1) "the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (2) "the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid." *United States v. Hyppolite*, 65 F.3d 1151 (4th Cir. 1995), *quoting Leon*, 468 U.S. at 923.

### II.    The Prince George's County Warrant-Samsung Galaxy S III (January 17, 2020- Exhibit B)

Prince George's County executed the initial warrant for Mr. Vanderpool's residence on December 3, 2019. During the search officers seized eleven devices including a Samsung Galaxy III phone, two laptops, and several other cellular telephones.

On January 17, 2020, Prince George's County Detective Savoy applied for a warrant to search the Samsung Galaxy S III phone identified by HEX number and "to capture **all** stored data to include but not limited to: photographs, emails, text messages, video clips, contacts and call details." The affiant recited the same facts supporting the initial search warrant, including

JA26

the fact that Mr. Vanderpool had photographed R.S. with his cell phone.  The affiant also represented that "the Defendant was in constant communication with the witness officer as well as employees from the tow company from the time of the incident until the time that he was arrested."

### The state warrant authorized only the search of Target Device 1.

The Defense understands that, although the warrant was obtained in January 2020, the Government intends to rely on the search and extraction of data which occurred in October 2020. The Government has not indicated whether it will seek to introduce evidence obtained from Target Device 1 or any device aside from Target Device 8.

The Supreme Court has recognized that "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." *Riley v. California*, 573 U.S. 373, 396-97 (2014) (emphasis in original).  For example, "many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives— from the mundane to the intimate." *Id*. at 395.  Cell phones are more than just telephones—"[t]hey could just as easily be called cameras, video players, rolodexes, calendars, tape records, libraries, diaries, albums, televisions, maps, or newspapers." *Id.* at 393.  Simply, cell phones "are not just another technological convenience," but rather "minicomputers" that, for many Americans, "contain and . . . may reveal . . . the privacies of life." *Id.* at 403.

Given the "serious risk that every warrant for electronic information will become, in effect, a general warrant," *Ulbricht*, 858 F.3d at 99, courts must "exercise caution" to ensure warrants for

9

JA27

digital data are strictly and expressly limited to the places and items for which probable cause exists. *United States v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010).

**A.    The Warrant to Search the Cell Phone Fails to Establish Probable Cause to Seize "all stored data'"**

Federal courts have insisted that when applying for a warrant to search a digital device, law enforcement must distinguish, and provide probable cause for, each of the various locations it wishes to search.  In the context of cell phones, for example, a warrant may permit a search of only those areas of the phone in which the affiant provides probable cause to believe evidence will be found, e.g., text messages, emails, call log, photos, videos, etc.  Federal courts have held that a warrant authorizing a search of additional areas of the phone, for which the affidavit supplies no probable cause, is invalid, and its fruits must be suppressed. After all, a search of those areas would be no different from looking for "undocumented aliens" inside a "suitcase." *Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987).

In *United States v. Lofstead*, 574 F. Supp. 3d 831 (D. Nev. 2021), for example, the government got a warrant to search the defendant's cell phone for evidence of sex trafficking after he was arrested following an exchange of phone calls and text messages with an undercover FBI agent posing as a sex worker in which the defendant agreed to purchase sex.  Among other things, the warrant authorized the investigator to search and seize:

- "[a]ny and all records and materials that may be found within [the phone], in any format and media (including, but not limited to; images videos, e-mails, chat logs, text messages, instant messages and electronic messages), pertaining to the Target Offenses"; and

- "[a]ny and all documents, records, or correspondence, in any format or medium (including but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) pertaining to the Target Offenses."

10

JA28

*Id.* at 838.

Following an indictment for attempted sex trafficking of children, the defendant moved to suppress the fruits of the search, arguing the warrant "lack[ed] any cognizable limitations and exceed[ed] the government's demonstrated probable cause." *Id.* The court agreed. The warrant was "unreasonably broad under the circumstances," *id.* at 844, as the probable cause in the warrant affidavit was the phone and text message "communications" between the defendant and the FBI agent, yet the warrant permitted agents to seize numerous types of digital data that had no connection to such communications. *Id.* In particular, the warrant authorized the search and seizure of "all photos," "all videos," "all emails," "all internet search histories," and "all social media messages." *Id.* The warrant, the court explained, "essentially contemplate[d] the right to search everything seized," and therefore "amount[ed] to a general search of [the defendant's] phone, largely predicated on hopes of finding evidence there was not probable cause to collect." *Id.*

Other federal courts have suppressed evidence under similar circumstances. In *United States v. Opoku*, 556 F. Supp. 3d 633, 642-45 (S.D. Tex. 2021), the court suppressed evidence seized from the defendant's cell phone because the affidavit did not establish probable cause, and the resulting warrant was therefore overbroad and insufficiently particular. As relevant here, the warrant was overbroad because it "authorize[d] the seizure of 'all data,' 'all cell phone memory,' and 'all removable media'" from the phone, even though the affidavit did not establish probable cause to believe *all* the phone's files would contain evidence of the alleged crime. *Id.* at 643. And even if the court read the warrant narrowly, to permit seizure and search of only the eleven categories of data enumerated in the affidavit, the warrant was still overbroad, since those categories "[we]re not 'carefully tailored' to limit 'the search to the specific areas and things for

11

JA29

which there is probable cause to search.'" *Id.* (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).  Indeed, "[o]f the eleven categories, the facts as alleged in the Affidavit only directly refer[ed] to two[.]" *Id.*  The court disagreed that the "generalization that violent gang members 'use their cell phones to communicate with others about planning and the execution of crimes'" was sufficient to "create a nexus with the cellphone's 'call history,' 'emails,' 'contact information,' 'voicemails,' but even if it did, the same could not be said for 'any photographs or videos,' 'any internet history," 'any Because the affidavit did not establish probable cause to search all the categories of files identified in the warrant, the warrant "was overbroad, not particular, and in violation of the Fourth Amendment." *Id.*  Suppression was therefore required.

In *United States v. Winn*, 79 F. Supp. 3d 904, 909-10 (S.D. Ill. 2015), police received a report that the defendant "was using his cell phone to photograph or videotape a group of thirteen and fourteen-year-old girls in their swimsuits without their permission" at a public pool, while also "rubbing his genitals on the exterior of his swim trunks."  Officers obtained a warrant to search the defendant's phone for evidence of public indecency and to seize:

> any or all files contained on said cell phone and its SIM Card or SD Card to include but not limited to the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, any system files on phone, SIM Card, or SD Card, or any data contained in the cell phone, SIM Card or SD Card to include deleted space.

*Id.* at 910-11.  During the search, the officers discovered child pornography.  *Id.* at 911.

The district court held the warrant was "facially overbroad" and "exceeded the probable cause to support it." *Id.* at 919.  "Based on the complaint supporting the search warrant," the court explained, "there was probable cause to believe that only two categories of data could possibly be evidence of the crime: photos and videos." *Id.*  The warrant document "did not offer any basis" to

12

JA30

believe that evidence of public indecency would be found in other areas of the phone, such as the calendar, call logs, GPS information, or internet history and usage. *Id.* at 919-20. The warrant therefore constituted "a general warrant," and the court suppressed all evidence seized pursuant to it, even evidence found in portions of the phone for which probable cause existed. *Id.* at 926-27.

In short, federal courts recognize that when authorizing a warrant for a device containing electronic data, police must establish probable cause as to each specific category of files or information they hope to search. *See, e.g., United States v. Chandler*, 571 F. Supp. 3d 836, 844 (E.D. Mich. 2021) (affidavit did not establish probable cause to search for contact lists, phone books, document files, or browsing history); *United States v. Oglesby*, No. 4:18-cr-626, ECF No. 21-2 at 1 (S.D. Tex. Mar. 20, 2019) (holding warrant was overbroad in its description of which categories of cell phone data could be searched); *United States v. Rarick*, 636 F. App'x 911, 912 (6th Cir. 2016) (unpublished) (holding " portions of the warrant were not limited to files specific to what the government was searching for" and were thus constitutionally "infirm"); *In re Nextel Cellular Tel.*, 2014 WL 2898262, at *13 (D. Kan. June 26, 2014) ("[P]robable cause to believe drug trafficking communication may be found in phone's the [sic] mail application will not support the search of the phone's Angry Birds application."); *United States v. Morales*, 77 M.J. 567, 570 (A. Ct. Crim. App. 2017) (ordering suppression because "the information presented to a military magistrate only provided probable cause to search [defendant's] phone for text messages," and therefore "a search for photographs on the phone, which revealed digital photographs of appellant's crime, was unreasonable").

### B.     The Cell Phone Evidence Should Also Be Suppressed Because the Search Was Unconstitutionally Overbroad.

The wholesale seizure for later examination of records that are not described in a warrant has been characterized as "the kind of investigatory dragnet that the Fourth Amendment was

13

JA31

designed to prevent." *See United States v. Abrams*, 615 F.2d 541, 543 (1st Cir.1980). That is why, when lawfully searching for digital data, "[o]fficers must be clear as to what it is they are seeking on the [device] and conduct the search in a way that avoids searching files of types not identified in the warrant." *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001); *see also United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010); *United States v. Tamura*, 694 F.2d 591, 595–96 (9th Cir.1982).

Indeed, all items in a set of files—like a cell phone—can only be inspected when the warrant provides "sufficiently specific guidelines for identifying the documents sought," and the officers conducting the search actually follow those guidelines. *Tamura*, 694 F.2d at 595. Without these safeguards, once the government has obtained authorization to search the device, "the government may claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant. There is, thus, 'a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant.'" *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (citing *Comprehensive Drug Testing, Inc.*, 621 F.3d at 1177).

Here, the warrant authorizes the search and seizure of **all stored data** on the cell phone, the warrant provides *no guidelines whatsoever* for identifying and searching the categories of information sought by the warrant. The government has provided no detail whatsoever as to who conducted the search, what search terms were used, or what—if any—data was segregated from review. Indeed, based on the warrant affidavit, the government seized an entire image of the cell phone (including any applications, photos, etc.) and looked through *everything* with no defined methodology for evidence of the alleged crimes.

14

JA32

For example, the warrant authorizes the seizure of "emails" without limitation. The warrant does not provide the government the authority to look through every single one of those emails. Yet the warrant does not specify how the government planned to locate relevant emails.

Because this type of sweeping search is, in effect, a general warrant, suppression is warranted. *See United States v. Carey*, 172 F.3d 1268, 1276 (10th Cir. 1999) (suppressing evidence where search was not limited to the items specified in the warrant).

## III.    The Federal Search Warrant (June 23, 2020-Exhibit C).

The Government indicates that the federal investigation of Mr. Vanderpool began in March 2020. In June 2020, law enforcement applied for a federal search warrant to search the devices seized pursuant to the initial state search warrant, identified as Target Devices 1-11. The federal warrant relies on the same facts provided to the State Court regarding the alleged sexual assault. The federal warrant asserts a separate basis for investigation, the existence of a kick-back tow scheme. The affidavit refers to records of telephonic contacts and texts with two tow company employees. Like the state search warrant, the search warrant application fails to establish probable cause for each of the category of items law enforcement sought to search and seize. The Defense adopts the arguments and law set forth in **II.A** as equally applicable to the federal warrant.

The federal warrant is also misleading in two additional respects. The affvidavit incorrectly represents that the state court issued a warrant to search Target Devices 5-11. The only warrant provided to the Defense and previously referenced by the Government is the state warrant for Target Device 1 referenced above. Second, Target Device 8 (Samsung Galaxy S9) was not seized from the home but taken from Mr. Vanderpool at his arrest. Law enforcement extracted the WhatsApp message the Government intends to introduce from this device on

15

JA33

October 6, 2020.  There was unreasonable period of delay between the phone's seizure and the application of search warrant by federal law enforcement.

A.     **The Nearly-Seven-Month Delay Between Seizing Mr. Vanderpool's Cell Phone and Applying for the Federal Search Warrant Was Constitutionally Unreasonable and Necessitates Suppression of the Evidence.**

The seizure of Mr. Vanderpool's phone was unlawful because it was unsupported by probable cause. Even if the Court were to find that probable cause justified the phone's initial seizure, however, the evidence obtained from the phone pursuant to the federal search warrant must be suppressed because the warrantless retention of the phone for nearly seven months prior to the federal search warrant violated the Fourth Amendment.

Federal Courts of Appeal have made clear that the delay in obtaining a warrant to search a seized item can violate the Fourth Amendment even when the initial seizure is supported by probable cause.[2] Indeed,

> [i]t is common for the police to temporarily seize a suspect's personal property if they have probable cause and intend to apply for a warrant to search the property for evidence of a crime. When the police do so, however, the Fourth Amendment requires that they act with diligence to apply for a search warrant.

*United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020).

As the Fourth Circuit has explained, "[t]o determine if an extended seizure violates the Fourth Amendment, we balance the government's interest in the seizure against the individual's possessory interest in the object seized." 915 F.3d 266, 271 (4th Cir. 2019). While "[a] strong government interest can justify an extended seizure," the individual's interest can "outweigh[] the government's," rendering an extended seizure unreasonable. *Id.* An individual's possessory

---

[2] As explained above, Mr. Vanderpool contests that probable cause existed to justify the seizure of the phone.

JA34

interest may be diminished "if he consents to the seizure or voluntarily shares the seized object's contents." *Id.* at 272.

In *Pratt*, the court found that although the police had probable cause to *seize* a cell phone, the 31-day delay in obtaining the search warrant for the phone was unreasonable and the evidence from the phone should have been suppressed. *Id.* The government's only proffered rationale for the delay in obtaining the search warrant was law enforcement decision-making about whether to seek a warrant in North or South Carolina. *Id.*

Similarly, in *United States v. Mitchell*, the Eleventh Circuit found that a 21-day delay between the seizure of a computer hard-drive based on probable cause and the application for a search warrant violated the Fourth Amendment. 565 F.3d 1347 (11th Cir. 2009). The agent's explanation for the 21-day delay was that he had gone out of town for training and did not think the search warrant was urgent. *Id.* at 1351. The Eleventh Circuit found the explanation unpersuasive and the delay unreasonable.

Here, as in *Pratt* and *Mitchell*, there is no explanation for either the federal agents' nearly-seven-month delay that outweighs Mr. Vanderpool's possessory interest in his phone, which was diminished neither by consent nor shared use. Because the unreasonable delay violated the Fourth Amendment, the evidence obtained from the phone must be suppressed.

**Conclusion**

For the reasons set forth above, both the state and federal warrants were obtained in violation of the Fourth Amendment and the evidence seized as a result must be suppressed.

Respectfully submitted,

_____/s/_____
Amy S. Fitzgibbons

17

JA35

Ellie Marranzini
Assistant Federal Public Defenders
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: Amy_Fitzgibbons@fd.org
           Ellie_Marranzini@fd.org

18

JA36

# EXHIBIT A

JA37

## IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

I, Lieutenant M. Ebaugh #2849, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

### 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _____ a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of Criminal Law Article, CR §3-304, Annotated Code of Maryland.

### 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to search the item as described below:

**Single-family home located at ▮▮▮ Duel Place, Fairmount Heights, Prince George's County, Maryland 20743**

The place is described as a two-story single-family home with beige brick and dark shutters. The numbers "5115" are placed to the left of the door on a white placard with black numbers. There are three steps that lead to the front door with a white handrail.

### 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Lieutenant M. Ebaugh, #2849, is currently employed by the Prince George's County Police Department and is assigned to the Internal Affairs Division. Your affiant has been employed by the Prince George's County Police Department since Sep 7, 2004. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, robbery, assault, narcotic investigations, sex offenses, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland, resulting in the conviction of persons violating the laws of this State.

USA_000488

JA38

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this affidavit is being submitted for the limited purpose of obtaining authorization to search a specific person, your affiant has not included each and every fact known to him concerning this investigation. Your affiant has set forth the facts that he believes are essential to establish the necessary foundation for the issuance of a search warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and witness officer , both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Prince George's County, Maryland. The Defendant and the witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.

The Defendant asked the Victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer placed the Victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the victim if she was a prostitute. The Victim kept asking the officer if he could release the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle, and he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, and was unable to leave because the Defendant had her detained in the police station and unwillingly complied with the Defendant's demand.

USA_000489

JA39

The Defendant demanded that the Victim get on top of him and forced the victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

During the investigation, detectives learned that the Defendant took a photograph with his cellular phone during the traffic stop. Additionally, the Defendant was not in full uniform during the traffic stop but was described as wearing tan kaki pants, and an army fatigue shirt.

During the investigation it was also stated that the Defendant used condoms, taken from the Victim's car, to have sex with her. There were multiple condoms and only one was used. The Vicitm described the condoms as Magnums with a gold wrapper.

On December 2, 2019, a warrant was obtained charging the defendant with Rape First Degree. Warrant #3E00665500.

During the investigation, a search was conducted through police databases, which shows Martique Cabarl Vanderpool has provided ███ Duel Place, Fairmount Heights, Prince George's County, Maryland 20743, on numerous occasions as his residence, and recently advised his employer that this is his current address.

All events occurred in Prince Georges County, Maryland.

## 5. JUSTIFICATION OF PLACE TO BE SEARCHED:

Based on your Affiant's knowledge, training, experience, and the facts contained herein, your Affiant believes that evidence of violations of CR 3-304, Annotated Code of Maryland are contained in the residence identified at ███ Duel Place, Fairmount Heights, Prince George's County, Maryland 20743.

Through my training, knowledge, and experience, your affiant knows that persons who commit crimes from which they derive personal satisfaction often keep mementos, trophies, or detailed accounts of their experiences. Based on the facts provided by the witnesses, it is your affiant's belief that the Defendant took photographs of the victim.

Your affiant knows that digital media such as photos can be stored in a variety of means such as on removable USB devices like flash drives or removable hard drives, or internal storage on electronic devices such as computers, cell phones, or tablets.

Your affiant is aware that electronic media with digital transmission capabilities can be used to transmit evidence into cloud storage services. Cloud storage is remote storage

USA_000490

JA40

used to retain files such as images, videos, or documents without retaining them locally on a specific device, and multiple devices can be used to transmit or retrieve digital files. Your affiant further knows that electronic media may be shared between electronic devices via the cloud. Your affiant also knows that digital storage media can be very small and easily concealed in a variety of locations.

Based on the facts provided by the witnesses, the Defendant wore specific clothing that was not his police-issued uniform during the time that he committed these crimes. It was stated the Defendant stole gold wrapped Magnum condoms from the Victim's car and that all were not used that day and may be contained in the residence.

Your Affiant knows that persons involved in the crimes of violence often utilize cellular telephones to communicate with witnesses and possible co-conspirators before and after the commission of the crime and maintain records of these contacts within their cellular telephones.

## 6.  DESCRIPTION OF ITEMS TO BE SEIZED:

- Any and all tan Khaki pants

- Army fatigue shirts

- Any gold wrapper Magnum condoms.

- Any and all electronic media capable of retaining digital image or video files, to include, but not limited to, tablets, computers, "smart" cell phones, USB storage devices such as flash drives or external hard drives, "SD" cards, memory cards, "smart" picture frames.

- Any and all still photography media such as prints of the known victim

- Any and all video graphics media, including, but not limited to digital video recorders (DVR) and digital video files,

- Any and all electronic devices with data transmission, internet access, or cloud storage capabilities to include, but not limited to, computers, tablets, cell phones, "smart" devices.

- Any and all diaries, journals, ledgers, memorandums, or notations of evidentiary value.

- To open any locked doors, drawers, compartments, containers, outdoor sheds, safes, lockboxes, or any other storage medium capable of concealing the aforementioned items.

USA_000491

JA41

• Any documents, mail matter, of <u>Martique Vanderpool.</u>

      For all of the foregoing reasons, I respectfully request that you issue a Search and Seizure Warrant for the above-described place.

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
Affiant's Signature

_____
Date

_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203, ANNOTATED CODE OF MARYLAND ON THIS _____ DAY OF _____, 2019

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

USA_000492

JA42

# EXHIBIT B

JA43

# IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to *Sean D Wallace* a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Samsung Galaxy S III with HEX number 990 004 700 187 55

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at

USA_000495

JA44

Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost.
Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at ██ Duel Place, Fairmount Heights, Prince George's County, Maryland. A Samsung Galaxy S III with HEX number 990 004 700 187 55 recovered from the upstairs bedroom in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

All these events did occur in Prince George's County.

USA_000496

JA45

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.   JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Samsung Galaxy S III with HEX number 990 004 700 187 55

And to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

USA_000497

JA46

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

_____Detective C. Savoy #2442_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

___17th___ DAY OF ___January___, 2020 at ___2:12 pm___ hours

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

USA_000498

JA47

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

### SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

Samsung Galaxy S III with HEX number 990 004 700 187 55

2. **You shall seize the following items, evidence, and/or contraband:**

Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2/20 at 2:12pm._
**DATE/ TIME**

_[signature]_
**JUDGE'S SIGNATURE**
_Sean D. Wallr_
**JUDGE'S PRINTED NAME**

USA_000499

JA48

# EXHIBIT C

JA49

DJD/cg USAO #2020R00256

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| In the Matter of the Search of ) *(Briefly describe the property to be searched* ) *or identify the person by name and address)* ) TARGET DEVICES CURRENTLY LOCATED AT 6707 ) GROVETON DRIVE, CLINTON, MARYLAND ) ) | Case No. 8:20-mj-1605 TMD |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

TARGET DEVICES LISTED IN ATTACHMENT A THAT ARE CURRENTLY LOCATED AT 6707 GROVETON DRIVE, CLINTON, MARYLAND (See Attachment A)

located in the _____ District of _____ Maryland _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Extortion Under Color of Official Right |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1951 | Extortion Under Color of Official Right |

The application is based on these facts:

See affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jaclyn Bloomingdale, Special Agent, FBI
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3).

Date: 6/23/2020

*Judge's signature*

City and state: Greenbelt, MD

Thomas M. DiGirolamo, Magistrate Judge, US Dist. Court
*Printed name and title*

USA_000483

JA50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF    )
TARGET DEVICES CURRENTLY          )    CASE NO.    8:20-mj-1605 TMD
LOCATED AT 6707 GROVETON          )
DRIVE, CLINTON, MARYLAND          )    UNDER SEAL
                                  )

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A SEARCH WARRANT

1.    I, Jaclyn Bloomingdale, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2.    As a FBI Special Agent, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.    I have been a Special Agent with the FBI since March 2005. I am currently assigned to the Public Corruption/Civil Rights squad in the Baltimore Division of the FBI and have been assigned investigations concerning public corruption and civil rights violations. During my employment with the FBI, I have gained experience through training in seminars, classes, and daily work related to conducting these types of investigations. I have participated in the execution of numerous search warrants, some of which have involved public corruption offenses. Many of the search warrants resulted in the seizure of computers, cell phones and/or "smart phones," magnetic storage media for computers, other electronic media, and other items evidencing violations of federal laws.

**USA_000465**

JA51

4.    The statements in this affidavit are based on: my personal knowledge and observations during the course of this investigation; information obtained by or known to other law enforcement agents that they conveyed to me; my personal review of records, documents, and other physical evidence obtained during the investigation; and information gained through my training and experience. This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant.

5.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones and laptops described herein and in Attachment A (collectively, the "**Target Devices**")—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

6.    I submit that there is probable cause to believe that the **Target Devices** contain evidence of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1951 (extortion under color of official right).

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.    As listed in Attachment A, the **Target Devices** to be searched are:

a.    **Target Device 1:** Samsung Galaxy III with HEX number: 990 004 700 187 55 Jan 17th

b.    **Target Device 2:** Apple IPhone Model: A1332 FCC: BCG:E2380B OC:579C-E2380B

c.    **Target Device 3:** Dell Laptop Product Key: cwthy-bg3cr-2b38w-8qm4r-ygtt8

d.    **Target Device 4:** Dell Laptop Serial Number: 5RFH2R2

2

USA_000466

JA52

    e.    **Target Device 5:** Kyocera Model: E4277 cell phone with HEX number AOO000 27C 06E 40 Jan 17th

    f.    **Target Device 6:** Samsung Cell Phone with HEX number ADO000 392 73A FB Jan 17th

    g.    **Target Device 7:** Samsung Galaxy S6 edge+ cell phone Jan 17th

    h.    **Target Device 8:** Samsung Galaxy S9 cell phone with serial number RF8K7071 FJM

    i.    **Target Device 9:** Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553

    j.    **Target Device 10:** Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB1 06 10

    k.    **Target Device 11:** Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 06108886

8.    Law enforcement recovered the **Target Devices** while executing a search warrant at ▮ Duel Place, Fairmount Heights, Maryland 20743 on December 2, 2019. The **Target Devices** have been in the custody of the Prince George's County Police Department at 6707 Groveton Drive, Clinton, Maryland.

9.    On or about January 17, 2020, the Honorable Sean D. Walker, Circuit Court Judge for Prince George's County, Maryland, signed a search warrant for the forensic download of **Target Device 1** and **Target Devices 5–11**.

10.    In my training and experience, I know the **Target Devices** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Devices** first came into the possession of law enforcement.

## PROBABLE CAUSE

11.    Based on my education, training, and experience, and the experience of other law enforcement officers as relayed to me, I know that individuals involved in wire fraud, mail fraud,

3

USA_000467

JA53

and extortion under color of official right often use cellular telephones and computers to facilitate their criminal activity. I know that persons involved in wire fraud, mail fraud, and crimes of violence, including extortion under color of official right utilize computers, cellular telephones, and other electronic devices to communicate with witnesses and possible co-conspirators before and after the crime and to maintain records of these contacts. Additionally documents and records relating to extortion payments may also be stored or maintained on electronic devices, including but not limited to, banking and other financial transactions.

12. I know, and other law enforcement officers familiar with crimes of extortion under color of official right investigations have communicated to me, that individuals involved in extortion often utilize computers and cellular telephones to store photographs of victims of their crimes, photographs of money obtained from receiving bribes, and photographs of scenes where crimes were committed.

A. VANDERPOOL's rape of victim, R.S.

13. Former Fairmount Heights Police Department office Martique VANDERPOOL joined the Fairmount Heights Police Department on December 20, 2017, and resigned from the department on November 23, 2019.

14. On September 6, 2019, at approximately 2322 hours, VANDERPOOL, and a witness officer, Philip Dupree, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. VANDERPOOL and Dupree stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration. VANDERPOOL asked R.S. to step out of the vehicle because she did not have her driver's license on her person. R.S. became upset and wanted to leave. VANDERPOOL then told R.S. that he was going to impound her vehicle. R.S. began to cry and started yelling. Dupree put R.S.

4

USA_000468

JA54

in handcuffs. VANDERPOOL called a tow company, Tino's Towing, to have R.S.'s vehicle impounded.

15.    While doing an impound inventory of the vehicle, VANDERPOOL noticed some condoms in the armrest and asked R.S. if she was a prostitute. R.S. repeatedly asked VANDERPOOL if he could do a hook and release of her vehicle, and VANDERPOOL replied, "I'll see what we can do." VANDERPOOL stated that maybe he and R.S. could work something out. R.S. replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." R.S. heard VANDERPOOL tell the tow truck driver, "Don't worry Kevin, I'll get you another one." VANDERPOOL told the tow truck driver to take the vehicle, and the tow truck driver complied. Dupree left the scene, and VANDERPOOL took R.S. to the Fairmount Heights Police Station, located at 6100 Jost Street, Fairmount Heights, Maryland.

16.    When Dupree returned to the Fairmount Heights Police Station, he observed R.S. sitting in a chair. According to R.S., once she and VANDERPOOL were at the police station, VANDERPOOL asked R.S., "So what are we going to do about this?" VANDERPOOL told R.S. that she could either have sex with VANDERPOOL or get arrested and go to jail. R.S. was detained by VANDERPOOL and unable to leave the police station causing R.S. to fear for her safety. R.S. unwillingly complied with VANDERPOOL's demand for sex in exchange for her release and the release of her vehicle.

17.    VANDERPOOL demanded that R.S. get on top of him and forced R.S. to engage in vaginal intercourse. After the vaginal intercourse, VANDERPOOL went to the back of the office and returned with citations issued to R.S. R.S. was confused and began crying. VANDERPOOL called the tow truck driver to release R.S's vehicle to her at no cost. Once R.S. was released, R.S. immediately reported the incident to her mother.

5

USA_000469

JA55

18.  During the investigation, investigators learned that VANDERPOOL took a photograph with his cellular telephone during the traffic stop, that VANDERPOOL used condoms, taken from the R.S's car, to have vaginal intercourse with her, and that VANDERPOOL was HIV positive when he forced R.S. to have vaginal intercourse with him.

B.  Interview of DUPREE

19.  Detectives learned through an interview of Dupree on November 7, 2019 that VANDERPOOL "likes to tow cars." When Dupree was asked why, he replied, "Probably because, um, you know, that's – that's the thing that people do. They tow cars to get extra money." Dupree continued, "Baltimore city has somethin' like that goin' on. I think – what do they call it? Like, it's a kickback or somethin' like that." When Dupree was asked how that would work, he replied, "So, I guess um, you would – you – you I guess you tow the – I- I-guess you pull the person over, and you run their information and you don't have, um, you don't have no insurance, you don't have no license." Dupree continued, "So, how do you wanna get out of this? You wanna pay me, um $300 or you want me to tow your car? I guess it works like that."

20.  Dupree told investigators that he hears complaints from people in the community regarding Fairmount Heights Police Department's towing practices, including "his department likes to tow cars" and "y'all must have something going on with the tow company."

21.  When Dupree was asked if he ever saw VANDERPOOL take a kickback from a tow company, he said, "No, he's not gonna do that in front of me." Dupree continued,

> Most police officers probably don't wanna do an impound. They don't. I mean, it's – it's stupid. You - you get nothing out of doing an impound. You don't. I mean, what - what - I mean, it's not like a 10-15. I mean, you get – you're impoundin' a car, so what? They would have to be - I- I'm just – I'm just. You got an officer impoundin' 60 vehicles in a month? What - what would be your reason to do that? I could see 60 stops.

6

USA_000470

JA56

22.    As investigators questioned Dupree to determine how VANDERPOOL would

benefit from towing cars, an investigator summarized the scheme by saying,

> So, basically, the tow company is sayin', "If you can find a car for me to tow, I'll
> give you $60 for every car." So, that would be tow company working with officer.
> But then when you have the cars, the vehicles, or where you're—you're basically
> out looking for women or you're looking for women with kids, and then you're
> basically, like, "Hey, we're gonna tow your car unless you give them, all of that
> money is goin' to the officer."

Dupree agreed with the investigator's summary of the towing scheme. Dupree told investigators

that the victims of the towing scheme do not file complaints because they are typically driving

without a license or car insurance and feel as though got off "scott-free."

C. State Search Warrant Execution at VANDERPOOL's residence on December 2, 2019:

23.    On or about December 2, 2019, the Honorable Dorothy Engel, Circuit Court

Judge for Prince George's County, Maryland, signed a search warrant for the residence located

at █ Duel Place, Fairmount Heights, Maryland 20743, a residence known to investigators to

be the residence of Fairmount Heights Officer Martique VANDERPOOL. On or about

December 3, 2019, law enforcement executed the search warrant at █ Duel Place, Fairmount

Heights, Maryland 20743. During the search of the residence, law enforcement recovered,

among other items, the **Target Devices**, various Velcro law enforcement patches, currency that

appeared to be counterfeit, and approximately twenty Fairmount Heights Police towing impound

records dated between December 21, 2018 and June 4, 2019.

24.    **Target Device 4** is believed to be the property of the Internal Revenue Service.

VANDERPOOL was employed by the IRS and served as a revenue officer for its collection

function assigned to the Baltimore, Maryland post of duty. His duties consisted of collecting

unpaid past due federal income tax owed by businesses and individuals along with unfiled federal

tax returns. He began his employment with the IRS on August 19, 2019 and was terminated by

7

USA_000471

JA57

the IRS on December 17, 2019 for cause in connection to his arrest for sexual assault. He was designated as a probationary employee during his first year of employment with the IRS.

D. Towing complaints involving Vanderpool

25. The city of Fairmount Heights has received several complaints regarding VANDERPOOL's towing practices. The following are examples of complaints, as told by the complainants.

26. On January 23, 2019, I.B. sent an email to Fairmount Heights Police Chief Watkins requesting to know if the 1200–1300 blocks of Chapelwood Lane fell within the jurisdictional boundaries of the Fairmount Heights police department. On January 24, 2019, I.B. received a reply from chief@fairmountheightsmd.gov stating, "not within our jurisdiction." I.B. responded by requesting to know why his vehicle was towed by Tino's Towing from the 1200–1300 block of Chapelwood Lane where it was legally parked. I.B. explained that upon contacting VANDERPOOL, I.B. was directed to the police station to pay $100 in cash and $175 to Tino's Towing. After reviewing I.B.'s complaint, Fairmount Heights Police Chief Watkins responded with the following in an email:

> Rather than address all the questions, the officer lacked proper jurisdiction to impound the vehicle. The reasons would certainly dictate the placement of a "72" hour violation notice to the owner would have been in order, however, this should have been the responsibility of either PGPD or DPW&T and not FHPD. I'm certainly sorry this happened to you and I will ensure you that no one from this department conducts these types of towing operations outside of our jurisdiction. I have contacted Tino's Towing and directed the vehicle be released to you without charge. Please contact me if there are any problems.  Chief

27. On March 29, 2019, P.W. reported that while attending a funeral at First Baptist Church Fairmount, her vehicle drifted down the street and came to rest on a curb. No injuries or property damage occurred. VANDERPOOL advised P.W. that her vehicle was being impounded and that to avoid receiving citations, P.W. had to go to the police station and pay a $100 vehicle

8

USA_000472

JA58

release fee. Once P.W. paid the $100 release fee at the police station, P.W. had to pay another $175 in cash to get her vehicle back to Tino's Towing. When P.W. was at the police station, P.W. heard VANDERPOOL on the phone with the tow truck driver. Upon review of her vehicle release receipt, P.W. noticed that it did not have a citation number. P.W. contacted Fairmount Heights Police Chief Watkins via email. Chief Watkins told P.W. to meet with Fairmount Heights Police Lieutenant Ivey, who P.W. met with to discuss her complaint. P.W. did not remember the name of the police officer who towed her car, but would recognize his face if shown a picture.[1]

28. Fairmount Heights Police received a complaint from A.G., who claimed that his vehicle was unlawfully towed on July 2, 2019 by Tino's Towing in the Seat Pleasant Police Department jurisdiction at the direction of Fairmount Heights Officer VANDERPOOL. A.G. stated that he contacted the Seat Pleasant Police Headquarters, who had no record of the tow. A.G. went to the Fairmount Heights police station to file a complaint about his car being towed and spoke with Fairmount Heights Police Lieutenant Ivey. A.G. eventually paid $100 to Fairmount Heights for the vehicle release and $175 to Tino's Towing, who demanded payment in cash only. A.G. was issued a citation for impeding traffic by Fairmount Heights but does not believe it was filed because A.G. never received anything in the mail regarding the citation. A.G. contacted Lieutenant Ivey regarding the status of his complaint after learning about VANDERPOOL's arrest for rape. Lieutenant Ivey told A.G. that the Captain has the complaint sitting on his desk.

29. The complaints of Vanderpool's towing victims demonstrate that Vanderpool was illegally towing vehicles. Based upon the discovery of impound records at

---

[1] VANDERPOOL signed the Tino's Towing receipt dated March 28, 2019.

9

USA_000473

VANDERPOOL's residence, Dupree's statement to investigators that VANDERPOOL was involved in a towing scheme to receive kickbacks, interviews of citizens who had their cars towed by VANDERPOOL, VANDERPOOL's statement to the tow truck driver ("Don't worry Kevin, I'll get you another one"), and my knowledge regarding towing kickback schemes, I believe that VANDERPOOL was receiving money from Tino's Towing for every vehicle that VANDERPOOL tows. Additionally, when VANDERPOOL conducts vehicle stops on vehicles that he could potentially impound, VANDERPOOL extorts the driver for money.

E. Toll Analysis:

30.    Below is a chart containing VANDERPOOL's contacts with Tino's Towing employees, Valentino HINES and Kevin OSHIN, from September 6, 2019 through December 3, 2019:

| Dates of Activity | Contacts With (User) | Total Contacts | Texts | Calls |
|---|---|---|---|---|
| Sept. 6, 2019 to Oct. 30, 2019 | 202-294-2950 (Valentino "Tino" Hines) | 58 | 12 | 46 |
| Sept. 6, 2019 to Oct. 5, 2019 | 202-281-6776 (Kevin Olekayode Oshin) | 69 | 24 | 45 |

The chart shows that VANDERPOOL was in frequent telephonic contact during the above noted time periods with the the owner of Tino's towing, Valentino Hines and Tino's towing employee, Kevin Oshin.

## TECHNICAL TERMS AND DEFINITIONS

31.    Based on my training and experience, I use the following technical terms to convey the following meanings:

32.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio

10

USA_000474

JA60

signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

33. Based on my training, experience, and research, and the training, experience, and research of other law enforcement officers, I know that the **Target Devices** have capabilities that allow them to serve as a wireless telephones, and that many wireless telephones have the capabilities to allow them to serve as a digital camera, portable media players, GPS navigation devices, and/or internet search devices. Based on my training, experience, and research, and the training, experience, and research of other law enforcement officers, I also know that wireless telephones such as the **Target Devices**, as well as any of their removable media, serve to record and store pictures as digital picture files and/or store other types of digital files. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

11

USA_000475

JA61

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35.     Forensic evidence: As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the **Target Devices** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Devices** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a photograph that has been deleted from the device).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a

12

USA_000476

computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36.     Nature of examination: Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Devices** to human inspection to determine whether they contain evidence described by the warrant.

37.     Manner of execution: Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

13

USA_000477

## CONCLUSION

38.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Devices** described in Attachment A to seek the items and information described in Attachment B.

Jaclyn Bloomingdale, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___23___ day of June 2020.

Honorable Thomas M. DiGirolamo
United States Magistrate Judge

14

USA_000478

JA64

8:20-mj-1605 TMD

## **ATTACHMENT A**
*Items to Be Searched*

The property to be searched are the **Target Devices:**

  a.   **Target Device 1:** Samsung Galaxy III with HEX number: 990 004 700 187 55 Jan 17th

  b.   **Target Device 2:** Apple IPhone Model: A1332 FCC: BCG:E2380B OC:579C-E2380B

  c.   **Target Device 3:** Dell Laptop Product Key: cwthy-bg3cr-2b38w-8qm4r-ygtt8

  d.   **Target Device 4**: Dell Laptop Serial Number: 5RFH2R2

  e.   **Target Device 5:** Kyocera Model: E4277 cell phone with HEX number AOO000 27C 06E 40 Jan 17th

  f.   **Target Device 6:** Samsung Cell Phone with HEX number ADO000 392 73A FB Jan 17th

  g.   **Target Device 7:** Samsung Galaxy S6 edge+ cell phone Jan 17th

  h.   **Target Device 8:** Samsung Galaxy S9 cell phone with serial number RF8K7071 FJM

  i.   **Target Device 9:** Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553

  j.   **Target Device 10:** Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB1 06 10

  k.   **Target Device 11:** Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 06108886

The **Target Devices** are currently in law enforcement's possession at 6707 Groveton Drive,

Clinton, Maryland.

USA_000479

JA65

## ATTACHMENT B
### *List of Items Authorized to be Searched for and Seized*

1. All "records" (that is, documents, information, photographs, videos, communications, and any other items) contained in the **Target Devices** described in Attachment A that relate to violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1951 (extortion under color of official right), from December 20, 2017 until December 3, 2019, including, but not limited to, the items listed below:

    a. Incoming/outgoing/missed phone call log(s);

    b. SMS/MMS messages and other communications and notes;

    c. Voicemail messages;

    d. Photographs, audio clips, and video clips;

    e. Telephone contact lists;

    f. All bank records, checks, credit card bills, account information, and other financial records; and

    g. Records of the existence of and private messaging through social media accounts, including but not limited to, Instagram, Facebook, and Twitter.

2. Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as: logs; phonebooks; saved usernames and passwords; documents; browsing history; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

USA_000480

JA66

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.      With respect to **Target Device** 4, I am aware of potential federal tax return information on the device and its protection under Internal Revenue Code, Section 6103. Law enforcement personnel will take measures to safeguard such information as not to violate Title 26 U.S.C. §§ 7213 and 7213A while performing a search.

5.      With respect to the search of the **Target Devices**, the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

      a.    surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

      b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

      c.    "scanning" storage areas to discover and possible recover recently deleted files;

      d.    "scanning" storage areas for deliberately hidden files; or

      e.    performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6.      If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

2

USA_000481

JA67

7.      With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

3

USA_000482

JA68

DJD/eg  USAO #2020R00256

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means      ☑ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

District of Maryland

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   8:20-mj-1605 TMD |
| | ) | |
| TARGET DEVICES CURRENTLY LOCATED AT 6707 GROVETON | ) | |
| DRIVE, CLINTON, MARYLAND | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Maryland _____
*(identify the person or describe the property to be searched and give its location)*:

TARGET DEVICES LISTED IN ATTACHMENT A THAT ARE CURRENTLY LOCATED AT 6707 GROVETON DRIVE, CLINTON, MARYLAND  (See Attachment A)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before  *July 7, 2020*  *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Duty Magistrate Judge _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *6/23/2020  10:00 AM*      _____
*Judge's signature*

City and state:      Baltimore, Maryland      Thomas M. DiGirolamo, Magistrate Judge, US District Court
*Printed name and title*

JA69

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>8:20-mj-1605 TMD | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned electronically along with the warrant to the designated judge pursuant to Fed. R. Crim. P. 4.1 and 41(f)(1)(D).

Date: _____

 

_____
*Executing officer's signature*

Jaclyn Bloomingdale, Special Agent, FBI
_____
*Printed name and title*

JA70

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. DLB-23-00234** |
| v. | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## ORDER

Upon consideration of the Defendant's Motion to Suppress Search and Seizure Pursuant to Warrants, it is this _____ day of _____, 2023, hereby:

**ORDERED**, that the defendant's Suppress Search and Seizure Pursuant to Warrants is GRANTED for the reasons set forth in its motion and considered at hearing on the Motion.

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA71

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | **CRIMINAL NO. DLB-23-00234** |
| v. | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## MOTION TO DISMISS FOR PREINDICTMENT DELAY

Martique Cabral Vanderpool, the Defendant, through undersigned counsel, respectfully moves this Court to dismiss the indictment due to the government's delay in prosecuting the case, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure. This prosecution deprives Mr. Vanderpool of his due process rights in violation of the Fifth Amendment of the United States Constitution. In support of this Motion, Mr. Vanderpool states as follows.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 2019, then-Fairmount Heights Police Officers Vanderpool and Dupree conducted a traffic stop of R.S. The Indictment alleges that Mr. Vanderpool falsified a municipal incident report that omitted four facts regarding the traffic stop. Specifically, the incident report omits that Mr. Vanderpool and Dupree brought R.S. back to the police station, and had the car that R.S. was driving towed from the scene of stop. At the station, Mr. Vanderpool and R.S. had consensual sex. According to the then-Fairmont Heights Police Chief, the police department received an anonymous call regarding the traffic stop and an alleged sexual assault. Lt. Edward

1

JA72

"Earl" Ivey attempted to locate R.S. and ultimately, discussed the traffic stop with her on several occasions but later was ordered to stop contacting her and retained counsel. Officer Dupree was subsequently charged in a series of criminal cases for unrelated incidents that occurred while he was serving as a police officer.

Related to this incident, Mr. Vanderpool was originally charged in Prince George's County District Court with, *inter alia*, first degree rape (and lesser included offenses), assault, and misconduct in office. *State v. Vanderpool*, No 3E00665500. The District Court dismissed the first degree rape charge after the preliminary hearing failed to establish probable cause to support the count. The state obtained an indictment that included first degree rape, assault, kidnapping and misconduct in office charges in Prince George's County Circuit Court Case CT200085X. Mr. Vanderpool was arrested on December 3, 2019. From January 6 through January 22, 2020, Mr. Vanderpool was released on home detention. After the state indictment, Mr. Vanderpool was returned to custody.

Two years after the incident, on September 8, 2021, Mr. Vanderpool was indicted federally with one count of deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242. Crim. No. 21-354-DLB, ECF 1. On September 24, 2021, Mr. Vanderpool made his initial appearance and an order of detention by agreement was entered based on his state detention status. On May 6, 2022, Prince George's County Circuit Court Judge Mason released Mr. Vanderpool under pretrial supervision and conditions that included home detention. On May 22, 2022, Mr. Vanderpool's motion for release in the federal case was denied, effectively frustrating the state court's release order.

In January 2023, Mr. Vanderpool was tried by a jury in the state case. He was acquitted of all charges except for engaging in sexual contact with a person in custody under Maryland

2

JA73

Criminal Law Code, § 3-314(c), a misdemeanor offense punishable by imprisonment not exceeding 3 years. At the time, Mr. Vanderpool had been detained for more than three years. On February 14, 2023, Mr. Vanderpool was sentenced to time served.

Despite Mr. Vanderpool's acquittal on the most serious charges in the state indictment, and his having served the statutory maximum sentence for the offense of which he was convicted, the federal government continued to pursue the federal civil rights charge. While the parties proceeded to and prepared for trial, the government sought and failed to obtain approval under the United States Department of Justice's Petite Policy, which provides that defendants prosecuted at the state level will not be prosecuted federally for crimes arising from the same conduct except when (1) there is a compelling federal interest and (2) with approval of an Assistant Attorney General. *See* U.S. Dep't of Justice, United States Attorneys' Manual 9-2.031 (1999); *see also Petite v. United States*, 361 U.S. 529 (1960) (ordering the lower court to dismiss the indictment). The government moved unopposed to dismiss the indictment against Mr. Vanderpool on July 12, 2023, and this Court approved the dismissal on July 17, 2023. *See* Crim. No. 21-354-DLB, ECF 93.

But the government's prosecution of Mr. Vanderpool did not end there. On July 6, 2023, Mr. Vanderpool was indicted in the instant case with a single count of falsification of a record under 18 U.S.C. § 1519. The alleged falsification of record—here, a municipal police incident report—took place on September 7, 2019, three years, nine months, and 29 days before the indictment. The indictment alleges that Mr. Vanderpool in the incident report:

> (1) omitted that he and another officer known to the Grand Jury [, Phillip Dupree,] took the handcuffed victim to an abandoned police station on September 6, 2019;
> (2) omitted the fact that he had sex with Victim 1 on September 6, 2019;
> (3) omitted that he and another officer known to the Grand Jury [,Phillip Dupree,] caused the vehicle that Victim 1 was driving to be towed from the scene of the traffic stop, and falsely stated that the registered owner picked up the vehicle (thereby falsely implying that the owner had picked up the vehicle from the scene of the traffic stop),

3

JA74

(4) omitted that he procured the release of the vehicle to Victim 1 from the towing company without Victim 1 having to pay the release fee.

Indictment, ECF 1.

Since the events giving rise to the indictment took place in September of 2019, two key witnesses, Lieutenant Earl Ivey and former-Fairmount Heights Police Officer Phillip Dupree, have become unavailable to serve as witnesses in Mr. Vanderpool's trial. Lieutenant Ivey passed away in 2022. Dupree was subsequently indicted in three criminal cases. On July 28, 2021, Dupree was charged in the District of Maryland with conspiracy to commit bank fraud. *United States v. Dupree*, Crim. No. 21-284-PX, ECF 1 (D. Md.). Dupree is now pending trial (scheduled for October 30, 2023) on a Third Superseding Indictment charging conspiracy to commit wire fraud, wire fraud, arson affecting interstate commerce, conspiracy to commit bank fraud, and bank fraud. *Id.* ECF 151. On November 18, 2021, Dupree was charged by indictment in the Circuit Court for Prince George's County, Maryland, with kidnapping, misconduct in office, and perjury. *State v. Dupree*, CT211227X. Trial is scheduled for December 4, 2023. On August 16, 2022, Dupree was charged in the District of D.C. with deprivation of rights under color of law, in violation of 18 U.S.C. § 242, and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). *United States v. Dupree*, Crim. No. 22-275-CKK, ECF 1 (D.D.C.). Trial is not currently scheduled in that case.

## **ARGUMENT**

The Due Process Clause of the Constitution's Fifth Amendment protects defendants facing a criminal charge from suffering due to the government's delay in bringing a case "when the delay actually prejudices the conduct of the defense." *United States v. Nelson*, 530 F. Supp. 2d 719, 726 (D. Md. 2008) (quoting *United States v. Marion*, 404 U.S. 307, 325 (1971)). Mr. Vanderpool now faces a prosecution so delayed that it violates his Fifth Amendment right to due process.

4

JA75

I.      **The Nearly-Four-Year Delay In This Case Amounts to a Due Process Violation.**

To prevail on a claim of preindictment delay, a defendant must show that the defense is prejudiced from the delay. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). If a defendant can establish actual prejudice, this Court next "must balance the defendant's prejudice against the government's justification for delay." *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996) (citing *Howell*, 904 F.2d at 895; *United States v. Automated Medical Laboratories*, 770 F.2d 399, 403 (4th Cir. 1985)). In conducting that balancing, the Court must consider "whether the government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" *Id.* (citing *Howell*, 904 F.2d at 895; *Automated Medical Laboratories*, 770 F.2d at 403).

Unlike most other federal circuits, the Fourth Circuit has expressly rejected the approach that a defendant must show the prosecution's delay was intentional and undertaken to gain tactical advantage. *Id.* at 905. Rather, this Court must consider preindictment delay claims on "case-by-case" basis "based on the circumstances of each case." *Howell*, 904 F.2d at 895.

A. **Mr. Vanderpool's Defense Was Actually Prejudiced By the Nearly-Four-Year Delay.**

First, Mr. Vanderpool must demonstrate that the government's preindictment delay in prosecuting this case prejudiced his defense. *Id.* The prejudice Mr. Vanderpool suffered from the delay must be "substantial" such that a defendant is "meaningfully impaired in his ability to defend against the [government's] charges to such an extent that the disposition of the criminal proceeding was likely affected." *Jones*, 94 F.3d at 907 (citing *Marion*, 404 U.S. at 324). A defendant's claims of prejudice may be based on what a witness may have testified to at trial. *See, e.g., Howell*, 904 F.2d at 893; *Automated Medical Laboratories,* 770 F.2d at 402–04; *Jones*, 94 F.3d at 907; *United*

5

JA76

*States v. Lovasco*, 432 U.S. 783, 784–85 (1977).  In Mr. Vanderpool's case, the prejudice is, as required, actual prejudice.

In *Howell v. Baker*, the Fourth Circuit determined that, "[i]n order to make a showing of prejudice, Howell was required to (1) identify 'the lost witness,' (2) 'demonstrate the content of the witness' testimony,' and (3) 'show that efforts were made to locate' the witness."  904 F.2d at 893.  Here, Mr. Vanderpool suffered actual prejudice due to the loss of not one but two witnesses, both of which are unavailable: Lieutenant Ivey, who passed away, and Dupree, who is facing criminal charges in three separate matters. Both witnesses would be essential defense witnesses in challenging the credibility of R.S.'s accounts to law enforcement. There is no documentation of the conversations that R.S. had with either Ivey or Dupree. According to her statements and trial testimony, Lieutenant Ivey was the first police officer to contact her regarding the September 6, 2019, incident; she did not report it on her own. R.S. recounts that she had multiple conversations with Lieutenant Ivey and Dupree prior and subsequent to giving an interview to the PGPD Detective investigating the case, that they convinced her to go forward, and that they helped her out on multiple occasions by sending her money and essentials such as laundry detergent. In her trial testimony, R.S. referred to Ivey as her "spiritual uncle," and described Dupree as someone who cared about her. In R.S.'s first recorded statement to the PGPD she falsely stated that Dupree was not present when she had sex with Mr. Vanderpool at the police station. She later revealed that he was in fact present, standing right next to them, and that she had initially lied in an attempt to keep him out of it. Given the number of statements, some of which were materially inconsistent, given by R.S., related to the September 6, 2019, incident, both Ivey and Dupree would have been important witnesses for the defense to inquire into additional statements, as well as other motive to fabricate or skew her account.

6

JA77

Additionally, after Lt. Ivey's death his widow provided papers that she found which she believed were related to his duties as a Fairmont Heights supervisory police officer. Those documents reveal that Lt. Ivey was involved in the forced resignation of then-Chief of Police Watkins (who testified in the state case) and investigation into the Fairmont Heights Police Department. The documents also included a section related to Officer Dupree's allegations against the Fairmont Heights Police Department, including the lack of resources, training and policies governing procedure (including the receipt of general orders relevant to the use of the Fairmont Heights Police Station).

At the time of the investigation, Lt. Ivey was also responsible for maintaining police personnel and training record files. The discovery indicates that Fairmont Heights turned over Officer Dupree's personnel file to the Prince George's County police and/or the Prince George's County State's Attorney's Office without maintaining a copy.

Lt. Ivey witnessed the relationship between Mr. Vanderpool and Dupree and could testify to Dupree's animosity towards Mr. Vanderpool because he believed that Mr. Vanderpool was receiving special treatment.

Recently, the Government provided the defense with copies of training records that appear to be computer-generated. Presumably, the Government intends to argue that Mr. Vanderpool received some training with respect to the potential consequences of police misconduct. However, the records appear to be incomplete and fail to list any specific training provided by Fairmont Heights. Lt. Ivey could provide testimony clarifying these records.

On top of the complete absence of two essential defense witnesses, the length of preindictment delay will have naturally contributed to gaps in the memories of other key witnesses, including R.S., the owner of the car she was driving, and the employees of the tow company.

JA78

**B. Under the Fourth Circuit's Balancing Test, the Burden Shifts to the Government to Justify the Delay.**

Having established that actual prejudice resulted from the preindictment delay, the burden now shifts to the government to provide a justification for the delay. In conducting that balancing test, the Court considers "whether the government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" *Jones*, 94 F.3d at 907 (additional citations omitted).

The Department of Justice's own policies have already precluded the original federal prosecution in this case. *See* U.S. Dep't of Justice, U.S. Attorneys' Manual 9-2.031 (1999). The Petite Policy "establishes guidelines for the exercise of discretion by appropriate officers of the Department of Justice in determining whether the bring a federal prosecution based on substantially the same act(s) or transactions involved in a prior state or federal proceeding." *Id.* Here, prosecutors were unable to secure approval to pursue the deprivation of civil rights charge against Mr. Vanderpool. The current prosecution appears to be an effort to circumvent the Petite Policy and the state court jury's verdict acquitting Mr. Vanderpool of the bulk of the criminal conduct of which he was accused. Significantly, Mr. Vanderpool was never charged with any form of obstruction of justice either in state or federal court up to this point, despite both the state and federal government possessing the alleged falsified document at the outset of their investigations over three years ago. This piecemeal approach to litigation provides a significant tactical advantage to federal prosecutors who have conceded that the federal civil rights charge is not appropriate after evaluating Mr. Vanderpool's defense and acquittal in the state case.

What is more, Mr. Vanderpool has already served the maximum sentence of three years for the one crime he was convicted of in state court. In light of these facts, considered together,

8

JA79

no justification provided by the government can salvage a sense of justice and fairness for Mr. Vanderpool.

Accordingly, the indictment should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Mr. Vanderpool's prosecution should be dismissed due to impermissible preindictment delay by the prosecution in violation of the Fifth Amendment. Mr. Vanderpool has suffered actual prejudice from the delay in this case. When this Court weighs that prejudice against the reason for the delay, the scale tips in favor of dismissing the Indictment. As a result of the constitutional violation established here, Mr. Vanderpool respectfully requests that this Court enter an Order dismissing this case with prejudice.

Respectfully submitted,

James Wyda
Federal Public Defender
  for the District of Maryland


____/s/_____
Amy S. Fitzgibbons
Ellie Marranzini
Assistant Federal Public Defenders
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: amy_fitzgibbons@fd.org
          ellie_marranzini@fd.org

JA80

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. DLB-23-00234** |
| v. | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**ORDER**

Upon consideration of the Defendant's Motion Dismiss for Preindictment Delay, it is this

_____ day of _____, 2023, hereby:

**ORDERED**, that the defendant's Motion to Dismiss the Indictment is GRANTED for the

reasons set forth in its motion and considered at hearing on the Motion.

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA81

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | Case No. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |

▪▪▪▪▪▪▪▪▪▪▪▪

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS**

INTRODUCTION ........................................................................................................................ 2

FACTUAL BACKGROUND ...................................................................................................... 3

ARGUMENT ............................................................................................................................... 8

I.    All Three Warrants Satisfy Fourth Amendment Requirements ......................................... 9

A.   The Federal Warrant Satisfied Fourth Amendment Requirements ................................... 10

1.    The Federal Warrant was Supported by Ample Probable Cause and was Not Misleading 10

2.    The Delay in Searching Target Device 8 Pursuant to the Federal Warrant Was Not
      Unreasonable and Does Not Warrant Suppression ......................................................... 13

3.    The Validity of the Federal Warrant Does not Depend Upon the Validity of the State
      Warrants ........................................................................................................................... 17

B.   The State Residence Warrant Satisfied Fourth Amendment Requirements and A *Franks*
      Hearing is Not Required .................................................................................................. 19

1.    The State Residence Warrant was Supported by Ample Probable Cause, and is
      Sufficiently Particular and Not Overbroad ..................................................................... 19

2.    A *Franks* Hearing is Not Required ................................................................................ 22

C.   The State Device Warrants Satisfied Fourth Amendment Requirements ......................... 25

1.    The State Device Warrants Were Supported by Ample Probable Cause to Seize All Stored
      Data .................................................................................................................................. 25

2.    The State Device Warrants Were Not Overbroad ........................................................... 26

II.   Investigators Relied Upon the Warrants in Good Faith .................................................... 28

CONCLUSION .......................................................................................................................... 30

JA82

**INTRODUCTION**

The government, by and through undersigned counsel, respectfully submits its response in opposition to the defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants (the "Motion to Suppress"), ECF No. 13, in which the defendant claims that three search warrants (a state search warrant for his residence, a state search warrant for a specific electronic device, and a federal search warrant for that specific device and others) violated the Fourth Amendment, and that therefore evidence seized pursuant to those warrants must be suppressed.[1] The defendant also asserts that a *Franks* hearing is necessary with respect to one of the state warrants. *See Franks v. Delaware*, 438 U.S. 154 (1978).

As an initial matter, the government intends at trial to seek the admission of evidence obtained from electronic devices searched pursuant to a federal warrant. Specifically, the government intends to offer evidence—including inculpatory WhatsApp voice recordings in which the defendant, a police officer, bragged about his sexual encounter with a woman in custody —that agents recovered from a cell phone that was initially seized from the defendant by local law enforcement officers during the defendant's arrest ("the personal cell phone"). Although the defendant has challenged the search warrant for his residence and has moved to suppress evidence from another specific electronic device (a different cell phone) seized during that search, he has not challenged the *arrest* warrant or specifically moved to suppress the evidence obtained from the defendant's personal cell phone. The government assumes that this was a mistake, and therefore in this response treats the defendant's motion as if it moves for suppression of the personal cell phone as well as all other devices.

---

[1] The defendant's second challenge is to a warrant to search a specific electronic device identified as Target Device 1. *See* ECF No. 13, at 8. However, the government assumes that the defendant intends to challenge all state device warrants—particularly the state warrant for the defendant's personal cell phone, identified as Target Device 8, which was seized incident to his arrest and on which federal agents found incriminating evidence that the government will offer at trial.

JA83

The evidence the government plans to use was obtained pursuant to a valid federal search warrant. As part of the federal investigation, FBI agents obtained a warrant for 11 electronic devices that were at that point lawfully in the state's possession, having been seized pursuant to a search warrant for the defendant's home (ten devices) or incident to the defendant's arrest (the personal cell phone). The federal warrant was based on evidence supporting a finding of probable cause to believe that those devices contained evidence of several potential federal offenses. The federal warrant was based on ample probable cause; clearly identified the items to be searched and the types of evidence to be sought; and delineated a specific search protocol. The federal warrant alone provides a legal justification for the search that led to the evidence at issue, and the defendant's motion to suppress therefore should fail, even if his challenges to the state warrants were correct. However, the defendant's challenges are not correct, as the state warrants were also supported by ample probable cause and did not contain any intentional misrepresentations, let alone any intentional misrepresentations that would require a *Franks* hearing. Finally, even if any warrant had been deficient, suppression would still not be warranted because both state and federal investigators relied upon the warrants in good faith. Therefore, the government respectfully asks this Court to deny the Motion to Suppress and to deny the defendant's request for a *Franks* hearing.

## FACTUAL BACKGROUND

*September 6, 2019, Traffic Stop*

In September 2019, the defendant was working as a police officer with the Fairmount Heights Police Department (FHPD) in Fairmount Heights, Maryland. Late at night on September 6, 2019, the defendant and another FHPD officer conducted a traffic stop of R.S., a then-19-year-old woman who was speeding and driving without a license. The defendant searched R.S.'s car, told her he was going

JA84

to impound it, and arranged to have it towed. When R.S. became agitated and began running into traffic, she was arrested, handcuffed, and eventually transported from the scene.

Rather than taking R.S. to the Department of Corrections for processing, as is standard FHPD protocol, the defendant and the other officer took her, in handcuffs, to the small, then-deserted Fairmount Heights police station. There, the defendant engaged in sexual acts with R.S. Afterward, the defendant took R.S. to the tow yard to which her car had been taken and arranged for the towing company to release the car to her without charge. The defendant issued R.S. traffic citations and a criminal citation for Disorderly Conduct.

The defendant thereafter filed an "Incident Report" regarding his interactions with R.S. In the narrative portion of that report, which gave rise to the single obstruction count in the indictment, the defendant wrote that on the previous night, he and the other officer had conducted a traffic stop and that the driver, R.S., had been placed in handcuffs, arrested for disorderly conduct, and "issued the appropriate citations." Then, according to the report, "[t]he registered owner picked up the vehicle and [R.S.] was released and sent on her way." The report identifies R.S. as the driver of the car and includes a photograph of R.S.

*The State Investigation and State Search Warrants*

FHPD learned of the traffic stop incident and opened an investigation. The investigation was later transferred to the Prince George's County Police Department ("PGCPD") Special Investigation Response Team because the incident under investigation involved a member of law enforcement.

During the state investigation, law enforcement officers spoke with numerous witnesses, including R.S. and Philip Dupree ("Dupree"), the officer who was with the defendant the night of the traffic stop. R.S. recalled for investigators the events of September 6, reported that the sex was not consensual, described the clothing the defendant was wearing that night, and identified herself in a

4

photograph that the defendant had attached to his Incident Report. Dupree also provided information about the traffic stop and additional information about his interactions with the defendant.

Throughout the course of their investigation, state investigators sought and received numerous warrants, including a warrant for the defendant's arrest on charges of rape and sexual assault, and a warrant to search his residence for evidence associated with those alleged crimes. Both were executed in early December 2019. Incident to his arrest, officers seized from the defendant his personal cell phone (a Samsung Galaxy S9 cell phone with serial number RF8K7071 FJM, referred to in state documents as "Target Device 8").[2] Following his arrest, officers took the defendant to the Department of Corrections, where he was held without bond until January 9, 2020, at which time he was temporarily released to home detention with electronic monitoring (until he was returned to state custody less than two weeks later).

During the search of the defendant's residence, which took place shortly after his arrest, officers seized multiple electronic devices, including eight cell phones and two laptops (Target Devices 1-7, 9-11). On January 17, 2020, the state obtained a separate search warrant for each device in state custody—the device seized incident to his arrest (*i.e.*, Target Device 8, the personal cell phone) and each of the devices seized pursuant to the warrant to search his residence. State investigators, however, were unable to execute the warrant on the personal cell phone because they could not unlock the phone. Evidence from the personal cell phone (including the WhatsApp recordings) was not recovered until federal agents obtained them pursuant to the federal warrant.

---

[2] This is the cell phone on which the incriminating WhatsApp voice recordings were recovered. We assume (and respond as if) the defendant's specific challenge to Target Device 1 (*see* ECF No. 13, at 9-15) is directed at all state search warrants for the defendant's electronic devices.

JA86

On January 21, 2020, a state grand jury indicted the defendant on various charges, including rape, stemming from the September 2019 traffic stop. The defendant was arraigned the next day and taken into state custody in February 2020, where he remained through his state trial.

*The Federal Investigation and Federal Search Warrant*

A month after the defendant's indictment on state charges, in March 2020, this matter was referred to the Federal Bureau of Investigation ("FBI"). The FBI's investigation focused on whether the defendant and others had violated federal civil rights, wire fraud, mail fraud, or conspiracy statutes. As part of this investigation, the FBI sought to take possession of and search the eleven devices the state had seized in December 2019, including Target Device 8—the personal cell phone seized from the defendant incident to his arrest. The Honorable Thomas M. DiGirolamo, United States Magistrate Judge, authorized the search and seizure of all eleven devices on June 23, 2020. The warrant and supporting affidavit ("federal warrant") prepared by Special Agent Jacklyn Bloomingdale are attached as Exhibit 1.

In relevant part, Agent Bloomingdale attested to facts about the federal investigation into the defendant's alleged criminal conduct, relating both to the sexual assault and a potential towing kickback scheme. With respect to the sexual assault, Agent Bloomingdale recited facts consistent with those that state investigators had included in the residence warrant and the state device warrant. Specifically, Agent Bloomingdale stated that following a traffic stop on September 6, 2019, the defendant directed R.S. to step out of the car, placed her in handcuffs, and arranged to impound the car. Agent Bloomingdale further stated that the defendant discovered condoms in the car, took some of them, asked R.S. if she was a prostitute, and suggested they could work something out. In addition, Agent Bloomingdale asserted that after taking R.S. to the police station, the defendant told her that she could either have sex with him or go to jail. R.S., who was detained and feared for her safety,

6

JA87

submitted to the defendant's demand for sex in exchange for her release and the release of the car. During the sexual act, the defendant used one of the condoms taken from the car. Agent Bloomingdale also explained that investigators had learned that the defendant took a photograph of R.S. with his cell phone during the traffic stop.

Agent Bloomingdale then attested to additional facts relating to the potential towing kickback scheme, including the fact that Dupree told investigators that the defendant "likes to tow cars." Agent Bloomingdale also outlined specific complaints from area residents about the defendant's involvement in the towing scheme. The application requested authorization to search for evidence related to specific, identified federal violations associated with the sexual assault and the towing scheme – *i.e.*, 18 U.S.C. § 242 (deprivation of rights under color of law); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1951 (extortion under color of official right), occurring from December 20, 2017, until December 3, 2019.

In the application, Agent Bloomingdale specifically requested authorization to search for "electronically stored information that might serve as direct evidence of the crimes described on the warrant," as well as "forensic evidence that establishes how each of the Target Devices was used, the purpose of its use, who used it, and when." Exh. 1, at 14. Agent Bloomingdale explained in the application that, based upon her training, experience, and research, she knew that devices like the target devices had telephone, camera, media player, GPS, and internet search capabilities and that information gathered from these capabilities, including digital picture and other types of digital files, might be contained on the target devices. Agent Bloomingdale also detailed the specific records to be searched and the specific protocol to search them. Exh. 1, at 15 and Attachment B.

JA88

The affidavit in support of the warrant contained a single immaterial mistake.[3] Agent Bloomingdale stated in the affidavit that all eleven target devices had been recovered "from the upstairs bedroom in the Defendant's residence" during the search of the defendant's home when, in fact, one of the target devices—Target Device 8, the personal cell phone—had been recovered that same day from the defendant during a search incident to his arrest. This inadvertent error occurred because Agent Bloomingdale had relied on information provided in the state warrant affidavit by Detective Cleo Savoy (the affiant for all the state device warrants), who had mistakenly copied and pasted information into the search warrant for Target Device 8 (the personal cell phone seized from the defendant incident to his arrest) from the search warrants she had prepared for the numerous other devices recovered from the defendant's residence that same day.[4]

## ARGUMENT

The defendant has challenged all three warrants and asks this Court to suppress evidence recovered from the searches on several grounds, asserting that: (1) none of the warrants is supported by probable cause; (2) a *Franks* hearing is required to address specific omissions from the residence warrant; (3) both the residence warrant and state device warrant are overbroad; (4) the residence warrant lacks sufficient particularity; (5) the federal warrant is misleading; and (6) the delay between seizing the device and applying for the federal warrant was unconstitutional. None of these arguments has merit.

Most importantly, even if either of the state warrants had been constitutionally deficient (which, as explained below, they were not), the defendant's arguments would still fail. That is because the federal warrant—which was supported by ample probable cause, was not at all

---

[3] The government has informed defense counsel and this Court of this inadvertent mistake. *See United States v. Vanderpool*, No. 21-cr-354-DLB (D. Md.) ECF No. 75, at 1-2.

[4] The Government has spoken to Detective Savoy about this issue and confirmed the information outlined above. Detective Savoy executed these search warrants, including the search warrant for Target Device 8, on January 17, 2020.

8

JA89

misleading, and was executed in a reasonable time—would have cured any residual defect from the state warrants. For that reason, the government addresses the federal warrant first.

## I.    All Three Warrants Satisfy Fourth Amendment Requirements

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In reviewing a search warrant application, a magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal citations and quotation marks omitted). In doing so, magistrates and reviewing courts recognize that "warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A magistrate judge's determination of probable cause is to be given "great deference," and a court should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Warrants must also state with particularity the place to be searched and the items to be seized. However, the Fourth Amendment does not articulate a specific "particularity requirement." *United States v. Cobb*, 970 F.3d 319, 326-27 (4th Cir. 2020), as amended (Aug. 17, 2020) (internal citations

9

JA90

and quotation marks omitted). Rather, once probable cause is established to believe evidence of a crime will be found in a particular place, only two things must be described in the warrant: "the place to be searched and the persons or things to be seized." *Id.* at 327 (cleaned up). If the warrant is specific enough that the executing officer can distinguish between the items to be seized and those that are not, or if the warrant limits the officer's discretion to seizing only evidence of a particular crime, then "the particularity standard is met." *United States v. Blakeney*, 949 F.3d 851, 862 (4th Cir. 2020). Finally, "[t]he Fourth Amendment requires that a warrant be no broader than the probable cause on which it is based." *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (internal citations and quotation marks omitted).

As explained more fully below, a commonsense reading of the warrants in this case demonstrates that each was supported by ample probable cause; neither the residence warrant nor the state device warrant was overbroad; and the residence warrant was sufficiently particular. In any event, the federal warrant is independently sufficient to support the seizure of evidence from the target devices.

A.      The Federal Warrant Satisfied Fourth Amendment Requirements

The federal warrant was supported by ample probable cause and any delay in searching the seized device was reasonable under the circumstances. For these reasons, none of the information obtained from the federal warrant should be suppressed.

   1.      *The Federal Warrant was Supported by Ample Probable Cause and was Not Misleading*

The federal warrant provided more than sufficient probable cause for officers to seize evidence relating to specific, identified federal offenses during a defined time period, and pursuant to a defined search protocol. *See generally* Exh. 1 & Attachment B. Indeed, the defendant makes no specific argument that the federal warrant lacked probable cause, nor could he. Instead, the defendant

JA91

simply adopts the arguments he makes in support of challenging the state device warrant. *See* ECF No. 13, at 15. But such a generalized attack cannot credibly establish a lack of probable cause, particularly in light of the fact that the affidavit in support of the federal warrant differs substantively from the state device warrant. Additionally, the federal warrant is immune from any infirmity in the state device warrant.

First, the federal warrant provided sufficient probable cause for officers to seize evidence relating to four identified federal offenses: 18 U.S.C. § 242 (deprivation of rights under color of law); 18 U.S.C § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1951 (extortion under color of official right). The affidavit identifies specific findings from the state and federal investigations that indicated that the defendant may have participated in both a sexual assault and a towing kickback scheme. And Agent Bloomingdale's affidavit carefully identifies the specific type of digital evidence to be seized, and sets out the basis for her belief, based upon her training, experience, and research, that evidence of the four identified federal crimes would be found on the devices.

There can be no question that the federal warrant is supported by probable cause, and the defendant's half-hearted attempt to challenge the probable cause supporting the federal warrant should be rejected. The Fourth Circuit has previously explained that even "where a warrant does not otherwise describe the evidence to be seized, that gap can be filled, at least sometimes, if the warrant instead specifies the relevant offense." *Blakeney*, 949 F.3d at 862-63 (emphasis omitted). And here there is no gap to fill, as the affidavit both describes the precise evidence to be seized *and* specifies the relevant federal offenses.

Second, the defendant's efforts to cast the federal warrant as misleading falls flat. The defendant identifies an inadvertent mistake included in the federal warrant—which does not affect

11

JA92

either the validity of the warrant or whether the warrant is supported by sufficient probable cause.[5] In fact, the defendant makes no claim that this mistake has such an effect; nor could he. Instead, he simply states, without further explanation, that the mistake—which the government discovered and brought to the attention of the defense and the Court—is "misleading."

As explained in the government's prior notice to the court, the federal warrant incorporated a "copy and paste" error from the state device warrant for Target Device 8 / the personal cell phone; specifically, that the phone had been recovered from the defendant's residence rather than from his person, incident to his arrest. The defendant was arrested (and the personal cell phone was seized) just as he was leaving his residence on the day state investigators executed the search of his residence. Agent Bloomingdale, in drafting the federal warrant application, innocently and understandably relied upon the facts that Det. Savoy, the state affiant, had included in the state affidavit for that phone; accordingly, Det. Savoy's error was reflected in Agent Bloomingdale's affidavit as well. However, there was no intent here to mislead, and the defendant does not suggest that there was. In any event, the inadvertent error was not material, as including the fact that the personal cell phone was recovered from the defendant pursuant to an arrest as he was leaving his residence would have equally supported issuance of a warrant to search its content.

This Court has recognized that such inadvertent errors occur and have no bearing on a warrant's validity. In *United States v. Crockett*, No. CR ELH-18-166, 2018 WL 5279492, at *15 (D. Md. Oct. 24, 2018), an affidavit to search a residence inaccurately had stated that two images of child pornography matched an IP address connected with the upload of 133 images. In fact, there was no IP captured at all for the two images. *Id.* The affiant stated that the inaccuracy was due to a "cut and

---

[5] The defendant also claims that the federal warrant mistakenly states that a state judge issued a warrant for the forensic download of Target Devices 1 and Target Devices 5-11. This is not a mistake, as state warrants for Target Devices 1, 5-11 were obtained and provided to the defendant in multiple discovery productions.

JA93

paste error." *Id.* The district court held that error was not made intentionally or recklessly because, among other reasons, the affiant had no "reason or motive to deliberately prepare an internal document with the wrong IP address or any IP address." *Id.* Similarly, here, neither Det. Savoy (in drafting the state warrant) nor Agent Bloomingdale (in relying in part upon the state warrant to draft the federal warrant) had reason or motive to deliberately mislead. Det. Savoy made an honest mistake, which was repeated when Agent Bloomingdale relied upon part of Det. Savoy's affidavit to prepare the affidavit for the federal warrant. *See United States v. Fall*, 955 F.3d 363, 372 (4th Cir. 2020) (finding no evidence of dishonesty or recklessness in preparing the affidavit where there was "an objectively reasonable basis for the officers to objectively believe that probable cause existed") (citing *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995)).

      2.      *The Delay in Searching Target Device 8 Pursuant to the Federal Warrant Was Not Unreasonable and Does Not Warrant Suppression*

The defendant also challenges the delay between the seizure of his electronic devices by the state and the subsequent federal search of those devices by the federal government. However, the government did not delay in searching Target Device 8 (or any other device) after obtaining a warrant to take possession of the devices from the state authorities in June 2020; indeed, the federal government did not take possession of the devices until after securing a warrant to do so. And any delay in *seeking* the warrant after learning they were in the state's possession was reasonable, and does not warrant suppression of evidence. The federal government worked diligently in its investigation into multiple potential federal offenses to secure probable cause to support a search of those devices for evidence of potential federal crimes.

Where law enforcement seizes an item, they must act diligently in securing a warrant to search that item. *See United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (explaining that a seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of

13

JA94

execution unreasonably infringes possessory interests"). To determine whether a delay following the seizure of property violates the Fourth Amendment, a court must "balance the government's interest in the seizure against the individual's possessory interest in the object seized." *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019). This inquiry focuses on two factors: (1) the justification for the delay, and (2) the defendant's possessory interest. *Id.* at 271-72. Here, all the devices were initially seized by the state pursuant to either a search warrant based upon probable cause or a contemporaneous search conducted pursuant to an arrest warrant based upon probable cause.

Relying heavily on *Pratt* and *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), the defendant argues (ECF No. 13, at 16-17) that the delay between the seizure of the devices from his home (and, we extrapolate, the seizure of Target Device 8 during his arrest), and any subsequent search by federal authorities, was unconstitutional. But the defendant's argument finds no support in either *Pratt* or *Mitchell*.

In *Pratt*, FBI agents seized the defendant's phone without a warrant after learning that it held evidence of a crime. 915 F.3d at 270. Pratt did not consent to the seizure, did not provide his phone's passcode, was not arrested, and was not taken into custody. *Id.*; *see* Brief of Pratt, TLW-16-207, 2017 WL 6806325, at *11 (Dec. 27, 2017). Agents obtained a search warrant 31 days later. *Pratt*, 915 F.3d at 270. Reversing the district court, the Fourth Circuit held that the delay in obtaining a warrant to search the contents of a cellphone after law enforcement seized it without a warrant was unreasonable under those circumstances. *Id.* at 273.

Important to its decision, the Court found that the defendant had maintained a possessory interest in the phone by refusing to provide it to law enforcement and by safeguarding its contents. *Id.* at 272. The Court, relying in part on *Mitchell*, also found the government's justification (indecision over whether to seek a warrant in North Carolina or South Carolina) unpersuasive. *Id.* In

JA95

*Mitchell*, agents approached the suspect's home without a warrant, were invited in, and took his computer's hard drive without his consent based upon a reasonable suspicion that it contained child pornography. 565 F.3d at 1349. The Eleventh Circuit held that the search of the hard drive 21 days later (because the agent left town and did not consider the warrant urgent) was unreasonable. *Id.* at 1351-52.

The circumstances surrounding the seizure and search of Target Device 8 (and all other devices at issue here) are easily distinguishable from those in *Pratt* and *Mitchell*. First, both Pratt and Mitchell involved *warrantless* seizures. *See United States v. Moore*, No. 3:19cr86, 2022 WL 16636821, at *2 (W.D.N.C. Nov. 2, 2022) (finding *Pratt* and *Mitchell* inapplicable because "they involve warrantless seizures of items to preserve potential evidence followed by unreasonable delay in obtaining warrants to search them, determine their relevance, and return them to their lawful owner if not incriminating," unlike a "search warrant for the defendant's apartment [that] authorized the seizure of cellphones"); *see also United States v. Brady*, 577 F. Supp. 3d 420, 427 (E.D. Va. 2021) (finding *Pratt* and *Mitchell* inapplicable to seizures pursuant to a warrant). Here, state authorities seized Target Device 8 incident to the defendant's arrest (which was executed pursuant to an unchallenged, valid arrest warrant as he was leaving his residence). Shortly thereafter, investigators seized the remaining electronic devices during the execution of the residence warrant. *See Moore*, 2022 WL 16636821, *2 ("The defendant has not shown that the Fourth Amendment requires officers to search items seized with judicial approval within a particular time frame.").

Second, the federal government obtained in June 2020 a probable cause warrant to both "seize" the devices from the state authorities *and* search them pursuant to the contours of the federal warrant. Thus, there was *no* delay, much less an unreasonable one, between the federal government's seizure of the devices and its efforts to search them.

15

JA96

Third, the defendant's possessory interest in his devices—a factor courts consider when evaluating the constitutionality of any delay—was "severely diminished" following his arrest and lengthy detention. In a recent and highly analogous case, *United States v. Dorsey*, No. CR RDB-18-0347, 2019 WL 3804113, at *5 (D. Md. Aug. 13, 2019), the court found no problem with a much longer delay than occurred here. In *Dorsey*, the court found that the federal government's interest in seizing a defendant's phone from the local police outweighed his "slight" possessory interest in it because the phone had remained in the local police's possession for nearly a year since his arrest, and the defendant, who remained in custody since his arrest except for a brief period, made no attempt to regain possession of it; once federal agents learned the phone was in state custody and could contain evidence pertaining to their federal investigation, they "work[ed] diligently" to secure a warrant. *Id.* at *3-*5. Under these circumstances, the court reasoned that the defendant "had no control over his phone" and "was not so much as inconvenienced by its seizure." *Id.* at *5. And the court recognized that the government was "mindful" that the defendant "was incarcerated and had no access to his phone," and that the government "diligently pursu[ed] an important investigation." *Id.*

Such is the case here. As explained above, the defendant was arrested pursuant to a valid (and unchallenged) arrest warrant in early December 2019 and was immediately taken into custody and held continuously through his 2023 trial, except for 13 days between January and February 2020, when he was briefly released. *Id.* at *5. Thus, any possessory interest he had in his phone during the period between the state's seizure of the phone and its application for a search warrant was "severely diminished" as he "was not so much as inconvenienced by its seizure." *Id.* Meanwhile, after opening its investigation in March 2020, the FBI worked diligently in pursuing its multi-faceted investigation into multiple potential federal crimes (*i.e.*, deprivation of rights, mail fraud, wire fraud, and

16

JA97

conspiracy). And they did so during the heart of a devastating (and debilitating) global pandemic.[6] Once the federal government determined that evidence of potential federal crimes may be recovered from the defendant's electronic devices, it applied for a warrant to both seize the phones and search them.

To the extent the defendant challenges the delay between when the federal government *opened* its investigation and when it applied for the warrant to seize and search the defendant's phone, the delay was reasonable because any possessory interest the defendant may have maintained in his phone while he was incarcerated was near-nonexistent. And the reason for the delay was explained by a complicated, federal investigation into multiple federal offenses during the onset of an unprecedented global pandemic. Suppression of any evidence from the defendant's device is not warranted.

      3.      *The Validity of the Federal Warrant Does not Depend Upon the Validity of the State Warrants*

The defendant makes multiple challenges to the state device warrants, which should be rejected for reasons addressed below. However, even if there were any defects in the state warrants, those defects would not negate the validity of the federal warrant. As explained above, the federal warrant was supported by probable cause and did not rely upon any of the information obtained from the state warrants.[7] *See Murray v. United States*, 487 U.S. 533, 542 (1988) (explaining that the

---

[6] *Cf. Seth v. McDonough*, 461 F. Supp. 3d 242, 247-48 (D. Md. 2020) ("The Court struggles to put into words the magnitude of COVID-19's devastation. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. . . . In Prince George's County, the virus arrived early and spread with a vengeance. As a result, the County has experienced the highest number of confirmed cases and the second-highest number of deaths in the State. . . . Due to these realities, Maryland has been under a state of emergency and Prince George's County a stay-at-home order since March."); *see also United States v. Muhammad*, No. 3:21cr34, 2021 WL 4473143, at *3 (E.D. Va. Sept. 29, 2021) ("[T]he Government could not have foreseen the pandemic and its implications for criminal jury trials.").

[7] Although the federal warrant application relied upon some information from the state warrant *applications*, the probable cause for the federal warrant, which was based upon federal investigatory efforts, was not based upon information *obtained or retrieved* from the state devices that were seized pursuant to the state device warrant. Indeed, state investigators *were unable to access* certain incriminating evidence recovered from Target Device 8.

17

JA98

"independent source doctrine" applies to the lawful seizure of tangible evidence independent of a tainted seizure); *see also United States v. Bullard*, 645 F.3d 237, 244 (4th Cir. 2011) (explaining that evidence is admissible if it would have been obtained even absent an illegal search); *United States v. Aloba*, No. 19-50343, 2022 WL 808208, *1 (9th Cir. 2022) (holding that a subsequent federal warrant for digital evidence supported by probable cause provided an independent source for the same digital evidence seized pursuant to an overbroad state warrant). In fact, state investigators were unable to extract evidence (including the WhatsApp voice recordings) from Target Device 8 / the personal cell phone, thus confirming that the government did not obtain any evidence already retrieved by state authorities pursuant to a (claimed) defective warrant.

In *United States v. Glover*, police unlawfully seized a vehicle without probable cause and held it until they secured a search warrant days later. 9 F. App'x 167, 169-170 (4th Cir. 2001) (per curiam). The Fourth Circuit held that the subsequent search was not tainted by the illegal seizure because the contested evidence "was obtained pursuant to a valid search warrant, issued on the basis of information acquired independently of the seizure." *Id.* at 171. The Court reasoned that "the nexus between the arguably illegal seizure and the search yielding the challenged evidence was 'sufficiently attenuated to dissipate the taint' of the illegal action." *Id.* at 172 (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)); *see also United States v. Blank*, No. WDQ-14-0448, 2015 WL 4041408, at *7 (D. Md. June 30, 2015), *aff'd*, 659 F. App'x 727 (4th Cir. 2016) (holding that "even if the initial seizure of the cell phone was unlawful, the Government [satisfied] the independent source doctrine" when the detectives were seeking a warrant to search the contents of a phone based on independent information they had); *see also United States v. Romero*, 585 F.2d 391, 395 (9th Cir. 1978) (upholding district court's denial of a motion to suppress where federal investigators sought a federal warrant for information that was later suppressed in a state proceeding due to defects in the state

18

warrant). The present case is similar. The facts supporting probable cause to support the federal warrant were gathered through the efforts of the federal investigation into potential violations of multiple federal crimes. Although the devices were initially seized pursuant to the state warrant, the basis for the federal interest in those devices is independent from that of the state's, and no information recovered from those devices was used to secure the federal warrant. Under these circumstances, even if there were error in any of the state warrants, there would be no basis to impute that error to the federal warrant. *Murray*, 487 U.S. at 542; *Bullard*, 645 F.3d at 244-45; *Glover*, 9 F. App'x at 171-72; *Aloba*, 2022 WL 808208, at *1. In any event, as explained below, the state warrants were based on probable cause and complied with Fourth Amendment requirements.

B.      The State Residence Warrant Satisfied Fourth Amendment Requirements and A *Franks* Hearing is Not Required

      *1.*      *The State Residence Warrant was Supported by Ample Probable Cause, and is Sufficiently Particular and Not Overbroad*

The state residence warrant was supported by ample probable cause that "evidence of a crime [would] be found in" the defendant's residence at the time of the search. *Gates*, 462 U.S. at 238. The warrant application, prepared by Lieutenant M. Ebaugh of the PGCPD, set forth detailed facts uncovered during the investigation into an alleged sexual assault, that three types of evidence of that specific crime would likely be found in the defendant's residence: the specific clothing the defendant was wearing the night of the traffic stop (*i.e.*, Khaki pants and an army fatigue shirt); the brand of condoms the defendant took from the car R.S. was driving and then used during the alleged assault (*i.e.*, Magnum condoms in gold wrappers); and electronic devices that may contain evidence of the offense. Exh. 2, at 2-4. The basis for obtaining the electronic devices was detailed in the application by Lt Ebaugh: based upon his training and experience, Lt. Ebaugh explained that the defendant had already taken one photograph of R.S. and the investigation had uncovered reason to believe that,

JA100

consistent with others who derive personal satisfaction from certain crimes and retain mementos of them, the defendant may have taken other photos as well. *Id.* (And, in fact, the investigation proved this to be the case, as additional photos of R.S., taken the night of the traffic stop, were found on the defendant's personal cell phone). The Honorable Dorothy Engel, Judge, Circuit Court for Prince George's County, signed the warrant for the defendant's residence on December 2, 2019.

The defendant nonetheless argues (ECF No. 13, at 4) that the three-month delay between the alleged sexual assault and the search of the defendant's residence rendered "stale" any probable cause supporting the warrant, and that the warrant failed to establish how "non-distinctive" items like clothing and condoms, as well as a single photograph of R.S., constitute evidence of a crime. These arguments should be rejected.

The fundamental inquiry in a staleness challenge is "whether the alleged facts are so dated that, at the time of the search, it is doubtful that evidence of criminal activity can still be found." *United States v. Johnson*, 865 F. Supp. 2d 702, 705 (D. Md. 2012) (citing *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984)). This inquiry requires a full accounting of "all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property seized." *United States v. Ebert*, 61 F.4th 394, 401 (4th Cir. 2023). Thus, "[t]he mere lapse of substantial amounts of time is not controlling in a question of staleness." *United States v. Mobley*, No. CR ELH-21-00383, 2022 WL 4120581, at *13 (D. Md. Sept. 8, 2022) (citing *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997)).

Here, the nature of the alleged unlawful activity and property seized make clear that probable cause for the warrant was not stale and that the identified items were likely to remain in the defendant's residence. First, Lt. Ebaugh explained in the affidavit that sexual offenders often retain mementos of their criminal activity and that the defendant was known to have: (1) used his personal

20

cell phone to take at least one photograph of R.S., and (2) taken condoms from the car R.S. was driving. Both types of evidence could serve as mementos that would likely be found at the defendant's residence. *See United States v. Ramsburg*, 114 F. App'x 78, 82 (4th Cir. 2004) (unpublished) (rejecting claims of staleness "when the instrumentalities of the alleged activity tend to be retained").

Second, the nature of the property sought pursuant to the warrant—Khaki pants, military fatigue clothing, Magnum condoms, and digital evidence—supported a finding of probable cause. These items were described with particularity in the warrant as either having been used or having been taken by the defendant during the alleged crime, and were of a type that would not normally be destroyed or discarded. The Fourth Circuit has previously explained that a delay between an offense and a search for items that are likely to be retained and kept in one's residence does not render stale the probable cause supporting the warrant. *See United States v. Farmer*, 370 F.3d 435, 439-40 (4th Cir. 2004) (finding "documents including . . . records of payment . . . bank statements, canceled checks, check registers, [and] all payment receipts" to be "precisely the types of records that are not ordinarily destroyed or moved about from one place to another") (internal citation omitted); *see also United States v. Bolling*, No. 2:21-00087, 2023 WL 5616188, at *9 (S.D. W.Va. Aug. 30, 2023) ("Evidence not likely to become stale includes . . . electronic devices.") (citing *Farmer*, 370 F.3d at 439-440). Digital information may be stored on devices for years and recovered even after a suspect's attempt to delete it. *Ebert*, 61 F.4th at 401. For this reason, it was more than likely that any digital evidence of the crime would be found and recovered from the defendant's devices in a search three months—or even three years—later. Likewise, it is precisely the innocent nature of the other items sought—*e.g.*, clothing, and condoms—that makes it likely that they would be found in the defendant's residence months (or even years) after the alleged offense. *See United States v. Pelham,*

21

749 F. Supp. 304, 308-09 (D.D.C. 1990) (finding a six-month delay "less significant" because the warrant sought clothing and documents, which were "items innocent on their face" rather than obvious contraband that a suspect would likely keep for "only a short period of time"). This Court should reject defendant's argument that the probable cause underlying the state residence warrant was "stale," as substantial evidence supported Judge Engel's decision that there was "a fair probability that evidence of a crime would be found at" the defendant's residence. *Ebert*, 61 F.4th at 401.

The state residence warrant was also sufficiently particular and not overbroad. The defendant primarily challenges (ECF No. 13, at 5-6) the seizure of all electronic media capable of retaining and transmitting images. But this challenge fails, as the warrant plainly "identifie[d] the items to be seized by their relation" to the alleged sexual assault and, as explained above, set forth ample probable cause to support a finding that the evidence would be found (and why they would be found) in the defendant's residence and/or on the defendant's electronic media. *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). No more is required. *Cobb*, 970 F.3d at 327.

2.     *A* Franks *Hearing is Not Required*

Defendant asserts (ECF No. 13, at 6) that a *Franks* hearing is required because the residence warrant contained allegedly intentional or reckless material omissions concerning the photograph of R.S. and the purpose for the initial traffic stop. This assertion is groundless and this Court should deny defendant's request for a *Franks* hearing.

A defendant may receive a *Franks* hearing only if he first makes "a substantial preliminary showing" that: (1) allegations in the affidavit constitute deliberate falsehoods (or a reckless disregard for the truth); *and* (2) absent the false allegations, the remaining allegations are insufficient to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). This showing must be

JA103

more than conclusory and must be accompanied by a detailed offer of proof. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). The defendant has not made (and cannot make) either showing.

Here, the defendant identifies three alleged omissions from the state residence warrant that form the basis of his request for a *Franks* hearing. The defendant accuses the affiant of "misrepresentations" because he did not mention that: (1) R.S. was initially stopped for speeding; (2) law enforcement was in possession of a photograph of R.S. taken at the traffic stop; and (3) R.S. had not indicated, during her law enforcement interviews, that additional photographs had been taken. But after identifying these "omissions," the defendant both fails to explain why these alleged "omissions" were important, or to support his bare allegation that they were either "deliberate falsehood[s]" or statements made in "reckless disregard for the truth." *Franks*, 438 U.S. at 171.

On the first point, it is not clear why any of the three alleged "omissions" would be important, let alone critical, to a statement of probable cause; the government cannot think of any reason (and the defense has offered no reason) why a warrant based on probable cause that an officer took a handcuffed motorist to a police station and raped her would need to include the fact that the motorist was initially stopped for speeding. On the second point, it is not clear why it would be important (let alone critical) to mention that officers were already in possession of a copy of one photograph from the scene; inclusion of that fact would have strengthened, not weakened, the statement of probable cause, because the fact that the defendant took a photo on his cell phone would have underscored Lt. Ebaugh's sworn statement that he knew from his training and experience that "persons who commit crimes which they derive personal satisfaction [from] often keep mementos, trophies, or detailed accounts of their experiences." Exh. 2, at 3. On the third point, it is not clear how R.S. could have been expected to know how many photographs the defendant may have taken of her with his phone, and thus it is unclear how "omission" of this fact could be relevant, let alone important or critical.

23

JA104

Moreover, even if the identified "omissions" were in fact relevant, the defendant has failed to demonstrate that they were intentional misrepresentations. The Fourth Circuit has instructed that establishing "mere negligence" in recording facts in an affidavit is "not enough." *Colkley*, 899 F.2d at 301. Nor is proof of an "intentional omission in the weak sense." *Id.* Rather, a defendant must identify omissions that are "designed to mislead" or are made "in reckless disregard of whether they would mislead." *Id.* This "burden is a heavy one." *United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994).

The defendant's "bare allegations" of intentional, misleading omissions absent a "substantial preliminary showing" of proof are far from sufficient to warrant a *Franks* hearing. *See United States v. Chandia*, 514 F.3d 365, 373 (4th Cir. 2008) (denying *Franks* hearing where motion to suppress did not contain an offer of proof either in the form of "affidavits or sworn or otherwise reliable statements of witnesses" or by "satisfactorily explain[ing]" their absence). The defendant has made no showing and offered no proof, much less "a detailed offer of proof," that Lt. Ebaugh had any intent to mislead the issuing judge. *Colkley*, 899 F.2d at 300 (requiring a defendant's showing of an intent to mislead to be "more than conclusory" and "accompanied by a detailed offer of proof"). Moreover, the Fourth Circuit has expressed "doubts about the validity of inferring bad motive" from omissions alone. *Id.* at 301. To do so, the Court explained, would "collapse[] into a single inquiry the two elements—'intentionality' and 'materiality'—which *Franks* states are independently necessary." *Id.*

Even assuming that the alleged omissions were relevant, and even assuming an intent to mislead, a *Franks* hearing would still be unwarranted. "An omission must do more than potentially affect the probable cause determination: it must be '*necessary* to the finding of probable cause.'" *Id.* (citing *Franks*, 438 U.S. at 156) (emphasis added). In other words, the defendant must demonstrate

24

JA105

that, if the "omitted" information had been included, that would have "defeat[ed] probable cause." *Id.* The defendant has not even claimed, let alone demonstrated, that any of these alleged "omissions" could even possibly have defeated probable cause.

For these reasons, this Court should deny the defendant's request for a *Franks* hearing.

C.       The State Device Warrants Satisfied Fourth Amendment Requirements

The state device warrants—through which the state obtained authority to search each of the electronic devices seized pursuant to the residence warrant and (for Target device 8 / the personal cell phone) incident to arrest—were supported by probable cause and were not overbroad. For these reasons, none of the information obtained from the state device warrants should be suppressed.

       *1.*     *The State Device Warrants Were Supported by Ample Probable Cause to Seize All Stored Data*

The state device warrants provided sufficient probable cause for officers to seize all stored data, including photographs, emails, text messages, video clips, contacts, and call details, from the devices recovered pursuant to the arrest warrant and the residence warrant. The affidavits, prepared by PGCPD Detective Cleo Savoy, make clear that the nature of the defendant's alleged criminal activity was such that the sought-after evidence could be located in any component of his cell phone. Det. Savoy explained in her affidavit that the defendant had been arrested and charged with rape. *See, e.g.*, Exh. 3, at 3. Det. Savoy further explained that the investigation had determined that the defendant had, since the night of the traffic stop, been in "constant communication" with both Officer Dupree and employees from the tow company he used that night. *Id.* And Det. Savoy explained that the defendant had taken a picture of R.S. with his cell phone. *Id.* Considering these facts, it was Det. Savoy's belief, based upon her training and experience, that where more than one person participated in (and thus had knowledge of) an offense (*e.g.*, Officer Dupree or the towing employees), they "often communicate in advance" through the "use of cellular telephones." *Id.* at 4. Det. Savoy also explained

25

JA106

that subscriber information, call detail records, and text and call history records are created and stored by the cellular carrier, and that call records can create connections between co-conspirators. *Id.* Using this information, Det. Savoy explained, she could determine if the defendant was involved in the alleged rape of R.S. *Id.*

The defendant, citing no Fourth Circuit authority, asserts that evidence seized pursuant to the state device warrants should be suppressed because the warrant did not establish probable cause with respect "to each specific category of files or information" to be searched. ECF No. 13, at 13. But it is well-settled in the Fourth Circuit that "[a]s to the scope of an electronic search, if there is probable cause to search a computer [or a cell phone] for evidence of a crime, that probable cause is usually sufficient to sustain a search of the entire computer." *United States v. Nelson*, No. CR DKC 20-0038, 2022 WL 2789093, at *10 (D. Md. July 15, 2022) (citing *Cobb*, 970 F.3d at 329 and *Williams*, 592 F.3d at 520). Because Det. Savoy's affidavit provided a "substantial basis" for the magistrate judge to find probable cause that the defendant's phone contained evidence of criminal activity throughout its files, *Lalor*, 996 F.2d at 1581, a search of the entire phone was appropriate. *United States v. Hurwitz*, 459 F.3d 463, 473-74 (4th Cir. 2006) (upholding magistrate judge's finding that probable cause supported seizing all of a suspect's business files because investigation suggested they were "permeated" with evidence of criminal activity) (citing *United States v. Oloyede*, 982 F.2d 133, 141 (4th Cir. 1992)); *see also Cobb*, 970 F.3d at 329.

2.    *The State Device Warrants Were Not Overbroad*

Once again citing no Fourth Circuit authority, the defendant asserts that the state device warrants were overbroad because they did not identify the specific files to be searched or the manner in which to search them. This argument fails.

26

JA107

First, "so long as the Fourth Amendment's basic requirements of probable cause and particularity are met," as they were here, "officers are 'impliedly authorized . . . to open each file on the computer and view its contents, at least cursorily, to determine whether the file [falls] within the scope of the warrant's authorization." *Cobb*, 970 F.3d at 329 (citing *Williams*, 592 F.3d at 521-22). Nothing more is required. In *Cobb*, the Fourth Circuit held that a warrant was not lacking in particularity even though it did not explain "the types of files sought, the location of the files, the timeframe or the relationship between the files and the information about the" suspected crime. *Id.* at 326. The Court reasoned that although officers suspected evidence of criminal activity was located on the suspect's computer, the officers "could not foretell" what evidence that may be or where it may be located on the computer. *Id.* at 330. But "[t]hat is not what the Fourth Amendment demands." *Id.*

Second, although it has become practice in this District to include search protocols in warrant affidavits (such as those included in the federal warrant), doing so is not constitutionally required and the absence of such protocols does not require suppression. The Supreme Court has specifically held that "[n]othing in the language of the Constitution or in [the Supreme Court's] decisions interpreting that language suggests that, in addition to the requirements set forth in the text [of the Fourth Amendment], search warrants also must include a specification of the precise manner in which they are to be executed." *United States v. Grubbs*, 547 U.S. 90, 98 (2006) (*quoting Dalia v. United States*, 441 U.S. 238, 255 (1979)).

To the contrary, as the *Dalia* Court explained, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant—subject of course to the general Fourth Amendment protection against unreasonable searches and seizures." *Dalia*, 44 U.S. at 257. The Court continued that "[i]t would extend the

27

JA108

Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the court must set forth precisely the procedures to be followed by the executing officers." *Id*. at 258.

The majority of the courts of appeals agree. In *United States v. Richards*, the Sixth Circuit specifically recognized that "the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis: 'While officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant, . . . a computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.'" *United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) (quoting *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009)) (collecting cases from the 1st, 3rd, 6th, 7th, 8th, 9th, 10th, and 11th Circuits).

Because a search protocol is not a constitutional requirement, the absence of one does not justify suppression. The search here was within the scope of the warrant (which was supported by probable cause), and therefore officers could lawfully search for evidence related to the sexual assault of R.S. The defendant makes no allegation, nor does he offer evidence to demonstrate, that officers, in searching electronic evidence pursuant to the state device warrant, continued to search or seized evidence *not* within the warrant's scope. Therefore, the defendant's argument fails.

## II.    Investigators Relied Upon the Warrants in Good Faith

Even assuming that any of the supporting affidavits failed to establish probable cause, or that a warrant was otherwise defective, or that a search pursuant to a warrant was unreasonable, suppression would not be proper in this case. When officers seize evidence in good faith reliance on a facially valid warrant issued by a neutral magistrate, and the affidavit is later found to lack probable

28

JA109

cause, the evidence is not subject to the Fourth Amendment's exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 908 (1984); *Herring v. United States*, 555 U.S. 135, 140 (2009) ("The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies."). When considering whether to apply the good-faith exception, courts "should examine the totality of the information presented to the magistrate in deciding whether an officer's reliance on the warrant could have been reasonable." *United States v. Legg*, 18 F.3d 240, 243 n.1 (4th Cir. 1994). Even so, "searches conducted 'pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.'" *United States v. Burton*, 756 F. App'x 295, 301 (4th Cir. 2018). Under this standard, the officers' and agents' reliance on the warrants was certainly reasonable.

As explained above, the facts set forth in each affidavit established the affiants' bases for believing that the defendant had engaged in both state or federal offenses and why evidence of those offenses would be found in the places identified. Moreover, the "cut and paste" error in the state device warrant, which was then inadvertently transferred to the federal warrant, had absolutely no bearing on determining probable cause. More importantly, such a "Scrivener's error" would not prevent an officer or agent from relying upon the warrant in good faith. *See United States v. Waker*, 463 F. Supp. 2d 348, 353 (W.D.N.Y. Nov. 1, 2006) (finding that a warrant with the incorrect date of April 30, 2004 instead of 2005 was an insignificant Scrivener's error); *see also United States v. Drake*, No. 1:04cr53, 2008 WL 111337, at *4, *5 n.2 (N.D. W. Va. Jan. 9, 2008) (finding no intent to mislead and recognizing that "[t]he present practice of using computers to reprint the body of documents results in dates and other data within the body of one document to be inadvertently made a part of another document").

JA110

The defendant does not establish—or even allege—any grounds upon which the supposed deficiencies of the warrants render the officers' and agents' reliance on the facially valid warrants objectively unreasonable.[8] Because the warrants were supported by probable cause and law enforcement officers acted in good faith in securing and executing the warrants, the defendant's motion to suppress evidence obtained pursuant to the warrants should be denied.

## CONCLUSION

For the reasons stated herein, this Court should deny the defendant's Motion to Suppress.


Respectfully submitted, this 8th day of September, 2023.


Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Elizabeth Hutson*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Elizabeth A. Hutson
Trial Attorney
Elizabeth.Hutson@usdoj.gov


Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

---

[8] The defendant does assert (ECF No. 14, at 8) that the good faith exception is unavailable where an affiant includes or omits intentionally misleading information in an affidavit and that misleading information forms the basis of probable cause. But, as fully explained above, *see* p. 24, none of the identified "omissions" from the residence warrant was intentionally misleading or material to the justification for the warrant.

30

JA111

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS has been served by e-filing upon counsel for the Defendant, this 8th day of September, 2023.

*/s/ Elizabeth Hutson*
Elizabeth Hutson

JA112

# EXHIBIT 1

DJD/cg  USAO #2020R00256

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Maryland

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>TARGET DEVICES CURRENTLY LOCATED AT 6707<br>GROVETON DRIVE, CLINTON, MARYLAND | )<br>)<br>)<br>)<br>)<br>)    Case No.    8:20-mj-1605 TMD |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

TARGET DEVICES LISTED IN ATTACHMENT A THAT ARE CURRENTLY LOCATED AT 6707 GROVETON DRIVE, CLINTON, MARYLAND  (See Attachment A)

located in the _____ District of _____ Maryland _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Extortion Under Color of Official Right |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1951 | Extortion Under Color of Official Right |

The application is based on these facts:

See affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jaclyn Bloomingdale, Special Agent, FBI
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3).

Date:  6/23/2020

_____
*Judge's signature*

City and state:    Greenbelt, MD

Thomas M. DiGirolamo, Magistrate Judge, US Dist. Court
*Printed name and title*

USA_000483

JA114

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF )
TARGET DEVICES CURRENTLY )    CASE NO.    8:20-mj-1605 TMD
LOCATED AT 6707 GROVETON )
DRIVE, CLINTON, MARYLAND )    UNDER SEAL
)

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A SEARCH WARRANT

1.    I, Jaclyn Bloomingdale, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2.    As a FBI Special Agent, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.    I have been a Special Agent with the FBI since March 2005. I am currently assigned to the Public Corruption/Civil Rights squad in the Baltimore Division of the FBI and have been assigned investigations concerning public corruption and civil rights violations. During my employment with the FBI, I have gained experience through training in seminars, classes, and daily work related to conducting these types of investigations. I have participated in the execution of numerous search warrants, some of which have involved public corruption offenses. Many of the search warrants resulted in the seizure of computers, cell phones and/or "smart phones," magnetic storage media for computers, other electronic media, and other items evidencing violations of federal laws.

USA_000465

JA115

4.      The statements in this affidavit are based on: my personal knowledge and observations during the course of this investigation; information obtained by or known to other law enforcement agents that they conveyed to me; my personal review of records, documents, and other physical evidence obtained during the investigation; and information gained through my training and experience. This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant.

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones and laptops described herein and in Attachment A (collectively, the "**Target Devices**")—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

6.      I submit that there is probable cause to believe that the **Target Devices** contain evidence of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1951 (extortion under color of official right).

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      As listed in Attachment A, the **Target Devices** to be searched are:

a.      **Target Device 1:** Samsung Galaxy III with HEX number: 990 004 700 187 55 Jan 17th

b.      **Target Device 2:** Apple IPhone Model: A1332 FCC: BCG:E2380B OC:579C-E2380B

c.      **Target Device 3:** Dell Laptop Product Key: cwthy-bg3cr-2b38w-8qm4r-ygtt8

d.      **Target Device 4:** Dell Laptop Serial Number: 5RFH2R2

2

USA_000466

JA116

8:20-mj-1605 TMD

e.   **Target Device 5:** Kyocera Model: E4277 cell phone with HEX number AOO000 27C 06E 40 Jan 17th

f.   **Target Device 6:** Samsung Cell Phone with HEX number ADO000 392 73A FB Jan 17th

g.   **Target Device 7:** Samsung Galaxy S6 edge+ cell phone Jan 17th

h.   **Target Device 8:** Samsung Galaxy S9 cell phone with serial number RF8K7071 FJM

i.   **Target Device 9:** Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553

j.   **Target Device 10:** Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB1 06 10

k.   **Target Device 11:** Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 06108886

8.   Law enforcement recovered the **Target Devices** while executing a search warrant at ██ Duel Place, Fairmount Heights, Maryland 20743 on December 2, 2019. The **Target Devices** have been in the custody of the Prince George's County Police Department at 6707 Groveton Drive, Clinton, Maryland.

9.   On or about January 17, 2020, the Honorable Sean D. Walker, Circuit Court Judge for Prince George's County, Maryland, signed a search warrant for the forensic download of **Target Device 1** and **Target Devices 5–11**.

10.   In my training and experience, I know the **Target Devices** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Devices** first came into the possession of law enforcement.

**PROBABLE CAUSE**

11.   Based on my education, training, and experience, and the experience of other law enforcement officers as relayed to me, I know that individuals involved in wire fraud, mail fraud,

3

USA_000467

JA117

and extortion under color of official right often use cellular telephones and computers to facilitate their criminal activity. I know that persons involved in wire fraud, mail fraud, and crimes of violence, including extortion under color of official right utilize computers, cellular telephones, and other electronic devices to communicate with witnesses and possible co-conspirators before and after the crime and to maintain records of these contacts. Additionally documents and records relating to extortion payments may also be stored or maintained on electronic devices, including but not limited to, banking and other financial transactions.

12.    I know, and other law enforcement officers familiar with crimes of extortion under color of official right investigations have communicated to me, that individuals involved in extortion often utilize computers and cellular telephones to store photographs of victims of their crimes, photographs of money obtained from receiving bribes, and photographs of scenes where crimes were committed.

A.  VANDERPOOL's rape of victim, R.S.

13.    Former Fairmount Heights Police Department office Martique VANDERPOOL joined the Fairmount Heights Police Department on December 20, 2017, and resigned from the department on November 23, 2019.

14.    On September 6, 2019, at approximately 2322 hours, VANDERPOOL, and a witness officer, Philip Dupree, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. VANDERPOOL and Dupree stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration. VANDERPOOL asked R.S. to step out of the vehicle because she did not have her driver's license on her person. R.S. became upset and wanted to leave. VANDERPOOL then told R.S. that he was going to impound her vehicle. R.S. began to cry and started yelling. Dupree put R.S.

4

USA_000468

JA118

in handcuffs. VANDERPOOL called a tow company, Tino's Towing, to have R.S.'s vehicle impounded.

15.    While doing an impound inventory of the vehicle, VANDERPOOL noticed some condoms in the armrest and asked R.S. if she was a prostitute. R.S. repeatedly asked VANDERPOOL if he could do a hook and release of her vehicle, and VANDERPOOL replied, "I'll see what we can do." VANDERPOOL stated that maybe he and R.S. could work something out. R.S. replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." R.S. heard VANDERPOOL tell the tow truck driver, "Don't worry Kevin, I'll get you another one." VANDERPOOL told the tow truck driver to take the vehicle, and the tow truck driver complied. Dupree left the scene, and VANDERPOOL took R.S. to the Fairmount Heights Police Station, located at 6100 Jost Street, Fairmount Heights, Maryland.

16.    When Dupree returned to the Fairmount Heights Police Station, he observed R.S. sitting in a chair. According to R.S., once she and VANDERPOOL were at the police station, VANDERPOOL asked R.S., "So what are we going to do about this?" VANDERPOOL told R.S. that she could either have sex with VANDERPOOL or get arrested and go to jail. R.S. was detained by VANDERPOOL and unable to leave the police station causing R.S. to fear for her safety. R.S. unwillingly complied with VANDERPOOL's demand for sex in exchange for her release and the release of her vehicle.

17.    VANDERPOOL demanded that R.S. get on top of him and forced R.S. to engage in vaginal intercourse. After the vaginal intercourse, VANDERPOOL went to the back of the office and returned with citations issued to R.S. R.S. was confused and began crying. VANDERPOOL called the tow truck driver to release R.S's vehicle to her at no cost. Once R.S. was released, R.S. immediately reported the incident to her mother.

5

USA_000469

18.     During the investigation, investigators learned that VANDERPOOL took a photograph with his cellular telephone during the traffic stop, that VANDERPOOL used condoms, taken from the R.S's car, to have vaginal intercourse with her, and that VANDERPOOL was HIV positive when he forced R.S. to have vaginal intercourse with him.

B.  Interview of DUPREE

19.     Detectives learned through an interview of Dupree on November 7, 2019 that VANDERPOOL "likes to tow cars." When Dupree was asked why, he replied, "Probably because, um, you know, that's – that's the thing that people do. They tow cars to get extra money." Dupree continued, "Baltimore city has somethin' like that goin' on. I think – what do they call it? Like, it's a kickback or somethin' like that." When Dupree was asked how that would work, he replied, "So, I guess um, you would – you – you I guess you tow the – I- I-guess you pull the person over, and you run their information and you don't have, um, you don't have no insurance, you don't have no license." Dupree continued, "So, how do you wanna get out of this? You wanna pay me, um $300 or you want me to tow your car? I guess it works like that."

20.     Dupree told investigators that he hears complaints from people in the community regarding Fairmount Heights Police Department's towing practices, including "his department likes to tow cars" and "y'all must have something going on with the tow company."

21.     When Dupree was asked if he ever saw VANDERPOOL take a kickback from a tow company, he said, "No, he's not gonna do that in front of me." Dupree continued,

> Most police officers probably don't wanna do an impound. They don't. I mean, it's – it's stupid. You - you get nothing out of doing an impound. You don't. I mean, what - what - I mean, it's not like a 10-15. I mean, you get – you're impoundin' a car, so what? They would have to be - I- I'm just – I'm just. You got an officer impoundin' 60 vehicles in a month? What - what would be your reason to do that? I could see 60 stops.

USA_000470

22.    As investigators questioned Dupree to determine how VANDERPOOL would benefit from towing cars, an investigator summarized the scheme by saying,

> So, basically, the tow company is sayin', "If you can find a car for me to tow, I'll give you $60 for every car." So, that would be tow company working with officer. But then when you have the cars, the vehicles, or where you're – you're basically out looking for women or you're looking for women with kids, and then you're basically, like, "Hey, we're gonna tow your car unless you give them, all of that money is goin' to the officer."

Dupree agreed with the investigator's summary of the towing scheme. Dupree told investigators that the victims of the towing scheme do not file complaints because they are typically driving without a license or car insurance and feel as though got off "scott-free."

C.  State Search Warrant Execution at VANDERPOOL's residence on December 2, 2019:

23.    On or about December 2, 2019, the Honorable Dorothy Engel, Circuit Court Judge for Prince George's County, Maryland, signed a search warrant for the residence located at ▮ Duel Place, Fairmount Heights, Maryland 20743, a residence known to investigators to be the residence of Fairmount Heights Officer Martique VANDERPOOL. On or about December 3, 2019, law enforcement executed the search warrant at ▮ Duel Place, Fairmount Heights, Maryland 20743. During the search of the residence, law enforcement recovered, among other items, the **Target Devices**, various Velcro law enforcement patches, currency that appeared to be counterfeit, and approximately twenty Fairmount Heights Police towing impound records dated between December 21, 2018 and June 4, 2019.

24.    **Target Device 4** is believed to be the property of the Internal Revenue Service. VANDERPOOL was employed by the IRS and served as a revenue officer for its collection function assigned to the Baltimore, Maryland post of duty. His duties consisted of collecting unpaid past due federal income tax owed by businesses and individuals along with unfiled federal tax returns. He began his employment with the IRS on August 19, 2019 and was terminated by

7

USA_000471

JA121

the IRS on December 17, 2019 for cause in connection to his arrest for sexual assault. He was designated as a probationary employee during his first year of employment with the IRS.

D. Towing complaints involving Vanderpool

25.    The city of Fairmount Heights has received several complaints regarding VANDERPOOL's towing practices. The following are examples of complaints, as told by the complainants.

26.    On January 23, 2019, I.B. sent an email to Fairmount Heights Police Chief Watkins requesting to know if the 1200–1300 blocks of Chapelwood Lane fell within the jurisdictional boundaries of the Fairmount Heights police department. On January 24, 2019, I.B. received a reply from chief@fairmountheightsmd.gov stating, "not within our jurisdiction." I.B. responded by requesting to know why his vehicle was towed by Tino's Towing from the 1200–1300 block of Chapelwood Lane where it was legally parked. I.B. explained that upon contacting VANDERPOOL, I.B. was directed to the police station to pay $100 in cash and $175 to Tino's Towing. After reviewing I.B.'s complaint, Fairmount Heights Police Chief Watkins responded with the following in an email:

> Rather than address all the questions, the officer lacked proper jurisdiction to impound the vehicle. The reasons would certainly dictate the placement of a "72" hour violation notice to the owner would have been in order, however, this should have been the responsibility of either PGPD or DPW&T and not FHPD. I'm certainly sorry this happened to you and I will ensure you that no one from this department conducts these types of towing operations outside of our jurisdiction. I have contacted Tino's Towing and directed the vehicle be released to you without charge. Please contact me if there are any problems.  Chief

27.    On March 29, 2019, P.W. reported that while attending a funeral at First Baptist Church Fairmount, her vehicle drifted down the street and came to rest on a curb.  No injuries or property damage occurred. VANDERPOOL advised P.W. that her vehicle was being impounded and that to avoid receiving citations, P.W. had to go to the police station and pay a $100 vehicle

8

USA_000472

JA122

release fee. Once P.W. paid the $100 release fee at the police station, P.W. had to pay another $175 in cash to get her vehicle back to Tino's Towing. When P.W. was at the police station, P.W. heard VANDERPOOL on the phone with the tow truck driver. Upon review of her vehicle release receipt, P.W. noticed that it did not have a citation number. P.W. contacted Fairmount Heights Police Chief Watkins via email. Chief Watkins told P.W. to meet with Fairmount Heights Police Lieutenant Ivey, who P.W. met with to discuss her complaint. P.W. did not remember the name of the police officer who towed her car, but would recognize his face if shown a picture.[1]

28.    Fairmount Heights Police received a complaint from A.G., who claimed that his vehicle was unlawfully towed on July 2, 2019 by Tino's Towing in the Seat Pleasant Police Department jurisdiction at the direction of Fairmount Heights Officer VANDERPOOL. A.G. stated that he contacted the Seat Pleasant Police Headquarters, who had no record of the tow. A.G. went to the Fairmount Heights police station to file a complaint about his car being towed and spoke with Fairmount Heights Police Lieutenant Ivey. A.G. eventually paid $100 to Fairmount Heights for the vehicle release and $175 to Tino's Towing, who demanded payment in cash only. A.G. was issued a citation for impeding traffic by Fairmount Heights but does not believe it was filed because A.G. never received anything in the mail regarding the citation. A.G. contacted Lieutenant Ivey regarding the status of his complaint after learning about VANDERPOOL's arrest for rape. Lieutenant Ivey told A.G. that the Captain has the complaint sitting on his desk.

29.    The complaints of Vanderpool's towing victims demonstrate that Vanderpool was illegally towing vehicles. Based upon the discovery of impound records at

---

[1] VANDERPOOL signed the Tino's Towing receipt dated March 28, 2019.

9

USA_000473

JA123

VANDERPOOL's residence, Dupree's statement to investigators that VANDERPOOL was involved in a towing scheme to receive kickbacks, interviews of citizens who had their cars towed by VANDERPOOL, VANDERPOOL's statement to the tow truck driver ("Don't worry Kevin, I'll get you another one"), and my knowledge regarding towing kickback schemes, I believe that VANDERPOOL was receiving money from Tino's Towing for every vehicle that VANDERPOOL tows. Additionally, when VANDERPOOL conducts vehicle stops on vehicles that he could potentially impound, VANDERPOOL extorts the driver for money.

E. Toll Analysis:

30.    Below is a chart containing VANDERPOOL's contacts with Tino's Towing employees, Valentino HINES and Kevin OSHIN, from September 6, 2019 through December 3, 2019:

| Dates of Activity | Contacts With (User) | Total Contacts | Texts | Calls |
|---|---|---|---|---|
| Sept. 6, 2019 to Oct. 30, 2019 | 202-294-2950 (Valentino "Tino" Hines) | 58 | 12 | 46 |
| Sept. 6, 2019 to Oct. 5, 2019 | 202-281-6776 (Kevin Olekayode Oshin) | 69 | 24 | 45 |

The chart shows that VANDERPOOL was in frequent telephonic contact during the above noted time periods with the the owner of Tino's towing, Valentino Hines and Tino's towing employee, Kevin Oshin.

**TECHNICAL TERMS AND DEFINITIONS**

31.    Based on my training and experience, I use the following technical terms to convey the following meanings:

32.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio

10

USA_000474

JA124

8:20-mj-1605 TMD

signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

33. Based on my training, experience, and research, and the training, experience, and research of other law enforcement officers, I know that the **Target Devices** have capabilities that allow them to serve as a wireless telephones, and that many wireless telephones have the capabilities to allow them to serve as a digital camera, portable media players, GPS navigation devices, and/or internet search devices. Based on my training, experience, and research, and the training, experience, and research of other law enforcement officers, I also know that wireless telephones such as the **Target Devices**, as well as any of their removable media, serve to record and store pictures as digital picture files and/or store other types of digital files. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

11

USA_000475

JA125

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35.    Forensic evidence: As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the **Target Devices** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Devices** because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a photograph that has been deleted from the device).

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a

12

USA_000476

JA126

computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36.     Nature of examination: Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Devices** to human inspection to determine whether they contain evidence described by the warrant.

37.     Manner of execution: Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

13

USA_000477

JA127

## CONCLUSION

38.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Devices** described in Attachment A to seek the items and information described in Attachment B.

Jaclyn Bloomingdale, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _23_ day of June 2020.

Honorable Thomas M. DiGirolamo
United States Magistrate Judge

14

USA_000478

JA128

8:20-mj-1605 TMD

## ATTACHMENT A
*Items to Be Searched*

The property to be searched are the **Target Devices:**

a. **Target Device 1:** Samsung Galaxy III with HEX number:  990 004 700 187 55 Jan 17th

b. **Target Device 2:** Apple IPhone Model: A1332 FCC: BCG:E2380B OC:579C-E2380B

c. **Target Device 3:** Dell Laptop Product Key: cwthy-bg3cr-2b38w-8qm4r-ygtt8

d. **Target Device 4:** Dell Laptop Serial Number: 5RFH2R2

e. **Target Device 5:** Kyocera Model: E4277 cell phone with HEX number AOO000 27C 06E 40  Jan 17th

f. **Target Device 6:** Samsung Cell Phone with HEX number ADO000 392 73A FB  Jan 17th

g. **Target Device 7:** Samsung Galaxy S6 edge+ cell phone Jan 17th

h. **Target Device 8:** Samsung Galaxy S9 cell phone with serial number RF8K7071 FJM

i. **Target Device 9:** Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553

j. **Target Device 10:** Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB1 06 10

k. **Target Device 11:** Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 06108886

The **Target Devices** are currently in law enforcement's possession at 6707 Groveton Drive,

Clinton, Maryland.

USA_000479

JA129

## ATTACHMENT B
*List of Items Authorized to be Searched for and Seized*

1.      All "records" (that is, documents, information, photographs, videos, communications, and any other items) contained in the **Target Devices** described in Attachment A that relate to violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1951 (extortion under color of official right), from December 20, 2017 until December 3, 2019, including, but not limited to, the items listed below:

      a.      Incoming/outgoing/missed phone call log(s);

      b.      SMS/MMS messages and other communications and notes;

      c.      Voicemail messages;

      d.      Photographs, audio clips, and video clips;

      e.      Telephone contact lists;

      f.      All bank records, checks, credit card bills, account information, and other financial records; and

      g.      Records of the existence of and private messaging through social media accounts, including but not limited to, Instagram, Facebook, and Twitter.

2.      Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as: logs; phonebooks; saved usernames and passwords; documents; browsing history; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

USA_000480

JA130

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. With respect to **Target Device** 4, I am aware of potential federal tax return information on the device and its protection under Internal Revenue Code, Section 6103. Law enforcement personnel will take measures to safeguard such information as not to violate Title 26 U.S.C. §§ 7213 and 7213A while performing a search.

5. With respect to the search of the **Target Devices**, the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

      a.    surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

      b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

      c.    "scanning" storage areas to discover and possible recover recently deleted files;

      d.    "scanning" storage areas for deliberately hidden files; or

      e.    performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

2

USA_000481

JA131

7.    With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

3

USA_000482

JA132

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means    ☑ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Maryland

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.    8:20-mj-1605 TMD
)
TARGET DEVICES CURRENTLY LOCATED AT 6707 GROVETON )
DRIVE, CLINTON, MARYLAND )
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Maryland_____
*(identify the person or describe the property to be searched and give its location)*:

TARGET DEVICES LISTED IN ATTACHMENT A THAT ARE CURRENTLY LOCATED AT 6707 GROVETON DRIVE, CLINTON, MARYLAND  (See Attachment A)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _July 7, 2020_ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Duty Magistrate Judge_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _6/23/2020 10:00 AM_    _[signature]_
                                                    *Judge's signature*

City and state:    Baltimore, Maryland    Thomas M. DiGirolamo, Magistrate Judge, US District Court
                                            *Printed name and title*

JA133

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>8:20-mj-1605 TMD | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned electronically along with the warrant to the designated judge pursuant to Fed. R. Crim. P. 4.1 and 41(f)(1)(D).

Date: _____

_____
*Executing officer's signature*

Jaclyn Bloomingdale, Special Agent, FBI

*Printed name and title*

JA134

# EXHIBIT 2

JA135

# PRINCE GEORGE'S COUNTY CIRCUIT COURT

## SEARCH WARRANT PROCESSING FORM
### (to be completed by officer)

Officer's Name: _Lt. Ebaugh #3849_

E-mail Address: _MLEbaugh@co.PG.md.US_

Telephone No.: _240-482-5089_

Reviewed by ASA (name): _Joy/Hoppmeyer_

SEARCH OF:

Premises (address): _5115 Duel Pl_

_Fairmont Heights, MD 20743_

Vehicle (make/model/year):

Person (name/DOB):

Misc. (phone # and/or phone company, narcotics package tracking #):

Issuance Judge: _Engel    Sealed_

Issuance Date: _12/2/19_

Return Judge:

Return Date:

**<u>Warrant is to be returned within 10 days of its execution, or if not executed, no later than 30 days from issuance date.</u>**

JA136

# IN THE DISTRICT/CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## MOTION TO SEAL

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

Comes now the State of Maryland, by and through Aisha Braveboy, State's Attorney for Prince George's County, Maryland, and prays that this Honorable Court, pursuant to Maryland Annotated Code, Criminal Procedure Article §1-203, order the Clerk of the Circuit Court for Prince George's County, Maryland to seal and prevent disclosure of the attached Affidavit in Support of Search and Seizure Warrant for **a two-story single-family home with beige brick and dark shutters,** for a period of 30 days, and respectfully represents the following:

1. That this search and seizure warrant relates to an investigation which is of an ongoing nature and is likely to yield further information which could be of use in prosecuting criminal activities;
2. That failure to maintain the confidentiality of the investigation would jeopardize the use of information already obtained in the investigation and would impair the continuation of the investigation; and

WHEREFORE, your Petitioner prays that this Honorable Court sign an Order sealing the aforementioned Affidavit in Support of Search and Seizure Warrant for a period of 30 days.

AISHA N. BRAVEBOY
STATE'S ATTORNEY

By: _____

Melissa E. Hoppmeyer
Assistant State's Attorney

JA137

## IN THE DISTRICT/CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

### ORDER TO SEAL
### AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

UPON MOTION OF THE OFFICE OF THE STATE'S ATTORNEY, I FIND that there is good cause to believe that the criminal investigation to which the affidavit is related is of a continuing nature and likely to yield further information that could be of use in prosecuting alleged criminal activities; I further

FIND that the failure to maintain the confidentiality of the investigation would jeopardize the use of information already obtained in the investigation, impair the continuation of the investigation or jeopardize the safety of a source of information; therefore

IT IS HEREBY ORDERED on this __2__ day of __December__, 2019, that the Clerk of the Circuit Court for Prince George's County seal and prevent the disclosure of the attached Affidavit in Support of Search and Seizure Warrant for **a two-story single-family home with beige brick and dark shutters,** for a period of 30 days; it is further

ORDERED that upon the expiration of the 30 days, a copy of the attached affidavit will be unsealed and a copy thereof will be delivered within 15 days to the person from whom property was taken or if that person is not on the premises at the time of delivery, to the person apparently in charge of the premises from which the property was taken.

_____
JUDGE

JA138

**IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

I, Lieutenant M. Ebaugh #2849, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _D. Engel_ a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of Criminal Law Article, CR §3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to search the item as described below:

**Single-family home located at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland 20743**

The place is described as a two-story single-family home with beige brick and dark shutters. The numbers "5115" are placed to the left of the door on a white placard with black numbers. There are three steps that lead to the front door with a white handrail.

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Lieutenant M. Ebaugh, #2849, is currently employed by the Prince George's County Police Department and is assigned to the Internal Affairs Division. Your affiant has been employed by the Prince George's County Police Department since Sep 7, 2004. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, robbery, assault, narcotic investigations, sex offenses, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland, resulting in the conviction of persons violating the laws of this State.

Page **1** of **7**

JA139

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this affidavit is being submitted for the limited purpose of obtaining authorization to search a specific person, your affiant has not included each and every fact known to him concerning this investigation. Your affiant has set forth the facts that he believes are essential to establish the necessary foundation for the issuance of a search warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and witness officer , both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Prince George's County, Maryland. The Defendant and the witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.

The Defendant asked the Victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer placed the Victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the victim if she was a prostitute. The Victim kept asking the officer if he could release the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle, and he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, and wasunable to leave because the Defendant had her detained in the police station and unwillingly complied with the Defendant's demand.

JA140

The Defendant demanded that the Victim get on top of him and forced the victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

During the investigation, detectives learned that the Defendant took a photograph with his cellular phone during the traffic stop. Additionally, the Defendant was not in full uniform during the traffic stop but was described as wearing tan kaki pants, and an army fatigue shirt.

During the investigation it was also stated that the Defendant used condoms, taken from the Victim's car, to have sex with her. There were multiple condoms and only one was used. The Vicitm described the condoms as Magnums with a gold wrapper.

On December 2, 2019, a warrant was obtained charging the defendant with Rape First Degree. Warrant #3E00665500.

During the investigation, a search was conducted through police databases, which shows Martique Cabarl Vanderpool has provided 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland 20743, on numerous occasions as his residence, and recently advised his employer that this is his current address.

All events occurred in Prince Georges County, Maryland.

## 5. JUSTIFICATION OF PLACE TO BE SEARCHED:

Based on your Affiant's knowledge, training, experience, and the facts contained herein, your Affiant believes that evidence of violations of CR 3-304, Annotated Code of Maryland are contained in the residence identified at <u>5115 Duel Place, Fairmount Heights, Prince George's County, Maryland 20743.</u>

Through my training, knowledge, and experience, your affiant knows that persons who commit crimes from which they derive personal satisfaction often keep mementos, trophies, or detailed accounts of their experiences. Based on the facts provided by the witnesses, it is your affiant's belief that the Defendant took photographs of the victim.

Your affiant knows that digital media such as photos can be stored in a variety of means such as on removable USB devices like flash drives or removable hard drives, or internal storage on electronic devices such as computers, cell phones, or tablets.

Your affiant is aware that electronic media with digital transmission capabilities can be used to transmit evidence into cloud storage services. Cloud storage is remote storage

Page **3** of **7**

JA141

used to retain files such as images, videos, or documents without retaining them locally on a specific device, and multiple devices can be used to transmit or retrieve digital files. Your affiant further knows that electronic media may be shared between electronic devices via the cloud. Your affiant also knows that digital storage media can be very small and easily concealed in a variety of locations.

Based on the facts provided by the witnesses, the Defendant wore specific clothing that was not his police-issued uniform during the time that he committed these crimes. It was stated the Defendant stole gold wrapped Magnum condoms from the Victim's car and that all were not used that day and may be contained in the residence.

Your Affiant knows that persons involved in the crimes of violence often utilize cellular telephones to communicate with witnesses and possible co-conspirators before and after the commission of the crime and maintain records of these contacts within their cellular telephones.

## 6. DESCRIPTION OF ITEMS TO BE SEIZED:

- Any and all tan Khaki pants

- Army fatigue shirts

- Any gold wrapper Magnum condoms.

- Any and all electronic media capable of retaining digital image or video files, to include, but not limited to, tablets, computers, "smart" cell phones, USB storage devices such as flash drives or external hard drives, "SD" cards, memory cards, "smart" picture frames.

- Any and all still photography media such as prints of the known victim

- Any and all video graphics media, including, but not limited to digital video recorders (DVR) and digital video files,

- Any and all electronic devices with data transmission, internet access, or cloud storage capabilities to include, but not limited to, computers, tablets, cell phones, "smart" devices.

- Any and all diaries, journals, ledgers, memorandums, or notations of evidentiary value.

- To open any locked doors, drawers, compartments, containers, outdoor sheds, safes, lockboxes, or any other storage medium capable of concealing the aforementioned items.

Page **4** of **7**

JA142

- Any documents, mail matter, of <u>Martique Vanderpool.</u>

     For all of the foregoing reasons, I respectfully request that you issue a Search and Seizure Warrant for the above-described place.

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____  
Affiant's Signature

_____  
Date

_____  
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203, ANNOTATED CODE OF MARYLAND ON THIS ____ DAY OF _____, 2019

_____  
SIGNATURE OF JUDGE

_____  
JUDGE'S PRINTED NAME

Page **5** of **7**

JA143

**IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**
**SEARCH AND SEIZURE WARRANT**

TO: Lieutenant M. Ebaugh #2849 of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Det. C. Savoy #2442, Prince George's County Police Department, which are incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, person, and/or motor vehicle and seize the following specified items:

1.    **You shall conduct a search on the place located at:**

    **Single-family home 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland 20743**

    The place is described as a two-story single-family home with beige brick and dark shutters. The numbers "5115" are placed to the left of the door on a white placard with black numbers. There are three steps that lead to the front door with a white handrail.

2.    **You shall seize the following items, evidence, and/or contraband:**

- Any and all tan Khaki pants

- army fatigue shirts

- Any gold wrapper Magnum condoms.

- Any and all electronic media capable of retaining digital image or video files, to include, but not limited to, tablets, computers, "smart" cell phones, USB storage devices such as flash drives or external hard drives, "SD" cards, memory cards, "smart" picture frames.

- Any and all still photography media, such as prints of the known victim.

- Any and all video graphics media, including, but not limited to, digital video recorders (DVR) and digital video files.

- Any and all electronic devices with data transmission, internet access, or cloud storage capabilities to include, but not limited to, computers, tablets, cell phones, "smart" devices.

- Any and all diaries, journals, ledgers, memorandums, or notations of evidentiary value.

- To open any locked doors, drawers, compartments, containers, outdoor sheds, safes, lockboxes, or any other storage medium capable of concealing the aforementioned items.

JA144

- Any documents, mail matter, of <u>Martique Vanderpool.</u>

3.    Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4.    You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with a verified inventory of the items seized.

5.    If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

12/2/19
DATE

3:10 pm
TIME

JUDGE'S SIGNATURE

Dorothy Engel
JUDGE'S PRINTED NAME

JA145

# EXHIBIT 3

JA146

**IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

**SEARCH AND SEIZURE WARRANT**

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

    Samsung Galaxy S9 cell phone with serial number RF8K7071FJM

2. **You shall seize the following items, evidence, and/or contraband:**

Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_11/17/2020 @ 2:21 p.m._
DATE/ TIME

_____
JUDGE'S SIGNATURE

_Sean D. Wallace_
JUDGE'S PRINTED NAME

JA147

**IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

### 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallur_ a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

### 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Samsung Galaxy S III with HEX number 990 004 700 187 55

### 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

### 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at

JA148

Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did.  The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost.
Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland.  A Samsung Galaxy S III with HEX number 990 004 700 187 55 recovered from the upstairs bedroom in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

All these events did occur in Prince George's County.

JA149

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.    JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime. When these communications occur, they often occur by use of cellular telephones. Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time. Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime. The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Samsung Galaxy S III with HEX number 990 004 700 187 55

And to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

JA150

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

Detective C. Savoy #2442
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

17th DAY OF January, 2020 at 2:12 pm hours

_____
SIGNATURE OF JUDGE

Sean D. Wallace
JUDGE'S PRINTED NAME

JA151

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

### SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

   Samsung Galaxy S III with HEX number 990 004 700 187 55

2. **You shall seize the following items, evidence, and/or contraband:**

   Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3.    Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4.    You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5.    If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2/20 at 2:12pm._
DATE/ TIME

_Sean D. Wallr_
JUDGE'S SIGNATURE

_Sean D. Wallr_
JUDGE'S PRINTED NAME

JA152

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallen_ a judge of the Circuit/District Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Kyocera Model: E4277 cell phone with HEX number A00 000 27C 06E 40

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at

JA153

Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost.
Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Kyocera Model: E4277 cell phone with HEX number A00 000 27C 06E 40was recovered from the upstairs bedroom in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

All these events did occur in Prince George's County.

JA154

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.    JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6.  DESCRIPTION OF THE ITEMS TO BE SEIZED:

Kyocera Model: E4277 cell phone with HEX number A00 000 27C 06E 40 and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
Affiant's Signature

_____Detective C. Savoy #2442_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203, ANNOTATED CODE OF MARYLAND ON THIS

__17th__ DAY OF __January__, 2020 at __2:10 p.m.__ hours

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

**IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

**SEARCH AND SEIZURE WARRANT**

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

    Kyocera Model: E4277 cell phone with HEX number A00 000 27C 06E 40

2. **You shall seize the following items, evidence, and/or contraband:**

    Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

    The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2020  2:18 pm_
DATE/ TIME

JUDGE'S SIGNATURE

_Sean D. Wallace_
JUDGE'S PRINTED NAME

JA157

# IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallace_ a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Samsung Cell Phone with HEX number A00 000 392 73A FB

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

JA158

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration. The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Samsung Cell Phone with HEX number A00 000 392 73A FB was recovered from the upstairs computer room in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

JA159

All these events did occur in Prince George's County.

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.   JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Samsung Cell Phone with HEX number A00 000 392 73A FB and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

JA160

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

Detective C. Savoy #2442
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

17th DAY OF January , 2020 at 2:14 pm hours

_____
SIGNATURE OF JUDGE

Sean D. Wallie
JUDGE'S PRINTED NAME

JA161

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

### SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

     Samsung Cell Phone with HEX number A00 000 392 73A FB

2. **You shall seize the following items, evidence, and/or contraband:**


Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US


3.     Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.


4.     You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.


5.     If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

1/17/2020 @2:14p.m.
_____
DATE/ TIME

_____
JUDGE'S SIGNATURE

Sean D. Wallace
_____
JUDGE'S PRINTED NAME

JA162

**IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

**APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT**

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallace_ a judge of the Circuit/District Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Samsung Galaxy S6 edge+ cell phone

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at

JA163

Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost.
Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Samsung Galaxy S6 edge+ cell phone was recovered from the upstairs bedroom in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

All these events did occur in Prince George's County.

JA164

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.     JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Samsung Galaxy S6 edge+ cell phone and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

JA165

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
Affiant's Signature

Detective C. Savoy #2442
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203, ANNOTATED CODE OF MARYLAND ON THIS

___17th___ DAY OF ___January___, 2020 at ___2:07 pm___ hours

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

JA166

**IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

## SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

   Samsung Galaxy S6 edge+ cell phone

2. **You shall seize the following items, evidence, and/or contraband:**

   Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

   The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2020 at 2:07 pm_
DATE/ TIME

_____
JUDGE'S SIGNATURE

_____
JUDGE'S PRINTED NAME

JA167

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallace_ a judge of the Circuit/District Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Samsung Galaxy S9 cell phone with serial number RF8K7071FJM

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

JA168

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Samsung Galaxy S9 cell phone with serial number RF8K7071FJM was recovered from the upstairs bedroom in the Defendant's residence.
During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

All these events did occur in Prince George's County.

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.    JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Samsung Galaxy S9 cell phone with serial number RF8K7071FJM and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

Detective C. Savoy #2442
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

____17th____ DAY OF ____January____, 2020 at ___2:21 pm___ hours

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

**IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

**SEARCH AND SEIZURE WARRANT**

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant.  You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

   Samsung Galaxy S9 cell phone with serial number RF8K7071FJM

2. **You shall seize the following items, evidence, and/or contraband:**

   Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3.    Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4.    You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5.    If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void.  This Warrant may be executed at any time of the day or night.

_11/17/2020 @ 2:21 p.m._
DATE/ TIME

_Sean D. Wallace_
JUDGE'S SIGNATURE

JUDGE'S PRINTED NAME

## IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallace_ a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

JA173

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration. The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553 was recovered from the upstairs computer room in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

JA174

All these events did occur in Prince George's County.

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.    JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553 and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

JA175

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

_____Detective C. Savoy #2442_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

__17th__ DAY OF __January__, 2020 at __2:20 p.m.__ hours

_____
SIGNATURE OF JUDGE

_____Sean D. Wallace_____
JUDGE'S PRINTED NAME

JA176

# IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

   Sprint LG Rumor 2 cell phone with serial # 003CYTB1935553

2. **You shall seize the following items, evidence, and/or contraband:**

   Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

   The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2020 at 2:20pm_

DATE/ TIME

_[signature]_

JUDGE'S SIGNATURE

_Sean D Wallace_

JUDGE'S PRINTED NAME

JA177

# IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallace_ a judge of the Circuit/District Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB106 10

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

JA178

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost.
Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB106 10 was recovered from the upstairs computer room in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

JA179

All these events did occur in Prince George's County.

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.   JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime. When these communications occur, they often occur by use of cellular telephones. Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time. Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime. The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB106 10 and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

JA180

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

_____Detective C. Savoy #2442_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

__17th__ DAY OF __January__, 2020 at __2:15 p.m.__ hours

_____
SIGNATURE OF JUDGE

_____Sean D. Wallace_____
JUDGE'S PRINTED NAME

JA181

# IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

   Sprint Sanyo Cell Phone Model SCP-3820 with HEX number A0000012BBB106 10

2. **You shall seize the following items, evidence, and/or contraband:**

   Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

   The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2020 @ 2:16 p.m._

DATE/ TIME

JUDGE'S SIGNATURE

_Sean D. Wallace_

JUDGE'S PRINTED NAME

JA182

**IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

### 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _Sean D. Wallen_ a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

### 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 061D8886

### 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

### 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

JA183

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland. A Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 061D8886 was recovered from the upstairs computer room in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

JA184

All these events did occur in Prince George's County.

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5. JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime. When these communications occur, they often occur by use of cellular telephones. Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time. Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime. The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 061D8886 and to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

JA185

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

_____Detective C. Savoy #2442_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

___17th___ DAY OF ___January___, 2020 at ___2:18 pm___ hours

_____
SIGNATURE OF JUDGE

_____Sean D. Wallace_____
JUDGE'S PRINTED NAME

JA186

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

### SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

   Sprint Sanyo Cell Phone Model SCP-2400 with HEX number 061D8886

2. **You shall seize the following items, evidence, and/or contraband:**

   Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

   The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2020 @ 2:18pm_

DATE/ TIME

JUDGE'S SIGNATURE

JUDGE'S PRINTED NAME

JA187

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | **Case No. 8:23-cr-234-DLB** |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |

▪▪▪▪▪▪▪▪▪▪▪

GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS FOR PREINDICTMENT DELAY

## Table of Contents

INTRODUCTION ........................................................................................................................ 2

RELEVANT BACKGROUND ...................................................................................................... 2

ARGUMENT ................................................................................................................................ 6

    I.   Legal Framework ................................................................................................................ 6

    II.  Identifying the Purported Delay ......................................................................................... 7

    III. The Defendant Cannot Establish Substantial Actual Prejudice from the Purported Delay ............... 8

    IV. Even Assuming Prejudice, any Purported Delay Did Not Violate Fundamental Conceptions of
Justice or the Community's Sense of Fair Play and Decency ................................................ 14

CONCLUSION .......................................................................................................................... 17

JA188

## INTRODUCTION

The government, by and through undersigned counsel, respectfully submits it response in opposition to the defendant's Motion to Dismiss for Preindictment Delay (the "Motion to Dismiss"), *see* ECF No. 14, in which the defendant claims that undue delay by the government rendered two allegedly critical defense witnesses unavailable for trial. The defendant's attack on the indictment is meritless, as he cannot show that either witness would have been at all helpful (let alone critical) to his case, and he therefore cannot establish *any* prejudice from the purported delay, let alone prejudice that is "actual" and "substantial," as the law requires. Moreover, he also cannot establish that there *was* any undue delay, or that, if there was, the delay violated either fundamental conceptions of justice or the community's sense of fair play and decency. For these reasons, the government respectfully asks this Court to deny the Motion to Dismiss.

## RELEVANT BACKGROUND

### Overview of the Case

In September 2019, the defendant was working as a police officer with the Fairmount Heights Police Department (FHPD) in Fairmount Heights, Maryland. Late at night on September 6, 2019, the defendant and another FHPD officer stopped R.S., a 19-year-old woman who was speeding and driving without a license. The defendant and the other officer impounded the car, which belonged to R.S.'s then-boyfriend, and had the car towed from the scene. When R.S. learned that the car was being towed, she became upset and agitated. She was arrested, handcuffed, and eventually transported from the scene.

Rather than taking R.S. to the Department of Corrections for booking and processing, as was standard FHPD protocol, the defendant and the other officer transported her, in handcuffs, to the small, deserted Fairmount Heights police station. There, the defendant engaged in sexual acts

2

with R.S. Afterward, the defendant and the other officer transported R.S. to the tow yard to which her car had been taken and arranged for the towing company to release the car to her without charge. The defendant issued R.S. traffic citations and a criminal citation for Disorderly Conduct.

The defendant thereafter filed the Incident Report that gave rise to the obstruction charge he currently faces. In the narrative portion of the report, the defendant wrote that on the previous night, he and the other officer had conducted a traffic stop and that the driver, R.S., had been placed in handcuffs, arrested for disorderly conduct, and "issued the appropriate citations." Then, according to the report, "[t]he registered owner picked up the vehicle and [R.S.] was released and sent on her way." The report made no mention of the trip to the station; the sexual act; the towing of the car; or the subsequent release of the car to R.S.; and it falsely reported that the car had been returned to the legal owner.

**Role of the Two Witnesses the Defense Claims are Unavailable**

The defendant alleges that he has been actually and substantially prejudiced by the alleged unavailability of two witnesses – FHPD Lt. Earl Ivey, who was involved in the very early stages of this investigation for the FHPD and who has since passed away, and Officer P.D., who was the other officer with the defendant when he had sex with R.S. while she was in custody.

In the very early stages of an FHPD investigation into the events of September 9, 2019, Lt. Ivey met with R.S. on several occasions. Within two weeks, however, the investigation was referred to the Prince George's County Police Department (PGCPD), a much larger agency, for a full investigation. The PGCPD investigation eventually led to the defendant's arrest on December 3, 2019, and his subsequent indictment in January 2020 on multiple state offenses (including rape) stemming from his sexual encounter with R.S. while she was in custody.

Meanwhile, the federal government began its own investigation, focused on whether the

3

JA190

sexual encounter between the defendant and R.S. constituted a violation of R.S.'s constitutional rights. In September 2021, a federal grand jury indicted the defendant on one count of violating 18 U.S.C. § 242 for depriving R.S. of her right to be free from an unreasonable seizure by subjecting her to nonconsensual sexual conduct by a person acting under color of law. *United States v. Vanderpool*, No. 8:21-cr-354 (D. Md. Sept. 8, 2021), ECF No. 1. While that federal investigation was pending, Officer P.D. was separately indicted—in multiple venues, both state and federal— on various charges unrelated to the sex-in-custody incident with R.S.

The state's rape case against defendant Vanderpool proceeded to trial in January 2023 while the federal civil rights indictment was still pending. Although neither Lt. Ivey (who had already passed away) nor Officer P.D. was called as a witness for either side, the defendant was acquitted on all but the least-serious charge of sex with a person in custody.

At that trial, the defendant testified in his own defense and made numerous inculpatory admissions that will be front-and-center in his upcoming federal trial.[1] For example, the defendant admitted (among other things): that he and Officer P.D. stopped R.S. for speeding; that they learned that she did not have a license; that R.S. was upset and "acting crazy"; that they had the car she was driving towed; that they arrested R.S., handcuffed her, and transported her in handcuffs to the FHPD station, which was deserted but-for them; that once at the station, the defendant engaged in a sex act with R.S., vaginally penetrating her; that prior to engaging in that sex act with R.S., he handed a condom to Officer P.D., who was present and dimmed the lights during the sex act; that when the defendant was finished, he left to use the bathroom, as Officer P.D. walked toward R.S. with a condom in his hand; that afterward, the officers together drove R.S. to the tow lot, where the defendant had the owner release the car to R.S. None of the information related to

---

[1] The government plans to file a separate motion *in limine* requesting a specific ruling concerning the admission of these statements.

4

JA191

the towing or the trip to the station had been included in the Incident Report that the defendant prepared after the traffic stop.

In January 2023, immediately following the state trial, federal prosecutors requested trial transcripts. However, the government did not receive a transcript of the defendant's testimony until March 24, 2023 (and did not receive a full set of transcripts from the state trial until May 21, 2023). On July 6, 2023, four months after the government received the transcript of the defendant's testimony (and less than two months after the government received the full set of trial transcripts), a federal grand jury returned the current indictment, charging the defendant with one count of writing a false and misleading Incident Report, in violation of 18 U.S.C. § 1519. *See* ECF No. 1. The admissions outlined above, made under oath at the state trial, provide powerful evidence supporting the crime charged in the indictment—specifically that the defendant intentionally falsified his report by omitting that he and Officer P.D. arranged to have the car R.S. had been driving towed from the scene of the traffic stop; omitting that the defendant and Officer P.D. took the then-handcuffed R.S. to the deserted police station; omitting that the defendant engaged in sexual acts with R.S.; omitting that the defendant arranged, after the sexual acts, for the car to be released to R.S. without charge; and including a false claim that the registered owner [R.S.'s then-boyfriend] picked up the car.

A few days after the return of the current indictment, the government sought and obtained, with the consent of the defendant, dismissal-without-prejudice of the initial civil rights indictment. *United States v. Vanderpool*, No. 8:21-cr-354 (D. Md. Sept. 8, 2021), ECF No. 94.[2]

Trial on the current indictment is currently calendared for October 16, 2023, although the defendant has declared his intent to seek a continuance.

---

[2] The government intends to file one motion *in limine* to preclude any reference to the initial, now-dismissed federal indictment, and another motion *in limine* to preclude reference to the fact or outcome of the state trial.

JA192

## ARGUMENT

This Court should deny the defendant's motion to dismiss the indictment based upon alleged preindictment delay. The defendant cannot establish any prejudice, let alone the required "actual" and "substantial" prejudice, from any purported delay in indictment. For that reason, the motion must be denied. Moreover, the defendant cannot show that there *was* any delay, given that the government indicted the defendant within four months of obtaining new evidence in the form of his state trial testimony, and within six months of him providing that testimony in court. And even if there *had* been delay (there was not), *and* if there *had* been substantial actual prejudice from that delay (there was not), the government's prosecution of the defendant for obstructing justice, based in part upon evidence from his January 2023 state trial, would not violate fundamental conceptions of justice or the community's sense of fair play and decency. For all of these reasons, the defendant's motion must be denied.

## I. Legal Framework

The Fourth Circuit has adopted a two-step process for analyzing a defendant's claim that a preindictment delay violated due process. *Jones v. Angelone*, 94 F.3d 900, 904 (4th Cir. 1996); *see also Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). First, the defendant has the burden of showing "substantial actual prejudice" caused by the delay. *United States v. Villa*, 70 F.4th 704, 715 (4th Cir. 2023). Establishing actual prejudice that is "substantial" requires a showing that the defendant "was meaningfully impaired in his ability to defend against the [] charges to such an extent that the disposition of the criminal proceeding was likely affected." *Jones*, 94 F.3d at 907-08 (collecting cases). "[P]otential prejudice," speculative prejudice, or the simple "passage of time" is insufficient to establish a due process violation. *Id.* at 907 (quoting *United States v. Marion*, 404 U.S. 307, 323 (1971)); *see also United States v. Jenkins*, 701 F.2d 850, 855 (10th Cir.

6

JA193

1983) ("Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice" resulting from pre-indictment delay.).

Second, if (and only if) a defendant meets the "heavy" burden of establishing substantial actual prejudice, *Jones*, 94 F.3d at 907, then a court evaluates whether, when considering the government's reasons for the delay, there has been a violation of "fundamental conceptions of justice or the community's sense of fair play and decency." *Villa*, 70 F.4th at 715; *see also United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 404 (4th Cir. 1985) ("The basic inquiry then becomes whether the [g]overnment's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'") (citations omitted).

## II.    Identifying the Purported Delay

The defendant's argument is premised upon his calculation of a delay of "three years, nine months, and 29 days" from when he allegedly falsified his Incident Report to when he was indicted on the obstruction charge at issue here. ECF No. 14, at 3. The defendant is using the wrong math. As outlined above and explained more fully below (*see* Part IV), the government obtained powerful evidence in support of this charge in March 2023, when it received a transcript of the defendant's January state-trial testimony, in which the defendant made numerous inculpatory admissions. With that evidence in hand, the government sought a federal indictment charging the current obstruction offense. *See Villa*, 70 F.4th at 709, 716 (upholding district court's denial of motion to dismiss for preindictment delay where there was "no delay in bringing the second indictment," although it was obtained fourteen months after the defendant's initial arrest on state charges and after an earlier federal indictment, because the government moved swiftly once it

JA194

obtained additional information related to a new federal charge). For this reason, assuming there was any "delay," that delay should be measured in *months*, not years, as the defendant was charged shortly after the government was able to obtain, review, and evaluate the defendant's admissions from his state trial.

## III.    The Defendant Cannot Establish Substantial Actual Prejudice from the Purported Delay

Regardless of how the purported delay is calculated, the defendant cannot establish *any* prejudice from the delay, much less *actual* prejudice as the Supreme Court requires. *Jones*, 94 F.3d at 906 ("The Supreme Court has repeatedly emphasized that, in order to establish a due process violation, the defendant must show that the delay 'caused him *actual* prejudice in presenting his defense.'"). For this reason, his motion to dismiss based upon a purported preindictment delay must be denied.

The defendant claims substantial actual prejudice from the unavailability of two witnesses: Lt. Ivey and Officer P.D. Where, as here, the claim of prejudice is based upon the unavailability of witnesses, the Fourth Circuit requires a defendant to: (1) identify the witness he would have called; (2) "demonstrate, *with specificity*, the expected content of that witness' testimony"; (3) satisfy the court that the defendant has made serious efforts to locate the witness; and (4) "show that the information the witness would have provided was not available from other sources." *Jones*, 94 F.3d at 908 (emphasis added). Inherent in evaluating the second step is whether the content of the witness's testimony would have been exculpatory or favorable to the defendant. *Id.* at 908-09. If not, a defendant cannot establish prejudice. *Id.* at 909. Here, the defendant's claims of substantial actual prejudice fail dramatically for both witnesses at steps two and four.

According to the defendant, Det. Ivey and Officer P.D. would have been "essential" in "challenging the credibility of R.S.'s accounts to law enforcement" because R.S. made several

8

JA195

"materially inconsistent" statements over time and (according to the defendant) both Lt. Ivey and Officer P.D. were key to helping the defense explore her "motive[s] to fabricate." ECF No. 14, at 6. The defendant also speculates that Lt. Ivey, if available, may have testified about allegations P.D. made against the FHPD; about training provided to FHPD officers; and about P.D.'s animosity toward the defendant. The unavailability of this testimony, the defendant asserts, causes him actual prejudice. The defendant's argument fails for multiple, independent reasons discussed below.

> *The defendant will not be prejudiced, let alone substantially so, by the absence of additional avenues to attack R.S.'s credibility.*

The defendant's claim that his defense will be substantially prejudiced absent these additional avenues to attack R.S.'s credibility fails for multiple reasons. First, his presumption is proven false by the outcome of the state trial—where neither Lt. Ivey nor Officer P.D. testified, and where a jury (after hearing a barrage of attacks on R.S.'s credibility from other sources) nevertheless acquitted the defendant on every count that relied on her credibility. Additionally, the claim fails because in the federal trial, R.S.'s credibility is not essential (or even relevant, unless and until she testifies) to the obstruction charge the defendant currently faces. Attacking R.S.'s credibility was understandably essential to defending against the state rape charge because in order to convict, the jury would have had to credit R.S.'s claim that the sex was non-consensual. But consent is not an element in the federal case, where the government need only prove beyond a reasonable doubt (1) that the defendant knowingly falsified his report; (2) that the defendant acted with the intent to impede any future investigation or administrative inquiry into the sex-in-custody matter; and (3) that the sex-in-custody incident happened to be a matter within federal jurisdiction. *United States v. Hassler*, 992 F.3d 243, 246-47 (4th Cir. 2021) (reciting elements of 18 U.S.C. § 1519) (citation omitted). The government can prove (and the defendant can defend against) these

9

JA196

elements based on facts the defendant himself admitted during his state trial. The government might elect to call R.S. as a witness, but it *need* not do so, because proof of the required elements does not depend on whether the sexual encounter the defendant has already admitted to was consensual.[3] Accordingly, the defendant cannot plausibly argue that unavailable testimony from Lt. Ivey or Officer P.D. concerning R.S.'s credibility or motivation for bias would "meaningfully impair[] . . . his ability to defend against" an obstruction charge for which R.S.'s testimony is not necessary in the first place. *Jones*, 94 F.3d at 907-08.

> *The defendant has not identified any helpful – let alone critical – testimony he could expect from either witness.*

Next, the defendant's motion fails because he has not even attempted to identify—let alone to identify "with specificity," as is required—the expected content of either Lt. Ivey's or Officer P.D.'s allegedly helpful testimony. *Jones*, 94 F.3d at 908; *see also United States v. Sample*, 565 F. Supp. 1166, 1175 (E.D. Va. 1983) (explaining that to establish a due process violation a defendant must "demonstrate the general content of the lost evidence and show that it had a material connection with his defense to the crimes charged"). This is not surprising, as neither Lt. Ivey nor Officer P.D. could rationally be expected to assist the defense in this case.

<u>Lt. Ivey</u>

The defendant has not identified with specificity how testimony from Lt. Ivey would have been favorable to his defense of the obstruction charge. Lt. Ivey, initially assigned to investigate R.S.'s allegation of rape, developed a close relationship with R.S., who considered him a "spiritual Uncle." There is no indication in Lt. Ivey's investigative files that he doubted R.S.'s allegation

---

[3] Of course, if the government does *not* call R.S., it is *impossible* that the defendant could suffer prejudice from an inability to call witnesses whose sole value would be to impeach a non-testifying individual. For reasons the government will outline in a separate motion *in limine* to exclude inadmissible and irrelevant character evidence that might be offered against R.S., impeachment of a non-testifying person is not relevant.

JA197

that the defendant raped her, and therefore there is no suggestion (let alone a showing) that his testimony would have been helpful to the defendant, even in the rape case. It is even more difficult to imagine how Lt. Ivey's testimony would have been favorable (or even relevant) to the federal obstruction charge.

The defendant asserts that Lt. Ivey's wife found some documents after his death that "she believed were related to his duties" as an FHPD supervisory officer, and he claims that these documents included one outlining allegations Officer P.D. made against the FHPD. ECF No. 14, at 7. Again, the defendant makes no effort to identify what Lt. Ivey would have said about those documents or how that testimony would have been relevant or helpful to his defense. The Fourth Circuit has made clear that where an absent witness's "testimony remains completely speculative, with nothing more than [the defendant]'s own assertions offered as support," a defendant cannot establish substantial actual prejudice from the unavailability of that testimony. *United States v. Drayton*, 267 F. App'x 192, 196 (4th Cir. 2008); *see also Automated Medical Laboratories, Inc.*, 770 F.2d at 404 (holding that where a witness's testimony remains "highly speculative," there is no prejudice sufficient to support a due process violation).

The defendant has also suggested that Lt. Ivey could have discussed personnel and training records that were turned over to Prince George's County authorities. ECF No. 14, at 7. But the defendant fails to identify what testimony Lt. Ivey would have offered or to explain how that testimony would have been helpful. Even more fundamentally, the defendant has failed to show (or even allege) that Lt. Ivey was the only witness who could discuss FHPD training protocols generally, or the defendant's training history and records specifically. *See Jones*, 94 F.3d at 908 (explaining that a defendant claiming actual prejudice from the unavailability of a witness because of delay must "show that the information the witness would have provided was not available from

11

JA198

other sources"); *see also United States v. Naserkhaki*, 713 F. Supp. 190, 193 (E.D. Va. 1989) (finding no actual prejudice in "the absence of any convincing showing" that unavailable witnesses "are the only witnesses who could provide the evidence described").

The defendant also asserts that Lt. Ivey could have testified about animosity between the defendant and Officer P.D., ECF No. 14, at 7, and again he fails to explain how this seemingly damaging testimony would aid his defense, let alone how the lack of this testimony would "meaningfully impair[]" his defense. *Jones*, 94 F.3d at 908. Failing to do that, he cannot establish substantial actual prejudice. *Id.*

<u>Officer P.D.</u>

Similarly, with respect to Officer P.D., the defendant failed to identify what testimony he would offer or how the testimony would be helpful to the defendant. Officer P.D. has given a number of statements about the incident involving R.S., and none of those statements is favorable to the defendant. In fact, P.D's statements impeach the defendant's version of events more than they impeach R.S.'s. Officer P.D. has stated: that, after the arrest of R.S., the defendant alone drove R.S. to the police station while P.D. went to check out a different location (rather than driving R.S. to the station with the defendant in the back seat, as the defendant claimed under oath); that P.D. then went to the station, where he found R.S. sitting on a couch; and that he never saw any flirtatious activity between R.S. and the defendant. In those statements, he also offered that the defendant was a "predator" who engaged in other criminal activity. After providing these statements during the investigation into the R.S. incident, Officer P.D. wrote and signed a letter to the Mayor of Fairmount Heights (Filed separately, under seal, in redacted form, as **Exhibit 1**) in which he wrote (among other things) that the defendant "pulled over a young female, took her back to the station, and raped her, in which he made threats towards her and gave her ultimatums

12

JA199

in exchange for her vehicle he impounded." Officer P.D. referred to this as a "cruel and heinous act," and claimed that he immediately reported the defendant's actions to, of all people, Lt. Ivey. In this letter to the Mayor, Officer P.D. added a particularly salacious and damning claim that he had not mentioned during his formal interviews: he claimed that when he arrived at the station and saw the defendant and R.S., the defendant asked Officer P.D. if he "want[ed] to fuck her also."

The suggestion that Officer P.D. would offer testimony helpful to the defense is not only speculative, but also entirely lacking in credibility. By any measure, it is insufficient to support his claim of a due process violation.

*The defendant's other arguments regarding prejudice fare no better.*

Finally, the defendant asserts, without support, that the purported preindictment delay will "contribute[] to gaps in the memories of other key witnesses." ECF No. 14, at 7. But the Fourth Circuit has previously explained that "[a]ctual prejudice cannot be proven through generalized claims of memory loss." *United States v. Lynch*, 56 F.3d 62, *3 (4th Cir. 1995) (Table) (unpublished) (quoting *United States v. Scott*, 795 F.2d 1245, 1249 (5th Cir. 1986)); *see also United States v. Kaltflesh*, 621 F. App'x 157, 158-59 (4th Cir. 2015) ("Speculative or conclusory claims alleging 'possible' prejudice as a result of the passage of time are insufficient."). As for any other generalized claims of prejudice stemming from a delay, the Fourth Circuit "will not presume that the defendant has been prejudiced by delay between commission of the offense and arrest or indictment" provided the indictment is brought within the statute of limitations, as it was here. *Jones*, 94 F.3d at 907; *see also Sample*, 565 F. Supp. at 1178 ("[T]his kind of general claim of possible prejudice from the passage of time is precisely the sort of prejudice that the statute of limitations was designed to safeguard."); *cf. United States v. Muhammad*, No. 3:21cr34, 2021 WL 4473143, at *4 (E.D. Va. Sept. 29, 2021) ("[Statutes of limitation] balance defendants' interests in

JA200

the timely administration of justice and their ability to adequately mount a defense against the state's interest in protecting the public.").

Because the defendant has not met his heavy burden of establishing any prejudice from any purported preindictment delay, much less substantial actual prejudice, his motion to dismiss the indictment must be denied. *Jones*, 94 F.3d at 907-08.

### IV.    Even Assuming Prejudice, any Purported Delay Did Not Violate Fundamental Conceptions of Justice or the Community's Sense of Fair Play and Decency

Even assuming undue delay, and assuming actual substantial prejudice from that assumed delay, the defendant's motion to dismiss the indictment would still fail. The government's decision to seek an indictment for an obstruction charge in a timely manner after a state trial during which the defendant made numerous inculpatory admissions was consistent with the fundamental conceptions of justice and the community's sense of fair play and decency.

As explained above, the government in September 2021 sought an indictment on a civil rights offense based upon information available to it at that time. The defendant's assertion (*see* EFC No. 14, at 8) that federal prosecutors were "unable to secure approval" to pursue that charge under the Department of Justice's *Petite* Policy following the defendant's state trial is not based in fact; more importantly, it is irrelevant.[4] Prosecutors, exercising the executive branch's exclusive prosecutorial discretion to decide what charges to bring in a given case, reviewed the testimony provided at the state trial—by the defendant, by R.S., and by others—and exercised its discretion to dismiss the civil rights charge and pursue an obstruction charge that was based in part on the newly acquired evidence.

The Supreme Court has recognized that continuing an investigation is a valid basis for

---

[4] The government cannot comment on the Department's deliberative process, other than to say that information about the government's deliberations in making charging decisions is not available to the defendant, who has nevertheless included as "fact" his baseless speculations about the reasons for the government's charging decisions.

JA201

delay, even where some prejudice may result to the defendant. *United States v. Lovasco*, 431 U.S. 783, 795-96 (1977). As the Supreme Court explained, a prosecutor acts consistently with the standards of fair play and decency if the prosecutor waits to seek an indictment until she is "completely satisfied that [she] should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Id.* at 795. The Due Process Clause "does not require" a prosecutor to "subordinate the goal of orderly expedition to that of mere speed." *Id.* at 795-96 (citations omitted). For this reason, the Supreme Court has held that an investigative delay "does not deprive [a defendant] of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796; *see also United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009) (explaining there is no due process violation if a delay results from a good faith investigation).

The purported delay in bringing the obstruction indictment in this case was not to secure a tactical advantage; rather, the initial delay in getting to trial on both the state rape charge and the federal civil rights charge was the result of a worldwide pandemic[5] and then any additional delay was the result of the discovery in 2023 of new, powerful evidence supporting an obstruction charge. The government's actions in (allegedly) "waiting" to secure the new charge is fully consistent with standards of fair play and decency. *Lovasco*, 431 U.S. at 795-96.

The Fourth Circuit's decision in *Automated Medical Laboratories, Inc.*, is instructive. There, the defendant claimed a due process violation based upon a 45-month preindictment delay following the completion of an FDA investigation. 770 F.2d at 402. The Court rejected the

---

[5] *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247–48 (D. Md. 2020) ("The Court struggles to put into words the magnitude of COVID-19's devastation. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. . . . In Prince George's County, the virus arrived early and spread with a vengeance. As a result, the County has experienced the highest number of confirmed cases and the second-highest number of deaths in the State. . . . Due to these realities, Maryland has been under a state of emergency and Prince George's County a stay-at-home order since March."); *see also Muhammad*, 2021 WL 4473143, at *3 ("[T]he Government could not have foreseen the pandemic and its implications for criminal jury trials.").

defendant's claim, noting that a portion of the delay "was attributable to additional investigative activities required when the case actually reached Government prosecutors at the Department of Justice." *Id.* at 404. The Court observed that even though "[t]he wheels of government bureaucracy may, at times, seem to turn at a frighteningly slow pace," it is "wise policy" for the government to engage in "careful investigation and consideration prior to the bringing of criminal charges," and that this type of delay does not constitute a due process violation—particularly where the defendant experienced "slight, possibly nonexistent, prejudice" from the delay. *Id.* This same analysis applies here. Even assuming *any* prejudice from purported delay, it was "slight, [and] possibly nonexistent." *Id.* And any purported delay was the result of "careful investigation and consideration" by the government before seeking an indictment on an obstruction charge. *Id.* Under these circumstances, the defendant cannot establish a due process violation.

Finally, the defendant adds a non-sequitur: that he has already served his state sentence (*see* ECF No. 14, at 8-9). This fact has no bearing on this Court's consideration of whether there was an improper delay here (there was not); whether that alleged delay caused any substantial actual prejudice to the defendant (it did not); or, if so, whether the purported preindictment delay outweighs the government's reasons for the delay (it does not). The defendant does not explain how his having served his state sentence on a state conviction weighs in favor of dismissing the indictment on a federal charge. To the extent he is suggesting that his sentences for a state charge and a federal charge (if he had been prosecuted and convicted earlier on a federal charge) could have run concurrently, the Fourth Circuit has already rejected that argument as a basis for finding a due process violation based upon alleged preindictment delay. *See Uribe-Rios*, 585 F.3d at 358 ("[T]he opportunity to serve concurrent sentences does not implicate Appellant's Fifth Amendment right to a fair trial.").

16

JA203

This Court should deny the defendant's motion because there was no delay, there was no prejudice, and even assuming both delay and prejudice, the reasons for the (alleged) preindictment delay do not violate fundamental conceptions of justice or the community's sense of fair play and decency.

## CONCLUSION

For the reasons stated herein, this Court should deny the defendant's motion to dismiss the indictment.

Respectfully submitted, this 8th day of September, 2023.


Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Elizabeth A. Hutson
Trial Attorney
Elizabeth.Hutson@usdoj.gov


Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

JA204

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S RESPONSE IN

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR PREINDICTMENT DELAY

has been served by e-filing upon counsel for the Defendant, this 8th day of September, 2023.


   */s/ Barbara (Bobbi) Bernstein*
   Barbara (Bobbi) Bernstein

JA205

# EXHIBIT 1

## (FILED SEPARATELY UNDER SEAL)

JA206

**In the United States District Court for
the District of Maryland**

|  |  |  |
|---|---|---|
| | * | |
| **United States of America** | * | |
| | * | **Criminal No. DLB-23-00234** |
| **v.** | * | |
| | * | |
| **Martique Cabral Vanderpool,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**Reply to Government's Response to Motion to Suppress Evidence**

Introduction.................................................................................................1

I.    The federal warrant sought access to the fruits of an unconstitutional
seizure and lacked probable cause as to each device and file type…….............2

    A.  The devices were the fruit of an unconstitutional seizure by the
time of the federal warrant application, nearly seven months after
their seizure.........................................................................................2
        1.  Even if the initial seizure of the devices was justified by probable
cause and/or a warrant, the delay in seeking a warrant rendered
the seizure unreasonable...................................................................4
        2.  The Fourth Amendment does not allow the federal
government unquestioned access to the fruits of an illegal
seizure.........................................................................................5
        3.  Mr. Vanderpool maintained a possessory interest in his
devices, particularly his personal cell phone.............................9
        4.  Good faith does not apply to this unreasonable seizure…...........12

    B.  The federal warrant lacked probable cause for each device and file type......13
        1.  The Fourth Amendment's particularity and probable cause
requirements assume special importance when law enforcement
seeks to seize and search digital data......................................14
        2.  A warrant for digital data must establish probable cause as to
each category of files or information that police seek to seize
and search.....................................................................................15
        3.  The federal warrant was a general warrant, authorizing an
exploratory rummaging of every device seized.........................20

JA207

   C. The good faith exception does not apply where a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid……………………………………………………………………………..21

 II. A *Franks* hearing is warranted for the state and federal warrants………………..22
   A. Legal standard………………………………………………………………..22
   B. The state premises warrant omitted material facts in seeking to search Mr. Vanderpool's home for evidence of rape………………………………22
   C. The same omissions persist in the state device warrant, in addition to omissions regarding Dupree's and R.S.'s reliability issues…………………..24
   D. The federal warrant contained additional intentional omissions material to probable cause……………………………………………………………..27

Conclusion…………………………………………………………………………………..28

JA208

## Introduction

On December 2, 2019, the Prince George's County Police Department ("PGCPD") arrested Mr. Vanderpool and executed a search warrant of his home, seizing his personal cell phone (referred to in the warrants as "Target Device 8") from his person incident to arrest and additional electronic devices from within his home.[1] Forty-five days after the devices were seized, on January 17, 2020, the state applied for search warrants for Mr. Vanderpool's devices, but never searched them. The devices remained in state police custody until June of 2020, when federal agents sought and obtained a warrant for them.

Mr. Vanderpool moved to suppress the evidence searched pursuant to both the state and federal warrants. The warrants suffered from a cascading array of defects, with each containing one more constitutional infirmity than the one before it. The state premises warrant was facially lacking in probable cause and omitted material facts. The state devices warrant lacked probable cause for file types, was overbroad, and omitted material facts.[2] The federal devices warrant lacked probable cause as to file types, was overbroad, omitted material facts, and was the fruit of an unconstitutionally prolonged seizure. The good faith exception does not apply to any of these constitutional violations. As a result, the evidence obtained pursuant to the state and federal warrants must be suppressed.

---

[1] *See* Gov't Response, No. 21-354-DLB, ECF 75 at 2 (clarifying that the arrest and search were executed on December 2, 2019, not December 3, 2019, as stated in subsequent warrant applications).

[2] The government's response points out that Mr. Vanderpool's motion makes reference to a state search warrant for Target Device 1, and assumes that Mr. Vanderpool intended to challenge all of the state device warrants, including the warrant for Target Device 8. The government is correct – Mr. Vanderpool's intention is to challenge all state device warrants. Mr. Vanderpool noted in his motion to suppress that the only state device warrant received in discovery was the warrant for Target Device 1. ECF 13 at 15. The government's first discovery production on December 10, 2021, included state warrants, including the warrant for Target Device 1. The warrant for Target Device 8 was produced in Production 7 on May 16, 2023, after Mr. Vanderpool filed suppression motions in the prior case, DLB-21-354. Because the device in the more recently disclosed warrant is identified by serial number, and not as "Target Device 8," counsel did not realize until a more recent further review that a different warrant had been provided in that production.

1

JA209

The government's primary argument in response is that even if either of the state warrants had been constitutionally defective, the federal warrant would have cured any residual defect from the state warrants. This is wrong. Mr. Vanderpool does not argue that the evidence obtained pursuant to the invalid state warrants was relied upon in the federal search warrant affidavit. Rather, the federal search warrant suffers from its own independent constitutional infirmities, and the resulting searches must therefore be suppressed.

## I.   The federal warrant sought access to the fruits of an unconstitutional seizure and lacked probable cause as to each device and file type.

On June 23, 2020, more than six and a half months after the seizure of the devices, federal agents applied for and obtained a search warrant for devices, including Mr. Vanderpool's personal cell phone (Target Device 8). The federal search warrant was constitutionally defective for two primary reasons.

**First,** the devices were the fruit of an unconstitutional seizure at the time of the warrant application. The government cannot therefore rely upon the independent source doctrine or inevitable discovery to save the federal warrant.

**Second**, the warrant affidavit lacked probable cause as to *each device* it sought to search, as well as each category of data it sought to seize from the devices.

### A. The devices were the fruit of an unconstitutional seizure by the time of the federal warrant application, nearly seven months after their seizure.

The state seized Mr. Vanderpool's devices on December 2, 2019, and waited 45 days before applying for a search warrant for those devices. Though the state never searched the devices,[3] it maintained custody of them for nearly seven months until handing them over to federal agents. Federal agents began investigating this case in March of 2020. By the time

---

[3] The state search warrant authorization expired 15 days after its approval, so by February 1, 2020, there was no longer any lawful authority to search the devices.

2

JA210

federal agents applied for the search warrant in June of 2020, the seized devices were the fruits of a Fourth Amendment violation due to the unreasonable delay between the seizure and the search warrant application.

The government contends that there was no unreasonable delay because (1) the devices here were not seized without a warrant, distinguishing the case from *Pratt* and *Mitchell*, (2) the relevant timeline in assessing the delay is from the time the federal government obtained the devices to the time the federal government undertook efforts to search them, and (3) Mr. Vanderpool's possessory interest in his devices was "severely diminished" following his arrest and subsequent detention. As will be explained below, the government is wrong on all three counts.

**First,** even if the initial seizure of the devices was justified by probable cause and/or a warrant, the delay in seeking a warrant rendered the seizure independently unreasonable. While several of the devices were seized during the execution of the premises warrant, Mr. Vanderpool's personal cell phone, the only device the government has specifically indicated that it intends to offer evidence from, was seized incident to his arrest, and not pursuant to a warrant.

**Second**, the Fourth Amendment does not allow the federal government unquestioned access to the fruits of an illegal seizure. The government has provided no justification for the state's 45-day delay, for the subsequent (unquantified) delay between the federal agents' learning that the devices were in state custody and the federal search warrant application, or for the sum of six plus months that elapsed between seizure and search. The government offers no authority for the proposition that the Court can simply ignore the months-long seizure that preceded the federal search. The Fourth Amendment does not

3

JA211

permit one sovereign to unlawfully seize an individual's personal property, and then cleanse the Fourth Amendment violation attached to that seizure by simply passing the property on to another sovereign with a better warrant. The Court should refuse to endorse this practice, which incentivizes law enforcement to seize first and ask questions later.

**Third**, Mr. Vanderpool did nothing to diminish his possessory interest in his devices, particularly his personal cell phone. The Court should reject the government's problematic argument that any detained defendant, by virtue of his inability to access his personal property, loses essentially all interest in his property.

**And finally**, the good faith exception cannot be applied to this unreasonable seizure.

1. **Even if the initial seizure of the devices was justified by probable cause and/or a warrant, the delay in seeking a warrant rendered the seizure unreasonable.**

The government argues that this case is distinguishable from *Pratt* and *Mitchell* because here the phone and other devices were seized with a warrant. But that distinction fails both factually and legally. As a factual matter, and contrary to the representations made to the magistrate in the search warrant affidavit, Mr. Vanderpool's phone (Target Device 8) was not seized pursuant to a warrant; it was seized incident to his arrest. The search incident to arrest doctrine is an exception to the warrant requirement allowing the temporary seizure of a cell phone from an arrestee so that law enforcement can obtain a search warrant. *Riley v. California*, 573 U.S. 373 (2014). It in no way diminishes law enforcement's obligation to "proceed[] diligently" in securing a warrant to search its contents. *See United States v. Pratt*, 915 F.3d 266, 272 (4th Cir. 2019); *see also United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020) ("The right of the police to temporarily seize a

4

JA212

person's property pending the issuance of a search warrant presupposes that the police will act with diligence to apply for the warrant.")

And for those devices that were seized under the premises warrant, the warrant did not articulate probable cause with respect to particular devices, did not authorize a search of the devices, and did not suspend the government's obligation to work diligently to obtain a warrant. This is unlike the warrant in *United States v. Brady*,[4] which "authorized **not only seizure of all electronic devices, but also a search** of their contents for evidence of the crime." 577 F. Supp. 3d 420, 427 (E.D. Va. 2021) (emphasis added). Even if the initial seizure of a device is justified by probable cause, law enforcement's interest in the device "is delimited by the obligation to seek a search warrant without unreasonable delay." *United States v. Smith*, 967 F. 3d 198, 209 (2d Cir. 2020). "The longer the police take to seek a warrant, the greater the infringement on the person's possessory interest will be, for the obvious reason that a longer seizure is a greater infringement on possession than a shorter one." *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012). That an initial seizure was supported by a warrant factors into the balancing analysis, but does not exempt a case from it.

### 2. The Fourth Amendment does not allow the federal government unquestioned access to the fruits of an illegal seizure.

The government's response points out that federal agents did not take possession of devices until after obtaining a warrant to do so, but fails completely to address the months-long state seizure of the devices that preceded federal agents' access to them. The

---

[4] Cited by the government at ECF 17 at 15.

government alternatively argues that any delay in the federal government's seeking a warrant after learning the devices were in the state's possession was reasonable.

The government's seizure of the devices was the direct fruit of their unlawful retention by the state. The state's unlawful seizure led directly to, and was essential to, the federal government's unlawful seizure. There is no authority for whitewashing one sovereign's illegal seizure by passing property on to another. None of the multiple federal courts that have considered the seizure of devices passed from one agency or sovereign to another completely ignores the initial lengthy seizure. To the contrary, courts assess the entire timeline of the seizure, with an eye towards what federal agents should have known— and should have done—when in order to comply with their obligation to diligently obtain a warrant in a reasonable period of time.

Reviewing federal courts do not ignore extended retention of property by state authorities prior to a search solely because federal authorities subsequently obtained a search warrant.  In fact, courts have granted suppression in cases where, as here, state authorities retained cellular phones for an extended period before federal authorities obtained and executed search warrants for those same phones.  In *United States v. Briscoe*, Judge Bennett granted a motion to suppress the federal government's cell phone search where the phone was in Baltimore Police custody for over six years until it was transferred to the custody of the ATF, which promptly applied for a search warrant. No. RDB-20-0139, 2022 WL 294296, at *2 (D. Md. Feb. 1, 2022).

In *United States v. Tisdol*, the District of Connecticut judge found that the state police's initial seizure of a smartphone was constitutional, but held that the FBI's 34-day delay in seeking a warrant was unreasonable. 544 F. Supp. 3d 219 (D. Conn. 2021). There,

JA214

the federal investigation was opened three months after state police seized the device, and the federal search warrant was sought just days after that. At the time of the federal search warrant application, the device was in state police custody. *Id.* at 222. The government argued that the delay should be measured as the four days between the FBI developing probable cause and the warrant application. *Id.* at 225. The Court rejected that argument and determined that the length of delay should be measured, "at best," as the 34 days between when DNA lab results were released (connecting the defendant to a federal offense) and the search warrant application. *Id.*

In *United States v. Nguyen*, the phone at issue was initially seized on November 2, 2018, by a Mississippi sheriff's deputy. No. 119CR00004JAJHCA2, 2021 WL 1325797, at *1 (S.D. Iowa Mar. 16, 2021). Sometime later, an Iowa narcotics agent learned that Nguyen's phone remained in Mississippi police custody and had not been searched; on January 13, 2021, the Iowa agent asked the Mississippi sheriff's deputy to send him the phone, and on January 18, 2021, he received it. *Id.* On February 12, 2021, the Iowa Special Agent sought and obtained a search warrant, and on February 22, 2021, the phone was downloaded. *Id.* The government argued that Iowa law enforcement acted diligently to obtain the cell phone and a search warrant for it once they learned it was in Mississippi police custody. But the court measured the delay from Mississippi seizure to Iowa search warrant as 27 months, and determined that the conduct of Iowa law enforcement was not reasonable in two respects:

> **First**, Iowa law enforcement and prosecutors should have known that the cell phone was seized as soon as they learned of the Mississippi traffic stop, and they should have acted diligently then to obtain the cell phone and a search warrant. They knew or should have known what was seized in

7

JA215

> Mississippi no later than April 23, 2019, when the indictment was superseded to charge a conspiracy beginning on or about the date of the Mississippi stop, some 21 months before they sought a warrant. **Second**, the 5-month delay between when SA Peterson learned from Deputy Johns that the cell phone was still in police custody in Mississippi and the application for a warrant is also well beyond what is reasonable under the circumstances, as is the delay of at least 4 months between gaining that knowledge and requesting that the cell phone be sent to Iowa.

*Id.* at *2.

Here, no justification has been offered for the state's 45-day delay in seeking a search warrant, for the state's continued retention of the devices for months after the search warrant's authorization expired, or for the federal agents' delay in seeking a warrant for the devices once they learned they were in state police custody. While the government explains that the FBI began investigating this case in March 2020, there is no indication of when the FBI learned that the devices were in the state's possession. The federal search warrant affidavit was similarly silent with respect to the FBI's timeline as to the devices. Even if the Court considers solely the delay attributable to the federal agents, the delay is unjustified and as a result unreasonable. The federal agents should have known about the devices shortly after the investigation opened, and should have acted diligently at that point to request a warrant. The totality of the delay is far past reasonable.

Unnecessary delays are problematic not only because they infringe on an individual's possessory rights, but also because they "undermine the criminal justice process in a more general way: they prevent the judiciary from promptly evaluating and correcting improper seizures." *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012). The federal search warrant affidavit did not inform the magistrate of the timeline of the devices' seizure or

8

JA216

when federal agents learned of the devices' location, precluding the magistrate from raising any concerns or attempting to correct the improper seizure.

### 3. Mr. Vanderpool maintained a possessory interest in his devices, particularly his personal cell phone.

Though Mr. Vanderpool was arrested and detained on the same day that his devices were seized, he did nothing to diminish his possessory interests in the devices, particularly his personal cell phone. The government's argument that any detained defendant lacks essentially any possessory interest in his seized devices proves too much and oversimplifies the analysis federal courts apply.

In considering the nature of someone's possessory interest for purposes of an unreasonable delay analysis, courts look to the nature of the item seized and whether the individual diminished their possessory interest in the item. In *Pratt*, the Fourth Circuit held that Pratt, who did not consent to the phone's seizure and was not allowed to retain any of its files, "had an undiminished possessory interest in the cellphone." 915 F.3d at 272-73. The Court acknowledged the Supreme Court's recognition of "strong privacy interest[s] in a cellphone[,]" due to the nature of the device. *Id.* (citing *Riley v. California*, 573 U.S. 373 (2014)). The Court's analysis did not hinge on whether Pratt was detained. In fact, the Fourth Circuit's opinion made no mention of Pratt's detention status. Similarly, in *United States v. Smith*, the Second Circuit determined that "Smith did nothing to reduce his property interest by means of consent or voluntarily relinquishing control of his tablet computer," and noted that "[t]he sheer volume of data that may be stored on an electronic device like a [tablet] raises a significant likelihood that much of the data on the device that has been seized will be deeply personal and have nothing to do with the investigation of criminal activity." 967 F.3d 198, 207-08 (2d Cir. 2020); *see also United States v. Mitchell*, 565 F.3d

9

JA217

1347, 1351 (11th Cir. 2009) (concluding that because "[c]omputers are relied upon heavily for personal and business use[,]" "the detention of the hard drive for over three weeks before a warrant was sought constitutes a significant interference with Mitchell's possessory interest."); *United States v. Christie*, 717 F.3d 1156, 1163 (10th Cir. 2013) (defendant had voluntarily relinquished her possessory interests in computer where a co-owner consented to its seizure and the defendant did not object to the seizure at any point.); *United States v. Wilkins*, 538 F. Supp. 3d 49, 91 (D.D.C. 2021) ("An individual's property interest in their own cell phone can generally be assumed to be significant.").

Mr. Vanderpool's interest in his devices, particularly his personal cell phone, was significant due to the nature and volume of the personal data they contained. He did nothing to diminish his interest in the devices. He did not consent to their seizure, he did not co-own them with someone who consented to their seizure, and he did not relinquish them voluntarily. The only reason Mr. Vanderpool could not physically possess his devices while in custody is that the state itself prohibited him—through jail regulations—from possessing his devices in jail. It cannot be the case that the government can simply decree, by way of a jail regulation, that an individual has a diminished possessory interest in any property he is prohibited from using once he crosses the threshold of a jail. "It is well established that the constitutional protection against an unreasonable search is distinct from the protection against an unreasonable seizure. A search compromises the individual interest in privacy; a seizure deprives the individual of **dominion over his or her person or property**." *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997) (emphasis added). A person who is detained still has *dominion* over his property, even if he does not physically possess it; he can gift a cell phone to a family member, sell it to a friend, or donate it to

10

JA218

charity (assuming someone can facilitate the transaction). But he is prevented from doing any of that if the cell phone has been seized and kept by the police. In this way, the detention does not undermine one's possessory interest in their property.

The government cites to *United States v. Dorsey*, where the court found that the defendant had a "slight" possessory interest in his phone, in part because he remained in custody and made no attempt to regain possession of it. No. CR RDB-18-0347, 2019 WL 3804113, at *5 (D. Md. Aug. 13, 2019). The *Dorsey* opinion should not guide the Court here. The opinion rests heavily on a perceived factual distinction with *Pratt* (that Pratt was not incarcerated when his phone was seized) that the Fourth Circuit made no mention of and did not incorporate into its analysis in any way.

Other courts decline to place the burden on a defendant to request a return of seized property, as the practice conflicts with the government's obligation "after a seizure to 'diligently obtain a warrant in a reasonable period of time.'" *Nguyen*, 2021 WL 1325797, at *2 (citing *Illinois v. McArthur*, 531 U.S. 326, 334 (2001)). The lack of such attempts should not equate with one's forfeiture of any possessory interest in seized property. And, in any event, unlike the defendant in *Dorsey*, Mr. Vanderpool *did* attempt to regain possession of his phone. Between approximately January 9 and January 22, 2020, Mr. Vanderpool was released on home confinement in the state system. On multiple occasions beginning on the day of his arrest, Mr. Vanderpool (himself, through family, and through counsel) requested the return of his property, particularly his personal cell phone, which contained contacts, files, and other information he needed access to. State law enforcement did not return the devices or allow Mr. Vanderpool access to their contents, nor did they immediately seek a warrant. "When police neglect to seek a warrant without any good explanation for that

11

JA219

delay, it appears that the state is indifferent to searching the item and the intrusion on an individual's possessory interest is less likely to be justifiable." *Burgard*, 675 F.3d at 1033.

### 4. Good faith does not apply to this unreasonable seizure.

While the government invokes the good faith exception to the exclusionary rule with respect to any defects in the search warrant affidavits, ECF 17 at 28, it does not specifically invoke good faith with respect to Mr. Vanderpool's claim of unreasonable seizure. The good faith exception does not apply where the constitutional error is an unreasonable delay in seeking a warrant, as opposed to a defect with the warrant process.

Application of the good faith exception to this type of violation would eviscerate any deterrent effect on unreasonably long seizures. "Police could seize any item—a phone, a computer, a briefcase, or even a house—for an unreasonably long time without concern for the consequences, evidentiary and otherwise." *Burgard*, 675 F.3d at 1035; *see also Wilkins*, 538 F. Supp. 3d at 95 ("Procuring a late-obtained warrant cannot be enough to remedy this type of unreasonable delay, because by merit of the type of violation at issue a warrant is always eventually obtained—meaning under this logic the exclusionary rule could not ever operate to deter this Fourth Amendment violation."); *Nguyen*, 2021 WL 1325797, at *3 (declining to apply good faith to an unreasonably long seizure); *Tisdol*, 544 F. Supp. 3d at 229 (same); *Briscoe*, 2022 WL 294296, at *4 (applying exclusionary rule to unreasonably long seizure).

The exclusionary rule was meant to deter "deliberate, reckless, or grossly negligent disregard for Fourth Amendment Rights." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quotations omitted). Here, the violation resulted from law enforcement's delay in obtaining a warrant for devices that were seized several months prior. Law enforcement are presumed

12

JA220

to be aware of the law that a seizure must last "no longer than reasonably necessary for the police, acting with diligence, to obtain a warrant." *United States v. Song Ja Cha*, 597 F.3d 995, 1005 (9th Cir. 2010) (citing *Illinois v. McArthur*, 531 U.S. 326, 332, (2001)). And *Pratt*, a unanimous and uncontroversial decision following established Supreme Court precedent, was decided in February of 2019. The government's obligations under the Fourth Amendment were clear in 2020.

### B. The federal warrant lacked probable cause for each device and file type.

In his motion to suppress, Mr. Vanderpool argued that the federal search warrant for his devices failed to establish probable cause to seize "all stored data." ECF 13 at p. 15 (adopting arguments set forth in II.A. as to federal warrant). The government does not respond to this argument with respect to the federal warrant, other than to state that "Agent Bloomingdale's affidavit carefully identifies the specific type of digital evidence to be seized, and sets out the basis for her belief, based upon her training, experience, and research, that evidence of the four identified federal crimes would be found on the devices." ECF 17 at 11. The government does not explain how the warrant affidavit articulated probable cause as to *each device* let alone as to each category of data within each device.

The government's response does engage with this argument with respect to the state devices warrants, however. ECF 17 at 26. There, the government posits that if there is probable cause to search a device for evidence of a crime, that is usually sufficient to sustain a search of the entire device. The government's response ignores numerous federal court decisions who have considered this issue closely and come out the other way. The Court should find, consistent with this weight of authority, that probable cause must be articulated for file types within electronic devices, and that the federal warrant failed to do so here.

13

JA221

### 1. The Fourth Amendment's particularity and probable cause requirements assume special importance when law enforcement seeks to seize and search digital data.

A warrant affidavit must establish probable cause, i.e., it must show that "it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993). Probable cause is location-specific: a magistrate may not approve a warrant unless she has "a substantial basis for concluding that probable cause exits[s] to search a *particular place* for evidence of a specific crime." *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) (internal citation omitted) (emphasis added). If a warrant permits police to search in places, or seize items, for which there is no probable cause, it is impermissibly "overbroad." *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018). A search pursuant to a warrant is also "limited in scope by the terms of the warrant's authorization." *United States v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017) (internal citation omitted). This "particularity requirement protects against a general, exploratory rummaging in a person's belongings, to the extent that a valid warrant leaves nothing to the discretion of the officers performing the search." *Id.*

When "the property to be searched" consists of "electronic data," such as computer hard drives, cell phones, or email accounts, the particularity requirement—and therefore the probable cause requirement—"assume[] even greater importance." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *abrogation on other grounds recognized by United States v. Chambers*, 751 F. App'x 44, 46 (2d Cir. 2018) (unpublished); *see also, e.g., United States v. Nasher-Alneam*, 399 F. Supp. 3d 579, 588 (S.D. W. Va. 2019) (same); *In re Cellular Telephones*, No. 14-MJ-8017-DJW, 2014 WL 7793690, at *5 n.44 (D. Kan. Dec. 30, 2014) (same). These forms of "electronically-stored information," *Nasher-Alneam*, 399 F. Supp. 3d at 588,

14

JA222

are "akin to a residence in terms of the scope and quantity of private information they may contain," *Ulbricht*, 858 F.3d 71, 99. Indeed, the Supreme Court has recognized that "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." *Riley v. California*, 573 U.S. 373, 396-97 (2014) (emphasis in original).

Given the "serious risk that every warrant for electronic information will become, in effect, a general warrant," *Ulbricht*, 858 F.3d at 99, courts must "exercise caution" to ensure warrants for digital data are strictly and expressly limited to the places and items for which probable cause exists, *United States v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010).

### 2. A warrant for digital data must establish probable cause as to each category of files or information that police seek to seize and search.

Consistent with these principles, federal courts have insisted that when applying for a warrant to search a digital device or an email account, law enforcement must distinguish, and provide probable cause for, each of the various locations it wishes to search. In the context of cell phones, for example, a warrant may permit a search of only those areas of the phone in which the affiant provides probable cause to believe evidence will be found, e.g., text messages, emails, call log, photos, videos, applications downloaded from the phone's app store, etc. Federal courts have held that a warrant authorizing a search of additional areas of the phone, for which the affidavit supplies no probable cause, is invalid, and its fruits must be suppressed. After all, a search of those areas would be no different from looking for "undocumented aliens" inside a "suitcase." *Maryland v. Garrison*, 480 U.S. 79, 84-85.

JA223

In *United States v. Winn*, 79 F. Supp. 3d 904, 909-10 (S.D. Ill. 2015), police received a report that the defendant "was using his cell phone to photograph or videotape a group of thirteen and fourteen-year-old girls in their swimsuits without their permission" at a public pool, while also "rubbing his genitals on the exterior of his swim trunks." Officers obtained a warrant to search the defendant's phone for evidence of public indecency and to seize:

> any or all files contained on said cell phone and its SIM Card or SD Card to include but not limited to the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, any system files on phone, SIM Card, or SD Card, or any data contained in the cell phone, SIM Card or SD Card to include deleted space.

*Id.* at 910-11. During the ensuing search, officers discovered images of child pornography. *Id.* at 911.

The district court held the warrant was "facially overbroad" and "exceeded the probable cause to support it." *Id.* at 919. "Based on the complaint supporting the search warrant," the court explained, "there was probable cause to believe that only two categories of data could possibly be evidence of the crime: photos and videos." *Id.* The complaint "did not offer any basis" to believe evidence of public indecency would be found in other areas of the phone, such as the calendar, phonebook, contacts, SMS messages, MMS messages, emails, ringtones, audio files, call logs, installed application data, GPS information, WIFI information, or internet history and usage. *Id.* at 919-20. Yet the warrant permitted officers to search all the latter locations and to seize "virtually every piece of data that could conceivably be found on the phone." *Id.* The warrant therefore constituted "a general warrant," and the court suppressed all evidence seized pursuant to it, even evidence found in portions of the phone for which probable cause existed. *Id.* at 926-27.

16

JA224

The court in *United States v. Oglesby*, No. 4:18-CR-0626, 2019 WL 1877228 (S.D. Tex. Apr. 26, 2019), cited and adhered to the analysis in *Winn*. Believing the defendant had committed a string of car burglaries, the police in *Oglesby* obtained a warrant to search his phone for:

> any and all evidence that may be found therein including, but not limited to: photographs/videos; text or multimedia messages (SMS and MMS); any call history or call logs; any e-mails, instant messaging, or other forms of communication of which said phone is capable; Internet browsing history; any stored Global Positioning System (GPS) data; contact information including e-mail addresses, physical addresses, mailing addresses, and phone numbers; any voicemail messages contained on said phone; any recordings contained on said phone; any social media posts or messaging, and any images associated thereto, including but not limited to that on Facebook, Twitter, and Instagram; any documents and/or evidence showing the identity of ownership and identity of the users of said described item(s); [and] computer files or fragments of files.

*United States v. Oglesby*, No. 4:18-cr-626, ECF No. 21-2 at 1 (S.D. Tex. Mar. 20, 2019). Police found "incriminating photographs and videos," as well as inculpatory GPS data, on the phone. *Oglesby*, 2019 WL 1877228, at *1.

The court agreed with the defendant that "the warrant was overbroad in its description of which categories of data on the cell phone could be searched, as it allowed the police to search the entire contents of the phone, without limitations." *Id.* at *2. It is "[o]bvious[]," the court wrote, that "police will not have probable cause to search through and seize such an expansive array of data every time they search a cell phone." *Id.* at *7. Rather, if police "want[] to seize every type of data from [a] cell phone, then it [i]s incumbent upon [them] to explain in the complaint how and why each type of data [i]s connected to [the defendant's] criminal activity." *Id.* The warrant in *Oglesby* failed to meet

17

JA225

this standard: it did not establish probable cause as to "the various categories of data described in the warrant," and it "d[id] not limit the search to any particular files or data that could contain relevant evidence." *Id.* at *9. Accordingly, the fruits of the cell phone search had to be suppressed. *Id.* at *9-10.

The defendant in *United States v. Rarick*, 636 F. App'x 911, 912 (6th Cir. 2016) (unpublished), was arrested for "obstructing official business" after he used his cell phone to film a police officer during a traffic stop. Police swore out an affidavit asserting probable cause to believe evidence of that offense—i.e., the video the defendant shot—would be found on his phone. *Id.* A state judge issued a warrant "that authorized the search and seizure of, among other things, "'all information within' [the defendant's] phone, 'including but not limited to machine-readable data, all previously erased data, and any personal communications'; 'any and all electronic data contained in the device's memory as well as on other internal, external or removable media to include but not necessarily limited to . . . images, voice memos, photographs, and videos.'" *Id.* Pursuant to that warrant, officers discovered child pornography. *Id.* at 913.

The Sixth Circuit concluded "[c]ertain portions of the warrant, such as the portion authorizing seizure of 'images' and 'videos,' were specifically targeted to what the officers had probable cause to search," namely, "a video or image taken by [the defendant] on the date and around the time of his arrest." *Id.* at 915. Those portions therefore "passe[d] constitutional muster." *Id.* But other "portions of the warrant were not limited to files specific to what the government was searching for" and were constitutionally "infirm" as a result. *Id.* Because nothing seized under the latter portions of the warrant was admitted at trial, the Sixth Circuit ultimately affirmed denial of the defendant's suppression motion. *Id.*

18

JA226

The court's analysis made clear, however, that it believed such evidence was seized in violation of the Fourth Amendment and would have required suppression if the government had sought to introduce it.

In short, federal courts recognize that when seeking a warrant for a device or account containing electronic data, police must establish probable cause as to each specific category of files or information they hope to search. *See also, e.g., In re Nextel Cellular Tel.*, No. 14-MJ-8005-DJW, 2014 WL 2898262, at *13 (D. Kan. June 26, 2014) ("[P]robable cause to believe drug trafficking communication may be found in phone's the [sic] mail application will not support the search of the phone's Angry Birds application."); *United States v. Morales*, 77 M.J. 567, 570 (A. Ct. Crim. App. 2017) (ordering suppression because "the information presented to a military magistrate only provided probable cause to search [defendant's] phone for text messages," and therefore "a search for photographs on the phone, which revealed digital photographs of appellant's crime, was unreasonable"); *United States v. Woods*, No. 18-cr-0153, 2018 WL 7253603, at *6-7 (D. Minn. Nov. 16, 2018) (distinguishing *Winn* and holding warrant not "overbroad" because it authorized search limited to discrete "categories of information" (such as photographs, videos, call logs, address books, and text messages) for which affidavit established probable cause); *In re Search of Google Email Accounts Identified in Attachment A*, 92 F. Supp. 3d 944, 952 (D. Alaska 2015) ("[T]he warrant sought by the government is overbroad because it would authorize the government to seize and search the *entirety* of the six Gmail accounts, even though the government has only established probable cause to look at a small number of emails within a narrow date range." (emphasis in original)).

19

JA227

The government's argument to the contrary is unavailing. The government cites *United States v. Nelson*, No. CR DKC 20-0038, 2022 WL 2789093 (D. Md. July 15, 2022) for the proposition that "if there is probable cause to search a computer [or a cell phone] for evidence of a crime, that probable cause is usually sufficient to sustain a search of the entire computer." ECF 17 at 26. But *Nelson* does not go quite so far. There, Judge Chasanow opined that the warrants, which authorized the seizure and search of cell phones within residences, "pass constitutional muster, *albeit barely*." *Nelson*, 2022 WL 2789093, at *11 (emphasis added). The court pointed to evidence that the defendants had been shown to use more than one phone during the course of the drug conspiracy, and that the residences were occupied by individuals involved in the drug conspiracy. *Id.* In short, the court found that probable cause had been established as to all of the devices to search for evidence of drug crimes.

### 3. The federal warrant was a general warrant, authorizing an exploratory rummaging of every device seized.

Here, Agent Bloomingdale's affidavit sought authorization to search essentially all categories of files within 11 devices, including 9 cell phones and 2 laptops without articulating probable cause specific to any particular device. The affidavit explained that Target Device 4 had only been possessed by Mr. Vanderpool for the four months he was employed by the IRS. ECF 13-3 at ¶24. There is no allegation that any particular device was used in the commission or would contain evidence of the investigated offenses. While the affidavit notes contacts between Mr. Vanderpool and Tino's Towing employees, it does not specify whether any of the target devices were purportedly used to make those contacts.

While the affidavit lays out allegations of conspiracy, wire fraud, mail fraud, and extortion under color of right, it does not articulate why there is reason to believe evidence

20

JA228

of any of these offenses would be found on each of the seized devices, or within every file type of each device. At most, the affidavit articulates a basis to search Mr. Vanderpool's communications with Tino's Towing employees and bank records. It provides no basis to, for example, search his WhatsApp conversations with individuals completely unrelated to the investigation.

Because the warrant is overbroad, any evidence seized from it must be suppressed.

### C. The good faith exception does not apply where a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid.

Under the good-faith exception to the exclusionary rule, evidence derived from an unconstitutional search should not be suppressed when it is obtained in reliance on a facially valid warrant. *United States v. Leon*, 468 U.S. 897 (1984). The Supreme Court has emphasized, however, that "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23. There, the good faith exception would not apply, and suppression would be appropriate "if the officers . . . could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926. Suppression is also appropriate where "a warrant may be so facially deficient— i.e., in failing to particularize the place to be searched or the things to be searched---that the executing officers cannot reasonably presume it to be valid." *Id; see also United States v. Doyle*, 650 F.3d 460, 470 (4th Cir. 2011) (good faith does not apply to warrant affidavit whose "deficiencies...were so great as to render it objectively unreasonable for [the agent] to rely on the warrant.")

Where an affidavit fails to establish probable cause as to the specific file types that police seek to seize and search, courts do not hesitate to hold the good faith exception inapplicable. *See, e.g., United States v. Oglesby*, 2019 WL 1877228, at *9 (S.D. Tex. Apr. 26,

21

JA229

2019); *United States v. Winn*, 79 F. Supp. 3d 904, 922-24 (S.D. Ill. 2015); *United States v. Morales*, 77 M.J. 567, 576-77 (A. Ct. Crim. App. 2017). This Court should do the same. Because Agent Bloomingdale's affidavit provided no factual basis for believing evidence of a crime would be found in the Target Device's various file types, the good faith exception does not apply.

**II.    A *Franks* hearing is warranted for the state and federal warrants.**

Because each of the warrants in this case contained intentionally or recklessly-made omissions material to the determination of probable cause, a *Franks* hearing is warranted.

**A. Legal standard**

"To establish entitlement to a *Franks* hearing based on information omitted from the warrant affidavit, [the defendant] [is] required to make a 'substantial preliminary showing' that the omissions were intentional or reckless, and that the omitted information was material to the magistrate's probable cause determination." *United States v. Jones*, 942 F.3d 634, 640 (4th Cir. 2019) (internal citations omitted). "[T]he significance—or insignificance—of a particular omission to the determination of probable cause may inform [the court's] conclusion regarding the agent's intent." *United States v. Lull*, 824 F.3d 109, 117 (4th Cir. 2016).

**B. The state premises warrant omitted material facts in seeking to search Mr. Vanderpool's home for evidence of rape.**

The state premises warrant contained material omissions, namely, that law enforcement was in possession of the photograph of R.S. taken during the traffic stop, that in interviews with R.S. there was no indication of any additional photographs being taken, and that officers had stopped R.S. for speeding. The omissions were made with the intent to mislead, or in reckless disregard of their misleading impact, and were material to probable

JA230

cause. It is only without these omissions that the affiant offers any justification for searching Mr. Vanderpool's residence. Indeed, in the "Justification of Place to be Searched" section of the warrant, the affiant states, "Based on the facts provided by the witnesses, it is your affiant's belief that the Defendant took photographs of the victim." ECF 17-2 at 7. That section continues to articulate that "digital media such as photos can be stored" on digital devices including computers, cell phones, or tablets. *Id.* The affiant's stated intention is to search Mr. Vanderpool's residence for evidence of the investigated offense, including specifically for "Any and all still photography media such as prints of the known victim," and devices "capable of retaining digital image or video files." *Id.* at 8. In other words, a key justification to search the home was to search for the photograph that agents knew they already had.

Had the affidavit stated that law enforcement *already had* the photograph mentioned, there would have been no probable cause to search the home for photographs of the victim, or for digital media that could store photographs of the victim. And, in an investigation into an alleged sexual assault, without probable cause to search for photographs, there was no other basis to justify seizure of any electronic devices. *See Doyle*, 650 F.3d at 472 (evidence of child molestation does not support probable cause to search devices for child pornography); *United States v. Hodson,* 543 F.3d 286, 292 (6th Cir.2008) (suppression warranted where warrant affidavit "established probable cause for one crime (child molestation) but designed and request a search for evidence of an entirely different crime (child pornography)."). The affidavit articulated no other nexus to digital evidence aside from the photograph.

23

JA231

These omissions were intentionally made in order to establish a nexus between the investigation and digital devices within the home, for which probable cause was otherwise blatantly lacking.

**C. The same omissions persist in the state device warrant, in addition to omissions regarding Dupree's and R.S.'s reliability issues.**

The state device warrant affidavit for Target Device 8 (the personal cell phone) contains information copied and pasted from the premises warrant with the addition of just six sentences, underlined in the excerpt below:

> On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

> On December 3, 3019, a search warrant was executed at the Defendant's residence at 5115 Duel Place, Fairmount Heights, Prince George's County, Maryland.  A Samsung Galaxy S Ill with HEX number 990 004 700 187 55 recovered from the upstairs bedroom in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

ECF 17-3 at 4.

The material omissions from the premises warrant persist here. Additionally, the state device warrant misstates the date of Mr. Vanderpool's arrest and misrepresents that the personal cell phone was seized pursuant to a premises warrant, when in fact it was seized incident to arrest. While the arrest date misstatement might be explained as an unintentional and unimportant scrivener's error, the second misstatement impacts the magistrate's

24

JA232

constitutional analysis. Rather than determining whether there is probable cause to search a device that was seized pursuant to a warrant and probable cause, the magistrate was asked to authorize a search for a device seized without a warrant 45 days prior.

Perhaps more significantly, though, the device warrant omitted known issues with the credibility of two witnesses upon whose accounts the affidavit relied. By the time of the state device warrant application on January 17, 2020, PGCPD investigators knew that both R.S. and Dupree ("the witness officer") had each lied to investigators more than once, and Dupree was being actively investigated for fraud.

**Dupree lied at least three times, including once under oath.** On November 7, 2019, PGCPD Detective Savoy interviewed Dupree regarding the September 6, 2019, intervention with R.S. He falsely claimed that he left before any sexual contact took place between R.S. and Vanderpool.[5] On December 3, 2019, Dupree was interviewed again by Detective Savoy; he repeated that he was not present during the sexual encounter. On January 14, 2020, Dupree appeared at state Grand Jury. According to PGCPD reports, he was "verbally aggressive towards ASA Joy," and lied under oath, claiming that he left the station on September 6, 2019, "before the incident happened." PGCPD reports note that the ASA "wants to meet with Detective Flax in auto theft in order to get Dupree charged with insurance fraud." The report explained that since the ASA "had an agreement with Dupree's attorney, they cannot charge Dupree as it relates to Vanderpool's case."

**R.S. lied at least twice.** On October 3, 2019, during an interview with Detective Pettis, R.S. claimed that officer Dupree left before the sexual encounter took place. On November 13, 2019, during an interview with Detective Savoy, R.S. reiterated that officer

---

[5] Discovery bates number USA_001876-7.

25

JA233

Dupree left before the sexual encounter took place. On December 3, 2019, PGCPD received new information from R.S., who stated that Dupree *was* present *watching* the sexual encounter and admitted that she had lied in earlier statements to keep Dupree out of trouble. R.S. reiterated this to Detective Savoy during a recorded interview on Jan. 6, 2020.

Though the affidavit relied heavily on information provided by both witnesses, it did not inform the magistrate of their known reliability problems. This omission is material. The Fourth Circuit has held that "a judicial officer's assessment of probable cause ... *must* include a review of the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016) (quoting *United States v. Perez*, 393 F.3d 457, 461–62 (4th Cir. 2004)); *see also United States v. Glover*, 755 F.3d 811, 814 (7th Cir. 2014) (concluding that an affidavit that "omitted all information regarding the informant's credibility ... undermined the issuing magistrate's ability to perform his role as a neutral arbiter of probable cause"); *United States v. Hall*, 113 F.3d 157, 158 (9th Cir. 1997) (holding that a search warrant based solely upon an informant's claims lacked probable cause where the affidavit omitted "absolutely critical" information calling into question the informant's credibility).

Excised of the information provided by R.S. and Dupree, the affidavit lacked probable cause to support a search of the devices. The PGCPD investigation in this case relied entirely on witness statements, primarily R.S. and Dupree. Investigators met with and interviewed each witness numerous times. Omission of demonstrated issues with their reliability was intentionally or recklessly done in order to obtain the warrants.

26

JA234

### D. The federal warrant contained additional intentional omissions material to probable cause.

The federal search warrant affidavit contains many of the same omissions as the state warrants, and omits important information regarding the timing of the device seizure. The affidavit begins by reiterating the summary contained in the state warrants, which, as explained above, relied on statements made by R.S. and Dupree. In fact, paragraphs 14 through 17 are a nearly verbatim recitation of the state warrant affidavit. *Compare* ECF 13-3 at 4-5 *with* ECF 17-3 at 3-4. The federal warrant affidavit adds additional allegations based on Dupree's statements to investigators regarding a towing-kickback scheme. The affidavit repeated misstatements regarding the date of the warrant execution and the location of Target Device 8, stating that the devices were recovered from the search of Mr. Vanderpool's residence on December 3, 2019. Finally, the federal affidavit omits information regarding when federal agents learned that the devices were in state police custody.

That the federal warrant relied on information from R.S. and Dupree without informing the magistrate of their reliability problems is grounds for a *Franks* hearing for the reasons articulated above with respect to the state device warrant. Those grounds are even stronger in reference to the federal warrant, because Dupree's statements are relied upon even more extensively than in the state warrants.

The affidavit's omission of *when* federal agents learned the devices were in state police custody is important too because, as explained above, those devices were the product of an unconstitutional seizure, and this information was kept from the magistrate. Had the magistrate been informed that Target Device 8 was seized incident to arrest *and* that the devices had been held by the state for nearly seven months without justification, probable

27

JA235

cause would have been defeated. *See United States v. Tate*, 524 F.3d 449, 456-67 (4th Cir. 2008) (remanding for *Franks* hearing where warrant affidavit omitted that facts were derived from an illegal trash search).

Mr. Vanderpool has made a substantial preliminary showing that all three warrants contained intentional or reckless omissions that were material to probable cause. Good faith does not apply to *Franks* violations. *See United States v. Leon*, 468 U.S. 897, 914 (1984). A *Franks* hearing is warranted with respect to the state and federal warrants.

### Conclusion

For the reasons articulated in Mr. Vanderpool's motion to suppress and above, the state and federal warrants were obtained in violation of the Fourth Amendment and the evidence seized as a result must be suppressed.

Respectfully submitted,

_____/s/_____
Ellie Marranzini
Ned Smock
Assistant Federal Public Defenders
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: Ellie_Marranzini@fd.org
Ned_Smock@fd.org

JA236

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **Case No. 8:23-cr-234-DLB** |
| **v.** | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**· ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■**

## GOVERNMENT'S [PROPOSED] SURREPLY REGARDING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS

The government respectfully submits this [proposed] surreply to address claims raised for the first time or significantly expanded in the defendant's 28-page Reply memorandum.  Doc. 32 (the Reply).  The defendant introduces at least three new or substantially expanded challenges to the federal warrant and provides an entirely new basis for his request for a *Franks* hearing.  Whereas the defendant's initial motion primarily challenged the state warrants, his Reply centers on three challenges to the federal warrant: that federal agents unreasonably delayed getting a warrant; that the warrant was a "general warrant," lacking probable cause for each device and file type; and that the good faith exception is unavailable in cases of allegedly unreasonable delay.  Additionally, the defendant entirely re-imagines his *Franks* argument, which initially rested on a claim that the state detective who sought the original residence warrant omitted three particular facts, and which now rests on the claim that federal agents omitted those same facts *and* omitted information about the credibility of two witnesses referenced in the affidavit *and* omitted information about the state warrant process.

The government hereby responds to these new and expanded defense claims.  Additionally, it is the government's understanding that the defense hopes to call witnesses at the upcoming motions hearing, regardless of how the Court rules on the request for a *Franks* hearing; accordingly, the

JA237

government addresses here why this re-framed defense motion does not justify an evidentiary hearing.

## I.   There Was No Unreasonable Delay.

The state obtained facially-valid warrants, signed by a judge, for the defendant's arrest and for a premises search that would include the seizure of his electronic devices. The state then followed up with facially-valid warrants, also signed by a judge, to search each relevant individual device. Thus, by the time the FBI opened its investigation two months later, there had been three separate judicial findings of probable cause related to this case. Even though the FBI agents knew that the defendant's devices had been lawfully seized and they were aware that a state judge had already authorized a search of the devices, the agents consulted with the Assistant United States Attorney who was then assigned to the case and obtained yet another warrant for the devices. *Cf. United States v. Bynum*, 293 F.3d 192, 198 (4th Cir. 2002) ("[T]hat [an agent] consulted with the prosecutor prior to applying for the search warrant provides additional evidence of his objective good faith[.]"). In obtaining this additional warrant, the affiant-agent provided a detailed description of extensive evidence gathered during a timely federal investigation that had established probable cause with respect to multiple federal offenses. The agent appropriately limited the warrant to the relevant timeframe, Doc. 17 Ex. 1 Attachment B ¶ 1 (limiting timeframe to "December 20, 2017 until December 3, 2019"), and specifically identified what items could be sought and where they might be found, *id.* ¶¶ 1, 5. The defendant's request for application of the exclusionary rule under these circumstances is without basis in law or public policy.

For reasons set forth in the government's initial Response to the defense motion, Doc. 17, there was no unreasonable delay here. In his Reply, the defendant cites a string of inapposite cases that together stand for the unremarkable proposition that law enforcement may not seize property

2

JA238

without a warrant and then carelessly toss that evidence aside for months or years before seeking to search it. *See, e.g., United States v. Briscoe*, No. RDB-20-0139, 2022 WL 294296 (Feb. 1, 2022) (involving a phone taken from defendant and then held in a detective's desk for six years); *United States v. Tisdol*, 544 F. Supp. 3d 219 (D. Conn. 2021) (involving an unclaimed phone recovered near a crime scene and searched more than a month later after detectives learned DNA from the suspect matched a firearm recovered near the scene); *United States v. Nguyen*, No. 1:19-cr-00004, 2021 WL 1325797 (S.D. Iowa Mar. 16, 2021) (involving a phone seized during a traffic stop during which no charges were filed, and held for more than two years before being searched).  A delay is particularly problematic where, *unlike* here, the electronic device is seized without a warrant or consent and not incident to arrest, and where the device *itself* contains the primary evidence of the crime under consideration. *See United States v. Berroa*, No. 19-cr-10164-ADB, 2021 WL 149254, at *4, *7 (D. Mass. Jan. 15, 2021) (distinguishing cases where "the contents of the phones . . . at issue were needed to discern whether there was a basis for a criminal charge," and applying good faith exception to exclusionary rule);  *see also, e.g., United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) (involving a tablet suspected of containing child pornography, seized during a traffic stop without a warrant or consent or incident to arrest, and where "the tablet's evidentiary value turned solely on what the police might find from a search of its contents"; notably, the court refused to apply the exclusionary rule, despite finding an unreasonable delay); *United States v. Pratt*, 915 F.3d 266 (4th  Cir. 2019) (involving a phone suspected of containing evidence of child pornography, seized outside a hotel room without a warrant or consent and not incident to arrest); *United States v. Burgard*, 675 F.3d 1029, 1033 (7th  Cir. 2012) (involving a phone suspected of containing evidence of child pornography, seized without a warrant or consent and not incident to arrest); *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009) (involving a computer suspected of containing evidence of

3

JA239

child pornography, seized without a warrant or consent and not incident to arrest); *cf. United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) (involving a phone suspected of containing evidence of public indecency, seized with consent but without a warrant and not incident to arrest; court deemed the delay to be reasonable).

Here, officers obtained the phone during an arrest for which they had obtained both an arrest warrant and a premises search warrant authorizing seizure of devices as evidence in support of an alleged sexual assault;[1] officers then obtained device warrants; and FBI agents subsequently consulted with prosecutors and obtained another warrant. This is a far cry from the reckless law enforcement action other courts have criticized. *Cf. United States v. Dorsey*, 2019 WL 3804113, at *4 (D. Md. Aug. 13, 2019) (finding no unreasonable delay when FBI obtained phone from state authorities after more than a year); *United States v. Moore,* 2022 WL 16636821, at *2 (W.D.N.C. Nov. 2, 2022) (finding no unreasonable delay, and distinguishing *Mitchell, Pratt, and Burgard* by noting that "[t]he defendant's argument rests on cases that are inapposite. They involve warrantless seizures of items to preserve potential evidence followed by unreasonable delay in obtaining warrants to search them, determine their relevance, and return them to their lawful owner if not incriminating."); *United States v. Wright*, 534 F. Supp. 3d 416, 427 (M.D. Pa. 2021) (finding no unreasonable delay when the federal government received cell phones from state authorities 13 months after they were seized incident to arrest of person suspected of drug trafficking, where federal authorities obtained a search warrant for the phones shortly after receiving them, and distinguishing cases where "ascertaining the contents of the property at issue was necessary to determine whether

---

[1] As explained in earlier pleadings, *see, e.g.*, Doc. 17 at 8, the state device warrants mistakenly stated that the defendant's personal phone was seized from his home. Federal agents, relying on that information, did not learn until more than three years later (while preparing to respond to an earlier version of the defense Motion to Suppress) that this information was mistaken, and that the defendant's personal phone was in fact seized from his person incident to arrest. The government immediately updated defense counsel and the Court with this information.

4

JA240

there was a basis for a criminal charge"); *see also United States v. Leon*, 468 U.S. 897, 908 (1984) (emphasizing that the Supreme Court "ha[s] expressed a strong preference for warrants" and that "the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination").

## II.    The FBI Warrant Was Not a "General Warrant."

The FBI warrant set out, in detail, probable cause to believe that the defendant had committed multiple federal offenses over the course of approximately two years, and it described, with care, the specific types of evidence for which there was probable cause to search in the defendant's devices (because, among other reasons, "persons involved in wire fraud, mail fraud, and crimes of violence, including extortion under color of official right utilize computers, cellular telephones, and other electronic devices to communicate with witnesses and possible co-conspirators before and after the crime and to maintain records of these contacts," Doc. 17 Ex. 1 at ¶ 11). The warrant also explained, with equal care, where that evidence might be found (including in "[v]oicemail messages" and "audio clips," *id.*, Attachment B, at ¶ 1). The warrant was temporally limited based on the facts establishing probable cause, and it outlined a search protocol that was similarly tailored. *Id.* at ¶¶ 5-7. *Cf. United States v. Moore*, No. 3:19-cr-86, 2022 WL 16636821, at *1 (W.D.N.C. Nov. 2, 2022) (noting that "[w]hether probable cause for a search exists is a 'practical, common-sense' question, asking whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' and underscoring that because "[a] magistrate judge's determination of probable cause is given 'great deference,' . . . a reviewing court asks only 'whether the judicial officer had a "substantial basis" for finding probable cause'") (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Nevertheless, the defendant likens the FBI warrant to a general warrant authorizing law enforcement to rummage freely through the defendant's devices. Reply, at 20.

5

JA241

Again, the defendant's authorities are inapposite; together they stand for the simple proposition that the place to be searched pursuant to a warrant must be a place where the evidence being sought could reasonably be found. *See, e.g., United States v. Rarick*, 636 F. App'x 911 (6th Cir. 2016) (noting that probable cause to look for a particular video in a defendant's phone cannot justify search of "all information" in the phone; nevertheless noting that the portions of the warrant justifying search of such things as "images" and "videos" passed constitutional muster); *Winn*, 79 F. Supp. 3d at 919 (search warrant was overbroad because it authorized search of an entire phone when the only evidence being sought – photos and videos – could not possibly be found in such places as the phone's calendar, phone book, ringtones, call logs, etc.)[2]; *United States v. Oglesby*, No. 4:18-cr-0626, 2019 WL 1877228 (S.D. Tex. Apr. 26, 2019) (noting that an affidavit establishing probable cause to arrest for car burglaries, but containing no nexus to a phone, cannot justify a search of the phone).

### III.    <u>The Good Faith Exception *is* Available in Claims of Unreasonable Delay.</u>

The defendant, in a broad overstatement, claims that "the good faith exception does not apply where the [alleged] constitutional error is an unreasonable delay." Reply, at 12.  The cases he cites do not support that claim, and in fact support the opposite conclusion.

When an officer acts in good faith, the exclusionary rule does not apply. *See Leon*, 468 U.S. at 918.  This is because the exclusion of evidence is an extreme remedy, to be used only when absolutely necessary to deter bad conduct by officers. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)

---

[2] The defendant inaccurately cites *Winn* for the proposition that the remedy for an overbroad warrant is to suppress even evidence found in the places for which probable cause existed.  Reply, at 16.  *Winn* does not say this; rather, it says simply that the remedy for a "general warrant" is suppression. 79 F. Supp. 3d at 926 ("Because the warrant is a general warrant, it has no valid portions.").  Where the warrant is not a "general warrant," but is instead overbroad in certain respects, the remedy is to separate "the constitutionally infirm portion" from the rest and to suppress only evidence from that portion. *United States v. Cobb*, 970 F.3d 319, 330 (4th Cir. 2020).

JA242

(suppression "has always been [a] last resort, not [a] first impulse"); *United States v. Herring*, 555 U.S. 137, 141 (2009) (exclusion applies only when its deterrent effect outweighs the "substantial cost" of "letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system'") (quoting *United States v. Leon*, 468 U.S. 897, 908 (1984)). This balance naturally varies with the degree of law enforcement culpability. *Leon*, 468 U.S. at 911. For the rule to apply, law enforcement conduct must be sufficiently deliberate such that exclusion can meaningfully deter it. *Id.* at 922. Simply put, "the benefits of deterrence must outweigh the costs." *Herring*, 555 U.S. at 141. "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

The cases cited by the defense – once again inapposite to the defendant's situation – stand only for the unsurprising proposition that the good faith exception does not apply when law enforcement's unjustified delay involves "deliberate, reckless, or grossly negligent" conduct that meets this need for deterrence. *See Davis v. United States*, 564 U.S. 229, 238, 240 (2011) ("Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case" where officers did not act "deliberately, recklessly, or with gross negligence."). In fact, the case on which the defendant principally relies rejects the defendant's position. *See United States v. Burgard*, 675 F.3d 1029, 1036 (7th Cir. 2012) ("All we say is that the good-faith exception is not *automatically* available as soon as a warrant materializes.") (emphasis added).

In other cases, not cited by the defense, courts routinely apply the good faith exception to unreasonable delays. In a particularly on-point case, the court denied suppression of evidence found in a phone that was seized incident to arrest and searched 15 months later, noting that the government believed that a previous warrant had authorized search of the phone. *United States v. Berroa*, No. 19-cr-10164-ADB, 2021 WL 149254, at *7 (D. Mass. Jan. 15, 2021). The court found nothing to

7

JA243

suggest bad faith "where the Phone was seized during the execution of a valid search warrant and the officers may have believed that the language of [a previous warrant] authorized" the search. *Id.*; *see also, e.g., United States v. Blanchard*, 544 F. Supp. 3d 166, 172-73 (D. Mass. 2021) (denying suppression of evidence from a phone that was seized without a warrant and searched four months later; noting that "[d]eterrence benefits do not outweigh the value of admitting the evidence where police act in good faith," and that the delay did not constitute the type of deliberate, reckless, or grossly negligent conduct the exclusionary rule was designed to deter); *United States v. Kormah*, No. 21-40012-TSH, 2023 WL 1490372, at *11 (D. Mass. Feb. 1, 2023) (denying suppression of evidence from a phone that officers seized incident to arrest and searched more than four months later; finding *no* unreasonable delay and noting that even if the delay had been unreasonable, suppression would be unwarranted because there was no bad faith).

## IV.    There is No Basis for a *Franks* Hearing.

The defense has revised its initial request for a *Franks* hearing based on its new allegation that the FBI intentionally omitted information about the credibility of two witnesses whose statements were included in the affidavit, and about the circumstances surrounding the state warrant.[3] To obtain a hearing, the defendant must make a "substantial preliminary showing" on two prongs: (1) that the agent intentionally or recklessly omitted material facts, with a subjective intent to mislead the magistrate; and (2) that the omitted facts, if included, would have defeated the finding of probable cause. *See United States v. Haas*, 986 F.3d 467, 475 (4th Cir. 2021) (an officer acts with reckless disregard when she fails to "inform the magistrate of facts she subjectively knew would negate

---

[3] With respect to the circumstances surrounding the state warrant, the defendant alleges that the FBI intentionally omitted information about the date on which the FBI learned that the devices were in state custody, Reply at 29-30, and implies that the agent intentionally misled the court about where the defendant's personal phone had been seized. However, the agent, having no reason to question the state warrant's assertion that the personal phone was seized from the home, also had no reason to believe that it was relevant at all what date the FBI learned of the existence of the devices in state custody. Any accusation of bad faith on these points thus runs counter to logic.

8

JA244

probable cause"); *United States v. Pulley*, 987 F.3d 370, 377 (4th Cir. 2021) ("[T]he *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading"; "[N]egligence, and even gross negligence, is not enough."). If the defense fails to make a "substantial preliminary showing" on either prong, he does not get an evidentiary hearing. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) ("In order to even obtain an evidentiary hearing on the affidavit's integrity, a defendant must first make" this substantial preliminary showing.).

The Fourth Circuit has described the burden of a defendant seeking a *Franks* hearing as "heavy," *Tate*, at 454, and has noted that it is especially heavy where, as here, the motion is based on alleged omissions rather than allegedly false affirmative assertions, *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011). The "substantial preliminary showing" cannot be based on mere assertions; the defendant's allegations "must be accompanied by an offer of proof." *United States v. Chandia*, 514 F.3d 365, 373 (4th Cir. 2008). This may include "affidavits or sworn or otherwise reliable statements of witnesses." *Id.* No such proof has been offered in this case. The defendant has presented *no* evidence of bad faith, and has certainly failed to make a "substantial preliminary showing" on both prongs. [4] Accordingly, he is not entitled to a hearing. *Colkley*, 899 F.2d at 300.

The alleged credibility omissions relate to two witnesses cited in the affidavit: R.S., the victim of the defendant's sexual assault, and Officer 2, the defendant's police partner on the night of the assault. [5] R.S.'s multiple accounts of the vehicle stop, arrest, and assault were consistent over time in all major respects except for one: in December 2019, she admitted that Officer 2, whom she

---

[4] The defendant has made no offer of proof on his *Franks* claim and has submitted no evidence to support his request for a hearing. The only offer of proof he made related to whether he had a possessory interest in his seized phone; on that point, he claimed in his Reply that he had made multiple requests for the return of his phone. Reply at 13. The defendant did not submit any evidence to support this claim, and the government to date has no information about whether it is true. Even if the defendant asked for his phone back, he is not entitled to a *Franks* hearing. Given that his phone was seized through legal process at the time of his arrest, any diminished possessory interest the defendant might have had was easily outweighed by the government's interest in holding and searching a phone that was legally seized after a finding of probable cause.

[5] Officer 2 is referenced in the Indictment as "an officer known to the grand jury." Doc. 1.

9

JA245

had previously said was not present at the police station during the assault, was in fact present. She explained that she had initially left him out because unlike the defendant, Officer 2 did not assault her, and because Officer 2 had encouraged the defendant to return her car to her. Officer 2, for his part, provided corroboration for R.S.'s general allegations, except that he too claimed at first (multiple times, including under oath) that he was not present for the actual assault. However, in May 2020, he wrote in a letter to the Mayor of Fairmount Heights that the defendant "pulled over a young female, took her back to the station, and raped her," and that when Officer 2 "cleared the scene" and "went back to the station," the defendant "made a statement to me asking me if 'I wanted to fuck her also.'" Letter to the Mayor, May 14, 2020, at 3.

Case law makes clear that not every fact known to the agent must be included in an affidavit. *Colkley*, 899 F.2d at 300. And the defense has cited no case suggesting that every fact affecting a witness's *credibility* must be included in a warrant. This is no surprise, as such a requirement would be entirely unworkable, especially in a case, such as this one, involving extensive investigation and numerous witness interviews. The cases cited by the defense merely show that when law enforcement bases an affidavit entirely or almost entirely on a *confidential informant* who has *significant credibility issues*, the officer must include credibility information in the affidavit.

In *United States v. Lull*, the officer who swore out a warrant had just moments before overseen a drug-buy using a confidential informant who stole from the detectives during that very buy and who was immediately fired as an informant. 824 F.3d 109, 112 (4th Cir. 2016). Moments later, the officer swore out a warrant without mentioning the theft or on-the-spot dismissal of the informant. *Id.* at 112-113. The court held that such a blatant oversight, just moments after the deceptive conduct and immediate dismissal, had to have been intentional. *Id.* at 115-16. Other cases cited by the defense include similar circumstances to those in *Lull. See, e.g., United States v. Glover*, 755 F.3d

10

JA246

811, 815 (7th Cir. 2014) (involving a "minimally corroborated" confidential informant with a "checkered past" that included a gang affiliation "and fourteen criminal convictions, including four for crimes committed while he was working as an informant," none of which was revealed in the warrant); *United States v. Hall*, 113 F.3d 157, 160-61 (9th Cir. 1997) (involving an affidavit based entirely on the uncorroborated claims of a confidential informant who "had a substantial criminal record, including a conviction for making a false report to police.")

None of the defense scenarios is even close to what happened here. In this case, there was *no* confidential informant, let alone a sole, uncorroborated one. "Unlike search-warrant applications based on information provided by unidentified CIs, applications based on information provided by cooperating witnesses need not rely on the witnesses' credibility when police independently corroborate the information." *Pulley*, 987 F.3d at 378. Confidential informants – generally law-breakers who are trying to work off their own charges by providing information to law enforcement – are not the same as other witnesses; indeed, many pattern jury instructions expressly recognize this difference, when they warn jurors to treat the testimony of informers with caution and great care. *See, e.g.*, Fifth Circuit Criminal Jury Instructions 1.15 (2019) (directing that such testimony "must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses"). But the FBI affidavit here did not rely on *any* confidential informant testimony; rather, it relied on multiple statements from multiple victims and witnesses who made allegations that were corroborated by documents, phone tolls, and towing records. There was no material omission here.

Moreover, there is no evidence (let alone a "substantial preliminary showing") that any omissions were intentional or even conscious, let alone subjectively intended to mislead a magistrate. *See Pulley*, 987 F.3d at 377 ("[R]eckless disregard in the *Franks* context requires a showing that the

11

JA247

affiant personally recognized the risk of making the affidavit misleading[.]").  The section of the affidavit that deals with the sexual assault comprises only six paragraphs out of 38 in the affidavit. And as even the defendant notes, the agent included several paragraphs that were "a nearly verbatim recitation" of the facts set forth in the (facially-valid, and thrice judicially-approved) state warrants, Reply at 29; the agent then focused her original-drafting efforts on adding detailed findings from the federal investigation the FBI had conducted since opening the case in March 2020.

Finally, the defendant has not met (and cannot meet) the second prong of the *Franks* test, because inclusion of the "omitted" information would not have defeated a finding of probable cause. The omitted information would have included not only that both R.S. and Officer 2 initially denied Officer 2's role as an eyewitness to the sexual assault, but also that both witnesses eventually confirmed that Officer 2 was, in fact, present at the station where the assault occurred.  Additionally, the information Officer 2 provided about a possible towing scam was heavily corroborated, by phone records, towing records, and multiple victim testimonials.

Under these circumstances, there is no reason to believe (let alone a "substantial showing") *either* that the agent purposely omitted credibility information to mislead a magistrate, *or* that inclusion of the information would have defeated the finding of probable cause.  Accordingly, the defendant is not entitled to any evidentiary hearing at the motions hearing on February 8.

For these reasons, and for the reasons stated in the government's opposition, Doc. 17, the Court should deny the defendant's motion to suppress.

Respectfully submitted, this 26th day of January, 2024.

12

JA248

Kristen Clarke
Assistant Attorney General
Civil Rights Division

_____/s/_____
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Elizabeth A. Hutson
Trial Attorney
Elizabeth.Hutson@usdoj.gov


Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

13

JA249

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S [PROPOSED] SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS has been served by e-filing upon counsel for the Defendant, this 26th day of January, 2024.

*/s/ Elizabeth Hutson*
Elizabeth Hutson

JA250

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Docket Number |
| vs. | ) 8:23-cr-00234-DLB-1 |
| | ) |
| MARTIQUE CABRAL VANDERPOOL, | ) |
| | ) |
| Defendant. | ) |
| | ) |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE DEBORAH L. BOARDMAN
UNITED STATES DISTRICT COURT JUDGE
MONDAY, FEBRUARY 12, 2024, AT 9:30 A.M.

<u>APPEARANCES</u>:

On Behalf of the Plaintiff:

    BARBARA S. BERNSTEIN, AUSA
    TARA KNOLL ALLISON, AUSA
    USDOJ/CRT
    150 M street, NE, 7th floor
    Washington, DC 20008
    202-353-0032
    Bobbi.bernstein @usdoj.gov

    Tara.allison @usdoj.gov

On Behalf of the Defendant:

    ELLIE MARRANZINI, ESQ.
    NED SMOCK, ESQ.
    Office of the Federal Public Defender
    6411 Ivy Lane, suite 710
    Greenbelt, MD 20770
    301-344-0600
    Ellie_marranzini @fd.org.

KATHY CORTOPASSI, RDR, CRR, CRC, Official Court Reporter
301-344-3499
United States District Court, Greenbelt, Maryland

***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

JA251

THE COURT: Okay. Good morning, everyone. Would the Government call the case. Everyone can be seated. Thank you.

MS. BERNSTEIN: Your Honor, I'm not familiar with this practice. I'm sorry.

THE COURT: Welcome. If you could, yeah, just call the case.

MS. BERNSTEIN: United States versus Martique Cabral Vanderpool, Case Number 23-234.

THE COURT: And introduce yourself, please.

MS. BERNSTEIN: Good morning, Your Honor. I'm Bobbi Bernstein appearing on behalf of the United States.

THE COURT: Okay. Good morning.

MS. ALLISON: Good morning, Your Honor. I'm Tara Allison also appearing on behalf of the United States.

THE COURT: Okay. Good morning. And welcome to the District of Maryland.

MS. BERNSTEIN: Thank you, Your Honor.

THE COURT: All right. Have a seat.

MS. MARRANZINI: Good morning, Your Honor, Assistant Public Defender Ellie Marranzini and here with my co-counsel Ned Smock, we're appearing on behalf of Martique Vanderpool, who is seated to my left.

THE COURT: Okay. Good morning both of you. Good morning, Mr. Vanderpool.

JA252

DEFENDANT: Good morning.

THE COURT: Okay. We have a number of motions to address today.

The parties filed something over the weekend. How do we wish to address that issue? I understand you'd like to do so under seal. Would you like to approach the bench?

MS. BERNSTEIN: Yes, Your Honor.

THE COURT: All right. Please do so. And make sure Mr. Vanderpool can hear. All right.

(SEALED proceedings held. Not included herein.)

THE COURT: All right. We're back on the public record.

Okay. As I mentioned, we have a lot of ground to cover today. And at the parties' request, I had previously agreed to address the issues in the order in which they have proposed.

So, let's first start with the motion to dismiss for pre-indictment delay. That's ECF-14.

All right. I've read the motion. I've read the opposition.

Ms. Marranzini, it's your motion. Do you have anything else to add? Or Mr. Smock?

MR. SMOCK: Yes, Your Honor. Just briefly I wanted to highlight a number of points.

First of all, I think the Court is familiar with

the timeline here. The incident in question occurred in September of 2019, and charges were initially brought in Prince George's County.

Two years after the incident, the Federal Government filed an indictment charging Mr. Vanderpool with deprivation of rights under color of law.

He was acquitted in state court of most of the serious -- the most serious charges in January of 2023.

And then in July of 2023, the Government here filed this new indictment, which was nearly four years after the conduct in question.

And so we recognize that the standard here requires us to establish prejudice. I wanted to identify two main points with respect to prejudice, and it relates to two witnesses.

The first one is Lieutenant Ivy. And just so the Court has a little bit of background -- this is sort of an unusual background. This is involving a small department. I think there were about four officers in the Fairmont Heights Police Department. Lieutenant Ivy was one of them.

The evidence would show that Lieutenant Ivy was in direct contact with the complaining witness, who was referred to as R.S., several times in the time after the incident prior to Prince George's Police Department initiating its investigation and prior to the time that Prince George's

police investigators actually interviewed the complaining witness.

This was -- I think the evidence would show that this was an unusual relationship with a 19-year-old. Lieutenant Ivy met with her a number of times, including taking her to lunch.

The evidence would show that Lieutenant Ivy was, in fact, ordered not to meet with the complaining witness by Prince George's Police and continued to do so despite their orders. And that, in fact, he was referred to as her, quote, "spiritual uncle," something I've never heard with respect to a law enforcement officer and a witness.

So, this is a really unusual situation and a situation that the defense would have wanted to inquire into with Lieutenant Ivy on the stand.

Lieutenant Ivy, as the Court is well aware, has since passed away.

THE COURT: What would Lieutenant Ivy have said that would have been exculpatory?

MR. SMOCK: Our theory is that Lieutenant Ivy had a grudge against Mr. Vanderpool. And his involvement with the complaining witness was aimed at, essentially, crafting her ultimate testimony and what she would tell the police.

Officer Dupree is another witness. Officer Dupree and Lieutenant Ivy were close. Officer Dupree, as the Court

JA255

is aware, was implicated directly in this matter.

Officer Dupree, as we can talk about in much more detail in regard to the Franks motion, was present during the charged conduct and initially lied repeatedly about whether or not he was present.

Officer Dupree and Lieutenant Ivy had every interest in essentially distancing Dupree from this incident and, in fact, implicating Mr. Vanderpool, and did so by manipulating the complaining witness in this case.

THE COURT: So, let me just interrupt you. The charge now is falsification of the incident report. How does the testimony of either Dupree or Ivy -- or how would it help your defense to this particular charge?

MR. SMOCK: I think that gets to the nature of the Government's proof in this case and the fact that the Government isn't being clear about what the nature of their proof would be.

So, the Government, in its pleadings, essentially says, "We don't know whether or not we're going to call the complaining witness. And if we don't call the complaining witness, then this evidence is entirely irrelevant."

We don't necessarily agree that it would be entirely irrelevant if the complaining witness doesn't testify, but we certainly concede that our motion here would be -- would have less strength if that were actually the

case.

If the Government were simply proceeding based upon Officer Vanderpool's testimony in his state court trial, it is true that there wouldn't be as much emphasis on discrediting the account of the complaining witness.

That they haven't said. They haven't committed to that one way or another.

If, in fact, she is going to testify in the trial, it's crucially important for the defense to be able to attack her credibility. And that would be done through testimony -- or would have been done through testimony from Lieutenant Ivy and Officer Dupree about the nature of their interactions with the complaining witness in the period before law enforcement started speaking with her and, in fact, afterwards, as well.

Officer Dupree was involved in an even more unusual relationship with the complaining witness, engaging in sort of flirtatious texts, providing her with necessities, meeting with her over and over again.

This is highly unusual conduct by a person who himself was implicated in this conduct and ultimately was forced to acknowledge that he was present during this incident, so.

THE COURT: How does any of this testimony undermine the anticipated evidence of the Government of the

towing situation?

Setting aside the alleged sexual conduct, the fact that he did not report in the incident report that the car was actually towed; he said it was returned to its owner.

MR. SMOCK: I'm not sure. I don't think that that testimony would impact that aspect of the case.

But to be clear, the Government's theory, and its prosecution here, relates to four separate alleged misstatements. And that's only one of them.

THE COURT: All right.

If the jury finds one of those, is your client convicted?

MR. SMOCK: You're putting me on the spot here. I think that may be the case. We haven't worked out the jury instructions.

But I think that alone wouldn't be a basis for denying this motion. I think the defense certainly has a due process right to challenge every aspect of the case.

THE COURT: That's fair.

MR. SMOCK: And the sexual conduct is certainly the one that the jury would focus on. I think it's the most serious allegation.

So, our position is that the fact that the Government waited for nearly four years to charge this conduct is a serious violation of his Fifth Amendment rights,

prevents us from having access to two witnesses who we would have been able to call to evaluate and to call into question the complaining witness's account. And for that reason, the motion should be granted.

THE COURT: Okay. Thank you.

Ms. Allison? Are you intending to introduce in your case-in-chief Mr. Vanderpool's testimony in the state trial?

MS. ALLISON: Yes, Your Honor.

THE COURT: What was his testimony, according to you?

Well, I guess according to the transcript.

MS. ALLISON: Mr. Vanderpool admitted that he had sex with R.S. while R.S. was in custody. That was what he testified to in the state trial.

THE COURT: Did he testify about the towing issue at all? Or was that irrelevant?

MS. ALLISON: I believe he did, Your Honor. And I believe his testimony about the towing incident was that R.S.'s car was towed and then after the sex in custody, the car was returned to her at no cost.

THE COURT: And that's contrary to a statement in the incident report which I haven't seen?

MS. ALLISON: That's correct, Your Honor.

THE COURT: Which I haven't seen. I'd love to have

a copy of the incident report if you have that.

MS. MARRANZINI: Your Honor, it's in our exhibit binder for the motion to suppress. It's at Exhibit 13.

THE COURT: Thank you.

(Pause.)

So, the second-to-last line says, "The registered owner picked up the vehicle and R.S. was released and sent on her way."

At his state trial, Mr. Vanderpool said that it was towed and the registered owner did not pick it up; is that right?

MS. ALLISON: That's correct, Your Honor.

And R.S. was not the registered owner of the vehicle.

THE COURT: Do you intend to call R.S.?

MS. ALLISON: The Government has not made that determination yet at this point, Your Honor.

The Government's position is that R.S. is not a critical witness to this case and to this obstruction charge. Certainly, the Government could call her. However, by the defendant's own statements and his own admissions, he admits to the underlying sexual contact that happened in custody; and, therefore, R.S. is not an essential witness to the Government's case.

THE COURT: So, you're not committing.

MS. ALLISON: Correct, Your Honor.

THE COURT: So perplexing to me. In civil cases, you have to know every witness, what everyone says five months in advance; but in criminal cases, we don't do that. And I can't force you to tell me whether you're calling her or not, and you're telling me you don't know. Correct?

MS. ALLISON: That's correct, Your Honor.

And our position is even if we were to call her, potential impeachment and pure speculation as to potential impeachment of a noncritical witness is not a basis for prejudice let alone substantial, actual prejudice which is the defendant's burden here.

THE COURT: Okay.

All right. Anything else to add on the motion to dismiss for pre-indictment delay?

MS. ALLISON: No, Your Honor.

THE COURT: All right. Thank you.

MS. ALLISON: Thank you.

THE COURT: Mr. Smock, anything else?

MR. SMOCK: No. Thank you, Your Honor.

THE COURT: All right. Thank you.

Okay. I'm going to read my ruling into the record. It's not short. I'm just giving you that heads up.

Let me start with the allegations. According to the current indictment, on September 6, 2019, Fairmont

Heights Police Officer Martique Vanderpool and another officer pulled over a young woman for speeding. After she started behaving erratically, Vanderpool had the car towed, arrested her, handcuffed her and, with the other officer, took her to the Fairmont Heights police station, which was then empty.

At the police station, Vanderpool had sex with her. Afterwards, he took her to where her car was being held and had her car returned to her free of charge.

The next day, Vanderpool wrote an incident report about what happened. His report did not mention that he had the victim's car towed from the scene, that he and the other officer took the victim to the police station, that he had sex with her there, and that he then had the car she was driving released to her without her having to pay the fee.

On January 21st, 2020, a state Grand Jury indicted Vanderpool on sexual assault charges, including one count of having sex with a person in custody for his conduct on September 6th.

In March of that year, the Federal Government opened its own investigation into what happened.

About six months later, on September 8 -- not six months later, about a year and a half later, on September 8, 2021, a Federal Grand Jury indicted Vanderpool on one count of deprivation of Civil Rights under color of law in

violation of Title 18 of the United States Code Section 242.

On January 17, 2023, the jury in the state case convicted Vanderpool of having sex with a person in custody.

On February 14th, Vanderpool was sentenced to time served and released from state custody.

On July 6, 2023, Vanderpool was indicted on one count of falsifying a record in violation of Title 18 of the United States Code Section 1519. That is the Federal charge he now faces.

On July 17th of last year, the first Federal indictment was dismissed.

Vanderpool moves to dismiss the indictment for pre-indictment delay in violation of his Fifth Amendment right to due process.

When a defendant moves to dismiss on the basis of pre-indictment delay, the Court must consider two questions: 1) whether the defendant has demonstrated substantial, actual prejudice; and if so, 2) whether considering the Government's reasons for delay, there has been a violation of a fundamental conceptions of justice or the community's sense of fair play and decency. United States versus Villa, 70 F4th 704 at 715 (4th Cir. 2023).

Before I evaluate the legality of the delay, I consider how long the delay was. Vanderpool contends that the delay ran from the moment he submitted the allegedly

falsified form to the moment the United States indicted him on this charge: Three years, nine months, and 29 days.

The United States contends that the delay, if any, ran from when the Government received a transcript of Vanderpool's inculpatory state trial testimony to the date of Vanderpool's indictment, about five months.

In the Fourth Circuit, the delay is the time from when the Government learns it has probable cause to indict the defendant to when the Government brings the indictment. And that's Villa again, 70 F4th at 716.

On one hand, the United States does not assert that it lacked probable cause to indict Vanderpool for falsifying the police incident report until it had his state trial testimony. Instead, it says only that the testimony provided powerful evidence in support of this charge.

On the other hand, there is no reason to think the United States knew it had probable cause to indict Vanderpool on this charge before it opened its investigation in March 2020, let alone from the moment he falsified the record. The upshot is the length of the delay is longer than five months but less than three years, nine months, and 29 days.

No matter what, the legality of this delay will turn on in whether it resulted in actual substantial prejudice to Vanderpool and whether it was justified.

JA264

Vanderpool has not demonstrated that the delay substantially prejudiced him.

To establish substantial actual prejudice, the defendant must show not only that the prejudice was actual, as opposed to speculative, but also that he was meaningfully impaired in his ability to defend against the Government's charges to an extent that the disposition of the criminal proceeding was likely affected. That's from Villa again at 716.

This is a heavy burden. Jones versus Angelone 94 F.3d 900 at 907 (4th Cir. 1996).

The Government alleges in the indictment that the report was false and misleading because, as Vanderpool then well knew, he and another officer known to the Grand Jury took the victim back to the abandoned police station in handcuffs following the traffic stop. He had sex with her on September 6th, 2019.

He and another officer known to the Grand Jury caused a towing company to tow the vehicle from the scene of the traffic stop, and Victim 1 -- excuse me -- the victim, not the registered owner, later retrieved the vehicle from the towing lot, and he procured the release of the vehicle to the victim from the towing company without the victim having to pay the fee.

Vanderpool contends that the Government's delay

prejudiced him by preventing the testimony of two witnesses, Lieutenant Ivy and Officer Dupree.

When the claimed prejudice is the unavailability of witnesses, as here, courts have generally required that the defendant identify the witness he would have called, demonstrate with specificity the expected content of that witness's testimony, establish to the Court's satisfaction that he has made serious attempts to locate the witness and, finally, show that the information the witness would have provided was not available from other sources. Jones 94 F.3d at 908.

Of course, the defendant is prejudiced by the absence of a witness's testimony only if the testimony would tend to exculpate the defendant. Jones at 909.

Mr. Vanderpool has met two of these requirements. He has identified the unavailable witnesses, and he has established that their testimony cannot be secured.

Between the alleged offense and the operative indictment, Lieutenant Ivy passed away; and over that same period, Dupree has been charged with multiple criminal offenses. He is facing trial on them. And he likely would invoke his Fifth Amendment right against self-incrimination if called to testify.

Nevertheless, Vanderpool has not established what these witnesses would have testified, how their testimony

would have helped him, or why he could not secure comparable testimony from other sources.

His main argument is that the testimony of both men is essential for the impeachment of the victim of the alleged sexual assault. He points to the victim's inconsistent statements to Ivy and DuPree.

He argues that given the number of statements, some of which were materially inconsistent given by R.S., the victim, related to the September 6, 2019, incident, both Ivy and DuPree would have been important witnesses for the defense to inquire into additional statements as well as other motive to fabricate or skew her account.

While true, these men may have been important witnesses for the defense to attack the victim's credibility, they are not essential witnesses for impeachment.

At a state trial for rape, Vanderpool succeeded in challenging the victim's credibility without the testimony of Lieutenant Ivy and Officer Dupree.

In fact, in his motion to suppress, Vanderpool argues that the victim's credibility can be dismissed simply in virtue of inconsistencies in some of her other statements to police officers and what Vanderpool characterizes as her own admission that she initially lied about whether Dupree was present for the assault.

Vanderpool has not established that the testimony

of Ivy or Dupree is essential to his defense.

Vanderpool also has not established that the testimony of either man would have been helpful.

For one thing, it is not clear how impeaching the victim's testimony would undermine, much less defeat, the Government's bid to prove that Vanderpool falsified a record.

The Government has not committed to using her testimony, much less relying on it.

For another, it is not clear that either witness would have said anything that would impugn the victim's claim that Vanderpool had sex with her at the police station.

At most, Vanderpool insinuates that their testimony might have helped him draw out other motives to fabricate or skew her account. But that claim is speculative and vague.

What's more, Vanderpool does not establish that either man could offer testimony that he did not have the car towed, and that the car's owner actually did retrieve the car.

Vanderpool does not sketch out what other testimony he expected Dupree to provide, let alone establish that it would have helped exculpate him. So, he has not demonstrated that he faces actual substantial prejudice from the absence of Dupree's testimony.

Vanderpool sheds more light on the testimony he expected from Lieutenant Ivy, but not enough to establish

actual prejudice.

First, Vanderpool reports that Ivy's widow found papers she believed were related to his duties.  Vanderpool suggests, does not quite say, that these documents might have shown that he was not properly trained or advised on the use of Fairmont Heights' police station or incident reporting.

Perhaps Vanderpool would have tried to have Ivy testify to that effect with the aim of demonstrating that he did not knowingly falsify his report by omitting mention of the alleged sexual assault, yet it is far from obvious how he would have connected those dots.

Second, Vanderpool hints, again without actually asserting, that Ivy could have helped him impeach then Chief of Police Watkins who testified in the state case.  But Vanderpool does not say what Watkins testified about, how impeaching Watkins would help him in this case, or even how Ivy's testimony would have helped him challenge Watkins' credibility.

Next, Vanderpool says that Ivy could have helped him impeach Dupree by discussing Dupree's personnel file or the animosity Ivy allegedly witnessed Dupree exhibit towards Vanderpool.

However, unless Vanderpool's aim is to establish that Dupree invented the sexual assault allegation, a claim even Vanderpool does not make, it is not clear how this

20

testimony would have helped him. Nor does Vanderpool even say, much less show, that he could not obtain comparable testimony from someone else.

There is also an irony here. On the one hand, Vanderpool claims he has been prejudiced by the loss of vital testimony he expected from Dupree; on the other hand, Vanderpool suggests that he would have sought to challenge Dupree's credibility. He does not explain how he can have it both ways.

In short, Vanderpool has not demonstrated what Ivy would have testified. He has not demonstrated how the testimony he anticipated would have helped exculpate him, and he has not demonstrated that only Ivy could have played this role. He has not established actual, substantial prejudice from Ivy's absence.

Finally, Vanderpool worries that the delay contributed to gaps in the memories of other key witnesses. The case law clearly indicates, however, that the loss or impairment of memories does not amount to actual prejudice for purposes of the due process clause. United States versus Nelson, 530 F. Supp. 2d 719, 727 (D. Md. 2008).

I now turn to justification. Even if Vanderpool had demonstrated actual substantial prejudice, the Government has justified the delay.

If delay results from a protracted investigation

JA270

that was nevertheless conducted in good faith, the Supreme Court has held that to prosecute a defendant following investigative delay does not deprive him of due process even if his defense might have been somewhat prejudiced by the lapse of time. United States versus Uribe Rios, 558, F.3d 347 at 358 (4th Cir. 2009).

That is the case here. The United States reports that it brought this charge after Vanderpool's state trial because he made numerous inculpatory admissions in his trial testimony and because the COVID-19 pandemic precluded a more efficient pretrial investigation.

Even if such reasons may not suffice where the actual prejudice to the defendant from the delay is substantial, there is no due process violation when these reasons are considered in light of the slight, possibly nonexistent, prejudice suffered. See United States versus Automated Medical Laboratories Inc., 770 F.2d 399 at 404 (4th Circ. 1985).

Vanderpool does not deny making inculpatory statements at trial, nor does he deny that the COVID-19 pandemic impacted the investigation. Instead, Vanderpool speculates that this case appears to be an effort to circumvent his acquittal on several of the state charges and a Department of Justice's Petit Policy, which restricts federal prosecutions for conduct at issue in prior

proceedings.

Whatever the appearance of circumvention around the Petit Policy there may be, there is no suggestion that the current indictment violates that policy, and Vanderpool's speculation about the Government's motivations for charging him with this indictment does not negate the Government's explanation.

Vanderpool also notes that he has already served the three-year maximum sentence he could have served for the state charge of which he was convicted.

The Fourth Circuit has concluded that this sort of argument cannot demonstrate prejudice or unjustified delay. That's in Uribe Rios 558 F.3d at 358-59.

If Vanderpool is arguing that he could have served concurrent time for this charge and the state charges, the prospect of serving concurrent sentences is too speculative to establish actual prejudice. That's also from Uribe Rios.

And if his point is that the Government delayed in order to prolong his time in prison by preventing him from serving state and federal sentences concurrently, then his claim is speculative and legally inadequate. The opportunity to serve concurrent sentences does not implicate a defendant's Fifth Amendment right to a fair trial, Uribe Rios at 358.

Even if the Government's timing was not ideal and

may raise eyebrows, it is not a betrayal of fundamental conceptions of justice or the community's sense of fair play and decency.

So, for those reasons, I deny the motion to dismiss the indictment for pre-indictment delay.

Let's move on to the motion to suppress. There are several components to the motion to suppress. There is a motion for a Franks hearing and then there's a facial attack to the four corners of the various affidavits.

Should we start with the Franks hearing?

MS. MARRANZINI: Sure, Your Honor. And I guess I should start by acknowledging there's three warrants at issue, two of which evidence was seized pursuant to.

There was the initial state residence warrant during which physical and digital evidence was seized; there was the later state device warrant on January 17th of 2020. And I believe the evidence is undisputed that the state was not able to extract any devices as a result of that warrant; and then there's the final Federal warrant through which devices were extracted.

The Government has indicated that they do not intend to introduce any evidence from any of the other devices, aside from the personal cell phone that is the subject of our kind of more focused attack on the seizure.

But they haven't yet decided, is my understanding,

whether they are going to seek to admit any evidence that was seized from the home. And so for that reason, a ruling from Your Honor is still necessary on the validity of the first premises warrant.

In that one, the gist of the Franks attack is that the affiant omitted critical facts, including the fact that the photograph that they claimed they were seeking evidence of was already in the police investigator's possession because it was attached to the incident report at issue.

The fact that the -- R.S. had been stopped for speeding; whereas, the affidavit makes it seem like she was pulled over kind of out of the blue, and we -- our position is that those omissions were material and they were made, if not intentionally, then with reckless disregard for whether they would mislead the magistrate.

The second state affidavit contains more significant --

THE COURT: Can we just go one at a time?

MS. MARRANZINI: Yes, Your Honor.

THE COURT: So, let's just talk about the state premises warrant. So, I read your papers on that. I've read the warrant. I don't see how you have made a substantial preliminary showing of materiality or intentionality.

Anything else to add on that?

MS. MARRANZINI: No, Your Honor.

JA274

THE COURT: All right. Let's move on to the state devices warrant.

MS. MARRANZINI: The state devices warrant contains the same defects but adds the additional problem, which is that at that point they're relying on the witness accounts of two witnesses, R.S. and the other officer who was present, Dupree. And by that point, state investigators are well aware that both of those witnesses have lied to them on prior occasions multiple times, and that information is omitted from the warrant.

Yet, the warrant would lack probable cause if those witness accounts were not contained.

THE COURT: Okay. That's an argument you first made in your reply; correct?

It doesn't matter. You've made the argument.

So, what are the inconsistent statements? And how are they material to probable cause?

MS. MARRANZINI: So, the issue is that the affidavit relies on the witnesses' statements and an affidavit does not inform the magistrate that those witnesses had credibility issues that were known to the investigators.

And the proof of that is that the lead detectives on the case -- originally, the lead detective in the state matter was Detective Pettus, and she spoke to the victim for the first time in October. The case gets reassigned to

Detective Savoy, and she reinterviews the victim in November. And she speaks to her, kind of covers all of the same ground. And it's actually on the same day -- and, again, the victim is telling an account of what happened in which Officer Dupree leaves the scene at the traffic stop. Officer Dupree does not return to the police station with Vanderpool and the complaining witness. And Officer Dupree is not present for the sexual act that takes place at the police station, and also Officer Dupree is not present when there's a visit to the towing company.

So, that's the complaining witness's initial first two or three statements.

December 2nd was the day that the State received the arrest warrant and the premises warrant. And that same day, the investigative records would show the complaining witness reached out telephonically to the lead detective to say, "I haven't been 100 percent honest with you. Essentially, I need to go back on the record because the other officer, he was there, actually, the whole time."

And so, while there may be a question of whether agents had that information in time to adjust their initial search warrant affidavit, there's no question that they had it in time for the second search warrant affidavit, which is January 17th of 2020.

Similarly, investigators had interviewed

Officer Dupree multiple times. And in the final interview that they had with him, which I think was on December 3rd of 2019, Detective Savoy, who at this point has learned from the complaining witness that Dupree was, in fact, present for the entirety of the events in question, directly confronts Officer Dupree and essentially says, "Why am I hearing that you were there? Like, you keep saying that you left, that you went 10-7, why am I hearing that you went there?" And he again says, "I don't know what you're talking about."

And after that point, Dupree is brought to the Grand Jury to testify. And according to investigators' notes, he lies in the Grand Jury because he reiterates his original -- his only account that he's told thus far, which is that he wasn't there when the acts in question took place.

And there's an investigator note that was produced in discovery that is clear on that point and is clear that the State's Attorney wanted to investigate him for perjury. And it's also clear -- and this is known to the investigating detectives at the State matter -- that he was also separately being investigated for insurance fraud and other offenses that would have a bearing on his credibility.

Yet, he's mentioned in the search warrant affidavit, and the magistrate at no point is informed that there are concerns about this individual's credibility.

THE COURT: So, if these concerns had been

fulsomely disclosed as you claim they should have been, how would that have negated the probable cause determination?

MS. MARRANZINI: Because it would have -- to the extent the affidavit is relying entirely on the accounts of these two witnesses, it would have caused a great deal of question about whether those accounts can be relied upon.

THE COURT: So, their credibility entirely about whether or not this incident happened at all would have been called into question and, therefore, the Magistrate Judge would have said, "Well, I don't believe that this even happened"?

MS. MARRANZINI: Well, the problem -- and this happened in an analogous context in the Fourth Circuit's decision in Lull is where an affidavit that omitted all information regarding an informant's credibility, the issue is that it undermines the magistrate's ability to perform his role as a neutral arbiter and determine whether probable cause exists.

So, yes, if their reliability is completely called into question and their statements were removed from the warrant, there would be no probable cause to search.

THE COURT: So, is the analysis that you remove their statements entirely? Or you disclose their inconsistent statements to the magistrate judge and at that point the judge reviews it?

MS. MARRANZINI: I mean, what they were supposed to have done is disclose their reliability issues so that the magistrate could ask followup questions or, you know, raise concerns about it. And the magistrate was deprived of his ability to do that because of these omissions.

THE COURT: So, we are talking about omissions, as you just said. And Lull was an omission case. And Lull said in that case that you could infer intent.

So, I'm now moving from materiality to the intentionality problem, that you could infer the officer's intent, either an intention to mislead or reckless disregard for the truth, from the omission itself, which there was -- I think we can agree, I think, particularly egregious, --

MS. MARRANZINI: Right.

THE COURT: -- the informant lied on the day that he did the controlled buy; and then within minutes of that, they terminated him as an informant and charged him. And then minutes later, maybe hours later, then filed for an affidavit saying to the magistrate judge, "You can believe this guy."

So, how do you, under Lull, establish intent?

MS. MARRANZINI: I think it's clear from the way the investigation proceeded in this case, which is that it started out being entirely based on witness accounts, the fact that these concerns about -- or these, you know, varying

statements amongst the witnesses were kind of front and center in the investigation to the point that -- and Mr. Smock referenced this in the context of the motion to dismiss -- you know, Dupree, who is the witness who was mentioned in the affidavit, was one concern for the investigating detectives; but Ivy was, too.

And there was also a note in their investigation that there was a consideration of pressing perjury charges against him, as well.

And both of those individuals had this demonstrated ongoing communication with the complaining witness to the point, again, that Lieutenant -- that the ASAs instructed the police chief to order Lieutenant Ivy to cease having communications with the complaining witness. And this is all in January before the second State warrant is sworn out.

So, I think, you know, these were issues that the detectives were dealing with because they were problems for the detective. They were apparent. And so omitting them from the affidavit, I think, certainly comes with the inference that it was done intentionally, if not recklessly.

THE COURT: So, maybe I missed this in your papers, or -- you know the facts better than I do -- but you were just focusing on Ivy. I haven't -- have you argued that you're entitled to a Franks hearing because they did not reveal information about Ivy? I thought it was just Dupree.

MS. MARRANZINI: No, Your Honor. Our papers mention only Dupree because Dupree is the only other witness mentioned in the search warrant affidavit.

But in terms of whether we would be able to show intentionality, there's also this additional context with respect to Ivy and his interactions with the complaining witness that were front and center in the detectives' minds.

THE COURT: Okay.

All right. Anything else?

MS. MARRANZINI: And then with respect to the Federal warrant, those same concerns persist and add to that the error with respect to where the personal cell phone was seized from.

All of the warrant affidavits indicate that the personal cell phone was seized from the home during the execution of the search warrant.

We learned in 2023 that the personal cell phone was seized from Mr. Vanderpool's person incident to arrest. That means that the reviewing magistrate would have had to consider that device as a device seized incident to arrest rather than pursuant to a warrant.

THE COURT: Well, there was an arrest warrant for him.

MS. MARRANZINI: That's right.

THE COURT: So, there's probable cause to arrest

him, his person.

MS. MARRANZINI: That's right. But there was no warrant that specifically identified that cell phone as an item to be seized or an item to be searched.

THE COURT: So, if they had arrested him at the threshold of his door, we'd be in a different circumstance?

MS. MARRANZINI: I think so.

THE COURT: Okay. Good argument.

MS. MARRANZINI: Just to be clear, that we're just discussing the Franks issue at this point; right?

THE COURT: Absolutely. Absolutely.

So, Ms. Bernstein, I want to focus on the intentionality problem, which, you know, encompasses intent to mislead or reckless disregard for the truth.

What is your response to the defense's position that Detective Savoy, who was steeped in the investigation in January of 2020, was apparently aware of the inconsistent statements given by R.S. and Ivy -- of Dupree, excuse me -- and Dupree about whether or not Dupree was present during the sexual assault? What's your position on whether or not they've made a substantial preliminary showing of intentionality?

MS. BERNSTEIN: They've made absolutely no showing. So, not only a preliminary -- not a preliminary showing. Not a substantial showing.

And if I could back up just one step for what the requirement is. The very first step in a Franks analysis, the threshold to even get his foot in the door, the defendant has to show -- has to make a substantial preliminary showing that the affiant, either Detective Savoy for the State warrant or Agent Bloomingdale for the Federal warrant, intentionally omitted information with the intent to mislead the magistrate.

And the Fourth Circuit has made clear that a mere allegation -- speculation isn't enough. The mere fact of omission isn't enough. And that what the affiant should have done or could have done is not the question. The question is: The affiant's subjective intent.

And so what that means is that the affiant knows that omitting this information runs the risk of misleading the magistrate and chooses to omit that information, anyway.

The Fourth Circuit has also been clear that a request -- a Franks motion has to be accompanied by an order of proof. So, that's not by allegation or speculation or why do we think -- why do we think Cleo Savoy didn't mention it? Why do we think -- the burden is on the defendant to make a substantial preliminary showing that that omission was intentional.

Now, I stand here with the question about Detective Savoy. Respectfully, I think -- I think that

question -- as a legal matter, the defense clearly has not made a substantial preliminary showing. But as a factual matter, I think we can actually set that aside because there was no evidence that was garnered from her warrant.

So, the warrant that really matters is the Federal warrant; that's the warrant from which our evidence came.

So, focusing on Agent Bloomingdale, who was the affiant on the Federal side, preliminary matter there is absolutely no showing. There has been no offer of proof, no affidavit submitted on the defense side that she omitted anything intentionally.

I would note that there is evidence to the contrary. There is evidence in the record in the form of the affidavit recently submitted by Agent Bloomingdale and the affidavit submitted last night by Agent Zimmerman. And that is affirmative evidence that this omission was not intentional.

I do want to emphasize, though, Your Honor, --

THE COURT: So, just tell me where is that? And particularly the Zimmerman affidavit. Actually, both of them.

MS. BERNSTEIN: The Zimmerman affidavit is the one that we sought leave to file last night. And it's been -- we weren't sure whether to file the affidavit or to mark it as an exhibit for today. So, in an abundance of caution, we did

both. So, we have it marked as Exhibit Number 1 -- Government's Exhibit Number 1 for today.

THE COURT: Okay.

MS. BERNSTEIN: Agent Bloomingdale's affidavit is the one that we submitted last week, Your Honor, in response to the Court's request for supplemental briefing.

And I do want to emphasize one thing with respect to those two affidavits, which is: We do have affirmative evidence in the record that this omission was not intentional or was not done with intent to mislead the magistrate, which is the standard.

But I want to emphasize that we don't need to rely on either of those affidavits because the burden is squarely on the defendant.

And I expect that the defense will say they have witnesses here today, and those are witnesses through whom they want to make their substantial preliminary basis. But that's not the legal test. This proof, the level of proof that they have to meet is the threshold before they can even get a hearing and call witnesses.

And that's really important, Your Honor, because otherwise they would be entitled to a hearing on the question of whether -- they would be entitled to evidence on the question of whether they're entitled to evidence.

And the reason for that threshold bar is that when

law enforcement gets a warrant signed by a judge, there's a presumption of validity to that warrant. And it would not make sense to have every defendant come into court on every warrant with a right to call witnesses and challenge that and have an evidentiary hearing. And that's why there's a threshold of proof required.

So, I want to -- I'm sorry. Did Your Honor have a question?

THE COURT: No. Go ahead.

MS. BERNSTEIN: You asked the question with respect to Cleo Savoy, but I want to answer -- and like I said, I think Cleo Savoy was a little bit irrelevant because there was no evidence seized from her warrant.

But you asked what the Government makes of the omission -- of the credibility information. And my answer so far has focused on the defense's absolute failure to produce any evidence of that.

But I do want to answer -- I want to answer on the facts, as well.

So, this motion that -- this motion, based on the omission of credibility information, is based on a premise that is incorrect. The premise it's based on is that the affiant was required to include this information and that, therefore, the omission of this information was misleading to the magistrate.

JA286

That premise fails on both points. The defense has cited no case suggesting that there is an affirmative duty by an officer filling out an affidavit to include credibility information for every witness.

All of the cases the defense has cited deal with whether or not they have to include credibility information with respect to a confidential informant. A confidential informant is, of course, by definition, confidential. The judge viewing information from a confidential informant has no context in which to view it. So, the affiant in that case tells the magistrate something about this person. Usually it's "This person has provided reliable information before."

Now, when the only -- what the only thing that the Government knows about that confidential person is "Well, this person provides unreliable information." That's something that the affiant needs to reveal to the magistrate judge.

Lull, as the Court's questions seem to recognize, Lull is an extreme case. But what the cases the defense cited, the proposition they stand for is that in that narrow situation where the Government is relying either entirely or almost entirely on a confidential informant, and the Government knows that this confidential informant is not reliable, that's something that the affiant has to reveal.

None of that happened in this case. There was no

JA287

confidential informant in any of the affidavits. Again, I'm going to focus my argument on the Federal affidavit in particular.

That Federal affidavit, the probable cause was based on a statement by R.S., statements by Officer Dupree, statements by other victims of a towing scam, towing records, phone records. There was a wealth of information in there. And none of that involved a confidential informant.

So, the initial premise that they were required to include that information is incorrect.

If I may, though, I also want to talk about the facts of the omission that is alleged here.

So, the defendant is alleging that the Government -- that Agent Bloomingdale intentionally omitted information about the credibility of R.S. and Officer 2. Their burden is to show that that was with intent to mislead the magistrate. I want to talk about those omissions in a little more detail.

As Ms. Marranzini said, the credibility information that was not included with respect to R.S. is that R.S., when she came forward and said that she had been raped by Defendant Vanderpool, she said the Defendant Vanderpool and Officer Dupree arrested her at the scene, they handcuffed her, they had her car towed. She was then taken back to an abandoned police station, a deserted police station, where

Defendant Vanderpool raped her, and she was then given her car back.

Now, in her initial telling, she said that Officer Dupree was not present at the station when she was raped. She made that statement a number of times.

And then as Ms. Marranzini mentioned, in December 2019, on her own, she called the police and she said, "There's something I have to tell you." She said, "I wasn't telling the truth about Officer Dupree. He was, in fact, there at the station when I was raped."

That's the omission that the defense is talking about, that the warrant didn't say that she called in December and admitted that she hadn't told the complete truth.

I want to look at that in conjunction with Officer 2. Because Officer 2 gave an account in which he generally corroborated R.S. on the stop, generally corroborated R.S. about what happened at the scene, generally corroborated R.S. about the car being towed. And then Dupree also said, "Whatever happened at the station, I wasn't there."

As Ms. Marranzini mentioned, he gave that statement a number of times, including under oath in the Grand Jury.

But then, as Your Honor knows from a letter that we attached to an earlier filing, in May of 2020, which was

JA289

before the Federal warrant was sworn out, Officer Dupree wrote a letter to the mayor of Fairmont Heights in which he referred to this incident, and he said in that letter that Defendant Vanderpool had raped a woman at the station. And then he said in the letter, "That while at the station, Vanderpool had turned to him and asked if he wanted to F her, too."

So, the bottom line is these two witnesses corroborate each other in tremendous respects. And then even with respect to the information that was allegedly omitted, they ultimately corroborate each other there, as well. They ultimately both say, "Yeah, Officer Dupree was at the station when Defendant Vanderpool raped R.S."

So, the next question, Your Honor asked whether the remedy -- if there had been an intentional omission, whether the remedy would be to strike R.S. and Officer Dupree from the warrant or whether it would be to add in the omitted information.

The answer is the latter. The remedy would be to add in the omitted information. If that information had been added in, what would be in the warrant is what I just told you, Your Honor, and it is inconceivable to the Government that what I just told you would defeat probable cause. If anything, the fact that Dupree ultimately admitted that he was there when Vanderpool raped R.S. would actually

strengthen the argument for probable cause.

Is there anything else I can answer for the Court on this issue?

THE COURT: No.

MS. BERNSTEIN: May I make one clarification for the record, Your Honor?

Ms. Marranzini mentioned that the Government has said that we don't intend to use any information from the 10 devices other than the personal phone. And just one tiny little clarification. We have said that at this point we don't have any expectation of doing that. We left our toe in the door in case something changes. And we said that if we do identify anything that we want to use, we would seek leave from the Court and we would give them significant notice before trial.

THE COURT: Okay. Very good. Thank you.

MS. MARRANZINI: May I briefly respond?

THE COURT: Certainly.

MS. MARRANZINI: To the Government's point regarding the case law having to do with confidential sources, I just wanted to point out that both of the individuals that were -- whose accounts were relied upon in both of the State warrants were unidentified except for the fact that one of them is identified as a police officer, which would, if anything, bolster his credibility in the eyes

of a magistrate rather than undermine it.

And, you know, the evidence that we have proffered with respect to him is, again, that the Government was well aware of his issues with credibility to the extent that they were going to potentially charge him with perjury.

And I'm just going to read from the note that we referenced in our pleading. This is from a PGPD investigative timeline. It states that on January 14, 2020, Dupree Grand Jury, "And he showed up with a crew that included Lieutenant Ivy and two other Seat Pleasant officers for support. They were not subpoenaed. Dupree was out of control and was verbally aggressive toward ASA Joy, yelling, 'You don't know me.' And it escalated to the point that Detective Savoy had to step --"

THE COURT: Slow down. Slow down. Go ahead.

MS. MARRANZINI: -- "had to step in and calm him down. Dupree told the Grand Jury he left before the incident happened. He gave the statement that he already gave."

"When asked by the Grand Jury why he left, Dupree deflected by saying" -- and I'm going to just orally redact this next part from my statement -- "ASA Joy wants to meet with Detective Flax in Auto Theft in order to get Dupree charged with insurance fraud. Since she had an agreement with Dupree's attorney, they cannot charge Dupree as it relates to Vanderpool's case. Lieutenant Ivy is continuing

to meet with the victim after getting a direct order from the chief, and he had lunch with her recently.  Ivy also advised that he has a lot of notes, but he has not provided those notes to investigators.  ASA Joy is looking into charging Ivy with perjury once his Grand Jury statement transcripts come back because he lied to the Grand Jury and said he was never approached by Dupree about the incident.  He's sticking to his story that this came from an anonymous source."

"He also testified before the Grand Jury yesterday, and they wanted the entire Department charged.  They were not feeling any of their testimony.  They could tell everyone is covering up."

So, the point of this is that it's -- it demonstrates, I think --

THE COURT:  It demonstrates a lot of problems with Officer Dupree.

MS. MARRANZINI:  That's right.

THE COURT:  Both his temperament, perhaps his desire to protect himself because he didn't want to be, you know, affiliated with this.

But what I'm not understanding is whether he made any statements that would have undermined probable cause to believe that Mr. Vanderpool committed the offenses outlined in the affidavits.  Whether or not his problems, his difficulties that you identified, some of his credibility

issues, how would that have negated probable cause? I'm just not following that.

MS. MARRANZINI: For a couple of reasons. One is that he -- if he had admitted that he was there, he was obviously a potential target of the same criminal investigation. And he wasn't charged.

THE COURT: Okay.

MS. MARRANZINI: And if -- and he's the one carrying on this communication with the complaining witness, and the complaining witness has identified Mr. Vanderpool as the offender.

The whole context that was aware -- that PGPD was aware of was that Lieutenant Ivy and Dupree were lying, they were arguably obstructing justice and interfering with the key witness in the case, and they were doing all of that to keep Dupree out of the spotlight.

THE COURT: Okay.

MS. MARRANZINI: And so, you know, that's evidence that the agents were well aware of.

And, again, both -- all three affidavits refer to witness officer as though he's someone who has no comments to be made about his credibility.

In the Federal warrant, by the time of the Federal warrant, which is in 2020, not only has Officer Dupree, you know, been the subject of potential investigations by the

State for insurance fraud and perjury, but we believe he was also actively being investigated by the FBI for offenses that are now indicted in the District Court of Maryland.

And the Federal affidavit relies even more extensively on his statements because he is the genesis of this towing kickback scheme that comes from Officer Dupree.

THE COURT: Well, on that topic, and I'm looking at the Federal affidavit, the section where it says, "Interview of Dupree," to me there seems to be only one statement that he made that incriminates Mr. Vanderpool, and it's detectives learned through an interview of him that Vanderpool, quote, "likes to tow cars."

And then Agent Bloomingdale recounts Dupree's general description of how towing schemes work. And then there are -- there's citation to towing complaints involving Vanderpool, emails about supporting this alleged kickback.

So, Dupree really is not that essential to the towing scheme.

MS. MARRANZINI: I don't know if I agree with that, Your Honor. Because it's four paragraphs of Dupree, which, you know, we'll concede were complemented by the FBI's review of these towing complaints; but those towing complaints are also referencing, again, emails and communications with Lieutenant Ivy. So, it's impossible to kind of disentangle Dupree and his role in attempting to obstruct the

investigation into this September 6, 2019, incident.

Ms. Bernstein cited the letter that Dupree sent to the mayor in May of 2020. That was, of course, after both State search warrant affidavits were written.

Just one moment, Your Honor.

It was after both State warrants were written, before the Federal warrant. And I just think it's difficult to argue that investigators weren't well aware of these issues with his credibility and the way his credibility issues might have also impacted the complaining witness's credibility.

THE COURT: So, are you insinuating that Dupree lied to protect himself, he exerted undue influence over this victim; and, essentially, maybe he's the one that had sex with her but was blaming Vanderpool?

MS. MARRANZINI: That's a possibility. That's not necessarily our theory.

THE COURT: Got it.

MS. MARRANZINI: I'm saying that agents, when they wrote to the magistrate to summarize their evidence of this incident that took place on September 6th and they're mentioning there was a witness officer present, knew that there were concerns about that witness officer's credibility when they failed to make any qualifications to the magistrate. And that failure must have been intentional. If

JA296

it wasn't intentional, then it was completely reckless because it was completely apparent to them. And that would have been material to the magistrate's assessment of probable cause.

THE COURT: Okay.

MS. MARRANZINI: Since we didn't have any -- you know, there wasn't at that point any physical evidence or any other -- there wasn't any videos, there weren't any other witnesses, it was just the complaining witness and the officer witness.

THE COURT: Okay.

MS. MARRANZINI: There was a question about, I think, the important, like whether we should even be talking about search warrant number 2. I don't know if Your Honor wants me to --

THE COURT: I am curious about that.

MS. MARRANZINI: -- address that point.

I think to the extent -- and we're obviously going to have more to say about this separate argument about the seizure of the cell phone, but to the extent that part of the Government's argument that federal agents did everything properly and exercised good faith relies heavily on their representation that at the time that they learned about the phone, they believed that the phones were lawfully seized by PGPD, that was pursuant to this warrant that the affiant was

Detective Cleo Savoy that failed to share any of these omissions that we've just gone over.

And so, there's no way to cleanly get from the seizure -- from the search warrant for that phone, which folks are saying that they're relying on, to believe that that phone was lawfully seized, to then the search warrant by the FBI for the phones without looking at the validity of that warrant and what the federal agents knew or should have known about the validity of that warrant.

THE COURT: I think I understand your argument. But if the federal agents relied on the fact that a warrant was obtained and the devices were seized pursuant to a warrant, whether or not that warrant, then, is rendered invalid, I don't know that that really affects the analysis of their state of mind when they sought a warrant or, you know, when they delayed in seeking a warrant.

MS. MARRANZINI: Well, I think it's relevant in this case because I think it will be clear that federal investigators had access to much, if not all, of the same information that the state investigators had, which included all of this information about the witness credibility and then potentially the fact that Dupree was also under a federal investigation.

And so there's no way to say that this is an independent source, this is an independent warrant that is,

you know, attenuated from the taint of the initial warrant. Because each step of this investigation with respect to the warrants is, you know, incremental. There's one warrant. And then the second warrant adds a couple more paragraphs. And then the Federal warrant adds additional information but still relies on a lot of the initial warrants.

THE COURT: Okay. I understand.

MS. MARRANZINI: And the case law that the Government cited for the independent source rule relied, in part, on the Supreme Court's decision in Murray, which, you know, articulated that if officers don't include in their warrant application information that they obtained illegally and officers would have sought a warrant even if they had not done the original illegal search, then the independent source doctrine applies and the second warrant's okay.

But they note, quote, "So long as a later lawful seizure is genuinely independent of an earlier tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession), there's no reason why the independent source doctrine should not apply."

And so the point is that there's this important caveat when the police are holding on to property that they've seized pursuant to a warrant that in our estimation is flawed. And then the Federal Government is seeking to obtain that same property pursuant to their own warrant, but

they're also in a position to determine that aspects of the probable cause statement were flawed.

THE COURT: Okay. I understand your argument.

Before I rule on the Franks issue, let's talk about the other attacks on the warrants; okay?

MS. MARRANZINI: Yes.

THE COURT: So why don't we turn, then, to the unreasonable delay argument.

MS. MARRANZINI: Sure, Your Honor.

THE COURT: So, I've read Pratt. And I've read the other cases on this particular issue. It seems pretty clear to me that those cases involve the seizure of phones, often, without a warrant. Why can't I just -- why don't I just stop there with my analysis?

Here we have the seizure of devices pursuant to warrants.

MS. MARRANZINI: Well, I think the heft of our argument is going to be on the personal cell phone, given the Government's indication that they're at this time not intending to rely on the evidence extracted from the other devices which were seized pursuant to a warrant.

THE COURT: Well, because of the fortuity of what happened that day, where he happened to be in his front yard and not in his house, you think that this was a warrantless seizure and therefore Pratt applies?

MS. MARRANZINI: Yes, in part. But that's not the entire explanation.

I mean, we're talking about a device that, yes, was seized incident to arrest. And maybe the Court sees that as kind of a technical distinction given that had Mr. Vanderpool been in his home at the time of his arrest, the device would have arguably been seized pursuant to a search warrant.

But the search warrant, unlike in some of the cases that I've been citing in this briefing, for example, EBDA's decision in Brady did not specifically identify any devices and did not authorize the search of the devices.

So, even if this device had been inside the home, it could have been seized, but it couldn't have been searched.

THE COURT: Okay. Well, then we've got this state devices warrant.

MS. MARRANZINI: Right.

THE COURT: Right? Okay.

MS. MARRANZINI: But it's not seized pursuant to the warrant in the home. It's seized incident to arrest.

And the reason I think the distinction is more than technical here is because, as I mentioned, the initial warrant didn't specifically identify that phone. So, it wasn't like "this phone in particular we are seeking because we have established probable cause for this phone." They

just said "any device in the home that could maintain the storage of photographs, videos, et cetera."

It's not seized under the guise of that warrant. It's seized incident to arrest. And so it's under his own doctrine, which is that it's a warrantless seizure. The Government can seize it, but then they have to diligently pursue a warrant, which they do not. Despite the fact that the original State warrant was clearly focused on looking into his phone to see whether he had taken a picture of the complaining witness during the incident, they waited 45 days before applying for a warrant for all of the devices, including that one. And so our argument is that that warrant is also invalid because it was an unjustified, unreasonably prolonged delay.

THE COURT: Why don't you address the justifications that the Government has offered?

MS. MARRANZINI: Sure.

The Government, with respect to the State device, has essentially said, "We were understaffed and overburdened because we were investigating so many other instances of police officer misconduct at that time."

They did not justify the delay based on any other investigative activity that had to do with Mr. Vanderpool's case, at least not as it pertains to the devices.

THE COURT: Do they have to?

JA302

MS. MARRANZINI: A lot of the case law that addresses this issue does consider whether agents were reasonably pursuing other leads or other avenues in terms of the search warrant in question, and that's not what happened.

THE COURT: Isn't the question whether or not there was diligence? And diligence can be assessed whether it's sort of diligence within the case or diligence in just generally investigating any crime given they don't have infinite resources.

MS. MARRANZINI: Most of the decisions within the universe of cases that both parties have cited on this front, while there has been statements kind of suggested in dicta that like a unit that's totally overburdened, you know, that might be a justification, most of the courts are looking specifically at what an agent did when in a particular case.

And I can give the Court a couple of examples, and I'll start with a comment that the Eleventh Circuit made in Mitchell, which said, at Page 1353, "We also recognize that there may be occasions where the resources of law enforcement are simply overwhelmed by the nature of a particular investigation so that a delay that might otherwise be unduly long would be regarded as reasonable."

In other cases, including the Second Circuit's decision in Smith, the Court said, quote, "The fact that a police officer has a generally heavy caseload or is

responsible for a large geographical district does not, without warrant, entitle the officer to wait without limit before applying for a warrant to search for an item that the officer has seized. And this is all the more so if the item has been warrantlessly seized."

The Seventh Circuit in Burgard says, "It remains possible that a police department's failure to staff its offices adequately or to give officers sufficient resources to process warrant applications could lead to unreasonable delays."

And I guess I just want to pause for a moment and back up to say that I think it is clear that an evidentiary hearing on this point is warranted. I have a list of cases from this universe of cases that we've briefed on in which an evidentiary hearing has been held. The cases include the District of Maryland's decision in Dorsey in which one case agent testified.

THE COURT: Well, that was a six-year delay without a warrant. That was Judge Bennett's case; right?

MS. MARRANZINI: The delay that the Court found was that the FBI waited 53 days, and it was a phone that the Baltimore Police Department had had in its custody for a year.

THE COURT: I'm mixing up my cases.

MS. MARRANZINI: And that's also a case in which

the Court found that the defendant had abandoned the phone.

So, the underlying case from the Eleventh Circuit's decision in Mitchell, there was an evidentiary hearing in which one case agent testified.

The case underlying the Second Circuit's decision in Smith, there was an evidentiary hearing in which three government witnesses testified and then three defense witnesses.

The Fourth Circuit's decision in Pratt, the underlying case had an evidentiary hearing where two government witnesses testified.

The District of Connecticut's decision in Tisdale, there was an evidentiary hearing with two government witnesses.

District of Massachusetts, Kormah, two government witnesses.

The Middle District of Pennsylvania, Wright, the Government called one state agent and one federal agent, no defense witnesses. And there the Court specifically noted that the standard for a hearing is that once the defendant establishes a basis for his motion, it's the Government's burden to show that the delay was reasonable.

The District of Maryland's decision in Briscoe, there was an evidentiary hearing held. I wasn't able to determine who testified, just that there was a hearing.

JA305

And the decision underlying -- or the case underlying the Burgard case, there was a hearing with two Government witnesses.

And so I think, you know, when we're talking about -- it's usually pretty straightforward that when we're talking about a question in which the Government has to establish that something that took place was reasonable, they have the burden of establishing that.

THE COURT:  Why haven't they done that through the detailed affidavits of Agent Zimmerman and Agent Bloomingdale?

I understand you want a hearing.

MS. MARRANZINI:  Right.

THE COURT:  I understand you want the witness to testify.  But we've got these detailed affidavits.

Do you want them to reiterate what they're saying? Do you want to try to cross-examine them and say that, in fact, these aren't the reasons for delay?

MS. MARRANZINI:  So, if Your Honor were to accept everything in those affidavits as true, and if you were to find that that proffered justification were sufficient, then, yes, we want the right to confront and cross-examine those witnesses and potentially undermine the veracity of their accounts, or bring to light additional facts that they didn't offer that we think would be relevant in this analysis.

THE COURT: What other facts? You don't know. You just want --

MS. MARRANZINI: No, I mean, we know. We have them in our witness outlines. And we have exhibits.

But, you know -- but I think even if Your Honor were -- let's just say we're going to accept as true everything in the affidavit, I think that it fails to establish the reasonableness of both agencies' investigations in this case.

I mean, we have, first of all, this phone that was held by the State for 45 days before agents sought a warrant. There was no attempt -- the warrant was issued on January 17th; and on the face of the warrant, it said that this is void if it's not executed within 15 days. And we would proffer that we have evidence that there was no attempt made to extract or download those devices within the 15 days.

So, they wait too long to get the warrant, they wait too long to execute the warrant, and then they just hang on to the phone, which undermines the notion that they thought this was important evidence. And that's something that courts take into account. Like, if this evidence that has been seized is important to the Government, then they need to move quickly to get it.

And it just simply wasn't a priority for them. They're busy with other cases. They have other stuff going

on. It coincides with the December holidays. People are going on leave. And they don't get a warrant until 45 days later. And then they don't attempt to execute it.

The Federal Government's justification is that we learned about this -- this and other cases -- at the end of February. We learned about the phone's seizure at the end of February. And it appears that they had identified their desire to get warrants for those devices relatively early on in their investigation, and that's evidenced by the fact that by the middle of March, they're submitting a search warrant affidavit to an AUSA for those devices.

Then there's a pause, right, between March and the end of June when they actually get the warrants. And that delay is attributed in large part to COVID and in large part to other things they were doing on other cases that they deemed to be more of a priority.

THE COURT: Did you think their explanation of the pause between March and June was unreasonable?

MS. MARRANZINI: Yes.

THE COURT: Why?

MS. MARRANZINI: Because despite the upheaval that COVID caused, particularly with respect to the court system, it very clearly didn't impact the ability of an agent to electronically submit approval for a search warrant. And we know that to be true because we know that --

THE COURT: We didn't develop -- I was a magistrate judge then. We didn't develop those protocols, if I recall correctly, until several weeks into the pandemic. I mean, there was -- that was a very challenging time for the Court. I can't speak for law enforcement, but.

MS. MARRANZINI: I'm not going to disagree that it was a challenging and unprecedented time for the court or for law enforcement. But I am going to point out that by their own affidavits' representations, they did seek and obtain telephonically, the same case agent, a warrant in another case in April. And that other case is now a case that has been charged. And one of the co-defendants, coincidentally, is Officer Dupree.

So, COVID cannot be the sole justification for why between March, when they were ready to submit a search warrant, and June, when they finally did submit a search warrant, that that was the reason for the delay.

I think what it ultimately boils down to is that they prioritized other cases, in part because they knew Mr. Vanderpool was already detained and already being prosecuted by the State and in part because they believed that the devices were being lawfully retained by the State.

But they weren't being lawfully retained by the State. They were subject to, you know, a delayed search warrant, but a warrant that had expired by the time the Feds

even get wind of this case. The warrant expired, I think, February 1st in the State. So, at that point the State has no justification for continuing to hold on to it.

Meanwhile, a lot of these cases talk about, you know, whether the person was detained and whether they maintained any possessory interest over the phone.

And I think we explained in our papers some of the reasons we think that analysis is problematic.

But even with that being the case, Mr. Vanderpool, we will demonstrate, was seeking the return of his phone in every possible way, was not detained for the first couple weeks in January during which the State had still not proceeded to apply for a search warrant for his phone.

And what it comes down to is that both entities, they sat on the phones for too long. They didn't prioritize the phone. It clearly wasn't a priority in their investigation; otherwise, they would have moved sooner.

And even if the delays are explained by being overwhelmed by investigations of other officers, both at the State level and at the Federal level, then it comes down to a failure to adequately allocate resources, which can, in and of itself, result in a Fourth Amendment violation.

It can't be the case that because Mr. Vanderpool was pending other charges and because investigators had other pressing matters that they were focused on that his

possessory interest in the phone gets less Fourth Amendment protection than another similarly situated defendant might have.

THE COURT: I know you disagree with the cases that say the defendant's possessory interest is diminished while he's detained. I understand the policy reasons you might disagree with that. But most of the cases do say that; correct?

MS. MARRANZINI: Right. But not all of the cases that -- in which a defendant was detained, you know, hold that conclusively against them. And Briscoe was one of those examples where someone was detained. And that was in the District of Maryland.

You know, what the cases -- and like Pratt being the primary case in this circuit on this issue made no mention of the individual's detention status, it was not a part of the Court's reasoning in ruling that suppression should have been granted. What the Court focused on --

THE COURT: I think he was detained after the delay.

MS. MARRANZINI: I think, you know, checking the record, that's right. But the Court's reasoning didn't hinge on that observation or of that fact.

THE COURT: They didn't have occasion to discuss that because he wasn't detained during the delay. That's my

reading of the facts in that case. Yeah. Okay.

MS. MARRANZINI: But what we have here, Your Honor, is 45 days for the State, nearly four months separately for the Federal Government. We've got a phone that's been in custody for seven months by the time the Federal law enforcement gets a search warrant.

Our evidence would also show that the Feds didn't make any effort to extract that phone for two months -- three months, I think, after -- until September of 2020.

And so what we have is this overwhelming picture of there just simply not being a prioritization of searching this device.

When courts are looking at how to balance the Government's interest in the seizure of the evidence versus the individual's possessory interest, right, on the individual's side, they look at whether the person has consented and whether the person has abrogated any of their privacy rights by, you know, co-owning the device with another person, whether they've abandoned the item, whether they've failed to make any attempts to recover the item. And none of that is the case here.

On the other side of the coin, courts look at whether the Government has shown its prioritization of the item that seeks to be searched, whether they're moving diligently in this investigation, whether there are -- you

know, if one agent is tied up on something, whether there was another agent that could have ostensibly stepped in and assisted with the investigation or the drafting of the search warrant, to the point where there's courts criticizing agents that took more than a number of days, you know, to pursue search warrants.

And I know that part of the Government's argument is going to be that here with respect to particularly the federal agents, that they were in conversations with the AUSAs, and the AUSAs were saying there's no rush on this.

But I don't think that that can excuse a delay when the AUSA is also part, obviously, of the Government.

THE COURT: Can we switch gears?

MS. MARRANZINI: Yes.

THE COURT: Can you -- you have an overbreadth in a particular -- particularity challenge. And you cite to some nonbinding cases. And you don't seem to address the Cobb case, United States versus Cobb, 970 F.3d, 319 (4th Cir. 2020), which talks about the Fourth Amendment requirements for particularity, in particular for searching computers or electronic devices. You make the argument that the device warrant should have identified the files or the types of files that they were searching.

But as I read the Cobb case, that case just shuts down that argument entirely.

So, are you pursuing this argument?  You can certainly preserve it for appeal.  And I'm also happy to hear how this case is distinguishable from Cobb.

MS. MARRANZINI:  I don't have anything further to add on that point aside from what we've briefed.

THE COURT:  Okay.  All right.

Are there any other arguments under the umbrella of the motion to suppress?

MS. MARRANZINI:  With respect to any other claims, we would rest on our briefing and then just urge the Court, you know, with respect to this delay issue, to authorize an evidentiary hearing on this point.  It's -- the cell phone that is at issue is an important piece of evidence in this case.  It's not a case-dispositive piece of evidence, but it is important --

THE COURT:  What is the evidence?  I've been so curious the entire time.  It's a WhatsApp message?  Is that --

MS. MARRANZINI:  The gist of it is that there's audio recordings via WhatsApp.

THE COURT:  I see.

MS. MARRANZINI:  From, arguably, Mr. Vanderpool discussing what took place on September 6, 2019.

THE COURT:  I understand.  Okay.

MS. MARRANZINI:  And that evidence, again, was not

discovered until September of 2020 when the FBI extracted the phone.

And then with respect to this evidentiary question, I think we've outlined our points for why we believe a hearing is warranted, but I just also wanted to point out that the Government's initial responses to this point proffered very little by way of an explanation. The largest explanation was provided in response to Your Honor's order that they specifically answer those questions.

THE COURT: Well, I think they took the position that perhaps they didn't need to take that step because Pratt doesn't apply here.

MS. MARRANZINI: I think that's right.

But to the extent Your Honor is going to accept the representations made by the federal agents or the representations made via the federal agents by the state agents, Mr. Vanderpool has a right to confront that evidence.

THE COURT: Okay. All right. Thank you very much.

So, Ms. Bernstein, let's see. What about the argument that Target Device 8 was not seized pursuant to a warrant?

MS. BERNSTEIN: If I may, Your Honor, may I start by sort of backing up and reframing? Because I want to give the overall context and then dive into that question.

THE COURT: As long as you dive into that question.

MS. BERNSTEIN: I promise. I absolutely promise I will.

So, the defense argument is focused on a close-up reading of Pratt, Mitchell, Nguyen, Tisdale.

What I want to do is take a step back, start with some overarching principles, and then zoom back in. And the reason I want to do that is because I think doing that will make three things clear.

First of all, as the Court has already alluded to, our case isn't even in the neighborhood of Pratt. Our case isn't in "Pratt World."

The second thing is even if we were in Pratt World, under our circumstances, a 45-day delay is well within the bounds of reasonable.

And then, third, is that even if the delay were unreasonable, suppression in this case, which we haven't really talked about yet, would be a completely inappropriate remedy.

And so I want to back up very quickly to those overarching principles.

The first, Your Honor, is that the reasonableness requirement of the Fourth Amendment is not formulaic. What is reasonable is deeply dependent on the totality of the circumstances in any particular case.

The second fundamental principle is that when law

JA316

enforcement gets a warrant signed by a judge, there is a presumption of validity to that warrant.

The third principle is that even if a warrant is determined to be flawed in some way, suppression is not a first instinct but a last resort.

And it's important to talk about why, because the Supreme Court has recognized that suppression comes at a really heavy cost. It comes at the cost of ignoring reliable evidence, in some cases letting innocent people go free; and because it has that incredible cost, it can only be used when that cost is justified. And that cost is justified when there is important police misconduct that can be deterred by suppression.

So, the Courts have recognized that the more intentional and the more egregious or the more systematic the police misconduct, the more likely suppression is an appropriate response.

But the opposite is also true. The less intentional, less egregious, and less systematic any sort of misconduct is, the less appropriate suppression will be.

And I do want to quote from the Supreme Court, "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it and sufficiently culpable that deterrence is worth the price." That's from Herring.

Okay. So, those are the principles that I want to start with. And now I want to move back in.

Mitchell, Pratt, Tisdale, the cases the defense relies on, as the Court has already suggested, they stand for the proposition that when there is a warrantless search, when the police take evidence without any legal process because they believe that there is evidence on that -- they take property without legal process because they believe there's evidence on their property, they need to act within a reasonable time frame to figure out whether that assumption is correct.

Simply speaking, a warrantless search is a prerequisite to this type of unreasonable delay argument that the defense is making.

I want to quote more. The Western District of North Carolina, because this is very recently. This is 2022. The Court in Moore said -- a similar situation, distinguished Mitchell, Pratt and the other cases as inapposite because it said there was no warrant in those cases. And what Moore said is the defendant has not shown that the Fourth Amendment requires officers to search evidence seized with a warrant within any particular time frame.

So, if evidence is seized without a warrant and if we are in Pratt Land, then the decision about whether a delay is reasonable depends on the balancing that Ms. Marranzini

JA318

talked about. That's the balancing of the Government's interest in the seizure against the defendant's possessory interest in the property.

Now, when the Government does have a warrant, the Government's interest in that property, interest in that seizure goes sky high. And when the Government has a warrant, the defendant's possessory interest plummets.

The defendant's possessory interest -- you can do it on either side of the balance. The Government's interest in the property is also stronger when the -- when their -- when there's an ongoing prosecution of the defendant that is independent of that evidence.

So, in other words, when the Government arrests somebody because they think there's evidence on this phone and there's no legal process, they take the phone, and they have some -- of course they have to act quickly to find out if, in fact, they have the evidence to support the arrest.

That balance is different when there is, as we have -- and I'll get to this in a minute -- when we have an arrest warrant saying that there is probable cause to believe that the defendant has committed a crime and the evidence that we're looking for relates to that crime.

As the Court also noted, on the defendant's possessory interest in the property side of the balance, that possessory interest goes down when the defendant is

charged -- when the defendant is charged with the crime based on an arrest warrant but also, as the Court noted, when the defendant is incarcerated.

Okay. So, with those principles in mind, now I promise I'm going to get to the Court's question because now I want to zoom back and talk about the facts in our case.

So, first of all, there were 11 devices, 10 of them were definitely seized pursuant to the premises warrant. So, those are clearly outside of Pratt Land.

Of course, the one that we care about most is the one that was not. So, I want to talk now about the defendant's personal phone.

So, this item was seized incident to arrest from the defendant. I want to talk about what actually happened with this phone; and then after that, I want to talk about what the FBI believed happened with this phone.

So, what actually happened with the phone is the Government had -- the State had an arrest warrant where there was a judicial finding of probable cause to believe that the defendant had committed the rape.

The State also had a signed warrant to search the premises. And that was a finding of probable cause that that premises warrant specifically mentioned the phones and other devices, and it found that there was probable cause to seize the phones and other devices during the search of

Mr. Vanderpool's home.

Now, under normal circumstances, the arrest of Mr. Vanderpool would have happened inside his house; and if he had his phone in his pocket, in his hand, wherever, it would have been covered by this warrant, this finding of probable cause.

As the Court mentioned, if they had arrested him outside his house on the threshold of his door or in his yard, it would have been -- the phone in his hand or in his pocket would have been covered by the warrant.

The only reason that didn't happen in this case was because the defendant was a former law enforcement officer who had posted pictures of himself with an assault rifle online, and they made the assessment -- local law enforcement made the assessment that it would be too dangerous to go into his house. So, they waited for him to leave his house. If they had arrested him in his yard, it would have been covered by the warrant. They let him get what we've been told is about 30 feet down the sidewalk, and they arrested him.

So, because of that, the search of this -- the seizure of this phone technically doesn't fall within the warrant.

But there had at that point already been a judicial finding that that particular phone, there was probable cause to believe that that particular phone would have evidence of

the crime for which there was probable cause to arrest Mr. Vanderpool.

The Government would submit, Your Honor, that that set of facts takes us completely out of Pratt Land. Even if this phone wasn't technically seized pursuant to the warrant, it was seized after several judicial findings of probable cause.

Did that answer the Court's first question?

THE COURT: Yes.

MS. BERNSTEIN: Okay. So now, even if the Court were to determine that we're not completely out of Pratt Land, if the Court were to determine that we were still in Pratt Land, we would, at the very least, be at the very border of Pratt Land. And under the circumstances -- but at that point we would then go to this balancing. And the circumstances of our case, a 45-day delay would be well within the bounds of reasonable.

THE COURT: What about the defense's request to have an evidentiary hearing to ask questions of Agent Zimmerman and Agent Bloomingdale?

MS. BERNSTEIN: I want to go back to -- even the threshold requirement that Ms. Marranzini mentioned was once the defendant establishes a basis for his motion, the Government must show that the delay was reasonable.

I believe that the defendant has failed on both

parts of that.

So, first of all, the defendant has not established a basis for his motion. There's -- these warrants are all valid on their face, and the only challenge that they've raised to the warrant is this 45-day delay, which I admit would be at least something interesting to discuss if we were in Pratt Land. If we're out of Pratt Land, it's not even interesting to discuss.

Within Pratt Land, the 45-day delay, even if we were in Pratt Land and we had to do the weighing, we would be weighing the Government's interest in the evidence against the defendant's possessory interest in the property and, again, very fact-based inquiry on the Government. And part of the Government's interest, we also factor in the reasons for the delay when we're thinking about the balancing.

So, the Government's interest in this case, if this phone had been seized in his house or on the threshold or in his yard, we would have this seize pursuant to a warrant. Here, we don't have that. We have adjacent to it. We have the next best thing.

So, we have the second highest Government interest in this property. We also have that the evidence related to a crime for which the defendant was arrested with a separate finding of probable cause in an arrest warrant.

And then on the possessory, the defendant's

JA323

possessory interest side, that interest goes down because of the warrant-adjacent nature of the case and also because he was incarcerated for most of the 45-day delay.

But then I also want to talk about the reasons for the delay, which were laid out in the affidavit, that this wasn't just a case where the police were, you know, choosing to work on other things, although, as the Court pointed out, being very busy with other cases is an explanation that can warrant an extended delay.

In this case, this SIRT unit, the Special Investigations Response Team, was in December of 2019 and January of 2020 overwhelmed with really important cases. And so that was taking up a lot of time, and they were working diligently on that.

But I also want to add in that they were working on this case, as well. And it's in the affidavits that one of the things the detective, the lead detective, was working on, was right after the search of Defendant Vanderpool's home, there were some things found in the search that required immediate followup. And so she had to be doing those things. And those are not matters that I want to discuss in open court, but we can approach if the Court needs more on that.

Moreover, as is in the affidavit, the lead detective was still working important homicide cases. She had just recently transferred from a homicide unit to SIRT.

She had done that transfer because there was a credible threat on her life. She had additional stress because of that. At point, she was under 24/7 protection. And she had to appear in court for that.

Meanwhile, this unit had to deal with the trial of an officer who is accused of raping, I think it was, a colleague. The unit then, after that trial, there was an allegation that another officer had provided law enforcement-sensitive information to the defense team in that first trial. The SIRT unit had to investigate that.

Also, in December, there was the suicide of a police officer. SIRT had to investigate that.

There was an officer-involved shooting. SIRT had to investigate that.

And I want to point out that even the cases that the defense relies on suggest that that kind of explanation would be satisfactory.

Mitchell talks about how the court would be sympathetic to overriding circumstances or necessary diversions of police resources.

Pratt itself talks about overwhelmed resources or overriding circumstances can justify delay.

Christie, the Tenth Circuit case, dealt with officers having to work on a more pressing case.

Vallimont in the Eleventh Circuit, officers had to

divert their resources to other cases. Their resources were overwhelmed.

Okay. So, then the question is: What is reasonable under those circumstances with the extenuating circumstances that we had officers working diligently in good faith with overwhelmed duties and limited resources?

So, I want to talk about some of the cases out there. Blanchard. There was a four-month delay, which is almost three times the delay in our case, three times the 45 days.

Christie in the Tenth Circuit, there was a five-month delay, almost four times in our case.

Stabile in the Third Circuit, a three-month delay, which is twice the length of our case.

Kormah, District of Massachusetts, four-month delay.

Dorsey, which the defense mentioned, District of Maryland 2019, that was a one-year delay.

And I want to note on Dorsey, also, it was interesting that they have the -- the Government gave a timeline of events and backed that timeline up with emails, which is exactly what we've done in this case.

In Moore, the Western District of North Carolina, 64 days, which is 50 percent more than we have here.

Wright, from the Middle District of Pennsylvania,

JA326

13-month delay, which is eight times the delay we have here.

Blanchard, District of Massachusetts, four-month delay.

And, interestingly, there the Court found that there was no unreasonable delay, also noted that if there had been an unreasonable delay, suppression would be an inappropriate remedy.

So, I'm prepared to talk about suppression unless the Court has questions about the reasonableness of the delay.

THE COURT: No. Thank you.

MS. BERNSTEIN: So, I talked before about the overarching principles of suppression and that it's a costly remedy and one that is only worth the cost when there is significant, intentional police misconduct that needs to be deterred.

In this case, the error on the State side, if there is any error, like if the Court were to determine, A, we are in Pratt Land, and, B, 45 days is unreasonable, the error on the State case would be shying some little bit over the line of what would be reasonable under the circumstances. There would be no bad faith. There would be no systemic, intentional police misconduct that could be remedied by suppression.

The Courts have said when there is insufficient

JA327

justification, when there isn't intentional misconduct, the cost of exclusion is just too high.

In Burrowa (ph.), District of Massachusetts, said that where the error is isolated negligence, quote, "exclusion cannot pay its way."

So, that's on the State side.

On the Federal side, I mentioned before I want to talk about what actually happened with the phone, and then I wanted to talk about what the FBI understood happened to the phone.

And I know the Court knows this from the briefings, but the information that the federal agents had was that the personal cell phone, like every other device, had been seized from the defendant's home pursuant to the search warrant. They had every reason to believe that was the case. They didn't learn otherwise until a year ago, until April of 2023. That's when they first learned that this one phone was actually seized incident to arrest rather than pursuant to the warrant.

I want to quote from Wilkins, District of DC, 2021, there was a 15-month delay there. And the quote there is that, "If the officer gathering evidence had an objectively reasonable reliance on the search warrant, the exclusionary rule will typically not apply."

In this case, if the Court were to suppress this

JA328

evidence, it would turn the exclusionary rule on its head because what the Court would be doing is deterring really good law enforcement action. Because what the Federal Government did here, as is clear from the affidavits that were submitted, in late February, they had a meeting with PG County where they got a ton of information dumped on them relating to a bunch of different cases involving alleged misconduct by police officers from multiple different departments.

Within 17 days, Your Honor, they had gone through that morass of evidence, had focused in on Vanderpool, had familiarized themselves with the State file, had conducted three more interviews related to the towing scam that there was evidence of, and they had drafted a warrant. All of that within 17 days of getting this morass of information from the State.

And but for COVID. But for COVID, we would have been talking about a Federal search warrant that was done 17 days after this case came to their attention.

I want to respond to something Ms. Marranzini said about the delay because she said that the federal agents chose to divert their attention to other cases.

And I just want to make clear for the record, as is already clear from the affidavits, the agents did that following the direction of the Chief Judge of the District

JA329

Courts, saying that -- and their own supervisors with the FBI and the AUSAs who were supervising the case.

There was, you know -- COVID was disastrous for PG County.

I want to just read into the record Seth versus McDonough, (D. Md. 2020). "The Court struggles to put into words the magnitude of COVID's devastation. In PG County, the virus arrived early and spread with a vengeance. Due to these realities, Maryland has been under a state of emergency, and PG County a stay-at-home order since March."

So in that world -- and if you'll notice the timing, Your Honor. The FBI did an interview on the Vanderpool case on March 10th. So, one day before the world shut down with COVID.

And then when COVID descended and the court shut down and the court and the AUSAs and the FBI supervisors directed the agents to focus only on emergency situations, to push through only emergency warrants, and so that's why they diverted their attention for April and May to this other case in which there were -- there was suspected ongoing criminal activity committed by officers who were still active in law enforcement. And so that was urgent and needed to get to the court right away.

The Vanderpool warrant, on the other hand, remember at that time the agents had every reason to believe that the

personal phone, like every other device, had been seized pursuant to a warrant, pursuant to the premises warrant.

So, under those circumstances, not only would suppression be, in our view, inappropriate, but actually fundamentally upside down.

The mistake on the Federal part is not a mistake on their part at all. They relied on a warrant that was in front of them, and they thought that -- and that was accurate. And so there is no error whatsoever that suppression could remedy by deterrence.

Does the Court have any questions about -- is there anything else that I can answer?

THE COURT: Just give me a minute.

No, I don't think so.

Ms. Marranzini, anything else to add before we take about a 20, I'd say 25-minute break?

MS. MARRANZINI: Yes, just briefly, Your Honor.

First is that there's no such thing as a warrant-adjacent seizure.

THE COURT: I think she was using shorthand to talk about the Government's interest under Pratt. I understand what you're saying, but --

MS. MARRANZINI: And I get her point. But I don't think that because the phone could have ostensibly been seized within the house means that this case doesn't fall

under the umbrella of case law that would otherwise apply to the delay in this case, a delay that would, under all other circumstances, be presumptively unreasonable.

THE COURT: Would you agree, though, that let's say we are in, as Ms. Bernstein has said several times, Pratt Land. If we're in Pratt Land, then one of the factors I have to consider is the Government's interest in it.

And here, because the phone was seized pursuant to an arrest warrant or search incident to arrest, and the arrest was pursuant to an arrest warrant, which was supported by probable cause, doesn't that heighten the Government's compelling interest in the phone?

MS. MARRANZINI: I don't see --

THE COURT: As opposed to if it was seized from his person as he was walking down the street and they thought it might have evidence on it of a crime?

MS. MARRANZINI: I don't know that that meaningfully contributes to that side of the scale. I think that what we know is that he's arrested. He's charged. He's charged before the phone is searched.

So, we'll concede, right, that they didn't need to search the phone in order to charge him. But I don't see a basis in the case law for finding that that meaningfully changes the balance of the interest in this case.

And if I may also, I'm concerned that if we're not

going to be able to have an evidentiary hearing on this point, that the possessory interest aspect of this analysis will be lost on the Court because we're prepared to present evidence on that point. And so I may --

THE COURT: Well, why didn't you present that earlier? I saw a reference in your paper that at some point he and/or his family members tried to get the phone, but it was unclear when or how those efforts were made.

MS. MARRANZINI: We were prepared to present that evidence in an evidentiary hearing, and I can proffer that.

THE COURT: Why don't you give me a proffer.

MS. MARRANZINI: So, what we can proffer is that on the night of Mr. Vanderpool's arrest, he was transported from his home to an interrogation room at a PGPD police station. When he was placed into the interrogation room, the detective who was bringing him in, who I believe was Detective Ohn, pulled out of his own pocket the blue phone at issue, which corroborates, right, that the phone was not seized during the home search but, rather, incident to arrest. And he also took from Mr. Vanderpool personal property that was on him, including his wallet, keys, belt, shoelaces.

In the interrogation room, Mr. Vanderpool asked for the ability to make a phone call and was told later, like you'll be able to do this later.

Mr. Vanderpool, from there, was transported to the

JA333

Upper Marlboro Jail by Detective Cleo Savoy. And while he was being transported, Detective Savoy had in her possession the personal property that was taken from him incident to arrest, including the blue phone.

And at that point, Mr. Vanderpool had not been shown an arrest warrant or a search warrant, and so it wasn't clear to him what basis the agents were searching under or what they were attempting to seize.

Once he gets to the jail with Detective Savoy, he asks Detective Savoy, "Can I get my phone?" And she says, "No." And he says, "Well, can I get some numbers from my phone, some information from my phone?" And she says, "No."

Soon thereafter, he's being processed by a booking agent at the PGPD, at the Upper Marlboro Jail, and he asks the booking agent if he can get his property receipt because he figured that the property receipt would show the property that was seized from him incident to arrest and that that property would be kept at the jail. Because when people are booked, their personal effects are kept at the jail; whereas, when evidence is seized, you know, as evidence in a case, it's kept with the investigating officers.

If property is kept at the jail, then Mr. Vanderpool knew that once he was released, he could immediately get that like on his way out. Or he could ask a family member to go to the jail and pick up that property for

him, which shows that Mr. Vanderpool had every intention of exercising dominion over his personal property to include his cell phone.

And this is all just to further the point that just because someone's crossing the threshold of the jail and they're physically not allowed to have their phone in the jail, it doesn't mean that they lose all possessory interest in it because possession is, in part, physical possession; but it's, in part, your intent to exercise dominion and control over an item. And he had every intention of exercising dominion and control over an item that he reasonably believed was going to be maintained with his property at the jail.

He doesn't get released. He remains in jail for a couple, a few more weeks. And the evidence would show that immediately his primary concerns, as expressed to his family, were obtaining legal representation and getting his property back, and his property including his phones, his car keys and his car, and his wallet.

And he made multiple comments to family members and to his ultimately retained legal counsel on that front. He signed two Powers of Attorney that awarded his mother the authority to do several legal things on his behalf, including receiving his property.

And his mother embarked on a frustrating and

energy-consuming journey to attempt to retrieve his property. With an absence of information, she went to the desk at the Upper Marlboro Jail, asked the booking agent for the property receipt. She went to the police station in PG County, was told to go to a different precinct. Spoke to multiple desk agents, all the while bringing with her a Power of Attorney in an attempt to show that she had the legal ability to retrieve his property.

And there would also be evidence that Mr. Vanderpool's counsel made the request for the return of property from the State's Attorney.

At the beginning of January, for a few weeks, Mr. Vanderpool is released on home detention. And paramount among his concerns when he was released on home detention was the retrieval of his phone, because he found it difficult to do basic things without having access to the information in his phone. And, again, with respect to the timeline, this is still before the State has applied for a warrant or made any attempt to search the device.

Ultimately, we know he was unsuccessful in regaining the possession of his property, including his phone. But I think that in distinction with multiple of the cases in which there was either consent by the defendant to the seizure of the device or an admission that the device, you know, contained evidence of the crime that was being

JA336

investigated, or that the defendant had in any way abandoned the property, we would be able to establish that Mr. Vanderpool's possessory rights remained undiminished with respect to this property.

Meanwhile, you know, as we mentioned, we have a State warrant that was issued January 17th, expired on its face February 1st, yet no attempt by the State was made to extract that device until after it had expired.

We have a Federal warrant that was issued at the end of June 2020, was extracted in September 2020, though it expired in July. And I have no evidence that there were any attempts made to extract it within the window of time that it was supposed to be executed by.

And so we have, you know, a Government that has indicated that this device was simply not a priority either to apply for a search warrant for it or to get the evidence from.

We have the timeline of what the same case agents did in another case which they deemed to be more of a priority, given the nature of the other individuals who were under investigation. And that timeline is that on January 28, 2020, Michael Owen was arrested by PGPD, and his home was searched and his phone was seized.

10 days later, on February 7th, 2020, PGPD obtained a search warrant for the download of the phone.

JA337

22 days after the seizure, on February 19, 2020, PGPD obtained a search warrant for the iCloud account connected to that device.

And the affidavit suggests that the FBI learned about the Owen case at the same time that they learned about the Vanderpool case and that they intended to pursue both investigations in the same time frame.

April 28, 2020, is the FBI's application of the search warrant of the iCloud account, which is 91 days from the seizure and two months after they learned about the case.

And so there was evidence that they were actively investigating that case.

The evidence with the FBI in our case shows that they were actively investigating and reviewing the materials in March, then paused due to COVID.

And there's no other proffer of investigation that took place between March and June. And so that remaining three months can only be justified by COVID. And our position is that that's not a sufficient justification given the property, the possessory interest at stake; given the timeline of this other case; and that we know that it was possible, at least by the end of April, to obtain a warrant telephonically; and by the fact that the State warrant at that point, not only was it delayed, but it was void on its face and had never been executed.

And I think it's clear that the federal agents knew that it had never been executed because they were not presented with any evidence that had been retrieved from the device.

With respect to what other courts have done with other delays, I just wanted to reiterate a couple -- or expand upon a couple of points, which is that in, you know, some of these cases where suppression has been granted have been significantly shorter delays. In Pratt, it was 31. Mitchell, 21. Briscoe, of course, was six years, was significantly longer, but the Court goes out of its way to note that the defendant was incarcerated for much of the time and never once asked for the return of his phone. Tisdale was 34 days.

And courts, you know, in Mitchell, they note that the agent could have applied for a search warrant during the 2-1/2 days between the seizure of the device and him going away on training or had another case agent do it.

In the Eleventh Circuit's decision in Laced (ph.), which denies suppression or affirms the denial of a suppression, which was after a 25-day delay, they noted that the officers worked diligently on the investigation, that the defendant had consented to the seizure and been allowed to keep certain files, and that the warrant affidavit had a lot of original content that explained why it took the agents as

JA339

long as it did to, you know, get it finished.

In Burgard, which is a Seventh Circuit, it affirms the denial of a suppression involving a six-day delay. It ultimately finds the delay reasonable, but notes that it was implausible that an experienced officer couldn't write the warrant affidavit in less than six days.

And so the point here is while we do have a record that the State was very interested in the phone, we also know that they took 45 days to get the affidavit. And I think Detective Cleo Savoy said both that she was surprised, thinking back, that it took her that long, because at the time she felt like she was working diligently towards it, but she also noted that she thought that 45 days was the deadline for applying for a search warrant for a phone.

And then, you know, we have the Federal Government, who shows that they're working actively in the first couple weeks of March but then pauses during COVID.

And so we think balancing everything, particularly Mr. Vanderpool, what would we establish as his repeated attempts to demonstrate his possessory interest, that a delay of this magnitude can't be justified, that suppression is -- an evidentiary hearing is warranted but suppression is warranted because otherwise there would be no deterrent effect on such unreasonably long seizures.

And even if the officers aren't intentionally, you

know, attempting to disregard someone's Fourth Amendment possessory rights, it is important for officers -- there is clear case law indicating that officers need to pursue diligently a warrant for something that has been seized and that case law was in effect before the investigations in either the State or Federal Government in this case.

THE COURT: Ms. Marranzini, before we break, is there any other argument you'd like to add on any of your motions? The motion to suppress? We can talk about the juror questionnaire afterwards.

MS. MARRANZINI: No, Your Honor.

THE COURT: All right.

Okay. It's noon. Our court reporter needs a break.

Why don't we take about a 45-minute break where people can grab something to eat, and then I will come back and rule at least on part of the motions, perhaps all of them. Okay? All right. Thank you all.

THE CLERK: This Honorable Court now stands in recess.

(Court was recessed at 11:58 a.m.)

(Proceedings resumed after recess at 1:15 p.m.)

THE COURT: Okay. Please be seated.

Okay. First off, I want to thank everyone for your patience. I know I said 45 minutes, and it just wasn't

enough time. So, thank you for your patience. I appreciate that.

So, I'm going to rule on the motions. Once again, this is not short. The parties have raised a number of issues, cited many cases; and I want to give this thorough attention. And this will be the basis for my ruling.

On December 2, 2019, the State obtained a warrant for Mr. Vanderpool's arrest on the charge of rape first degree. That same day, the State obtained a warrant authorizing the search of Vanderpool's residence and the seizure of evidence of that offense, including electronic devices. This is referred to as the state premises warrant.

On December 3rd, the State executed the state premises warrant; and in the course of their search of Vanderpool's residence, state police seized multiple devices, but not his personal cell phone. State police arrested him near the residence that same day and seized the personal cell phone incident to arrest for which the police had an arrest warrant.

On January 17, 2020, the State obtained warrants to search each of the electronic devices state police had seized, including Vanderpool's personal cell phone. I will refer to these collectively as the state device warrant.

Finally, on June 23, 2020, the Federal Government obtained a warrant to take possession of the devices from the

State and search them. I will refer to this warrant as the Federal warrant.

Vanderpool challenges the validity of all three warrants and requests a Franks hearing on each one. None of his arguments persuades the Court.

Under rare, narrow circumstances, a defendant may challenge the integrity of a facially sufficient warrant affidavit, United States versus Colkley, 899 F.3d 297 at 300 (4th Circ. 1990), citing of course, the seminal case Franks against Delaware, Supreme Court case from 1978, 438 U.S. 154.

To obtain an evidentiary hearing on an affidavit's integrity, the defendant must satisfy a two-part test. To satisfy the subjective component, the defendant must make a substantial preliminary showing that a false statement, knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant. Franks, 438 U.S. at 155 to 156. This showing cannot be conclusory. It demands a detailed offer of proof, Colkley, 899 F.2d at 300.

To satisfy the objective component, the defendant must establish that the falsehood was essential to the probable cause determination. That's from Colkley.

If, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

Franks, 438 U.S. at 171 to 72.

The Franks test, of course, also applies to material omissions. Colkley, 899 F.2d at 300.

However, when a defendant relies on an omission, this heavy burden is even harder to meet. In that situation, a defendant must provide a substantial preliminary showing that, one, law enforcement made an omission; two, law enforcement made the omission knowingly and intentionally or with reckless disregard for the truth; and, three, the inclusion of the omitted evidence in the affidavit would have defeated its probable cause. United States versus Haas, H-A-A-S, 986 F.3rd 467 at 474 (4th Circ. 2021).

Mr. Vanderpool has not made the required showing for a Franks hearing on any of the warrant affidavits. In his opening brief, he focuses on the state premises warrant. He alleges the affiant, Lieutenant Ebeaugh, omitted three material facts: One, that law enforcement already had one photo that Vanderpool took of the victim on the day of the offense; two, that the victim's testimony to investigators gave them no particular reason to believe there were multiple photos; and, three, that the officers initially pulled the victim over for speeding. Including these facts, either together or individually, would not have negated probable cause.

Let's start with the traffic stop. Vanderpool

argues that by excluding the fact that the officers had stopped the victim for speeding, the affiant gave the judge the misimpression that the stop was unlawful.

I disagree. The affiant did not insinuate, much less seek to establish, that Vanderpool unlawfully stopped the victim. Whether he conducted a lawful traffic stop of the victim was irrelevant to the probable cause determination about whether he committed the crime of rape in the first degree against the victim after the traffic stop and whether evidence of that crime could be found in his home.

Including in the affidavit that Vanderpool lawfully pulled the victim's car over for speeding would not negate probable cause to believe he sexually assaulted her after the traffic stop.

Next I address the photograph Vanderpool took and the search for additional photos.

Mr. Vanderpool argues that if the affiant had told the reviewing judge that the Government already had the same photograph the affiant reportedly required a warrant to search the residence to seize, and that the victim, when she was interviewed by police, gave no indication that Vanderpool took more photographs of her, there would not have been probable cause to believe additional photos or other evidence would be found in his home.

But the affiant did not say that he sought a

JA345

warrant to search for a single photograph on the basis of a single witness's testimony; rather, he swore that on the basis of the testimony of witnesses, plural, he thought Vanderpool took photographs, plural, of the victim.

The irony of this argument is that if the Government had included the fact that it possessed a photo that Vanderpool had taken of the victim, that would have bolstered support for probable cause to search the home for other photographs. Omitting the existence of the photograph and the fact that the victim did not say he took more than one picture of her does not defeat probable cause.

Mr. Vanderpool has not established that the investigators omitted any -- excuse me -- the affiant omitted any material fact from the premises warrant affidavit.

Without the omission of material facts, the Court need not decide whether the facts were omitted with the intent to deceive or with recklessness as to their potentially deceptive character.

But on this point, Vanderpool puts forth no proof. He also fails to satisfy the subjective prong. He is not entitled to a Franks hearing on the premises warrant. And to the extent he seeks a Franks warrant on the state device warrant and the federal warrant, based on these omissions, he has not made the required showing for the same reasons.

Now, turning to the state device warrant and the

federal warrant. Vanderpool seeks a Franks hearing on these warrants, as well.

First, Vanderpool notes that the state device warrant misstates the date of his arrest by one day. But even Vanderpool concedes that this minor error was probably unintentional and irrelevant. This is a wise concession. The incorrect date by one day of his arrest was not intentionally or recklessly stated, and it certainly was not material.

Second, Vanderpool points out that the affidavits for the state device warrant and the Federal warrant misrepresented that the personal cell phone was seized pursuant to a premises warrant when, in fact, it was seized incident to arrest.

The United States says that this was an accident. Detective Savoy, the state device warrant affiant, copied and pasted information into the search warrant for the personal cell phone from others she had prepared for the other electronic devices recovered at Vanderpool's residence that day. And then Agent Bloomingdale, the Federal warrant affiant, relied on that erroneous affidavit.

Vanderpool submits no evidence that either affiant intended to deceive the reviewing judge into believing, or misstated with reckless disregard for the truth, that the phone was seized from Vanderpool's person incident to arrest

and not from his home pursuant to a search warrant.

As a result, Mr. Vanderpool has not satisfied the subjective component of the Franks test. Even if he had, he does not satisfy the objective component because this error was immaterial. The truth that the personal cell phone was seized from his person when police executed the arrest warrant outside his home on the same day they executed the search and seizure warrant at his home would not have negated probable cause to believe evidence of a crime would be found on his personal cell phone.

Third, Vanderpool argues that the device warrant and the Federal warrant affidavits should have informed the reviewing courts that the victim, N. Dupree, ^significant sources of information, made inconsistent statements to investigators about whether Dupree was present when Vanderpool and the victim had sex.

Vanderpool contends that these inconsistencies completely compromised the credibility of the victim, N. Dupree, and that because they did, the Court should consider whether striking the information they contributed would have negated probable cause.

Vanderpool then, of course, contends that excising this information from the affidavits would have negated probable cause.

Vanderpool has not established that these omissions

99

were material.

I begin by clarifying the applicable legal standard. The question is whether the affiant omitted facts that, when included, would defeat a probable cause showing; that is, the omission would have to be necessary to the finding of probable cause. United States versus Tate, 524 F.3d 449 at 455 (4th Circ. 2008).

So, to determine whether these omissions were material, I must determine whether the Government -- excuse me -- whether, had the Government included the omitted inconsistencies, there would not have been probable cause.

It is true that in United States versus Lull, 824 F.3d 109 (4th Circ. 2016), the Fourth Circuit considered whether there would have been probable cause if the statements of the compromised witness were excised entirely, but that is only because the witness's demonstrated unreliability thoroughly undermined his credibility for case-specific reasons I will describe shortly. That's at 118 of Lull.

So, I will not consider the effect of completely excising the information provided by Dupree and the victim unless I find that their inconsistencies so undermine their credibility that they were demonstrably unreliable witnesses.

I find that including the omitted facts about the inconsistencies of Dupree and the victim, their inconsistent
JA349

statements would not have negated probable cause.

First, even if the victim and Dupree were inconsistent about whether Dupree was present when Vanderpool and the victim had sex, the two were consistent that Vanderpool and the victim had sex. And their accounts were otherwise in accord.

Second, I do not find that their inconsistencies about whether Dupree was present during the incident so tarnished their credibility that they could not be relied on about the incident or about the rest of the events on September 6th.

Not only were their accounts otherwise consistent, but the victim came forward of her own volition to tell the truth. But even if these omissions were material, Vanderpool has failed to establish that either Detective Savoy or Agent Bloomingdale made these omissions with the intent to deceive or with recklessness as to their deceptive character. Vanderpool offers no direct evidence of intent or recklessness. His evidence of intent is based entirely on an inference from the omissions.

The Fourth Circuit has cautioned against inferring bad motive under Franks from the fact of omission alone, for such an inference collapses into a single inquiry the two elements:  Intentionality and materiality, which Franks states are independently necessary.  That's from Colkley, 899

JA350

F.2d at 301.

Nevertheless, the Fourth Circuit has acknowledged that the significance, or insignificance, of a particular omission to the determination of a probable cause -- of probable cause may inform the Court's conclusion regarding the agent's intent. That's from Lull, 824 F.3d at 117.

In Lull, the court inferred intent from an omission. Police gave an informant some money to conduct a controlled buy from the defendant at the defendant's home. After the buy, but before the informant returned to the police, the informant hid $20 of the funds in his underwear. When the officers asked him where it was, he told them he didn't understand the question. Then he lied and told them he had given it to the defendant during the buy. Skeptical, the officers searched him and found money. The Sheriff's Office immediately determined that the informant was not reliable and terminated him as a confidential informant, arrested him, and charged him with a felony.

Half an hour later, the same police officers obtained a warrant to search the defendant's home, relying almost entirely on the information provided by the informant during the controlled buy. The affidavit omitted that the informant stole the money, lied about it, and had been arrested.

After the District Court denied Lull's Franks

motion, the Fourth Circuit reversed, holding that Lull had satisfied both the objective and subjective components of the Franks test. The Fourth Circuit inferred that the warrant affiant had been at least reckless in omitting the information about the informant's credibility. The Court emphasized the significance of four facts: One, the decisiveness with which the Sheriff's Office acted in discharging and arresting the information; two, the affiant's knowledge of the consequences of the informant's crime; three, the temporal proximity of the arrest to the decision to omit information from the affidavit; and, four, the obvious impact of the informant's misconduct on any assessment of his reliability. That's from Lull at Page 116.

Unlike in Lull, the credibility of an informant is not at issue here. But even if the same test applies to other witnesses, this case is not Lull.

With respect to the state warrant, only two factors are similar; with respect to the Federal warrant, only one is.

As in Lull, the inconsistencies at issue here concern the subject of the investigation, which increases the odds the investigators knew they were relevant to the witness's credibility.

And the state warrant affidavit is similar to Lull in another respect: The witnesses made the misstatements to

the warrant affiant, Detective Savoy.

The other two factors are different. Unlike in Lull, here the inconsistencies did not lead the investigators to conclude the witnesses were not credible and to discharge them; and whereas in Lull, the investigators filed an affidavit omitting the false statements on the very day they were made, meaning, they had no time to evaluate whether the witness was credible. Nevertheless, here investigators did not submit the affidavit until weeks for the state device warrant or months for the Federal warrant until after the inconsistencies were identified.

In Lull, the Fourth Circuit inferred that the omissions were dispositive of recklessness only when this unique set of circumstances was taken together. That's Lull at 116 to 117.

With at least two significant facts different here, there is not enough for the Court to infer that Detective Savoy or Agent Bloomingdale failed to inform the magistrate judge of facts they subjectively knew would negate probable cause. Because Vanderpool has not met the subjective element of the test, a Franks hearing is not appropriate.

Mr. Vanderpool has not shown that a Franks hearing is necessary to evaluate the integrity of the affidavits for any of the three warrants.

JA353

Mr. Vanderpool challenges the state premises warrant on three grounds -- additional grounds, I should say: Lack of probable cause, lack of particularity, and overbreadth. None justify suppression. There is probable cause for a search if it is reasonable to believe that the items to be seized will be found in the place to be searched, United States versus Lalor, L-A-L-O-R, 996 F.2d 1578 at 1582. It's a Fourth Circuit case from 1993.

As the Supreme Court explained, probable cause turns on a totality of the circumstances analysis and requires a practical, common sense decision whether there is a fair probability that contraband or evidence of a crime will be found in a particular case. United States versus Gondres-Madreno, 3 F.4th 708 at 714 (4th Circ. 2021), quoting the seminal case Illinois versus Gates.

Vanderpool argues there was not probable cause to search his home for photos of the alleged victim, the clothing he wore during the alleged assault, the condoms taken from the victim, and other evidence. There is no probable cause, he claims, because three months had elapsed since the offense. The facts and the warrant affidavit did not create a fair probability that evidence would be found in the home. And many, if not all, of the items seized were so generic -- to be seized, I should say, were so generic that they would not constitute evidence of the crime, anyway.

The warrant affidavit established there was a fair probability that evidence of the alleged assault would be found in Vanderpool's residence.

As the Fourth Circuit has recognized often, a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence. United States versus Grossman, 400 F.3d 212 at 217 (4th Circ. 2005).

This case clears that low bar. The affidavit in support of this warrant included factual assertions linking the items to be seized to his home. Not only did Ebeaugh attest that Vanderpool had taken at least one photograph of the victim on his cell phone and had taken condoms from her car, he also attested that those who commit sexual assault often retain these and other mementos of their offenses and specified that unused condoms may be contained in the residence.

In addition, Ebeaugh attested that Vanderpool was not wearing his police-issued uniform during the alleged assault but, rather, the type of clothing: Khaki pants and military fatigues that the warrant designated for seizure. It was reasonable to think that the defendant's clothing would be at his home. Under the law of this Circuit, the affidavit said enough.

Vanderpool also argues there was no probable cause because three months had elapsed between the alleged assault and the warrant application. I disagree. When deciding a staleness challenge, the fundamental inquiry is whether the alleged facts are so dated that, at the time of the search, it is doubtful that evidence of criminal activity can still be found at the premise searched. United States versus Johnson, 865 F. Supp. 2nd 702, 705 (D. Md. 2012).

That is not the case here. As the affiant explained, the perpetrators of sexual assault often retain the sort of mementos and records the warrants sought. None of the items sought are the sort of things that are ordinarily destroyed, United States versus Farmer, 370 F.3d 435 at 440 (4th Circ. 2004).

And because photos stored on electronic devices, particularly photos associated with sexual offenses that the perpetrator might want to return, are not consumable like narcotics; they are unlikely to disappear so soon. United States versus Ebert, 61 F.3d 394, 401 (4th Circ. 2023).

Next are Vanderpool's breadth and particularity challenges. The Fourth Amendment requires that a warrant be no broader than the probable cause on which it is based, United States versus Hurwitz, 459 F.3d 463, 473 (4th Circ. 2006). In addition, a valid warrant must be particularly -- must particularly describe the place to be searched and the

persons or things to be seized. United States versus Kimble, 855 F.3d 604 at 610 (4th Circ. 2017).

The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant. United States versus Williams, 592 F.3d 511 at 519 (4th Circ. 2010).

Vanderpool argues that this warrant was overbroad and insufficiently particular because it allowed for the seizure of broad categories of items without any limitation or connection to the facts offered in support of probable cause. Describing the items to be seized in capricious language like "any and all electronic media capable of retaining digital image or video files, any and all diaries, and any documents."

This warrant was neither overbroad nor inadequately specific. The Fourth Circuit routinely upholds comparably broad warrants that include comparably broad, vague language. For example, Williams at 592 F.3d at 520; United States versus Sueiro, S-U-E-I-R-O, 59 F.4th 132 at 137 (4th Circ. 2023); an unpublished Fourth Circuit case, United States versus Thompson, 2023 Westlaw 4363652 from July 6th of last year.

Moreover, when a warrant states a charged offense

such as referenced to the crime -- such as reference to the crime effectively narrows -- excuse me.

When a warrant states a charged offense, such reference to the crime effectively narrows the description of the items to be seized. Sueiro 59 F.4th at 139.

That is the case here. As the affidavit in the warrant application notes, the State charged Vanderpool with rape first degree on December 2nd, 2019. That reduces the breadth of the warrant.

Nor did the affidavit fail to establish how the items to be seized would constitute evidence of the crime. In brief, the State sought to seize military-style clothing of the kind that Vanderpool wore on the date of the alleged offense, the specific brand of condoms he allegedly took from the victim that day, the device he used to take at least one photo of the victim that day and devices he might have stored that photo on, the device or devices he used to communicate with the victim and witnesses or otherwise memorialized the offense, any records he might have made of what he did that day. It was a fairly straight -- it is fairly straightforward that these items would constitute evidence of the assault.

Because this warrant was supported by probable cause, sufficiently detailed, and appropriately limited, evidence obtained as a result of these seizures will not be

suppressed on this ground.

I now turn to the state device warrant. Vanderpool argues that the device warrant fails to establish probable cause to seize all stored data on the devices. Without citing any Fourth Circuit precedent, he asserts that police must establish probable cause as to each specific category of files or information they hope to search on an electronic device, but the Fourth Circuit has twice rejected this proposition. United States versus Cobb, 970 F.3d 319 at 328, a 2020 case, and then also the Williams case, 592 F.3d at 521 to 522.

By attesting that there was good reason to think evidence might be found throughout the devices, the State established probable cause to seize all data stored.

He makes a similar argument that the warrant was unconstitutionally overbroad because it authorized the search and seizure of all stored data and provided no guidance whatsoever for identifying and searching the categories of information sought. Again, the Fourth Circuit has rejected this argument in Cobb and Williams.

Because the officers had a probable cause to believe that the devices contained evidence pertinent to the offense under investigation, more specificity about the search was not required under the Fourth Amendment. Cobb, 970 F.3d at 329.

Mr. Vanderpool makes the same arguments against the Federal Government's warrant for these same reasons. The argument falls short as to that warrant, as well.

Let me now turn to the issue of unreasonable delay.

Mr. Vanderpool argues that the evidence obtained from his devices should be suppressed because the delay between their initial seizure and their ultimate search was unreasonably long.

A seizure that is lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests. United States versus Jacobsen, 466 U.S. 109 at 124, 1984.

To determine if an extended seizure violates the Fourth Amendment, we balance the Government's interests in the seizure against the individual's possessory interest in the object seized. United States versus Pratt, 915 F.3d 266 at 271 (4th Circ. 2019).

In addition to those factors, courts consider the length of the delay and the government's justification for it. That's also from Pratt at 271 to 272. See also U.S. versus Smith, 967 F.3d 198 at 206 (2d Circ. 2021).

A strong government interest can justify an extended seizure. Pratt, 915 F.3d at 271.

At the outset, this argument faces a problem. It is not clear whether Pratt applies to a seizure pursuant to a

valid warrant. Every case Vanderpool cites for his position, from a range of jurisdictions, involves a warrantless seizure, yet all but one of the devices at issue were initially seized by the State pursuant to the Prince George's County warrant for the search of Vanderpool's home, which specifically provided for the seizure of all electronic devices like these; and all of the devices were subsequently seized and searched by the Federal Government pursuant to a warrant of its own.

The Fourth Circuit has never taken up this question directly. A couple of District Courts within the Fourth Circuit have concluded that Pratt does not apply to warranted seizures. See United States versus Moore, 2022 Westlaw 16636821, Western District of North Carolina, November 2nd, 2022; United States versus Brady, 577 F. Supp. 3rd, 420 at 427 (E.D.V. 2021).

On one occasion, a court in this district applied Pratt to devices that, like most of Vanderpool's, were seized pursuant to a warrant to search the defendant's home, but the Court did not explain why. That was in United States versus Reeves, 2022 Westlaw 717451, (D. Md.) March 10, 2022.

The Circuit-level cases on the issue suggest that the test does not apply to warranted seizures. The Fourth Circuit has underscored that the issue in Pratt was whether an extended pre-warrant seizure of a defendant's property --

there, a cell phone -- could become unreasonable with the passage of time. United States versus Caldwell, 7 F.4th, 191 at 201, note 7, (4th Circ. 2021).

So defined, Pratt is irrelevant when the question is whether a warranted search took place unreasonably long after a warranted seizure.

Other circuits with similar or identical tests have emphasized the significance of a warrant. As the Seventh Circuit has explained in an opinion cited favorably by Pratt, even a permissible warrantless seizure, such as the initial seizure here, must comply with the Fourth Amendment's reasonableness requirement. Thus, the Supreme Court has held that after seizing an item, police must obtain a search warrant within a reasonable period of time. United States versus Burgard, 675 F.3d 1029 at 2032, (7th Circ. 2012).

That same case said, "After seizing an item without a warrant, an officer must make it a priority to secure a search warrant that complies with the Fourth Amendment." That's Burgard at 1035.

The Second Circuit has said much the same, even if a little bit more equivocally. That's Smith, 967 F.3d at 205 and at 210.

Putting all of this together, it is unlikely that Pratt applies to a warranted seizure. That alone would defeat Vanderpool's argument as to the search of the devices

seized pursuant to the premises warrant.

At the very least, if Pratt does apply to the search of the devices seized pursuant to a warrant, the fact that these devices were seized pursuant to a warrant strengthens the Government's interest in the seizure. Pratt 915 F.3d at 271.

As courts in this district have recognized, the Government's interest will be stronger in the case of seizures for probable cause than for reasonable suspicion. United States versus Nkongho, that's spelled N-K-O-N-G-H-O, 2021 Westlaw 4421883, (D. Md) September 27, 2021. See also United States versus Wilkins, 538 F. Supp. 3rd, 49 at 94, (D. Md 2021).

That is all the more true where, as here, probable cause is cemented by judicial approval in the form of a warrant to seize the devices at the defendant's residence and a warrant to arrest him.

That leaves the other factors: The length of the seizure, the Government's justification for the delay, and the strength of Vanderpool's possessory interest.

First, the Government has a strong interest in the personal cell phone. To be sure, the Government's interest in the device is arguably slightly weaker than its interest in the other devices because it was seized incident to arrest rather than pursuant to a warrant. But that interest is

still robust because the phone was seized with probable cause to believe it would contain evidence of a crime, incident to Vanderpool's arrest pursuant to arrest warrant, mere feet from the home where the premises warrant authorized the Government to seize the device. See, for example, United States versus Burton, 756 Fed Appendix 295, 300, (4th Circ. 2018).

Second, between the state seizure and the federal search, Vanderpool had a somewhat diminished possessory interest in these devices. On one hand, the Court is mindful that an individual has a significant possessory interest in his cell phone. That's Reeves, 2022 Westlaw 717451 at 2.

Vanderpool did not consent to the seizure of his phone or volunteer the contents of the devices. And according to Vanderpool's proffer at this hearing, he has the evidence to establish that he, his mother, acting pursuant to his power of attorney, and his counsel requested the return of the devices on multiple occasions after his arrest, including while he was released. Requesting the return of seized property can signal an enduring possessory interest. See Burgard 675 F.3d at 1033.

On the other hand, no case holds that requesting the return of a device is sufficient on its own to secure the defendant's complete, unimpaired, possessory interest in the device.

While an individual who is free from police custody maintains a strong possessory interest in a cell phone by objecting to its seizure and refusing to consent to its search, an individual who is incarcerated has only significantly diminished interest. United States versus Dorsey, 2019 Westlaw 3804113 (D. Md) August 13, 2019. That's citing a Ninth Circuit case from 2015 and a Supreme Court case from 1984. In the interest of brevity, I won't cite all of those cases, but they are found in that opinion.

In addition, United States versus Horsley, 2022 Westlaw 827254, (W.D.V.) March 18, 2022; the Brady case I cited earlier; and United States versus Tisdale, 544 F. Supp. 2nd -- excuse me, F. Supp. 3rd, 2019, 2026 (D.Ct 2021).

For all but a couple weeks of the relevant time period, Mr. Vanderpool was in state custody. The upshot is that even assuming he can establish every fact he has offered to prove at an evidentiary hearing, it would remain true that his possessory interest in a phone that he could not possess for the vast majority of the period at issue was not at full strength. There is no need for an evidentiary hearing on his possessory interest in his personal cell phone because even if I believe everything in his lawyer's proffer, which I credit, it would not change my analysis.

Then there is the length of the delay. The parties dispute how to calculate it. Vanderpool claims it is the

nearly seven months from the date the State seized the devices, December 2, 2019, to the date the United States applied for a warrant to search them, June 23, 2020.  I think I actually heard today it was longer than that; it was when they actually searched them.

The United States claims it is between zero and three months on a few theories.

One, there was no delay because the United States obtained a single warrant authorizing the Federal Government to seize the devices from the State and search them.

Two, the delay ran from the State's seizure of the device to the State's application for a warrant to search the device.

And, three, the delay ran from the opening of the Federal investigation in March 2020 to the search warrant in June 2020.

And, four, the delay ran from the time the Federal Government determined that evidence of potential Federal crimes may be recovered from the defendant's electronic devices to the warrant.

Neither side cites any controlling authority on how to mark the time in a situation like this.  Vanderpool cites three cases.  In United States versus Briscoe, 2022, Westlaw 294296, (D. Md) February 1, 2022.  State police seize the defendant's phone without a warrant incident to arrest.

After a state officer affiliated with an FBI task force extracted data from the device, he returned it to another state police officer who put the phone in a desk. Over six years later, the Federal Government took over the investigation and obtained a warrant to search the phone.

Understandably, the Court found that a warrantless six-year seizure was unreasonably long, even though the defendant had a diminished possessory interest because he was incarcerated for much of the relevant time and had not asked for the phone.

Most relevant here, the Court identified the length of the delay as the six-and-change years from the initial seizure by the local police to the Federal search warrant.

In United States versus Tisdale, the Court measured the delay differently. There, two officers responded to a shooting on September 9, 2020, and recovered the victim's phone at the scene. Both were officers of the municipal police department, but one was also designated as an officer of an FBI task force. While the victim was in the hospital, the State arrested him for several unrelated crimes. On September 17th, the State sent out DNA samples taken from other evidence at the scene for testing. On November 4th, the State sent the results to the municipal police department confirming the shooting victim's DNA matched the DNA found on a gun with an obliterated serial number in his car. The

local officer, who had no Federal affiliation, immediately submitted a warrant for the victim's arrest on a State charge of unlawful gun possession.

For reasons unclear in the opinion, the officer affiliated with the FBI task force did not learn about the DNA results until December 4th. In response, he opened a Federal investigation, withdrew his colleague's application for a State arrest warrant, and on December 8th applied for a Federal warrant to search the phone they had recovered at the scene of the shooting, which had remained in State custody.

Tisdale later moved to suppress the evidence obtained from the phone on the basis of unreasonable delay. The United States argued that the length of the delay was just four days, from December 4th when the Federal-affiliated officers -- officer learned the DNA results and, thus, knew that there was probable cause for a search, to December 4th (sic) when he applied for a search warrant.

The defendant argued that the delay was about three months from the initial seizure on September 9th to the application for a search warrant on December -- excuse me -- on September 9th to the application for a search warrant on December 8th.

The Court found the delay was 34 days. From the November 4th release of the DNA results to the municipal police department to the December 8th warrant application,

the Court reasoned that the underlying constitutional principle is that if the police have probable cause to seize an item in the first place, there is little reason to suppose why they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant.

And in the case before it, the police had probable cause as soon as the DNA results came back positive. It was true that the Federal-affiliated officer did not know the results of the DNA test until a month after his colleague, but the Government's complete lack of explanation for the month-long communication failure between the two officers actively investigating the matter pertaining to the defendant totally disregards the temporal limitations of the Fourth Amendment's reasonable requirement, so the 34-day delay was unreasonable.

Finally, in United States versus Nguyen, that's N-G-U-Y-E-N, 2021 Westlaw 1325797, Southern District of Iowa, March 16, 2021. In that case, on November 2nd, 2018, a sheriff's deputy in Mississippi stopped a vehicle in which the defendant was a passenger and seized his phone and some money without a warrant. The deputy also found THC oil, marijuana, or both. But the stop did not result in any criminal charges.

The next month, an Iowa state trooper stopped a vehicle in which Nguyen was a passenger. This time he was

charged in Federal Court with possession of marijuana with intent to distribute.

On April 23, 2019, a superseding indictment charged him with conspiracy to distribute marijuana from at least the date of the Mississippi stop. At some point in late 2020, an Iowa agent learned that the Mississippi deputy had the defendant's phone. On January 13, 2020 -- 2021, he asked for it. Five days later, on January 18th, the Iowa agent received it by certified mail. On February 12th, he sought a warrant to search it. On February 22nd, he searched it.

After the defendant moved to suppress for unreasonable delay, the parties disagree about how to measure the length of the delay. The defendant argued for the 27 months that elapsed between the seizure and the search. The United States argued for the length of time between when the Iowa agent learned of the phone and when he applied for the warrant, at least four months.

The Court found that delay was anywhere from four months to 27 months and held that it was unreasonable by any measure.

Returning to our case, I find that the Federal Government's delay was no longer than four months. Tisdale and Smith make that clear. At the heart of the Tisdale analysis is the principle drawn from Smith. If the police have probable cause to seize an item in the first place,

there is little reason to suppose why they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant.

There is no plausible argument that the United States had probable cause to seize Vanderpool's personal cell phone before February 27, 2020, when Federal agents learned about the State investigation's for the first -- State's investigation for the first time.

In fact, the United States could not have had probable cause to seize and search the devices until the following days when the State informed Federal agents that the devices existed and were in State custody pursuant to search and seizure warrant for the devices.

Ultimately, the United States applied for a warrant to seize and search the personal cell phone, along with other devices, on June 23rd, 2020.

At the longest, then, the delay was just under four months from February 27, 2020, to June 23rd, 2020.

Vanderpool would have the Court ascribe the entire period the State possessed the device to the Federal Government, but the cases he cites do not justify going so far.

Nguyen is indecisive about how to calculate the length of delay. It provides no persuasive reason to start the clock here months before the Federal Government had

JA371

opened an investigation into Vanderpool or knew the devices existed.

In both Tisdale and Briscoe, state officers were involved in the investigations in their capacities as FBI Task Force Officers from the outset, making it more reasonable to attribute the delay to both sovereigns.

And distinguishing all three of Vanderpool's cases is the fact that here, the State secured a warrant to search Vanderpool's personal cell phone well before the Federal Government was involved in the case.

Vanderpool argues that the 45-day delay between when the State seized his personal cell phone incident to his arrest and when the State obtained a warrant was unreasonable. I disagree. In Pratt, the Fourth Circuit approvingly cited an Eleventh Circuit case involving a 45-day delay, United States versus Valimont, 378 Fed. App'x 972 (11th Circ. 2010).

As the Fourth Circuit described it, the Valimont court held that the 45-day delay between the warrantless seizure of the computer and the procurement of a warrant to search it was reasonable because the investigator was diverted to other cases, the county's resources were overwhelmed, and the defendant diminished his privacy interest by giving another person access to the computer. That's from Pratt 915 F.3d at 272.

The State's justification for this delay is at least as compelling as that in Valimont. According to the February 2nd, 2024, affidavit of Special Agent Bloomingdale and the comparable affidavit of Special Agent Zimmerman, between the State seizure of the device and its application for the search warrant, the law enforcement unit conducting the investigation, the Prince George's County Police Department Special Investigations Response Team was handling three to four times as many cases as it usually did, straining its capacity. Several of these cases were also complex, time-sensitive investigations concerning the conduct of other law enforcement officers.

Making matters worse, Detective Savoy, the lead detective on the Vanderpool case, had recently transferred into the unit in response to a credible threat on her life and had to appear in court multiple times in this window to address that threat.

Pratt's embrace of Valimont indicates that the State's 45-day delay was reasonable.

Turning to the fourth and final factor, the Government's -- the Federal Government's justification for the timeline as recounted in Agent Bloomingdale's affidavit and the affidavit of Agent Zimmerman is adequate.

In brief, the Federal Government proceeded as quickly as it reasonably could under the unique constraints

and devastation of the opening weeks of the COVID-19 pandemic.

The Government's justification in Reeves, the Court found that justification weighed in favor of the reasonableness of the delay. And I agree.

The Government's justification is worth recounting in more detail.

As I have already noted, the United States did not learn of the State's investigation into Vanderpool until February 27, 2020. With the State focused on the sexual assault charges, the Federal agents decided to focus on Vanderpool's alleged involvement in a kickback scheme.

On March 9th and 10th, federal agents interviewed three individuals about the scheme and reviewed relevant records. Those steps led federal agents to conclude that they should apply for a warrant to search Vanderpool's devices.

On March 16, 2020, Bloomingdale sent a draft warrant application to an Assistant United States Attorney; but by that point, the United States had entered COVID-19 lockdowns. With the United States District Court for the District of Maryland closed except for emergencies and federal law enforcement operating under significant constraints, the U.S. Attorney's Office did not file the draft warrant application.

In the meantime, federal agents focused their limited resources on what they took to be their most urgent cases, including one involving a law enforcement officer who was still on duty.

On June 3rd, with a major case behind them and the pandemic more stable, the Federal Government returned to its work on Vanderpool's case. On June 23rd, federal agents finalized the affidavit, and Judge DiGirolamo approved it telephonically.

This justification is significantly stronger than the justifications rejected in Pratt, which was that agents needed a month to decide which state to seek a warrant in. United States versus Mitchell, 565 F.3d 1347 at 1351, (11th Circ. 2009). In that case, justification that was rejected was that the agent left town for a training and didn't think a warrant was urgent.

And the Government's justification here is at least as strong as the justifications accepted in the two other cases that Pratt cites, that's Valimont and then United States versus Laist, L-A-I-S-T, 702 F.3d 608, 616 to 617, (11th Circ. 2012). There, the agents working on the warrant affidavit were managing investigations in 10 counties.

Like the Court in Reeves, I find that this delay, attributable in significant part to the exceptional circumstances of the COVID-19 pandemic, supports the

JA375

reasonableness of the delay.

An evidentiary hearing on the Government's justification would not change the analysis. Mr. Vanderpool does not proffer any specific evidence he believes such a hearing would surface that would undermine the Government's account, and he does not identify any specific assertions in either of the agents' affidavits that he believes are inaccurate.

As a result, I deny his request, which was made today for the first time, to hold an evidentiary hearing on the Government's justification for the delay.

In sum, one factor significantly supports the conclusion that the delay was reasonable: The Government's strong interest in the devices.

Two factors moderately support the same position: Vanderpoll's possessory interest in the phone and the Government's justification for its delay. One factor cuts the other way, the length of delay.

Overall, the analysis favors concluding that under the unique circumstances of this case, including the early days of the COVID-19 pandemic, this delay was reasonable.

For that reason, the evidence obtained from the devices seized pursuant -- incident to arrest and the premises warrant will not be suppressed for unreasonable delay, ECF-13. Motion to suppress is denied.

JA376

Thank you for your patience.

Let's turn to the juror questionnaire.

So, before we get to that, just a few housekeeping matters. I think the trial was scheduled to start on a Tuesday, June -- what's the date?

THE CLERK: June 3rd, Your Honor. Oh, June 4th, I'm sorry.

THE COURT: Okay. So, we'll need to start on a Monday. Any objection?

MS. BERNSTEIN: No, Your Honor.

MS. MARRANZINI: No, Your Honor.

THE COURT: All right. So, the trial will start on June 3rd.

I've reviewed your juror questionnaire, and I made some revisions to it. I'm going to ask my law clerk to hand you copies. Now, unfortunately, they're not redlined. I think it just would have been too much.

So, let me just, before you take a look at it, just note a few things. I've consulted with our clerk's office and how this process would work, and they've advised me that some of the information you asked for, the preliminary information, is already requested of the jurors. So, I've deleted that, which would be redundant. That's things such as how long have you been a Maryland resident, your current marital status, do you have any children.

They asked -- the clerk's office asks for job title and employer. And they also ask: "Do you have any medical or physical condition that might make it difficult for you to serve as a juror?" As to that question, I've still included that in the juror questionnaire because I think it's -- it can't hurt to ask that one twice.

So, I guess we can proceed one of two ways. I can give you time to look at this now and then you can tell me if you have any objections to what I have, or I'd be willing to, I suppose, just reconvene on a telephone call after you've had time to look at it.

Ms. Bernstein, do you want to take a look at it and let me know if you have any objections now? Or how would you like to proceed? And I'll ask Ms. Marranzini, of course.

MS. BERNSTEIN: Just looking at it very quickly, Your Honor, I would seriously doubt we would have any objection to it. But I wouldn't mind having a couple days just to look at it more closely.

THE COURT: Okay. Ms. Marranzini?

MS. MARRANZINI: Same position.

THE COURT: Yeah, it makes sense. Okay. All right. Why don't you do that and then meet and confer with each other and then perhaps submit something joint in writing and let me know your position on it.

I'll just give you a few thoughts. Some of the

questions about, for instance, "Who do you most admire?" and some other questions I did not think were necessary, so I deleted those things.

Also, there is something called -- something that the clerk's office sees, which is questionnaire fatigue. If they're too long, people just phase out. And I'm not sure it's very helpful to anyone.

As it stands, I still think this is too long. But I gave you the benefit of the doubt and didn't strike every question I thought was unnecessary.

But all right. So, why don't you take a look at that and let me know by the end of the week. All right?

We need to have this finalized by late March. The summons will go out in early April. And if all goes according to plan, I should have the questionnaires by, I think, mid May. And so we will need to schedule a hearing sometime in mid May, maybe mid to late May, where we go over the questionnaires together and then decide if there's anyone, based on their responses, who everyone agrees just will not be -- should not be called.

Does that make sense, Ms. Bernstein?

MS. BERNSTEIN: It does, Your Honor. Thank you.

THE COURT: Okay. Ms. Marranzini?

MS. MARRANZINI: Yes, Your Honor.

THE COURT: All right. So why don't we pick a

date.

What are our next dates in this case?  Do we have a pretrial conference?  Or motions in limine?  Do we have anything?

MS. BERNSTEIN:  We do, Your Honor.  I think motions in limine are currently due in March.  But that actually was one issue that we wanted to raise today.  We've consulted, and we wanted to make a joint motion to move that motion in limine date to -- April?

MS. MARRANZINI:  Yes.  Which would impact the pretrial conference, which is currently scheduled for May 10th.  So I think we were hoping Your Honor might be willing to postpone the deadline and the conference a bit more into May, in part because there's some, I think, evidence questions that haven't been resolved.  And so to the extent they can be resolved and don't need to be the topic of motions, then it's easier.

THE COURT:  That makes perfect sense to me.  Why don't you also just let me know by the end of the week a schedule you propose.  But let's pick a hearing date now.  Okay?  All right.

How about Monday, May 20th?

MS. BERNSTEIN:  I'm powering up my phone right now so I can check my calendar, Your Honor.

THE COURT:  All right.

JA380

MS. MARRANZINI:  That works for defense counsel.

MS. BERNSTEIN:  Yes, Your Honor, that works for the Government, as well.

THE COURT:  Okay.  Let's plan for 10 o'clock on Monday, May 20th.  That will be our motion in limine hearing. And we will also at that point discuss the juror questionnaires, which I think I will be able to provide to you in advance of that hearing.

So, the week before, I can send you, I think, those questionnaires so you can take a look at that, and then we can have a productive conversation on the 20th.

Okay.  Is there anything else we can address today regarding scheduling?

I'll start with you, Ms. Bernstein.

MS. BERNSTEIN:  Nothing for the Government, Your Honor.  Thank you.

THE COURT:  Ms. Marranzini?

MS. MARRANZINI:  Nothing further aside from leaving open this question of the motions in limine schedule.

THE COURT:  Absolutely.  So, I am fine for moving the dates.  You just need to give me enough time to process the information you filed.

So, what's the time I allotted myself out of the current schedule between when the motions in limine are totally briefed and the hearing?  Do you have that in front

JA381

of you?

MS. MARRANZINI: There's currently just over a month between responses and the pretrial conference.

THE COURT: Okay. If you could give me similar amount of time. Or even three weeks would be enough.

MS. MARRANZINI: Okay. And would it make sense to also address -- kind of bump the jury instruction and voir dire submission to be something that's also addressed at the pretrial conference? Those are currently due April 11th, about a month before the pretrial conference.

THE COURT: Right.

MS. MARRANZINI: So we could, in theory, have jury instructions and voir dire due around the same time that the motions in limine are briefed. Or would you prefer them on a different timeline?

THE COURT: I thought that's how I typically do it, is that voir dire and -- what? We have to talk about voir dire because it's slightly different now that we have a jury questionnaire in this case. But jury instructions are right around the time motions in limine are due, but I don't have a calendar.

There we go. Thank you.

MS. MARRANZINI: It's about a week after the response deadline for motions in limine.

THE COURT: Okay. Why don't you just mirror this

JA382

and move the dates how you see fit. Okay? But give me at least three weeks to process all of it. Does that make sense?

MS. MARRANZINI: Yes, Your Honor.

THE COURT: All right. That's great. Thanks.

All right. Just one bit of housekeeping. My courtroom deputy brought to my attention that the release order in this case is entered in the now-dismissed case. I think there is an incorporation by reference in this case to those release conditions. But I'm going to enter that release order in this case just so it's a little cleaner.

Any objection, Ms. Marranzini?

MS. MARRANZINI: No, Your Honor.

THE COURT: Ms. Bernstein?

MS. BERNSTEIN: No, Your Honor.

THE COURT: Okay. All right.

Anything else we can address from the Government's perspective?

MS. BERNSTEIN: Nothing further from the Government.

THE COURT: From the defense?

MS. MARRANZINI: No, Your Honor.

THE COURT: Okay. We are adjourned.

But could I see counsel at the bench just off the record? Great, thanks.

JA383

THE CLERK: All rise. This Honorable Court now stands adjourned.

(Court was adjourned at 2:31 p.m.)

JA384

CERTIFICATE OF OFFICIAL REPORTER

I, Kathy Cortopassi, RDR, CRR, CRC, previously employed as a Federal Official Court Reporter, in and for the United States District Court for the District of Maryland, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 18th day of March, 2025.


/s/ Kathy Cortopassi
Kathy Cortopassi, RDR, CRR, CRC
U.S. Official Court Reporter

JA385

FILED_____ ENTERED
LOGGED_____ RECEIVED

FEB **1 2** 2024

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA

v.

MARTIQUE CABRAL VANDERPOOL,

Defendant

CRIMINAL NO. DLB-23-234

**DEFENDANT'S EXHIBIT LIST
MOTIONS HEARING**

| Exhibit No. | Description | Witness | Identified | Admitted |
|---|---|---|---|---|
| 1 | State residence warrant (redacted) | | | |
| 2 | State cell phone warrant (redacted) | | | |
| 3 | Federal search warrant (redacted) | | | |
| 4 | Owen search warrant (redacted) | | | |
| 5 | Bloomingdale certification | | | |
| 6 | Emails regarding timing of search of phones | | | |
| 7 | Evidence collection report | | | |
| 8 | Reports for cellular downloads | | | |
| 9 | April 15, 2020, email about court closure | | | |
| 10 | 2020-07 Standing Order | | | |
| 11 | Wash. Post article | | | |
| 12 | Indictment 21-284-LKG | | | |
| 13 | Incident Report (redacted) | | FEB 1 2 2024 | |
| 14 | PGCPD Timeline and Case Summaries (redacted) | | | |
| 15 | PGCPD Case Tracking Log and Summaries (redacted) | | | |
| 16 | Power of Attorney 12.5.19 | | | |
| 17 | Power of Attorney 12.13.19 | | | |
| 18 | Affidavit of Special Agent Bloomingdale | | | |

1

JA386

| Exhibit No. | Description | Witness | Identified | Admitted |
|---|---|---|---|---|
| 19 | Property Note | | | |
| 20 | Screen grabs from custodial interview | | | |

JA387

UNITED STATES OF AMERICA

vs.

MARTIQUE CABRAL VANDERPOOL

FILED _____ ENTERED
LOCATED _____ RECEIVED

FEB 12 2024

CLERK, DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Criminal No. DLB 23-234

Government's Exhibits

| Exhibit No. | Witness | Identification | Admitted | Description |
|---|---|---|---|---|
| 1 | | FEB 1 2 2024 | | **FBI Special Agent Zimmerman Affidavit** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit List (Rev. 3/1999)

JA388

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | \* | |
| UNITED STATES OF AMERICA | \* | |
| | \* | **Case No. 8:23-cr-234-DLB** |
| v. | \* | |
| | \* | |
| MARTIQUE CABRAL VANDERPOOL, | \* | |
| | \* | |
| Defendant | \* | |
| | \* | |

. ∎∎∎∎∎∎∎∎∎∎∎

**GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE THE DEFENDANT FROM
INTRODUCING SELF-SERVING HEARSAY STATEMENTS AND FOR A PRETRIAL
RULING REGARDING THE SCOPE OF THE RULE OF COMPLETENESS**

The government at trial intends to introduce, pursuant to Federal Rule of Evidence 801(d)(2)(A), certain portions of a transcript of defendant Martique Cabral Vanderpool's testimony at a previous state trial. *See State v. Vanderpool*, No. 20-0085X (the "state trial"). When offered by the government, these prior statements by the defendant are admissible as non-hearsay admissions of a party-opponent. Fed. R. Evid. 801(d)(2)(A). The same statements are generally *inadmissible* when offered by the defendant. However, the government anticipates that the defense may seek to introduce certain additional portions of the state trial transcript pursuant to Federal Rule of Evidence 106 (often referred to as the rule of completeness). Specifically, the government is concerned that the defense may attempt to elicit evidence of the defendant's self-serving claims that his sexual conduct with a young woman he and another officer had just arrested and taken to a deserted police station in the middle of the night was entirely consensual. Because the rule of completeness allows a defendant to offer his own statement only if doing so is necessary to correct a misimpression created by the government offering an excerpt out of context, the rule does not permit the defendant to offer these self-serving statements regarding

JA389

consent.

To avoid the significant delay and distraction that would result from litigating disputes regarding the rule of completeness during trial, the government respectfully seeks a pretrial ruling regarding the parameters of that rule. The government also seeks the Court's approval for a proposed procedure, outlined below, by which the parties can identify any specific rule-of-completeness disagreements in time for the Court to settle any disputes before trial.

## I.      RELEVANT BACKGROUND

### A.  The September 6, 2019, Incident

In September 2019, the defendant was working as a police officer with the Fairmount Heights Police Department (FHPD) in Fairmount Heights, Maryland. Late at night on September 6, 2019, the defendant and another FHPD officer stopped R.S., a then-19-year-old woman who was driving without a license and speeding to get to her young son, who had been injured in a fall. The defendant and the other officer impounded the car that R.S. was driving and had it towed from the scene. When R.S. learned that the car was being towed, she became upset and unruly. She was arrested, handcuffed, and eventually transported from the scene.

Rather than taking R.S. to a separate location for booking and processing, as is standard FHPD protocol, the defendant and the other officer transported her, in handcuffs, to the small Fairmount Heights police station, which was deserted after-hours. There, the defendant engaged in sex with R.S. while the other officer stood by. Following this encounter at the station, the defendant and the other officer transported R.S. to the tow yard to which the car R.S. was driving had been taken and arranged for the towing company to release the car to her without charge (despite R.S. having no license and not owning the car). The defendant issued R.S. traffic citations and a criminal citation for Disorderly Conduct.

JA390

### B. The Incident Report

The defendant then filed an Incident Report regarding his interactions with R.S.  In the narrative portion of the report, the defendant wrote that he and the other officer had conducted a traffic stop and that the driver, R.S., had been placed in handcuffs, arrested for disorderly conduct, and "issued the appropriate traffic citations as well as a Criminal Citation . . . for Disorderly Conduct."  Then, according to the report, "[t]he registered owner picked up the vehicle and [R.S.] was released and sent on her way."

The defendant's Incident Report contains various material omissions and false statements that give rise to the single obstruction count in the federal indictment.  Specifically, the report omits: that the defendant and the other officer arranged to have the car R.S. had been driving towed from the scene of the traffic stop; that the defendant and the other officer took the then-handcuffed R.S. to the deserted police station; that the defendant engaged in sex with R.S.; and that the defendant arranged, after the sexual conduct, for the car to be released to R.S. without charge.  The report also falsely states that the registered owner [R.S.'s then-boyfriend] picked up the car (and implies that this occurred at the scene of the traffic stop).

### C. The State Trial

In December 2019, the Prince George's County State's Attorney's Office charged the defendant with various offenses, including rape, stemming from the defendant's sexual encounter with R.S. following the traffic stop.  At a state trial in January 2023, the defendant was acquitted of all charges except for a single misdemeanor charge of sex in custody (CR 3-314(e)).  In July 2023, the defendant was indicted federally on one count of writing a false report in violation of 18 U.S.C. § 1519.  ECF No. 1.  Trial on that charge is scheduled for October 22, 2024.

The defendant testified in his own defense at the state trial, where he made numerous

JA391

inculpatory admissions that will be offered against him in the federal trial, and where he also made numerous self-serving exculpatory statements about his interactions with R.S. Additionally, the defendant made statements—both inculpatory and exculpatory—about voice messages he had left for a friend (which the state had offered against him, and which the federal government will also offer against him at the upcoming federal trial), in which he boasted about his interactions with R.S.

*i. The Defendant's Inculpatory Statements*

During his state trial testimony, the defendant made numerous inculpatory statements that will be offered against him in his federal trial. For example, the defendant admitted, under oath: that he and the other officer pulled R.S. over for speeding; that R.S. said that her son had fallen on his head and been injured; that the officers learned that R.S. did not have a driver's license and impounded the car she was driving; that R.S. became erratic and the other officer took her to the ground and handcuffed her; that the defendant searched the car, found condoms, and thought that R.S. might be a human trafficking victim; that the officers had the car towed; that R.S. was placed under arrest; that the officers together transported R.S. to the police station, which was otherwise deserted; that the defendant handed the other officer a condom before the defendant engaged in sex with R.S.; that the other officer dimmed the lights as the defendant engaged in sex with R.S.; that afterwards, the other officer was walking toward R.S. when the defendant left to go to the restroom to wash up; and that the officers then drove R.S. to the tow lot, where the defendant had the owner release the car to R.S.

The government intends to offer some or all of these admissions in the upcoming federal trial.

*ii. The Defendant's Arguably Exculpatory Statements*

During his state-trial testimony, the defendant also offered self-serving exculpatory claims that the sexual encounter with R.S. was purely consensual. He claimed that, as soon as he found R.S.'s identification in the car, she "immediately … became really playful, and she started making a lot of sexual comments." He told the jury that while R.S. was in the police car, in handcuffs, during what he described as a one-to-two-minute drive to the police station, R.S. told the officers, "You can stumble in this pussy if you want." He claimed that while he was writing R.S. a criminal citation—before having sex with her—she was "euphoric . . . really happy," and "skipping around." He claimed that he told R.S. that he was going to give her traffic tickets and that he was charging her with a criminal offense for disorderly conduct and that after this, he and R.S. had a discussion and "agreed to sex." He claimed that he went home to get condoms, and that when he returned to the deserted police station, he handed a condom to his partner and then took off his own pants and underwear. He claimed that as soon as R.S. "seen [his] penis, when she seen [him] putting on the condom, she just took her clothes off like real fast." After that, according to the defendant, he and R.S. had a discussion about whether or not they would have oral sex, and when he declined to have oral sex with R.S., she announced, "real confident[ly]," that "yeah, I'll jerk it, but I want to ride it." The defendant then engaged in sexual intercourse with R.S. on a couch in the police station. During the sexual conduct, the other officer "dimmed the lights." When it was over, R.S. "attempted to give [the defendant] her phone number," but the defendant did not take it.

The government may or may not offer these statements into evidence as the admission of a party-opponent under Rule 801. However, if the government chooses not to do so, the defendant should be barred from offering these same statements because, as detailed below, the defendant's statements are inadmissible hearsay when offered by the defendant, and Rule 106 does not dictate

a different result.

### iii. The Defendant's Statements About His WhatsApp Voice Messages

During his testimony in the state trial, the defendant also offered commentary about a series of voice messages he had left for a friend over the messaging application WhatsApp. In the messages, left in the days after the defendant's interactions with R.S., the defendant bragged to his friend about his encounter with R.S., whom he described as a 19-year-old girl he "fucked" at the police station. In the messages, which the state played in the prior trial and which the government will offer at the federal trial, the defendant described the traffic stop and explained that R.S. had been upset and had said that her son was injured; the defendant also talked about the "bitch start[ing] [to] go[] like real crazy"; about his partner "slam[ming] her kinda" and handcuffing her; about noticing condoms in the car and "getting, like, horny"; and about how the defendant "ended up fucking her, like, while she was in custody, you know what I'm saying?"

In subsequent messages, the defendant clarified that the sex happened at the police station, and that during it he noticed that R.S. was "wet" and he thought "like damn, is she enjoying this?!" The defendant also explained to his friend that he gave R.S. citations anyway ("I still fucking wrote her shit, like a bunch of tickets and a citation"), and explained why: because if he didn't, she could come back and make allegations and it would look suspicious; but because he gave her tickets anyway, it would look like any other stop ("I just wrote a criminal citation. Traffic citations. But my thing is, I like to be consistent. So when you look at my track record, it don't look like she's an exception. . . . That's my whole thing. That's the same thing my partner be saying. Cuz he be doing this shit all the time and he's like, 'yeah I don't charge them with nothing.' But if they do say something, it looks to me, at least it looks *worse*. You didn't charge her with nothing, you just let her go. . . . At least if you charge her with some stuff, it looks like 'okay, she could just be mad.

JA394

Could just be making an allegation.'  You did what you were supposed to do, you know?  You charged her.").

In the state trial, the defendant admitted that some of these WhatsApp messages were in fact about R.S., but claimed that these messages were just "locker room talk."  He further claimed that the messages were taken out of context and that they did not all relate to R.S.

The government does not currently expect to offer any statements from the defendant's state-trial testimony relating to the WhatsApp messages.   [The government will offer the WhatsApp messages themselves, but not the defendant's state-trial testimony *about* the messages.] However, the government anticipates that the defendant may, during the federal trial, attempt to offer these minimizations from the state trial. These statements, like the other self-serving statements about the incident with R.S., are inadmissible hearsay, unaffected by Rule 106.

## II.    ARGUMENT

Out-of-court statements made by a defendant are not hearsay if offered by the prosecution. Fed. R. Evid. 801(d)(2)(A) (excluding from the hearsay rule a statement offered against an opposing party); *see also United States v. Benson*, 957 F.3d 218, 229 (4th Cir. 2020) ("[A] defendant's own statements constitute admissions by a party-opponent and are admissible pursuant to [Rule 801(d)(2)(A)].") (alterations and internal quotation marks omitted).  However, if the defendant offers those same statements for the truth of the matter asserted, the statements constitute hearsay and are inadmissible unless they fall within a separate hearsay exception.  Fed. R. Evid. 802 ("Hearsay is not admissible . . ."); *United States v. Davis*, 75 F.4th 428, 436 n.9 (4th Cir. 2023) ("[I]f [the defendant] had sought to introduce [his own statement] in the defense case, it would be hearsay.").  In other words, absent an exception to the hearsay rule, the defendant may not introduce his own state-trial testimony to prove the truth of any matter asserted within those

JA395

statements.  Fed. R. Evid. 802.

Rule 106, commonly referred to as the rule of completeness, provides a limited exception to the rule that a defendant may not put into evidence his own out-of-court statements (unless he takes the stand and subjects himself to the truth-seeking function of cross-examination).  Fed. R. Evid. 106.  The rule provides that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time."  *Id.*  The rule of completeness was designed to prevent an offering party from taking a statement out of context and presenting it in a manner that distorts the facts or misleads the trier of fact as to the declarant's meaning.  *See* Fed. R. Evid. 106 advisory committee note ("The rule is based on two considerations.  The first is the misleading impression created by taking matters out of context.  The second is the inadequacy of repair work when delayed to a point later in the trial.").  Offering a particularly illustrative example, the Seventh Circuit has noted that the rule would appropriately be invoked if, for example, one party "accus[ed] the Biblical David of blasphemy for saying, 'There is no God,' [when] his full statement [was], 'The fool hath said in his heart, there is no God.'"  *United States v. LeFevour*, 798 F.2d 977, 981 (7th Cir. 1986) (citing Trial of Algernon Sidney, 9 Howell's State Trials 818, 868-69 (K.B. 1683)) (declining to apply the rule of completeness when there was no danger of the initial statement leaving a misleading impression).

The Fourth Circuit has similarly recognized the limited nature of the exception created by Rule 106.  *See, e.g.*, *United States v. Hassan*, 742 F.3d 104, 134 (4th Cir. 2014) (noting that the purpose of the rule is "to prevent a party from misleading the jury" and that the rule does not render otherwise-inadmissible hearsay admissible) (internal quotation marks omitted); *United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) (affirming the exclusion of self-serving statements that

JA396

"were neither necessary to avoid misleading the jury or to place the portions admitted into proper context"); *United States v. Moussaoui*, 382 F.3d 453, 481 (4th Cir. 2004) ("[R]ule [106] is protective, merely.  It goes only so far as is necessary to shield a party from adverse inferences, and only allows an explanation or rebuttal of the evidence received.") (internal quotation marks omitted); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (emphasizing that the rule's "purpose is to prevent a party from misleading the jury"); *see also United States v. Todd*, No. 18-4161, 2022 WL 3210717, at *4 (4th Cir. Aug. 9, 2022) ("Rule 106 is not a device for a party to evade testifying and facing cross-examination."); *United States v. Rich*, No. 21-0432-BAH, 2024 WL 2396706, at *7 (D. Md. May 23, 2024) (noting that "Courts generally interpret Rule 106 narrowly" and denying defense motion to admit Rule 106 evidence that was not necessary to correct any misleading impression).

In a particularly instructive case, the Fourth Circuit recently affirmed a district court's refusal to allow a defendant to introduce a self-serving exculpatory statement that the defendant had made during a recorded jail call in which he also made an inculpatory statement that the government used against him.  *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023).  The defendant in *Davis* was arrested with drugs and a gun in his car and was charged with possession of a firearm in furtherance of drug trafficking.  While detained pending trial, the defendant made two relevant comments about the firearm during a 14-minute recorded jail call with his girlfriend: first, he arguably *exculpated* himself by saying, about the firearm, "I told them people that, shoot, that none of that ain't mine.  If it was mine, I would claim it"; and then two minutes later he arguably *inculpated* himself by saying "I ain't want to talk about how the gun got in the car." *Id.* at 432.  The government offered the inculpatory statement and moved to preclude the defendant from offering the self-serving exculpatory statement made two minutes earlier in the same

JA397

recording. The district court granted the motion and precluded the defense from offering the self-serving statement, noting that there was nothing "misleading or unclear about the section that the [prosecution] want[ed] to offer" and that the exculpatory portion was not "necessary to clarify or give context to [the inculpatory firearm comment]." *Id.* at 433. Affirming that decision, the Fourth Circuit reiterated its earlier holdings that "Rule 106 does not require the admission of self-serving, exculpatory statements made by a party [that] are being sought for admission by that same party," and deferred to the trial court's finding that the self-serving, exculpatory comment was not needed to place the inculpatory firearm comment in proper context. *Id.* at 436-37 (internal quotation marks omitted); *see also Todd*, 2022 WL 3210717, at *4 (upholding exclusion of additional statements that "were hearsay, self-serving, and not needed for context"); *Hassan*, 742 F.3d at 135 (upholding exclusion of exculpatory statements where the jury was "[not] likely to have been confused or misled by their exclusion"); *United States v. Hedgepeth*, 418 F.3d 411, 423 (4th Cir. 2005) (explaining that allowing the defendant to admit an additional statement, beyond what the government had admitted, "would not have corrected any distortion of the contents" of the portion admitted by the government); *United States v. Bollin*, 264 F.3d 391, 414 (4th Cir. 2001) (upholding exclusion of redacted prior testimony where the "omitted testimony was not necessary to avoid misleading the jury or otherwise place the admitted testimony in context"), *overruled on other grounds by United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017).

As was the case in *Davis*, the inculpatory portions of the defendant's prior statement here are straightforward and not subject to misinterpretation. Nonetheless, the government anticipates that the defendant may seek to introduce pursuant to Rule 106 the additional, self-serving portions of his state trial testimony in which he claims that the sexual encounter was consensual and in which he minimizes the WhatsApp recordings. Nothing about the defendant's claims regarding

JA398

R.S.'s alleged consent is necessary to "clarify or explain" his admissions that he and the other officer arrested R.S., handcuffed her, and drove her to the police station, where the defendant had sex with her. 75 F.4th at 436. Likewise, nothing in his comments about the WhatsApp messages is necessary to "clarify or explain" the state-trial-transcript statements that will be admitted by the government. Accordingly, there is no basis for the defendant to admit his own statements other than to offer his defense without having to take the stand and submit to cross-examination. As the Fourth Circuit has made clear, the Rules of Evidence "do not . . .provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party," *Wilkerson*, 84 F.3d at 696 (citing Fed. R. Evid. 803-804), and the defendant therefore cannot admit his own statements unless they are "necessary to avoid misleading the jury or to place the portions admitted into proper context," *Lentz*, 524 F.3d at 526. In this case, there is no misleading impression in need of correction.

Permitting the defendant to use Rule 106 as a means to admit his own self-serving statements would allow him essentially to testify without "facing cross-examination"—precisely a harm that the hearsay rules were designed to prevent. *Todd*, 2022 WL 3210717, at *4; *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (permitting a defendant to offer his own statements would allow the defendant to "effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury").

### III.    PROPOSED PROCEDURE

The government respectfully proposes the following procedure for addressing any rule-of-completeness issues prior to trial: the government will provide to the defense team, at least two weeks prior to trial, a copy of defendant Vanderpool's state-trial-testimony transcript, highlighted

JA399

to indicate the portions of that testimony that the government might offer in its case-in-chief.  The defense will then identify for the government, within one week of trial, any additional portion of the testimony that it believes should come in under Rule 106 if the government offers the highlighted parts.   If, after consultation, the parties remain unable to resolve all rule-of-completeness issues, they will alert the Court to any specific disagreements before trial begins.

## IV.    CONCLUSION

For the reasons stated above, the government respectfully requests an *in limine* ruling (1) that if the government admits at trial the defendant's inculpatory statements from his state trial testimony, the defendant will be precluded from offering his own self-serving hearsay statements from the same testimony unless the statements are necessary to correct a misimpression created by the government's excerpts; (2) that the government shall identify for the defense, by two weeks prior to trial, those portions of the defendant's state-trial testimony that the government might introduce in its case-in-chief; (3) that the defense shall identify, by one week prior to trial, any additional portions it thinks must be admitted under the rule of completeness; and (4) that the parties shall identify for the Court, before trial begins, any unresolved rule-of-completeness issues.

Respectfully submitted, this 26th day of June, 2024.

Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

JA400

Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

JA401

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE THE DEFENDANT FROM INTRODUCING SELF-SERVING HEARSAY STATEMENTS AND FOR A PRETRIAL RULING REGARDING THE SCOPE OF THE RULE OF COMPLETENESS has been served by e-filing upon counsel for the Defendant, this 26th day of June, 2024.


　　*/s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein

JA402

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | Case No. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |

. ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

**GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE REFERENCE TO THE
EXISTENCE AND OUTCOME OF PRIOR STATE TRIAL**

The government, by and through undersigned counsel, respectfully requests an *in limine* order precluding any evidence of, argument about, or reference to the fact that the defendant, Martique Cabral Vanderpool, was previously tried by the State of Maryland in the Circuit Court for Prince George's County, Maryland, where he was convicted of having sex with a person in custody and acquitted of numerous charges related to an alleged sexual assault. *See State v. Vanderpool*, No. 20-0085X (the "state trial"). Reference to the existence and outcome of the state trial should be excluded for three independent reasons: (1) any evidence of the state trial is irrelevant to the charged offense; (2) any testimony about the outcome of the state trial is hearsay that is not otherwise exempt from the hearsay rule; and (3) reference to the existence or outcome of the state trial would prejudice and confuse the jury, and would invite jury nullification.

**RELEVANT BACKGROUND**

In September 2019, the defendant was working as a police officer with the Fairmount Heights Police Department (FHPD) in Fairmount Heights, Maryland. Late at night on September 6, 2019, the defendant and another FHPD officer conducted a traffic stop of R.S., a then-19-year-old woman who was driving without a license and speeding to get to her young son, who had been

JA403

injured in a fall. The defendant searched the car R.S. was driving, told her he was going to impound it, and arranged to have it towed from the scene. When R.S. became agitated and began running into traffic, she was arrested, handcuffed, and eventually transported from the scene by both officers in a single car.

Rather than taking R.S. to a separate location for booking and processing, as is standard FHPD protocol, the defendant and the other officer transported her, in handcuffs, to the small, deserted Fairmount Heights police station. At the station, the defendant engaged in sexual intercourse with R.S. as the other officer stood nearby. After the sexual encounter, the defendant and the other officer transported R.S. to the tow yard to which the car she was driving that night had been taken and arranged for the towing company to release the car to her without charge (despite R.S. having no license and not owning the car). The defendant issued R.S. traffic citations and a criminal citation for Disorderly Conduct.

The defendant then filed an Incident Report regarding his interactions with R.S. In the narrative portion of the report, he wrote that at around 11:22 p.m. the previous night, he and the other officer had observed a Ford Mustang speeding in a 40 MPH zone. The officers conducted a traffic stop, during which the driver, who did not have a driver's license, became upset and "erratic" and repeatedly ran into traffic and failed to obey commands. The defendant also wrote in the report that the driver, R.S., was placed in handcuffs and arrested for disorderly conduct. According to the report, R.S. "was issued the appropriate traffic citations[,] as well as a Criminal Citation . . . for Disorderly Conduct," after which "[t]he registered owner picked up the vehicle and [R.S.] was released and sent on her way."

The defendant's Incident Report contains various material omissions and false statements that give rise to the obstruction charge in the one-count federal indictment. Specifically, the report

JA404

omits: that the defendant and the other officer took the then-handcuffed R.S. to the abandoned police station; that the defendant had sex with R.S. at the police station; that the defendant and the other officer arranged to have the car R.S. had been driving towed from the scene of the traffic stop; and that the defendant arranged, after the sexual encounter, for the car to be released to R.S. without charge. The report also falsely states that the registered owner [R.S.'s then-boyfriend] picked up the car.

In December 2019, the Prince George's County State's Attorney's Office charged the defendant with various offenses, including, among others, 1st and 2nd degree rape, sex with a person in custody, 2nd degree assault, and misconduct in office. These charges stemmed from the sexual encounter between the defendant and R.S. following the traffic stop described above. The defendant was tried by the state in early January 2023; he testified and was acquitted of all charges except for the misdemeanor charge of sex with a person in custody.

On July 6, 2023, a federal grand jury returned the current Indictment, charging the defendant with one count of writing a false and misleading Incident Report, in violation of 18 U.S.C. § 1519. ECF No. 1.[1]

## ARGUMENT

### I.   Evidence of the Defendant's State Trial and Acquittals is Irrelevant to his Federal Prosecution.

Any evidence of, argument about, or reference to the state trial or its outcome should be precluded because it is irrelevant to any issue to be considered by the federal jury. That a state jury

---

[1] A prior federal grand jury in 2021 returned an indictment charging the defendant with a civil rights offense, in violation of 18 U.S.C. § 242, for depriving R.S. of her right to be free from an unreasonable seizure. *United States v. Vanderpool*, No. 8:21-cr-354 (D. Md. Sept. 8, 2021), ECF No. 1. Upon a consent motion by the government, that indictment was dismissed without prejudice on July 17, 2023. *Id.*, ECF No. 94. The government will file a separate motion *in limine* to preclude any reference to the initial, now-dismissed federal indictment.

JA405

acquitted the defendant of multiple state charges stemming from his sexual encounter with R.S. does not tend to prove or disprove any element of the single obstruction charge to be considered by a federal jury. Rather, it tends only to show that a different sovereign failed to meet its burden of proof with respect to different charges supported by different facts. *See, e.g., United States v. Smith*, 981 F.2d 1252, 1992 WL 369904, at *3 (4th Cir. 1992) ("[E]vidence of a prior acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime.") (quoting *United States v. Kerley*, 643 F.2d 299, 300-01 (5th Cir. 1981)); *United States v. Benkahla*, 2006 WL 3760060, at *2-3 (E.D. Va. Dec. 19, 2006) (excluding evidence of prior acquittal because the evidence was irrelevant, was hearsay, and was likely to mislead the jury and cause confusion); *see also United States v. Benson*, 957 F.3d 218, 236-37 (4th Cir. 2020) (holding that district court did not abuse its discretion by instructing the jury—after defense had referred to the dismissal of a state-court murder charge as being evidence of reasonable doubt—that the state-court dismissal was irrelevant); *United States v. Jones*, 808 F.2d 561, 567 (7th Cir. 1986) ("Here, the acquittal shows only that state prosecutors failed to meet their burden of proof.").

Evidence of a prior acquittal is *especially* irrelevant where, as here, the elements of the acquitted crime and the charged crime are different. *See, e.g., United States v. Halteh*, 224 F. App'x 210, 214 (4th Cir. 2007) (noting that "[a] prior acquittal, especially when the elements of the charged crimes are different, does not tend to prove innocence" and that "the limited probative value" of evidence of an acquittal "may be substantially outweighed by the danger of unfair prejudice or jury confusion"); *id.* (endorsing other courts' "reasoning that the fact of acquittal on a different charge arising out of the same criminal conduct is simply not relevant to a later trial on another charged crime"); *United States v. Ro*, 465 F. App'x 217, 222 (4th Cir. 2012) (explaining

that an acquittal "of a charge different from the one at issue in" the present case "was not relevant"); *United States v. Truslow*, 530 F.2d 257, 265 (4th Cir. 1975) (stating that generally "evidence of other offenses and charges and acquittals are not" admissible).

Here, the defendant was acquitted in a prosecution by a different sovereign on charges based on an alleged rape. None of the elements of the current obstruction charge overlap with those state charges. Simply put, the defendant's acquittal of multiple state sex-offense-related charges has no bearing on the single federal obstruction charge he currently faces, and evidence of the state trial should be excluded for that reason.

## II.     The State-Court Acquittals Constitute Inadmissible Hearsay.

In addition to being irrelevant to any issue that will arise in the defendant's federal trial, evidence of the prior state trial on sex-offense charges constitutes inadmissible hearsay. *See, e.g.*, *Smith*, 1992 WL 369904, at *2 ("[A] judgment of acquittal is hearsay, and there is no exception to the hearsay rule for judgments of acquittal.") (quoting *United States v. Sutton*, 732 F.2d 1483, 1493 (10th Cir. 1984)); *Benkahla*, 2006 WL 3760060, at *2 (same); *see also United States v. Kendrick*, 682 F.3d 974, 986 (11th Cir. 2012) (same). That is because "[t]estimony about a prior acquittal is evidence of assertions made outside [of] trial, offered to show the truth of the matters alleged— the essence of inadmissible hearsay." *United States v. Castro-Ramirez*, 461 F. App'x 467, 469 (6th Cir. 2012) (internal quotation marks omitted).

Because any evidence of, argument about, or reference to the defendant's acquittal on state charges is inadmissible hearsay not subject to an exception, it should be excluded for that reason also.

## III.    Evidence of the Defendant's State Trial and Acquittals is Unduly Prejudicial.

Any evidence of, argument about, or reference to the defendant's acquittals in state court

JA407

should also be precluded under Federal Rule of Evidence 403 because it would unavoidably prejudice and confuse the jury and would invite jury nullification. *See Benkahla*, 2006 WL 3760060, at *3 (emphasizing that admission of a prior acquittal would "lead[] the jury to endless speculation" and "would confuse and mislead the jury"; concluding that "the appropriate resolution is to exclude the previous acquittal altogether").

Indeed, federal courts of appeals routinely exclude evidence of a defendant's prior acquittal regardless of relevancy because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See, e.g., United States v. Bisanti*, 414 F.3d 168, 172-73 (1st Cir. 2005) (reasoning that evidence of a prior acquittal "has a tendency to confuse the jury rather than assist it"); *United States v. De La Rosa*, 171 F.3d 215, 219-20 (5th Cir. 1999) ("[E]ven if not for the[ relevance and hearsay] barriers to admissibility, evidence of a prior acquittal will often be excludable . . . because its probative value likely will be substantially outweighed by the danger of prejudice, confusion of the issues, or misleading the jury.") (internal quotation marks omitted).

Given that evidence of the defendant's state trial and acquittal have no relevance to the charge at issue in this case, the only purpose for its admission would be to invite jury nullification—an entirely improper basis for admission. *See United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (noting that although "a jury has the power of nullification[,] . . . defense counsel is not entitled to urge the jury to exercise this power"); *see also United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020) ("Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible[.]") (internal quotation marks omitted).

As explained above, the defendant was charged by the state for multiple offenses stemming from his sexual encounter with R.S. He was acquitted by a state jury of all but a single charge of

JA408

sex with a person in custody. His single federal obstruction charge stems from material omissions and false statements he made in a police report. If the federal jury were to learn that the defendant was acquitted of multiple state charges, jurors would certainly be "logically [led] to . . . speculat[e] as to which elements of the [state] offense[s] were not proven beyond a reasonable doubt." *Benkahla*, 2006 WL 3760060, at *3. This could prejudice either the government (by causing a jury to question why a federal prosecution is following a state trial acquittal) *or* the defendant (particularly if the jury learned of or speculated about the nature of and circumstances surrounding the state charges). This information is thus likely to cause the federal jury to decide the case on an improper basis—the very concern Rule 403 was designed to prevent. *See* Fed. R. Evid. 403 advisory committee notes (explaining that "unfair prejudice" as used in Rule 403 "means an undue tendency to suggest decision on an improper basis"); *see also Kerley*, 643 F.2d at 301 (holding that "the probative value of evidence of [defendant-officer's prior] acquittal . . . was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury").

## CONCLUSION

For the above reasons, the government respectfully requests an *in limine* order precluding evidence of, argument about, or reference to the existence and outcome of the defendant's trial and acquittals in state court. The government (which intends to offer into evidence numerous admissions the defendant made during the state trial) recognizes that it will be necessary at the defendant's federal trial for the parties to refer to testimony from the state trial. The government respectfully submits that the parties should refer to the state trial testimony as "prior sworn testimony" or "testimony from a prior proceeding related to this matter." *See, e.g., United States v. Jones*, 808 F.2d 561, 566 (7th Cir. 1986) (approving of district court's decision to exclude "all evidence of the defendants' prior acquittal and [to] instruct[] the parties to refer to the prior trial

JA409

simply as a 'proceeding' or 'testimony'").

Respectfully submitted, this 26th day of June, 2024.


Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov


Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing *GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE REFERENCE TO THE EXISTENCE AND OUTCOME OF PRIOR STATE TRIAL* has been served by e-filing upon counsel for the Defendant, this 26th day of June, 2024.


*/s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein

JA411

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **v.** | *  **Case No. 8:23-cr-234-DLB** |
| | * |
| **MARTIQUE CABRAL VANDERPOOL,** | * |
| | * |
| **Defendant** | * |
| | * |

. ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

## GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE ANY REFERENCE TO THE CIVIL SUIT FILED BY R.S. AGAINST THE DEFENDANT, UNLESS AND UNTIL R.S. TESTIFIES

The government, by and through undersigned counsel, respectfully moves *in limine* for an order precluding any reference to a civil suit filed by R.S., a potential government witness, unless and until R.S. testifies. The civil suit will be relevant as impeachment against R.S. if she testifies but will be irrelevant and prejudicial if she does not testify. Thus, the government moves to preclude any reference to the civil suit during *voir dire*, opening, or any other phase of the trial unless and until R.S. takes the stand.

### RELEVANT BACKGROUND

In September 2019, the defendant was working as a police officer with the Fairmount Heights Police Department (FHPD) in Fairmount Heights, Maryland. Late at night on September 6, 2019, the defendant and another FHPD officer stopped R.S., a then-19-year-old woman, for speeding. The officers arrested R.S. and had the car she had been driving towed from the scene. The officers then transported R.S., handcuffed, to a deserted FHPD station, where the defendant engaged in sexual acts with her while the other officer stood nearby. Following this encounter at the station, the defendant and the other officer drove R.S. to the tow lot and arranged for the towing

JA412

company to release the car to her without charge.

The defendant later submitted an incident report containing false statements and material omissions about his interactions with R.S. Based on that report, the defendant has been charged with one count of obstructing justice by writing a false police report.

In August 2022, R.S. filed a civil suit against the defendant, the other officer, and others. That case remains pending in the District of Maryland (Case No. 8:22-cv-1915-TJS). If R.S. testifies at the trial of this criminal matter, her civil suit will provide appropriate fodder for cross-examination regarding bias and regarding any inconsistencies between her civil complaint and her trial testimony. However, because the defendant has admitted that he engaged in sexual intercourse with R.S. at the deserted station that he and the other officer transported her to in handcuffs that night, R.S.'s testimony is not critical to the government's case; and if she does not testify, her civil suit will be entirely irrelevant and highly prejudicial. Because any improper mention of the civil suit—such as a reference during opening statement—would cause prejudice that could not thereafter be cured, the government respectfully moves for an order *in limine* precluding mention of the lawsuit unless and until it becomes clear that R.S. will testify.

**ARGUMENT**

If R.S. testifies at the defendant's trial, evidence of her pending civil lawsuit against the defendant will provide an appropriate basis for impeachment. *See United States v. Greenwood*, 796 F.2d 49, 54 (4th Cir. 1986) (explaining that a "pecuniary interest" in the outcome of a trial is an appropriate basis for impeachment). However, if she does not testify, that same evidence will be irrelevant and potentially highly prejudicial. Accordingly, any evidence of, or reference to, the civil lawsuit should be precluded unless and until R.S. testifies. Reference to the lawsuit for any purpose other than impeachment would also risk confusing and misleading the jury.

JA413

Evidence must be excluded from trial if it is not relevant. Fed. R. Evid. 402. Evidence is relevant only if it has a "tendency to make a fact more or less probable than it would be without the evidence[,] and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence of R.S.'s lawsuit is not relevant because there is no aspect of the defendant's obstruction charge that is made more or less likely by the civil suit. Accordingly, this evidence should be excluded unless and until R.S. testifies.

If R.S. does not testify, evidence of the civil lawsuit would also be excludable pursuant to Rule 403 for the independent reason that any limited probative value would be far outweighed by the danger of unfair prejudice and of confusing or misleading the jury. Fed. R. Evid. 403. If R.S. is not a witness in this case, reference to her civil lawsuit would serve no purpose other than perhaps to generate sympathy for the defendant, or to invite the jury to nullify based on a belief that a potential future civil settlement would constitute sufficient remedy for the defendant's actions. Either purpose would be improper. *United States v. Baker*, 928 F.3d 291, 299 (3rd Cir. 2019) (explaining that even relevant evidence may be inadmissible where it "could mislead the jury due to 'sympathy' for" the witness); *United States v. Gearheart*, 678 F. Supp. 3d 748, 754 (W.D. Va. 2023) (excluding irrelevant evidence that created a risk that the jury would "acquit [the defendant] based on sympathy"); *see also United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (noting that although "a jury has the power of nullification[,] . . . defense counsel is not entitled to urge the jury to exercise this power"); *United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020) ("Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible . . . .") (internal quotation marks omitted); *United States v. Polouizzi*, 564 F.3d 142, 162-63 (2d Cir. 2009) ("[I]t is not the proper role of courts to encourage jury nullification.").

**CONCLUSION**

JA414

For the reasons stated herein, the government respectfully requests an *in limine* order precluding any mention of R.S.'s lawsuit during *voir dire*, opening statements, or any other phase of trial unless and until R.S. takes the stand.

Respectfully submitted, this 26th day of June, 2024.

Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.allison@usdoj.gov

Criminal Section, Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-0032

JA415

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE ANY REFERENCE TO THE CIVIL SUIT FILED BY R.S. AGAINST THE DEFENDANT, UNLESS AND UNTIL R.S. TESTIFIES has been served by e-filing upon counsel for the Defendant, this 26th day of June, 2024

　/s/ *Barbara Bernstein*
Barbara (Bobbi) Bernstein

JA416

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **Case No. 8:23-cr-234-DLB** |
| **v.** | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

▪▪▪▪▪▪▪▪▪▪▪▪

**GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE REFERENCE TO THE
DISMISSED CIVIL RIGHTS INDICTMENT**

The government, by and through undersigned counsel, respectfully moves *in limine* for
an order precluding any evidence of, argument about, or reference to the fact that defendant
Martique Cabral Vanderpool was previously indicted by a federal grand jury for committing a
civil rights offense in violation of 18 U.S.C. § 242, and that, upon the government's consent
motion, that indictment was dismissed without prejudice in July 2023. Reference to the existence
and dismissal of the previous federal indictment should be excluded because it is irrelevant to the
offense charged in this case and risks confusing and misleading the jury.

**RELEVANT BACKGROUND**

The defendant, a former officer with the Fairmount Heights Police Department (FHPD), is
currently charged in a one-count indictment with obstructing justice by writing a false police report
about a traffic stop that he and a fellow officer conducted on September 6, 2019. The person
stopped by the defendant—19-year-old R.S.—was transported in handcuffs to a deserted FHPD
station, where the defendant engaged in sex with her while the other officer stood nearby. The
defendant then wrote an incident report that, among other things, omitted that R.S. was transported
to the police station, omitted that he engaged in sex with her, and falsely implied that she was

JA417

released from the scene of the traffic stop.

In December 2019, the Prince George's County State's Attorney's Office charged the defendant with multiple offenses, including rape, stemming from the defendant's sexual encounter with R.S. following the traffic stop. In September 2021, a federal grand jury charged the defendant with one count of violating 18 U.S.C. § 242 for depriving R.S. of her right to be free from an unreasonable seizure by subjecting her to nonconsensual sexual conduct. *United States v. Vanderpool*, No. 8:21-cr-354 (D. Md. Sept. 8, 2021), ECF No. 1 ("initial federal indictment" or "dismissed federal indictment").

The state case proceeded to trial while the initial federal indictment was still pending. At the state trial, in January 2023, the defendant was acquitted of all charges except for a single misdemeanor charge of sex with a person in custody.[1] Thereafter, upon a consent motion filed by the government in July 2023, the initial federal indictment was dismissed without prejudice. *Id.*, ECF No. 94. That same month, a federal grand jury returned the current indictment, charging the defendant with one count of writing a false and misleading Incident Report, in violation of 18 U.S.C. § 1519. ECF No. 1. Trial on the current indictment is scheduled for October 22, 2024.

## ARGUMENT

Any evidence of, argument about, or reference to the dismissed federal indictment should be precluded because it is irrelevant to any issue to be considered by the jury in the current prosecution of the defendant for obstructing justice. Moreover, admission of such evidence would create a grave risk of confusing and misleading the jury and causing undue prejudice.

First, any reference to the dismissed federal indictment should be precluded because it is irrelevant to whether the defendant is guilty or not guilty of the charged obstruction offense in this

---

[1] The government is filing a separate motion *in limine* to preclude any reference to the state trial and acquittals.

JA418

case (and, for that matter, whether he was guilty or not guilty of the now-dismissed civil rights charge).

To be sure, the defendant's conduct during and after the traffic stop, which gave rise to the initial federal indictment, is also the conduct about which the defendant is now charged with falsifying a police report. But evidence of the initial charge and subsequent dismissal of the civil rights indictment is not at all relevant to the pending obstruction charge. As the Fourth Circuit has previously explained, "a [government]'s decision to drop charges may have nothing at all to do with guilt or innocence." *United States v. Benson*, 957 F.3d 218, 236 (4th Cir. 2020). Indeed, "[s]everal circuits have unanimously upheld the exclusion of evidence of prior charging decisions on the ground that many factors unrelated to guilt may influence those decisions and their admission therefore risks misleading the jury and confusing the issues." *United States v. Reed*, 641 F.3d 992, 993-94 (8th Cir. 2011); *see also United States v. Candelaria-Silva*, 166 F.3d 19, 35 (1st Cir. 1999) ("[C]ases are dismissed for many reasons unrelated to the defendant's guilt."); *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990) ("[W]e cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty."). Rather, "non-prosecution decisions are irrelevant because they often take 'into consideration the availability of prosecutorial resources, alternative priorities, the expectation of prosecution by other authorities, or any number of other valid discretionary reasons.'" *Benson*, 957 F.3d at 236-37 (quoting *United States v. Bingham*, 653 F.3d 983, 999 (9th Cir. 2011)).

Evidence of a dismissed charge is "particularly" irrelevant where, as here, the dismissed charge and the current charge have "distinct elements." *Benson*, 957 F.3d at 236 ("[A government's] decision to drop charges may have nothing at all to do with guilt or innocence, particularly in relation to a federal crime with distinct elements."). In this case, none of the

JA419

elements of the two charges overlap. Thus, the government's exercise of its prosecutorial discretion to dismiss the earlier indictment does not make more or less probable any fact that is relevant to proving the obstruction charge. *See id.* at 236; *see also* Fed. R. Evid. 401 (describing relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence"). For this reason, any reference to the dismissed federal indictment should be precluded under Federal Rule of Evidence 402 ("Irrelevant evidence is not admissible.").

Second, any evidence of or reference to the dismissed federal indictment should be precluded under Federal Rule of Evidence 403 because it runs a high risk of prejudice to both parties and would undoubtedly confuse, mislead, and prejudice the jury. On one hand, if jurors learned that the defendant had previously been indicted for a serious civil rights felony, they might conclude, with or without evidentiary support, that the defendant is guilty of a sexual assault and therefore deserving of punishment. On the other hand, jurors who are unaware that "non-prosecution decisions . . . take into consideration . . . any number of . . . valid discretionary reasons" unrelated to guilt or innocence, *Benson*, 957 F.3d at 236-37 (internal quotation marks omitted), might assume that the dismissal reflects a weakness in the government's case. In short, allowing evidence of or reference to the dismissed federal indictment would present jurors with incomplete facts and would improperly invite them to speculate as to the meaning of and basis for the initial civil rights charge and/or its later dismissal.

Recognizing that the government may decline prosecution, drop a charge, or dismiss an indictment for a variety of reasons unrelated to a defendant's guilt or innocence, the Fourth Circuit has followed "[o]ther circuits … uniformly uph[olding] the exclusion of evidence of prior charging decisions because it risks misleading the jury and confusing the issues." *Benson*, 957 F.3d at 237 (citation omitted). *see also Reed*, 641 F.3d at 993-94 (collecting cases recognizing that evidence

JA420

of prior charging decisions "risks misleading the jury and confusing the issues"). And even if there were some limited relevance to the dismissed federal indictment, "explaining its significance and relevance to the jury," as well as the reasoning behind the government's charging decisions, "would consume time with little or no probative value at the end of the day, and [would] be unnecessarily confusing." *Bingham*, 653 F.3d at 999; *see also Delgado*, 903 F.2d at 1499 (explaining that even if evidence of a government's decision to drop certain charges were relevant, "it would not be admissible under Rule 403"). For this reason, any reference to the dismissed federal indictment should also be excluded under Rule 403.

For the reasons presented, the government respectfully requests an *in limine* order precluding reference to the dismissed federal indictment.

Respectfully submitted, this 26th day of June, 2024.


Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032


JA421

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE REFERENCE TO THE DISMISSED CIVIL RIGHTS INDICTMENT has been served by e-filing upon counsel for the Defendant, this 26th day of June, 2024.

 */s/ Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein

JA422

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

## ORDER

Upon consideration of the Government's Motion *in Limine* to Preclude the Defendant From Introducing Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding the Scope of the Rule of Completeness, it is this _____ day of _____, 2024, hereby:

**ORDERED**, that the government's motion is GRANTED for the reasons set forth in its motion. If the government admits at trial the defendant's statements from his state trial testimony, the defendant will be precluded from offering his own self-serving hearsay statements from the same testimony unless the statements are necessary to correct a misimpression created by the government's excerpts. By two weeks prior to trial, the government shall identify for the defense those portions of the defendant's state-trial testimony that the government might introduce in its case-in-chief; by one week prior to trial, the defense shall identify any additional portions it thinks must be admitted under the rule of completeness; and before trial begins, the parties shall identify for the Court any unresolved rule-of-completeness issues.

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA423

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  | * |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * |  |
|  | * | **CRIMINAL NO. 8:23-cr-234-DLB** |
| **v.** | * |  |
|  | * |  |
| **MARTIQUE CABRAL VANDERPOOL,** | * |  |
|  | * |  |
| **Defendant** | * |  |
|  | * |  |
|  | ******* |  |

## ORDER

Upon consideration of the Government's Motion *in Limine* to Preclude Reference to the Existence and Outcome of Prior State Trial, it is this _____ day of _____, 2024, hereby:

**ORDERED**, that the government's motion is GRANTED for the reasons set forth in its motion.  The Court precludes evidence of, argument about, or reference to the existence and outcome of the defendant's trial and acquittals in State v. Vanderpool, No. 20-0085X.  The parties shall refer to the state trial testimony as "prior sworn testimony" or "testimony from a prior proceeding."

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA424

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

## ORDER

Upon consideration of the Government's Motion *in Limine* to Preclude Any Reference to the Civil Suit Filed by R.S. Against the Defendant, Unless and Until R.S. Testifies, it is this _____ day of _____, 2024, hereby:

**ORDERED**, that the government's motion is GRANTED for the reasons set forth in its motion. The Court precludes any reference to R.S.'s civil suit during *voir dire*, opening statements, or any other phase of trial, unless and until R.S. takes the stand.

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA425

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | **CRIMINAL NO. 8:23-cr-234-DLB** |
| **v.** | * | |
| | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## ORDER

Upon consideration of the Government's Motion *in Limine* to Preclude Reference to the Dismissed Civil Rights Indictment, it is this _____ day of _____, 2024, hereby:

**ORDERED**, that the government's motion is GRANTED for the reasons set forth in its motion.

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA426

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE INADMISSIBLE AND IRRELEVANT EVIDENCE REGARDING R.S.'S CHARACTER

The United States of America, by and through undersigned counsel, respectfully files this motion *in limine* to exclude inadmissible and irrelevant character evidence attacking R.S., a potential government witness. If R.S. *does not* testify at trial, any evidence offered to attack her character or impeach her credibility will be inadmissible because it will be irrelevant and prejudicial and will be offered solely to invite jury nullification. If R.S. *does* testify, the defendant may properly challenge her character and/or impeach her credibility but may not do so outside the boundaries provided by the Federal Rules of Evidence. The government respectfully requests that the Court preclude improper character attacks if R.S. does testify; preclude evidence of (or implications regarding) her arrests without convictions, and her alleged sexual history or predisposition, regardless of whether she testifies; and preclude the defendant from attacking her character if she does not testify.

### RELEVANT BACKGROUND

The government hereby incorporates the "relevant background" in the government's Motion *in Limine* to Preclude the Defendant from Introducing Self-serving Hearsay Statements. ECF No. 86.

JA427

The same incident that gave rise to the federal charge in this case also gave rise to a state prosecution for rape and other offenses. *See State v. Vanderpool*, No. 20-0085X (the "state trial"). At the state trial in 2023, both the defendant and R.S. testified. The defendant admitted that he and another officer pulled R.S. over for speeding; that the officers had the car towed; that R.S. was handcuffed and placed under arrest; that the officers transported R.S. to the police station, which was otherwise deserted; that the defendant engaged in sex with R.S. while the other officer stood nearby; and that the officers then drove R.S. to the tow lot, where the defendant had the car released to R.S.

R.S. provided a similar account, adding that the sex was nonconsensual. R.S. was impeached with prior inconsistent statements and with evidence of communications between her and the other officer in the months following the incident. Additionally, the defense suggested that R.S. was a prostitute.

Because the defendant has admitted the conduct relevant to the current federal obstruction charge against him, R.S.'s testimony will not be necessary at trial. If R.S. nevertheless testifies, the impeachment evidence regarding prior inconsistent statements and communications with the other officer will be admissible; however, if R.S. does not testify, the same evidence will be irrelevant and prejudicial.[1] Trial is scheduled for October 22, 2024.

## ARGUMENT

Under the Federal Rules of Evidence, certain impeachment evidence will be admissible only if R.S. testifies, and other evidence will be inadmissible regardless of whether she testifies.

---

[1] Additionally, R.S. was arrested in 2023 on state drug and gun charges; however, as discussed below, because none of those charges has led to conviction, evidence of the arrest is not admissible, regardless of whether R.S. testifies. *See Hofner v. Brown*, 983 F.2d 570, 576 (4th Cir. 1992) (recognizing "the general prohibition against introducing past arrests not leading to conviction").

JA428

If R.S. testifies, the defendant may attack her credibility, so long as he does so consistently with the rules of evidence; if she does not testify, he may not attack her credibility.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." *United States v. Young*, 916 F.3d 368, 378 (4th Cir. 2019); *see also* Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. And even if evidence is relevant, a court may properly "exclude [it] if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

## I.    Admissible Evidence if R.S. Testifies

If R.S. *does* testify, the defendant may impeach her credibility or challenge her character—provided he does so in a manner consistent with the Federal Rules of Evidence. Thus, the defendant may attack R.S.'s character for truthfulness (a pertinent character trait), if he does so through opinion or reputation evidence. *See* Fed. R. Evid. 404, 405, 608(a); *see also United States v. Caro*, 597 F.3d 608, 633 (4th Cir. 2010) (discussing application of Rule 608(a), governing the admissibility of evidence of a witness's character for truthfulness or untruthfulness). Additionally, the Court may permit cross-examination regarding specific instances of conduct, "if such instances 'are probative of [R.S.'s] character for truthfulness or untruthfulness.'" Rule 608(b); *United States v. Parker*, 790 F.3d 550, 559 (4th Cir. 2015) (quoting Fed. R. Evid. 608(b)). The defendant may also attempt to impeach R.S. through the presentation of any prior inconsistent statements. Fed. R. Evid. 613(b); *see also United States v. Barnes*, 480 F. App'x 231, 235 (4th Cir. 2012) (explaining rule). And he may offer evidence to establish bias on the part of R.S.  Relevant evidence on these points is admissible so long as its probative value is not substantially outweighed by the risk of undue prejudice. Fed. R. Evid. 403.

## II.    Inadmissible Evidence Regardless of Whether R.S. Testifies

3

JA429

However, *even if* R.S. testifies, the defendant may not attack her character or credibility in a manner *inconsistent* with the Federal Rules of Evidence. Specifically, as discussed further below, it would be improper for the defendant to attack R.S.'s character by introducing evidence of her prior arrests (for which she has not been convicted); by introducing evidence suggesting that she engaged in other sexual behavior apart from the incident with the defendant on September 6, 2019; or by introducing any other evidence suggesting that she was a prostitute.

### A. Arrests With No Conviction

R.S. was arrested in 2023 on felony charges that have not led to any conviction. Rule 609, which permits the admission of certain criminal convictions of a witness, does not permit introduction of evidence regarding arrests that have *not* resulted in convictions. Fed. R. Evid. 609(a); *Saunders v. United States,* No. WDQ-04-0406, 2008 WL 4133853, at *4 (D. Md. Sept. 2, 2008) ("Mere arrests are not admissible to impeach a witness."); *Hafner v. Brown*, 983 F.2d 570, 576 (4th Cir. 1992) (recognizing "the general prohibition against introducing past arrests not leading to conviction"); *see also Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013) ("The well-established, general rule is that a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges."). Accordingly, evidence of R.S.'s arrests for various state felony offenses not resulting in convictions should be precluded regardless of whether or not she testifies.[2]

---

[2] On March 2, 2023, R.S. was arrested in Upper Marlboro, Maryland, for the misdemeanor offense of having a loaded handgun in the vehicle she was driving, in violation of Maryland Criminal Code Section 4-203; the felony offense of use of a firearm in commission of a crime in violation of Section 4-204; the felony offense of use of a weapon in a drug trafficking crime in violation of Section 5-621; the misdemeanor offense of CDS possession—not marijuana—in violation of Section 5-601; and the felony offense of possession with intent to distribute in violation of Section 5-602. R.S. was released on bail on March 3, 2023. As a result of this arrest, R.S. has a case in the Circuit Court for Prince George's County for the following charges: CDS: Possession with Intent to Distribute CR.5.602 (Felony); CDS: Possession-Not Cannabis CR.5.601(a)(1) (Misdemeanor); and CDS: Distribution

4

JA430

### B. Sexual History

At the state trial, defense counsel (properly) offered evidence of text messages between R.S. and the other officer from the months following the incident with defendant Vanderpool, and (improperly) insinuated that R.S. was a prostitute and had a sexual relationship with the other officer.

Whether or not R.S. testifies in the federal trial, any evidence of (or implication regarding) R.S.'s alleged sexual behavior or alleged sexual predisposition should be excluded. This evidence is irrelevant and highly prejudicial, and runs afoul of Rule 412. Rule 412 precludes the use, in any criminal proceeding "involving alleged sexual misconduct," of evidence offered to prove that a victim "engaged in other sexual behavior" or had a "sexual predisposition."[3] This evidence is excluded whether it is offered as substantive evidence or for impeachment (except in three specific circumstances—not applicable here—involving conduct to explain the source of semen, other sexual conduct with the defendant, or evidence the exclusion of which would raise a due process concern). Fed. R. Evid. 412(a) & (b); *see also* Fed. R. Evid. 412 advisory committee notes (1994) (noting that Rule 412 is a rule of exclusion that imposes significant limitations on the admissibility of "evidence relating to [a] victim's sexual behavior or alleged sexual predisposition, whether offered as substantive evidence or for impeachment"). Thus, regardless

---

with Firearm CR.5.621(b)(2) (Felony). *See* Case No. C-16-CR-23-001227. Each of the three charges received a "stet" disposition on October 20, 2023. The remaining charges have been dismissed.

[3] Although the defendant is not charged with a federal sex-offense, his charged obstruction offense is nevertheless a "criminal proceeding *involving* alleged sexual misconduct," and therefore Rule 412 applies. Fed. R. Evid. 412(a)(1) (emphasis added); *see also* advisory committee notes (1994 Amendments) ("There is no requirement that there be a criminal charge pending against the person or even that the misconduct would constitute a criminal offense" for the Rule's preclusive effect to apply). Similarly, although R.S. is not a victim of the charged obstruction offense, the "rule applies in all cases involving sexual misconduct without regard to whether the alleged victim . . . is a party to the litigation." *Id.* (1994 Amendments). By its plain terms, the Rule "applies to *any* witness who has been a victim of sexual assault." *United States v. Deuman*, 568 F. App'x 414, 421 (6th Cir. 2014).

JA431

of whether R.S. testifies, any evidence concerning her other (alleged or implied) sexual behavior or sexual predisposition should be precluded. *See, e.g., United States v. Parks*, 849 F. App'x 400, 405-06 (4th Cir. 2021) (upholding district court's exclusion of irrelevant evidence of a victim's prostitution before or after her interactions with the defendant); *United States v. Brown*, 810 F. App'x 105, 108 (3d Cir. 2020) (affirming exclusion of evidence of victims' history of prostitution because it "would have had little if any probative value" that "would have been substantially outweighed by the danger of unfair prejudice").[4]

Moreover, evidence of R.S.'s alleged sexual behavior or predisposition is precisely the type of evidence that would be introduced to invite jury nullification. Any such evidence is wholly irrelevant to whether the defendant knowingly wrote a false and misleading police report with the intent to impede or influence an investigation into a federal matter. Accordingly, any such evidence would needlessly distract the jury from the issues it must decide in this case and would be unduly prejudicial. *See United State v. Maynes,* 880 F.3d 110, 115-16 (4th Cir. 2018) (excluding evidence of victims' past sexual history and citing *United States v. Gemma*, 818 F.3d 23, 34 (1st Cir. 2016), for the proposition that evidence of a victim's past prostitution was "either entirely irrelevant or of . . . slight probative value in comparison to its prejudicial effect"; also

---

[4] Additionally, Federal Rule of Evidence 412 has a notice-and-hearing requirement. Fed. R. Evid. 412(c) (requiring a defendant to file a motion at least 14 days before trial indicating any intention to offer evidence of a victim's sexual behavior or predisposition and requiring a hearing, sealed and *in camera*, at which the victim has an opportunity to be heard). Failure to comply with this procedure results in exclusion of the evidence, absent a showing of good cause. *See, e.g., United States v. Saunders*, 736 F. Supp. 698, 699 (E.D. Va. 1990), *aff'd*, 943 F.2d 388 (4th Cir. 1991); *United States v. Blank*, No. CRIM. WDQ-14-10448, 2015 WL 4041408, at *14 (D. Md. June 30, 2015), *aff'd,* 659 F. App'x 727 (4th Cir. 2016) (citing Rule 412(c)(2)). If the Court does not exclude this evidence now, on the basis of the government's motion *in limine*, the government requests, in the alternative, that the Court order the defendant to provide any Rule 412 notice by August 4, 2024, the day on which expert notice is due.

noting that allowing the evidence would have risked focusing the trial on the victims' pasts rather than the conduct of the defendant).

### III.    Inadmissible Evidence if R.S. Does Not Testify

If R.S. does not testify at trial, any evidence offered to impeach her credibility or attack her character would be irrelevant and therefore inadmissible. The Fourth Circuit has recognized "as a general matter" that "evidence that merely impeaches [a person who does] not testify lacks relevance." *United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011); *see also United States v. Williams*, 954 F.2d 668, 672 (11th Cir. 1992) ("The law is clearly established that one may not introduce evidence to impeach a witness who does not testify."). This is so because the credibility of someone who does not testify is rarely, if ever, at issue in a case. *See, e.g., United States v. Lewis*, 274 F. App'x 259, 260 (4th Cir. 2008) ("Because the confidential informant did not testify, his credibility was not at issue."). In *United States v. Sanchez*, for example, the Fourth Circuit upheld the district court's decision to limit cross-examination of a testifying witness about the credibility of a non-testifying confidential informant. 118 F.3d 192, 196-97 (4th Cir. 1997). The court explained that because neither the government nor the defendant called the informant to testify, the informant's "general dishonesty and credibility" were "not at issue" and "not relevant to any . . . issue properly before the jury." *Id.* at 197.

That same reasoning applies here. The issues for the jury to decide here are (1) whether the defendant knowingly wrote a false and misleading police report about the circumstances surrounding the September 2019 traffic stop; (2) whether he did so with the intent to impede or influence any potential investigation; and (3) whether the matter about which he wrote was within the jurisdiction of the federal government. *See* 18 U.S.C. § 1519; *see also United States v. Spirito*, 36 F.4th 191, 202 (4th Cir. 2022) (reciting elements of 18 U.S.C. § 1519). If R.S. does not testify, evidence of her credibility and character will have no bearing on the jury's consideration of these

7

JA433

discrete factual issues. Simply put, R.S.'s credibility and/or character is not relevant to any element: it is not relevant to the defendant's knowledge or intent; to whether the Incident Report is false or misleading, or to whether the investigation of any alleged sexual assault under color of law falls within the jurisdiction of the FBI. Any evidence concerning R.S.'s credibility and character, assuming she does not testify, would be highly prejudicial and would confuse and mislead the jury. Moreover, this evidence would serve only to suggest that R.S. is unworthy of the law's protection and thus would improperly encourage jury nullification. *See* Fed. R. Evid. 403; *see also United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (noting that "defense counsel is not entitled to urge the jury to exercise th[e] power [of jury nullification]"); *United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020) ("Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible[.]") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court preclude improper character attacks if R.S. does testify; preclude evidence of (or implications regarding) her arrests without convictions, and her alleged sexual history or predisposition, regardless of whether she testifies; and preclude the defendant from attacking R.S.'s character if she does not testify.

Respectfully submitted this 28th day of June, 2024.

Respectfully submitted,

Kristen Clarke
Assistant Attorney General
Civil Rights Division

JA434

*/s/ Tara Allison*
Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov


Criminal Section, Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-0032

9

JA435

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE INADMISSIBLE AND IRRELEVANT EVIDENCE REGARDING R.S.'S CHARACTER has been served by e-filing upon counsel for the Defendant, this 28th day of June, 2024.

*/s/ Tara Allison*
Tara Allison
Trial Attorney

10

JA436

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. 8:23-cr-234-DLB** |
| **v.** | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## ORDER

Upon consideration of the Government's Motion *in Limine* to Exclude Inadmissible and Irrelevant Evidence Regarding R.S.'s Character, it is this _____ day of _____, 2024, hereby:

**ORDERED**, that the government's motion is GRANTED for the reasons set forth in its motion. Regardless of whether R.S. testifies, the defendant may not introduce (a) evidence of R.S.'s prior arrests for which she has not been convicted, or (b) evidence regarding R.S.'s alleged sexual history or predisposition. If R.S. does not testify, the defendant may not introduce evidence of her credibility or character.

SO ORDERED.

_____
Hon. Deborah L. Boardman
United States District Judge

JA437

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Defendant Martique Vanderpool's Omnibus Response to
Government's Motions *in Limine***

Defendant Martique Vanderpool, through counsel Zampogna, P.C., hereby opposes the Motions *in limine* filed by the Government in this matter.

On June 26, 2024 the Government filed its first four motions *in limine*:

- Government's Motion *in Limine* to Preclude the Defendant from Introducing Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding the Scope of the Rule of Completeness

- Government's Motion *in Limine* to Preclude Reference to the Existence and Outcome of Prior State Trial

- Government's Motion *in Limine* to Preclude any Reference to the Civil Suit filed by R.S. Agsint the Defendant, Unless and Until R.S. Testifies

- Government's Motion *in Limine* to Preclude Reference to the Dismissed Civil Rights Indictment

Additionally, on June 28, 2024, the Government filed an additional Motion *in Limine* to Exclude Inadmissible and Irrelevant Evidence Regarding R.S.'s Character.

1

JA438

## Procedural History

On September 6, 2019, Defendant Martique Vanderpool and another officer were the only two members of the Fairmount Heights Police Department (FHPD) on duty.[1]  The two officers observed a vehicle driving well above the speed limit and initiated a traffic stop.  The driver, R.S., was driving without a license.  The two officers then allegedly impounded the vehicle and arranged for it to be towed from the scene.  During this time, R.S. became erratic.  Officer Dupree placed R.S. into handcuffs, at which point she began smashing her head against the police cruiser.

The two officers then allegedly brought R.S. to the Fairmount Heights Town Hall, which houses the police station.  R.S. then allegedly engaged in sexual intercourse with Vanderpool.  Following the interaction, R.S. received traffic citations and a criminal citation for Disorderly Conduct.

Following the incident, the State of Maryland brought a series of charges against Vanderpool, including First Degree Rape, Second Degree Rape, Sex in Custody, Fourth Degree Sex Offense, Misconduct in Office, and Second Degree Assault.  The charge for First Degree Rape was dismissed in a motion for acquittal.  A jury then found Mr. Vanderpool not guilty of all the remaining charges besides Misconduct in Office.  After the jury verdict, the Government voluntarily dismissed

---

[1] The other officer, Philip Dupree, was recently convicted of a Violation of Civil Rights Under Color of Law under 18 U.S.C. § 242 in the District of Columbia (1:22-cr-275).  Mr. Dupree also faces charges in the District Court for Maryland alleging a Conspiracy to Commit Bank Fraud under 18 U.S.C. § 1349, Wire Fraud under 18 U.S.C. § 1343, Arson Affecting Interstate Commerce under 18 U.S.C. § 844(i), and Bank Fraud under 18 U.S.C. § 1344 (8:21-cr-284-LKG-2).

2

JA439

an indictment for Civil Rights Violation under 18 U.S.C. § 242 and filed the instant indictment alleging paperwork offenses.

### 1.  The Government Must be Barred from Introducing Vanderpool's Prior Statements in Court

The Government seeks to improperly introduce portions of Vanderpool's testimony at the State trial under Federal Rule of Evidence 801(d)(2)(A).  While that evidence is not considered hearsay, the Court must bar its admittance.

Vanderpool testified in the state trial in January, 2023.  Approximately six months following that trial, the United States issued an indictment against Vanderpool initiating the current matter.  Rather, Vanderpool faced a count of a violation of civil rights under 18 U.S.C. § 242, which was later dismissed voluntarily by the government.

Under Federal Rule of Evidence 403, evidence may be excluded if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Evid. 403. None of the evidence the government seeks to include meets this balancing test, as the committee notes "[t]he availability of other means of proof may also be an appropriate factor."  Fed. R. Evid. 403, Notes of Advisory Committee on Proposed Rules.

By the mere inclusion of the testimony, the jury will infer that Vanderpool has been involved in a criminal trial on this matter.  Based on the allegations made

**JA440**

in the state and federal criminal trials, the jury will be able to easily infer that Vanderpool was previously charged criminally related to this matter.  This would prejudice Vanderpool improperly, as the jury would be knowledgeable about the existence of Vanderpool's prior trial without being informed of the substantial differences in the charges brought by the Federal government.

If the government submits testimony from the state trial, Vanderpool must be permitted to provide further statements to put the testimony into context.  "[H]is testimony contained references to facts not in issue at the second trial... The references put in context the prior testimony which was relevant in the second trial." *United States v. Arthur*, 602 F.2d 660, 663 (4th Cir. 1979).  As such, if the Court permits the Government to introduce testimony from Vanderpool's prior trial, Vanderpool must be able to introduce context to the statements beyond what may be strictly relevant.

Vanderpool must further be permitted to introduce sections of his testimony from the state trial for cross-examination purposes.  Per Rule 806 of the Federal Rules of Evidence, hearsay can be admissible for impeachment purposes.  Fed. R. Evid. 806.  Evidence used for impeachment does not constitute hearsay if admitted for the purposes of challenging a witness' credibility rather than for the substantive nature of the statement.  Therefore Vandeprool's testimony at the state trial can be admitted for purposes of impeaching the credibility of a witness.

4

JA441

## 2. Vanderpool Objects to the Government's Motion to Suppress the State Trial

The Government seeks to have its cake and eat it too. Given the investigative complexities involved in this matter, the government's request to deny the jury knowledge of the state trial while citing from Vanderpool's testimony of that trial seeks confusing the jury.

By citing to Vanderpool's state trial testimony, the jury will know that Vanderpool had testified at a prior trial. Furthermore the Fifth Amendment of the United States is well-known enough that a reasonable juror could easily infer that Vanderpool had testified in his own defense at a prior trial. As such, prohibiting Vanderpool from mentioning the state trial would be extremely prejudicial towards Vanderpool as the jury would infer that further evidence exists against Vanderpool that the government declines to introduce.

Vanderpool concedes that he will not introduce evidence of a prior acquittal on a different charge as evidence of innocence in the current, paperwork-related offense. However, the existence of the state trial may become necessary to prevent confusion and improper inferences related to the prior testimony.

Vanderpool must be permitted to introduce evidence related to the investigation performed by state and federal law enforcement related to the state and federal trials. Vanderpool anticipates that the federal government will likely introduce an investigator as a substantive witness and so must be permitted to mention the state investigation in determining the underlying basis of the investigator's knowledge. *United States v.* Shaw, 2023 WL 3569992 (N.D.C.A. 2023)

5

JA442

(Evidence of prior investigations related to the conduct at issue could be used for impeachment). Additionally, if R.S. testifies, the variable nature of her testimony and interviews would necessitate the introduction that a state investigation occurred during cross-examination. Because of the important relationship between the state and federal investigations, the Court must permit Vanderpool to introduce evidence of the state criminal investigation into trial.

### 3. Vanderpool Must Be Able to Impeach Witnesses Other Than R.S. Using the Civil Suit

In their motion *in limine* seeking to prevent Vanderpool from introducing the existence of the civil suit to the jury, the Government concedes that it is proper impeachment evidence for R.S.. However, Vanderpool must be permitted to introduce the existence of the civil suit if other relevant witnesses testify.

Possessing a "pecuniary interest" in the outcome of a trial is an appropriate basis for impeachment. *United States v. Greenwood*, 796 F.2d 49, 54 (4th Cir. 1986). Other likely witnesses at the trial possess financial interests in the outcome of the trial as they are parties in the civil case. As such Vanderpool must be permitted to introduce the existence of the civil suit as impeachment material for these defendants should they testify at the trial.

Therefore, the Court should defer ruling on this motion until the Government introduces testimony from Vanderpool's state trial, to determine the context necessary to prevent improper prejudice that would interfere with Vanderpool's

JA443

right to due process rights under the Fourteenth Amendment of the United States. U.S. Const. Ament. XIV.

### 4. Vanderpool Agrees Not to Reference the Dismissed Civil Rights Indictment

The Government seeks to preclude any evidence of, argument about, or reference to the fact that the Government had previously charged Vanderpool with a single charge of a civil rights violation under color of law under 18 U.S.C. § 242.

Vanderpool agrees that the dismissed civil rights indictment poses no relevance to the factual questions that the jury must decide in this matter. Fed. R. Evid. 401; 402. However, Vanderpool does argue that it poses legal questions related to the Government's improper commentary on Vanderpool's Fifth Amendment rights through the filing of criminal charges alleging that Vanderpool failed to admit to crimes on a coerced police report.

### 5. Vanderpool Must Be Permitted to Introduce Relevant Evidence Regarding R.S.

The Government improperly seeks to control the trial strategies and tactics that Vanderpool can employ. As discussed in Vanderpool's Omnibus Motion *in Limine*, the police report written by Vanderpool is protected by *Garrity* and therefore any omissions allegedly made by Vanderpool that could expose him to criminal liability are protected. *Garrity v. State of New Jersey*, 385 U.S. 493, 496 (1967). As such, Vanderpool's state of mind when allegedly writing the report is relevant.

7

JA444

Vanderpool further disputes that R.S. is qualified as a victim under Federal Rule of Evidence 412. Fed. R. Evid. 412. The sole case cited by the Government to this allegation, *United States v. Deuman*, is unavailing in that regard. *United States v. Deuman*, 568 F. App'x 414, 421. That court permitted testimony from two witnesses concerning the defendant's prior sexual assault of two women. *Id.* In this matter, the Government is seeking to claim R.S. is a victim when a prior state trial found that there was no sexual assault, but rather that Vanderpool committed misdemeanor improper conduct.

As such, the Court must not prohibit Vanderpool from introducing evidence related to his state of mind regarding R.S. and must not consider her a victim under Rule 412.

**Conclusion**

For all of the foregoing reasons, the Court should deny the Government's Motions *in Limine* seeking to bar Vanderpool from establishing context for his prior testimony as well as the motions seeking to bar reference to the state criminal trial and introduce relevant evidence related to R.S.'s character. Furthermore, Vanderpool must be permitted to introduce the civil trial to impeach all potential witnesses with a pecuniary interest in the outcome of the present trial.

Dated: July 22, 2024                    Respectfully Submitted,

                                        */s/ Christopher Zampogna*
                                        Christopher Zampogna

8

JA445

Bar No. 28219
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 101
caz@zampognalaw.com


*/s/ Abraham Bluestone*
Abraham Bluestone
Bar No. 31114
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com
Counsel for Defendant Vanderpool

9

JA446

## Certificate of Service

I hereby certify that on July 22, 2024, I served the foregoing Vanderpool's Opposition to the Government's Motions *in Limine* on all parties involved via Pacer, the Court's ECF system.

*/s/ Abraham Bluestone*
Abraham Bluestone
Zampogna, P.C.

JA447

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OMNIBUS MOTIONS *IN LIMINE***

The United States of America, by and through undersigned counsel, respectfully files this response to the defendant's Omnibus Motions *in Limine*. Doc. 98.

**RELEVANT BACKGROUND**

The government hereby incorporates the "Relevant Background" section from the government's Motion *in Limine* to Preclude Defendant from Introducing Self-Serving Hearsay Statements. Doc. 86. As noted therein, the defendant is charged with falsifying an incident report about a traffic stop that he and another officer conducted of a 19-year-old female motorist, R.S. Specifically, the defendant is charged with falsifying the report by omitting that he and the other officer arranged to have the car R.S. had been driving towed from the scene of the traffic stop; that the defendant and the other officer took the then-handcuffed R.S. to a deserted police station; that the defendant engaged in sex with R.S. at the station; and that the defendant then arranged for the car [which did not belong to R.S.] to be released without charge to R.S. [who did not have a license]. The defendant is also charged with falsifying his report by including the false claim that the registered owner of the car [R.S.'s then-boyfriend] picked up the car [from the scene of the stop]. Trial is scheduled for October 22, 2024.

JA448

**ARGUMENT**

I.    **Evidence of the Defendant's Sexual Encounter With R.S. Has Extraordinary Probative Value That Is Not Substantially Outweighed by Any Danger of Unfair Prejudice.**

The defendant asks the Court to exclude "any testimony or evidence related to the alleged sexual assault or rape on September 6-7, 2019" because it would violate the Double Jeopardy Clause of the Fifth Amendment or, alternatively, because it is irrelevant and prejudicial under Federal Rule of Evidence 403. Doc. 98 at 3-5.

First, the Double Jeopardy Clause is not implicated here, where this federal obstruction prosecution follows a rape prosecution by the State of Maryland, a separate sovereign. *Gamble v. United States*, 587 U.S. 678, 681 (2019) (noting that the Court has "long held that a crime under one sovereign's laws is not 'the same offence' as a crime under the laws of another sovereign" and holding that a federal prosecution may follow a state prosecution where both are based upon the same underlying conduct); *see also United States v. Graves*, 846 F. App'x 170, 174 (4th Cir. 2021) (affirming district court's refusal to dismiss indictment on Double Jeopardy grounds where federal felony conviction followed acquittal on state misdemeanor charge).

Second, the evidence of defendant's sexual conduct with R.S. is immensely probative, as it is one of the specific matters about which the defendant is accused of falsifying his report. Any "prejudice" from evidence of the sex act itself stems from the powerful probative nature of the evidence; there is no risk of the *unfair* prejudice barred by Rule 403—let alone unfair prejudice that substantially outweighs the probative value. *See United States v. Johnson*, Nos. 21-4126, 21-4484, 2022 WL 4376082, at *3 (4th Cir. Sept. 22, 2022) ("Evidence which is prejudicial only because it is highly probative is not the type of prejudice that Rule 403 seeks to prevent."); *see also United States v. Miller*, 61 F.4th 426, 432 (4th Cir. 2023) (explaining that "*all* evidence that is highly probative invariably will be prejudicial to the defense" and noting that Rule 403 applies

2

JA449

only to prejudice that is "unfair") (internal quotation marks omitted); *Gilliam v. Foster*, 75 F.3d 881, 896 n.18 (4th Cir. 1996) (recognizing "distinction between evidence that is unduly or improperly prejudicial and evidence that is prejudicial only in the sense that it is relevant"). To the extent that the defendant is concerned that references to the conduct as "rape" will be unfairly prejudicial, that concern is moot, as the government intends to refer to the conduct as "a sexual act" or "sexual conduct," and not as a "rape." If the government calls R.S. as a witness, the government expects that she will describe a sexual act that she acceded to believing that she had no other choice; she will be instructed not to use the word "rape."

II.    **The Defendant's Audio Messages Describing the Sex with R.S. and His Actions Thereafter are Exceedingly Probative, Not Unduly Prejudicial, and Not Subject to Rule 404(b).**

Next, the defendant asks the Court to exclude WhatsApp voice messages that the defendant left for a friend in the days following his interactions with R.S. Doc. 98 at 5-7. In the messages, the defendant bragged about his encounter with R.S., whom he described as being "young … like 19," and whom he said he "fucked" at the police station. The defendant described the traffic stop and talked about R.S. being upset and explaining that her son was injured; about the "bitch start[ing] [to] go[] like real crazy"; about his partner "slam[ming] her kinda" and handcuffing her; about the defendant noticing condoms in the car and "getting, like, horny"; and about the defendant "end[ing] up fucking her, like, while she was in custody, you know what I'm saying?"

The defendant argues that the Court should exclude the voice messages under Rule 403 because in them he does not refer to R.S. by name and because, he asserts, the messages constitute mere "locker room talk." Doc. 98 at 7. Both the timing of the messages, left in the days after the defendant had sex with R.S., and the details in them—including R.S.'s age, the circumstances of both the traffic stop and her arrest, and the circumstances surrounding the defendant having sex

3

JA450

with her at the station—leave no doubt that the defendant is referring to the encounter with R.S. that he is charged with omitting from and misrepresenting in his report. In fact, in his trial testimony, the defendant admitted that he was, in fact, talking about R.S. in many of the WhatsApp messages (Q: But you're talking about the same traffic stop, correct? A: Yes ma'am). The defendant is free, of course, to argue at trial that he was not speaking of R.S.; however, the fact that he does not use R.S.'s name in the messages and that he might try to deny that he was speaking of her, does not constitute an appropriate basis for excluding the evidence.

In addition to containing explicit admissions about his conduct with R.S., the defendant's voice messages to his friend also contain the defendant's own explanation of the steps he took to try to ensure that authorities would not learn of his in-custody sexual conduct with R.S., and of why he took those steps. For example, he explained to his friend the thought process behind his decision to write R.S. citations after-the-fact: "I just wrote a criminal citation. Traffic citations. But my thing is, I like to be consistent. So when you look at my track record, it don't look like she's an exception. I handled her the same way as I pretty much handle everyone else that's in her situation. You know what I'm sayin'? . . . That's my whole thing. I mean my partner be saying because he be doing this shit all the time and he's like, 'yeah I don't charge them with nothing.' But if they do say something, it looks to me, at least it looks *worse.* You didn't charge her with nothing, you just let her go. . . . At least if you charge her with some stuff, it looks like 'okay, she could just be mad. Could just be making an allegation.' You did what you were supposed to do, you know? You charged her."

The defendant's own description of the sex act he is accused of omitting from his report, along with his own explanation of his thought process in taking steps to conceal his actions, are immensely probative of the charged offense – intentionally omitting mention of the sex act (and falsifying or omitting other details surrounding that conduct) with intent to impede, obstruct, or

4

influence any potential inquiry into that conduct.  The exceedingly high probative value of this evidence easily outweighs any small risk of unfair prejudice.  *See Johnson*, 2022 WL 4376082, at *3 ("Evidence which is prejudicial only because it is highly probative is not the type of prejudice that Rule 403 seeks to prevent.").

The defendant also argues that the voice messages should be excluded as inadmissible character evidence under Rule 404(b).  Doc. 98 at 7.  But the defendant's argument relies on the false premise that the voice messages the government plans to admit refer to the defendant's sexual encounters with other women on other occasions.  The defendant argues that his use of the phrase "track record . . . implies that [he] has engaged in sexual encounters at the Fairmount Heights Police Station on prior occasions." *Id.*  But the context of the statement, described above, shows that in the voice message, Vanderpool is referring to his track record of traffic stops, not to any track record of sex-in-custody.  ("I just wrote a criminal citation.  Traffic citations.  But my thing is, I like to be consistent.  So when you look at my track record, it don't look like she's an exception.").  To the extent that the defendant talks at all about other sexual encounters, he is speaking of his partner's encounters, not his own.  ("I mean my partner be saying because he be doing this shit all the time and he's like, 'yeah I don't charge them with nothing.'  But if they do say something, it looks to me, at least it looks *worse*.  You didn't charge her with nothing, you just let her go. . . .").  Because the voice messages the government plans to introduce are not evidence of any *other* crimes, wrongs, or acts, Rule 404(b) does not apply, and the messages are admissible.

**III.     The Defendant's Police Report is Not a *Garrity*-Compelled Statement.**

The defendant argues that the Court should preclude any suggestion that the defendant should have included in his police report that he had sex with R.S., because "the police report written by Vanderpool qualifies as a coerced statement under *Garrity*."  Doc. 98 at 8.  The case

JA452

he cites for that proposition, *Garrity v. State of N.J.*, 385 U.S. 493 (1967), is entirely inapposite; in *Garrity*, the Supreme Court held that when an officer under investigation for wrongdoing is forced to give a statement about that wrongdoing or face termination for his failure to do so, any statement he gives will be deemed compelled and will therefore be unavailable in a future criminal case against him. *Id.* at 500 (holding that officers who were told by investigators that any refusal to answer questions would result in termination had a Fifth Amendment right not to have their answers used against them in a subsequent criminal prosecution). *Garrity* in no way suggests that an officer is allowed to lie (expressly or by omission) in a routine police report and then claim that his report was coerced.

*Garrity* and its progeny deal with the coercion inherent in a police department threatening an officer with termination (or a similarly significant penalty) to punish an officer who is suspected of wrongdoing for asserting his Fifth Amendment right not to incriminate himself. The *Garrity* doctrine simply recognizes that forcing an officer (or other public employee) to choose between his or her livelihood and his or her exercise of a constitutional right puts undue pressure on the officer to surrender a constitutional right. *Id.* at 498 ("Where the choice is between the rock and the whirlpool, duress is inherent in deciding to waive one or the other.") (internal quotation marks omitted); *United States v. Carter*, 87 F.4th 217, 227 (4th Cir. 2023) ("A classic penalty situation arises when the government . . . asserts that invocation of the privilege would lead to punishment.") (internal quotation marks omitted). Thus, *Garrity* would have been implicated if the defendant had established that the Fairmount Heights Police Department, upon learning of the alleged sex assault of R.S., had demanded that the defendant answer questions or be fired; if that had happened, any statement the defendant made in response would have been unavailable for use in a subsequent criminal trial. But that didn't happen. FHPD made no such demand, and in fact the defendant declined to make any statement during the investigation of this

6

JA453

matter. *See United States v. Parry*, 717 F. App'x 262, 263-64 (4th Cir. 2018) (affirming district court's rejection of defendant's *Garrity* claims, because, "[i]n contrast to the situation in *Garrity*, there [wa]s no evidence [] that agents told [defendant] she would be fired if she did not participate in an interview with the agents or that she harbored such a belief"); *United States v. Cooper*, 269 F. App'x 253, 254 (4th Cir. 2008) (affirming district court's rejection of defendant's *Garrity* claim because, "[i]n contrast to the situation in *Garrity*, there was no evidence that [defendant] was told that if he did not cooperate by answering the questions of postal inspectors, he would be fired").

A police department, like FHPD, is allowed to require officers to write truthful reports, and those routine incident reports do not implicate *Garrity*. *See, e.g., United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019) (affirming district court's ruling that routine police reports were not compelled under *Garrity*); *see also United States v. Rios Ruiz*, 579 F.2d 670, 676 (1st Cir. 1978) (not discussing *Garrity*, but holding that an arrest report prepared by a police officer could be used at his criminal trial because it "clearly does not come within the ambit of the [F]ifth [A]mendment").[1]

---

[1] Notably, even in a situation where a police department *does* force an officer to make a statement or be fired (which did not happen here), *Garrity* does not bar use of that statement in an obstruction-only case like the one at hand. This is because the forbidden rock-whirlpool dilemma is created when the officer has to choose between, on the one hand, giving a statement and incriminating himself, and on the other hand, losing his job. There is no third option to lie, and when an officer does lie, he or she can be prosecuted for obstruction offenses related to that lie. *United States v. Veal*, 153 F.3d 1233, 1243 (11th Cir. 1998) (holding that *Garrity* does not prohibit prosecution for obstruction-related crimes based on the statement itself: "Although an accused may not be forced to choose between incriminating himself and losing his job under *Garrity*, neither *Garrity* nor the Fifth Amendment prohibits prosecution and punishment for false statements or other crimes committed while *making Garrity*-protected statements.... *Garrity* protection is not a license to lie or to commit perjury."), *overruled on other grounds by Fowler v. United States*, 563 U.S. 668 (2011); *McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005) ("*Garrity* does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer's investigation or making false statements during it."); *United States v. Holland*, No. 1:08-cr-00054, 2009 WL 273327, at *5 (W.D. Va. Jan. 29, 2009)

JA454

The defendant's reliance on *McDonough v. Toles*, 476 F. Supp. 3d 882, 887 (D. Minn. 2020), a civil § 1983 case not involving *Garrity*, is unpersuasive. *McDonough* involved a lawsuit claiming that an off-duty officer had been acting under color of law when he used excessive force against a bar patron; the court, finding that the officer had indeed been acting under color of law, merely noted that the police department's reference to *Garrity* in refusing to provide investigators with the officer's report about the bar incident offered additional support for the conclusion that the officer had been acting under color of law during the incident. *Id.* at 890. The court in *McDonough* did not analyze *Garrity* or address the propriety of the department's effort to withhold the police report as *Garrity*-compelled. *Id.* at 889-90.

The defendant's routine incident report is not a *Garrity*-compelled statement, and its admission at trial therefore does not implicate the Fifth Amendment.[2] To hold otherwise would be to hold that every officer who engages in misconduct on duty—such as by using excessive force during an arrest—could write a false report covering up the wrongdoing (lying about the excessive force) and could then claim Fifth Amendment protection for the false report. The defendant cites no authority for this remarkable proposition, and the government is aware of none. *See Holland*, 2009 WL 273327 at *5 ("Granting [defendant's] suppression motion would allow law enforcement officers facing similar circumstances to lie or conceal evidence with impunity in order to keep their jobs without fear of future prosecution. Such conduct cannot be allowed.").

---

(admitting *Garrity*-protected statements in prosecution for obstruction, reasoning that to suppress "would allow law enforcement officers facing similar circumstances to lie or conceal evidence with impunity in order to keep their jobs without fear of future prosecution"), *aff'd*, 417 F. App'x 359 (4th Cir. 2011).

[2] The defendant, who bears the burden of demonstrating in the first instance that his statement was compelled, has made no showing whatsoever on this point. *See In re: Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 352 (4th Cir. 1994) ("[T]he party asserting a privilege bears the burden of establishing that privilege.").

JA455

The defendant's report is not a coerced *Garrity* statement, and it is admissible.

## IV.    The Government Does Not Seek to Introduce Irrelevant Evidence.

Next, the defendant seeks to exclude evidence as irrelevant, including towing records, body-worn camera footage, and surveillance photographs.  Doc. 98 at 9-10.  The government does not intend to introduce the evidence listed by the defendant (unless the defendant in some way opens the door to the evidence), except as it relates to this specific incident.  For example, the government does not seek to introduce records of *other* towing incidents, although it may introduce records relating to the defendant having the car that R.S. was driving towed.

## V.    The Government Does Not Plan to Admit Evidence of the Defendant's Alleged Sex with Prostitutes, General Towing Scheme, or Theft of Evidence From Police Lockers.

The defendant also seeks to exclude his other "alleged bad acts, ranging from sex with prostitutes, an unfounded towing scheme[, and] the alleged theft of evidence from police lockers." Doc. 98 at 11-12.  The government does not plan to introduce this evidence.

## VI.    The Defendant's Testimony From the State Trial Is Relevant and Highly Probative; the Government Does Not Intend to Offer State-Trial Testimony From Any Other Witness.

Finally, the defendant seeks to exclude "the introduction of any testimony from the state trial." Doc. 98 at 13-14.  The defendant argues that the use of state-trial testimony of witnesses other than the defendant, for purposes other than impeachment for a prior inconsistent statement, violates his Sixth Amendment right to confront witnesses against him, because at the time of the state trial he was not charged with the federal obstruction offense.  The government does not intend to affirmatively introduce the state trial testimony of any witness other than the defendant. However, the government agrees with the defendant that if a witness from the state trial testifies in the federal trial, parts of that witness's state trial testimony could become admissible for impeachment (or rehabilitation) purposes as a prior inconsistent (or prior consistent) statement.

JA456

The defendant also argues, without citing any case law, that the "government must be prohibited from broad introduction of [his] testimony from the state trial" because a jury could make improper inferences as to his guilt if he decides not to testify in the federal trial.  Doc. 98 at 14.  Presumably, the defendant means that if a jury knew that he testified at a prior trial, and if he then chose not to testify in his federal trial, the jury would be left wondering why he chose not to testify in the second trial.  Of course, if the Court excludes all reference to the state trial, as the government has requested, Government's Motion *in Limine* to Preclude Reference to the Existence and Outcome of Prior State Trial, Doc. 87, any such concern will be entirely eliminated. The government intends to elicit the prior testimony without any reference to the state trial, by simply referring to the defendant's testimony as a statement made under oath in a prior proceeding.  The parties can refer to the defendant's prior statement in any number of ways without raising any hint that there was a prior criminal trial—for example, they can refer to it as "testimony at a prior proceeding," as "testimony from a prior court hearing," or as a "statement made under oath in relation to this incident." *See Bonnett v. Name Unknown,* No. GJH-21-2478, 2022 WL 1620013, at *3 (D. Md. May 23, 2022) (noting stipulation by parties that previous trial would be referred to only as "a prior proceeding"); *United States v. Triggs*, 153 F. App'x 184, 185-86 (4th Cir. 2005) (district court's pre-trial ruling requiring defendant to refer to prior state trial as a prior proceeding did not violate defendant's Sixth Amendment right to confront witnesses).

As the government has submitted in its Motion *in Limine* to Preclude the Defendant From Introducing Self-Serving Hearsay Statements, Doc. 86 at 7-8, the defendant's statements are admissible under Federal Rule of Evidence 801(d)(2)(A) as admissions by a party-opponent.

JA457

## CONCLUSION

For the foregoing reasons, the government respectfully asks this Court to deny each of the defendant's motions *in limine*.

Respectfully submitted this 29th day of July, 2024.

Respectfully submitted,

Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

Criminal Section, Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-0032

11

JA458

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S RESPONSE TO DEFENDANT'S OMNIBUS MOTIONS *IN LIMINE* has been served by e-filing upon counsel for the Defendant, this 29th day of July, 2024.

*/s/ Tara Allison*
Tara Allison
Trial Attorney

JA459

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. 8:23-cr-234-DLB |
| | * |
| MARTIQUE CABRAL VANDERPOOL, | * |
| | * |
| Defendant | * |
| | * |

\*\*\*\*\*\*\*

## GOVERNMENT'S REPLY TO DEFENDANT'S OMNIBUS RESPONSE TO GOVERNMENT'S MOTIONS *IN LIMINE*

The United States of America, by and through undersigned counsel, respectfully files this Reply to the Defendant's Omnibus Response to Government's Motions *in Limine*.  Doc. 99.

## ANALYSIS

**I.    Admission of defendant Vanderpool's state-trial testimony is not barred by Rule 403.**

The defendant argues that his state-trial testimony should be excluded as unduly prejudicial under Rule 403 because "[b]y the mere inclusion of the testimony, the jury will infer that Vanderpool has been involved in a criminal trial in this matter." Doc 99 at 3.  Next, he argues that if the government admits his testimony, he must be permitted to "introduce context to the statements beyond what may be strictly relevant," and must be permitted to introduce his own testimony "for purposes of impeaching the credibility of a[nother] witness." *Id.* at 4.

First, the harm the defendant fears from admission of his state trial testimony will be cured by an order precluding mention of the state trial.  If the parties refer to the trial testimony simply as "a statement made under oath in a prior proceeding," there will be no inference that the defendant previously faced a criminal prosecution in state court. *See Bonnett v. Name Unknown*, No. GJH-21-2478, 2022 WL 1620013, at \*3 (D. Md. May 23, 2022) (noting stipulation by parties

JA460

that a previous trial would be referred to only as "a prior proceeding"); *United States v. Triggs*, 153 F. App'x 184, 185-86 (4th Cir. 2005) (district court's pre-trial ruling requiring defendant to refer to prior state trial as "a prior proceeding" did not violate defendant's Sixth Amendment right to confront witnesses).

Second, as the government set forth in its Motion to Preclude the Defendant From Introducing Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding the Scope of the Rule of Completeness, Doc. 86, a defendant whose statement is offered against him may, in limited circumstances, insist on the introduction of additional statements, but only if the additional statements are necessary to correct a misimpression left by the government's presentation. *See generally id.* at 8-10.

The defendant cites one case in support of his objection to the admission of his state trial testimony. Doc. 99 at 4. But that case—*United States v. Arthur*, 602 F.2d 660, 663 (4th Cir. 1979)—undercuts his claim. In *Arthur*, the Fourth Circuit held that the government's admission of the defendant's testimony from a prior trial was *proper*, even where the admission of the testimony revealed that there had been a prior trial (because, the court noted, it would not have been clear to the jury that the defendant was the person being tried, let alone that he had been convicted), and even where the prior testimony included references to facts not at issue in the second trial (because, the court explained, those references were relevant to place into context the prior testimony). *Id.*

Third, the defendant, citing Federal Rule of Evidence 806, appears to seek permission to offer sections of his own testimony to cross-examine other witnesses ("Vanderpool must further be permitted to introduce sections of his testimony from the state trial for cross-examination purposes."). Doc. 99 at 4. Neither Rule 806, nor any other rule or precedent of which the government is aware, allows a party to use a prior statement by one witness to impeach testimony

2

JA461

of another witness. Although the defendant cites Rule 806 for the proposition that "hearsay can be admissible for impeachment purposes," *id.*, Rule 806 does not address the admissibility of hearsay to impeach. Rather, Rule 806 addresses the admissibility of evidence to impeach a declarant whose hearsay statement has been admitted. *See* Fed. R. Evid. 806 ("When a hearsay statement … has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness."). Thus, Rule 806 offers no support for the defendant's position.

For the reasons set forth in the government's motion, Doc. 86, the government may properly admit the defendant's state-trial testimony.

## II. Reference to the state trial should be excluded.

Although the defendant complains of the prejudice he could suffer if the jury were to learn that he had previously faced a criminal prosecution, *see generally* Doc. 99 at 3-4, he also objects to Doc. 87, the government's Motion to Preclude Reference to the Existence and Outcome of the State Trial, Doc. 99 at 5 ("Given the investigative complexities involved in this matter, the government's request to deny the jury knowledge of the state trial while citing from Vanderpool's testimony of that trial seeks confusing the jury."). Much of the defendant's argument on this point is spent explaining why the parties may need to refer to the fact that there was a state *investigation* into his conduct, rather than to the fact that there was a state *prosecution* for his conduct. Doc. 99 at 5-6. The government has sought to exclude only the latter. Doc. 87.

The defendant correctly points out that if a witness testifies in the trial inconsistently with a statement made during the investigation of this matter, the witness may be impeached with the prior statement. But this can be done, of course, without the parties or the witness making any reference to the fact that there were state *charges* and a state *trial*. An attorney wishing to impeach a witness with an inconsistent statement made at the state trial would simply confront that witness

JA462

with the witness's "prior statement made under oath." Reference to the existence and outcome of the state *trial* should be excluded. Doc. 87.

**III.    Reference to the civil suit filed by R.S. should be excluded unless it is relevant to impeach a testifying witness.**

In response to the government's Motion to Preclude Any Reference to the Civil Suit Filed by R.S. Against the Defendant, Unless and Until R.S. Testifies, Doc. 88, the defendant argues, correctly, that he should be able to introduce the existence of the civil suit to impeach any witness who is a party in the civil case. Doc. 99 at 6. The government agrees that any witness who is a party in the civil case, and who has a pecuniary interest in the outcome of the trial, can be impeached with information about the civil suit. However, the government does not plan to call any such witness, other than possibly R.S. Accordingly, the defendant should be precluded from mentioning the civil suit unless and until R.S. testifies.

Citing no authority, the defendant argues that "the Court should defer ruling on this motion until the Government introduces testimony from Vanderpool's state trial, to determine the context necessary to prevent improper prejudice that would interfere with Vanderpool's right to due process rights under the Fourteenth Amendment of the United States." Doc. 99 at 6-7. The defendant offers no connection (and the government is aware of none) between the admission of Vanderpool's state trial testimony and the admissibility of information about the civil suit.

Reference to the civil suit should be precluded unless and until a witness named in that suit takes the stand.

**IV.    The parties appear to agree not to reference the dismissed civil rights case.**

The defendant appears to agree that no party may refer to the dismissed civil rights indictment. Doc. 99 at 7.

**V.    The Court should exclude irrelevant and prejudicial implications regarding R.S.'s sexual history.**

4

JA463

In response to the government's motion to exclude irrelevant and prejudicial evidence related to R.S.'s character—including evidence of her prior arrests and implications regarding her sexual history or sexual disposition, *see* Doc. 95—the defendant writes that he "must be permitted to introduce relevant evidence regarding R.S.," and notes that his "state of mind when allegedly writing the report is relevant." Doc. 99 at 7. However, the defendant does not explain what R.S.-related evidence he believes is relevant, or why, and he does not address the government's argument that evidence of R.S.'s arrest history or alleged sexual history or disposition would be unduly prejudicial.

As a basic matter, the government agrees that the defendant's state of mind is relevant, as the government is required to prove, beyond a reasonable doubt, that the defendant intentionally falsified his report with intent to impede, obstruct, or influence any possible investigation or administrative inquiry into his conduct with R.S. But the government does not follow how evidence of R.S.'s arrest history (which would have been unknown to the defendant) or speculations about her sexual history or predilections are relevant to the defendant's state of mind in writing the report.[1]

Lastly, the defendant argues that R.S. should not be considered a victim for purposes of Rule 412, which prohibits the use, in a "criminal proceeding involving alleged sexual misconduct," of evidence relating to the alleged sexual behavior or sexual disposition of any victim. Fed. R. Evid. 412. On this point, the defendant claims that R.S. cannot be considered a victim of alleged sexual misconduct because the "state trial found that there was no sexual assault,

---

[1] The defendant is accused of falsifying a report to conceal the fact that he had sex, under color of law, with a young woman he and his fellow officer had arrested and taken to the police station in handcuffs. The wrongfulness of that conduct—and therefore the motive for the defendant to want to cover it up—in no way depends on the chastity of his victim.

5

JA464

but rather that Vanderpool committed misdemeanor improper conduct." Doc. 99 at 8. First, the conduct for which the defendant was convicted—the crime of having sex with a person in custody—clearly "involv[es] alleged sexual misconduct." Fed. R. Evid. 412. Moreover, as the Advisory Committee Notes to Rule 412 make clear, "[t]here is no requirement … even that the misconduct would constitute a criminal offense." Fed. R. Evid. 412, Advisory Committee Notes (1994 Amendments). Thus, R.S. is a victim for purposes of Rule 412.

For the reasons set forth in the government's initial motion to exclude improper character evidence relating to R.S., Doc. 95, the Court should exclude irrelevant and prejudicial evidence of R.S.'s arrest history and of her alleged sexual history or predisposition.

## CONCLUSION

For the foregoing reasons, the government respectfully asks this Court to grant each of the government's original Motions *in Limine.*

Respectfully submitted this 29th day of July, 2024.

Respectfully submitted,

Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

Criminal Section, Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-0032

6

JA465

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S REPLY TO DEFENDANT'S OMNIBUS RESPONSE TO GOVERNMENT'S MOTIONS *IN LIMINE* has been served by e-filing upon counsel for the Defendant, this 29th day of July, 2024.

/s/ *Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief

7

JA466

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Defendant Martique Vanderpool's Memorandum in Support of
Vanderpool's Motion to Impeach Sergeant Gill**

Defendant Martique Vanderpool, through undersigned counsel, hereby provides this Memorandum in Support of his Motion to Impeach Sergeant Gill pursuant to the Court's oral instruction on October 17, 2024 in response to Vanderpool's oral motion to question Sergeant Brendan Gill on his civil rights violation.

The Court must permit Vanderpool to present evidence related to Sergeant Gill's prior shooting incident for impeachment purposes.  The Court's duty to protect Vanderpool's Sixth Amendment right to confront the government's witnesses against him requires the Court to allow Vanderpool to question Sergeant Brendan Gill related to his violation of an individual's civil rights.

## I.    Sergeant Gill Committed a Civil Rights Violation

Sergeant Gill committed a civil rights violation contrary to the Government's description provided in open court. *Wilson v. Prince George's County, Maryland,* 893 F.3d 213, 224-5 (4th Cir. 2018).  The Fourth Circuit found that because "Officer

1

JA467

Gill used excessive force in violation of the Fourth Amendment, Officer Gill's conduct also violated the Maryland constitution." *Wilson*, 893 F.3d at 224-5.

However, while the Court granted Officer Gill qualified immunity claim, it did so by holding that it was not clearly established at the time of the shooting that Officer Gill's conduct would constitute a constitutional violation. The Fourth Circuit emphasized that "as of the date this opinion issues, law enforcement officers are now on notice that such conduct constitutes excessive force in violation of the Fourth Amendment." *Wilson*, 893 F.3d at 224.

## II.   Vanderpool Must Be Permitted to Question Sergeant Gill Related to his Civil Rights Violation

Vanderpool must be permitted to question Sergeant Gill in relation to his civil rights violation as those questions go directly to his credibility as a witness in a case involving an alleged potential civil rights violation. Fed. R. Evid. 607 ("Any party... may attach the witness's credibility"); Fed. R. Evid. 404(a)(3); Fed. R. Evid. 608(b)(1) (The Court may, on cross examination, allow a specific instance of conduct to be inquired into if it is probative of the character for truthfulness or untruthfulness of the witness").

The right of a defendant to confront government witnesses against him and to challenge their credibility is protected by the Sixth Amendment to the Constitution. *Davis v. Alaska*, 415 U.S. 308, 315-316, 94 S.Ct. 1105 (1974). This includes an "attack on the witness' credibility... by means of cross-examination

2

directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may related directly to issues or personalities in the case at hand." *Davis*, 415 U.S., at 316.

Despite the government's statements that Sergeant Gill's constitutional violation lies outside the scope of this matter, "[b]ias is never classified as a collateral matter which lies beyond the scope of inquiry, nor as a matter on which an examiner is required to take a witness's answer. Bias may be proved by extrinsic evidence even after a witness' disavowal of partiality." *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C.Cir. 1976) (citing 3 Weinstein's Evidence p607-17 (1975)). Therefore, Sergeant Gill's disposition to testify in a certain way lies within the scope of valid impeachment directions. Fed. R. Evid. 607.

Gill committed a civil rights violation. Because the government alleges that Officer Vanderpool may have committed a civil rights violation, Sergeant Gill's interest and experience with civil rights violations, having committed one himself, goes directly to the weight that the tier of fact must give to Sgt. Gill's statements. As a result, Sergeant Gill's civil rights violation constitutes valid impeachment information.

**Conclusion**

"Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess **all** evidence which might bear on the accuracy and truth of a witness' testimony. *United States v. Abel*,

3

JA469

469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450, 16 Fed. R. Evid. Serv. 838 (1984) (emphasis in original).  For that reason, the Court must permit Vanderpool to impeach Sergeant Gill related to his civil rights violation.

Dated: October 18, 2024                    Respectfully Submitted,

_/s/ Christopher Zampogna_
Christopher Zampogna
Bar No. 28219
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 101
caz@zampognalaw.com

_/s/ Abraham Bluestone_
Abraham Bluestone
Bar No. 31114
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com
Counsel for Defendant Vanderpool

4

JA470

<u>Certificate of Service</u>

I hereby certify that on October 18, 2024, I served a true and correct of the foregoing Vanderpool's Memorandum in Support of his Sixth Amendment Rights on all parties involved via Pacer, the Court's ECF system.

<u>*/s/ Abraham Bluestone*</u>
Abraham Bluestone
Zampogna, P.C.

5

JA471

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 8:23-cr-00234-DLB** |
| **MARTIQUE VANDERPOOL,** | |
| **Defendant.** | **The Honorable Deborah L. Boardman** |
| | **Trial Date: October 22, 2024** |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO IMPEACH A GOVERNMENT WITNESS

The government, by and through undersigned counsel, respectfully opposes the defendant's motion to impeach government witness Sgt. Gill. ECF 133. The defendant's motion is unsupported by reference to any law or evidentiary rule that would permit a defendant to impeach a law enforcement witness with information that the witness was involved, more than a decade ago, in an unrelated officer-involved shooting that resulted in exoneration by his department and a finding of no-liability by a federal court.

The government plans to call Sgt. Gill as a witness to explain the Records Management System used in Prince George's County to document police interactions with the public and to discuss relevant documents in this case. The fact that Sgt. Gill was involved in a police shooting more than a decade ago (for which he was cleared) is in no way pertinent to his anticipated testimony..

The defendant, in his motion, correctly notes that the Fourth Circuit held in *Wilson v. Prince George's County, Maryland*, that then-Officer (now-Sergeant) Gill's actions in the shooting, when viewed in the light most favorable to the complainant, constituted excessive force under the unique circumstances of the incident. 893 F.3d 213, 221 (4th Cir. 2018). But the Fourth

JA472

Circuit *also* held that *no* reasonable officer in Gill's position would have known at the time that shooting an individual under the unique circumstances presented would be viewed as an unconstitutional use of force. *Id.* at 222. Those unique circumstances involved an encounter with a person who the officer knew had destroyed property and violently assaulted someone, who was armed with a knife and was using that knife to harm himself, who had ignored the officer's repeated commands to drop the knife, and who was within 20 feet of the officer at the time of the shooting. *Id.* at 220. Thus, the Fourth Circuit understandably held that Officer Gill was entitled to qualified immunity because at the time of the shooting it was not clearly established by the Supreme Court, the Fourth Circuit, or the Court of Appeals of Maryland, that Officer's Gill's actions would constitute excessive force. *Id.* at 222.

And yet the defendant suggests that the Fourth Circuit's holding (that, *going forward*, officers would be on notice that similar conduct would constitute excessive force) somehow entitles him to question Sgt. Gill about the incident because, the defendant claims without explanation, "those questions go directly to his credibility as a witness . . . ." ECF 133, at 2. But neither Sgt. Gill's conduct nor the Fourth Circuit's decision considering that conduct implicated Sgt. Gill's credibility in any way. In fact, the Fourth Circuit "emphasize[d]" that it "d[id] not make credibility determinations" when evaluating the use of force at issue. And there were no allegations of dishonesty in connection with Gill's actions. 893 F.3d at 220. Moreover, an excessive force allegation, even if sustained, does not by itself implicate an officer's credibility. *Compare United States v. Estrada*, 430 F.3d 606, 618 (2d Cir. 2005) (explaining that actions "which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not") (citing reference omitted) and *Diggs v. Guynup*, 621 F. Supp. 3d 315, 320 (N.D.N.Y. 2022) (noting that "acts of violence generally have limited probative value concerning

a witness's credibility"), with *Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996) (noting that in a case involving claims of excessive force, questions about correctional officer's false worker's compensation claim *would* be probative of officer's credibility).

Next, the defendant claims (again without explanation) that Sgt. Gill's involvement in the shooting and his status as a defendant in a related civil lawsuit (in which he was found to be ***not*** civilly liable) somehow demonstrates his bias in the current, unrelated, criminal obstruction prosecution. The defendant's conclusory statement that Sgt. Gill's previous involvement in an officer-involved shooting and related lawsuit demonstrates (a general and unspecified) bias in this case does not make it so. Again, the defendant cites no law or federal rule in support of his insinuation of inherent bias.

The defendant's general reference to Rule 607 is unavailing. Rule 607 stands for the unremarkable proposition that the credibility of a witness may be attacked by any party. But the party wanting to impeach must still produce evidence that is *admissible for impeachment purposes*. The defendant has not cited to any rule that suggests in any way that Sgt. Gill's shooting is admissible for impeachment. Neither Rule 609 nor Rule 608 (to which the defense made reference in court) is applicable here. Rule 609, which addresses impeachment by criminal conviction, is inapplicable where there has been no conviction (let alone where there has been an exoneration). *See* Fed. R. Evid. 609 (permitting impeachment through evidence of certain criminal convictions). Rule 608, which permits impeachment (through opinion or reputation evidence) of a witness's character for truthfulness or untruthfulness, is similarly unavailing. As noted above, Sgt. Gill's shooting does not reflect in any way on his honesty. And this would be true even if Sgt. Gill had been disciplined for his conduct in the unrelated police shooting. *See, e.g., United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007) (affirming exclusion of evidence of witness officers'

JA474

reprimands for neglect of duty under Rules 401 and 402 as not relevant to their character for truthfulness and identifying Rule 608(a) as a basis for introducing testimony regarding officers' reputation for truthfulness instead); *see also Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967) ("[A]cts of deceit, fraud, cheating, or stealing . . . are universally regarded as conduct which reflects adversely on a man's honesty and integrity" whereas "[a]cts of violence . . . generally have little or no direct bearing on honesty and veracity").

Because the defendant has cited no rule or law supporting his effort to impeach this witness with evidence of the witness's involvement in a shooting incident, more than a decade ago, for which the witness was exonerated by his department and found not-liable by a court, the government respectfully asks this Court to preclude the defense from attempting to impeach Sgt. Gill with this evidence.

Respectfully submitted this 19th day of October, 2024.

/s/*Bobbi Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.bernstein@usdoj.gov
202-353-0032

Tara Allison
Trial Attorney
U.S. Department of Justice

JA475

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Opposition to Defendant's Motion to Impeach Sergeant Gill was filed via the Court's electronic filing system and served on all counsel of record.

/s/*Barbara (Bobbi) Bernstein*
Barbara (Bobbi) Bernstein

JA476

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Defendant Martique Vanderpool's Notice of Objection**

Vanderpool objects to the Court's instructions dated September 18, 2024 to the extent that they require Vanderpool identify exhibits before the government has completed its case, or suffer exclusion of his exhibits from use at trial.  Vanderpool expects that the Court will permit Vanderpool to identify exhibits after the government completes its case so as to not infringe on Vanderpool's constitutional rights.  Nevertheless, Vanderpool lodges an objection in the event that exhibits identified by Vanderpool after the government completes its case would not be permitted by the Court.

Similarly, requiring Vanderpool to identify witnesses before the government has completed its case infringes on his constitutional rights.

Nevertheless, Vanderpool provided a preliminary exhibit list on October 18, 2024 intended in good faith to comply with the Court's instructions without surrendering his rights.  Counsel recognize the Court's desire to rule on admissibility before trial so as to not delay the proceedings consistent with Local Rule 107.6.  Counsel request the opportunity to present an exhibit list and identify

1

JA477

witnesses throughout and after the government completes its case, assuming that Vanderpool intends to put on a defense.

Dated: October 21, 2024    Respectfully Submitted,

          */s/ Christopher Zampogna*
          Christopher Zampogna
          Bar No. 28219
          Zampogna, P.C.
          2101 L St NW, Ste 300
          Washington, DC 20037
          (202)223-6635 ext. 101
          caz@zampognalaw.com

          */s/ Abraham Bluestone*
          Abraham Bluestone
          Bar No. 31114
          Zampogna, P.C.
          2101 L St NW, Ste 300
          Washington, DC 20037
          (202)223-6635 ext. 102
          ab@zampognalaw.com
          Counsel for Defendant Vanderpool

JA478