# No. 25-4121

# United States Court of Appeals
## for the
## Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee*,

— v. —

MARTIQUE CABRAL VANDERPOOL,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

# JOINT APPENDIX
# VOLUME 2 OF 6 (PAGES 479-959)

STUART A. BERMAN
LERCH, EARLY &
  BREWER, CHARTERED
760 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
(301) 657-0729

*Counsel for Appellant*

HARMEET DHILLON
MICHAEL E. GATES
BARBARA A. SCHWABAUER
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
Post Office Box 14403
Washington, DC 20044
(202) 305-3034

*Counsel for Appellee*

CP COUNSEL PRESS  (800) 4-APPEAL • [812795]

# TABLE OF CONTENTS

**Page**

**VOLUME 1 OF 6**

District Court Docket Sheet ................................................................................ JA1

Indictment
     filed July 6, 2023 ................................................................................ JA16

Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants
     filed August 18, 2023 ........................................................................ JA19

     Exhibit A:  Initial Prince George's County Warrant
          dated December 2, 2019 ................................................ JA37

     Exhibit B:  Prince George's County Warrant-Samsung Galaxy S III
          dated January 17, 2020 ................................................ JA43

     Exhibit C:  Federal Search Warrant
          dated June 23, 2020 ................................................ JA49

     Proposed Order ................................................................................ JA71

Defendant's Motion to Dismiss for Preindictment Delay
     filed August 18, 2023 ........................................................................ JA72

Government's Response in Opposition to Defendant's Motion to Suppress
Evidence Seized Pursuant to Search Warrants
     filed September 8, 2023 ........................................................ JA82

     Exhibit 1: Federal Warrant
          dated June 23, 2020 ................................................ JA113

     Exhibit 2:  State Warrant
          dated December 2, 2019 ................................................ JA135

     Exhibit 3:  State Warrant
          dated January 17, 2020 ................................................ JA146

Government's Response in Opposition to Defendant's Motion to Dismiss for
Preindictment Delay
     filed September 8, 2023 ................................................................ JA188

Defendant's Reply to Government's Response to Motion to Suppress Evidence
 filed November 20, 2023 ........................................................................JA207

Government's [Proposed] Surreply Regarding Defendant's Motion to Suppress
Evidence Seized Pursuant to Search Warrants
 filed January 26, 2024...........................................................................JA237

Transcript of Motions Hearing before
The Honorable Deborah L. Boardman
 on February 12, 2024.............................................................................JA251

Defendant's Exhibit List
 filed February 12, 2024 .........................................................................JA386

Government's Exhibit List
 filed February 12, 2024 .........................................................................JA388

Government's Motion *in Limine* to Preclude the Defendant from Introducing
Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding
the Scope of the Rule of Completeness
 filed June 26, 2024................................................................................JA389

Government's Motion *in Limine* to Preclude Reference to the Existence and
Outcome of Prior State Trial
 filed June 26, 2024................................................................................JA403

Government's Motion *in Limine* to Preclude Any Reference to the Civil Suit
Filed by R.S. Against the Defendant, Unless and Until R.S. Testifies
 filed June 26, 2024................................................................................JA412

Government's Motion *in Limine* to Preclude Reference to the Dismissed Civil
Rights Indictment
 filed June 26, 2024................................................................................JA417

Proposed Order Re:  Government's Motion *in Limine* to Preclude Introduction
of Self-Serving Hearsay
 filed June 28, 2024................................................................................JA423

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to the Prior State Trial
 filed June 28, 2024................................................................................JA424

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to the Civil Suit (Unless Victim Testifies)
        filed June 28, 2024 ................................................................... JA425

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to Dismissed Indictment
        filed June 28, 2024 ................................................................... JA426

Government's Motion *in Limine* to Exclude Inadmissible and Irrelevant Evidence
Re:  R.S.'s Character
        filed June 28, 2024 ................................................................... JA427

Defendant's Omnibus Response to Government's Motions *in Limine*
        filed July 22, 2024 ................................................................... JA438

Government's Response to Defendant's Omnibus Motions *in Limine*
        filed July 29, 2024 ................................................................... JA448

Government's Reply to Defendant's Omnibus Response to Government's
Motions *in Limine*
        filed July 29, 2024 ................................................................... JA460

Defendant's Memorandum in Support of Motion to Impeach Sergeant Gill
        filed October 18, 2024 ............................................................. JA467

Government's Opposition to Defendant's Motion to Impeach a Government
Witness
        filed October 19, 2024 ............................................................. JA472

Defendant's Notice of Objection
        filed October 21, 2024 ............................................................. JA477

**VOLUME 2 OF 6**

Transcript of Bench Trial, Volume 1, before
The Honorable Deborah L. Boardman
on October 22, 2024 ......................................................................... JA479

Testimony of Mark Zimmerman:

Direct Examination by the Government (Ms. Allison) .......................... JA511
Cross-Examination by Defense (Mr. Zampogna) ................................. JA582
Redirect Examination by the Government (Ms. Allison)....................... JA616
Recross-Examination by Defense (Mr. Zampogna).............................. JA622

Testimony of Brendan Gill:

Direct Examination by the Government (Ms. Bernstein)....................... JA624
Cross-Examination by Defense (Mr. Zampogna) ................................. JA673
Redirect Examination by the Government (Ms. Bernstein)................... JA701
Recross-Examination by Defense (Mr. Zampogna).............................. JA704

Testimony of Doniese Collins:

Direct Examination by the Government (Ms. Bernstein)....................... JA710

Transcript of Bench Trial, Volume 2, before
The Honorable Deborah L. Boardman
on October 23, 2024 ......................................................................... JA726

Testimony of Doniese Collins:

Continued Direct Examination by the Government (Ms. Bernstein)..... JA734
Cross-Examination by Defense (Mr. Bluestone)................................... JA759
Redirect Examination by the Government (Ms. Bernstein)................... JA771

Testimony of Lyla Zeidan:

Direct Examination by the Government (Ms. Allison) .......................... JA778
Cross-Examination by Defense (Mr. Bluestone)................................... JA800
Redirect Examination by Government (Ms. Allison) ............................ JA810
Recross-Examination by Defense (Mr. Bluestone)............................... JA814

Testimony of Elizabeth Hung:

Direct Examination by the Government (Ms. Bernstein)........................ JA815
Cross-Examination by Defense (Mr. Zampogna) ................................. JA851
Redirect Examination by the Government (Ms. Bernstein).................... JA878
Recross-Examination by Defense (Mr. Zampogna)............................. JA894

Defendant's Notice of Requested Instructions
    filed October 23, 2024 ................................................................... JA909

Transcript of Bench Trial, Volume 3, before
The Honorable Deborah L. Boardman
    on October 24, 2024 ..................................................................... JA910

Transcript of Bench Trial, Volume 4, Verdict, before
The Honorable Deborah L. Boardman
    on October 30, 2024 ..................................................................... JA939

## VOLUME 3 OF 6

Government's Admitted Trial Exhibits:

1.  Incident Report [Certified Copy] ................................................ JA960

2.  RS Traffic Summons.................................................................... JA966

3.  RS Criminal Citation ................................................................... JA968

4.  (A-H)  Photographs of Station ..................................................... JA969

5.  (A-D)  Photographs of Dupree's Car ........................................... JA977

6.  (A-B)  Photographs of Vanderpool's Car .................................... JA980

7.  Vanderpool Time Sheets .............................................................. JA982

8.  CAD Report................................................................................. JA986

10. Vanderpool Phone Extraction Audio Files ................................. JA989

11. Vanderpool Phone Extraction Messages to and from
    Dupree 9/17 ................................................................................. JA993

12. Vanderpool Phone Extraction Messages to and from Dupree 10/6 ........................................................... JA1030

13. PGCPD Chief Referral Letter [Redacted] ............................... JA1037

14. FHPD General Order 2-2 Oath of Office ................................. JA1038

15. FHPD General Order 5-8 Mobile Video Recording ................. JA1039

16. FHPD General Order 5-12 Incident Reporting ......................... JA1044

17. FHPD General Order 5-14 Traffic Law Enforcement ............... JA1051

18. FHPD General Order 5-15 Traffic Law Enforcement Methods ................................................................................. JA1065

19. FHPD General Order 5-38 Prisoner Searches and Transportation ........................................................................ JA1075

20. FHPD General Order 5-50 Towing of Motor Vehicles ............. JA1096

21. FHPD General Order 8-1 Conduct of Members of the Department ............................................................................. JA1101

22. RMS Audit for RS Report [Certified Copy] ............................ JA1115

23. RMS Audit of Vanderpool Logons, 8.7.18-9.28.19 .................. JA1131

24. MPCTC Police Training Records (Excerpts) ............................ JA1132

25. NoVa Academy Diploma ......................................................... JA1135

26. WMATA Comparative Compliance Diploma ........................... JA1137

27. Metro Transit Rules of Arrest and Arrest Procedures Lesson Plan ........................................................................................ JA1138

28. Laws of Arrest Lesson Plan ..................................................... JA1149

29. Laws of Arrest PowerPoint (Excerpts) ..................................... JA1166

30. WMATA Training Ethics Essay ............................................... JA1167

31. NVCJ Sex Crimes PowerPoint (Excerpts) ............................... JA1168

32. NVCJ Constitutional Law and Civil Liability Lesson Plan ....... JA1169

33. NVCJ Constitutional Law and Civil Liability PowerPoint (Excerpts) ...................................................................... JA1195

41. (A-D)  Tow Lot Photographs .................................................. JA1200

42. C.C. Traffic Ticket [Redacted] .................................................. JA1204

43. Map: Tino's to Addison/Sheriff's to FHPD ............................. JA1205

44. Vanderpool Phone Extraction Timeline 9.6-9.7 ........................ JA1206

116. Nnamani CAD ...................................................................... JA1214

117. Audit Log Booking 143908-19-0002936 ................................. JA1216

118. Audit Log Impound 42865-19-0002936 .................................. JA1222

119. Timesheets 01.15.2019 .......................................................... JA1228

Defendant's Admitted Trial Exhibits:

1. RMS User Manual ................................................................... JA1230

2. FHPD General Order 6-5: Uniform Crime Reporting (UCR) ... JA1303

3. Fairmount Heights Police Calendar – September 2019 ............. JA1305

4. Police Report – Travis Nnamani ............................................. JA1306

5. RMS Audit – Travis Nnamani ................................................ JA1312

6. Photograph of FHPD Desktop Monitor ................................... JA1318

7. Photograph of FHPD Entry Door ............................................ JA1319

8. Photographs of FHPD Station 9/6/2019 .................................. JA1320

9. FHPD General Order 7-1: Computer Use and Security ............. JA1329

10. FHPD Time Sheets – 1/12/2019-1/25/2020 ............................ JA1333

11. Letters Re: Suspension ........................................................... JA1335

**VOLUME 4 OF 6**

Regular Sentencing Order
        filed October 30, 2024 ..................................................................JA1337

Verdict
        filed October 31, 2024 ..................................................................JA1340

Defendant's Motion for Arrest of Judgment or, in the Alternative, Motion for
Judgment of Acquittal and New Trial
        filed December 9, 2024 .................................................................JA1341

        Exhibit A:  State Warrant
                dated December 2, 2019................................................JA1377

        Exhibit B:  State Warrant
                dated January 17, 2020................................................JA1383

Government's Response to Defendant's Motion for Arrest of Judgment or,
in the Alternative, Motion for Judgment of Acquittal and New Trial
        filed December 23, 2024 ...............................................................JA1389

Defendant's Reply in Support of Omnibus Post Trial Motions
        filed January 8, 2025....................................................................JA1404

Memorandum Opinion Denying Defendant's Post Trial Motions
        filed February 5, 2025...................................................................JA1419

Defendant's Sentencing Memorandum
        filed February 6, 2025...................................................................JA1435

        Attachment:  Letter in Support .............................................JA1464

Government's Response to Defendant's Sentencing Memorandum
        filed February 13, 2025 .................................................................JA1493

Transcript of Sentencing Hearing before
The Honorable Deborah L. Boardman
        on February 20, 2025.....................................................................JA1509

Judgment in a Criminal Case
        filed February 21, 2025 .................................................................JA1619

Defendant's Notice of Appeal
filed March 3, 2025......................................................................JA1624

Order Granting Consent Motion to Partially Unseal Documents
filed May 15, 2025.......................................................................JA1628

## VOLUME 5 OF 6 (UNDER SEAL)

Defendant's Objections to Draft Presentence Investigation Report
filed December 23, 2024 ..............................................................JA1629

## VOLUME 6 OF 6 (MEDIA)[1]

Government's Media Exhibits:

9.      Dispatch Recording ...............................................................JA1637

9A.     Dispatch Recording [Demonstrative].......................................JA1638

34A.   9.8.19 WA0003 Excerpt 1 (Vanderpool to Washington)
With Captions [Demonstrative] .............................................JA1639

35.     9.8.19 WA0003 Excerpt 2 (Vanderpool to Washington)...........JA1640

35A.   9.8.19 WA0003 Excerpt 2 (Vanderpool to Washington)
With Captions [Demonstrative] .............................................JA1641

36.     9-9-19 WA0002 (Washington to Vanderpool) .........................JA1642

36A.   9-9-19 WA0002 (Washington to Vanderpool) With Captions
[Demonstrative]....................................................................JA1643

37.     9-9-19 WA0003 (Washington to Vanderpool) .........................JA1644

37A.   9-9-19 WA0003 (Washington to Vanderpool) With Captions
[Demonstrative]....................................................................JA1645

---

[1] Exhibits are in .mp4, .ogg, and .wav file format. A virus detection program, VIPRE Endpoint Security Version 13.1.8510, was run on the electronic files and no virus was detected.

38.   9-9-19 WA0004 (Vanderpool to Washington) ...........................JA1646

38A.  9-9-19 WA0004 (Vanderpool to Washington) With Captions
      [Demonstrative]...................................................................JA1647

39.   9-9-19 WA0005 (Washington to Vanderpool) ..........................JA1648

39A.  9-9-19 WA0005 (Washington to Vanderpool) With Captions
      [Demonstrative]...................................................................JA1649

40.   9-9-19 WA0006 (Vanderpool to Washington) ...........................JA1650

40A.  9-9-19 WA0006 (Vanderpool to Washington) With Captions
      [Demonstrative]...................................................................JA1651

REDACTED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____     )
                                        )
UNITED STATES OF AMERICA                )
                                        )
      v.                                )   Case No. 8:23-cr-00234-DLB-1
                                        )
MARTIQUE CABRAL VANDERPOOL,             )
                                        )
                Defendant.              )
_____     )

                                    Greenbelt, Maryland
                                    October 22, 2024
                                    9:37 a.m.

                    (REDACTED TRANSCRIPT)
                    BENCH TRIAL, VOLUME 1

          BEFORE THE HONORABLE DEBORAH L. BOARDMAN
                United States District Judge


                 A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

      U.S. DEPARTMENT OF JUSTICE
      Civil Rights Division
      150 M Street, N.E.
      7th Floor
      Washington, D.C.  20002
      BY:  BARBARA S. BERNSTEIN, ASSISTANT U.S. ATTORNEY
           (202) 353-0032
           bobbi.bernstein@usdoj.gov
      BY:  TARA KNOLL ALLISON, TRIAL ATTORNEY
           (412) 779-8970
           tara.allison@usdoj.gov




                    PATRICIA KLEPP, RMR
                   Official Court Reporter
              6500 Cherrywood Lane, Suite 200
                 Greenbelt, Maryland  20770


          ***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA479

2

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

    ZAMPOGNA PC
    2101 L Street, N.W., Suite 300
    Washington, D.C.  20037
    BY:  CHRISTOPHER ADAM ZAMPOGNA, ESQUIRE
        (202) 223-6635
        caz@zampognalaw.com
    BY:  ABRAHAM BLUESTONE, ESQUIRE
        (202) 223-6635
        ab@zampognalaw.com, ESQUIRE

ALSO PRESENT:

    MARTIQUE CABRAL VANDERPOOL
    LILLY RICHART, PARALEGAL
    S.A. ELIZABETH HUNG - FBI

REDACTED TRANSCRIPT

JA480

INDEX

October 22, 2024

USA v. MARTIQUE CABRAL VANDERPOOL

                                                                    PAGE

OPENING STATEMENT BY THE GOVERNMENT (Ms. Bernstein) ....... 18

OPENING STATEMENT BY THE DEFENDANT (Mr. Zampogna) ........ 28

WITNESSES FOR THE GOVERNMENT:

MARK ZIMMERMAN
        Witness sworn ....................................... 33
        Direct Examination by the Government (Ms. Allison) ... 33
        Cross-Examination by Defense (Mr. Zampogna) .......... 104
        Recross-Examination by Defense (Mr. Zampogna) ........ 145
        Witness Excused ..................................... 145

BRENDAN GILL
        Witness sworn ....................................... 149
        Direct Examination by the Government (Ms. Bernstein) . 149
        Cross-Examination by Defense (Mr. Zampogna) .......... 199
        Redirect Examination by the Government (Ms. Bernstein) 226
        Recross-Examination by Defense (Mr. Zampogna) ........ 229
        Witness Excused ..................................... 231

DONIESE COLLINS
        Witness sworn ....................................... 236
        Direct Examination by the Government (Ms. Bernstein) . 236

REDACTED TRANSCRIPT

JA481

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Maryland is now in session, the Honorable Deborah L. Boardman presiding.

THE COURT:  Okay.  Good morning, everyone.  Please be seated.

(All responding:  Good morning, Your Honor).

THE COURT:  All right.  We are here today for a criminal trial in the matter of United States v. Martique Vanderpool, Criminal Case No. 23-234.  This is a bench trial, not a jury trial.

Would the government introduce themselves for the record, please.

MS. BERNSTEIN:  Good morning, Your Honor.  I'm Bobbi Bernstein, appearing on behalf of the United States.

MS. ALLISON:  Good morning, Your Honor.  Tara Allison for the United States.

MS. BERNSTEIN:  And with us here at counsel table are Special Agent Elizabeth Hung from the FBI and our paralegal, Lilly Richart.

THE COURT:  Okay.  Good morning, ladies.  Please be seated.

MR. ZAMPOGNA:  Good morning, Your Honor.  For the defense, Christopher Zampogna.  To my left --

REDACTED TRANSCRIPT

JA482

MR. BLUESTONE:  Abraham Bluestone, Your Honor.

MR. ZAMPOGNA:  For the defendant.

THE DEFENDANT:  Martique Vanderpool.

THE COURT:  Okay.  Good morning to all of you.

Mr. Vanderpool, good morning.  Please be seated.

THE DEFENDANT:  Thank you.

THE COURT:  Okay.

Just a reminder, when Counsel is speaking -- when anyone is speaking, the witnesses, too, they just need to speak close to the microphone so that the court reporter can hear you, okay?

All right.  So I think we have one preliminary matter to address regarding Sergeant Gill before we start; is that correct?  I'll start with you, Ms. Bernstein.

MS. BERNSTEIN:  When we tried to come up with housekeeping issues, we came up with three.

One is, we can give you a quick update on the status of exhibits.  There were a couple of exhibits where there we still disputes about authenticity.

Second was the issue with Sergeant Gill.

And third, Judge, you mentioned something in our hearing last week about jury instructions, and obviously, they're not jury instructions now, they would be bench instructions.  But I wasn't sure where we left that.  Did you have bench instructions that you were going to distribute to us?

REDACTED TRANSCRIPT

JA483

THE COURT:  Just the elements --

MS. BERNSTEIN:  Okay.

THE COURT:  -- essentially.

I think we agreed on them a few weeks ago, but we will print them for you.

MS. BERNSTEIN:  Let me preface this with, none of us is used to doing a bench trial, so we're a little bit unsure of this, but would it be helpful to have the entire instructions for the record, so for example, that it's clear what law the Court is applying and it's clear that the law -- that the Court is not -- you know, the instructions about not holding certain things against the defendant, that we would have that on the record that that was the law the Court was applying?

I don't know what the normal practice is in a bench trial.

THE COURT:  So are you saying, introduce for the record the jury instructions that I would have given, and then I would abide by those that would apply in a bench trial.

MS. BERNSTEIN:  I think so, Judge, yes.

THE COURT:  Mr. Zampogna?

MR. ZAMPOGNA:  I suppose I don't have an objection but I don't know if you need to do that.  I'm just saying -- I'm not Your Honor, so I'm just -- it's a bench trial, so I don't see the necessity, but you know -- I mean, your decision, Your Honor.

REDACTED TRANSCRIPT

JA484

THE COURT: So at this point, why don't I give you the elements, which I think is the key component, and that will be my guide as I hear the evidence, and then, I can give you the rest of the jury instructions, and over lunch, perhaps you can look at them and see if any of them, you know, should be noted for me to apply here. I think I know the rules of evidence and know what inferences I can and can't draw, but I certainly want to make sure that I'm abiding by the law and that the record is clear that I'm doing that. So can we do that?

MS. BERNSTEIN: That sounds perfect. Let me just be clear, we absolutely know, the Court knows the law; it's simply a matter of what -- we're just not sure what is supposed to be on the record, so that was the only place that question was coming from.

THE COURT: I take no offense, I have no ego here; I want to get this right. I think it's an appropriate thing to raise, so that's not a problem at all, so -- just give me one moment.

MS. BERNSTEIN: Okay, thank you.

THE COURT: Okay. While we're printing that, let's move on to the exhibits issue. Where do we stand?

MS. BERNSTEIN: So as of the last hearing, we had authenticity questions about Exhibit 1, which is the incident report, Exhibit 22, which is the audit of that incident report, and Exhibit 9, which is the dispatch reporting, and we have

since worked out all of the authenticity issues, and so I think we have stipulations on that, and not stipulations to admissibility but stipulations to authenticity.

MR. ZAMPOGNA:  Yes, that's correct, Your Honor.

THE COURT:  Okay.

MS. BERNSTEIN:  Then we also --

THE COURT:  For -- hold on.  For Exhibit 1 --

MR. ZAMPOGNA:  1, 22, and 9?

MS. BERNSTEIN:  1, 9, and 22, yes.

(Reporter requesting clarification.)

MR. ZAMPOGNA:  Oh, my apologies.

THE COURT:  That's better, thank you.

So there's no objection to authenticity but remaining objection to admissibility, so a foundation for those documents will need to be laid, correct?

MS. BERNSTEIN:  I'm not sure if that's true for all of them, so I'll let the defense speak to that.

MR. ZAMPOGNA:  Yes, Your Honor, a foundation should be laid for them.  Thank you.

THE COURT:  Okay.

MS. BERNSTEIN:  We also had discussion at a hearing last week about Exhibits 11 and 12.  Those were the extraction reports from Mr. Vanderpool's phone.  We have since replaced those exhibits with extraction reports that show communications going both ways.  I think the defense is fine with that now too.

REDACTED TRANSCRIPT

JA486

So I think we've resolved all of our issues with respect to the exhibits.

MR. ZAMPOGNA:  That's correct, Your Honor.

THE COURT:  Okay.

MR. ZAMPOGNA:  Oh, sorry.

THE COURT:  Goldilocks, here; just right.

All right, okay.  So the next issue, the last housekeeping matter will be regarding impeachment of Sergeant Gill; is that correct?

MR. ZAMPOGNA:  That's correct, Your Honor.

THE COURT:  Okay, all right.

Okay.  I have reviewed the defendant's submission, ECF 133, which is the memorandum in support of Mr. Vanderpool's motion to impeach Sergeant Gill; I have also reviewed ECF 134, which is the government's opposition to that motion; I have of course read the operative rules again; and I read the Fourth Circuit opinion on the alleged civil rights violation.

My question for Mr. Vanderpool's counsel is, you are seeking to admit questioning about Sergeant Gill's conduct 12 years ago in a shooting of a civilian that formed the basis for a civil rights case, and you're seeking to admit questioning, not extrinsic evidence but questioning about that under Rule 608(b); is that correct?

MR. ZAMPOGNA:  Yes, Your Honor, 608(b) and 607, I believe, too.

REDACTED TRANSCRIPT

JA487

THE COURT:  All right.  I think 607 is just a rule that --

MR. ZAMPOGNA:  Yeah, it's just the general -- sorry.

THE COURT:  Let's try not to talk over each other; I'm as guilty of that as the next person.

But I think Rule 607 is just a general rule that says any party may attack the witness' credibility, including the party that calls the witness.  I think the vehicle for which you are attempting to admit this questioning is 608(b); is that correct?

MR. ZAMPOGNA:  Yes, that's the vehicle, Your Honor.

THE COURT:  Okay.  My question to you is, how is questioning about the alleged civil rights violation from 12 years ago probative of Sergeant Gill's character for truthfulness or untruthfulness?

MR. ZAMPOGNA:  I'm just standing with this -- I feel like Dean Martin.  No, I'm just kidding.

THE COURT:  Ryan Seacrest; that's a little more relevant.

MR. ZAMPOGNA:  So the probative value would be, this case relates to a civil rights violation, so he might have bias regarding his former -- or prior, I should say, event that related in a civil rights charge civilly against him.  So that may affect his testimony today.

THE COURT:  Does it matter that he will be testifying

REDACTED TRANSCRIPT

JA488

about the Prince George's County computer system and not about the actual incident here?  He wasn't a witness to this incident or the events here.  Does that matter?

MR. ZAMPOGNA:  Does it matter to his bias?  I believe he knows the facts of the case to some general sense, so he would know that this prosecution is based on obstruction, which is based on potentially civil rights violations or not or the indicia of, as we went through all that before, so I think that -- I think he's knowledgeable of that.  If he isn't, then, yeah, perhaps it isn't.  I mean, I guess I could ask a preliminary question, are you familiar with the underlying charge in this case.

THE COURT:  Well, let me ask you this.  If I were to allow you to ask Sergeant Gill questions about the specific instances of his conduct, what would you ask him?  There's been nothing that's been proven.  What happened was, the case went to the Fourth Circuit.  The Fourth Circuit found there's a genuine dispute of material fact as to whether or not his conduct was objectively reasonable and then went to the second prong of qualified immunity and found that at the time, it was not clearly established that what he did was a violation of the Constitution.  So what would you ask him?

MR. ZAMPOGNA:  Well, the second prong -- sorry, to be more clear -- was related to I think the notice issue.  So they said, from this point on, this matter would apply to future

REDACTED TRANSCRIPT

JA489

police officers.  However, there was like a -- there was a notice problem with this case, so that's no longer the law.  I mean, going forward, that qualified immunity would not apply to further officers.

So we dispute the non-application of the civil rights, but part of the reason -- I just really wanted to bring it up that he was investigated before that; I wasn't going to go into a detailed factual connection to that case and this case, to be honest; I just wanted to have it out there before the Court that he had been investigated and there was a civil rights civil case, based upon a use of force.

THE COURT:  And how is that relevant to his truthfulness or untruthfulness here as a witness in this case?

MR. ZAMPOGNA:  Well, we believe that there is potentially bias, then, in his testimony or he would be more apt to put more emphasis on that against our client when he's testifying, because he was subject to this proceeding before -- not this proceeding but a civil rights action before, which may influence his testimony.

THE COURT:  Okay.  Thank you, Mr. Zampogna.

MR. ZAMPOGNA:  Thank you, Your Honor.

THE COURT:  Ms. Bernstein.

MS. BERNSTEIN:  Judge, I think you hit the nail on the head when you pointed out that there was no finding of wrongdoing.  What happened here was that he was involved in a

REDACTED TRANSCRIPT

JA490

shooting 12 years ago, he was exonerated of wrongdoing.  He was then sued in a civil case, where the Court found, as you pointed out, Judge, that in the light most favorable to the plaintiff, there was a genuine issue of material fact, meaning there's no finding of what actually happened.  And then the Court said, We're putting people on notice that if this happened as the plaintiff alleges, officers in the future will know that that's a civil rights violation.

I found it hard to respond to the defendant's motion on this issue, because there's nothing there to rebut.  There's no rule that they've cited that allows them to use this impeachment.  It's not even clear what impeachment they want.  And to the extent that --

THE COURT:  Well -- let me interrupt.

MS. BERNSTEIN:  Yeah.

THE COURT:  What I heard from Mr. Zampogna is, he wants to ask Sergeant Gill something to the effect of, You yourself have been investigated for a civil rights violation, correct?

MS. BERNSTEIN:  Yes, and that -- if that's what he wants to ask, that is clearly not admissible, because Mr. Gill was investigated for a possible civil rights violation and was exonerated.  His shooting was investigated, he was exonerated.

THE COURT:  Well, he was exonerated by the police investigating him, not by a jury or by a governor.

REDACTED TRANSCRIPT

JA491

MS. BERNSTEIN:  Well, but the lawsuit isn't an investigation.  So the investigation is what ended up in exoneration.  Then the plaintiff filed a lawsuit, for which there is no finding, and I'm not aware of any law or any rule, the defendant has not cited any law or any rule that would allow questioning just about the fact that somebody made an allegation once, even if that allegation was never sustained.

THE COURT:  All right, thank you very much.

Okay.  I've considered the defense's motion to ask Sergeant Gill about specific instances of his conduct in an effort to attack his character for truthfulness under Rule 608(b).  I'm going to deny the request.

First, this was an alleged civil rights violation involving excessive use of force 12 years ago in an incident that's completely unrelated to this incident, both in time and nature, and Sergeant Gill's proposed testimony here has nothing to do with whether or not anyone engaged in excessive use of force.

In addition, there was no finding of liability or guilt against Sergeant Gill.  In fact, the Fourth Circuit found that he was entitled to qualified immunity.

Moreover, the specific instance of conduct would have -- if it were to come in would be the shooting, but what I heard from Mr. Zampogna is, he really wanted to ask about whether he was investigated.  That doesn't come in under

REDACTED TRANSCRIPT

Rule 608(b), but even if the questions were going to be about the specific instance of conduct, namely, the shooting and the circumstances of the shooting, I do not believe that those -- that conduct, which was never proven in a court of law, is relevant to Sergeant Gill's character for truthfulness or untruthfulness in this case.

So I will deny the request to attempt to impeach Sergeant Gill under Rule 608(b).

All right. Are we ready for opening statements?

MS. BERNSTEIN: We are, Your Honor.

THE COURT: Okay.

MR. ZAMPOGNA: Yes, Your Honor.

THE COURT: All right.

All right. My law clerk is going to hand you the instructions that we agreed on, so before we start, why don't you take as much time as you need to review those and tell me if you have any objections. Hopefully, you don't; I think we have agreed on these. And then I will read them into the record.

MR. ZAMPOGNA: That's fine, Your Honor, thank you.

THE COURT: All right. Ms. Bernstein?

MS. BERNSTEIN: They look good to the government too.

THE COURT: Okay. Let me read them into the record.

For you to find the defendant guilty, you must find that the government has proven each of the following elements beyond a reasonable doubt: First, the defendant knowingly

JA493

falsified or made a false entry into a record or document, in this case, a Fairmount Heights Police Department incident report; second, the defendant acted with the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter; and third, the matter was within the jurisdiction of an agency of the United States, in this case, the Federal Bureau of Investigation.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty.  If on the other hand, you find from your consideration of all of the evidence that the government has failed to prove one or more of these elements beyond a reasonable doubt, then you must find the defendant not guilty.

The first element the government must prove is that the defendant knowingly falsified or made a false entry in the listed record or document.  I instruct you that a person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident.

The government is not required to prove that a defendant knew that his acts or omissions were unlawful.  A defendant falsifies or makes a false entry in a document or record by including within that document or record any untrue material statement that he knows at the time to be untrue or by

JA494

intentionally omitting from that document or record any material fact.

A fact is material if it has a natural tendency to influence or is capable of influencing the decision of the person or entity to which it is addressed. A record or document may include a report prepared by law enforcement officers.

The second element the government must prove is that the defendant, in falsifying or make a false entry in or a material omission from a report, acted in relation to or in contemplation of a matter and intended to impede, obstruct, or influence the investigation or proper administration of that matter. There is no requirement that the matter had been pending at the time of the obstruction but only that the acts were taken in relation to or in contemplation of any such matter or case.

There is also no requirement that the falsifying of the document would naturally or probably result in obstruction of the investigation. The terms "impede," "obstruct," and "influence" have their ordinary meanings. To impede something means to hinder it, hold it up, block it, or get in the way of it. To obstruct something means to put obstacles in the way of something, to make it difficult or impossible to keep it from happening or to hinder it. To influence something means to affect or alter conduct, thought, or character of it by indirect and intangible means.

REDACTED TRANSCRIPT

JA495

The third element the government must prove is that the matter was within the jurisdiction of an agency of the United States, specifically, the Federal Bureau of Investigation.  The government is not required to prove that the defendant knew or even contemplated that the matter was within the jurisdiction of the FBI, or was federal in nature, or that he knew that a federal investigation was underway or would occur in the future.  The issue for you to decide is whether the matter the defendant allegedly sought to obstruct was in fact within the jurisdiction of the FBI.

Okay, I am ready.

Ms. Bernstein, it is your burden, and I am ready for your opening statement.

OPENING STATEMENT BY THE GOVERNMENT

MS. BERNSTEIN:  Good morning, Your Honor.  Can you hear me okay?

THE COURT:  I can.

MS. BERNSTEIN:  As you know, the defendant is a former police officer.  In 2019, he engaged in serious police misconduct and then falsified a report to cover up what he had done.  This case is about that false report.

Now, I know you've heard bits and pieces of our evidence through our arguments here in court.  What I want to do today, Judge, is lay out for you the full story that our evidence is going to show.

REDACTED TRANSCRIPT

JA496

Defendant Vanderpool worked for the tiny Fairmount Heights Police Department.  He was out patrolling one night with his partner, Officer Philip Dupree, when the two of them pulled over a young woman who was driving in a car alone, speeding.  When they pulled the woman over, she was frantic.  She said she was rushing to get to her young son, who had injured his head in an accident.

The defendant learned that the young woman was named Raynna Stewart.  She was 19 years old, driving her boyfriend's car, and she didn't have a license; she only had a learner's permit.  So the officers ordered her out of the car, and they told her that they were going to have it towed.

Raynna was beside herself.  She started arguing, and pacing, and running into the street.  Officer Dupree took Raynna to the ground and handcuffed her, and the officers placed her under arrest.  At that point, she was even more distraught.

With her hands cuffed behind her back, Raynna started banging her held on the side of the car door, while she was berating herself, yelling, I'm so stupid, I'm so stupid.

While Raynna was handcuffed on the side of the road, the defendant started searching the boyfriend's car, and when he did, he came across some condoms.  That moment, Judge, is the moment that that night took a turn that led eventually to this courtroom.  As the defendant would later tell a friend, the sight of the condoms in the car made him horny.  As he would

REDACTED TRANSCRIPT

JA497

also tell his friend, the sight of those condoms in the car made him assume that Raynna -- the young mother worried about her son, the 19-year-old, handcuffed in the custody of two armed police officers, the sight of the condoms made him assume that Raynna, in his words, liked to fuck.

The evidence will show that in that moment, the defendant decided he was going to use his badge to pursue his own sexual gratification, and that evidence includes the fact that at that moment, the defendant went off book.  What I mean by that is that up until then, the defendant had been calling in the stop like a regular traffic stop.  He had called into Dispatch when he pulled the car over, he called in the license plate.  He called in again to have them run a check on Raynna.

But after he found the condoms, Defendant Vanderpool and Officer Dupree both went radio silent.  They put the handcuffed young woman in a police car, and they took her away from the scene.  Instead of calling out on the radio, we have one in custody, and we're on our way to the Department of Corrections, instead of reporting their odometer reading and their destination, like they had been trained to do, they snuck Raynna away from the scene without telling anybody.

And then, instead of taking her to the Department of Corrections, where officers take prisoners, or even to the hospital, where they take someone in emotional distress, the officers took Raynna to the tiny little Fairmount Heights police

JA498

station, knowing that it would be locked and deserted in the middle of the night.

Now, Fairmount Heights P.D. is so small that their station is really just some office space in a municipal building that's only open during business hours, and yet that's where they took Raynna. When they got there, they took her in handcuffs up to the Fairmount Heights police station into a main open room in their office space, where Raynna was uncuffed and where the defendant, an on-duty police officer, said to her something to the effect of, we've got to make this right. And then the defendant took off his pants and penetrated Raynna right there on a sofa in the main room of the police department, with the door wide open and with Officer Dupree standing nearby.

When the defendant was finished with Raynna, the officers put her back in a police car, and they took her to the tow lot so she could get the car back. On the way, Defendant Vanderpool called the tow truck driver and asked him to meet them at the tow lot in the middle of the night, to give the car back to the young woman, who was not the registered owner and didn't have a driver's license.

You're also going to hear that the defendant gave Raynna a stack of traffic tickets and a criminal citation for disorderly conduct.

Now, at some point after dropping Raynna off at the tow lot in the wee hours of the morning, the defendant made his

JA499

way back to the police station, where he wrote up his report. Now, Defendant knew from his training that if the truth came out about what he had just done, he was going to be in a world of trouble, so he covered his tracks by falsifying his report. At about 2:49 in the morning, he sat down at a computer terminal in the Fairmount Heights police station, and he crafted out a narrative that was designed to make this whole interaction with Raynna look like it was just a regular old by-the-book traffic stop.

That report, of course, is at the center of this case. And when you see it, Judge, what you're going to see is that according to the report, Defendant Vanderpool and Officer Dupree just pulled a woman over for speeding, handcuffed her briefly at the side of the road, somehow got in contact with the registered owner of the car and then returned the car to him before sending Raynna on her way, nothing in the report about taking her from the scene in handcuffs, nothing about taking her to the deserted police station, nothing, of course, about having sex with her while she was in custody, and nothing about taking her back to the tow lot to give her the car back.

And when you see that report, you're also going to see an affirmative lie, that the officers gave that car back to the registered owner.

Based on that report, the defendant has been charged with one count of obstructing justice by falsifying a police

REDACTED TRANSCRIPT

JA500

report.

Now, most if not all of the facts that I just told you about that night are things that the defendant himself has admitted, either to his friend or in a prior court proceeding that you're well aware of, Your Honor, but the admissions in that court proceeding came after the defendant -- after there had already been allegations made about his interactions with Raynna, so after the defendant was already on the defensive.

As you know, though, our evidence also includes recordings of the defendant talking about what happened that night before there was ever any investigation.

You're going to hear recordings of messages the defendant left for a friend of his, a guy named Denny Washington, where he told Mr. Washington about that night. You're going to hear him talk to Mr. Washington about how he and Officer Dupree pulled the young woman over for speeding, how she was upset because her son had been in an accident, how when they pulled her over, she went kind of like crazy.

You're going to hear him tell his friend about Officer Dupree taking her to the ground.  His words are going to be something like, Dupree slammed her, like, kinda.

You're going to hear him tell his friend about the discovery of the condoms and tell his friend how he when found the condoms he got, like, horny.  Then you're going to hear him tell his friend that he took Raynna to the station and had sex

REDACTED TRANSCRIPT

JA501

with her. But those aren't going to be his words. What you're going hear him say is something like, I took her back in, and I fucked her, you know what I mean? I fucked her. And finally, you're going to hear him tell Mr. Washington something along the lines of, I ended up fucking her, you know, like while she was in custody; you know what I mean?

As you well know, Judge, and as you just read into the record, the government bears the burden of proving three things to you beyond a reasonable doubt. First, we have to prove that the defendant knowingly falsified his police report, either by omitting important facts, or by including affirmative lies, or as the evidence will prove in this case, by doing both.

You're going to hear the defendant's own admissions, both to his friend and in that prior court proceeding, and you're going to have a chance to compare what the defendant said happened that night to what he wrote in his report. And when you make that comparison, Judge, you're going to see at least those four glaring omissions I just talked about, and you're also going to see that affirmative lie, that they gave the car back to the registered owner. That's going to be your evidence on the first element.

Second, we have to prove to you that when the defendant falsified his report, he did so to obstruct or influence any possible investigation into his conduct. You're going to hear words out of the defendant's own mouth letting you

REDACTED TRANSCRIPT

JA502

know that that very night, he was specifically, consciously contemplating the possibility of a future investigation, and even more specifically, he was consciously contemplating how to influence that future investigation to make sure that he didn't get in trouble.  I'm talking, again, about the comments that he made to his friend, Mr. Washington.

So after you hear him tell Mr. Washington about how he, in his words, "fucked her" at the station, he then told Mr. Washington that he gave her a whole bunch of tickets and a criminal citation.  Mr. Washington couldn't understand that; why give her tickets and a citation after doing what Defendant Vanderpool had done?  So Defendant Vanderpool explained himself, in great detail; he explained exactly what he was thinking.  And Judge, you're going to hear that long, detailed explanation in that recording.

So for now, I'm just going to paraphrase.  What he explained to Mr. Washington was that he gave her those tickets and that citation in order to make this look like it was just a regular traffic stop.  That way, if the woman ever made a complaint, it would look like he did just what he was supposed to do and like maybe she's just mad.  It would make it his word against hers, he told Mr. Washington, and then he asked Mr. Washington, Tell me if that makes any kind of sense.

So you're going to know from the defendant's own mouth that he was specifically thinking, that very night, the very

JA503

morning that he sat down to type out that report, he was already thinking about the possibility of a future investigation, and he had already decided that the way to make that future investigation go away was to make this look like a regular run-of-the-mill photographic stop, as he writing his report, designed to make this look like a regular run-of-the-mill traffic stop.

Third, we have to prove to you that the underlying matter, in this case, an apparent abuse of authority by a person acting in his official capacity, happens to fall within the jurisdiction of the FBI.  You're going to hear from FBI agents who will tell you that when a police officer arrests someone, takes them to the station, and has sex with them, that is a matter within the jurisdiction of the FBI, and that's because an officer using his authority to coerce sex out of someone is a criminal civil rights offense.  So when there are facts even suggesting the possibility that that happened, the FBI opens an investigation.

So that's our evidence on the elements, but because I suspect from our pretrial wrangling that the defense is going get up in a minute and tell you that Defendant Vanderpool didn't write that report, I want to give you a brief preview of just some of the evidence you're going to hear on that point.

When a Fairmount Heights police officer writes a report, he or she does so in a computer system called RMS.

REDACTED TRANSCRIPT

JA504

Every officer in the county has his or her own unique user name and password to get into that system, and the officers logs on and then writes the report right in there.  That system, Judge, is amazing; it tracks every move an officer makes.

So when an officer starts filling out blanks on a form, that's recorded.  When he starts typing his narrative, that's recorded.  Every time he hits save, or views a report, or prints it out, bam, that's recorded.

The system also tells you exactly what computer the officer is sitting at while he's typing.  That data is going to allow for a timeline that's going let you know exactly who wrote that report.

After pulling Raynna over late at night, taking her to the station, having sex with her, Defendant Vanderpool and Officer Dupree took her back to the tow lot.  Phone records are going to show you that they dropped Raynna off at the tow lot at around 2:00 a.m. in the morning, give or take.  At 2:22 a.m., Defendant Vanderpool issued a traffic warning to a different motorist at an intersection that was less than half a mile from the tow lot and less than a half a mile from the police station. Twenty-seven minutes later, Defendant Vanderpool's unique user ID logged on into that system, and Defendant Vanderpool's user account started writing a report about the arrest Defendant Vanderpool had just made.

From 2:49 a.m. to 3:23 a.m., Defendant Vanderpool's

JA505

user account drafted up that report, the report with Defendant Vanderpool's name on it, about the arrest Defendant Vanderpool had just made, written from Vanderpool's perspective, and written by defendant Vanderpool's user account.

That system is going to show you that Defendant Vanderpool's user account finished that report at 3:23 a.m. and checked it back into the system.  6 minutes and 10 seconds later, Defendant Vanderpool, done for the night, clocked out of work.

So that's the evidence that we're going to show in this case, Judge, and what it will all boil down to is that the admissions the defendant has made about what he did that night, when added to his admissions to his friend about what he was thinking that night, essentially add up to an admission that he obstructed justice by falsifying a report.

So at the end of this case, my colleague is going to stand up here and ask you to find the defendant guilty as charged.

Thank you Judge.

OPENING STATEMENT BY THE DEFENDANT

MR. ZAMPOGNA:  We're just checking that.

Good afternoon, Your Honor.  I, Christopher Zampogna, represent Mr. Vanderpool with my cocounsel, and despite what has been said about the Fairmount Heights Police Department and its seemingly seamless way it operates, we believe amongst other

JA506

things that there will not be evidence to prove this case beyond a reasonable doubt.

I'm not going to take a lot of time to go through what our defense will be, because it depends upon how the prosecution presents its case.  However, I would like to show a few photos of this allegedly well seemingly run police department.

Please pull up the first photo.

This photograph is provided to us by the prosecution, which shows, we believe, that to be mike-HP, which is the computer that allegedly may have been used that evening and where it sits in a common room.  This picture doesn't show where the entrance and exits to this room are, and as the prosecution did state, this room is part of a municipal building; it isn't just specifically a police station itself.

And it's hard to pick out, but if you look at the computer itself, you can see in the bottom left-hand corner, there's even a little sticky note on the computer, if we can show the second picture.  This is a picture of that computer, with the actual screen.  And you can see -- and we will talk about this more in detail -- that it says, on the sticky note, Password.  It also has many other doc- -- many of the documents that are loaded onto the screen, which has different authors.

So this is just more of a background of the whole situation of police department and how it's run, and how the computer system is run, and we will get into this more during

REDACTED TRANSCRIPT

JA507

our defense.

I believe also, as they stated, they're going to try to prove their case by prior testimony of our client, but not really of any of the witnesses of this prior incident, or prior proceedings.  They will call several case officers, we believe.  They will call a computer person, that doesn't work, ironically, for Fairmount Heights but only for P.G. County.  The Fairmount Heights computer guy is actually named Jay Williams.  He's not being called.  They will not call anybody who works for Fairmount Heights or Fairmount Heights Police Department, we believe.

Did Vanderpool -- did my client have sex that evening?  Yes.  Did he commit a federal offense?  No.  Vanderpool admitted to this sex, when asked about it, that he had that at the police station.  He did not deny it.  The sex will not be proven to be nonconsensual, as they have alleged.  This is not proof of him committing a federal crime, again; office sex is not a federal crime.

No proof of him ever being trained on the computer, furthermore, will even be put into this case.  That is the RMS system.  We also -- as indicated, this is HP Mike, which is the specific computer.  And we can pull that.

Can we pull it up one more time?  Just so we have it to look at.

There were several computers that the

JA508

Fairmount Heights Police Department had in addition to this desktop.  You may hear that there is others that are -- I guess they're called Panasonic Hardbooks (phonetic).  I think they're ones that are used, that is, for -- in the police cars themselves or for their laptops, basically.  So there are several computers that they had at that time.

As I said, the prosecution will rely on testimony from prior matters in violation of its own -- in violation of its own orders.  Why?  Because the prosecution lacks testimony -- proof of any criminal misconduct, and their evidence does not even prove a prima facie case for the violation of obstruction, we believe.

I'm confident that after you listen to the mess of the department that the Fairmount Heights Police Department is and was, and why they have no person called from it and are only using evidence from prior prosecutorial proceedings, ironically, in violation of its own orders, you will find my client not guilty.

Thank you, Your Honor.

THE COURT:  Okay.

Ms. Bernstein, again, it's your burden.  And I have the order of your witnesses; let's just talk logistics.  It's 10:25.  You have Agent Zimmerman first; is that correct?

MS. BERNSTEIN:  Yes, Your Honor.

THE COURT:  Okay, and he will go the longest?

REDACTED TRANSCRIPT

JA509

MS. BERNSTEIN:  Yes, Your Honor.

THE COURT:  All right.  Why don't we call him and then let's take a break perhaps around -- let's say around 11:00, for about ten minutes or so, just a comfort break?

Does that work for our court reporter?  Yes.

Okay.

MS. BERNSTEIN:  Thank you, Your Honor.

THE COURT:  Okay.

MS. ALLISON:  The government calls Special Agent Mark Zimmerman of the FBI.

THE COURT:  As Agent Zimmerman is walking up, I just want to confirm, we've invoked the rule on witnesses?

MS. BERNSTEIN:  Yes, Your Honor.

THE COURT:  Okay.

MR. ZAMPOGNA:  Yes, Your Honor.

THE COURT:  All right.

THE COURTROOM DEPUTY:  Hello.

Could you please remain standing and raise your right hand.

You do solemnly swear or affirm under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

REDACTED TRANSCRIPT

JA510

MARK ZIMMERMAN - DIRECT EXAMINATION

Speak loudly clearly into the microphone, state your full name for the record, and spell your first and last names.

THE WITNESS:  Of course.  My name is Mark Zimmerman, M-A-R-K, Z-I-M-M-E-R-M-A-N.

THE COURTROOM DEPUTY:  Thank you.

MARK ZIMMERMAN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. ALLISON:

Q.   Please introduce yourself to Judge Boardman.

A.   Good morning, Your Honor.  My name is Mark Zimmerman.  I'm a special agent with the FBI.

THE COURT:  Okay.  Make sure you're speaking into the microphone.

THE WITNESS:  Of course, Your Honor.

BY MS. ALLISON:

Q.   Which unit are you in at the FBI?

A.   Currently, I'm assigned as the private sector coordinator.

Q.   How long have you been in that role for?

A.   Since February of this year.

Q.   Before that, what was your role at the FBI?

A.   So prior that, I worked for one of two public corruption squads in the FBI Baltimore Division.  The squad's name was C10.

Q.   Did you work a case investigating the conduct of Martique Vanderpool in September 2019?

A.   I did.

REDACTED TRANSCRIPT

JA511

Q.    Who is Mr. Vanderpool?

A.    Mr. Vanderpool is a former Fairmount Heights police officer.

Q.    What was your role in that investigation?

A.    I was one of the case agents assigned to that investigation.

Q.    We're going to talk more about your investigation, but first, I'd like you to tell the Judge a bit about yourself. Where did you grow up?

A.    Of course.  I grew up in the Maryland area.  I graduated from University of Maryland, College Park.  I then worked as a seasonal police officer in Ocean City, Maryland.

I then went on to work for an accounting firm, Ernst & Young LLP.  I obtained my CPA license there.  Worked for -- went to the Bureau of Alcohol, Tobacco, and Firearms and then moved on to be an FBI special agent in 2003.

Q.    Remind us, in 2019 and 2020, which squad were you assigned to?

A.    I was assigned to a public corruption squad out of the FBI's Baltimore division.

Q.    Super generally, what types of cases does the public corruption squad investigate?

A.    So that squad investigates fraud against the government, various political officials.  That includes color-of-law violations conducted by a police officer.

REDACTED TRANSCRIPT

JA512

MARK ZIMMERMAN - DIRECT EXAMINATION

Q.   How did the allegations against Martique Vanderpool first come to your attention?

A.   They were first brought to our squad's attention in February 2020, late February 2020, from Prince George's County Police Department.

Q.   Was there a referral from P.G. County?

A.   Yes.

Q.   Did the FBI accept the referral?

A.   Yes, it did.

Q.   Now, you said Mr. Vanderpool is a former Fairmount Heights police officer.  I have a few questions about the Fairmount Heights Police Department.

     Where is the department located?

A.   So the department's located in Prince George's County, Maryland.

Q.   I want to ask some questions about the department in 2019. About how big was the department then?

A.   It had five officers, including the Chief.

Q.   How many of those were full-time officers?

A.   Three, approximately three.

Q.   Even though the department was tiny, did they have marked police cars for officers to use?

A.   They did.

Q.   Did Fairmount Heights officers wear uniforms and carry guns?

REDACTED TRANSCRIPT

JA513

MARK ZIMMERMAN - DIRECT EXAMINATION

A.   They did.

Q.   Did they have computers to use in their police cars?

A.   Yes, they did.

Q.   Were Fairmount Heights officers state certified?

A.   They were.

Q.   And we're going to have another witness talk more about this in a bit, but can you just briefly explain what it means for an officer to be state certified?

A.   Of course.  An officer needs to attend a police training academy in order to ultimately obtain that certification.

Q.   In 2019, did Fairmount Heights have general orders?

A.   They did.

Q.   What are general orders?

A.   They're the rules that an officer is supposed to conduct his actions by.

Q.   Did Fairmount Heights officers take an oath of office?

A.   They did.

Q.   Did Mr. Vanderpool in particular take an oath of office at Fairmount Heights?

A.   He did.

     MS. ALLISON:  Ms. Richart, let's please pull up Government Exhibit 14.

     Judge, this was one of the exhibits the parties agreed to beforehand.  Do I need to offer into evidence this exhibit, or is it automatically in now that it's on the screen?

REDACTED TRANSCRIPT

JA514

MARK ZIMMERMAN - DIRECT EXAMINATION

THE COURT:  All of the exhibits are automatically in unless there is a standing objection to them.  So we do not need to offer them into evidence.  Once you have presented it, the courtroom deputy will mark it on the exhibit list as admitted.

MS. ALLISON:  Okay.  Thank you, Your Honor.

BY MS. ALLISON:

Q.  What is this, Special Agent Zimmerman?

A.  So this is Fairmount Heights Police Department General Order, and the subject is the Oath of Office.

MS. ALLISON:  Ms. Richart, please zoom in on part III.

BY MS. ALLISON:

Q.  Special Agent Zimmerman, please read part III on the screen.

THE COURT REPORTER:  Could you -- the microphone can move with you when you read; you can pull it towards you.

THE WITNESS:  Yes, ma'am.  That's -- okay.  I'll try to line this up.  Is that better?  Okay.

A.  I -- blank -- do solemnly promise and declare that I will support the Constitution of the United States, that I will be faithful and bear true allegiance to the State of Maryland and support the Constitution and laws thereof, and that I will to the best of my skill and judgment diligently and faithfully, without partiality or prejudice, execute the office of police officer for Fairmount Heights according to the Constitution and laws of the State.

REDACTED TRANSCRIPT

JA515

MARK ZIMMERMAN - DIRECT EXAMINATION

BY MS. ALLISON:

Q.    Is this the oath that Officer Vanderpool took?

A.    This is.

     MS. ALLISON:  You can take that down, Ms. Richart.

BY MS. ALLISON:

Q.    Around when did Mr. Vanderpool start working at
Fairmount Heights?

A.    December of 2017.

Q.    Did he work in security before that?

A.    He did.

Q.    Before working at Fairmount Heights, was he also a
Sheriff's Deputy in Arlington?

A.    He was.

Q.    I want to turn now to the night of September 6th of 2019.
Did you investigate the actions of Officer Vanderpool pertaining
to a traffic stop that night?

A.    Yes.

Q.    As to the traffic stop, what specifically were you
investigating?

A.    So a 19-year-old female, Raynna Stewart, was stopped during
a traffic stop.  Subsequent to that traffic stop, Ms. Stewart
was taken back to Fairmount Heights Police Department and had
sex with officer Martique Vanderpool.

Q.    Was the defendant the only officer involved in that stop?

A.    No.

REDACTED TRANSCRIPT

JA516

MARK ZIMMERMAN - DIRECT EXAMINATION

Q.   Who else was with him?

A.   Officer Philip Dupree.

Q.   Who is Officer Dupree?

A.   Officer Dupree is also a former Fairmount Heights Police Department police officer.

Q.   Was he the defendant's partner that night?

A.   He was.

Q.   What if anything was the young woman arrested for?

A.   Disorderly conduct.

Q.   According to your investigation, where did the sexual incident take place?

A.   In Fairmount Heights Police Department.

Q.   Can you describe the department for the Judge?

A.   Of course.  Fairmount Heights has a commercial building that contains different aspects, for the Mayor and for other parts of government.  Fairmount Heights Police Department is a portion of that building, contained in that building.

Q.   Is the building open to the public all night?

A.   It is not.

Q.   Back in 2019, what were the approximate hours that Fairmount Heights police department was open?

A.   Business hours, 8:00 to 5:00.

        MS. ALLISON:  Ms. Richart, please put on the screen Government Exhibit 19.

REDACTED TRANSCRIPT

JA517

MARK ZIMMERMAN - DIRECT EXAMINATION

BY MS. ALLISON:

Q.   What is this?

A.   Fairmount Heights Police Department General Order, subject is Prisoner Searches and Transportation.

MS. ALLISON:  Ms. Richart, please zoom in on the very last sentence on the first page.

BY MS. ALLISON:

Q.   Please read that sentence.

A.   Prisoners will be transported without unnecessary delay to the nearest processing facility.

Q.   What kinds of things does a processing facility have?

A.   The ability to fingerprint, take photographs, also jail facilities for holding.

Q.   In 2019, did Fairmount Heights have the things necessary to fingerprint and book someone?

A.   No.

Q.   Did Fairmount Heights even have a holding cell?

A.   It did not.

Q.   What was the process and facility used by Fairmount Heights?

A.   It was a facility located in Upper Marlboro.

Q.   So if a Fairmount Heights officer arrested someone, were they supposed to take that person to Upper Marlboro?

A.   That's correct.

MS. ALLISON:  Thank you, Ms. Richart; you can take

REDACTED TRANSCRIPT

JA518

MARK ZIMMERMAN - DIRECT EXAMINATION

that down.

BY MS. ALLISON:

Q.   In this case, where did the officers take Ms. Stewart?

A.   Fairmount Heights Police Department.

Q.   In your investigation, did you determine if there were any functioning surveillance cameras inside the police station where the incident occurred?

A.   There were none.

Q.   I want to talk to you now about Mr. Vanderpool's phone. During the course of your investigation, did the FBI get a search warrant to search Mr. Vanderpool's cell phone?

A.   Yes.

Q.   Did the FBI search his cell phone?

A.   Yes.

Q.   Did you yourself search through material from his phone?

A.   I did.

Q.   When you did that, did you find any evidence that shed light on what happened that night between Defendant Vanderpool and Ms. Stewart?

A.   I did.

Q.   Very generally, what did you find?

A.   When I searched through the phone, I found audio files where Mr. Vanderpool discussed what happened that night with a friend of his.

Q.   What did he say, very generally speaking, he did to

REDACTED TRANSCRIPT

JA519

Ms. Stewart that night?

A.   So he indicated that the traffic stop was conducted and that he that brought her back to the police station and they had sex.

Q.   And are those the exact words that he used?

A.   No.

Q.   We're going to hear a lot more about that later, but for now, I want to jump ahead to last year.

Are you familiar with a prior court proceeding at which the defendant gave testimony related to this case?

A.   I am.

Q.   When was that proceeding?

A.   January 2023.

Q.   By that time, had an investigation into the defendant's conduct relating to the traffic stop already begun?

A.   Yes.

Q.   At that proceeding, did the defendant testify under oath?

A.   He did.

Q.   Was he cross-examined?

A.   He was.

Q.   Did he talk about the traffic stop involving Ms. Stewart?

A.   He did.

Q.   I'm going to ask you a few general orienting questions about the defendant's admissions of that proceeding, and then we'll turn directly to the transcript.

MARK ZIMMERMAN - DIRECT EXAMINATION

Did the defendant say whether or not Ms. Stewart was upset when she was pulled over?

A.    Yes.

Q.    Did he say anything about Ms. Stewart's son?

A.    Yes.

Q.    Did he say whether Ms. Stewart had a driver's license?

A.    He indicated that she did not.

Q.    Was she arrested for disorderly conduct?

A.    She was.

Q.    Was she handcuffed?

A.    Yes.

Q.    Was her car towed?

A.    It was.

Q.    Where did the officers take her?

A.    Fairmount Heights Police Department.

Q.    What did Defendant Vanderpool do at the police department?

A.    Vanderpool had sex with Raynna Stewart at the police department.

Q.    All right.  Let's turn now to the transcripts.  Do you have a copy on the stand with you?

A.    I do.

MS. ALLISON:  And I believe we provided copy for Your Honor to have on the bench as well, if that's helpful.

BY MS. ALLISON:

Q.    We're going to walk through some specific excerpts from the

REDACTED TRANSCRIPT

JA521

transcripts.  For those excerpts, I'll read the question, and I'll ask you to read the answer that Mr. Vanderpool gave.

So let's start with the basics.  Let's turn to page E-50 of the transcript.

MS. ALLISON:  And for the record, the particular lines we're going to be reading are E-50, lines 11 through 24; E-51, lines 19 through 24; and E-52, lines 1 through 9.

BY MS. ALLISON:

Q.    Again, I'll read the question, I'll ask you to read the answer that Mr. Vanderpool gave.

"As a police officer, you investigated allegations of crimes?"

A.    "You mean, as a Fairmount Heights police officer?"

Q.    "Yes."

A.    "Yes, that's fair to say."

Q.    "Okay.  You conducted traffic stops?"

A.    "Yes, ma'am."

Q.    "And you had the more to determine whether or not a person's car would be towed during the traffic stop, correct?"

A.    "Yes, ma'am."

Q.    "And as a police officer, you had the power to arrest people?"

A.    "Yes, ma'am."

Q.    "As a result of you arresting individuals, they could be taken to jail, correct?"

JA522

A.   "Yes."

Q.   "And you've placed people in handcuffs, correct?"

A.   "Yes, ma'am."

Q.   "And you were issued a service weapon, correct?"

A.   "Yes, ma'am."

Q.   "A firearm?"

A.   "Yes, ma'am."

Q.   "Okay.  And while serving in your capacity as a sworn police officer, you carried that service weapon with you, correct?"

A.   "Yes, ma'am."

Q.   Let's turn to page E-53.  We're looking at lines 1 to 3 on this page.

"You instigated, or you and Dupree instigated a traffic stop."

A.   "Dupree initiated the traffic stop."

Q.   Let's turn to page E-14.

THE COURT:  E-what?

MS. ALLISON:  14.  Sorry, Judge.

And for the record, we're looking at E-14, lines 1 through 9, as well as E-14, line 15 through E-15, line 24.

BY MS. ALLISON:

Q.   "Do you remember the events of September 6th?"

A.   "Yes, sir."

Q.   "2019?"

REDACTED TRANSCRIPT

JA523

A.   "Yes, sir."

Q.   "Were you working on duty that day?"

A.   "Yes, sir."

Q.   "Okay.  While working on duty, did you observe the young lady named Raynna Stewart?"

A.   "Yes, sir."

Q.   "Why was she stopped?"

A.   "For speeding during the town of Fairmount Heights, 68 miles per hour, was in a 40 miles per hour zone.

Q.   "Okay.  And who pulled her over?"

A.   "Philip Dupree."

Q.   "Were you all in the same car or two separate cars?"

A.   "The same vehicle."

Q.   "Once she was pulled over for speeding, what happened?

A.   "We approached the vehicle.  I took the passenger side approach.  He took the driver's side approach.  I gave verbal commands for the driver to roll down their windows, turn their vehicle off, and then there was verbal contact with the driver."

Q.   "Tell us about the verbal contact with the driver."

A.   "So the driver -- she was later identified as Ms. Stewart. She was already on 10 if we were doing 1 through 10.  She's cursing, yelling, 'You motherfuckers, why you all stop me?  I got to go.'  She's reaching for stuff, she's grunting, and she's acting erratic, and we're trying figure out what's going on.  So I'm explaining to her, 'Hey, listen, you seem like you're trying

REDACTED TRANSCRIPT

JA524

MARK ZIMMERMAN - DIRECT EXAMINATION

to get somewhere.  I'm Officer Vanderpool.  This is my partner, Officer Dupree.  You're being audio and video recorded.  We work for the Town of Fairmount Heights.  Do you know why you're being stopped?"  She said, 'I don't know.  I had my seatbelt on."  I didn't know that information, but I said, 'No, you're being stopped for speeding.'"

Q.   "And after you told her that, what happened?"

A.   "She continued on.  I then asked for her license, registration, proof of insurance.  She said, 'I don't have nothing.  I have a driver's license, but I left it at home on the dresser.'"

Q.   You can put the transcript down.

     Did someone order Ms. Stewart out of her car?

A.   Yes.

Q.   According to the defendant, who was that?

A.   Officer Dupree.

Q.   Did Mr. Vanderpool claim that Ms. Stewart fought with Officer Dupree?

A.   He did.

Q.   Let's turn to the next page, E-16, and we'll be reading page E-16, line 22 through E-17, line 9.

     Please start reading on line 22 of page E-16.

A.   "And then they're fighting.  So my adrenaline was up at this time.  So I get on the radio.  I give our location description of the vehicle, tag number to the Prince George's

REDACTED TRANSCRIPT

JA525

County dispatch communications."

Q.    "How large is Dupree?"

A.    "I mean, he's pretty -- he's pretty muscular."

Q.    "How much does he weigh, do you think?"

A.    "Probably 235."

Q.    "So after she was fighting him, what happened?"

A.    "Well, she kept on it.  Like, he eventually was able to get her in cuffs.  He placed her on the ground, but she got up and kept running out into the street."

Q.    And you can set that down.

I had asked you earlier if she said anything about her son. Let's turn to page E-53 of the transcript.

MS. ALLISON:  For the record, the portions that we'll be reading are E-53, lines 9 through 22, through E-54, lines 4 through 12.

BY MS. ALLISON:

Q.    "And you made contact with Raynna Stewart?"

A.    "Yes, ma'am."

Q.    "When you made contact with her, she was the only person in that vehicle, correct?"

A.    "Yes, ma'am."

Q.    "Okay.  And she told you, when you made contact with her, that her son was injured, correct?"

A.    "She didn't say her son was injured.  She said inconsistent things.  First she said, 'He fell off a roof.'  Then she said,

JA526

MARK ZIMMERMAN - DIRECT EXAMINATION

'He fell out a window."

Q.   "She was talking about her infant son?"

A.   "She had mentioned her son hitting -- falling and hitting his head, something to that effect."

Q.   "All right.  So she told that her son had been injured, correct?"

A.   "She said that, but then she said something different that conflicts with that.  She said, 'No, he's actually fine' at one point."

Q.   Please turn to page E-58.  We're looking at line 7 through 21.

"Raynna told you that her son was injured when you pulled her over, right?"

A.   "She made mention of her son falling on his head, that he had fell on his head."

Q.   "And that she was speeding to try to get to him, correct?"

A.   "She may have mentioned that she was trying to go to her baby's daddy's house."

Q.   "You also learned that she only had a learner's permit, correct?"

A.   "Yes, ma'am."

Q.   "And you also learned that it wasn't her car that she was driving, correct?"

A.   "Yes, ma'am."

Q.   All right.  You can set that down.

REDACTED TRANSCRIPT

JA527

MARK ZIMMERMAN - DIRECT EXAMINATION

Did Mr. Vanderpool talk about the young woman's mental state that night?

A.    He did.

Q.    Let's go to page E-62, lines 15 through 19.

"Would you say she was having, like, a mental breakdown?"

A.    This portion isn't highlighted, so just want to make sure I don't read anything that -- that is not highlighted.  I apologize.

Q.    Sure.  Thank you for clarifying it.

Please read page E-62, line 17 through 19.

A.    17 through 19, all of it?

Q.    Yes.

A.    Okay.  Correction.  I'm now on 62.

"She was emotional at times and I would say like angry at the same time, so I don't know if it was a mental breakdown. She just was acting a little odd."

Q.    Let's turn now to page E-67, lines 11 through 16.

"When Raynna was in handcuffs, she started banging her head on the car, correct?"

A.    "Yes, ma'am."

Q.    "All right.  And she started yelling, 'I'm so stupid, I'm so stupid.'  Correct?"

A.    "Yes, ma'am."

Q.    You can set that down.

Did Officer Vanderpool learn anything about who the car

REDACTED TRANSCRIPT

JA528

MARK ZIMMERMAN - DIRECT EXAMINATION

belonged to?

A.    He did.

Q.    What did he learn?

A.    It belonged to a boyfriend.

Q.    Did Officer Vanderpool search the car?

A.    He did.

Q.    Let's go to page E-18, lines 24 to 25.

"You searched her car; is that correct?"

A.    "Yes.  Preliminary, I searched it."

Q.    Now, let's go to the highlighted portions of page E-64.

        MS. ALLISON:  And for the record, we're look at E-64, the highlighted portions of line 20 through E-65, line 4.

BY MS. ALLISON:

Q.    "Did you look through Raynna's car?"

A.    "Yes, ma'am."

Q.    "And when you looked through Raynna's car, you found condoms, correct?"

A.    "I didn't have to look.  They were in the center console area."

Q.    You can set the transcript down.

Did the defendant say anything about those condoms on the WhatsApp messages you mentioned earlier?

A.    He did.

Q.    On the WhatsApp messages, what did he tell friend about finding the condoms?

REDACTED TRANSCRIPT

JA529

A.    He said, they made him horny.

Q.    Turning back, now, to this prior proceeding, let's go to the very next page, E-66.

And we'll be reading the highlighted portions on E-66, lines 7 through 11 and 15 through 24.

"So you're saying, at the time of the traffic stop of Raynna Stewart, you never thought, oh, wow, look at these condoms, she must like to fuck."

A.    "No.  I was concerned in terms of human trafficking, sex trafficking."

Q.    "So you're saying today that you thought Raynna was a victim of human trafficking?"

A.    "I didn't know.  I was asking, because through training, I know that people take their ID.  She didn't have anything to present, and then I see all of these condoms."

Q.    "So you thought you saw indicia of human trafficking?"

A.    "Possibly.  That's why I asked to see if maybe she could be being trafficked or something."

Q.    Okay.  You can set the transcript down.

You said earlier that the car was towed.  Who towed the vehicle?

A.    Individual by the name of Kevin Oshin, for Tino's Towing.

Q.    Let's go now to page E-19.

And we're looking at lines 18 through 20 on E-19.

"Okay.  So at this traffic stop, did the tow company appear

REDACTED TRANSCRIPT

JA530

MARK ZIMMERMAN - DIRECT EXAMINATION

at the traffic stop?"

A.    "Yes, sir."

Q.    Let's go to the next page, E-20, lines 13 to 15.

"So did the tow company leave with her car?"

A.    "Yes, sir.  Well we -- yes, sir.  We left first, but yes, sir."

Q.    Finally, let's go to page E-68, lines 14 to 17, on E-68.

"When you're at the traffic stop and the tow company is coming to get her vehicle, she's still in handcuffs, correct?"

A.    "Yes, she was in handcuffs at that time, ma'am."

Q.    Okay.  You can set the transcript down.

Once the car was to towed, where did they go next?

A.    To Fairmount Heights Police Department.

Q.    Let's go now to page E-20, lines 20 to 23.

"When you left this traffic stop scene, how did you get to the station?"

A.    "We were in Dupree's vehicle, and he drove to the municipal building."

Q.    Please turn now to page E-69.

And we'll be reading page E-69, lines 14 through E70, line 3.

"After they take her car away, you and Dupree take her back to the Fairmount Heights police station, right?"

A.    "No, Dupree took her back."

Q.    "Where were you?"

REDACTED TRANSCRIPT

JA531

A.    "In the back seat."

Q.    "Were you in the car when she was transported to the Fairmount Heights police station?"

A.    "Yes, ma'am."

Q.    "The building was locked?"

A.    "Yes, ma'am."

Q.    "No one else was there, right?"

A.    "Well, when I went inside, I didn't see anybody, but I didn't tour the whole building."

Q.    Let's go down now to lines 16 to 18 on this same page, on E-70.

      "There's no holding cell at Fairmount Heights, correct?"

A.    "That's correct, ma'am."

Q.    Let's turn now to page E-22.

      And we're looking at only the highlighted portions of lines 1 through 10 on this page.

      "What happens when you get to the station?"

A.    "So Dupree, he says, 'Go open up the door, the front door.' So they stay in the vehicle.  I get out of the vehicle.  I walk around through the police entrance, and I go unlock the front door."

Q.    "Okay.  So then what happened?"

A.    "He brought her in shortly after that."

Q.    You can set the transcript down.

      Special Agent Zimmerman, when they got to the station,

JA532

where did they go?

A.    So in the police department, there's a common area, and they went to that common area.

Q.    At some point after they entered the department, were Ms. Stewart's handcuffs removed?

A.    Yes.

Q.    So she was not in handcuffs when the defendant had sex with her?

A.    That's correct.

Q.    According to the defendant, where specifically did he have sex with Ms. Stewart?

A.    On the couch, in the police department.

        MS. ALLISON:  Ms. Richart, please pull up Government Exhibit 4.

BY MS. ALLISON:

Q.    What are we looking at in Government Exhibit 4?

A.    So this is the common area of the police department.

Q.    Okay.

        MS. ALLISON:  And Ms. Richart, can you please scroll through each one of the photos in Exhibit 4, one by one.

BY MS. ALLISON:

Q.    Are these all photos of the Fairmount Heights Police Department?

A.    They are.

Q.    Let's go in particular to Exhibit 4B.

JA533

Can you explain what we're looking at in Exhibit 4B in particular?

A.   Of course.  So this is what I would call the common area of the police department, and the couch that I'll circle right here is the couch where the sex took place.

Q.   For the record, you're circling the couch in the middle of the photo?

A.   That's correct.

Q.   What is directly to the left of the couch?

A.   There's double doors.

Q.   Have you been in the Fairmount Heights Police Department?

A.   I have.

Q.   Where do those double doors lead?

A.   So those open up into a common area that's shared in the building.

Q.   Okay.

     And if you're the one standing here taking this photo, what would be behind you?

A.   So there would be a hallway behind me to the left, and there would be office spaces for the police department.

Q.   Let's turn to Exhibit 4C.

     And let's clear out that circle.

     Okay.  So on the left of the photo in 4C, is that the couch that you were just talking about?

A.   It is.

REDACTED TRANSCRIPT

JA534

MARK ZIMMERMAN - DIRECT EXAMINATION

Q.    What do we see on the other side of the room?

A.    On the other side, there's a work station, there's a computer, a chair, a desk, and a printer as well.

        MS. ALLISON:  You can take that down, Ms. Richart, thank you.

BY MS. ALLISON:

Q.    Let's turn back to the transcript; let's go to page E-29, lines 6 through 8.  And there is no question here, so if you could please read just the highlighted portions on lines 6 to 8.

A.    Dupree is standing there.  I gave him one of the condoms. I got the other condom.

Q.    Okay.  You can set the transcript down.

        At the start of the sex act, did someone dim the lights?

A.    Yes, Officer Dupree did.

Q.    Let's go to page E-35.

        And please read just the highlighted portions of lines 22 to 23 on this page.

A.    "Dupree, he's the one who dimmed the lights."

Q.    Okay, you can set that down.

        Special Agent Zimmerman, were those double doors that we just talked about open or closed during the sex?

A.    Open.

Q.    Let's go to the very next page, E-36.

        And please read lines 1 through 6 on this page.

A.    "And inside of the room, it's not pitch black dark.  The

REDACTED TRANSCRIPT

JA535

double doors, when you first walk in, they're open, so the light transmission is coming in from there as well as the back office, that door is open.  So you can clearly see everybody that's in there, everything that's in there."

Q.   You can set that down.

How did the sex act end?

A.   Mr. Vanderpool had an orgasm.

Q.   Same page, E-36.  Let's look at lines 12 to 13.

"So what happened?  How did you finish?"

A.   "I had an orgasm."

Q.   Let's go to what happened next, page E-37.  Please be sure to read only the highlighted portions on page E-37, lines 11 through 20.

A.   "Dupree, he walks over.  He has a condom.  I walk to the back.  I go to the restroom.  And then, I came back out.  She was putting on her clothes.  She may have used the restroom after that.  And then they left out, got back into the same vehicle that we came there in.  I locked the front door, and I went out the back shortly after that and got into the vehicle."

Q.   Okay, you can set the transcript down.

Did Mr. Vanderpool say if he needed to communicate with someone over the phone?

A.   He did.

Q.   Let's go to page E-40.  Please read only the highlighted portions on lines 10 to 11 of this page.

REDACTED TRANSCRIPT

JA536

A.   "So when we left out, we got into the vehicle and I'm speaking to Kevin."

Q.   You can set the transcript down.

Special Agent Zimmerman, is Kevin the tow truck driver that you mentioned earlier?

A.   Yes.

Q.   Okay.  Where did Mr. Vanderpool go next with Ms. Stewart?

A.   To the tow lot.

THE COURT:  Why don't we stop there and just take a ten-minute break.  We'll be back at about 11:10.

Thank you very much.

MS. ALLISON:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All --

THE COURT:  Let me just -- one admonition.

Agent Zimmerman, you are under oath.  Please do not talk to anyone about your prior testimony or your future testimony during the break; understood?

THE WITNESS:  Understood, yes, Your Honor.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Recess taken from 11:01 a.m. - 11:16 a.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Okay.  Please be seated.

REDACTED TRANSCRIPT

JA537

MARK ZIMMERMAN - DIRECT EXAMINATION

All right, Ms. Allison.

MS. ALLISON:  Thank you, Your Honor.

BY MS. ALLISON:

Q.   Special Agent Zimmerman, after leaving the police station, where did Mr. Vanderpool go next with Ms. Stewart?

A.   To the tow lot.

Q.   Let's turn to page E-38 of the transcript.

A.   Did you say E-30?

Q.   38.

A.   38, thank you.

Q.   We're looking at lines 1 through 10 on this page.

And please start reading the highlighted portion on line 1.

A.   "We told her that we can essentially make a call and the tow guy would likely look out for her.  So at that point, we got into the vehicle.  I began to try to make contact with the tow personnel, Kevin."

Q.   "You said this after the sex?  When did you have this conversation about 'we can make a call to the tow people'?"

A.   "That was before the sex."

Q.   Let's turn to page E-80.

And we'll be reading lines 8 through 13 of this page.

"So going back to the towing of the car, you guys drove her back to the impound lot, right?"

A.   "I never drove Ms. Stewart anywhere that night."

Q.   "Okay.  Dupree and you were in the car, driving her back to

REDACTED TRANSCRIPT

JA538

the impound lot, correct?"

A.   "Yes, we were all in the vehicle."

Q.   Please turn to page E41.

And we'll be reading only the highlighted portions of lines 10 through 20 on this page.

"At some point, did she get her car back?"

A.   "Yes, sir."

Q.   "How?"

A.   "The tow personnel, I'm assuming, gave it to her."

Q.   "Did you have any more contact with her?"

A.   "You mean after?"

Q.   "Yes, after September 6th."

A.   "No."

Q.   Okay, you can set that down.

Special Agent Zimmerman, did Mr. Vanderpool admit that Ms. Stewart was arrested that day?

A.   Yes.

Q.   Please turn to page E-59.

And we'll be reading the highlighted portions of lines 7 through 10.

"You and Dupree decide to make an arrest?"

A.   "I didn't decide to make an arrest."

Q.   "Was an arrest made of Raynna?"

A.   "Yes."

Q.   And for the last excerpt, let's go to page E-74.

REDACTED TRANSCRIPT

JA539

And we're looking at lines 14 to 17 on this page.

"You told your friend, Denton Washington, that you ended up having sex with her while she was in custody, correct?"

A.    "Yes, ma'am."

Q.    Okay.  You can set aside that transcript now, Special Agent Zimmerman.

Based on your investigation, what was Ms. Stewart arrested for?

A.    Disorderly conduct.

Q.    Was she ever booked and fingerprinted on that charge?

A.    She was not.

Q.    Was she ever taken to a booking facility that night?

A.    She was not.

Q.    Did Officer Vanderpool give her any tickets or citations?

A.    He did.

MS. ALLISON:  Ms. Richart, please pull up Government Exhibit 2.  And scroll through both pages so the witness can see.

BY MS. ALLISON:

Q.    What is Government Exhibit 2?

A.    Those are the traffic tickets that were given to Raynna Stewart.

Q.    How can you tell?

A.    The defendant's name is listed at the top of that page, one Raynna Andrea Sandra Stewart.

REDACTED TRANSCRIPT

JA540

MS. ALLISON:  Okay, you can take that down.

Please pull up now Government Exhibit 3.

BY MS. ALLISON:

Q.    What is this?

A.    This is a uniform critical citation to Raynna Stewart.

Q.    Whose name is at the very top of the page?

A.    Raynna Stewart's.

Q.    And whose signature and badge number is at the bottom?

A.    The badge number, Martique Vanderpool, it's 9359.

Q.    And do you know from your investigation, is that Mr. Vanderpool's badge number?

A.    Yes.

Q.    For the record, is this a handwritten citation?

A.    This is.

Q.    Do you recognize the handwriting?

A.    It's consistent with Mr. Vanderpool's handwriting in his application.

MR. BLUESTONE:  Objection.

BY MS. ALLISON:

Q.    And what application are you referring to?

THE COURT:  Hold on.  The objection?

MR. BLUESTONE:  That calls for expert opinion testimony.

THE COURT:  Sustained.  Evidence about whether this is his signature -- I think the question is about his signature, is

that correct, or is it handwriting?

MS. ALLISON:  It was the handwriting, Judge.

THE COURT:  So I'll sustain the objection, no testimony about how this handwriting compares to other handwriting.

MS. ALLISON:  Yes, Judge.

Ms. Richart, can you please zoom in on the narrative portion of this citation?

BY MS. ALLISON:

Q.  Special Agent Zimmerman, please read the narrative, starting with, "did willfully act."

A.  "Did willfully act in a manner to disturb the public peace by yelling profanity, curse words, to include bitch, motherfucker, causing attention from bystanders and others having to alternate travel routes because she continued to run into the middle of the street and banged her head against the car multiple times."

MS. ALLISON:  Ms. Richart, please zoom back out.

BY MS. ALLISON:

Q.  And again, Special Agent Zimmerman what are those numbers on the very bottom right of this page?

A.  That's the identifier for Martique Vanderpool, Fairmount Heights Police Department.

MS. ALLISON:  You can take that down, Ms. Richart.

JA542

BY MS. ALLISON:

Q.   I'm going to switch gears and talk more about the defendant's phone.  So you said earlier that the FBI got a search warrant for the phone.  Did a judge sign off on that search warrant?

A.   Yes.

Q.   Did you personally search through materials that came from the phone?

A.   I did.

Q.   Had there been a something called an extraction done of the phone?

A.   Yes.

        MS. ALLISON:  Ms. Richart, please pull up what's been marked as Government Exhibit 44.

BY MS. ALLISON:

Q.   What is this that we're looking at?

        THE COURT:  Can we just pause.

        MS. ALLISON:  Yes, Judge.

        THE COURT:  44?  I don't have 44 in the binder.

        MS. ALLISON:  We'll get you a copy right now.  Sorry about that, Your Honor.

        THE COURT:  I have 12 -- no, that's different.

        Mr. Zampogna, do you have Exhibit 44?

        MS. BERNSTEIN:  May I approach, Your Honor?

        THE COURT:  You may.

JA543

MR. ZAMPOGNA:  I believe we do, yes.

THE COURT:  Okay.

MS. BERNSTEIN:  I apologize.

THE COURT:  No problem.

MS. BERNSTEIN:  May I come get that back from you, Your Honor?  I want to make sure I gave you the right one.

THE COURT:  I already wrote on it.

MS. BERNSTEIN:  (Handing.)

BY MS. ALLISON:

Q.   What is this that we're looking at in what's been marked as Government Exhibit 44?

A.   So this is a Cellebrite extraction report, and it's the timeline, so it's items that were identified by Cellebrite in a certain timeline.  The timeline that was used to generate this was September 6th, 2019, beginning at 11 p.m., ending at September 7th, 2019, at 4 a.m.

Q.   Okay.  Let's unpack that a bit.  In laymen's terms, what is an extraction?

A.   So it's -- well, in this instance, the extraction report is a report of data for a certain time frame or however it is.  In this case, it's timeline, so it's artifacts that the report would have identified and generated this report.

Q.   So basically, the FBI made a copy of the data on the phone; is that right?

A.   That's correct, they did, yes.

REDACTED TRANSCRIPT

JA544

MARK ZIMMERMAN - DIRECT EXAMINATION

Q.   Was the data in the extraction what the FBI was searching?

A.   Yes.

Q.   Was the data in the extraction what you yourself were searching?

A.   Yes.

Q.   And you mentioned this was a Cellebrite report.  Super generally, what is Cellebrite?

A.   So Cellebrite is a software that's used to search a phone or to look at data within a phone.

Q.   You mentioned when you were first talking about this exhibit that there were some dates and you had date parameters. Can you explain more about that?

A.   Of course.  So I -- I referenced before the time frame. And so this report was run September 6th, 2019, 11 p.m. to September 7th, 2019, 4 a.m.  And so that time range is what was used to generate this report.

THE COURT:  Where do you see those dates?

THE WITNESS:  Well, I know from running this, and if No. 3 is the first one sequentially that's identified, 9/6/2019, 11:23:31 p.m.

BY MS. ALLISON:

Q.   And so to be clear, are you pointing to the date and time in the time stamp column here?

A.   Yes.

MS. ALLISON:  You can zoom out, Ms. Richart.

REDACTED TRANSCRIPT

JA545

BY MS. ALLISON:

Q.   Are you, yourself entering the start date and end date of the search that you wanted to do here?

A.   Yes.

Q.   Why did you choose that date range to search?

A.   It was relevant to the events of that night.

Q.   And I want you to explain just a few of the things that we see here.  So there's -- the first column says Type?

A.   That's correct.

Q.   What does that mean, Type?

A.   So the software identifies some type of activity, whether it be a call log or instant message.  It's -- what -- it interprets the data and gives it a label, calls it Type, and then direction, if it's a communication, it's going to be Incoming and Outgoing, if you move over from the left to the right.

Q.   So basically, from the start date and the end date, this is all of the stuff that the FBI grabbed from the data; is that the case?

A.   The report of that stuff, in that time frame, yes, for that timeline.

Q.   Okay.  And the time stamp column, I believe you already explained that, but can you explain how this time stamp is generated?

A.   Of course.  Cellebrite identifies that date and time, and

JA546

it's put in that time stamp column.

Q.   The next column says Party; what does that mean?

A.   So if it's a communication, or for instance -- for No. 3, for example, a call log, it's To or From, so a party of that communication.

Q.   So it actually gives the phone number of who it's to or from?

A.   That's correct.

        MS. ALLISON:  And Ms. Richart, can you zoom in on the Description column?

BY MS. ALLISON:

Q.   There's a whole bunch of stuff here.  Can you explain in layman's terms what is showing up in this Description column?

A.   So this is the data that the Cellebrite program -- when I gave it that parameter, it's the data that I dumped in here for a description of that item.

Q.   Okay.  And super generally, it says source file.  What's a source file?

A.   So it's a file contained on the phone somewhere, so the program would have taken information from that file.

        MS. ALLISON:  Thank you, Ms. Richart.  You can zoom back out.

BY MS. ALLISON:

Q.   And again, did you, yourself generate this report that we're looking at?

REDACTED TRANSCRIPT

JA547

MARK ZIMMERMAN - DIRECT EXAMINATION

A.    I did.

MS. ALLISON:  The government offers into evidence Exhibit 44.

THE COURT:  I think it's admitted already.  Thank you.

MS. ALLISON:  Thank you.

You can take that down, Ms. Richart.

BY MS. ALLISON:

Q.    I'm going to turn now to those WhatsApp messages that Defendant Vanderpool left for his friend.  First of all, remind us where they were found.

A.    So they were found on Martique Vanderpool's cell phone.

Q.    Were you able to identity the person the defendant was messaging with?

A.    Yes, the messages were with Denton Washington, also referred to as Denny Washington.

Q.    As part of your investigation, were you able to figure out what Mr. Washington did for a living?

A.    Yes, he was a former Prince George's County police officer.

Q.    Could you tell from listening to the messages how Mr. Vanderpool and Mr. Washington actually used WhatsApp to communicate?

A.    Yes.  So the WhatsApp feature has a feature in it, you can make a phone call or you can do voice mail messages.  And so for example, Mr. Vanderpool would have communicated by sending a voice mail message of various lengths, whether it's 20 seconds,

JA548

or five minutes, or ten minutes.  That message would then be sent to Mr. Washington.  Mr. Washington could then listen to it, listen to the topics discussed in the voice mail message and then respond with another voice mail message that he would record and send to Mr. Vanderpool.  And so that exchange of messages is those audio files.

Q.   So rather than written texts, these are actually audio messages back and forth?

A.   That's correct.

Q.   I'd like you to walk us through how those WhatsApps were found.  So you just talked about how the FBI searched the extraction for files around the time of the incident.  Were you able to narrow down that search to audio files?

A.   I was.

Q.   Did you generate a report about these audio files?

A.   I did.

        MS. ALLISON:  Ms. Richart, please pull up what's marked as Government Exhibit 10.

BY MS. ALLISON:

Q.   What is this in Exhibit 10?

A.   So this is a report of audio files in between two dates. The first date on there is September 6th, 2019.

Q.   And are you getting that from the very first row?

A.   Yes.

        MS. ALLISON:  Ms. Richart, can you please highlight

JA549

MARK ZIMMERMAN - DIRECT EXAMINATION

that very first row.

BY MS. ALLISON:

Q.   And Special Agent Zimmerman, can you please circle the date that you're talking about?

A.   Of course.

Q.   Okay.  Can you please read that date.

A.   9/6/2019, 7:36 and 16 seconds a.m.

THE COURT:  Can I interrupt.  All of the time stamps that are in these extraction reports, whether it's Exhibit 44 or this one, are they East Coast time?  I mean, are they the actual time here in Maryland when they occurred, or is there Greenwich Mean Time?  I just want to understand the times.

MS. ALLISON:  Thank you, Your Honor.

BY MS. ALLISON:

Q.   What time zones, Special Agent Zimmerman, are these times that we're seeing in these extraction reports?

A.   Yes, so -- they're East Coast, and they're -- it's designated by UTC minus 4, so that was selected, and that's why they are East Coast times.

THE COURT:  What does UTC minus 4 mean?

A.   Universal time.  I can't recall what the C stands for, but it's Greenwich Mean Time.  If you select New York, for example, it will back off four hours from Greenwich Mean Time.  So these are in East Coast time.

REDACTED TRANSCRIPT

JA550

MARK ZIMMERMAN - DIRECT EXAMINATION

MS. ALLISON:  Thank you, Your Honor.

You can zoom out, Ms. Richart.

BY MS. ALLISON:

Q.    Okay.  So the start time was September 6th of 2019 at 7:36 a.m.  What was the end time?

A.    So if you want to go to the last page, September 9th, 2019.

Q.    Can you please circle that on the screen?

A.    Of course.

Q.    Is that September 9th at 8:59 p.m.?

A.    Yes.

Q.    What do these time and date stamps correspond to?

A.    They correspond to the file name that's listed on the left, which is an audio file.

Q.    And can you please circle that file name that you're talking about?

A.    Yes.

Q.    And can you actually read the file name that you just circled for the record?

A.    Yes, it's PTT-20190909-WA0029.opus, and I actually wrote over the continuation of that file.

Q.    Okay.  So the first part that file name is numbers, 20190909?

A.    That's correct.

Q.    What those numbers correspond to?

A.    The date.

REDACTED TRANSCRIPT

JA551

MARK ZIMMERMAN - DIRECT EXAMINATION

Q.    What date?

A.    September 9th, 2019.

Q.    Is that the date of the WhatsApp file?

A.    Yes.

Q.    And then I see after that the letters WA.  Do you know what these letters mean?

A.    That indicates WhatsApp.

        MS. ALLISON:  You can zoom back out, Ms. Richart.

        And can we go back to the first page.

BY MS. ALLISON:

Q.    Did you, yourself listen to the WhatsApp audio files?

A.    I did.

Q.    And I see here in the very top left --

        MS. ALLISON:  Ms. Richart, can you zoom in on the very top left of this report?  I'm sorry, where it says data files and audio.

BY MS. ALLISON:

Q.    I see the parenthetical (28).  What does the number 28 mean on this file?

A.    So that's the number of audio files contained in this report.

Q.    Okay.  So between the start date and the end date, the search pulled up 28 audio files?

A.    That's correct.

        MS. ALLISON:  You can take that down, Ms. Richart.

REDACTED TRANSCRIPT

JA552

MARK ZIMMERMAN - DIRECT EXAMINATION

BY MS. ALLISON:

Q.   We're going play the WhatsApp files later in the trial, but you can you just tell us generally, does the defendant talk on the WhatsApps about what he did to the 19-year-old woman he stopped on September 6th?

A.   He does.

Q.   While we're talking about the phone, I want to ask you about some other searches.

Did you check for messages sent between Defendant Vanderpool and Officer Dupree, his partner from that night?

A.   Yes.

Q.   How did you do that, in layman's terms?

A.   So in reviewing the data from the phone, there's a search feature to look at instant messages and call communications, and so I reviewed that data.

Q.   When you were doing this search for messages between Mr. Vanderpool and Mr. Dupree, did you find anything of note for your investigation that happened on September 17th of 2019?

A.   I did.

Q.   Very generally, what did you find?

A.   Mr. Vanderpool sent a photograph of a computer screen that displayed the report from that night that involved Ms. Stewart. That image file was sent from Mr. Vanderpool to Mr. Dupree.

MR. ZAMPOGNA:   Your Honor, can I just object to the

REDACTED TRANSCRIPT

JA553

use of "Mr. Vanderpool?"  I know it's his phone; could we just say it's his phone.

THE COURT:  Yeah, objection is sustained.

Let's characterize exactly what was observed, not the witness' characterization of what he thinks it was.

MS. ALLISON:  Yes, Your Honor.

BY MS. ALLISON:

Q.   And so Special Agent Zimmerman, just referring to the phones rather than to people --

A.   Of course.

Q.   -- what went from Mr. Vanderpool's phone to Mr. Dupree's phone on September 17th?

A.   An image file that showed a photograph of a computer screen, displaying Ms. Stewart's narrative of her report.

Q.   When you were doing the search, did you also find anything of note for your investigation that happened on October 6th of 2019?

A.   I did.

Q.   And referring to phones and not people, generally, what did you find?

A.   The same thing.  That same image file was sent from the phone to a phone associated with Mr. Dupree.

Q.   Was it -- whose phone was it sent from?

A.   Mr. Vanderpool's phone.

Q.   Okay.  Let's start with September 17th.  About how many

REDACTED TRANSCRIPT

JA554

days after the incident was this?

A.   Eleven.

Q.   Let's pull up now Government Exhibit 11A.

What is this?

A.   So this is the Cellebrite extraction report that was generated based on instant messages on that particular day.

MS. ALLISON:  Ms. Richart, can you please --

THE COURT:  Can you pause?

MS. ALLISON:  Yes, Judge.

THE COURT:  Do I have 11A?  I have 11, which is several pages long, and then I go to 12.  What am I missing?

MS. ALLISON:  I'm sorry about that, Your Honor.

THE COURT:  Hold on.

MS. BERNSTEIN:  Judge, can you check behind 11 and see if there's 11A there?

THE COURT:  Hold on.

I see 11A without a tab, yes.

Okay.

BY MS. ALLISON:

Q.   Okay.  So remind us again, super generally, what are we looking at in 11A?

A.   These are instant messages on 9/17/2019.

MS. ALLISON:  Ms. Richart, please zoom in on the top left of this page, where it says Instant Messages.

REDACTED TRANSCRIPT

JA555

BY MS. ALLISON:

Q.   I see the number 79 here.  What does the number 79 mean?

A.   So it identified 79 instant messages on this report.

Q.   Okay.  And who would those instant messages have been to and from?  Referring to phones and not people.

A.   Of course.  So it would have been from Mr. Vanderpool's phone to the phone associated with Mr. Dupree and others.

MS. ALLISON:  You can zoom back out.  Thank you, Ms. Richart.

THE COURT:  Wait; and others?  I thought that was just between Vanderpool phone and Mr. Dupree, or do you mean, perhaps, a group chat in which Mr. Dupree and others are on it?

THE WITNESS:  There are communications that if -- are listed as other individuals as well.

BY MS. ALLISON:

Q.   So Special Agent Zimmerman, you were filtering for messages between Vanderpool's phone and Dupree's phone.  As part of that process, did you also grab some messages that included other people in addition to those phones?

A.   I was filtering for instant messages on that day, all of them, and that included these contacts that we're talking about.

BY MS. ALLISON:

Q.   Okay.

MS. ALLISON:  Thank you, Judge.

REDACTED TRANSCRIPT

JA556

MARK ZIMMERMAN - DIRECT EXAMINATION

BY MS. ALLISON:

Q.    So if we're looking at the Source column --

MS. ALLISON:  Ms. Richart, can you please highlight that?

BY MS. ALLISON:

Q.    What does the Source column mean in this document?

A.    So it's an instant messaging service.  It's a service that Cellebrite report recognizes to fit in the category of an instant message.

MS. ALLISON:  You can zoom back out.

BY MS. ALLISON:

Q.    The next column is From.  What does the From column mean?

A.    From the phone number.

Q.    Same thing, the next column is To.  What does that mean?

A.    The phone number for -- associated with Dupree.

Q.    Okay.

MS. ALLISON:  Can you please zoom in on the time stamps column?

BY MS. ALLISON:

Q.    What do these time stamps correspond to?

A.    So that line item.  So that corresponds to the No. 1 line item, that time stamp date and time.

Q.    So does it correspond to the time of the message in that row?

A.    Yes.

REDACTED TRANSCRIPT

JA557

Q.   And same question with this; with this extraction report, is the time that we're looking at Eastern Time?

A.   It is.

MS. ALLISON:  You can zoom back out.

Can you please highlight the Content column.

BY MS. ALLISON:

Q.   We're going to talk about some specific messages, but just generally, what are we looking at in this Content column?

A.   So the Content column lists the direction of the message and then the con- -- basically, the text in the message under Body.

Q.   Okay.  So when it says Direction:  Outgoing, what does this mean?

A.   From the phone in question to whatever party's listed in the To column.

(Reporter requesting clarification.)

A.   I'm sorry, the party listed in the To column.

BY MS. ALLISON:

Q.   Same thing, the Body.  What does the Body mean?

A.   The body is the -- the text of the communication.

MS. ALLISON:  You can zoom back out.

BY MS. ALLISON:

Q.   Let's turn to page 7 of this report.

MS. ALLISON:  Ms. Richart, please zoom in on row 6.

REDACTED TRANSCRIPT

JA558

BY MS. ALLISON:

Q. All right. What are we looking at in row 6?

A. So this is a message, and it's from the phone number that ends with 4354, which is known to be associated with -- the phone associated with Martique Vanderpool. It's to the phone number associated with Dupree. You can see the time stamp of 9/17/2019 at 3:24:40 p.m. And the body of the message reads, Why Tf is sheriff's at my house.

Q. Okay. So this is from Mr. Vanderpool's phone to Mr. Dupree's phone?

A. That's correct.

Q. You said, the body says, Why Tf is sheriff's at my house?

A. Yes.

Q. Do you know what Tf means?

A. In texting form? The fuck.

Q. And can you circle the date and time of that message?

A. (Complying.)

Q. So for the record, you circled 9/17/2019 at 3:24 p.m.

A. Yes.

Q. Okay. Let's go now to page 10.

MS. ALLISON: And Ms. Richart, please zoom in on row 11 on this page.

BY MS. ALLISON:

Q. Okay. Is there a message back from Mr. Dupree's phone to Mr. Vanderpool's phone here?

REDACTED TRANSCRIPT

JA559

A.   There is.

Q.   What is the date and time of this message?

A.   9/17/2019.  03:31:32 p.m.

Q.   Is that about seven minutes later?

A.   Yes.

Q.   What does the message say from Mr. Dupree's phone to Mr. Vanderpool's phone?

A.   This shit is too much Bro.

Q.   Let's turn to page 11.

     MS. ALLISON:  Ms. Richart, please highlight row 12.

BY MS. ALLISON:

Q.   Is this another message from Mr. Dupree's phone to Mr. Vanderpool's phone?

A.   This is.

Q.   What is the time of this message?

A.   9/17/2019 at 3:31 and 30 seconds -- 36 seconds p.m.

Q.   So both of these messages were at 3:31 p.m.?

A.   That's correct.

Q.   What does this message say?

A.   "Don't know."

Q.   Did that appear to be in response to, Why the fuck is sheriff's at my house?

A.   Yes.

Q.   Let's go to page 13.

     MS. ALLISON:  Ms. Richart, please highlight row 16.

REDACTED TRANSCRIPT

JA560

MARK ZIMMERMAN - DIRECT EXAMINATION

BY MS. ALLISON:

Q.    What do we see in row 16?

A.    So in this row, there is an outgoing message that includes the image that's in the right-hand side of this display.  It's to the phone number associated with Dupree from the phone associated with Mr. Vanderpool.

THE COURT:  Why are the blank -- why are the two columns empty?  I don't see a number in the second column on page 13, row 16.

MS. ALLISON:  Can we zoom back out so we can see the full screen for a moment, Ms. Richart?

THE COURT:  So do you know, Agent Zimmerman?

THE WITNESS:  I don't know, ma'am -- Your Honor.  When the report is run, that's the product that is provided.  I don't know why there's nothing in there.

MS. ALLISON:  Can we go back briefly to page 1 of this Exhibit, Ms. Richart?

BY MS. ALLISON:

Q.    And so the columns that are blank, the first is the Source column; is that right?

A.    That's right.

Q.    Okay.  And remind us, what does the Source column mean?

A.    So it's describing the source of the data that was gathered by the report.

Q.    In layman's terms, what does that mean, what does

REDACTED TRANSCRIPT

JA561

MARK ZIMMERMAN - DIRECT EXAMINATION

IMS service mean?

A.    The messaging service.

Q.    Okay.  Same thing, what do we see in some of the From columns?

A.    Phone numbers.

            MS. ALLISON:  Let's turn back now to page 13, row 16.

BY MS. ALLISON:

Q.    Okay.  And so do we see anything in this second column here?

A.    So we see 16, and then the next two columns are blank.

Q.    Okay.  Who -- can you circle who the message is to, whose phone?

A.    Of course.

Q.    What direction did it say this message was going?

A.    Outgoing.

Q.    And whose report -- when were you generating this Cellebrite report, was it material from whose phone?

A.    Mr. Vanderpool's phone.

Q.    Okay.  And so this is showing it's an outgoing message from material dumped from Mr. Vanderpool's phone?

            MR. BLUESTONE:  Objection; leading.

            THE COURT:  Sustained.

BY MS. ALLISON:

Q.    Can you explain generally what Outgoing means here in this particular report?

JA562

A.   Yes.  So the phone is analyzed would be the phone associated with Mr. Vanderpool.  So "Direction:  Outgoing" would indicate that there's a -- something is outgoing from the phone in question, and so that's what this is identifying.  So this was sent from the phone.

MS. ALLISON:  Ms. Richart, can you please highlight the image file we see in the last column?

Zoom in on, please.

BY MS. ALLISON:

Q.   What is the file name that we're looking at here, Special Agent Zimmerman?

A.   File name is Resized_20190917_174427.jpeg.

Q.   And is this image pretty small and blurry in this document?

A.   Yes, it is.

Q.   Did you resize the image?

A.   So I opened the file that's listed in this report, and that allowed a viewable form of this image.

MS. ALLISON:  Let's turn to page 32.

BY MS. ALLISON:

Q.   What is this on page 32?

A.   This is that image file.

Q.   What is this an image of?

A.   So this is case details related to Ms. Stewart's stop, and I know that -- I'm familiar with the case folder number, 19-0052405.

MARK ZIMMERMAN - DIRECT EXAMINATION

So this is information related to the stop that night.

Q.   Can you please circle the case folder number you just read?

A.   Yes.

THE COURT:  Who took this picture?

THE WITNESS:  This was on the phone, Your Honor.

THE COURT:  Okay.

BY MS. ALLISON:

Q.   And when you say, This was on the phone, whose phone was it on?

A.   Martique Vanderpool's phone.

Q.   For the record, you circled the case folder number towards the top left of the page?

A.   I did.

Q.   What did you say about this case folder number?

A.   So that's associated with Ms. Stewart's stop that night and the report.

Q.   Let me remove that circle.

Are you able to tell what date and time this photo was taken?

A.   Well, I can tell you what's displayed on the computer screen, and that time is 5:44 p.m. on 9/17/2019.

MS. ALLISON:  Thank you, Ms. Richart.  You can zoom back out.

BY MS. ALLISON:

Q.   Does this appear to be a photo of a computer or laptop?

REDACTED TRANSCRIPT

JA564

A.   Yes.

THE COURT:  Can we pause.  Where did you see the time that the photograph was taken; can you direct me?

THE WITNESS:  Of course.  The bottom right of the screen, and -- I know we zoomed in a minute there to make it a little bit more clear.

MS. ALLISON:  Yes.

THE COURT:  Oh, I see.

MS. ALLISON:  Ms. Richart, can you highlight -- or zoom in on that again?

Thank you.

And for the record, this is towards the bottom right of the screen on page 32.

THE COURT:  So the time you've determined is because that's what the computer says in the picture, and -- but not from the Cellebrite extraction, correct?

MS. ALLISON:  Correct.

THE WITNESS:  That's correct.  The time and date that I see there is just the time and date in the image itself, that's correct; that's what I'm reading.

THE COURT:  All right.

THE WITNESS:  The report itself has a time and date as well.

MR. BLUESTONE:  We'll object to that as being hearsay within hearsay, Your Honor.

REDACTED TRANSCRIPT

JA565

MARK ZIMMERMAN - DIRECT EXAMINATION

THE COURT:  Overruled.  The picture says what the picture says.

MS. ALLISON:  Let's go back now to page 14.

Ms. Richart, please highlight row 18 on this page -- or zoom in on.

BY MS. ALLISON:

Q.   Is this an ingoing or an outgoing message from Mr. Vanderpool's phone?

A.   It's an outgoing message.

Q.   Who is the message to?

A.   The phone number associated with Dupree.

MS. ALLISON:  And Ms. Richart, can we zoom in on the attachment in this file.

BY MS. ALLISON:

Q.   What is the file name here?

A.   Resized_20190917_174514.jpeg.

Q.   Is this image also pretty blurry and tiny here?

A.   It is.

Q.   Were you able to obtain a bigger, more clear image file?

A.   So I opened that image file, and I was able to see it displayed on the screen once I did that.

MS. ALLISON:  Let's zoom back out.

BY MS. ALLISON:

Q.   Now, for this image file, what time was this one sent?

A.   So the time stamp on this one was 9/seven- -- thank you; if

JA566

you can zoom in.  9/17/2019 at 05:49:30 p.m.

Q.    And remind us, that last image file we were looking at, was that also sent at 5:49?

A.    I would want to go back to confirm.

        MS. ALLISON:  Let's go back to page 13, row 16, and please highlight the time stamp there.

A.    It was, yes.

BY MS. ALLISON:

Q.    Okay.

        MS. ALLISON:  Let's turn to page 34.

BY MS. ALLISON:

Q.    What is this?

A.    So this is the narrative of the night Ms. Stewart was stopped.  This is the narrative portion.  So similar to the photograph from a minute ago that we just described, this is a photograph of a computer screen that displays that narrative.

Q.    How can you tell it's the narrative from that night?

A.    I'm familiar with the report and the narrative in the report, and I know that that matches.

Q.    After this image was sent, was there any message from Mr. Dupree's phone to Mr. Vanderpool's phone?

A.    Yes.

        MS. ALLISON:  Let's go to page 15.

        Ms. Richart, please zoom in on row 20.

REDACTED TRANSCRIPT

JA567

BY MS. ALLISON:

Q.   And was this an incoming message or an outgoing message?

A.   This was incoming.

Q.   Who was the message from, whose phone?

A.   The phone associated with Dupree.

Q.   What does the message say?

A.   Copy.

Q.   Can you please circle where you see that?

A.   (Complying.)

Q.   So that's in the last column?

A.   Yes.

Q.   What time was this message sent?

A.   5:50:01 p.m.

Q.   Was this about one minute after the image files were sent?

A.   About 30 seconds, yes.

Q.   Okay.

     MS. ALLISON:  You can take that down, Ms. Richart, thank you.

BY MS. ALLISON:

Q.   So remind us, what was the date of the messages we were just looking at?

A.   September 17, 2019.

Q.   Do you know of anything else that happened on September 17th of 2019?

A.   I do.

REDACTED TRANSCRIPT

JA568

Q.    What else happened that day?

A.    So there was a letter from Fairmount Heights Police Department's Chief to Prince George's County Police Department, asking for an investigation into the conduct of Mr. Vanderpool.

MS. ALLISON:  Can we have up on the screen government Exhibit 13?

BY MS. ALLISON:

Q.    Is this the letter you were just describing?

A.    This is.

Q.    What's the date we see in the top left corner of the letter?

A.    September 17th, 2019.

Q.    And who is the letter to?

A.    Chief Henry Stawinski III at Prince George's County Police Department.

A.    Who is the letter from?

A.    Stephen Watkins, Chief of Police for Fairmount Heights Police Department.

Q.    Which officer is the Fairmount Heights Chief asking P.G. County to investigate?

A.    Martique Vanderpool.

MS. ALLISON:  Thank you.  You can take that down.

BY MS. ALLISON:

Q.    Turning away from September 17th, you mentioned there was another message related to this case on October 6th; is that

REDACTED TRANSCRIPT

JA569

MARK ZIMMERMAN - DIRECT EXAMINATION

right?

A.   Yes.

Q.   Did you do a similar filter search for that day?

A.   I searched for instant messages, the same search, on that particular day, yes.

         MS. ALLISON:  Can we please have up Government Exhibit 12?

BY MS. ALLISON:

Q.   What is this?

A.   This is that search.

Q.   Did you yourself generate this report as well?

A.   I did.

Q.   Did you find messages on this date from Mr. Vanderpool's phone to Mr. Dupree's phone?

A.   I did.

Q.   Did you find any messages back from Mr. Dupree's phone on this date?

A.   I did not.

         MS. ALLISON:  Can we zoom in on this very first row?

BY MS. ALLISON:

Q.   Who is the message from and to?  Referencing phones.

A.   The "From" is from Mr. Vanderpool's phone, and the "To" is to the phone number associated with Dupree.

Q.   What did the message to Mr. Dupree's phone say?

A.   The report for that chick, the traffic stop and detention

JA570

MARK ZIMMERMAN - DIRECT EXAMINATION

only lasted an hour, and she was sent on her way.

Q.   What were the date and time that this message was sent?

A.   10/6/2019 at 06:57:53 p.m.

Q.   And again, for this report, is this 6:57 p.m. Eastern Time?

A.   Yes.

MS. ALLISON:  Let's turn to page 3.  Please zoom in on row 4?

BY MS. ALLISON:

Q.   Is this also a message to Mr. Dupree's phone?

A.   This is.

Q.   What is the time of this message?

A.   6:57:58 p.m.

Q.   Was the last message 6:57 as well?

A.   Yes.

Q.   What was sent in this message?

A.   So the image file included is the same image file of the narrative of the night Ms. Stewart was stopped.

Q.   Did you also pull up a bigger, more clear version of this image file?

A.   I did.

Q.   How did you do that?

A.   I opened the image file that's referenced here.

MS. ALLISON:  Let's go to page 6.

BY MS. ALLISON:

Q.   Is this that image file?

REDACTED TRANSCRIPT

JA571

MARK ZIMMERMAN - DIRECT EXAMINATION

A.    It is.

Q.    And remind us, super generally, what we're looking at here?

A.    So this is the narrative from Ms. Stewart's police report. I'm familiar with the police report, so I'm familiar with that narrative, and at the bottom, you can see, Current User: Vanderpool, Martique.

Q.    Can you highlight what you're talking about at the bottom there?

A.    Of course.

      I can circle it.

Q.    Circling would be great, yeah.

A.    (Complying.)

      MS. ALLISON:  So for the record, the witness has circled, above the word "Panasonic," the words, "Current User: Vanderpool, Martique."

      Let's go back now to page 4.

      Please zoom in on row 6.

BY MS. ALLISON:

Q.    Is this another message to Mr. Dupree's phone?

A.    This is.

Q.    What does this message say?

A.    Traffic stop was at 11:22 p.m.  It was coded at 12:31 a.m.

Q.    What time was this message sent?

A.    6:59:24 p.m.

      MS. ALLISON:  You can zoom back out, Ms. Richart.

REDACTED TRANSCRIPT

JA572

Case 8:23-cr-00234-DLB    Document 150    Filed 11/27/24    Page 95 of 247

95

MARK ZIMMERMAN - DIRECT EXAMINATION

BY MS. ALLISON:

Q. Were those the relevant messages you found for October 6th, 2019?

A. Yes.

MS. ALLISON: Thank you. You can take that down, Ms. Richart.

BY MS. ALLISON:

Q. All right. I want talk about training for just a moment. Generally, what training did Mr. Vanderpool need to have in order to be a Fairmount Heights police officer?

A. He had to attend an accredited police academy.

Q. Did the FBI talk to people who trained the defendant at the academy in Virginia?

A. Yes.

Q. Was one of those people instructor Lyla Zeidan?

A. Yes.

Q. Do you know if Ms. Zeidan has been subpoenaed to testify at this trial?

A. She has.

Q. Did the FBI also talk to people who trained the defendant at Metro Transit Police Academy in Maryland?

A. Yes.

Q. Was one of those people Officer Doniese Collins?

A. Yes.

Q. Do you know if Ms. Collins has been subpoenaed to testify

REDACTED TRANSCRIPT

JA573

at this trial?

A.   Yes, she has.

Q.   All right.  Let's switch gears and focus on a few general orders.

MS. ALLISON:  Ms. Richart, please pull up Government Exhibit 19.

BY MS. ALLISON:

Q.   Generally, what is this?

A.   This is Fairmount Heights Police Department General Order. The subject is Prisoner Searches and Transportation.

MS. ALLISON:  Ms. Richart, please turn to page 5.

And zoom in on paragraph 2.

BY MS. ALLISON:

Q.   Special Agent Zimmerman, please read this paragraph.

A.   In all transport situations, the transporting officer will give the vehicle's odometer mileage, the beginning location, and the destination to the dispatcher via the police radio.  At the conclusion of the transport, the transporting officer will give the ending vehicle's mileage and destination.

MS. ALLISON:  Please pull up now Government Exhibit 21.

BY MS. ALLISON:

Q.   What is Government's Exhibit 21?

A.   Fairmount Heights Police Department General Order, and the subject is Conduct of Members of the Department.

REDACTED TRANSCRIPT

JA574

MS. ALLISON: And Ms. Richart, please turn to page 5. And zoom in on section 22.

BY MS. ALLISON:

Q. Special Agent Zimmerman, please read the first sentence of section 22.

A. No officer shall knowingly make or cause to be made any omission or false, inaccurate, or improper entries in any official records, forms, or reports.

MS. ALLISON: You can take that down.

Please put on the screen Government Exhibit 16.

BY MS. ALLISON:

Q. What is this?

A. Fairmount Heights Police Department General Order related to incident reporting.

MS. ALLISON: Ms. Richart, please zoom in on the first paragraph, I(A).

BY MS. ALLISON:

Q. Please read this paragraph.

A. Written police reports and documentation concerning police activities are essential in meeting the management, operational, informational, and budgetary need of the Fairmount Heights Police Department. Officers of the Department must be aware of and properly complete all required reports and paperwork as prescribed. This General Order establishes procedures concerning how police information is to be received, recorded,

REDACTED TRANSCRIPT

JA575

and documented.

MS. ALLISON:  Okay.  We can zoom back out.

Ms. Richart, please zoom in now on paragraph I(C).

BY MS. ALLISON:

Q.   Special Agent Zimmerman, please read that paragraph.

THE COURT:  Please read slowly.

THE WITNESS:  Of course.

A.   Officers of this Department will initiate a Fairmount Heights Incident Report on all dispatched calls or events discovered on patrol in accordance with this General Order.

MS. ALLISON:  Let's turn now to page 6 of this Exhibit.

Ms. Richart, please zoom in on the very first sentence on this page.

BY MS. ALLISON:

Q.   Please read that sentence.

A.   Report narratives will be accurate and will describe exactly what happened if known to the writer.

MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

BY MS. ALLISON:

Q.   Is there an incident report about this matter with the defendant's name on it?

A.   There is.

REDACTED TRANSCRIPT

JA576

MARK ZIMMERMAN - DIRECT EXAMINATION

MS. ALLISON:  Ms. Richart, please pull up Government Exhibit 1.

BY MS. ALLISON:

Q.   What is this?

A.   This is the incident report related to the stop of Raynna Stewart.

Q.   Who actually pulled this report from the system?

A.   Prince George's County Police Department.

Q.   What system did they pull it from?

A.   I believe it was the RMS, Record Management System.

Q.   Who did they provide this report to?

A.   Special Agent Hung, and then she forwarded it to me.

Q.   What is this report called, at the very top of the page?

A.   This is the Fairmount Heights Police Department Incident Report.

MS. ALLISON:  Ms. Richart, please zoom in on the top section.

BY MS. ALLISON:

Q.   What is the date and time next to the words, "Occurred On"?

A.   9/6/2019 at 11:22:54 p.m.

Q.   To the left of that, what is the location given for the incident?

A.   Sheriff Road Eb/Cabin Branch Drive.

Q.   Back to the right column, what appears next to the words, "Entered By"?

REDACTED TRANSCRIPT

JA577

A.    Entered by Vanderpool, Martique, No. 9359.

Q.    To your knowledge, what do the numbers 9359 mean?

A.    That's Mr. Vanderpool's Fairmount Heights Police Department identification number.

        MS. ALLISON:  Let's turn to page 2.

        Ms. Richart, please zoom in on the top section.

BY MS. ALLISON:

Q.    Does the report notes Ms. Stewart's build?

A.    It does.

Q.    What was her your build on this report?

A.    Thin/small.

Q.    Let's turn to page 4.

        Generally, what are we looking at on page 4?

A.    So this is the incident report.  This is the section -- the narrative section of that report.  So that bottom portion is the narrative section associated with the stop of Ms. Stewart.

        MS. ALLISON:  Ms. Richart, can you please zoom in on the narrative section?

BY MS. ALLISON:

Q.    Special Agent Zimmerman, please read this narrative section.

A.    On 9/6 -- on 9/6/2019, at approximately 11:22 hours, I was conducting stationary radar as a two-man unit with Officer Dupree, No. 9360, at 61st Avenue and Sheriff Road, when I observed a blue Ford Mustang bearing D.C. registration GB7058

REDACTED TRANSCRIPT

JA578

enter my radar enforcement zone while speeding in a posted 40 mile per hour zone.  There were no other cars traveling that direction or in my visual sight where I was aiming/pointing the radar unit.

I conducted a traffic stop on this vehicle.  The driver was the only occupant of the vehicle and initially advised that she did not have a driver's license and that she left it at home. She was later identified as Raynna Stewart via her Maryland learner's permit.  When notified that her vehicle may get impounded, she became erratic.  She was removed from the vehicle because of her erratic loud shouting/cursing.  She then got out of the vehicle and would not obey my commands or Officer Dupree's commands to reframe [sic] from cursing and yelling and to stop running into the middle of the street.  She would not sit still as ordered and began yelling while on the sidewalk, then ran back into the street, almost getting hit by a large truck.  Cars had to cross the yellow center dividing line in order to reframe from hitting her.  Bystanders/citizens who were walking appeared to be disturbed by her behavior and ended up having to cross the street to avoid her.  She was placed in handcuffs to restrain her.  She then began to banging her head on the exterior of her car really hard while calling herself stupid.  She did this several times.  She was issued the appropriate traffic citations as well as a criminal citation, No. 092002 -- 22539- -- 3965.  I'm going to read that number one

REDACTED TRANSCRIPT

JA579

more time.  No. 092002235965 [sic] for disorderly conduct.  The registered owner picked up the vehicle, and Ms. Stewart was released and sent on her way.

(Reporter requesting clarification.)

A.  Of course.  No. 092002253965.

And the last sentence is, All events occurred in Prince George's County, Maryland.

BY MS. ALLISON:

Q.  Thank you, Special Agent Zimmerman.

Does the narrative itself contain the name, Officer Vanderpool?

A.  It does not.

Q.  Is it written in first person or third person?

A.  First person.

Q.  According to the report, who was the reporting officer working with at the time of the traffic stop?

A.  According to the report, the reporting off- -- Officer Dupree was working with Mr. Vanderpool at the time of this stop.

I'm sorry, can you repeat the question?

Q.  Sure.  So according to the report, who was the reporting officer, the "I" in this report, working with?

A.  Martique Vanderpool, thank you.

Q.  Who was he working with at the time of the traffic stop?

A.  Officer Dupree.

REDACTED TRANSCRIPT

JA580

Q.   According to the defendant's statements at that prior proceeding, who was the officer working with Dupree that night?

A.   Martique Vanderpool.

Q.   Does the report say anything about Ms. Stewart's car being towed?

A.   It does not.

Q.   Does it say anything about her being transported from the scene of the traffic stop?

A.   It does not.

Q.   Does it say anything about going to the tow lot to have the car returned to Ms. Stewart?

A.   No.

Q.   What does it say happened to the car?

A.   It says, The registered owner picked up the vehicle.

MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

Nothing further for this witness, Your Honor.

THE COURT:  Okay.  Cross-examination?

MR. ZAMPOGNA:  Can I just have five minutes to -- or not, Your Honor.

THE COURT:  Sure, you can have five minutes.

We'll take a five-minute recess.

MR. ZAMPOGNA:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

JA581

(Recess taken from 12:13 p.m. - 12:23 p.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Please be seated.

Okay.  Mr. Zampogna, cross-examination of Agent Zimmerman.

MR. ZAMPOGNA:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ZAMPOGNA:

Q.   Good afternoon, Agent Zimmerman.

A.   Good afternoon.

Q.   I have a few questions for you today.

You've been an FBI agent for about 21 years; is that accurate?

A.   That's correct, over 21 years.

Q.   And you've generated a lot of work in this case; is that accurate?

A.   I have generated a lot of work in this case, yes.

Q.   And there's been an investigation here maybe spanning three years, at least?

A.   It came to us in February of 2020.

Q.   And there was many interviews, there was even search warrants issued in this case?

A.   There were, that's correct.

Q.   And several -- there's -- you probably created at least 10

REDACTED TRANSCRIPT

JA582

302s yourself, about?

A.    I've created 302s.

Q.    Okay.  So we're here today on just one charge after that investigation of 18 U.S.C. 1519; is that correct?

A.    One charge today, that's correct.

Q.    And in one of the prior -- prior to today, there was a search warrant that was issued; isn't that correct?

A.    Yes.

Q.    And were there mistakes in that search warrant?

A.    Yes.

Q.    And you created an affidavit related to that?

A.    I did.

Q.    And in that affidavit, you admitted there were some mistakes made; is that correct?

A.    There were mistakes in the investigation, yes, that's correct.

        (A following portion is sealed by order of the Court and is contained in a sealed transcript.)

BY MR. ZAMPOGNA:

Q.    In addition to the -- in addition to what we have just spoken about, you created, as I said some, 302s; is that correct?

A.    Yes.

Q.    And in one case, you interviewed Mr. Washington; is that accurate?

A.    That's accurate.

Q.    And you also interviewed Sergeant Ahn, David Ahn?

A.    I believe so, yes.

Q.    And a Moore, Police Chief Moore?

A.    Yes.

Q.    And Watkins as well?

A.    I never interviewed Watkins.

Q.    Okay.  And in Mr. Washington's 302, you indicated that --

          MS. ALLISON:  Objection; calls for hearsay.

          THE COURT:  Overruled.

BY MR. ZAMPOGNA:

Q.    You indicated that he said to you that he -- that there were still tickets written after having sex with her; is that accurate?

A.    I always would like to see my 302 --

Q.    Sure.

A.    -- if I'm going to refer to a 302.

Q.    Okay, hold on; let me get that.

          MR. ZAMPOGNA:  Sorry, Your Honor; I have to pull it up, here.

          THE COURT:  Mr. Zampogna, are you seeking to introduce statements in this 302 to prove the truth of the matter in the statements?

          MR. ZAMPOGNA:  No, I just -- I was wanting to -- well, I wanted to know if he interviewed this individual and what he

JA584

said that --

THE COURT:  What the person said?

MR. ZAMPOGNA:  Yes.

THE COURT:  Why isn't that hearsay?

MR. ZAMPOGNA:  It would be, Your Honor, yes.  I won't ask that question.  Thank you, Your Honor.

BY MR. ZAMPOGNA:

Q.   Was there also anything in the interview that you spoke to him about the context of the -- that is, Mr. Williams' -- I'm sorry, Mr. Washington's context of the -- which we haven't heard yet -- WhatsApp messages?

A.   I'm sorry, can you ask the --

Q.   Well, he exchanged quite a few exchanges with -- potentially with Mr. Vanderpool.  Do you recall if there was any discussions as to what these interviews were about related to women; were there nicknames?

A.   There were communications exchanged, and he acknowledged that.  Is that what you're asking, the context of those?

Q.   Yes, yes.

A.   Women were discussed during those communications.

Q.   Did they have nicknames?

A.   Yes, some of them did.

Q.   Okay.  And then in Sergeant Ahn's -- or Ahn; I may be mispronouncing it -- it was a 302 you wrote 2/5/2024.  This was related to the search warrant.  Do you recall how the phone was

REDACTED TRANSCRIPT

JA585

received in that search warrant?

A.   I recall having learned how the phone was received from Mr. Vanderpool; is that what you're asking?

Q.   Do you recall how the agent picked up the phone?  Was it put in an evidence bag, for instance, or not?

A.   I'm sorry, are you talking about the initial seizure of the phone?

Q.   Yes.

A.   Okay.  So I understand that Mr. Vanderpool was leaving his residence, and he was stopped outside of his residence, and then, the phone was taken off him thereafter.

Q.   And where was it placed when it was taken off him; was it put into someone's pocket or was it put into a phone bag?

A.   I don't know if it was put in a phone bag.  It was taken off him later.

Q.   Would it be proper to put it in a phone bag or your pocket?

A.   It depends on the circumstance.  When you say "phone bag," can you clarify?

Q.   Well, I assume it's like an evidence bag, that you would put evidence in an evidence bag.

A.   Eventually a phone will go in an evidence bag, yes.

Q.   Okay.

You wrote in your 302 about your interview with Mr. Moore that there were four individuals working at the police department at the time of the incident?

REDACTED TRANSCRIPT

JA586

MS. ALLISON:  Objection; hearsay.

MR. ZAMPOGNA:  It was his own words as to who was working there.

THE COURT:  I'll overrule the objection for now.

A.   Can I see that 302?

BY MR. ZAMPOGNA:

Q.   Sure.  Well, I can even rephrase it from the 302.

Do you recall if there were four people working in the police station that you learned about during the time of this alleged incident in September 2019?

A.   I don't recall specifically learning that there were four, but as we prepared for today, there were documents that were reviewed which brought my understanding to the number which was filed that I discussed during my testimony.

Q.   And do you recall if one those individuals is deceased?

A.   One of those individuals is deceased, yes.

Q.   Is that Mr. Ivey?

A.   Yes.

Q.   Okay.

(Reporter requesting clarification.)

MR. ZAMPOGNA:  Yes, I-V-E-Y.

BY MR. ZAMPOGNA:

Q.   Did, at any of your interviews, you recall anyone suggesting or yourself learning if Mr. Vanderpool was typing on a computer that evening?

REDACTED TRANSCRIPT

JA587

MS. ALLISON:  Objection; calls for hearsay.

THE COURT:  Overruled.

A.    If I recall during any of the interviews --

Q.    If anyone saw him typing on a computer that evening.

A.    I did not see -- that's right, I do not recall that.

Q.    Did you review the personnel file of Mr. Vanderpool?

A.    I did.

Q.    And did you see if there was any accommodations in there?

A.    I don't rec- -- what type of accommodations?

Q.    Any kind of -- from Officer Ivey or Watkins saying he was a good officer.

MS. ALLISON:  Ob- --

A.    I would have to look at it.

BY MR. ZAMPOGNA:

Q.    Okay.

THE COURT:  "Commendations" or "accommodations"?

MR. ZAMPOGNA:  Commendations, my mis- -- not accommodations, like staying; that's my -- that's my mistake.

THE COURT:  So commendations, like --

MR. ZAMPOGNA:  Commendations, yes, such as --

THE COURT:  Like praise.

MR. ZAMPOGNA:  Yes, praising, yeah.

A.    There may have been.  If you want show me something, I can ...

REDACTED TRANSCRIPT

JA588

BY MR. ZAMPOGNA:

Q.   That's okay.  Do you recall if he was ever reprimanded, that you learned about, that is, Officer Vanderpool, prior to this incident?

A.   Prior to this incident?  I can't recall any instance.

Q.   Do you recall if he was suspended?

A.   I don't recall him being suspended --

Q.   Okay.

A.   -- prior to this incident.

Q.   You testified that you read all the WhatsApp messages; is that accurate?

That you're testifying to today?

A.   You said, I read all the --

Q.   Yes, you read; not you testified to them, but did you read them all?

A.   I listened.  They're audio files.

Q.   Okay.

A.   So I didn't listen to every audio file on the phone, but I listened to the ones in question today.

Q.   Okay.  And they took place, as we believe, either on the 8th or the 9th?

A.   There were audio files, many instances throughout the phone, so there were many, many audio files.  There were some including those dates.

Q.   Okay.  And at no point was there an indication that the

REDACTED TRANSCRIPT

JA589

woman involved in the sex said she did not consent?

A.    So there -- he never said that she did not consent to the sex, if that's what you're asking?

Q.    Yes.

A.    She -- he did not say that, that's correct.

Q.    She was not handcuffed during the sex; is that right?

A.    That's correct.

Q.    Now, in the state trial, there was also testimony read -- or you read some of this testimony in the state trial, is that accurate, today?

A.    From the court proceeding that happened on January 2023, I did --

Q.    The prior proceeding, I should say; I shouldn't say where it was from.  The prior proceeding.  My apologies.

A.    I did read from the transcript --

Q.    Okay, yes.

A.    -- from the court hearing --

        THE COURT:  Let's not talk over each other.
Mr. Zampogna, if you could wait for him to stop, and the same for you, Mr. Zimmerman.

        THE WITNESS:  Yes, ma'am.

        MR. ZAMPOGNA:  Sorry about that.  Thank you, Your Honor.

A.    I'll just repeat, I did read from the hearing that took place on -- in January 2023.

REDACTED TRANSCRIPT

JA590

BY MR. ZAMPOGNA:

Q.    Okay.  You read about there being a -- Ms. Stewart being taken to the ground; is that right?

A.    I'm familiar with a lot of pieces.  I believe that was something that I read in it, yes.

Q.    And then you also read that she was taken to the police station; is that accurate?

A.    Yes.

        MR. ZAMPOGNA:  Could you -- could you pull up the picture of the police station, the entry door photograph that we have?

    (Discussion off the record.)

    I think it's our own -- the entry door.

BY MR. ZAMPOGNA:

Q.    While he's doing that, you've been to the police station at Fairmount Heights, have you not?

A.    I have.

Q.    And when you come to the station, it's not just a police station.  It's in addition, I think as you testified, a municipal building; is that accurate?

A.    That's correct.

Q.    And so within that building, besides the police station, there would be housed, possibly, the Mayor or other individuals that run the municipality?

A.    That's correct.

REDACTED TRANSCRIPT

JA591

Q.    And when you come into the police station -- or I'm sorry, the building itself, there's a main entrance, and as you're walking to the main entrance, there's a door to your right; is that accurate?

A.    That's correct, yes.

Q.    And the door to your right, I believe its nomenclature is Police; is that right?

A.    Yes.

Q.    And that door, have you -- well, strike that.

When you come in that front door, I think you testified earlier to the pictures as well, you come into a general common area; is that accurate?

A.    When you say, When you come into the front door, what I testified was, there was a common area just outside of the double doors of the police department.

Q.    Right.

A.    That's a common area for the building.

Q.    Oh, as you're entering the building; I'm trying change the perspective.

As you're walking into the building.

A.    Okay.  If you walk into the building --

Q.    Yes.

A.    -- there's a little area with the receptionist straight ahead.

Q.    And then, to the right of that, are those the double doors

JA592

you're speaking of?

A.    They're not; you actually have to go through those doors, and then I believe that's the common area that then connects -- that is just outside the police doors.  But once you go into the main area, there's doors to your right, to then go into -- further into the building.

Q.    Okay.  So to the right is not the police department?

A.    No, it is; it's all -- once you go in, there's a police department's on the right as well, but it's a big building, it's a commercial building, so there's other areas (indicating).

Q.    Okay.  So you come in, there's one general area, and then there's a second common area, or a common area, I guess you described it, after that; is that -- am I misstating what you said?

A.    So from what I recall, going into the entry of the building, then there's the receptionist there.  The receptionist is in the entryway.  And then, to the right, when you go through the doors, somewhere -- and I can't remember if it's immediately there or soon thereafter -- is the common area they were describing that's just outside of the police department.

Q.    And then the police department doors you spoke of earlier connect to that common area; is that right?

A.    That's right.

Q.    Okay.  The double doors I think that you tes- --

A.    That's correct, yeah.

REDACTED TRANSCRIPT

JA593

Q.    Sorry, I didn't mean to interrupt.

A.    That's okay.

Q.    So we have a picture I think now of what I was trying to describe earlier, probably inartfully, of when you come in the door, to the right, is that the door you see if you're trying to come in the main entrance of the municipal building?

A.    That is, yes.

Q.    And do you know if that door leads into the police department?

A.    It does.

Q.    Okay.  And do you know how the police department is set up beyond that door?

A.    Well, so the setup of the police department area is consistent with the photographs that were provided earlier.

Q.    Okay.  Well, we can --

        MR. ZAMPOGNA:  Could we bring up one of the -- can you bring up the one that was provided earlier?  I think it was Exhibit 4, I guess.  Yeah.

        MS. BERNSTEIN:  (Indicating.)

        MR. ZAMPOGNA:  Oh, I've got to press this?  Sorry.  I apologize.

BY MR. ZAMPOGNA:

Q.    So this is the picture you're speaking about; is that accurate?

A.    So that's the common area of the police department, yes.

JA594

THE COURT:  For the record this is 4A, right?

MR. ZAMPOGNA:  Yes, Your Honor.  It's Government's 4A, yes.

THE COURT:  Okay.

BY MR. ZAMPOGNA:

Q.    And so what I'm trying to elicit is, behind this -- or I don't know, behind me, if I were staring at it, or if you're staring at it, what's the other direction from those double doors; do you know?

The opposite direction?  If you came to the double doors and you started walking straight, where do you go, if you know?

A.    So as you had indicated, to give you an example, if I'm taking the picture, and it's behind me --

Q.    Yes.

A.    -- so there's a hallway, and there's offices back there. That's part of the police department.

Q.    And those offices are, as you said, occupied by police officers; is that right?

A.    They're for police business.

Q.    For police business.  Do you know if any of those were occupied by the Chief of Police?

A.    Currently?

Q.    Well, at the time or -- when you visited, I guess I'll ask; that's all you can really testify to.

A.    Okay.  The Chief of Police was in one of those rooms.  He

REDACTED TRANSCRIPT

JA595

was, if I recall correctly -- the hall -- this -- he's further down the hall.  There's an office.  He's in that area.

Q.   And there was a picture -- there's a computer in this common room as well; is that accurate?

A.   That's correct.

Q.   And do you know what the name of that computer is?

A.   I know it was provided to me.  I can't recall as I sit here right now.

MR. ZAMPOGNA:  Could you pull up General Order --

BY MR. ZAMPOGNA:

Q.   We're going pull up General Order 82.1.1, Computer Use and Security, which is a general order of the Fairmount Heights Police Department.

THE COURT:  Do we have an Exhibit number?

MR. ZAMPOGNA:  9.  I'm sorry; I think we gave it to you in our binder, I believe.

THE COURT:  Defense Exhibit 9.

Okay.

MR. ZAMPOGNA:  Oh, I'm sorry.  It was -- oh, they did it for me.

Thank you.

BY MR. ZAMPOGNA:

Q.   Have you read this order?

A.   I've seen several orders.  I don't know I don't specifically recall this one.

REDACTED TRANSCRIPT

JA596

Q.    Do you want take some time to take a look at it?

A.    Of course.

THE COURT:  Do you want to hand the witness a copy of it?  It's several pages.

MR. BLUESTONE:  Permission to approach the witness, Your Honor?

THE COURT:  You may.

MR. BLUESTONE:  (Handing.)

THE WITNESS:  Thank you.

A.    I can read through the entire thing, or do you want to reference me to --

BY MR. ZAMPOGNA:

Q.    Well, I was going to ask, do you know if it discusses having a computer in a common area?  Because this is Computer Use and Security.

A.    Okay.  Does it specifically say those words is what you're asking me?

Q.    Yeah, should you have computers secure in common areas, or does it discuss common areas having computers in it?

A.    Okay, I can look through -- through here to see if it discusses common areas.

Q.    Well, we could -- I could pass on to -- does it discuss passwords to be used for computers; do you know?

A.    Again, I can continue working through it.  It does in Security A.  I see it says, Every user must have a unique

REDACTED TRANSCRIPT

JA597

log-in ID, passwords, and security token to access the system and retrieve the record.

(Reporter requesting clarification.)

A.    Password and security token.

Q.    And then later on, it does continue to talk about passwords, indicating that in a portable laptop, a radio call sign name or name of an officer on radio and password could be used to identify the individual?

A.    Okay.  Does that say that in a specific spot?

Q.    Let's see.

Well, before getting to that, do you know what a radio call sign is for an officer?

A.    I do.

Q.    And what is that?

A.    So that would be the unique identifier for the police officer.

Q.    And so each officer, when and how do they use that identifier?

A.    To identify themselves during duty.

Q.    Okay.  And so when you create a password, it might indicate -- they might use that in their password, possibly; is that right?

A.    So if you were to create a password, you could use any information as part of the password.

Q.    And then -- sorry.  And then as for identifying themselves,

JA598

you might use that to identify yourself as an officer in the password -- or in the document or anything in the computer?

A.    It identifies -- could be used in a password.

Q.    Okay.

In that Order, specifically, part II(E), it says that personnel are to be trained -- Department -- I'm sorry, I stepped away from the mike -- Department has assigned terminal agency coordinator who is responsible for requesting log-in, scheduling personnel training.

Do you know if they were trained on the system that was used, the RMS system?

A.    I don't know how they received the training on the RMS system if that's what you're asking.

Q.    Okay.  Do you know if they were trained?

A.    I don't know, as I sit here, if they were trained.

Q.    Okay.

MR. ZAMPOGNA:  Abraham, could you pick up the picture on the computer again, please.  I think this is Defense -- is this 1?  No, not 1, sorry; 6.

BY MR. ZAMPOGNA:

Q.    If you -- sorry.

MR. ZAMPOGNA:  Can you make that larger, please, if it's possible?  I'm not as technically inclined.  Okay, there we go.  The bottom; can you go to the bottom?

BY MR. ZAMPOGNA:

Q.   So this has been previously identified as the computer that was in the common area, as we have described, of the police station.  Do you recognize the screen, at least, in this?

A.   I've seen that screen before, yes.

Q.   And if you look at the screen, there's many different things on the screen.  For instance, there are different names of officers, is that right, on the screen?

I guess, Time Sheet Dupree, how about we start there, on the upper left-hand side; does that say, Time Sheet Dupree?

A.   It does say that, that's correct.

Q.   Okay.  And then there's other Word documents, I guess I would call them, with the "W," if I'm -- unless you don't believe that's --

A.   No, that's correct; those are Word documents, yes.

Q.   Okay.

         THE COURT:  Can I interrupt?

         MR. ZAMPOGNA:  Yes.

         THE COURT:  Do you know who took this picture and when it was taken?

         THE WITNESS:  I do not know who took this picture or when it was taken.

BY MR. ZAMPOGNA:

Q.   The bottom left-hand corner, there is a sticky note.  Do you see that?

JA600

A.    I do.

Q.    And there's I guess tape even attached to it as well.

A.    Yes.

Q.    And at the top of it -- sorry -- it says "PW," and then there's a dash.  Could you read the rest of that, if you could?

A.    Of course.  fhpd, looks like 19 -- 1935, so fhpd1935.

Q.    Do you know when the Fairmount Heights Police Department was created?

A.    I believe, 1935, or the town was founded in 1935, if I recall.

Q.    Okay.  Would you consider that to be a secure way to keep a password?

A.    I would not keep my password this way.

Q.    Okay.

      Now, you investigated the entire department in addition to my client; is that accurate?

      Police Department of Fairmount Heights.

      (Reporter requesting clarification.)

BY MR. ZAMPOGNA:

Q.    Yes, the Police Department of Fairmount Heights.

            MS. ALLISON:  Objection.

            Your Honor, may we approach?

            THE COURT:  You may.

      (Discussion at sidebar, outside the presence of the witness, all counsel present.)

REDACTED TRANSCRIPT

JA601

THE COURT: Okay. Mr. Vanderpool, if you can hear me, raise your right hand.

THE DEFENDANT: (Complying.)

THE COURT: Okay. We are not under seal, but we are without earshot of the witness, so Ms. Allison.

MS. ALLISON: Yes, Judge. We've had pretrial litigation to keep out --

THE COURT: I need you to speak up a little bit.

MS. ALLISON: Yes. We've had pretrial litigation to keep out several things, including investigations of more things that I believe that defense wanted to stay out, and so it's the government's position that there are doors being opened here, and we just want to make sure that they're flagging that and on the same page.

THE COURT: Okay. What line of questioning are you beginning now?

MR. ZAMPOGNA: I was going to ask if there was an investigation of the entire -- of other people at the department.

THE COURT: Okay, and then what?

MR. ZAMPOGNA: And that's really it; I wasn't going to go into much more detail. Not opening the door, but I wasn't going to go into specifics.

MS. ALLISON: We have no objection to that, Judge. There have been a couple of questions --

MARK ZIMMERMAN - CROSS-EXAMINATION

THE COURT:  Make sure you speak loud enough for the court reporter to get --

MS. ALLISON:  Okay, I'm sorry.  We have no objection to that, Judge.  There have been a couple lines of questions that we think are opening doors and that the defense is probably not meaning to, and so we just wanted to draw that to everybody's attention.

For example, asking about commendations and whether there have ever been complaints about him raises -- opens doors to character evidence that I would assume the defense does not want to open doors to.  Asking questions about other women, that was another thing that we litigated beforehand, that I believe the defense wanted to keep out of the case, and that door is now being opened.  Questions now about -- if they ask this witness about other investigations, that again appears to be opening a door that the defense was trying to keep closed.

So I just want to make sure that everybody is on the same page before the defense unwittingly opens that door.

MR. ZAMPOGNA:  I was just going to ask the one question, if there had been, not any specifics.  That's all.

MS. ALLISON:  We have no objection to that.

MR. ZAMPOGNA:  That's all I was going to ask there.

THE COURT:  Okay.

MR. ZAMPOGNA:  I wasn't going to get much further; I was pretty much almost --

REDACTED TRANSCRIPT

JA603

(Reporter requesting clarification.)

THE COURT:  You --

MR. ZAMPOGNA:  I was pretty much -- sorry.  I'm sorry.

I was pretty much almost done with that line of questioning; it was a quick question.

THE COURT:  All right.  Objection's overruled with that.

Okay.

(Sidebar discussion concluded.)

BY MR. ZAMPOGNA:

Q.   Okay.  So my question was, had you investigated other individuals at the department?  Without being specific.

A.   We have.

Q.   Okay.

I believe we have --

MR. ZAMPOGNA:  Could you pull up Government's Exhibit 7?  I just switched that I hope to the right number.

There's actually another one.  Oh, that's the 7 -- oh, there we go, I'm sorry; it switched the picture on me.  I was like, that's not the picture I'm looking for.

BY MR. ZAMPOGNA:

Q.   Okay.  This is a sign-out -- well, this -- well, take a look at it, and if you can describe it, please do so.

A.   Of course.  It's a sign-in and signed out log, essentially, that the police officers dated 9/6/2019 for Fairmount Heights

REDACTED TRANSCRIPT

JA604

Daily Attendance, is how it's titled.

Q.    And for Martique Vanderpool, when did he sign in, according to this, and sign out?

A.    In at 10:00 p.m., out at 3:00 a.m.

Q.    Okay, thank you.

THE COURT:  And for the record, you were looking at page 2 of Government Exhibit 7, correct?

MR. ZAMPOGNA:  Yes -- I don't know, he has to answer that.

Oh, I am looking at that page, yes, Your Honor.

THE COURT:  Okay.

MR. ZAMPOGNA:  7.2, yes, I'm sorry, Your Honor.  It starts at the top, says Fairmount Heights Daily Attendance, is the top of how it's identified, and I should have also said it's U.S. 0099726, for the record.

THE COURT:  All right, thank you.

BY MR. ZAMPOGNA:

Q.    You testified on direct that there was a -- you said -- you've described it as a narrative, I believe, several times; that is some word -- I'll just keep it as your words, a narrative of an incident on 9/6 and 7 of 2019.  Do you recall that?

A.    Yes.

Q.    Do you know if there was more than one narrative of that incident?

REDACTED TRANSCRIPT

JA605

A.    That's the only narrative that I'm familiar with, of that incident.

Q.    Did you know there was more than one entered into the computer system?

A.    Just to clarify, I'm referring to the narrative that's part of that case report.  Is there another case report number you're referring to, or are you talking about entries in the system?

Q.    Into the RM- -- I'm sorry, I'll let you finish.

A.    I was just going to say, entries into the system that touched that report.  I'm just trying to clarify.

Q.    Yes.  There was entries into the RMS system about that report in addition to the one you spoke about; is that accurate?

A.    Okay.  And that would make sense, because you have to access the RMS report to write the reports that are in that system, to write the report, yes.

Q.    If you know; I don't want you to guess --

A.    Okay.

Q.    -- okay?  If you know.  If you don't know, that's fine.

     Okay.

     Do you also recall that I believe there was a car -- there was a vehicle, obviously, associated with transporting Ms. Stewart to the station; is that accurate?

A.    Yes.

Q.    And do you recall was it an unmarked vehicle?

A.    It was.

JA606

Q.   Okay.  And there was --

     MR. ZAMPOGNA:  Let's see.  I think it's Government's 11A.  I don't know if you can -- if the government's side could bring that up for me, on page 7?

     It starts at the top, and this is really small, so I have to put my glasses on to try to see this.

     I got it here, yeah.

BY MR. ZAMPOGNA:

Q.   At the top, it says -- if that's the right one.  Okay, it says 5(2), and then Dupree.

     Okay.  Do you see that?

A.   I do.

Q.   Okay.  And if you go to 5- --

     MR. ZAMPOGNA:  Can you -- I'm sorry.  Can you take 5(2) and 5(3) and like blow them both up, or make them larger?  That's probably a bad word to use.  Make them bigger.

BY MR. ZAMPOGNA:

Q.   Do you see both these entries, and one says Dupree, and one says Dad?

A.   I do.

Q.   And are they both at the same time?

A.   They are.

Q.   And that time is 12:35 with 20 seconds?

A.   Yes.

Q.   And both say, in the -- I guess it's under the word Body,

REDACTED TRANSCRIPT

JA607

Call me now.

A.    That's correct.

THE COURT:  It's a few minutes before 1:00.  We need to break for lunch Mr. Zampogna.  Can we resume cross-examination after lunch?

MR. ZAMPOGNA:  Yes, Your Honor, thank you.  It shouldn't be too much longer.

THE COURT:  Okay, you can have as much time as you need; I'm not rushing you.

MR. ZAMPOGNA:  Okay, thank you, Your Honor.

THE COURT:  All right.  So let's resume, let's say, 2:05, okay?

MR. ZAMPOGNA:  Thank you, Your Honor.

THE COURT:  Agent Zimmerman, reminding you once again, you're under oath.  Please do not discuss your past testimony or your expected future testimony with anyone.  Do you understand?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Lunch recess taken from 12:58 p.m. - 2:09 p.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Okay, please be seated.

So before we resume, you are now all aware of the

REDACTED TRANSCRIPT

JA608

MARK ZIMMERMAN - CROSS-EXAMINATION

temperature control issues that we have in this courthouse.

You're lucky you don't have to work here every day.

MR. ZAMPOGNA:  Thank you, Your Honor.  I'll resume my cross.

We were going to have the government, I guess, pull up our exhibits too, so hopefully, that will go seamlessly.

THE COURT:  Great.

BY MR. ZAMPOGNA:

Q.   I wanted to direct your attention to an Exhibit we already had, which was -- or you had already discussed, which is Government's Exhibit 11, page 8, which is the Cellebrite exhibit -- well, I don't know what you want to call it, but it says Cellebrite on the first page, Exhibit 11; Extraction Report I think is what was being used as a name.  And there was a No. 8 at the top and, I guess, No. 8(1).  I don't know if those can be enlarged.

You testified that -- well, you testified about this; do you recall?

A.   Yes.

Q.   And these -- the Why Tf is sheriff's at my house, we believe, went from Dupree's -- hopefully I'm reading -- from Du- -- well, to Dupree from -- well, you can tell me; what was that?  Who is it to and who is it from; do you know?

A.   Of course.  It's listed --

Q.   I mean, phone.  When I say "phone," I mean whose phone or

REDACTED TRANSCRIPT

JA609

alleged -- yeah, go ahead -- phone is it from and whose phone is it to?

A.    The direction is listed as Outgoing.  And it's from the cell phone associated with Martique Vanderpool, and it's to the phone numbers listed for Mr. Dupree.

Q.    Okay.  And this -- it says "sheriff's" in there; is that right?  Is that one of the things in the body of the text?

A.    That is, yes, sheriff's.

Q.    And the Sheriff -- do you know if -- if we assume it's the Sheriff's department of Prince George's County, they're not part of the Prince George's County Police Department, are they?

A.    I don't know the structure of how the Sheriff's department ...

Q.    Okay.

A.    -- works.

Q.    And you don't know why they were at his house, do you?

A.    No.

Q.    Okay.  And there was also a letter brought up, if you recall, on direct, right, preceding, or I think succeed- -- right after this, I think, which was from Officer Watkins -- I'm sorry, Capt- --the -- Chief Watkins I think is how he went by.  Do you recall that?

A.    I do.

Q.    And that letter isn't mentioned in either of these texts, is it?

JA610

A.    That letter is not mentioned, that's correct.

Q.    All right.  I'd like to move on to I think it's Government 3 that was brought up -- sorry, that was brought up in the -- and if you look at this, this is a -- just as a quick description, this is Government's 3, and it looks as if it's a uniform criminal citation for a traffic stop.  Is that accurate?

A.    That's accurate.

Q.    Okay.  And at the very bottom, it has some writing, and before the numbers 9359, it has the letters BMTF.  Do you see those?

A.    I do.

Q.    Do you know what those mean?

A.    I don't.

Q.    Okay.

        MR. ZAMPOGNA:  And then if you could go to Government Exhibit 1, please, and to the narrative section.  I think that's -- thank you -- page 4.

BY MR. ZAMPOGNA:

Q.    We talked a lot about, I guess -- I don't know if I want to say pronouns, but the word -- the letter -- or the name -- sorry -- the word "I" being used here.  You don't know for certain who that "I" is referring to, do you?

A.    I know the name that's associated with writing this report.

Q.    Okay, but that doesn't mean that's associated with the letter I?

A.   I don't know who was behind the keyboard that typed the letter I, if that's what you're asking me.

Q.   Okay, that's fine.

We have some exhibits as well, Exhibit 2 from the defense.

MR. ZAMPOGNA:  If you can pull that up, or I could do something up here.  Oh, good.

Oh.  Oh, he's going to -- I'm sorry.  He's going to -- my associate will bring it up, then, sorry about that.  We had hoped to be able to give them all the numbers; I guess not.

Could you bring it up -- oh, there it goes.

Thank you.

BY MR. ZAMPOGNA:

Q.   This is a general order from the Fairmount Heights Police Department.  Do you see that?

A.   I do.

Q.   Okay.  And in this order -- you're familiar, there are orders for the Fairmount Heights Police Department; is that right?

A.   There are general orders for Fairmount Heights Police Department, yes.  We covered some earlier, yes.

(Reporter requesting clarification.)

A.   We covered some earlier, that's correct, general orders.

Q.   And in this -- do you know if the Fairmount Heights Police Department requires there to be an RMS system used with inputting general orders?

REDACTED TRANSCRIPT

JA612

A.    An RMS system used with inputting general orders?

Q.    I'm sorry, inputting reports.  I'm sorry.

A.    Okay.  My understanding is that the reports are put into the RMS system.

Q.    And it -- I believe it's ...

(Conference between Mr. Zampogna and Mr. Bluestone.)

BY MR. ZAMPOGNA:

Q.    Oh, I'm sorry, yeah.  So it says -- yeah, I'm sorry.

Policy.  The Fairmount Heights Police Department will contribute the accurate and appropriate classification of part I and part II event reports to the State of Maryland and the FBI.

Is that -- did I read that right?

A.    You did read that right.

Q.    Okay.

MR. ZAMPOGNA:  All right.  Then we have Exhibit -- A1.

Thank you; sorry about that.

BY MR. ZAMPOGNA:

Q.    It also says in this report -- I'm sorry, it's the same number.

Completion of Reports.  To ensure that the information is collected for UCR purposes, officers will complete and submit the appropriate report in accordance with the PGPD Report Manual and incident classification and coding system.

Did I read that right?

A.    You did.

REDACTED TRANSCRIPT

JA613

MARK ZIMMERMAN - CROSS-EXAMINATION

Q.   Okay.

MR. ZAMPOGNA:  Can we have Exhibit 8?

BY MR. ZAMPOGNA:

Q.   Now, you spoke earlier of how the police station was set up, and we received a number of -- this is actually a production by the government to us, US -- US0105156, which was a photograph taken the evening of the alleged incident in the municipal building.  Are you aware of this photograph?

A.   I recall seeing similar photographs taken at the police station as this.  I'm familiar with this.

Q.   Okay.  So this -- this isn't the police department itself, is it?

A.   I believe that's elsewhere in the municipal building, elsewhere in the municipal building, municipal building.

Q.   Yeah, I'm sorry; they're actually -- I didn't mean to interrupt you; I apologize.  There are two photographs attached to this or -- actually, eight or nine.

MR. ZAMPOGNA:  Just scroll through them all if you could.

BY MR. ZAMPOGNA:

Q.   So you recall that in the indictment, it says that this building was abandoned; do you recall that?

MS. ALLISON:  Objection.

THE COURT:  Overruled.

Do you know what's in the indictment?

REDACTED TRANSCRIPT

JA614

MARK ZIMMERMAN - CROSS-EXAMINATION

A.    I would want to see what's in the indictment.  When you say "abandoned," do you mean, nobody was inside the building at that time?

BY MR. ZAMPOGNA:

Q.    That's just the word used -- I didn't write it, but that was the word that I read.

I don't know if we have marked the indictment as an exhibit -- no, we didn't, but we can provide it to you.

A.    Okay.

MR. BLUESTONE:  Permission to approach, Your Honor?

THE COURT:  You may.

MR. BLUESTONE:  (Handing.)

THE WITNESS:  Thank you.

A.    It reads, "to an abandoned police station."

BY MR. ZAMPOGNA:

Q.    Okay.  This was in the building; is that accurate?

A.    That's my understanding, yes.

Q.    Okay.  That's -- this looks like a party that was going to occur?

A.    It's not taking place right now; it looks like it was set up for a party, yes.

Q.    Could have occurred, okay?

MR. ZAMPOGNA:  All right.  That's all I have at this time, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you very much.

REDACTED TRANSCRIPT

JA615

Any redirect?

MS. ALLISON:  Yes, Your Honor.

MR. ZAMPOGNA:  Give me a second to move my stuff here.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MS. ALLISON:

Q.   Special Agent Zimmerman, you were asked questions about your original investigation earlier on into this incident.  Do you remember those questions?

A.   Yes.

Q.   At the outset, were you investigating a color of law violation?

A.   At the outset, there was a variety -- in part, yes.

Q.   You were asked questions about the vehicle, police vehicle that was being driven the night of the traffic stop; do you remember those questions?

A.   I do.

Q.   Whose vehicle was it that was being driven?

A.   It was Officer Dupree's vehicle.

Q.   Was it a police squad car, was it an unmarked car?

A.   It was an unmarked car.

Q.   Was it just a normal personal car, or was it outfitted for police use?

A.   It was outfitted for police use.

Q.   How so?

JA616

A.    It had police lights in order to effect a stop.

Q.    Did it have anything else to outfit it for police use?

A.    It also had a computer in it, and ... that's it.  That's what I recall.

        MS. ALLISON:  Ms. Richart, can we please put up on the screen Government's Exhibit 5D?

BY MS. ALLISON:

Q.    What is this?

A.    This is the vehicle that was used that night, to make the stop.

        MS. ALLISON:  Can we turn now to Exhibit 5 A.

BY MS. ALLISON:

Q.    What is this a photo of?

A.    This is a photo of the interior of that car.

Q.    What do we see in the interior?

A.    So we can see the computer station that's in the center of that vehicle as well as a control in the center, there, that I know to be lights or sirens or other placed emergency equipment.

        MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

BY MS. ALLISON:

Q.    Do you know if it was unusual for Fairmount Heights officers to drive unmarked vehicles that were outfitted for police use?

A.    Yes.

REDACTED TRANSCRIPT

JA617

Q.    Was it unusual?

A.    It was.

MS. ALLISON:  Let's pull up Government Exhibit 18, and let's turn to page 3 -- well, I guess I'll stop.  Sorry about that.

BY MS. ALLISON:

Q.    What are we looking at here in Exhibit 18?

A.    These are Fairmount Heights Police Department General Orders, and the subject is Traffic Enforcement Methods.

MS. ALLISON:  Let's turn now to page 3 of this exhibit.

And Ms. Richart, please zoom in on section C.

BY MS. ALLISON:

Q.    Special Agent Zimmerman, can you please read section C?

A.    The Fairmount Heights police fleet consists of several marked and unmarked vehicles.  The use of an unmarked vehicle for traffic enforcement/observation is acceptable with the specific approval of the Chief.

Continue?

Q.    Yes, please.

A.    Prior to using an unmarked police vehicle for traffic enforcement purposes, officers will ensure that it is equipped with emergency lights and siren and that they are operational.

MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

JA618

BY MS. ALLISON:

Q.   So regardless of whether it was common or uncommon, was it possible for officers to be permitted to use unmarked vehicles at Fairmount Heights?

A.   Yes.

Q.   Now, you were asked about a letter, the referral letter from P.G. County -- I'm sorry, from Fairmount Heights to P.G. County.  Do you remember those questions?

A.   I do.

Q.   And I believe Mr. Zampogna asked you if the letter was preceding or succeeding the message, Why the fuck the sheriff's at my house; do you remember those questions?

A.   I remember those questions, yes.

Q.   Can you remind us, what was the date of the letter?

A.   September 17th, 2019.

Q.   And what was the date of the message, Why the fuck the sheriff's at my house?

A.   The same date, September 17th, 2019.

        MS. ALLISON:  Ms. Richart, can you please pull up Defense Exhibit 2?

BY MS. ALLISON:

Q.   Is this the Uniform Crime Reporting General Order that Mr. Zampogna asked you questions about?

A.   Yes, it is.

Q.   Super generally, what is the Uniform Crime Reporting or

UCR?

A.   So there's -- the State of Maryland and the FBI both have one.  The Uniform Crime Reporting is run primarily by the FBI, and it's the collection of data from arrests, essentially, and other law enforcement action.

Q.   So is this a national database?

A.   Yes.

Q.   Does this general order appear to cover what's reported to that national database?

A.   It does.

          MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

          All right.  Let's pull up Government Exhibit 7 and turn to page 2.

BY MS. ALLISON:

Q.   Is this the daily attendance sheet that Mr. Zampogna was asking you questions about?

A.   Yes.

Q.   And what does it say for the hours of Martique Vanderpool on this sheet?

A.   It says in at 10:00 p.m., out at 3:00 a.m.

          MS. ALLISON:  Let's turn now to the last page of this Exhibit.  I believe it's page 4.

BY MS. ALLISON:

Q.   Is this a pay sheet for Mr. Vanderpool?

JA620

A.   Yes.

MR. BLUESTONE:  Objection; leading.

THE COURT:  Sustained.

What is this?

THE WITNESS:  It's a time sheet for Mr. Vanderpool.

MS. ALLISON:  Ms. Richart, can you please zoom in on the top left, Saturday, 9/7?

BY MS. ALLISON:

Q.   What are the hours in and out in this portion of the pay sheet?

A.   It says in at 12:00 a.m., out at 3:30 a.m.

Q.   So what does this tell you?

A.   This tells you total hours of 3.5 is listed on here.

Q.   And what's the relevance of this?

MR. ZAMPOGNA:  Objection; I don't know -- okay, go ahead.

THE COURT:  Overruled.

A.   The relevance of this?  There is after a traffic stop that happened the night on the 6th, September.

BY MS. ALLISON:

Q.   How did you initially describe this document?

A.   A pay -- a time sheet record, essentially, a signed time sheet record.

Q.   Okay.

MS. ALLISON:  And let's zoom out there, please,

Ms. Richart, and let's zoom in on the part towards the bottom left that says, Total Hours Pay Period.

BY MS. ALLISON:

Q.    And what are the hours listed here?

A.    43.5.

MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

Can I have one moment, Your Honor?

THE COURT:  Yes.

MS. ALLISON:  Nothing further.

MR. ZAMPOGNA:  Could I have one question, or am I done?

THE COURT:  You can have a question, sure.

MR. ZAMPOGNA:  Just one recross, and I think it's done.

RECROSS-EXAMINATION

BY MR. ZAMPOGNA:

Q.    Who owned the marked vehicle, if you know?

A.    I do know; Philip Dupree owned the unmarked vehicle.

MR. ZAMPOGNA:  Thank you.

THE COURT:  Okay.  Agent Zimmerman, you may be excused.  Your testimony is concluded.  Thank you very much.

THE WITNESS:  Thank you.

MS. ALLISON:  Judge, may we approach for one quick issue before we call our next witness?

JA622

THE COURT:  Sure.

(Discussion at sidebar.)

(A following portion is sealed and is contained in a sealed transcript.)

(Sidebar discussion concluded.)

THE COURT:  Next witness?

MS. BERNSTEIN:  The government calls Sergeant Brendan Gill.

THE COURTROOM DEPUTY:  If you could just please stand and raise your right hand.  Face me, please.

You do solemnly swear or affirm under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Speak loudly and clearly into the microphone.  State your full name for the record and spell your first and last names.

THE WITNESS:  Sure.  My name is Brendan Gill, B-R-E-N-D-A-N, G-I-L-L.

THE COURTROOM DEPUTY:  Thank you.

BRENDAN GILL, GOVERNMENT'S WITNESS, SWORN

REDACTED TRANSCRIPT

JA623

DIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Can you please introduce yourself to Judge Boardman and tell her what you do for a living?

A.   Well, I'm, as I stated, Brendan Gill.  I am a sergeant with the Prince George's County Police Department and a criminal justice data scientist.

Q.   What's your current position?

A.   I am the director of the Maryland Artificial Intelligence and Synthetic Media Threats task force.

Q.   Up until a couple months ago, what was your position?

A.   I was the officer in charge of the Information Technology Division's special project section for Prince George's County Police.

Q.   Can you tell us in nontechnical terms what that position entailed?

A.   I oversaw the unit that dealt with implementation, development, and deployment and training of electronic records systems for law enforcement in the county.

Q.   How long were you in that position?

A.   Almost ten years.

Q.   Are you familiar with the computer system that P.G. County uses to record interactions between the police and the public?

REDACTED TRANSCRIPT

JA624

A.    I am.

Q.    What's that system called?

A.    Motorola Premiere 1 Records Management System, or RMS for short.

Q.    That's how you all refer to it, as RMS?

A.    Yes.

Q.    How is it that you're familiar with RMS?

A.    I was the principal architect in its development, design, and implementation.

Q.    You designed the RMS system?

A.    I did, all of the fields, all of the values, all of the reporting structures; it was all my design.

Q.    How long have you been with swear?

A.    16 years.

Q.    In your 16 years with the police, have you been involved in training?

A.    I have.

Q.    Are you familiar with how officers in Maryland become certified?

A.    I am.

Q.    Are you familiar with the records systems for P.G. County Police and for other police who work in P.G. County?

A.    I am.

Q.    All right.  I'm going to ask you a bunch of questions about those topics.  First, I'd like you to it Judge Boardman just a

little bit about yourself.  Tell us very briefly about your background.

A.    Yeah.  I mean, I became a police officer in 2008.  I was an investigator for several years, worked robberies, carjackings, cold case homicide, narcotics and alcohol violations.

(Reporter requesting clarification.)

MS. BERNSTEIN:  You're going to have to go a little slower so we can --

A.    No problem.  Yeah, no problem.

Okay.  So I was a -- I did a year in patrol.  After my patrol assignment, I became an investigator.  I investigated carjackings, robberies, cold case homicide, narcotics, alcohol violations, and then from there, I focused on DUIs, became a DRE, an instructor, promoted a few times, and you know, I am grand tech (phonetic).

Q.    When did you get promoted to sergeant?

A.    2018?  Yes.

Q.    All right.  I want talk to you about the RMS system.  Is that just for the Prince George's County Police?

A.    No.

Q.    Who else uses it?

A.    All municipalities within Prince George's County.

Q.    Tell us what you mean by a municipality.

A.    So there are incorporated areas of Prince George's County, like towns.  They have their own police departments.  An example

JA626

would be Greenbelt, Laurel city; those are considered municipalities.

Q.   Do you know how many municipalities in P.G. County have their own police departments?

A.   Thirty-three.

Q.   Is Fairmount Heights Police Department one of them?

A.   Yes.

Q.   So now that you've explained what you mean by municipalities, each of those small municipal police departments also uses your RMS system?

A.   Yes.

Q.   I'd like you to give us a quick overview of the training requirements for an officer in P.G. County.  So first of all, does a police officer in Maryland have to be certified by the state?

A.   Yes.

Q.   What agency does that certification?

A.   It is called the Maryland Police and Corrections Training Commission.

Q.   How do you all refer to that?

A.   MPCTC.

Q.   All right.  And I sometimes trip over those letters, so if I refer to the state agency or the state board, will you know that I'm referring to MPCTC?

A.   Yes.

REDACTED TRANSCRIPT

Q.    Explain to us what that state board's role is.

A.    That organization sets specific training standards or duration of training, topics of training.  They certify instructors, courses of instruction, and individual officers that meet the minimum requirements to be an officer of the state.

Q.    All right.  I'm going to go through that in some smaller parts.  First of all, though, if you could just give us a sampling of some of the topics that the agency requires be taught to officers.

        MR. BLUESTONE:  Objection; lack of foundation.  Just because he went to the training does not mean that he is familiar with the standards that the MPCTC places on all instructors.

        THE COURT:  I think the question was a sampling of the topics that are required to be taught, so I will overrule the objection.

BY MS. BERNSTEIN:

Q.    You can answer, sir.

A.    Firearms training, defensive tactics training, academic courses of instruction that include incident documentation, arrest procedures, among many, many other topics.

Q.    Okay.  So that was just a sampling you gave us, but for each topic that the agency requires be taught, does it just say, go teach these topics, or does the agency specify what needs to

REDACTED TRANSCRIPT

JA628

BRENDAN GILL - DIRECT EXAMINATION

be taught?

A.    It's very specific; it's not a -- just go teach these topics.  It includes specific benchmarks, training evaluations, number of hours, and very specific instructors that are allowed to teach those very specific topics.

Q.    As someone who's been involved in training, can you tell us the reason for those standards?

A.    Yeah.  It's to ensure that all law enforcement officers in the state apply the -- receive the same training and apply the Maryland law equally throughout the entire state.

Q.    Even the newest officer in the smallest department.

A.    Yes.

Q.    All right.  I want to talk to you about the RMS system in particular.  Did you ever offer training on the RMS system?

A.    I did.

Q.    To whom?

A.    All Prince George's County Police employees as well as all instructors for municipal agencies that would then train those specific agencies, their employees.

Q.    When did you-all roll out the RMS system; do you remember?

A.    January 11th, 2016.

Q.    And then, did every officer who worked in P.G. County get trained on that system?

A.    Yes.

Q.    Do you know the defendant, former Fairmount Heights

REDACTED TRANSCRIPT

JA629

BRENDAN GILL - DIRECT EXAMINATION

police officer Martique Vanderpool?

A.    I do not.

Q.    Do you have any firsthand knowledge about an incident that happened on September 6th and 7th, 2019?

A.    I do not.

Q.    Did you go through P.G. County records and pull some records related to that incident?

A.    I did.

Q.    At whose request?

A.    The FBI.

Q.    All right.  I want you to talk to us about RMS and -- I want to talk about an incident report first.

      Are incident reports written in RMS?

A.    Yes.

Q.    Did you pull an incident report from RMS dealing with Defendant Vanderpool's arrest of a woman name Raynna Stewart?

A.    I did.

Q.    Did you also review a copy of that report that had been pulled by Sergeant Fellrath?

A.    I did.

Q.    Who is Sergeant Fellrath?

A.    He is the RMS systems administrator.  He replaced me upon my leaving the ...

Q.    Is he a custodian of records?

A.    Yes.

REDACTED TRANSCRIPT

JA630

BRENDAN GILL - DIRECT EXAMINATION

(Reporter requesting clarification.)

A. Sergeant Fellrath, F-E-L-L-R-A-T-H.

BY MS. BERNSTEIN:

Q. Did Sergeant Fellrath, the custodian of records, certify as authentic the copy that he pulled?

A. Yes.

Q. What system did he pull that incident report from?

A. RMS.

Q. All right. So what I want you to do now is explain, in layman's terms if you can, what this RMS system does.

A. It is a digital repository, and you can think of it as a file cabinet, where reports are created and stored in manila envelopes to document law enforcement activity, whether it be arrests, impounds, individuals that officers come into contact with, and/or crimes for all agencies in Prince George's County.

Q. When you talk here about the RMS system being like an electronic filing cabinet, is that an analogy that you use when you train people on the system?

A. It is.

Q. Do officers enter information directly into the system?

A. Yes.

Q. So when they're writing a report, they write it in RMS?

A. Yes.

Q. Once a report is entered into RMS, is it permanently stored?

REDACTED TRANSCRIPT

JA631

BRENDAN GILL - DIRECT EXAMINATION

A.    It is.

Q.    If you have an incident number for a particular incident, can you put that number into RMS and get the records related to it?

A.    You can.

Q.    Did you do that in this case?

A.    Yes.

MS. BERNSTEIN:  Can I have Exhibit 1 up on the screen, please?

BY MS. BERNSTEIN:

Q.    Is this the official incident report for the incident we were just talking about, on September 6th and 7th?

A.    Yes.

MR. ZAMPOGNA:  Object to the classification of official; I'm not ...

THE COURT:  Why don't you rephrase the question.

MS. BERNSTEIN:  Sure.

BY MS. BERNSTEIN:

Q.    How would you describe this incident report that we're looking at?

A.    The official incident report of this incident.

Q.    If somebody -- I'm going to get ahead of myself for a minute and then come back.

You're familiar with this incident report, right?

A.    I am.

REDACTED TRANSCRIPT

JA632

Q.   Does it talk about the criminal arrest of anybody?

A.   It does.

Q.   Who?

A.   A -- last name is Stewart.

Q.   If a police officer were to go to court to testify against Ms. Stewart and they went into the system to get the report for that arrest, what would they get?

A.   This report.

Q.   Right.  So I'll ask you --

THE COURT:  Why don't you show the witness the entire report; he's only seen the first page of Exhibit 1.

MS BERNSTEIN:  Sure.

If we could scroll through.

BY MS. BERNSTEIN:

Q.   Is that the report you were just answering about?

A.   Yes.

MS. BERNSTEIN:  And actually, if we can take this down for a minute.

BY MS. BERNSTEIN:

Q.   So before we dig into the report, I want you to talk to us a little bit more about how an officer goes about generating a report in RMS.

First of all, how does an officer access the system?

A.   So the system is a CJIS system, C-J-I-S.  It is criminal justice information.  It is a program that's installed on

REDACTED TRANSCRIPT

JA633

law enforcement computers.  Officers having gone through appropriate training and certification through the agency receive credentials to log into the program, a user name and a password that is uniquely signed assigned to them.  They then use those credentials at a police computer, and they log into the program.

Q.    Let me go back to something you just said.  Did you just say that in order to get a credential, you have to have training on the system?

A.    Correct.

Q.    And then, when an officer gets a credential, you said that's a user name and password?

A.    Yes.

Q.    For those of us who use computers at work, is that the same idea?

A.    Exactly, yes.

Q.    And that's to get into the specific system of RMS.

A.    Yes.

Q.    So talk to us now about what kinds of information gets stored in the system, all right?  When an officer writes a report in RMS, does the system capture when the officer starts that report?

A.    It does.

Q.    How about when he saves the report?

A.    It does.

JA634

Q. When a person is logged in and working on a report does the system track the different things the officer is doing?

A. It does; it tracks change over time.

Q. Does it capture whose user account authored a particular report?

A. It does.

MS. BERNSTEIN: Can we have Government Exhibit 1 up, please?

BY MS. BERNSTEIN:

Q. In the case of Government's Exhibit 1, this report that we were just talking about, do you know whose user account authored that report?

A. I do.

Q. According to this report that we're looking at, what was the date and time that it was entered?

A. September 7th, 2019 at 2:45:30 a.m.

Q. And according to this report, who is the reporting officer?

A. Vanderpool.

Q. What does Entered On mean?

A. That is a field that denotes when an officer began typing into the various fields within the digital report.

Q. So Entered On, in RMS language, means begun?

A. Yes.

Q. All right. Let's go through Exhibit 1, here.

Who is the reporting officer? You just said that, I think,

JA635

right?

A.   Yes; it was Vanderpool.

Q.   Does this report have a unique identifying number, or this incident?

A.   It does.

Q.   What's that called?

A.   It's a case report number.

Q.   Can you circle that on the screen?

A.   (Complying.)

Q.   And so you circled Case Report # on top right part of the screen.  Can you read the case report number for this incident?

A.   19-0052405-001.

MS. BERNSTEIN:  If we can take that down -- or just ...

BY MS. BERNSTEIN:

Q.   All right.  I want to scroll through this report and have you identify some different parts of it for us.  So on the first page, here, can you tell us what type of law enforcement action this is for.

A.   A disorderly conduct criminal citation.

Q.   Can you show us where you're looking, for disorderly conduct.

A.   (Complying.)

Q.   All right.  You've circled the top left part, there, where it says Summary of Incident.  What's the subject of the report?

JA636

You can go ahead and circle that.

A.   (Complying.)

Q.   What is the subject --

A.   Traffic stop.

Q.   Who's the person who was stopped?

A.   A Ms. Stewart.

Q.   Can you go ahead and circle that for us.

A.   (Complying.)

Q.   Now, looking at the bottom of the page -- looking at the bottom of the page, can you tell us how she is described.

First of all, what race is she?

A.   Black or African American.

Q.   How old is she?

A.   Nineteen.

     MS. BERNSTEIN:  Can we scroll to page 2, please.

     Just focus at the top, there.

BY MS. BERNSTEIN:

Q.   How was her build described?

A.   Thin/Small.

Q.   What was Ms. Stewart arrested for?

A.   A disorderly conduct.

     MS. BERNSTEIN:  If we can zoom in on that part in the middle of the page, where it says Arrest Information.

BY MS. BERNSTEIN:

Q.   According to this document, what was the type of arrest?

A.    A criminal citation.

Q.    What does that mean?  What is an arrest by citation?

A.    It is when an officer issues a summons, much in the way of a traffic -- or like a traffic ticket to an individual, for a criminal matter, with their promise to appear for court for a later date.

Q.    How does an officer do that, issue a criminal citation?

A.    A pen and a citation book that's in their car.  It's handwritten.

Q.    So if an officer issues a criminal citation, does he have to leave the scene?

A.    No.

        MS. BERNSTEIN:  If we can take that down and then scroll to page 3, please.

BY MS. BERNSTEIN:

Q.    What are we looking at on page 3?

A.    Miscellaneous information, which is blank.

Q.    So no real information on page 3?

A.    No.

        MS. BERNSTEIN:  Can we go to page 4?

BY MS. BERNSTEIN:

Q.    What are we looking at on page 4?

A.    The narrative.

Q.    All right.  Now, I want focus -- there are two parts here on page 4.  There's a part on the top that says

JA638

PGPD Sergeant Brendan P. Gill.  Did you write that part?

A.    I did.

Q.    When you're talking about the narrative, where -- can you circle the narrative that you're talking about.

A.    (Complying.)  There are two narratives here, the one I authored and the original narrative that was authored initially.

Q.    We'll go into that in just a minute.  First, though, if you can tell us, who generally writes a narrative in an arrest?

A.    The officer effecting that arrest.

Q.    In this case, whose user account wrote this narrative?

A.    Vanderpool.

        MS. BERNSTEIN:  All right.  Before we leave this exhibit, can we go back to page 1, please?

BY MS. BERNSTEIN:

Q.    All right.  Going back to where it says, Entered On, this report says it was entered on 2:45:30 a.m., and you just specified that that means when it was started, right?

A.    Yes.

Q.    Does this document tell you when it was finished?

A.    No.

Q.    Is there another document that will tell us when it was finished?

A.    Yes.

Q.    Separate question.  Is there any document that will tell us what computer this report was generated on?

REDACTED TRANSCRIPT

JA639

A.    Yes.

Q.    What's that document called?

A.    It's an audit log.

Q.    Did you run -- did you run an audit log for Mr. Vanderpool's log-ons?

A.    I did.

        MS. BERNSTEIN:  Can we have Exhibit 23 on the screen, please?

BY MS. BERNSTEIN:

Q.    What are we looking at?

A.    This is a log of credential access into the system in 2019.

Q.    Can you tell us what date range this exhibit covers?

A.    From the bottom, on 8/24/19 to the first row at the very top of September 9th, 2019.

Q.    Do you see any entry on this exhibit that correlates to the report we were just looking at?

A.    I do.

Q.    How many lines down?

A.    Three.

        MS. BERNSTEIN:  Can you please highlight that for us, Ms. Richart?

BY MS. BERNSTEIN:

Q.    According to this audit, what computer was used to generate that report we were looking at?

A.    The host name of that device was called mike-HP, or Henry

JA640

Paul.

Q.   Can you go ahead and circle that?

A.   (Complying.)

Q.   Do you have any personal knowledge about where the computer mike-HP is?

A.   No.

Q.   But wherever that computer is, is where the person using the defendant's user account drafted that report; is that right?

A.   Yes.

        MS. BERNSTEIN:  You can take that down, Ms. Richart.

BY MS. BERNSTEIN:

Q.   All right.  So talk to us about what other kind of information is tracked by the RMS system.

     Does it tell you when an officer starts writing a narrative?

A.   Yes.

Q.   Does it tell you when the officer saves along the way?

A.   Yes.

Q.   Does it tell you when he checks it back in?

A.   It does.

Q.   Tell us what that means, to check a report back in.

A.   Going back to my description previously about the digital filing cabinet, checking a document back in is putting it inside of a virtual manila envelope, putting it back into the filing cabinet, and closing the drawer so that it's accessible by

JA641

others.

Q.    Can an officer go back into a report and make changes?

A.    They can.

Q.    If he does that, is that captured by the system?

A.    It is.

But I will say that making changes can only occur if the report has not been approved by a supervisor or approved by Records.

Q.    Okay, we'll come back to that.

So I just asked you about all these things that the system tracks.  If you want to see a record of all of those things for a report, how do you do that?

A.    The -- an audit needs to be run on the document itself.

Q.    Did you do that for this report?

A.    I did.

MS. BERNSTEIN:  Can we have Exhibit 22 up, please?

BY MS. BERNSTEIN:

Q.    What are we looking at?

A.    This is the audit history for the same report we were just discussing.

MS. BERNSTEIN:  And let's go ahead and scroll all the way through, for the witness.

BY MS. BERNSTEIN:

Q.    All right.  So the very last two pages --

MS. BERNSTEIN:  If we can go to the last two pages

REDACTED TRANSCRIPT

JA642

beyond this.

BY MS. BERNSTEIN:

Q.   At the very end of this document is a certification from Sergeant Fellrath.  Is that the sergeant you mentioned who is the custodian of records?

A.   It is.

     MS. BERNSTEIN:  All right.  If we can go to page 14 of the document.

BY MS. BERNSTEIN:

Q.   So first, tell us just generally what this document is that we're looking at.

A.   This document is report-specific, and it tracks change to the document and access to the document over time.

Q.   So all that stuff we just talked about that the system records, that would be in this document for that incident report?

A.   Correct.

Q.   Is the oldest stuff on page 1, or is the newest stuff on page 1?

A.   The newest stuff is on page 1; it's ordered that way.

Q.   So if we want look at the beginning of this record, we have to go to the end; is that right?

A.   Correct.

     MS. BERNSTEIN:  All right.  So let's go to page 14.
     If I can have you blow up the bottom row, there,

REDACTED TRANSCRIPT

JA643

please.

BY MS. BERNSTEIN:

Q.   What happened on 2:49:50 a.m. on September 7th, 2019?

A.   The account assigned to Vanderpool created this report.

Q.   And 2:49:50 is 10 seconds shy of 2:50, right, so essentially, at 2:50, this report was created?

A.   Yes.

Q.   And again, that means it was begun?

A.   Correct.

        MS. BERNSTEIN:  Can we turn to page 7, please, and highlight row three from the bottom?

BY MS. BERNSTEIN:

Q.   What does that row tell us?

A.   This row shows that the account assigned to Vanderpool closed that report, or stopped working on it.

Q.   At what time?

A.   At 3:23:43 a.m.

        MS. BERNSTEIN:  Can we go up one line, highlight the line above it, please?

BY MS. BERNSTEIN:

Q.   This is the line that says CheckIn on the far left; tell us what this line tells us.

A.   Yeah.  At 3:23:50 a.m., the account assigned to Vanderpool checked the document in, in essence, placing the document in that manila folder in the file cabinet and closing the door on

JA644

it.

MS. BERNSTEIN:  Let's go back to page 14, please.

And then scroll up to 13.

BY MS. BERNSTEIN:

Q.    So when the defendant's user account logged in and started working on this report what were the first things, what were the first parts to be filled in?

A.    So yeah, these -- this document's showing that the description of the arrestee -- I'm sorry, the first thing that was filled out was the offense section and then the descriptor of the arrestee.

Q.    And are these basically blanks on a form that an officer has to fill in?

A.    Correct.  If you actually notice on the screen, it does show you there was -- you know, that center column is blank. That's the default blank value of the report.  Since this document tracks change over time, every time a value is entered into that specific field, it captures it on the far right column.

MS. BERNSTEIN:  Can we scroll up to page 12, please.

BY MS. BERNSTEIN:

Q.    Is that -- at the bottom of the page, is that just more of the same?

A.    It is, it's Arrestee segment -- arrestee information -- descriptions.

JA645

MS. BERNSTEIN:  Can we zoom in to the top corner of the page, please.

BY MS. BERNSTEIN:

Q.   Now, at the top of the page over in the box on the right, there's something there that starts with, On 9/6/2019, at approximately 11:22.  Do you see where I'm looking?

A.   I do.

Q.   Tell us what we're looking at there.

A.   That is the narrative for this incident.

Q.   Does this tell us what time the narrative was begun, or do we have to go somewhere else to see that?

A.   Potentially one more page up, just so that I'm very clear on that.

It was saved into the system at 3:07:20.

Q.   So we're now looking at page 11, and we're down at the bottom, right?

A.   Correct.

Q.   You said 3:07?

A.   Yes.

Q.   And then, as we scroll --

MS. BERNSTEIN:  If we could scroll up to page 10.

And keep going.

BY MS. BERNSTEIN:

Q.   Just in general, what are these pages telling us?

A.   Well, the narrative continued to grow, meaning, more

REDACTED TRANSCRIPT

JA646

details were added to the narrative, and they were saved over time.

MS. BERNSTEIN:  So where we -- and let's go back to that check out -- CheckIn -- I'm sorry, it's on this page, page 7 that we were looking at.  Can you zoom in on that again.

BY MS. BERNSTEIN:

Q.  So does this tell us that the user account is working on the report until 3:23:50 a.m.?

A.  Yes.  I would actually say that the user account was completed -- completed working on it at 3:23:43 a.m. -- that is when you see a closed segment -- and then it was returned to the filing cabinet at 3:23:50 a.m.

Q.  Okay, thank you.  And I mentioned -- I asked earlier if the system records if somebody goes back in and makes a change?

MS. BERNSTEIN:  Can we go to page 5, please.

BY MS. BERNSTEIN:

Q.  If we look at the very bottom, what happened at 1:30 p.m. on September 15th?

MS. BERNSTEIN:  If we can zoom in on that whole bottom fifth -- there we go, thank you.

A.  Oh, the narrative was changed and then saved.

BY MS. BERNSTEIN:

Q.  So whose user account made a change to this report?

A.  Vanderpool.

Q.  And you started to talk earlier about how it tracks

REDACTED TRANSCRIPT

JA647

BRENDAN GILL - DIRECT EXAMINATION

changes, but I want you to you just to explain that to us.

There are two columns of text, here, one kind of in the middle of the page and one on the right.  Which one of those is the original text, and which is the change?

A.    The center column is the latest information that was saved, and then the right column, the far right column, is the most current information that was then saved.  So if you look at it, the center was what was already there, and then what's all the way to the right is what was modified and then entered.

Q.    All right.  So I just want to ask you about a couple of changes.  If you could look at the column in the middle and tell me, according to that version of the narrative, where did the stop take place?

A.    It's incomplete; it says at 61st Avenue.

Q.    And then, when the use user account went in and made a change, what did Vanderpool's account change it to?

A.    61st Avenue and Sheriff Road.

Q.    All right.  Let me direct your attention down a little bit lower.  In the middle text box, where it says -- at the end of the sentence; just read the last -- starting with GB7- -- how that sentence ends.

A.    Entered my radar enforcement zone.

Q.    And then after the change, what it did it read?

A.    Entered my radar enforcement zone while speeding in a ...

MS. BERNSTEIN:  And can we go to the next page, just

JA648

to get the rest of that sentence.

A.    And it continues, posted 40-mile-per-hour zone.

MS. BERNSTEIN:  Okay.  We can take that down.

BY MS. BERNSTEIN:

Q.    So that's just little ministerial changes that were made on what date?

Do you need to see it again?

A.    Yeah, I would need to see that again.

MS. BERNSTEIN:  Can we have that up, please, on page 5.

A.    Yeah, September 15th, 2019.

BY MS. BERNSTEIN:

Q.    By whose user account?

A.    Vanderpool.

Q.    I'm sorry?

A.    Vanderpool.

Q.    Okay.

All right.  I want to switch gears a little bit.

MS. BERNSTEIN:  Can we have Exhibit 11A up, please?

And go to the photo on the last page?

I think that's 11, not 11A.

May I have a moment, Your Honor?

THE COURT:  Yes.

BY MS. BERNSTEIN:

Q.    All right.  So for the record, what we have up is 11A,

BRENDAN GILL - DIRECT EXAMINATION

page 34.

Can you tell us what we're looking at here?

A.    Appears to be a picture of a police Panasonic CF-31 computer with the RMS program open on the screen.

Q.    Do you recognize that as your RMS system on the screen?

A.    I do.

Q.    Can you tell just by looking at this when this photograph was taken?

A.    No.

Q.    Can you tell from looking at this who took it?

A.    No.

          MS. BERNSTEIN:  Let's scroll back two pages to thirty- -- okay, good.

BY MS. BERNSTEIN:

Q.    Now we're at 11A, page 32.  What are we looking at here?

A.    The police-issued Panasonic CF-31 computer with RMS open.

          MS. BERNSTEIN:  If we can zoom in on the bottom third, there?

BY MS. BERNSTEIN:

Q.    Can you tell who was logged into the RMS system when this photo was taken?

A.    Yes.

Q.    Who's that?

A.    Vanderpool.

Q.    Can you tell what date this photo was taken?

REDACTED TRANSCRIPT

JA650

BRENDAN GILL - DIRECT EXAMINATION

A.    I -- no.

Q.    Can you tell us your hesitation on that?

A.    The -- I can see that there's a date in the image, but I don't actually know if this image itself was taken on that specific date.  The date/time can be modified on computers.

Q.    Can be modified on what?

A.    On computers.

Q.    Okay.  So what is the date showing there in the corner?

A.    9/17/2019.

Q.    At what time?

A.    At 5:44 p.m.

Q.    Did you check the RMS audit that we were just looking at to see if there was a corresponding entry for this?

A.    I did.

Q.    Was there?

A.    There was.

            MS. BERNSTEIN:  Let's go back to 22, please.

            All right.  This time, let's go to page 5, and Ms. Richart, if you could highlight the second and third rows, please.

BY MS. BERNSTEIN:

Q.    What do these rows tell us?

      Start at the bottom if you would, the View row; what does that tell us?

A.    Sure.  Vanderpool's account viewed the document, that case

REDACTED TRANSCRIPT

JA651

report on September 17th, 2019 at 5:41:49 p.m.  That same account by then had pulled, then closed again the same document, 9/17/2019 at 5:45:23 p.m.

Q.   So how long did Vanderpool's account have this document open, the report open on that date?

A.   Four -- four-ish minutes.

Q.   Long enough to take a photo and send a DM?

A.   Yes.

MR. ZAMPOGNA:  That calls for speculation.

THE COURT:  Overruled.

A.   Yes.

MS. BERNSTEIN:  All right.  Ms. Richart, if you could highlight the top row, there, please.

BY MS BERNSTEIN:

Q.   What does this row tell us?

A.   An individual named Robinson viewed this report on October 4th, 2019 at 11:30:19 a.m.

Q.   So now we're talking October 4th.  Do you know who David Robinson is?

A.   I do.

Q.   Who's that?

A.   He was a captain in our Internal Affairs Division.

MS. BERNSTEIN:  Can we go up to page 4, please, and zoom in on the bottom.

JA652

BY MS. BERNSTEIN:

Q.   Is this another entry from the same date, October 4th?

A.   It is.

Q.   Who was viewing it -- at what time?

A.   Evan Baxter was viewing it, and the time being 11:49:57 a.m.

Q.   Do you know who Evan Baxter is?

A.   I do.

Q.   Who's that?

A.   A -- he was then a corporal assigned to our Internal Affairs Division.

Q.   So this document tells us that on October 4th, Internal Affairs was looking at this report.

A.   Correct.

        MS. BERNSTEIN:  All right.  Before we take this down, can we go back to page 1.

        And focus in on the last couple there, yes, last couple lines.

BY MS. BERNSTEIN:

Q.   We see your name there, and it says, you went in here and viewed the system on July 18th, 2024.  What's that?

A.   I -- I did look at the report on that date.

Q.   Who were you looking at it for on that date?

A.   At the request of the FBI.

        MS. BERNSTEIN:  Let's go down now to page 2 and scroll

JA653

to page 3 so the witness -- can we pop up two pages at the same time?  Okay.

So we've scrolled from 2 to 3 for the witness.  And if we can go back to 2 now.

BY MS. BERNSTEIN:

Q.   Tell us what we're looking at in that changeover from page 2 to 3.

A.   There was my adding details into the narrative section of the report.

Q.   And that's what we looked at earlier when you said you had your narrative at the top?

A.   Correct.

Q.   Can you circle here the narrative that you entered.

A.   It begins on page 2 and carries over into page 3.

MS. BERNSTEIN:  And I think the easier -- let's go back to Exhibit 1, please, page 4.

BY MS. BERNSTEIN:

Q.   The narrative at the top of this page, is this the same narrative that we were just looking at on Exhibit 22?

A.   It is.

Q.   All right.  I'm going to read this narrative -- first of all, is this -- this part appears what you wrote into the system, right?

A.   Correct.

Q.   I'm going to read this narrative and ask you to read along

BRENDAN GILL - DIRECT EXAMINATION

and make sure that I read it correctly, okay?

A.    Okay.

Q.    On this date, I made administrative changes to this report to comply with established reporting procedures and protocols. I have no firsthand knowledge of this incident, subsequent investigation, or lack thereof if that should be the case, or any pending or post-criminal procedures.  These administrative changes were performed at the request of the Office of the Mayor and Town Council for the Town of Fairmount Heights in consultation with the PGPD Chief of Police and/or designee.  For further information, please contact Police_RMS@co.pg.md.us.

      Did I read that correctly?

A.    You did.

Q.    When you made that entry into the system, did you change any other narrative that had already been put in there?

A.    No.

Q.    Now, are officers trained that when they write a report in the RMS system, they're creating a permanent record?

A.    Yes.

Q.    And you said that officers are taught what when they check in the report, they know that that's being made available to everyone else?

A.    Yes.

Q.    And I asked you earlier about whether when somebody searches a case number, this report comes up.  I'm going to ask

JA655

a variation on that question; are officers trained on that point?

A.   Yes.

Q.   Tell us why you went in on February 23rd, 2020 and added this narrative?

A.   This report was not submitted -- had not been submitted to a supervisor a records custodian in order for it to meet Maryland law for reporting requirements under the UCR program, or the Uniform Crime Reporting program.

Q.   Are officers trained in the RMS system taught that when they write a report, they are supposed to send it to a supervisor?

A.   Yes.

Q.   How do they do that in the system?

A.   So there is a spoke-wheel-like button on the case folder itself, on the same row as the document, and when the officers are finished with the report, they click that button.  It then gives them the prompt to either notify a specific supervisor by name, or a group or a bucket of supervisors, letting them know that the report is ready for their review and approval or rejection.

Q.   Let me see if I can give you a visual that will help.

          MS. BERNSTEIN:  Can we have 11A -- yes, page 32.

BY MS. BERNSTEIN:

Q.   Is this what you were just describing?

REDACTED TRANSCRIPT

JA656

BRENDAN GILL - DIRECT EXAMINATION

A.    It is.

Q.    Can you circle there, when you were just talking about a spoke wheel that they push to notify a supervisor; do you see that there?

A.    Yup (complying).  So that is the wheel.

Q.    Okay.  Hang on I'm going to get rid of what you just drew and let Ms. Richart zoom in on that.

All right.  So that spoke wheel that you just circled, officers are trained that they can push that button and they notify their supervisor that they have just written a report, right?

A.    Correct.

Q.    And they're supposed to do that?

A.    Yes.

Q.    Are they trained what will happen if they push that button the next time their supervisor logs onto the computer?

A.    Yes.

Q.    What are they told will happen the next time their supervisor logs on?

A.    There's a messaging button at the very top of the screen. Supervisors, when they log into it, will actually see a notification number at that -- on that button, for them to notify the supervisors that a report has been routed to them for their review and approval or rejection.

Q.    So an officer knows that if he pushes that button, his

JA657

supervisor's attention is going to be drawn to this report?

MR. ZAMPOGNA:  Objection to the "knows that" the supervisor's attention will be drawn to it.

THE COURT:  Why don't you frame it in terms of training.

MS. BERNSTEIN:  Sure, Judge.

BY MS. BERNSTEIN:

Q.   Is an officer trained that if he pushes that button, his supervisor's attention will be drawn to that report next time he or she logs on?

A.   Yes.

Q.   Is an officer trained that if he doesn't push that button, the supervisor's attention will not be drawn to it?

A.   Yes.

Q.   If an officer writes a report here but declines to push that button, is he still creating a permanent record?

A.   Absolutely.

Q.   And is that part of the training?

A.   Absolutely.

Q.   Will there be anything to bring that permanent record to the attention of their supervisor?

A.   No.

MS. BERNSTEIN:  Okay.  You can take that down, please.

BY MS. BERNSTEIN:

Q.   All right.  I want to switch gears a little bit and talk

REDACTED TRANSCRIPT

JA658

BRENDAN GILL - DIRECT EXAMINATION

about training regarding documentation.  You mentioned earlier that you've trained officers on the RMS system, right?

A.    Yes.

Q.    Now, when you do your trainings, do you talk to officers about what does and does not have to be documented?

A.    I do.

Q.    All right.  Let's start with a traffic stop.  If an officer makes a traffic stop and just writes a ticket how is that stop documented?

A.    A citation alone does not need to go in RMS; the ticket itself serves as the documentation.

Q.    What if the officer puts the driver in handcuffs, puts her in a police car, and drives her away from the scene?

A.    That is to be documented within RMS as an incident report or a case record.

Q.    What's an MDT; do you know that term?

A.    I do; it stands for mobile data terminal or mobile data computer.

Q.    So it's just what it sounds like; it's a computer that's in the car?

A.    Specifically, the CF- -- Panasonic CF-31 is an example of an MDT or MDC.

Q.    If an officer has an MDT, can he or she write these tickets and reports right from the car?

A.    Yes; it's designed for just that purpose.

REDACTED TRANSCRIPT

JA659

MS. BERNSTEIN:  Can we have Exhibit 2 up, please?

BY MS. BERNSTEIN:

Q.   What are we looking at?

A.   This appears to be a citation, a traffic ticket, in essence, a digital one.

Q.   And generally, where does an officer draft a traffic ticket like this?

A.   On their MDC, using a specific software program.

MS. BERNSTEIN:  Can we have Exhibit 3 up, please?

BY MS. BERNSTEIN:

Q.   What are we looking at here?

BY MS BERNSTEIN:

A.   It would appear to be a handwritten uniform citation, like a criminal summons.

Q.   Is this the thing that you said earlier is written on a physical ticket book?

A.   Yes.

Q.   Is that something that officers generally have in their car?

A.   Generally, yes.

Q.   So if an officer does a traffic stop, issues a ticket, and issues a criminal citation, can all of that be done from the scene?

A.   Yes.

Q.   Would there be any need to leave the scene?

REDACTED TRANSCRIPT

JA660

A.    No.

MS. BERNSTEIN:  Okay.  Can you take that down?

BY MS. BERNSTEIN:

Q.    I was asking you about training on what does and does not need to be documented.

Do you talk to people about impounding cars?

A.    Yes.

Q.    When an officer impounds a car, does he or she need to document that?

A.    Yes.

Q.    Is that part of your RMS training?

A.    It is.

Q.    What document does the officer have to fill out?

A.    An impound record, located within the impound module.

Q.    Can you think of any legitimate circumstance in which an officer could have a car towed and not document it?

A.    No.

MR. ZAMPOGNA:  Objection; calls for speculation, but it's already ...

THE COURT:  Overruled.

BY MS. BERNSTEIN:

Q.    All right.  Let's switch gears again.

Are you familiar with the term "CAD"?

A.    I am.

Q.    What does that term stand for?

REDACTED TRANSCRIPT

JA661

BRENDAN GILL - DIRECT EXAMINATION

A.    Computer-aided dispatch.

Q.    And very generally and nontechnically, what is that?

A.    A digital system used to record communications between individuals that call 911 and 911 call-takers, as well as between public safety, fire, EMS, and police and a dispatcher.

Q.    Tell us what a dispatcher is.

A.    A dispatcher is almost like an air traffic controller. Their main duties is to ensure that police, fire, and EMS resources are sent to appropriate areas for 911 calls, to ensure officers are safe, and to make sure that, you know, they're aware of where all the officers are at any given point in time.

Q.    So when a police officer is out in the field having an interaction with the public, is that generally transmitted back by radio?

A.    Generally, yes.

Q.    To the dispatcher?

A.    Yes.

Q.    Are those communications recorded?

A.    They are.

Q.    And is that -- tell me what that recording is called.

A.    It's an audio, some people call it a radio run, but in essence, it's just the audio of the channel, the audio of the communications between an officer and a dispatcher.

Q.    So a CAD recording, a radio run, a radio transmission, are they all the same thing?

REDACTED TRANSCRIPT

JA662

A.    In essence, yes.

Q.    All right.  So I want you to walk us through how these radio communications generally work, and let's take a traffic stop as the example.  When an officer pulls someone over, what kind of communications happen?

A.    The officer will inform a dispatcher first and foremost of their call sign, their location, the location of the traffic stop, 101 Main Street, for example, a physical description of a vehicle, like a blue Ford Focus, the license plate numbers and the state of that vehicle, of -- I'm sorry, of that registration plate, and then the total number of occupants.

Q.    And is there sometimes some kind of police jargon that goes back and forth on the radio run?

A.    Yes, very frequently.

Q.    Like, for example, does an officer say, I have two people in the car?

A.    Yeah.  An example of police jargon for that would be occupied two times.

Q.    Okay.  Let's say this arrest -- this traffic stop leads to an arrest situation.  Is there a requirement for the officer to notify Dispatch?

A.    Yes.

Q.    What does the officer have to notify Dispatch of?

A.    They have one in custody and are transporting an individual.  They would describe their race and gender from

JA663

point A to Point B, so from this location to Upper Marlboro jail.  They would also provide their starting mileage from when they left.  And the same is said then in reverse upon their arrival.

Q.    Did you review a CAD recording that corresponded with the traffic stop of Ms. Stewart that we've been talking about today?

A.    I did.

Q.    Is that Government Exhibit 9?

A.    I'm going to say yes?

Q.    Oh.  Well, were you given Government Exhibit 9 to listen to?

A.    Yes.

Q.    So assuming that is the same Government Exhibit 9 you have here, did you listen to Government Exhibit 9?

A.    Yes.

Q.    Did you also watch and listen to Government Exhibit 9A?

A.    Yes.

Q.    What is the difference?

A.    One is just -- made more clear what the words are in the trans- -- in the actual audio.

Q.    With captions?

A.    Yeah, it's captioned.

Q.    For 9A, is the entire radio run captioned or just part?

A.    Just parts.

Q.    What parts?

REDACTED TRANSCRIPT

JA664

BRENDAN GILL - DIRECT EXAMINATION

A.    When a Fairmount Heights unit is speaking.

Q.    Is there a written document that corresponds with a CAD recording?

A.    Yes.

Q.    What's that called?

A.    A CAD printout.

        MS. BERNSTEIN:  Can we have Exhibit 8 on the screen, please?

BY MS. BERNSTEIN:

Q.    Do you recognize this document?

A.    I do.

Q.    What is this?

A.    This is a CAD printout.

Q.    For what stop?

A.    Sheriff -- a traffic stop on Sheriff and Cabin Branch, the same stop, reference to the report that we discussed earlier.

Q.    So this is the traffic stop involving Raynna Stewart?

A.    It is.

Q.    What time did that traffic stop begin?

A.    11:22:54 p.m.

Q.    Can you circle where you're looking?

A.    (Complying.)

Q.    Okay.  So you've circled the top left of the screen.  I'm going to take away that mark and then ask Ms. Richart to zoom in on the top third of the page.

REDACTED TRANSCRIPT

JA665

Q.    All right.  So this incident began at what time?

A.    11:22:54 p.m.

Q.    And according this document ended when?

A.    The next day, at 12:31:57 a.m.

Q.    Okay.  So check my math, here.  Is that about an hour and ten minutes?

A.    Yeah, approximately.

Q.    Now, you said that you listened to the recording that corresponds with this incident, right?

A.    I did, yes.

Q.    Is it 70 minutes long?

A.    Absolutely not.

Q.    How long is it?

A.    15, 16 minutes.

Q.    Can you explain that?

A.    We do not include downtime or silence in recordings.  When we provide these types of recordings, we only actually capture when communications are being made, when words are being spoken. The rest of that white noise or white space is condensed, it's eliminated.  We don't --

Q.    So it's basically the communications for an hour and ten minutes squooshed down into 16 minutes?

A.    Correct.

Q.    And I can't remember if I asked this, but the communication that are on this recording that happened in an

JA666

BRENDAN GILL - DIRECT EXAMINATION

hour-and-ten-minute period, is that just this incident, or are there lots of incidents being talked about?

A.   Yeah, it's all incidents during that time frame.  So it doesn't matter who is using that radio channel at that time; those are all preserved and provided.

MS. BERNSTEIN:  Okay.  Can we have Exhibit 9A up, please.

And Judge, I'm sorry, technical question; when we have a demonstrative exhibit, like 9A, do we need to do anything to move 9 into the record?

THE COURT:  Well, has this already been -- is there any objection to this?

MS. BERNSTEIN:  No.

THE COURT:  No.  Okay.

MS. BERNSTEIN:  But --

THE COURT:  This is admitted just as if it were an actual paper document.  Okay.

MS. BERNSTEIN:  So 9A is a demonstrative, and the actual exhibit I won't be using.  The actual Exhibit is 9.

THE COURT:  Okay.  So what's the question?

MS. BERNSTEIN:  For the record, do you want me to have her put 9 up even though I'm not going to play it, or may I just move 9 into the -- may I just move to admit 9, the one that I'm not going to play?

THE COURT:  Well, are you ever going to play 9?

REDACTED TRANSCRIPT

JA667

MS. BERNSTEIN:  I was going to play the demonstrative instead, which is 9 with captions.

THE COURT:  Okay.  You can just play 9A, then.

MS. BERNSTEIN:  Okay, thank you.  And we'll have this issue again with the WhatsApp exhibits, where we have demonstratives.

Okay.  May I have 9A up, please.

Okay.

BY MS. BERNSTEIN:

Q.   Before we hit Play --

MS. BERNSTEIN:  Let's go back to the CAD -- I'm sorry, let's go back to No. 8.

BY MS. BERNSTEIN:

Q.   This CAD report, you said, is basically a physical report of the recording, related to the recording, right?

A.   In essence, yes.

Q.   Who are we about to listen to on the recording, as it relates to this call?  Who calls this call in?

A.   Fairmount Heights 3.

Q.   Do you know who that is, or does this -- does this exhibit in front of you identify who that is?

A.   It does, and I do.

MS. BERNSTEIN:  Can we zoom in on the bottom third of the page, please.

REDACTED TRANSCRIPT

JA668

BY MS. BERNSTEIN:

Q.   Okay.  Who is FA3?

A.   Vanderpool.

     MS. BERNSTEIN:  Okay, we can take that down.

BY MS. BERNSTEIN:

Q.   All right.  So before we hit Play, you've listened to 9A, right?

A.   Yes.

Q.   Who is it who calls in the traffic stop?

A.   Fairmount Heights 3.

Q.   Are we going to hear officer call in the plates for the car Ms. Stewart was driving?

A.   Yes.

Q.   Who's that?

A.   The same officer.

Q.   Do you know if Fairmount Heights 3 got an answer when he ran the plates?

A.   Yes.

Q.   Do you know whether Fairmount Heights 3 was told whether Ms. Stewart had a driver's license?

A.   Yes.

Q.   Tell us what happens at the end of the recording.

A.   There is an attempt by the dispatcher to raise both Fairmount Heights 3 as well as Fairmount Heights 4.

Q.   Let me stop you there for one second.  Fairmount Heights 3

JA669

and Fairmount Heights 4, why was the dispatcher trying to raise two of them?

A. Oh, the dispatcher was attempting send them to a 911 call.

Q. Were there two officers involved in the interaction, in the traffic stop?

A. Yes.

Q. Was that relayed over the radio?

A. Yes.

Q. By whom?

A. Fairmount Heights 3.

Q. Okay. And then you said the dispatcher was trying to raise them up. Tell us what that means.

A. Yeah, my apologies. That's police jargon for, get on the radio and pay attention, because I'm trying to send you somewhere.

Q. All right. Now explain that. So the dispatcher was trying to raise them up to do what?

A. Send them to a 911 call.

Q. What happened?

A. There was a lengthy attempt to get those two units of Fairmount Heights 3 and 4 to respond to the dispatcher. After five-plus attempts with no acknowledgment, the dispatcher used what's called a tone, and it's an audible signal that's designed to get officers to pay attention to the radio, in case the volume's down --

REDACTED TRANSCRIPT

JA670

Q.   Why does -- oh, I'm sorry.

A.   That's all right -- in case the volume may be down, on their radio.

Q.   And I'm sorry, because I stepped on you, but why does a dispatcher issue this tone if he or she doesn't get a response from officers?

A.   To get them to pay attention that they're being called.

Q.   Did anybody eventually respond to the dispatcher, after that tone?

A.   Yes.

Q.   Who responded?

A.   Fairmount Heights 4.

Q.   Did Fairmount Heights 3 ever respond after the dispatcher tried to call them up?

A.   No.

        MS. BERNSTEIN:  All right.  Let's go ahead and play Exhibit 9A.

     (Audio recording being played.)

BY MS. BERNSTEIN:

Q.   For the record, I've just stopped the recording at 1 minute 13, just to have you remind us, when there are no captions up there, what we're hearing is unrelated to this case; is that right?

A.   Correct.

        MS. BERNSTEIN:  Okay.  We can continue playing,

REDACTED TRANSCRIPT

JA671

please.

(Audio recording being played.)

BY MS. BERNSTEIN:

Q.   Okay.  For the record, we've stopped the recording at 3 minutes and 8 seconds in.  You've listened to this recording, right?

A.   I have.

Q.   For the next ten minutes or so, is there anything related to this case?

A.   There is not.

MS. BERNSTEIN:  Can we fast-forward, please, and pick up again at about -- yeah, let's pick up at 15 minutes.

(Audio recording being played.)

MS. BERNSTEIN:  You can take that down.

BY MS. BERNSTEIN:

Q.   At any point in that recording, does either officer report that they're taking Ms. Stewart away from the scene?

A.   No.

Q.   Do they ever report their mileage?

A.   No.

Q.   Do they report that they're leaving and going to the Fairmount Heights police station?

A.   No.

Q.   All right.  I'm going to leave that recording and go back to this incident involving Defendant Vanderpool and

REDACTED TRANSCRIPT

JA672

Raynna Stewart.

You said you pulled these incident reports and the audits, right?

A.    I did.

Q.    Did you look for any other reports?

A.    I did.

Q.    Did you check to see if there was a booking report for Ms. Stewart?

A.    I did.

Q.    Was there?

A.    No.

Q.    Did you check to see if there was an impound report?

A.    I did.

Q.    Was there?

A.    No.

          MS. BERNSTEIN:  May I have one moment?

          I'll tender the witness, Judge.

          THE COURT:  Mr. Zampogna, cross-examination?

          MR. ZAMPOGNA:  Yes, Your Honor, just about 30 seconds to get up there.

                    CROSS-EXAMINATION

BY MR. ZAMPOGNA:

Q.    Good afternoon, Officer.  I want to first talk about, you've mentioned in the direct the word "official" report.  What do you mean by that?

REDACTED TRANSCRIPT

JA673

BRENDAN GILL - CROSS-EXAMINATION

A.    The reports that are entered into the program when they are complete, meaning all of the required fields have been satisfactorily completed.

Q.    So that doesn't mean it's approved by a supervisor?

A.    Correct.

Q.    Doesn't mean a supervisor looks at it?

A.    Correct.

Q.    So when you wrote RMS manual why did you have a part that has supervision approval in it?

A.    It is a requirement for agencies to have reports that are authored have a second opinion, a second person to look at them, to ensure that they are accurate, that the narrative section is properly describing all of the other fields that are contained within the report, to satisfy UCR requirements.  That is what that supervisory review is for.

Q.    And in the normal course of business, there would be -- that would occur, or no?

A.    Yes.

Q.    Okay.  Now, let's switch directly to the Fairmount Heights Police Department specifically.  Are you aware of that department?

A.    I am aware of them, yes.

Q.    Okay.  And you -- did you create the sys- -- you created the system that connects to that department, right, the RMS system?

REDACTED TRANSCRIPT

JA674

BRENDAN GILL - CROSS-EXAMINATION

A.   I -- correct.  It's a County product, County system that was given to all municipalities for no charge.

Q.   But you authored it?

A.   I authored --

Q.   Or programmed --

A.   -- all of the -- yeah, in essence.  I provisioned it, yes.

Q.   I didn't mean to interrupt you, I'm sorry.  Programmed it --

A.   No, that's all right.

Q.   -- would be a better way put it, I guess, in computer jargon.

     Do you know how many computers exist at the Fairmount Heights Police Department?

A.   No, sir, I do not.

Q.   Do you know if it's more than one?

A.   I do not.

Q.   Do you know if they have desktops?

A.   I would presume that they would, but you're right, I do not in fact know.

Q.   So you don't know if they have laptops either, then.

A.   They do have laptops.

Q.   Are you -- okay.  Do you know how many laptops?

A.   I do not.

Q.   Do you know at the time of this incident how many laptops they may have had?

REDACTED TRANSCRIPT

JA675

A.    No, sir.

Q.    How do you know they had laptops?

A.    There was a picture in the previous exhibit that was a Panasonic Model 31 that's a laptop.

Q.    Okay.  But you don't know, besides that picture, that they had one?

A.    I don't know how many others, if that was the question, sir no.

Q.    You don't have any independent knowledge beside the picture is what I meant.

A.    Correct.

Q.    Okay.

      So do you rely on the local small department in this case to make sure that the system that you created or programmed is secure as far as how it's accessed from that police department?

A.    Yes.

Q.    Do you rely on -- I'm sorry, I didn't mean to stop you; I just wanted make sure you heard me say "rely."

A.    Yes.

Q.    Do you know personally if Martique Vanderpool was trained on RMS?

A.    I do not.

Q.    You didn't see him write any of these reports as you deemed them official directly, did you?

A.    When you say, did I see, as in did I physically stand

behind or next to him and watch him author a report?

Q.    Yes.

A.    I did not, no.

Q.    You know there's a password associated with that report, correct, or with Mr. Vanderpool; he has a password to enter your RMS system?

A.    Yes.  All officers are provided with a user name and a password that's unique to them.

Q.    Do you know what that password is?

A.    I do not.

Q.    Do you know if anyone else knew what that password was?

A.    No, sir, I do not.

Q.    I think you stated on direct that you saw the word "mike-HP" describing, I guess, or maybe "naming" a computer, if that's a better word; do you recall that?

A.    I do.

Q.    And do you have any idea what that means?

A.    I do.

Q.    What does it mean?

A.    I don't necessarily know what the actual word M-I-K-E dash H-P means, but that series of letters corresponds to an internal name of a specific computer.  It's called a host name.  That is, you know, a law enforcement computer on the INet connection that has RMS on it.

Q.    And to create a name on a computer, is that using the

REDACTED TRANSCRIPT

JA677

Microsoft program to create a name on that computer?

A.    I'm sorry, your question's a little too vague for me.

Q.    Well, how do you put a name -- how do you name --what's -- how do you name a computer?

A.    Yeah.  There are multiple different ways to set a naming -- name of a computer; there's a few different ways to do that.

Q.    What would be one way?

A.    When a computer is initially set up, in essence, it is given to that computer by an IT professional that has those rights to make changes on that computer at that time.  That host name stays with that computer, in essence, for the duration of that computer's life.

Q.    And if we're just talking about laymen terms in naming computers, like, for instance -- well, I'll just say my computer's a personal computer, and it's a PC.  Can I change the name of that computer?

A.    You can on your personal computer, yes.

Q.    Okay.  And in this case, are you -- you testified earlier, you don't know who is in charge of the Fairmount Heights IT department?

A.    I do not -- correct, I do not know who specifically by name is in charge of that department, yes.

Q.    And -- sorry.  And at the time of the "incident" in September of 2019, did you know?

A.    No.

REDACTED TRANSCRIPT

JA678

Q.   Okay.  So you don't know how the naming occurred on the computer.  As you testified, it could be many different ways -- or not many, several, two, I think, or three.

A.   Yeah, I would disagree with that.  I don't know, procedurally, if I were to sit in front of a computer and try to retroactively determine how it was done.  I can however tell you, because as I stated earlier, it is a CJIS system, those computers have specific requirements, so I can tell you that the naming convention was given to the computer when the computer was first, you know, set up by whoever did their IT.  But step by step, you're right, I don't know how that was done.

Q.   Okay.

     Do you know how many officers were at the Fairmount Heights Police Department in September 2019, including senior officers?

A.   No, sir.

Q.   Do you know if there was a Chief of Police?

A.   I do not know that.

Q.   Do you know the name Watkins?

A.   In -- related to this specific --

Q.   Yes.

A.   Yes.

Q.   And who was he?

A.   An officer assigned to that agency.

Q.   Okay.

A.   On behalf of that agency, I presume.

REDACTED TRANSCRIPT

JA679

Q.   So if he in fact looked at the report, as you described it, but did not approve of it, would that surprise you?

A.   Can you just be a little bit more clear?  I'm sorry if --

Q.   Well, we were talking about different officers accessing computers and reports I think earlier and supervisors approving of reports, and I think in your direct testimony, you talked about the difficulty in seeing it unless you press the little wheel -- at least that's how I describe it, or the -- I don't know how you said it exactly -- to send it to that person.

     Does that help?

A.   No.  No, unfortunately, it doesn't.

Q.   Okay.

A.   I think -- the workflow process is -- it's right in your face the minute you walk into that -- or you open up that folder.  In the image we saw in the previous exhibit, it actually had the stage of that workflow process name right there.  That would change if the report had been sent from an officer to a supervisor.

     But in reference to your other part of your question, sir, I apologize, I'm not sure I quite understand it.

Q.   Well, if a supervisor accessed the report but didn't approve it, would that be normal?

A.   I think it would be normal for other officers to view reports, but an officer that hasn't submitted a report to a supervisor for review would not give a supervisor the ability

JA680

programmatically to approve it.  In essence, if I didn't send it to you, even if you are a supervisor, and you wanted to go approve something, you couldn't, because it hasn't been sent to you for approval.

Q.   So let me just deconstruct a little.  So if a supervisor did look at a report, even though it wasn't sent to him, would they want to approve it, would they think, I should approve it, or they wouldn't?

A.   I unfortunately would have no way of knowing the answer to that.

MR. ZAMPOGNA:  Could you pull up Government Exhibit 22, please.

I don't know who's going to -- thank you.

BY MR. ZAMPOGNA:

Q.   So this is Auditing History.  I don't know if you -- can you see that on your screen?

A.   I do.

Q.   Okay.  And I believe it's on page 6, at the bottom.  You can see --

MR. ZAMPOGNA:  Oh, thanks for doing that.

BY MR. ZAMPOGNA:

Q.   -- two -- two times the word, Watkins, Stephen.  Could you tell me what that means on that -- those two?

A.   Sure.  Would you like me to go from the first one or the bottom one, or it doesn't matter -- not matter?

REDACTED TRANSCRIPT

JA681

BY MR. ZAMPOGNA:

Q.   I guess -- what do we usually think, back -- first to last? I don't know, the whole --

A.   Okay.  So the first box here, with the action of Close, states that a user ID of -- a user name, account Watkins, closed the report on 9/13/2019 at 11:37:37 a.m.  Prior to that, the same user name printed this report, also 9/13/2019 at 11:27:43 a.m.

Q.   Does -- and does that mean that it was open that whole time, or not?  Or can't we tell from this?

A.   I -- yeah.  From this, unfortunately, I would not be able to answer that question.  I can tell you that on those both dates and times, those are the two actions that were taken.

        MR. ZAMPOGNA:  Could you flip to the page 7 right after that, whoever's running this?  Thank you.

        And you could highlight the top, Stephen Watkins, View?

BY MR. ZAMPOGNA:

Q.   Could you indicate what this means, View?  Because I think the other pages said Close and Print, and now we see View.

A.   That "View" means that this user account was looking at the report on 9/13/19 at 11:26:17 a.m.

Q.   And then, from Earl Ivey at the beginning to I guess his end, which is ... yeah.

REDACTED TRANSCRIPT

JA682

Would this also be someone else who looked at this report or did something, or what did they do with this report, I guess I would ask.

A.   Yeah, so from my understanding of your question, Ivey also viewed this report.

Q.   Did he also print preview?

A.   He did.

Q.   And then it looks like -- so there's two.  Does that mean you do it twice, or -- and then you print it twice?  It says two prints and two print previews, right?  Do you know what that means, if you do that twice?

A.   I can tell you what the system captures under those, but I would not be able to answer what Ivey specifically did on his computer, if that makes sense.

Q.   What does it capture, then?

A.   The -- so there's a print and a print preview button on the program.  We found that sometimes individuals, if a computer is lagging, they'll try to maybe click it quicker, then a computer will do something faster, but in essence, that actually is not what it's -- what it does, so that's -- sometimes you'll see duplicate requests within, you know, about 10, 20 seconds of each other.

Q.   And I know I may have asked this earlier; do you know who Earl Ivey is?

A.   I do not.

REDACTED TRANSCRIPT

JA683

Q.   Okay.  Now, this report, besides these instances, there were others that accessed this report, as you called -- as you class- -- or as you used the term, "official" report besides these several; is that right?

A.   Correct.

Q.   Because we have, for instance, on -- I think it's 9:10 it was printed, we've gone through that, opened and printed, and then Watkins, as we said, on 9:13 did this, and then -- or someone with the name Watkins that typed into it, and then, it was again ac- -- it was accessed many times, at least, so we can say.  I can leave out all the names, but I don't -- read all of the dates, but I don't -- I think it's in the document to be looked at; is that accurate to say?

A.   You had said -- yeah, I would agree with you that there are a lot of individuals that looked at this report, but you had said, "typed into it."  I'm sorry; I would disagree with that statement.

Q.   Okay, I didn't mean to indicate that; I just meant to be viewed, printed, et cetera.

A.   Well, with that stipulation, yes, absolutely, there's multiple individuals that looked, viewed, and printed this document.

         MR. ZAMPOGNA:  Could you bring up the CAD report, please?

REDACTED TRANSCRIPT

JA684

BY MR. ZAMPOGNA:

Q.    Okay.  I think at the bottom, we -- you had highlighted or we highlighted earlier -- the government highlighted earlier Vanderpool's name.  You also see that there's Watkins' name at the bottom as well, Stephen Watkins.

A.    Yes, sir.

Q.    Do you know why that's in the CAD report?

A.    He was Fairmount Heights 4.

Q.    Okay.  Would that mean he -- I understand by looking at it, that's what it literally says, but what does it mean by having his name in the report, anything?

A.    He was on that call for service, or that traffic stop.

Q.    So he would have been in that traffic stop according this CAD report?

A.    According to this.

Q.    Okay.

        THE COURT:  So it's 4- -- excuse me, it's 3:55.  We've been going for about an hour and 40 minutes.  How much longer do you think you have?  And I am not rushing you; I am just planning.

        MR. ZAMPOGNA:  I don't know if -- you don't want me to talk fast, so probably 45 minutes or half an hour -- maybe half an hour or less, I guess.

        THE COURT:  Okay.  Why don't we just take a ten-minute comfort break, and then we'll come back, and we'll go until

REDACTED TRANSCRIPT

JA685

BRENDAN GILL - CROSS-EXAMINATION

5:00, okay?

MR. ZAMPOGNA:  Thank you, Your Honor.

THE COURT:  All right, thanks.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Recess taken from 3:55 p.m. - 4:10 p.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Okay.  Please be seated.

I'm hoping we can finish with this witness today, even if we have to stay slightly past 5:00, or perhaps not too much past 5:00.

Okay.  Mr. Zampogna.

MR. ZAMPOGNA:  Thank you, Your Honor.

BY MR. ZAMPOGNA:

Q.   I wanted to now turn to the a RMS manual itself.  And I think I may have misspoken earlier, when I said you programmed the RMS system; I think it was actually -- was it actually purchased from Motorola, or no?

A.   I did not purchase the system from Motorola.

Q.   Oh, okay.

A.   It is a Motorola product.

Q.   Oh, okay.

A.   However, the -- all of the customizations are done locally.

Q.   I see.  Okay, all right.  Then maybe I have misspoken, I

REDACTED TRANSCRIPT

JA686

don't know, but I just wanted make sure I was clear.

Okay.  So you are obviously familiar with RMS manual, I assume.

A.    Yes, sir.

Q.    You literally wrote it; is that right?

A.    Yes, sir.

Q.    Okay.  And when did you first create the RMS manual?

A.    The best guess --

Q.    Sure.

A.    So I don't have the exact dates --

Q.    Yeah.

A.    -- but the first version was created in 2016, sometime after July.

Q.    And I have put into evidence version 4.1.1.  What -- I mean, I know -- could -- well, what version would that be?  I know it's 4.1.1, but how many versions from the first one would that be; do you know?

A.    The first version I believe was version 4.0, so not -- it's not far from the initial release.

Q.    So it's only been edited a few times, maybe?

A.    It's -- from my memory, I'm going to -- I would agree with that.

Q.    Okay.  And if you go to page 16 --

MR. ZAMPOGNA:  And I don't know who has this to put it up.  Can you -- oh, I'm sorry it's our Exhibit 1, Defense

JA687

Exhibit 1, page 16.

BY MR. ZAMPOGNA:

Q.    This goes through a step-by-step analysis which you somewhat did I think with the U.S. Attorney's questioning as to how you enter into the fields information; is that right?

A.    I'm sorry, are you asking if that's what it does on this page --

Q.    Yes.

A.    -- or the manual itself?

Q.    Yeah, this page; does it speak about how to input information?

A.    No.

Q.    What does it say on this page?

A.    This page just simply defines what some of the various modules are within the program.

Q.    And when you say "modules," what does that mean?

A.    Like an impound module contains impound information and impound records, the same for the booking module that contains arrestee records and arrestee information.

Q.    Okay.  Then, if we flip to page 23, which is USO107633 -- I probably should have said that earlier.

It's a page that starts with the word "Offenses;" is that right?

A.    Yes.

Q.    And for instance, here, then -- maybe this is where I

REDACTED TRANSCRIPT

JA688

should have started.  It has like a pull-down menu, where when whoever's writing the report, this is what it looks like on the screen; am I describing it at all accurately or not?

A.   Yes.  So the screenshots do depict what an officer would see on that specific type of a screen.

Q.   Okay.  And prior to doing this, an officer has to log into the system; is that right?

A.   Yes, sir.

Q.   Okay.  And then, let's see, on page -- page 25, similarly, it says -- it has another entry to put in the offenders; is that right?

When it --

A.   Yes.

Q.   I'm sorry.  So that's what the screen looks like to whoever's typing it in; is that right?

A.   Correct.

Q.   Or using it, okay.

A.   I will, however, state, the field in the previous page, there was a notation about this being dynamic, meaning, when you fill out a report here on the bottom, additional fields may populate.  So although the screenshot you're displaying now is static, various drop-downs, based off of various selections, will trigger all the reporting requirements, and that is not displayed right here in this image.

Q.   Okay, all right.  I'm just trying to get an idea of how it

JA689

literally works, so -- and then, specific to this, our

discussions today, on page 37, there's a page called Narrative.

Is that -- I'll wait till -- sorry -- till it's pulled up.

Is that right?

A.    Yes, that's -- the title of this page is Narrative.

Q.    And when you saw the -- I guess, you know, the report, as

we described it, with Defense Exh- -- or I'm sorry,

U.S. Attorney's -- People's Exhibit 1, is -- would this be the

screen you would go into, to type that out?

A.    Yes, sir.

Q.    Okay.

And it even describes at the bottom of this -- and I'll

read it and highlight.  All narratives must support all elements

of the offenses listed on the offense tab.  And then, the

letter -- use the letters to shorthand a description of a person

within the narrative is no longer acceptable, not to be used.

(A) for arrest, for defendant, for field observation are

examples of prohibited characters.  And I assume that means like

defense with like the triangle, don't do that, or something; is

that -- am I wrong?

A.    I don't quite get the triangle analogy, but if you're

asking if me listing the arrestee as just the letter A is

prohibited by stuff like this, then that answer is yes.

Q.    Okay.  And then, I think it's on page 61, we go to the

supervisor's section, and this is where the report says, all

REDACTED TRANSCRIPT

JA690

records are to be submitted to a supervisor for approval and forwarded to Records via a process call Workflow.  Is that accurate?

A.    That is.

Q.    Okay.  And this describes, I guess, how the computer system moves the data; is that what's going on in this ...

A.    No, the data is automatically stored forever the minute it's entered into the fields.  So when it's changed from -- an illustrative example, we displayed during the auditing report where it was blank and then there was data added; that is automatically stored --

BY MR. ZAMPOGNA:

Q.    All right.

A.    -- the moment it's saved, in essence.

This, however, describes the digital path a report moves from an officer to then be submitted on behalf of that police department to the State of Maryland and the Bureau of Justice Statistics to comply with UCR; that's what this does.

Q.    Okay, yeah.  I was -- I must have inartfully said data moving, but that's what I was trying to get at.

So the -- so if a supervisor saw the report, would they normally just then leave it, or would they ask about it?  What would the RMS system ask -- say to them to do, this ...

A.    So I don't know what a supervisor would normally do.  I can say that the program is very clear that the report has not been

REDACTED TRANSCRIPT

JA691

BRENDAN GILL -- CROSS-EXAMINATION

submitted to a supervisor that they can then take action on it if a supervisor specifically goes in and hunts for that specific type of report.

The supervisor would not have the ability to approve it using this process unless it was submitted to them.

Q.   And the supervisor has folders himself or herself, right, to organize things that are approved and sent to them; is that right?

A.   No.

Q.   They don't have their own folders?

A.   Correct.

Q.   Oh, okay.

So the supervisors have no way to store anything in the system; is that your testimony?

A.   No.

Q.   Okay, what is it, then?

A.   I'm a little confused as to the question, now.  If --

Q.   Well, the question was, can the supervisor store information in the RMS system, and I believe you said no.

A.   I don't quite know what the supervisor, under your question, would need to specifically store.  If, presumably, the question is, does an officer -- or does a supervisor have the ability to write reports, yes, just like everybody else.  If the supervisor has the ability to denote approval, rejection, any sort of other comments or questions, this screen does illustrate

REDACTED TRANSCRIPT

JA692

a free text box with their approval decisions, and all of that detail, just like log-on activity or change over time, that is stored, but I'm not -- I'm not ...

Q.   Okay.  Well, how about on page -- I'm sorry, I didn't mean to stop you; go ahead.

A.   No, by all means.

Q.   Okay.  I guess I'm just trying to, you know, see how this works and see -- I guess, on page 63 -- yeah 63, US0107673, it says, Moving CSF Records from One Folder to Another. Supervisors and investigators can move a call for service record from one case folder to another.  So what does that mean?

A.   So there's a process by which a CAD report sends a very watered-down version of itself to the records system.  The RMS system and the CAD system are interconnected.  There are times where, for example, multiple individuals will call 911 to report the same incident.  Those various 911 calls would generate their own CAD report.  This procedure on page 63 describes how investigators and supervisors can go to the CAD system and take the various ancillary 911 reports, calls, and place them into a single folder for use.  That's what this page is discussing.

Q.   And that's their folder?

A.   That is the incident's folder.  So the RMS system is not predicated on a specific officer; it's all incident-based.  So an incident has a folder.

REDACTED TRANSCRIPT

JA693

Q.   So who would have access to that incident folder?

A.   Everybody that has access to the system.

Q.   Okay.

And then, there's a discussion on page 65 about how to -- basically, how to -- RMS Code Change Guide.  So this is more of a discussion of what?

A.   This is the procedures in which a Prince George's County police officer can request a disposition clearance adjustment based off of RMS details, yes.

Q.   Okay.  And what does that mean?

A.   Yeah.  Changing a code from a 300 series -- in laymen's terms, that's where no report is written, that's what a 300 means -- to a 500, which is, I don't need to write a report, this would describe some of that.

Q.   Okay.  Now, you said you didn't know much about the computer, or you didn't know how many computers the Fairmount Heights department had; is that accurate?

A.   Yes.

Q.   Is it common or is it good practice to have a computer in a common area with a password, possibly, on the screen?

A.   No, that would not be good practice.

Q.   Okay.

A.   And just so I'm clear, that is good practice to have a common computer; it is not a good practice to put that common computer's password on the screen.

REDACTED TRANSCRIPT

JA694

BRENDAN GILL - CROSS-EXAMINATION

Q.   Is it good practice having a common area, in other words, an area where any- -- multiple people could access, even the public?

A.   Sure.

Q.   So it would be good idea to have a police computer accessible to the public; is that your testimony?

A.   To the public, no, but a common area of the station, yes. Like a good example would be the Department of Corrections; there are four -- five or so computers there.  We're all sworn law enforcement in the jail; and we complete the process and paperwork.  So that would be good practice.

Q.   Right.  The public can't get into a correctional facility very easily; is that accurate?

A.   Yes, sir, it is.

Q.   Unless they commit a crime.  Okay, yeah.

     Okay.  Now, I think there's -- there is also part of the RMS system where it says, you can, if you believe there's a problem with the system, save the report to your desktop, or save it to your computer itself, but it's not good practice?

A.   I -- no, I would not be able to answer that in any specific way.

Q.   So it wouldn't be secure, then, to save something to a desktop from the RMS system that would be considered a report, or would it be considered a report?

A.   I -- no, the ... can you expand a little bit about your

REDACTED TRANSCRIPT

JA695

question?  I --

Q.   Let's say there's an RMS incident report and you decide, I'm going to cut and paste it and stick it on a Word document and save it on my desktop.  That's not advisable, I assume, or is it?

A.   No, that's not, that's not advisable, and actually -- there is no way to save an -- a digital record of that nature and then for it to then be still considered a digital record of that nature on your desktop.

Q.   So you can't cut and paste it?

A.   If you print it to a PDF, then convert the PDF to a Word document with Adobe Pro, and then edit it that way --

Q.   Okay.

A.   -- sure, but it's far removed from the program at that point.

Q.   I know we had earlier submitted the computer order from Fairmount Heights.  Let's see; I've got to find it myself. I think it's 7 -- sorry, it's 7-1, Exhibit 9 for the defense.

BY MR. ZAMPOGNA:

Q.   Are you familiar with this order at all?

A.   No, sir, I am not.

Q.   Okay.  Is it common for local police departments to have their own computer use and security orders?

A.   Yes.

Q.   Okay.  And as this states, it's important to have

JA696

BRENDAN GILL - CROSS-EXAMINATION

security -- I think it's part II -- each department computer has its own function and security features; that would be an important policy to have?

A.    Yes.

Q.    Okay.  Were you -- you weren't consulted about this order and how to create this order by Fairmount Heights?

A.    I was not.

Q.    Okay.

Would a supervisor who asked a subordinate to write a report, would that be acceptable?

A.    If -- so just so I'm clear, if I as a supervisor am asking another officer to go alter a police report, is that the question, if that's acceptable?

Q.    Yes.

A.    Yeah, absolutely.

Q.    Okay.  If they weren't at scene, would that be acceptable?

A.    Potentially.  I know that there's instances where reports can be written over the phone.

Q.    Okay.

I think in your -- according to the federal -- Fairmount Heights -- Fairmount Heights General Order, it does indicate -- I think it's on the next page too.

It talks at the about, at the bottom, Procedures, and it says, Members using the station's CJIS will log on through a VPN by entering their assigned user name, password, and token code.

JA697

BRENDAN GILL - CROSS-EXAMINATION

Do you know if there was a virtual private network at the Fairmount Heights Police Department?

A.    I do not.  However, this is specific to a very specific type of computer.

Q.    That's the computer you described that you use, right, a CJIS computer?

A.    No.  This is discussing an NCIC computer that requires an ORI number.  Those are highly regulated, controlled by the federal government.

Q.    Right.

A.    So I -- I'm not familiar with that process here.

Q.    That's fine, I'll move on.  So on the virtual private network, what is a virtual private network?

A.    It is a method that a computer can use to connect into something remotely, safely and securely.

Q.    And does that generate an IP address to its own?

A.    It can, it can use a static one.  There's a lot of different ways that that can be configured based off of the need of the type of system it's connecting into.

Q.    And what is an IP address?

A.    An assigned value to a computer that is used for location authentication and routing.

Q.    So when you say "location," you can actually tell from the IP address where a computer might be located?

A.    Potentially.  It does depend several factors, but that is

an avenue for location finding.

Q.    And in this case, did you run a search on the IP addresses of the computers used in Fairmount Heights?

A.    I did not.

Q.    Do you know anyone who did that?

A.    No.

Q.    Just one other question.

MR. ZAMPOGNA:  In 11A -- I think it's the Def- -- U.S.'s 11A -- sorry to make you switch back.

Thank you so much for helping me.

BY MR. ZAMPOGNA:

Q.    There's a picture.

(Conference between Mr. Zampogna and Ms. Bernstein.)

BY MR. ZAMPOGNA:

Q.    I think you looked at this earlier, the screenshot, I believe, maybe?

A.    Yeah, it looks fam- --

THE COURT:  Let me just -- for the record, this is page 32 of Exhibit 11A.

MR. ZAMPOGNA:  Okay.  Thank you, Your Honor.  I didn't even see page number on that one.

THE COURT:  There isn't one; I just counted.

MR. ZAMPOGNA:  Okay.  Well --

MS. BERNSTEIN:  Typed in the top left, Your Honor, very small.

REDACTED TRANSCRIPT

JA699

MR. ZAMPOGNA:  Okay.  I can't see it, but sure.

THE COURT:  I didn't see the number in the top left.

MR. ZAMPOGNA:  In any event, we're there.

BY MR. ZAMPOGNA:

Q.   So do you know what the little -- in the middle of the screen, below, Working in:  Prince George's County Police, and it says Message, there's two little triangles with exclamation points; do you know what those mean?

A.   The -- next to the -- can I circle?

Q.   Yeah, of course --

A.   Or are we discuss- --

Q.   -- whatever makes it easy for you.

A.   Are you talking about that right there (indicating)?

Q.   Yes, yes.

THE COURT:  Don't talk over each other, please.

MR. ZAMPOGNA:  Oh, I am sorry.

THE WITNESS:  Sorry.

BY MR. ZAMPOGNA:

Q.   You go.

A.   Are you talking about those?

Q.   Yes, I am.

A.   I am familiar with them.

Q.   Well, what do they mean?

A.   That is an indicator that the report is not approved by a supervisor and/or routed for UCR.

REDACTED TRANSCRIPT

JA700

Q.    Okay.

MR. ZAMPOGNA:  All right.  That's all I have, thanks.

THE COURT:  Okay, thank you.

Any redirect?

MS. BERNSTEIN:  Just a few minutes, Your Honor.

REDIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.    I just have a few more questions for you, Sergeant Gill.

I want to start with some questions about who the officers were who were on the scene of this arrest.  They identified themselves on the radio how?

A.    Verbally.

Q.    As who; what were their call signs?

A.    Fairmount Heights 3 and Fairmount Heights 4.

Q.    Do you have any personal knowledge of who those two call signs are assigned to?

A.    Personally, no.

Q.    Just based on what you read on that CAD?

A.    Yes, ma'am.

Q.    All right.  Do you know how Fairmount -- to whom Fairmount Heights has assigned FA4?

A.    No.

Q.    You were asked some questions at the beginning of cross about how a computer can be named.  Do you remember those questions?

REDACTED TRANSCRIPT

JA701

BRENDAN GILL - REDIRECT EXAMINATION

A.    Yes.

Q.    On a network, can two computers have the same name, on one network?

A.    No.

Q.    Every computer on a network has to have a unique identifying name?

A.    Yes.

Q.    My last question, or series of questions, is, a follow-up on the questions you got about supervisory approval.  You mentioned that -- you mentioned earlier that RMS rules require an officer to notify their supervisor and get approval on a report, right?

A.    Yes.

Q.    When a supervisor signs off on or approves a report, what is that supervisor indicating by approving it?

A.    That he has reviewed the narrative and the associated required fields throughout the other tabs, those details are consistent, and it is ready for the agency to report it to various other parties.

Q.    So this might sound like a circular question, but when a supervisor approves a report, is he or she indicating approval of it?

A.    No, not really.  He's indicat- -- well, I guess, yes, they're indicating at that point that the report is thoroughly consistent and it's devoid of obvious errors, like grammar or

JA702

BRENDAN GILL - REDIRECT EXAMINATION

spelling.

Q.   If an officer thinks -- if a supervisor thinks a report is hinky, should the supervisor approve it?

A.   No, no.

MS. BERNSTEIN:  May I have Exhibit 22 up again, please, on page 6?

BY MS. BERNSTEIN:

Q.   Now, you said you don't have any personal knowledge of who Stephen Watkins is, right?

A.   Correct.

MS. BERNSTEIN:  Can we go down to the bottom, please, and zoom in --

BY MS. BERNSTEIN:

Q.   -- on the bottom two rows that you were shown on cross-examination?

So whoever Stephen Watkins is, he looked at this report on September 13th, right?

A.   Yes.

Q.   I want you to do some math for me.  How many days was that before September 17th?

A.   Four.

MS. BERNSTEIN:  No further questions.

THE COURT:  Okay.

MR. ZAMPOGNA:  Can I just have one follow-up?

THE COURT:  Yes, as long as you talk into the

REDACTED TRANSCRIPT

JA703

microphone.

MR. ZAMPOGNA:  Okay.  Yeah, I'm sorry, Your Honor.

RECROSS-EXAMINATION

BY MR. ZAMPOGNA:

Q.  So just in recrossing what she just asked you, there was something about mike-HP, and I think it's Government Exhibit 23 I'd like to just show you.

MR. ZAMPOGNA:  If you can bring that up.

Thanks.

BY MR. ZAMPOGNA:

Q.  So in this one, in this exhibit, it has mike-HP listed several times.  And we did discuss IP addresses earlier?

A.  We did.

Q.  And in here, there are different IP addresses for mike-HP.

A.  Yup.

Q.  What would explain that, if you can only have one name on the network?

A.  So the IP address in this instance, due to the connection by municipality into a County network is not static.  The account -- the device name and that IP address are not indicative of this folder on this specific stand; it's saying that 192.168.1.37 is Prince George's County Government.  So that is what that designator is for.  It's not a specific building or room level locator.  The host, device name of mike-HP, that has to be unique and specific; otherwise, it would not connect into

REDACTED TRANSCRIPT

JA704

BRENDAN GILL - RECROSS-EXAMINATION

the County services.

Q.   And you're saying, the IP address here on this document isn't that IP address?

A.   I'm saying that it is not static.  So they change frequently.

Q.   So how would you know if there was more than one computer using different IP addresses if they change all the time?

A.   The IP changes, the name cannot.

Q.   So no one can ever change a name on a computer.

A.   On the government computer, correct.  That is a field that has to remain consistent.  Like another look would be -- or another example of this would be, I don't know, the only row on this page, sir, that looks like the cells are two, the device name would be DOC82616.co.pg.md.us.  That is that device's name for that computer.  Can that name be reused?  Yes, sir, but on a different machine, when that specific instance, that computer itself, the original, is destroyed.

Q.   Okay, thank you.

          MR. ZAMPOGNA:  Nothing further.

          THE COURT:  Okay.  Sergeant Gill, you may step down. Your testimony is concluded.  Thank you very much.

          THE WITNESS:  Thank you, Your Honor.

          THE COURT:  Okay.

          MS. BERNSTEIN:  The government calls Doniese -- I'm sorry, would you like me to call our next witness, Judge?

REDACTED TRANSCRIPT

JA705

THE COURT:  Just one moment; not quite yet.

So at the outset of the trial, you identified three exhibits that the defense did not agree to the admissibility of, Exhibit 1, 9, and 22.  Where do we stand with respect to those exhibits now?  9 was ...

MS. BERNSTEIN:  Those are the ones we addressed this morning, Your Honor, that we worked out all of the disputes over the weekend and there was no objection as of this morning.

THE COURT:  Okay.  What I heard, I thought, this morning, there was no objection as to authenticity, but there was still an objection as to admissibility?  So I'm confused.  I need to hear from the defense.  Where do you stand on Government's Exhibits 1, 9, and 22?

MR. BLUESTONE:  Your Honor, over the weekend, they did ask us to stipulate to the authenticity, and after receiving the certificates of authenticity for all three, we did stipulate to the authenticity.  We do maintain that Exhibit 1 is hearsay, which they said that they would not be using for hearsay purposes, I believe, and we still dispute the admissibility of 1 and 22.

THE COURT:  Do you move for the admission -- hold on.  Do you move for the admission of Exhibit 1?

MS. BERNSTEIN:  Yes, ma'am.

THE COURT:  On what grounds?

MS. BERNSTEIN:  Exhibit 1 is highly relevant, it's the

REDACTED TRANSCRIPT

JA706

incident report that is the basis for the charge.  We laid a foundation through this last witness.  We laid a foundation that this is the official report, with the name Martique Vanderpool on it.  We laid a foundation for the fact that this was a unique identifying account that drafted this report.  It is not hearsay; it's an 801(d)(2)(A) admission, and yes, Judge we move it into evidence, please -- or offer it into admission.

THE COURT:  Is it your position that this would also be a business record under 803(6)?

MS. BERNSTEIN:  The document itself is a business record.  We are offering it -- actually, may I have one moment.

THE COURT:  Mm-hmm.

(Conference between Ms. Bernstein and Ms. Allison.)

MS. BERNSTEIN:  I will simplify my answer; yes, Your Honor.

THE COURT:  Thank you.

MR. BLUESTONE:  Your Honor, as I discussed last week, because the government alleges that this report was falsified, it does not lack the reliability required for the business record exception to hearsay.  Furthermore, we still maintain they have not laid any form of adequate foundation showing that it was in fact Officer Vanderpool who authored the report, and so it does not qualify as an opposing party statement against interest.  That is, we still hold it to be hearsay -- inadmissible hearsay, Your Honor.

REDACTED TRANSCRIPT

JA707

MS. BERNSTEIN:  May I have one more comment on hearsay, Judge?

THE COURT:  You may.

MS. BERNSTEIN:  We are not offering it for the truth of the matter asserted; we are actually offering it for the falsity of the matter asserted.  It doesn't even fit with the definition of hearsay.

MR. BLUESTONE:  They have offered it -- parts of it for the falsity, but they claim that other parts of the incident report are accurate, and they are being admitted -- sorry, offered for the truth of the matter asserted, and so the document as a whole lacks the reliability or the -- to be a business record exception or -- and it lacks a foundation to be a statement against interest, Your Honor.

THE COURT:  Okay, thank you.

Anything else?

MS. BERNSTEIN:  Nothing, unless you have any questions Your Honor.

THE COURT:  No.  All right.

Okay.  I have considered the testimony of Sergeant Gill with respect to the RMS system and their creation of the document at Exhibit 1, which is the incident report that was generated through the RMS system.  I find that this document is admissible under Rule 803(6), which allows for the introduction of records that are kept in the regular course --

JA708

in the course of a regularly conducted activity of a business. It meets all the requirements under Federal Rule of Evidence 803(6) and United States v. Cone; it's a Fourth Circuit case from 2013, 714 F.3d 197 at 219.

For a record to be admitted as business record, it must be made by a regularly conducted business activity. We have that case here.

(2) Kept in the regular course of that business. We have evidence that this was kept in the regular course of business.

(3) The regular practice of that business to make the memorandum. This was the regular practice, to create an incident report.

And (4), made by a person with knowledge or from information transmitted by a person with knowledge. The entries in here were made by someone with access to the system and who had knowledge of the incident report.

So this is admitted under 803(6).

Let's turn to Exhibit 22. Exhibit 22 is a printout of the auditing history of this incident report. Sergeant Gill testified about it. This too falls under the business records exception under 803(6). Is there anything else from the government on Exhibit 22?

MS. BERNSTEIN: No, Your Honor.

THE COURT: From the defense?

REDACTED TRANSCRIPT

JA709

MR. BLUESTONE:  No, Your Honor.

THE COURT:  All right.  Both are admitted.

All right.  Your next witness.

MS. BERNSTEIN:  The government calls Doniese Collins.

THE COURT:  Good afternoon.  If you could please approach the witness stand to be sworn in.

THE COURTROOM DEPUTY:  If you could stand there, face me, and raise your right hand, please.  You do solemnly swear or affirm under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Speak loudly and clearly into the microphone, state your full name for the record, and spell your first and last names.

THE WITNESS:  Doniese Collins, D-O-N-I-E-S-E, C-O-L-L-I-N-S.

THE COURTROOM DEPUTY:  Thank you.

DONIESE COLLINS, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.   Good afternoon, Officer Collins.

A.   Good afternoon.

REDACTED TRANSCRIPT

JA710

Q.    Could you please introduce yourself to Judge Boardman and tell her where you work?

A.    Yes.  My name is Officer Collins, and I work for the Metro Transit Police Department.

Q.    Is that here in Maryland?

A.    Yes.

Q.    What's your position with Metro Transit?

A.    I'm a training coordinator.

Q.    Is that with an academy?

A.    Yes.

Q.    What's the academy?

A.    So now, our academy is the Metro Transit Police Department Criminal Justice Academy.

Q.    What was it called back in 2017?

A.    Metro Transit Police Academy.

Q.    Now, tell us very generally, what does a training coordinator do?

A.    So the training coordinator coordinates training.  So we have -- okay, we have our own academy.  So for any recruits that are coming through that are going through the basic program and also for any sworn members in service, any specialized training, we have to coordinate all their training to include maybe teaching classes, doing lesson plans, creating PowerPoints, so it's -- it's a lot.

Q.    That was going be my next question.  You actually do

REDACTED TRANSCRIPT

JA711

Q.   training yourself, in addition to coordinating training?

A.   Yes.

Q.   How long have you been a training coordinator for the academy?

A.   Since 2011.

Q.   How long have you been teaching there?

A.   Since 2011.

Q.   Do you teach at something called a comparative compliance course?

A.   Yes.

Q.   Did you teach a comparative compliance academy class in 2017?

A.   Yes.

Q.   And we'll talk in a minute about what those words mean, but first of all, did you ever teach the defendant, Martique Vanderpool?

A.   Yes.

Q.   Do you recognize him?

A.   Yes.

Q.   Can you point him out?

A.   He's -- has a blue suit with a yellow shirt.

        MS. BERNSTEIN:  Just for the record, she has -- may the record reflect that she's identified the defendant.

BY MS. BERNSTEIN:

Q.   Did you teach Mr. Vanderpool in a 2017 academy class?

JA712

DONIESE COLLINS - DIRECT EXAMINATION

A.    Yes.

Q.    All right.  I have a bunch of questions for you about training in general and about Mr. Vanderpool, but first, I'd like you to let the Judge get to know you a little bit better.

A.    Okay.

Q.    Did you grow up around here?

A.    I did.

Q.    Can you tell the Judge where you grew up and where you went to college.

A.    So I grew up in -- I'm from Laurel, but I grew up in Cheverly.  And I went to Fairmount Heights High School, and I ended up graduating from High Point University in High Point, North Carolina.

Q.    Out of college, did you go right into law enforcement?

A.    I did not.

Q.    What did you do?

A.    I was working in healthcare, so I worked for UnitedHealthcare in North Carolina, Blue Cross/Blue Shield of North Carolina, and then I moved here.  And I actually started working for CareFirst BlueCross BlueShield before I pursued my career in law enforcement.

Q.    When did you start in law enforcement?

A.    2007.

Q.    So you've been with Metro the whole time?

A.    Yes.

REDACTED TRANSCRIPT

JA713

Q.    Did you have to go to an academy when you first started law enforcement?

A.    Yes.

Q.    Where'd you go?

A.    So I went through the Northern Virginia Criminal Justice Academy.  That was the regional academy.

Q.    Now, when you started with the police department, did you work in patrol?

A.    Yes, every officer has to start in patrol.

Q.    And then you said you became training coordinator in 2011?

A.    Yes.

Q.    So I'm going to do math on the record; is that about 13 years you've been doing this?

A.    Yes.

Q.    All right.  I want to focus you on the 2017 class that you taught.  You said a minute ago that Defendant Vanderpool was in a comparative compliance course.  Can you tell us what that is?

A.    So we are a tri-jurisdictional agency, Metro Transit Police is.  So we are Maryland, D.C., and Virginia.  So even though, you know, we go through the Northern Virginia Criminal Justice Academy in Virginia, Maryland, they have offered a waiver program for individuals that have gone through a full academy.

      There are certain aspects of Maryland that may be different from other jurisdictions, where -- whether it be writing citations or law, so it's an abbreviated program that is usually

REDACTED TRANSCRIPT

JA714

DONIESE COLLINS - DIRECT EXAMINATION

typically six to nine weeks, and you actually have to -- there are certain objectives that you have to hit, but as long as you hit those objectives and you submit the information, Maryland will allow you to get certification in the State of Maryland.

Q.   So let's break that down a little bit.  If somebody has no law enforcement experience, do they have to go through a full academy?

A.   Yes.

Q.   Approximately how long is that, usually?

A.   It can -- generally, it's like six months.

Q.   But if somebody has been a certified police officer somewhere else and they move to Maryland, there's a compressed course that they take?

A.   If they've been somewhere else and they want to get on with a Maryland agency, as long as you -- you have to submit information to MPCTC, who is the oversight agency, and they say, okay, well, yes, you've gone through a full academy, you are -- you are allowed to go through a compliance program.

Q.   And that's a shorter academy, is that right?

A.   Yes, mm-hmm.

Q.   Talking about the defendant in particular, had Mr. Vanderpool already been through another academy?

A.   Yes.

Q.   Where had he gone; do you know?

A.   The Northern Virginia Criminal Justice.

REDACTED TRANSCRIPT

JA715

DONIESE COLLINS - DIRECT EXAMINATION

Q. The same academy you went to?

A. Yes.

Q. How long was the compliance course that he took?

A. I think it was eight weeks, I think it was eight weeks.

Q. All right. So I want to focus you on the compliance course. Do you-all just teach whatever you want, or do you have certain standards you have to follow?

A. No, we have to follow certain standards. I mentioned it before, MPCTC.

Q. Yeah, tell us what that is.

A. It's a mouthful. Okay. Maryland Police Correctional Training Commission, MPCTC. So they're the oversight agency for Police and also Corrections, so there are objectives that they say you have to hit; you have to teach to these objectives.

Q. And let me ask you a couple questions about what that means.

A. Okay.

Q. Are the objectives -- do they just give you topics to teach, or do they tell what you have to teach about those topics?

A. They tell you what you have to teach.

Q. Is that what you mean by objectives?

A. Yes.

Q. How specific are they about how you teach each topic?

A. So I'll give you an example. Like for legal, they'll say,

REDACTED TRANSCRIPT

JA716

you have to -- the recruit or trainee will know the -- these legal terms and the elements that comprise these terms, burglary, arson, sex crimes.

Q.   So just following up on that example, is part of the training teaching the officer, the recruits, about Maryland law?

A.   Yes.

Q.   Criminal laws?

A.   Yes.

Q.   Give us just a sampling, if you would, of some of the topics that you cover in this course.

A.   Human trafficking, rules of arrest, intellectual and developmental disabilities, handling persons with disabilities.

Q.   Are there a whole bunch of topics?

A.   There's a bunch.

Q.   And for each one, the state agency gives you guys the specific guidelines about what to teach; is that right?

A.   Yes, yes.

Q.   Now, as the training coordinator -- well, you said you were -- you taught at the academy as well, right?

A.   Yes.

Q.   Did you teach a number of courses?

A.   I did, yes.

Q.   All right.  And I'm not going to try to make you remember all of them, but just give us a sampling of some of the courses that you've taught.

REDACTED TRANSCRIPT

JA717

A.    Again, like human trafficking, I've taught the credentialing process, arrest procedures, I've taught writing reports, citations.

Q.    So you've taught a bunch of different things?

A.    Yes.

Q.    As a training coordinator, are you only familiar with the courses that you taught, or are you also familiar with the other courses being taught?

A.    I'm familiar with all of the courses, because again, I'm the one that puts all the training together, contacts the instructors, a lot of times will do the lesson plan and give them the lesson plan so that they can teach off of it, so ...

Q.    I was going ask if you review lesson plans, but what I think I just heard is that you also sometimes write the lesson plans; is that right?

A.    Yes, yes.

Q.    Do you review PowerPoints that other instructors use?

A.    Yes.

Q.    Do you sometimes sit in on other instructors' classes?

A.    Yes.

Q.    So your job is to be familiar with the whole curriculum?

A.    Yes.

Q.    All right.  When you listed topics, did you mention something called rules of arrest?

A.    I did.

REDACTED TRANSCRIPT

JA718

Q.    Is that a course that's taught in the compliance course?

A.    Yes.

Q.    Do you teach it?

A.    I teach it.

Q.    Did you teach it to Mr. Vanderpool?

A.    I did.

Q.    All right, so let's talk about that.  It's called rules of arrest.  Is that what it sounds like?

A.    It's arrest procedures.

Q.    Do you talk specifically about -- do you teach the students about the definition of an arrest?

A.    Yes.

Q.    Does it cover the procedures for how you make an arrest?

A.    Yes.

Q.    And does it touch on rules for documenting arrest?

A.    Yes.

Q.    In the compliance course, is there any training on report writing?

A.    Yes.

Q.    And you already said there's training on Maryland state criminal laws, right?

A.    Yes.

Q.    Do you all talk in the academy to these officers about different ways officers can get themselves into trouble?

A.    Yes.

REDACTED TRANSCRIPT

JA719

Q.    And do you talk about ways to avoid trouble?

A.    Yes.

Q.    All right.  I want to zero in on the rules of arrest class. You said you taught that in 2017, right?

A.    Yes.

Q.    Do you teach your students what it means for them to have someone in custody?

A.    Yes.

Q.    What does it mean?

A.    It means that a person is not free to leave.  Basically, in custody is an arrest, so you know, this person is detained.  You may have to transport them to answer a criminal charge, if they performed a criminal charge or some type of civil act.

Q.    What do you tell your officers about what their responsibilities are once they take someone into custody?

A.    So I tell them that once they take them into custody, that is your person.  You are responsible for their well-being the moment that you put those handcuffs on that person, putting them in the vehicle, transporting them to wherever they need to get, with this person is now crying that something happened to them, you may have to take them to the hospital, but you are responsible for that person, for the entirety, as soon as you put those handcuffs on that person.

Q.    And this question might be redundant, but if an officer handcuffs someone and takes them away from the scene, based on

JA720

your training, is that an arrest?

A.    Yes.

Q.    And that person's in custody?

A.    That person's in custody.

Q.    Could anybody pass your class without knowing that?

A.    No.

Q.    I want to walk you through the procedures that you teach to your students.  You said, you talk to them about arrest procedures, right?

A.    Yes.

Q.    You could talk to them about the procedures for traffic stops?

A.    Yes.

Q.    If an officer is pulling a car over, does he or she need to notify anybody of that?

A.    Yes.

Q.    So you're smiling; why are you smiling?

A.    Because we are -- I always talk to our officers about knowing that communications is our lifeline.  So those are dispatchers.  So as Metro Transit police officers, we can be on foot, or we could be in a vehicle.  So I always harp on, you need to let communications know who you are, where you are, and what you have.

Q.    And let me talk about that for just a minute, because you were describing your police department, Metro Transit, right,

and I'm not sure if I asked this question, but at your academy, do you train recruits who are coming to work for Metro Transit?

A.    We train recruits that are coming to Metro Transit, and --

Q.    And then do you also train recruits -- do you also train people who are going to work elsewhere?

A.    Yes.  So that is an aspect of the Maryland compliance program.  So there are only certain agencies that will teach it, along with MPCTC, so for us, we were teaching it at the time, so we had individuals from other agencies that as long as you pay the fee, you were invited to come and take our compliance program.

THE COURT:  Ms. Bernstein, it's 5:00.

MS. BERNSTEIN:  Yes.

THE COURT:  Is there a natural stopping point in the near future, or is that right now?

MS. BERNSTEIN:  This is a fine place to stop.

THE COURT:  Okay, all right.

You are excused for the day.  You remain under oath. Please do not talk to anybody about the testimony you have just provided or the anticipated testimony you expect to provide tomorrow, okay?

THE WITNESS:  Thank you.

THE COURT:  All right.  We'll see you tomorrow morning.

THE WITNESS:  All right.  Thank you, Judge.

REDACTED TRANSCRIPT

JA722

DONIESE COLLINS - DIRECT EXAMINATION

THE COURT:  I'll just wait to talk to the lawyers about a few housekeeping matters.

Okay.  We will resume testimony tomorrow at 9:30.

Before we started the trial, I think Ms. Bernstein asked about instructions and whether I would be following some of the jury instructions.  So what I propose to do is provide the lawyers with the jury instructions that we -- or that I found were the proper ones at our pretrial conference a few weeks ago.  You can look at them overnight.  If there are any instructions in this packet that you think that I need to follow as part of the bench trial, let me know; it's incumbent upon you.

I mean, I understand the burden of proof, and beyond a reasonable doubt, and I certainly know the elements of the offense, but if there's anything else in here that I you think I need to abide by in order to ensure Mr. Vanderpool a fair trial, then I need you to tell me that, okay?

All right.  So I'll have my law clerk hand out those instructions, and as they're written now, they are as if they're said to a jury; I wasn't going to take the time to edit them. You can do that if you need to.

Okay.  So if you can let me know before we start tomorrow which instructions, if any, you think I need to follow or be mindful of and you can identify them by instruction number, I would appreciate that.

REDACTED TRANSCRIPT

JA723

MR. ZAMPOGNA:  And you think, Your Honor, you'd like us to tell you, sorry, by emailing or filing something?

THE COURT:  If you can file something, that would be preferable.

MR. ZAMPOGNA:  Okay, Your Honor.

THE COURT:  All right, thanks.  Just by 9:00 tomorrow morning; I don't think this is much of a heavy lift.

MS. BERNSTEIN:  I agree, Judge.

THE COURT:  Okay.  Are there any housekeeping matters from the government's perspective that we need to address right now?

MS. BERNSTEIN:  No, Your Honor.

THE COURT:  Okay.

Mr. Zampogna.

MR. ZAMPOGNA:  No, Your Honor.

THE COURT:  Okay.  Have a good night; see you in the morning.

MS. BERNSTEIN:  Thank you.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(The proceedings were recessed at 5:04 p.m.)

REDACTED TRANSCRIPT

JA724

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 27th day of November, 2024.

_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter

REDACTED TRANSCRIPT

JA725

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                              )
UNITED STATES OF AMERICA      )
                              )
     v.                       )   Case No. 8:23-cr-00234-DLB-1
                              )
MARTIQUE CABRAL VANDERPOOL,   )
                              )
              Defendant.      )
_____)

                              Greenbelt, Maryland
                              October 23, 2024
                              9:38 a.m.


                BENCH TRIAL, VOLUME 2

     BEFORE THE HONORABLE DEBORAH L. BOARDMAN
           United States District Judge


              A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

     U.S. DEPARTMENT OF JUSTICE
     Civil Rights Division
     150 M Street, N.E.
     7th Floor
     Washington, D.C.  20002
     BY:  BARBARA S. BERNSTEIN, ASSISTANT U.S. ATTORNEY
          (202) 353-0032
          bobbi.bernstein@usdoj.gov
     BY:  TARA KNOLL ALLISON, TRIAL ATTORNEY
          (412) 779-8970
          tara.allison@usdoj.gov




              PATRICIA KLEPP, RMR
             Official Court Reporter
          6500 Cherrywood Lane, Suite 200
            Greenbelt, Maryland  20770

***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA726

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

        ZAMPOGNA PC
        2101 L Street, N.W., Suite 300
        Washington, D.C.  20037
        BY:  CHRISTOPHER ADAM ZAMPOGNA, ESQUIRE
             (202) 223-6635
             caz@zampognalaw.com
        BY:  ABRAHAM BLUESTONE, ESQUIRE
             (202) 223-6635
             ab@zampognalaw.com, ESQUIRE

ALSO PRESENT:

        MARTIQUE CABRAL VANDERPOOL
        LILLY RICHART, PARALEGAL
        S.A. ELIZABETH HUNG - FBI

***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA727

<u>INDEX</u>

October 23, 2024

USA v. MARTIQUE CABRAL VANDERPOOL

<u>WITNESSES FOR THE GOVERNMENT</u>:

DONIESE COLLINS
        Continued Direct Examination by the Government
        (Ms. Bernstein) ...................................   9
        Cross-Examination by Defense (Mr. Bluestone) .........  34
        Redirect Examination by the Government (Ms. Bernstein)  46
        Witness Excused ...................................  51

LYLA ZEIDAN
        Witness Sworn .......................................  52
        Direct Examination by the Government (Ms. Allison) ...  53
        Cross-Examination by Defense (Mr. Bluestone)..........  75
        Redirect Examination by Government (Ms. Allison) .....  85
        Recross-Examination by Defense .....................  89
        Witness Excused ...................................  89

ELIZABETH HUNG
        Witness Sworn .......................................  90
        Direct Examination by the Government (Ms. Bernstein)..  91
        Cross-Examination by Defense (Mr. Zampogna) .......... 126
        Redirect Examination by the Government (Ms. Bernstein) 153
        Recross-Examination by Defense (Mr. Zampogna) ........ 169
        Witness Excused ................................... 170

JA728

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session, the Honorable Deborah L. Boardman presiding.

THE COURT:  Okay.  Good morning, everyone.  Please be seated.

(All responding:  Good morning, Your Honor.)

THE COURT:  Okay.  Let's just address a few housekeeping matters.  First, I just want to follow up on a ruling that I made yesterday at the close of yesterday's evidence.  The government argued that Exhibit 1, Government Exhibit 1, the incident report, was admissible for among other reasons because it was not offered for the truth of the matter. I did not rule on that.  I have since reflected on that, and I'll make an additional ruling.

Yesterday, I found that the incident report is admissible under the business records exception.  I also find it is not hearsay under 801(c) as long as the government does not offer it for its truth.

There are two cases that are relevant to that.  One is United States v. Vidacak, V-I-D-A-C-A-K, 553 F.3d 344 (4th Cir. 2009).  There, the Fourth Circuit held that a defendant's false statements were not hearsay when they were offered for the falsity of the matter asserted, in other words, they were

introduced to show the defendant had lied during his application interview. And then, Anderson v. United States, 417 U.S. 211, it's a 1974 case, in which the Supreme Court said the defendant's statements were not hearsay when the point of the prosecutor's introducing the statements was simply to prove that the statements were made so as to establish a foundation for later showing through other admissible evidence that they were false.

I think Vanderpool makes a good point, that some of the information in the incident report appears to be admitted for the truth of the matter asserted. For instance, Agent Zimmerman testified that the report reflected that R.S. was thin, small, and was 19 years old.

If the government wants to admit those statements in the report for their truth, that is, that was her build and that was her age, that biographical information can come in under the business records exception. See Ramrattan, R-A-M-R-A-T-T-A-N v. Burger King Corp., 656 F. Supp. 522 at 529 (D. Md. 1987). Or if the document or parts of it are not being offered for their truth, or that particular part, in other words, just to show that the author of the report believed R.S. was thin, small, and 19 years old, then it's not hearsay and it's admissible in any event.

So those are my supplemental rulings on the incident report.

I also have received ECF 137, which is Mr. Vanderpool's notice of requested instruction.

Mr. Vanderpool wants me to read into the record instruction 14-A.

Any objection?

MS. BERNSTEIN:  We have no objection, Judge.

THE COURT:  Okay.  I will read that into the record, and of course, I will abide by it.

You have heard the testimony of law enforcement officials.  The fact that a witness may be employed by the federal, state, or local government as a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than of any ordinary witness.  It is your decision after reviewing all the evidence whether to accept the testimony of a law enforcement witness and to give that testimony whatever weight if any you find it deserves.

Of course, I will abide by that.  I certainly have no difficulty doing that.

Okay.  Ms. Bernstein.

MS. BERNSTEIN:  I have one quick issue that came up last night when we were talking about exhibits.  Before I get into that, do you want me to introduce folks at counsel table for the record?

THE COURT:  Yes.

MS. BERNSTEIN: Okay. Bobbi Bernstein on behalf of the United States. With me at counsel table is my colleague, Tara Allison, Special Agent Elizabeth Hung, and our paralegal specialist, Lilly Richart.

THE COURT: Okay. Good morning again. Same crew from yesterday. Good to see you all.

MR. ZAMPOGNA: Good morning, Your Honor. Christopher Zampogna for the defense, to my left, Mr. Bluestone, and to his left, my client, our client, Mr. Vanderpool.

THE COURT: Again, same crew. Good morning to all of you.

Good morning, Mr. Vanderpool.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Okay.

MS. BERNSTEIN: So Judge, a quick issue that came up last night was with respect to Exhibit --

THE COURT: Make sure you're speaking into the microphone.

MS. BERNSTEIN: Yeah, sorry. With respect to Exhibit 9 and 9A -- that was the dispatch recording -- the only exhibit that we actually used was 9A, which is marked on the Exhibit list as a demonstrative, so I just wanted to be very clear for the record that the government is moving 9A as a substantive exhibit.

I think the defense has an objection to that, but I'm

going let them explain that.

MR. BLUESTONE:  We do have an objection to that.  We have only ever stipulated to the authenticity and to the admissibility of 9, the original audio file, as Agent Zimmerman -- or Agent Gill -- Officer Gill testified to its substance and nature.  No one cleared any foundation to describe the process of creating those subtitles; he just testified that they were only the relevant portions.

I think this also applies later to the WhatsApp recordings as well, which the government has created demonstrative versions of, and we still oppose the placing of the demonstrative versions as substantive evidence, Your Honor.

MS. BERNSTEIN:  I could maybe make this easy, Judge.

THE COURT:  I'm all ears.

MS. BERNSTEIN:  We are fine either way, just want to be very clear can on the record that we trust the fact finder to be able to separate the captions from the underlying audio.  We're fine either way, on the record, but -- whichever exhibit goes into the record is fine.

THE COURT:  All right.  I will just admit 9 and not 9A, since no foundation has been laid to how the subtitles were determined, who did them.  So I will admit 9, but 9A -- I will reserve on the WhatsApp; that's not before me right now.  Okay.

Okay.  Anything else?

MS. BERNSTEIN:  Not from the government.

THE COURT: Okay.

MR. ZAMPOGNA: Not from the defense, thank you.

THE COURT: All right.

MS. BERNSTEIN: So we'll recall Doniese Collins.

THE COURT: Good morning.

Good morning, Officer Collins. You are still under oath, okay?

THE WITNESS: All right. Good morning. Thank you.

DONIESE COLLINS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.   Good morning, Officer Collins.

A.   Good morning.

Q.   Welcome back.

A.   Thank you.

Q.   When we broke last night, you were talking to us about an officer's obligation to call in to Dispatch when he or she makes a traffic stop; do you remember that?

A.   Yes.

Q.   And I think the last thing or one of the last things you said was that you teach your students that Dispatch is their lifeline. Was that the word you used?

A.   Yes.

Q.   All right, let's pick up there. Can you tell us what you mean by that.

A. Because they're the ones that will call additional units, whether it be out in the field, whether for routine, or call other jurisdictions to start our way if is it's a situation where an officer is in trouble.

Q. All right. So let's back up a little bit and start with a traffic call. So when -- or traffic stop.

When an officer makes a traffic stop, what if anything is that officer required to call in to Dispatch?

A. There's supposed let Dispatch know where they are, who they are, and if they have a traffic stop. Once Dispatch acknowledges, then they'll give the tag, the vehicle information, so that Dispatch can let them know if the vehicle is wanted, stolen, or something like that. So they have to wait for that return. Once they get that return from Dispatch, then they can go and make their approach, to speak to the driver.

Q. "Return" just meaning an answer from Dispatch?

A. Right, mm-hmm.

Q. Let's say the traffic stop progresses to the point where the officer is going to make an arrest. What does the officer need to transmit back to Dispatch?

A. Well, they need to let the -- Dispatch know that they are -- they either are about to take one into custody or that they have one in custody.

Q. And then let's say the officer is going to take that person away from the scene; what if anything does the officer need to

JA735

relay back to Dispatch?

A. They need to let Dispatch know that again, they have one in custody, and they are -- where they are and where they're en route to, which detention or holding facility, and they also have to indicate their starting mileage.

Q. Their odometer reading?

A. Yes.

Q. Why is that?

A. Just for the safety of the officer and also for the individual that they are transporting. Again, we talked before about that person is in our custody, so we have to ensure the safety of that person for the entirety. And also for the officer, because we don't want anything to happen to the officer while that person or while the officer is transporting the individual. So it's a kind of CYA for the officer and also for the individual being transported.

Q. All right. I want to go into that a little bit more, but first, what you're telling us about this being for the protection of both the officer and the person being transported, is that something you talk to your students about?

A. Yes.

Q. All right. So break that down for us. You said, calling into Dispatch, letting them know where you're going, and your odometer reading is for the protection of the officer. Let's talk about that part first. How does that protect the officer?

A. It protects the officer because we want to make sure that the officer is -- so the individual being transported, if the individual, after they get out, they say, okay, well this officer did this and that and this to me, we can actually look at the odometer reading, the time that they left, and say, well, there's no way, from this point, point A to point B that that could have happened. So that's a way to kind of protect the officer from any type of unrealistic allegations.

Q. You teach the officers that if somebody were to make a false claim against you, this would protect you?

A. Yes.

Q. So when you say it protects an officer, is that assuming the officer is doing what the officer is supposed to be doing?

A. Yes.

Q. Let me go to the flip side. You said it also protects the person being transported. How is that?

A. Same -- in the same token, if we know or Dispatch knows that it takes five minutes to get from one place or to another place and the odometer reading is showing that -- first of all, it takes -- it took a longer duration and the odometer reading was much longer, then the officer may have done something that they should not have been doing.

Q. So if the officer is not doing what he's supposed to be doing, this odometer reading is going to protect the person being transported?

JA737

A.   Yes.

Q.   Do you talk with officers in your training class about the need to document arrests?

A.   Absolutely.

Q.   What do you tell them?

A.   I tell them that, you know -- whenever you're doing something, especially like a police report, that report follows from the time that you write it.  It goes to a lawyer, they read it.  This is something that will go to court, this document is going to follow for the entirety of the case.  So it is very important that you make sure the information that you put in there is clear and concise and true and accurate.

Q.   And do you talk about whether they can leave anything out, anything important?

A.   I tell them not to omit and do not add anything.

Q.   How hard do you drill into them the importance of being truthful in their reports?

A.   Very ... a lot.  We talk about it a lot.

Q.   And when an officer pulls someone over for a traffic stop, arrests them, and has their car towed, what parts of that do you teach the officers need to be documented into the report.  And I'll ask you bit by bit.  How about the fact that they made an arrest?

A.   Yes.

Q.   How about that they took the person away from the scene in

JA738

cuffs?

A. Yes.

Q. How about that they had the car towed?

A. Yes.

Q. Any question about that?

A. There's no question.

Q. I asked you yesterday if you ever talk to the students about how officers have sometimes gotten themselves in trouble. Do you remember that?

A. Yes.

Q. Is that something that you-all talk to people about in the compliance course?

A. Yes, we do talk about that. The recruits and the officers that are going through the compliance course, they get an ethics class that is actually taught by our Internal Affairs, so yes, they do get that.

Q. Are you familiar with that ethics class?

A. Yes.

Q. Have you reviewed the lesson plans?

A. Yes.

Q. Have you reviewed the PowerPoint or anything else used in that presentation?

A. Yes.

Q. Have you sat through that class?

A. I have.

Q.   Talk to us about what officers are told in that ethics class about how officers get themselves in trouble.

A.   Well, they talk about, we are in a position of public trust, the trust is -- it is import- -- paramount that the public do trust us, so once you are sworn in, you are donning the badge -- donning the uniform, and you are -- you have to respect the badge, and with that, there may be certain instances that individuals may forget it or that they take it for granted, and we do a lot of case studies about certain individuals within our department that that's happened to and these individuals have ultimately lost their job, got terminated, and they have gotten litigated against, so yeah.

Q.   Are there any of those case studies that you remember that involved sex?

A.   There was one.

Q.   Tell us about that.

A.   There was an individual that -- he was in plain clothes, and his girlfriend found out that he was taking indecent liberties with other individuals.  When she found out, she contacted the department.  This individual got called down to Internal Affairs.  So one of the things that they did talk about was, if we do call you down to Internal Affairs, just know that you need to tell the truth, because we probably already know if we're already asking the question.

Initially, they asked him, have you done anything?  He

JA740

initially stated no, he denied anything, and then finally, after about three or four times, he finally said, Yes, I was taking indecent liberties while I was on duty, in a -- in the vehicle, although it was not marked, it was not a marked cruiser, which means that it was -- it didn't have any signs of Police or anything on it, but it was actually still his cruiser for while he was on duty.

He was -- he told them that, Yes, I was doing things sexual in nature in this cruiser, while I was on duty. And then he went in to start talking about other individuals that he was with, and he ultimately got terminated.

Q. What was the moral of the story?

A. The moral of the story is, as a police officer, you are supposed to be doing the right thing at all times, your integrity is intact. So even if you're in plainclothes, even if no one is watching, you're supposed to be doing what you're supposed to be doing at all times.

Q. I want to switch gears a little bit. Do you talk to your students in your class about something called general orders?

A. Yes.

Q. How do you talk to them about general orders? First off, real quickly, we've heard this before, but remind us what general orders are.

A. So general orders are like the policies and procedures for each individual's department.

Q.    Do you guys have a way that you refer to it when you're talking about general orders?

A.    Yes.  I tell them it's their bible; you need to follow.

Q.    So in this course that you're teaching, the Maryland compliance course, you said yesterday that you have some people who are coming to Metro Transit, but you have other people who are going to other departments, right?

A.    Yes, mm-hmm.

Q.    Which means they have different sets of general orders, right?

A.    Yes.

Q.    How do you teach that?

A.    So I -- a lot of times, I will tell individuals that are coming from other departments, they can bring in their general order, and we can kind of compare.  Some of -- so ours, it's called general orders, which it is called general orders for most departments.  Other departments, they call them standard operating procedures.  So I tell them you can bring your standard operating procedures when it deals with this instance or your general orders for your department.

Q.    Would any officer who went through your class know that he or she needs to be familiar with his own general orders?

A.    They should have an --

        MR. BLUESTONE:  Objection; calls for speculation.

        THE COURT:  Sustained.  Why don't you rephrase the

JA742

question.

BY MS. BERNSTEIN:

Q.   How clear do you make it to people in your class that every single person in the class has to be familiar with his or her department's "bible," or general orders?

A.   Very clear.

Q.   Okay.  I want talk know now about the incident in this case.  First of all, do you have any firsthand knowledge of what transpired between Defendant Vanderpool and a woman named Raynna Stewart in September of 2019?

A.   No.

Q.   Have you read an incident report related to that traffic stop?

A.   Yes.

Q.   At whose request did you read it?

A.   Yours.

        MS. BERNSTEIN:  Can we have Exhibit 1 on the screen, please?

        It's not on my screen.  Most of them ...

        Do you know if there's a magic fix, Ms. Diaz?

        THE COURTROOM DEPUTY:  I actually just switched over now.  Is it showing?

        MS. BERNSTEIN:  I'll just grab a copy of the exhibit, Judge.

        THE COURT:  All right.

MS. BERNSTEIN: Sorry we didn't check that before we started, Judge.

BY MS. BERNSTEIN:

Q. All right. Do you -- you're more important than I am, Officer Collins. Do you have the exhibit on your screen?

A. Yes.

Q. All right. I want to ask you some questions about whether this report is consistent or inconsistent with the training that you gave in that class, okay?

A. Okay.

Q. But so it's fresh in your mind --

MS. BERNSTEIN: Can we have page 4, please.

BY MS BERNSTEIN:

Q. And is that a narrative in front of you on page 4?

A. It is.

Q. You've read that narrative before, right?

A. Yes.

Q. Okay. What I want with to do, since I'm going to ask you some questions about this, I want it to be fresh in your mind, I'm going to read it out loud, ask you to follow along, and make sure that I'm reading it right, okay?

A. Okay.

Q. And then I'm going to ask you a couple of questions?

A. Okay.

Q. On 9/6/2019, at approximately 11:22 hours, I was conducting

stationary radar as a two-man unit with Officer Dupree, 9360, at 61st Avenue and Sheriff Road when I observed a blue Ford Mustang bearing D.C. registration GB7058 enter my radar enforcement zone while speeding in a posted 40 mph zone. There were no other cars traveling that direction or in my visual sight where I was aiming/pointing the radar unit.

I conducted a traffic stop on this vehicle the driver was the only occupant of the vehicle and initially advised that she did not have a driver's license and that she left it at home. She was later identified as Raynna Stewart via her Maryland learner's permit. When notified that her vehicle may get impounded, she became erratic. She was removed from the vehicle because of her erratic loud shouting/cursing.

She then got out of the vehicle and would not obey my commands or Officer Dupree's command to reframe [sic] from cursing and yelling and to stop running into the middle of the street. She would not sit still as ordered and began yelling while on the sidewalk, then ran back into the street, almost getting hit by a large truck. Cars had to cross the yellow center dividing line in order to reframe from hitting her. Bystanders/citizens who were walking appeared to be disturbed by her behavior and ended up having to cross the street to avoid her. She was placed in handcuffs to restrain her. She then began banging her head on the exterior of her car really hard, while calling herself stupid. She did this several times.

She was issued the appropriate traffic citations as well as a criminal citation, No. 092002253965 for disorderly conduct. The registered owner picked up the vehicle, and Ms. Stewart was released and sent on her way.  All events occurred in Prince George's County, Maryland.

So first of all, did I read that correctly, Ms. Collins?

A.    Yes.

Q.    Now, if the officer writing that report took that woman away from the scene in handcuffs, is this report consistent or inconsistent with your training?

MR. BLUESTONE:  Objection.  This is crossing the line from 701 testimony to 702 specialized opinion testimony.  This witness was never designated as an expert and is being asked to provide specialized opinion testimony on sufficiency of a report.

MS. BERNSTEIN:  We'd say, Judge, that this is lay testimony about her training that she personally gave to Defendant Vanderpool.

THE COURT:  I'll overrule the objection, but I think you could cross the line in the 701 testimony -- or excuse me, 702 testimony, so let's limit it to her training and how this comports with her training.

MS. BERNSTEIN:  Okay.

THE COURT:  Let me be clear; the training she has provided.

MS. BERNSTEIN: I understand.

BY MS. BERNSTEIN:

Q. And let me make that very clear, Officer Collins. My question is --

MR. BLUESTONE: Your Honor, which -- I apologize.

THE COURT: Mr. Bluestone.

MR. BLUESTONE: She never -- she has not testified that she trained Officer Vanderpool specifically in report-writing. She testified that she trained in him laws of arrest and that report-writing was broadly covered but not that -- a specific report-writing course, which was a separate course, as she testified yesterday.

MS. BERNSTEIN: I can ask a few follow-up questions, Judge.

THE COURT: So I will overrule the objection. In any event, that would go to weight, not admissibility.

Ms. Bernstein.

BY MS. BERNSTEIN:

Q. Before we get back to that, Officer Collins, let me ask a few follow-up questions. Did you personally train the defendant on the rules and laws regarding arrest and arrest procedure?

A. Yes.

Q. In that class, did you talk to the students about how they needed to document arrests?

A. Yes.

JA747

Q.   Do they also have a separate class that covers report-writing in even more detail?

A.   Yes.

Q.   Okay.  I'm going to ask you based on your training that you personally gave to this defendant, okay?

A.   Yes.

Q.   Based on your training to this defendant -- let me go back to the question about whether this would be consistent or inconsist- -- whether the report would be inconsistent or consistent with your training, okay?

A.   Mm-hmm.

Q.   If the person writing this report took the young woman away from the scene in handcuffs, would this report in front of you be consistent or inconsistent with the training that you personally gave the defendant?

A.   Inconsistent.

Q.   Why?

A.   There's nothing showing that this person was arrested, searched, and transported to wherever.

Q.   If the officer writing the report left the scene and didn't tell Dispatch, would that be consistent or inconsistent with the training you personally gave to this defendant?

A.   That is inconsistent.

Q.   How so?

A.   Because again, if someone is arrested, you have to let

Dispatch know -- they are a lifeline, so you need to let them know where you're going.  It's a checks and balance.

Q.    If the person writing this report had that woman's car towed away from the scene, is this report consistent or inconsistent with the training that you personally gave this defendant?

A.    Inconsistent.

Q.    How so?

A.    The information -- like if you're arresting someone, you have to indicate everything that you put in your report, because again, that information is going to be looked at in court proceedings.  So all the information that you put in your report needs to be clear and concise, true and accurate.

Q.    If the officer writing this report actually caused the car to be returned to the young woman rather than the registered owner, would this report be consistent or inconsistent with training you specifically gave the defendant?

A.    Can you repeat that question for me, please?

Q.    Yes.  If the officer writing this report actually caused the car to be given back to the youngs woman rather than to the registered owner, would this report be consistent or inconsistent with the training that you gave the defendant?

A.    Inconsistent.

Q.    How so?

A.    Because it's not true and accurate.

Q. All right. I'm going to come away from the report?

MS. BERNSTEIN: You can take that down, please.

BY MS. BERNSTEIN:

Q. You talked about the ethics course that students take during the compliance class. During that ethics course, or in cooperation with it, are the students asked to write an essay?

A. Yes, I have them write an essay afterwards, after they take the course.

Q. Now, you were not the primary instructor in the ethics course, right?

A. No.

Q. Who is it, then, who gave them the assignment to write an essay?

A. You said, who was it that gave them the assignment?

Q. Mm-hmm.

A. I was.

Q. You, personally.

A. Yes, personally, yes.

Q. What specifically is the assignment that you give the officers?

A. It's a writing prompt that they have to write about ethics and integrity.

Q. So that's the whole prompt, basically, just write an essay about ethics and integrity?

A. What it means to them.

Q.   Did Defendant Vanderpool write such an essay?

A.   He did.

Q.   Have you seen it?

A.   Yes.

     MS. BERNSTEIN:  May I have Exhibit 30 on the screen?

BY MS. BERNSTEIN:

Q.   Do you recognize what's on the screen?

A.   Yes.

Q.   What is that?

A.   This is his assignment, his summary.

     MS. BERNSTEIN:  And Judge, this is one of the exhibits for which you reserved a ruling.  I would offer this into evidence at this point.

     THE COURT:  I need a little more information.  Perhaps you elicited it, but I've lost the thread.

     Did you -- or perhaps you can ask the witness, did she teach the ethics course where this essay was submitted?  How does she know this particular essay was written by him?  It's not signed by him.  Where did she find it?

BY MS. BERNSTEIN:

Q.   Let's follow up on that; let's go back.

     The ethics class is not the class -- you were not the primary instructor on the ethics class, right?

A.   No, I'm not the primary instructor.

Q.   Who is it who personally gave them the assignment to write

this essay?

A.    I was the one that personally gave them the assignment.

Q.    What was the assignment that you personally gave them?

A.    It was a writing prompt.  I don't know if I ...

Q.    Yeah, just explain that, if you would.

A.    So after they take the ethics course, I give them a writing prompt that they have to write an essay from.

      (Reporter requesting clarification.)

A.    So it's -- from.

BY MS. BERNSTEIN:

Q.    And what is the assignment; what are they to write?

A.    So it's what ethics and integrity means to them.

          MS. BERNSTEIN:  Judge, may I ask questions from over here for a moment so I can see the screen?

          THE COURT:  Yes, just please talk into the microphone.

BY MS. BERNSTEIN:

Q.    All right.  And Officer Collins, you identified this as Officer Vanderpool's essay that he wrote, right?

A.    Yes.

Q.    Do you see his name on it?

A.    I do.

Q.    Can you circle it?

A.    Or I can --

Q.    You can actually write on the screen.

A.    Oh, okay.

Q. All right. And so for the record, you've circled M. Vanderpool in the top left corner. How did you locate -- how do you know that this is his essay?

A. Well, I do remember everyone turning it in, but I do have a cop- -- I keep a copy of everyone's essay that attended up until now. Maryland, they do require that we keep everything, records of everything, because we do get audited by the State of Maryland.

Q. Was this essay turned in to you, personally?

A. Yes.

Q. Did you read it at the time?

A. I did.

Q. Did you read it again recently when the government asked you to pull it up?

A. I did.

Q. Is it the same?

A. Yes.

MS. BERNSTEIN: I would like to offer this into evidence, Judge.

THE COURT: It seems like a foundation's been laid. Any objection?

MR. BLUESTONE: No objection, Your Honor.

THE COURT: All right, it's admitted.

MS. BERNSTEIN: And Judge, I'm sorry, but because my screen isn't working, I also can't erase marks. Is there

somebody else who can do that?

Thank you, Ms. Diaz.

THE COURT:  During a break, we will have our IT department fix that.

MS. BERNSTEIN:  Thank you.

BY MS. BERNSTEIN:

Q.   Okay.  Officer Collins, I'm going to ask you to read this essay that Mr. Vanderpool wrote on ethics.

A.   Okay.  Ethics is doing the right thing when no one is watching you.  Ethical behavior is very important in law enforcement and usually involves things installed in a person during the early years of their life.  Ethical behavior in my opinion are actions that you should not be ashamed of and you would conduct yourself in this manner regardless of the audience.  Ethics and ethical behavior involves holding yourself and others accountable.  Integrity is similar in meaning when talking about ethics and ethical behavior, because it involves morality principles, such as being honest and trustworthy, which serves as a reflection of your character.  Ethics, ethical behavior, and integrity are all classified as values in my opinion, and they are values that we should have especially as law enforcement officers.

Q.   Thank you.

MS. BERNSTEIN:  We can take that down.

Can we have Exhibit 26 up, please?

JA754

BY MS. BERNSTEIN:

Q.   Did Mr. Vanderpool graduate your course?

A.   Yes.

Q.   What are we looking at on the screen?

A.   We are looking at the certificate of -- from MPCTC, showing that he met the minimum standards, and the P number is the approval number for that particular class.

Q.   So is that essentially his diploma?

A.   Yes.

Q.   Can you circle the dates of the course that you taught?

A.   Yes (complying).

Q.   So for the record, you circled from February 6th, 2017 to April 14th, 2017?

A.   Yes.

Q.   That's the class you've been testifying about?

A.   Yes.

        MS. BERNSTEIN:  Okay.  We can take that down, please.

        May I have Government Exhibit 24.

BY MS. BERNSTEIN:

Q.   Do you recognize these as records kept by MPCTC?

A.   Yes, this is their transcript.

Q.   And you talked about that agency yesterday.  Do they keep records of officers' training?

A.   So they keep a record of when they went through the training.  They come and audit us for our records, all the

information that was taught.

Q.   Let's focus now on training, at the bottom, there.

A.   Okay.

     MS. BERNSTEIN:  I'm going to move over here so I can see, Judge.  Can you hear me okay from here?

     THE COURT:  Yes.

BY MS. BERNSTEIN:

Q.   All right.  So at the bottom of that page 1 on Exhibit 24, there's a section marked Training, right?

A.   Yes.

     MS. BERNSTEIN:  Okay.  What I want to do now is just scroll to the next page, if we can go to page 2.

BY MS. BERNSTEIN:

Q.   Do you see your class on that training record?

A.   Yes.

Q.   Can you point that out?

     All right.  Did Ms. Richart actually just -- now that it's been blown up, tell us where your training is.

A.   You want me to circle it again?

Q.   Sure.

A.   Okay (complying).

Q.   How many hours of training did Mr. Vanderpool get from you guys at the Metro Transit academy?

A.   360.

Q.   I want you look just one row above that.

MS. BERNSTEIN: If we can highlight that, Ms. Richart.

BY MS. BERNSTEIN:

Q. Can you read the row above that.

A. Electronic Records Management System Training.

Q. How many hours of training did the defendant get specifically -- do you guys call that the RMS system, Records Management System?

A. Yes, mm-hmm.

Q. Specifically, how many hours did the defendant get specifically on RMS training?

A. Sixteen.

Q. Did he pass?

A. Yes.

Q. What was his score?

A. One hundred.

Q. Okay.

MS. BERNSTEIN: You can take that down.

BY MS. BERNSTEIN:

Q. Before I sit down, I have one more question about Exhibit 1.

MS. BERNSTEIN: Can I have that back up?

Can we go to page 4?

BY MS. BERNSTEIN:

Q. Assuming the facts in that narrative to be true, based only on the training that you specifically gave to Mr. Vanderpool,

what should an officer in that situation have done?

MR. BLUESTONE:  Objection; going for opinion testimony.

MS. BERNSTEIN:  I'm sorry, what was the objection?

MR. BLUESTONE:  There's a 702 objection.

THE COURT:  So I will overrule that objection, but I need you to rephrase your question.  It was pretty open-ended and vague, what should an officer have done; at the scene, with the report?

MS. BERNSTEIN:  I'll be more specific.

Okay, this microphone is better.

BY MS. BERNSTEIN:

Q.  Looking at the narrative on Exhibit 1, and assuming those facts to be true, how should the officer at that scene have treated the young woman; what should he have done for the young woman, based on the training that you gave Defendant Vanderpool.

A.  I'm just reading this information.  He should have contacted EMS.

Q.  What's EMS?

A.  Emergency medical.  She was acting erratic, running in and out, banging her head, so she may have -- I mean, it appears to me, teaching mental health first day, that she may have had some type of mental health crisis.  So that information should have been in the narrative, because we are here to provide victim assistance.  So it doesn't look like any assistance was

provided.

Q.    Is that something you talk to your officers about, mental health crisis?

A.    Yes.

Q.    Okay.

        MS. BERNSTEIN:  Anything else?

        I have no further questions.  One of these gentlemen is going to ask you some questions now.

        THE WITNESS:  Okay.

        THE COURT:  Cross-examination.

        MR. ZAMPOGNA:  Yeah, Mr. Bluestone will do the cross.  Thank you.

        THE COURT:  Okay.

                        CROSS-EXAMINATION

BY MR. BLUESTONE:

Q.    Good morning, Ms. Collins.

A.    Good morning.

Q.    So -- thanks for coming back.  I think you were subpoenaed to testify yesterday and today?

A.    Yes.

Q.    All right.  And you said earlier that you grew up in Fairmount Heights?

A.    In Cheverly.  I went to Fairmount Heights.

Q.    And is that -- that's nearby, just for the record?

A.    It is.

Q. What was the reputation of the police force in Fairmount Heights?

A. I don't remember.

Q. All right. And then you be- -- what year did you become an officer again?

A. I'm sorry?

Q. What year did you become an officer?

A. 2007.

Q. And then a trainer?

A. Yes.

Q. What year did you become a trainer?

A. 2011.

Q. So you were only in the field on patrol or four years?

A. Thereabouts.

Q. And you engaged in traffic stops during that time?

A. Yes.

Q. If you had to guess, how many?

A. Up until that point? Because I still do traffic stops; I still go out on patrol.

Q. How often do you go on patrol?

A. It's like maybe -- maybe four times a month, maybe four times a month, we are required.

Q. When was the last time you arrested anybody?

A. Maybe two months ago.

Q. And have you ever been on a traffic stop that transitions

into an arrest?

A. Have I ever -- yes, I have.

Q. And during that -- and in order to make that line, you exercise discretion?

A. We always exercise discretion.

Q. And sometimes there can be multiple right answers?

A. Yes.

Q. Thank you. And you can hand- -- and can you handcuff somebody without it automatically being considered an arrest?

A. Yes.

Q. Thank you. Now, you mentioned earlier as well your training regarding reading odometer readings into the dispatch communications, correct?

A. Repeat that question for me?

Q. You testified earlier that when transporting somebody, you have to read the odometer readings?

A. Yes.

Q. Only a driver can see the odometer reading, correct, in a car?

A. I mean, if you're passenger, I guess you could look over, but I am assuming, yes.

Q. All right, thank you. For your classes, how -- approximately how many students are in each session?

A. I mean, it varies. It can be -- we've had as little as two people, up to twenty- -- 24.

Q.    And how many different courses do they have during their training?

A.    You want me to give you an actual amount?  It's a lot.

Q.    It's a lot, all right.

And then you testified, I believe, last night -- yesterday afternoon that MPCTC sets objectives for these -- this training?

A.    Yes.

Q.    They set objectives for every course?

A.    For -- they have certain courses.  Agencies that can go above and beyond, they can do more, but they set the basis.

Q.    And you then notify -- after someone passes, you notify MPCTC that they passed your course?

A.    Yes.

Q.    And then they issue a certification?

A.    Yes.

Q.    All right.

Now, you also discussed today a little bit about the incident report -- you have that in front of you -- and you said that you had been provided a description of the prior testimony that was provided.

MS. BERNSTEIN:  Objection; I don't think that correctly states the evidence.

THE COURT:  Sustained.  I don't recall any reference to prior testimony.

BY MR. BLUESTONE:

Q. You said that AUSA -- I believe you said that AUSA -- I'm sorry, that Ms. Bernstein, here, provided you a description of the events?

A. She had me look at a report; is that what you're referring to?

Q. Did she -- were you ever described the -- any prior testimony?

A. I'm not -- I don't understand what you're asking.

Q. There was a proceeding -- there was a prior proceeding. Were you ever provided any testimony from that proceeding?

A. No.

Q. Were you ever -- was that ever described to you?

A. No.

Q. Did you meet with investigators on September 27th, 2024?

A. Probably.

Q. And present at that meeting were -- was Ms. Bernstein, Ms. Allison, and Ms. Hung all at this table over here?

A. Yes.

Q. And during that meeting, they provided you a summary of his prior testimony?

A. I don't recall.

MR. BLUESTONE: I'm going to -- where's -- where'd the thing go?

MS. BERNSTEIN: While they work on that, I'm going to

object to what they they're about to do, which I think is to try to impeach this witness with a report written by somebody else.

THE COURT: So is this report written by her? Is it a prior inconsistent statement, or you are attempting to refresh recollection?

MR. BLUESTONE: Your Honor, the witness, at this prior interview, did make statements based on this showing that she is saying that she never received today.

THE COURT: So you can't impeach her with a statement written by someone else. If the document you are attempting to show her was not written by her, it's not a prior statement, certainly not a prior inconsistent statement.

MR. BLUESTONE: All right. Thank you, Your Honor.

THE COURT: You can always show the witness anything to refresh his or her recollection, if that's what you're attempting to do.

BY MR. BLUESTONE:

Q. All right. I'm going to show you this to refresh your recollection.

THE COURTROOM DEPUTY: If you can move that up, Counsel?

Yes, there you go.

MS. BERNSTEIN: Judge, think it might be more appropriate just to approach and show it to her, if that's -- if that works.

THE COURT: Let's do old school; you may approach the witness.

MR. BLUESTONE: All right. Thank you, Your Honor.

BY MR. BLUESTONE:

Q. (Handing.) Take a moment to look over the middle of page 2.

Let me know whenever you're finished.

The beginning would be the agent note, is the key paragraph there.

A. Okay.

Q. Does that refresh your recollection?

A. About what?

Q. About this meeting you had with --

A. I remember meeting -- I do remember meeting, but I'm trying to -- the recollection of what, that they were --

Q. That they provided --

A. -- that I was told a summary, or ...

THE COURT: Let's -- one at a time.

BY MR. BLUESTONE:

Q. That they provided you a description of a previous testimony related to this matter?

A. Of the report that I just looked at?

Q. No, a prior sworn statement in court.

THE COURT: Do you have any recollection of being shown a transcript of a prior sworn statement during that

meeting?

A.   Honestly, I don't have recollection of that.

BY MR. BLUESTONE:

Q.   All right, thank you.  And you were talking a bit about general orders earlier as well today.

Every department has different general orders?

A.   Yes.  Sometimes they're called standing operating procedures, so it just depends.

Q.   And it can range from a department having 8 to 50?

A.   I assume so, yes, depends.

Q.   And you've not -- never read the Fairmount Heights general orders?

A.   No.

Q.   And when you taught Mr. Vanderpool, he was not employed by Fairmount Heights?

A.   No.

Q.   He was employed by Prince George's Community College.

A.   Yes.

Q.   Thank you.  And you earlier also talked about some other courses that were taught.

A.   Yes.

Q.   You did not teach Officer Vanderpool the ethics course?

A.   I did not.

Q.   Did you watch that course being taught to him?

A.   I did not watch it, that par- -- on that particular -- for

that class, but I've sat in on other classes.

Q.    So you did not see that particular class?

A.    No.

Q.    You also spoke about a Record Management System class.  You did not teach that to Officer Vanderpool?

A.    No.

Q.    And you did not see that course being taught to him?

A.    No.

Q.    Have you seen any record of him being taught that course before today?

A.    No.

Q.    Thank you.  So you -- are the -- your course in 2017, did that cover the Law Enforcement Officers' Bill of Rights?

A.    We talked about the Bill of Rights in the ethics portion.

Q.    It was only discussed in the ethics portion?

A.    Yes.

Q.    Thank you.  And that was active at the time, in 2017?

A.    The Bill of Rights?

Q.    Law Enforcement Officers' Bill of Rights, in Maryland.

A.    Well, we talk about it now.  I don't know if it was ... I can't recall.

Q.    And you didn't teach students about any form of electronic ticketing system?

A.    No, we don't do electronic tickets; we still do paper tickets.

JA767

Q.    All right.  So you -- have you ever used an electronic ticket system?

A.    No.

Q.    And you did not teach the report-writing course to Officer Vanderpool?

A.    I did not.

Q.    And did you watch the report-writing course you taught Officer Vanderpool?

A.    I did not.

Q.    So you have no direct knowledge of what he heard or saw during that course?

A.    I have no direct knowledge.  However, I have all of the reports.

Q.    Thank you.  You stated -- and a report should contain the elements of the offense that it's alleging.

A.    Yes.

Q.    And you also should not include too much extra?

A.    Well, you don't want to put anything in there that doesn't make any sense or that didn't happen.

Q.    I believe the term you used was "concise."

A.    Right.

Q.    Yes.  And certain types of offenses do not have mandatory reports?

A.    Certain types of offenses?

Q.    Such as nonserious, minor, or miscellaneous offenses?

A. Yes.

Q. And that would be discretionary, then, for the officer?

A. Yes.

Q. Do you -- in 2017, did you teach with body-worn cameras?

A. No.

Q. And did you ever teach anybody named Philip Dupree?

A. That name rings a bell, but I don't think that I ever taught -- I don't know where I heard that name, but I don't -- I'm not sure.

Q. Did you ever teach Stephen Watkins?

A. That name doesn't ring a bell.

Q. Did you ever teach Earl Ivey?

A. Who?

Q. Earl Ivey.

A. That name doesn't ring a bell either.

Q. All right. You also shared a story earlier today about an officer who had sex in a police cruiser.

A. Yes.

Q. Were they ever criminally charged with that action?

A. I'm not sure.

Q. And you were talking -- but you did teach Officer Vanderpool about arrest procedures?

A. Yes.

Q. Do you know if Ms. Stewart was searched?

A. I'm sorry?

Q.    Do you know if Ms. Stewart was searched?

A.    It doesn't say that in this report.

Q.    Do you know if she was handcuffed?

A.    It says she was detained.

Q.    But outside of this report, you have no knowledge of this incident?

A.    I'm -- I don't know if she -- I don't know.

Q.    And when -- are sometimes people handcuffed for their own safety?

A.    That is a verbiage that a lot of law enforcement officers use.  We do tell them to be mindful, that it can come back to bite you.  But yes, that is -- sometimes, that's what a lot of law enforcement officers say when they put people in handcuffs.

Q.    And that is sometimes -- and is that ever taught at -- at your -- anything you've coordinated?

A.    We're putting you in handcuffs for your own safety?

Q.    No, that that -- it can -- that that is an element of discretion.

A.    Putting someone in handcuffs, that is discretionary, yes.

Q.    Thank you.

        MR. BLUESTONE:  No further questions.

        THE COURT:  Okay, thank you.

        Any redirect?

        MS. BERNSTEIN:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.    I just have a few things that I want to follow up on.

First, you were just asked some questions about your testimony that an officer should not put extra stuff in a report and should keep the report concise.  Do you remember those questions?

A.    Yes.

Q.    So I'm going to ask you some details, and I want you to tell me whether with those are extra details or whether they're details that need to go in a report, okay?

A.    Okay.

Q.    The fact that you arrest someone.

A.    That needs to go in the report.

Q.    The fact that you take them away from the scene in handcuffs.

A.    That needs to be in the report.

Q.    The fact that you take them to the police station.

A.    That needs to be in the report.

Q.    The fact that you impound their car?

A.    That needs to be in the report.

Q.    How about any interaction you have with them while they are in your custody at the police station?

A.    Repeat that question for me, please?

Q.    Interaction that you have with them while they are in your

custody at the police station.

A.    That needs to be in the report.

Q.    Any question about any of that?

A.    No question.

Q.    You were asked some questions about whether you had been given or shown prior testimony from another court proceeding. Do you remember those questions?

A.    Yes.

Q.    And you said that you had not, right?

A.    Right, yes.

Q.    During that meeting with us in September, did we tell you some pieces, not show you anything, did we tell you some pieces of what Mr. Vanderpool had said in another court proceeding?

A.    Yes.

Q.    Okay.

You were asked about whether an officer can take somebody into temporary detention; do you remember that?

A.    Yes.

Q.    I want you to talk with us about that a little bit more. Are there circumstances in which an officer might handcuff somebody at the scene and then let them go?

A.    Yes.

Q.    For example, for either an officer's safety or the person's safety, right?

A.    Yes.

JA772

Q.   What do you guys call that?

A.   Just temporary detention.

Q.   That's a temporary detention?

A.   Yes.

Q.   Does an officer need to document a temporary detention?

A.   Yes, on a use of force report.

Q.   If an officer handcuffs the person at the scene, puts them in a police car, drives them away from the scene to the police station, is that a temporary detention, based on the training that you personally gave to Mr. Vanderpool?

A.   No.

Q.   Any question about that?

A.   No.

Q.   The last topic I want to talk to you about, Mr. Bluestone asked you about discretion; do you remember that?

A.   Yes.

Q.   And he asked you if officers have discretion?

A.   Yes.

Q.   Is that something that you teach officers, that officer -- officer discretion, is that actually a term that you use in your teaching?

A.   It is.

Q.   Explain what that means.

A.   There are certain times that -- there are certain offenses that an officer doesn't have to physically -- or do a custodial

arrest. They can write them a citation in lieu of an arrest, depending on that individual; they know they're going to show up in court, they're going to pay the fine, so that's a discretion, where you don't actually physically have to arrest them. You can write them a citation in lieu of an arrest.

Q. So let's take, say, disorderly conduct as an example. An officer would have discretion to just write a ticket at the scene and then let the person go; is that right?

A. Yes.

MR. BLUESTONE: Objection; that's calling for 702 opinion testimony. This is not about -- she's not asking about training, what was taught, she's asking about the discretion an officer has.

THE COURT: Overruled.

BY MS. BERNSTEIN:

Q. Do you remember the question, ma'am?

A. No.

Q. Okay. We were talking about officer discretion, and that's something you train folks in the academy, right?

A. Yes.

Q. I want to talk specifically about disorderly conduct. So if an officer is interacting with somebody who is disorderly, does that officer have discretion to just give that person a citation for disorderly conduct and then let her go on her way?

A. Yes.

Q.    Okay.   So that's within an officer's discretion.

A.    Yes.

Q.    Does an officer have discretion to handcuff her, take her to the station, and have sex with her?

A.    No.

Q.    Ever?

A.    Ever.

Q.    That is not within discretion.

A.    That is not within discretion.

Q.    I want to talk about discretion with respect to reports. Are there certain circumstances, as Mr. Bluestone just asked you, in which a report is discretionary?

A.    No.

Q.    Let's say, for example, if an officer just pulls someone over and writes them a ticket; how is that interaction documented?

A.    On the ticket, and then, just -- you're going to write a citation.

Q.    So the ticket itself serves as a documentation in that case?

A.    Yes.

Q.    Now, if an officer chose to write a report about that, he could, right?

A.    He can -- he can write an incident report, yes.

Q.    So that might be an example of a discretionary report?

A.    Yes.

Q.    If an officer chooses to write a report, is honesty discretionary?

A.    Honesty is never discretionary.

Q.    So if he chooses to write a report, does that report still have to be true and accurate?

A.    It still has to have the elements; it has to be true and accurate.

Q.    Any discretion there when it comes to honesty?

A.    No.

Q.    Okay.

        MS. BERNSTEIN:  I have no further questions, Judge.

        THE COURT:  All right, thank you very much.

        MR. BLUESTONE:  No recross, Your Honor.

        THE COURT:  All right, thank you.

        MS. BERNSTEIN:  May this witness be excused?

        THE COURT:  Yes.

        Officer Collins, thank you very much.  You are now excused.

        THE WITNESS:  Thank you.

        THE COURT:  Mm-hmm.

        Why don't we take a brief midmorning break, for a comfort break and also to let IT address some of the problems with the screen, all right?

        MS. BERNSTEIN:  Thank you.

JA776

THE COURT:  So it is 10:40; let's take about 15 minutes.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Recess taken from 10:41 a.m. - 11:00 a.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court resumes in session.

THE COURT:  Okay.  Please be seated.

Ms. Allison.

MS. ALLISON:  The government calls Lyla Zeidan.

THE COURTROOM DEPUTY:  If you can just stand there and raise your right hand for me.

You do solemnly swear or affirm under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Speak loudly and clearly into the microphone, state your full name for the record, and spell your first and last names.

THE WITNESS:  All right.  Good morning.  My name is Lyla Zeidan.  That's spelled L-Y-L-A, the last name is Z-E-I-D-A-N.

THE COURTROOM DEPUTY:  Thank you.

JA777

LYLA ZEIDAN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. ALLISON:

Q.   Good morning, Ms. Zeidan.

A.   Good morning.

Q.   Please introduce yourself to Judge Boardman.

A.   Sure.  Good morning, Your Honor.  Again, my name is Lyla Zeidan.  I am currently an attorney advisor and instructor with the Department of Homeland Security at the Federal Law Enforcement Training Center in Glynco, Georgia.  Before that, I was the legal program manager and legal instructor for the Northern Virginia Criminal Justice Training Academy, which is located in Ashburn, Virginia, and before that, I was a prosecutor for the City of Virginia Beach.

Q.   Did you provide training to an officer named Martique Vanderpool in 2015?

A.   Yes, I did.

Q.   Where did you go to school?

A.   I went to law school at Regent University School of Law in Virginia Beach, Virginia.

Q.   And for how long have you been in your current position?

A.   I started my job with FLETC almost a year ago, it was January of this year, but before that time, I would have been at the Northern Virginia Criminal Justice Training Academy.

Q.   About how many years were you at the academy for?

A. Eleven and a half years.

Q. What was your position at the academy?

A. I started as the legal instructor, and then, they evolved my position into the legal program manager, since I was the only attorney on staff and taught all the legal classes.

Q. In 2015, were you teaching classes yourself?

A. Yes, I was.

Q. Super generally, what is the Northern Virginia academy?

A. It is a regional academy that trains law enforcement officers from 17 different agencies. We train sheriff's deputies, we train police officers. We have about 200 -- over 200 students a year come through, and each class session is usually anywhere from 100 to 140 students.

Q. About how long is the academy?

A. For sheriff's deputies, it is six months. For police officers, it is five months.

Q. Generally, what are some of the topics of the classes that you, yourself taught?

A. I would teach everything from -- I think it was over 30 topics that I taught, but they ranged anywhere from constitutional law, to search and seizure, to laws of arrest, to specific crimes, such as sex crimes, homicide, arson, and so forth.

Q. You mentioned you taught law enforcement officers and deputy sheriffs; is that right?

A.   That is correct.

Q.   What is the difference in the instruction between those two groups?

A.   The sheriff's deputies would usually work at a jail or some kind of setting in that environment, so they required an additional month of instruction.  And when I was at the academy, they would start one month ahead of the law enforcement, the police officers, as they needed that extra block of instruction relating to jail type of laws.

Q.   What was Mr. Vanderpool's background when he came to the academy in 2015?

A.   He was in the sheriff deputy program and the law enforcement program, so he would have had to conclude six months of training.

Q.   Was one of the classes that you taught a laws of arrest class?

A.   Yes, it was.

        MS. ALLISON:  Ms. Richart, can you please pull up Government Exhibit 28?

        And can you scroll through each page so the witness can see?

        Let's go back to page 1, now.

BY MS. ALLISON:

Q.   Ms. Zeidan, what are we looking at in this exhibit?

A.   We are looking at my lesson plan for laws of arrest.

Q.   Did you yourself write this lesson plan?

A.   I did.

Q.   How do you actually use it when you're teaching the class?

A.   It is an instructor guide, so I make sure that I touch upon everything in the lesson plan.  So it's pretty much an instructor guide, to make sure the instructor stays on point and teaches all the required material.

        MS. ALLISON:  Ms. Richart, can you highlight the top left of the page, where it says Session and Session Dates?

BY MS. ALLISON:

Q.   What does this Session mean?

A.   Every recruit class is given a session number, and this would have been the session that would have been taught, which is 132.  And the session date, since this is part of the law enforcement program, it's not specifically for sheriff's deputies; it ranges from February to June of 2015.  So that's when the law enforcement, the police officers would have been at the academy during that time.

Q.   Was Mr. Vanderpool in Session 132?

A.   Yes, he was.

Q.   So would this have been the class that you taught to Mr. Vanderpool?

A.   Yes, it would have been, that's correct.

Q.   How long was this class?

A.   This class was six hours.

MS. ALLISON: And Ms. Richart, can we please highlight the very bottom two lines on this page?

BY MS. ALLISON:

Q. So I see DCJS and then a whole bunch of numbers; what does this mean?

A. DCJS stands for the Department of Criminal Justice Services, and we are mandated to teach certain curriculum. As we are accrediting our officers once they graduate, they have to take a state exam to be certified as law enforcement officers. So we have to make sure we teach material in compliance with that organization.

MS. ALLISON: Ms. Richart, can you highlight in the middle right, where it says, Instructional Methods/Aids?

BY MS. ALLISON:

Q. What did you actually use to teach this class to the officers?

A. I used the lesson plan as my instructor guide, so it would be lecture, I would also use PowerPoint slides, and I would also use handouts, which were fill-in-the-blank, so that the students would have to pay attention in class in order to get the answers for the fill-in-the-blanks, and that is something they would keep, as a study guide.

Q. Is that general format what you use for just this class or all of your classes?

A. It would be a format for every single one of my legal

classes.

MS. ALLISON: Let's turn now to page 2.

BY MS. ALLISON:

Q. I see Performance Outcome at the top. Generally, what do performance outcomes mean?

A. They are the goals of the class. We want the student to be able to exhibit all of the items listed in the performance outcome once the class is concluded.

Q. Can you please read the very last bullet in the performance outcome section?

A. Trainee will acquire knowledge of her or his obligations to an arrestee, the laws of citizen arrest, the legal authority to pursue people who flee or escape, the requirements to arrest inside a home, and civil liability issues surrounding arrest.

Q. So is it one of the goals of your course that the officers would understand these concepts?

A. Yes, that is correct.

MS. ALLISON: Let's turn now to page 4.

BY MS. ALLISON:

Q. In this class, did you cover the concept of arrest?

A. Yes, I did.

Q. What did you explain to the officers was an arrest; how did you define it for them?

A. I defined it similarly that's reflected on my lesson plan, but I went into detail and told them it's pretty much one of the

JA783

greatest infringement on someone's liberty or freedoms and that probable cause was required to arrest someone, that they needed to make sure they met that standard.

Q. Can you please read the first line under Arrest?

A. To deprive a person of his liberty by legal authority.

Q. Is this what you taught your officers was the definition of arrest?

A. Yes, that is correct.

MS. ALLISON: Let's turn now to page 12.

And let's zoom in on section 12 on this page.

BY MS. ALLISON:

Q. What was the general topic of this section?

A. Once an officer or a sheriff's deputy makes an arrest, they are responsible for certain items, and we went through this list of the requirements they must still be responsible for after they arrest an individual and went through securing the possessions, maintaining the safety, obtaining medical treatment, and also reading Miranda if they were going to be interrogated.

Q. And without getting into the weeds, how did you explain the concept of custodial arrest to officers?

A. I explained custodial arrest as more a permanent type of seizure, that the person would not be free to leave, and that entailed they would be going to a magistrate or being formally charged, but did I stress the importance of making sure that we

had probable cause to make that custodial arrest, and then using handcuffs would also be implied when someone is going to be doing a custodial arrest.

Q. So how do handcuffs play into whether something is or isn't a custodial arrest?

A. Usually when someone's just being detained, they're not handcuffed, but whether someone is going to be arrested, the officer or the sheriff's deputy would say, You're under arrest, and then would use the handcuffs in order to permanently seize that person and secure them and their belongings.

Q. So let's say someone was handcuffed, arrested, and taken from the scene; what did you teach your officers about whether or not that would be a custodial arrest?

A. I would tell them that that would be a custodial arrest.

Q. How can you tell?

A. First of all, you would tell them that they're under arrest; secondly, you placed handcuffs; and then you took them away from the scene, which, again, would be my definition of a permanent seizure. That person is not merely detained, but it's more of a permanent type of seizure; they're not free to leave at that point.

Q. You've been using the word "permanent." Do you mean permanent as in for life, or do you mean permanent in another sense?

A. No, it's just more permanent. Usually, we talk about more

like a brief detention and more -- or like a brief seizure and then more of a permanent-type seizure. So a brief seizure would be stopping somebody for a speeding ticket, where something more permanent would be, their freedom status has not changed. Now they're going to a magistrate or a judge, and they may not be going home; they could be in jail after that.

Q. Gotcha. So someone being transported from the scene, would that be brief or a permanent, in your opinion?

A. That would be more of a permanent seizure, which would also be considered a custodial arrest.

MS. ALLISON: All right. Let's turn now to page 16.

BY MS. ALLISON:

Q. Do you talk about the potential liability an officer can face when they're performing an arrest?

A. Yes, I do.

MS. ALLISON: And please highlight, Ms. Richart, section 20.

BY MS. ALLISON:

Q. Is this the section where you're explaining officers' liability to them?

A. Yes, that's correct.

Q. Please read the very last sentence in this section.

A. Documentation is important if faced with any of these situations, even if a warning is given. This will assist in the event that a claim is made against you.

Q. How do you explain this concept, the importance of documentation, to your officers?

A. I stress that once the event is over, whether it's an arrest or whatever the action was, that your memory's going to fade over time, and so it's importantly that you document everything that happened, because details are extremely important, and we need to make sure that we describe everything about the arrestee, we need to describe everything that the law enforcement officer did, to make sure that we are following agency policy and the law.

So we definitely went into great detail about the importance of writing documentation fully and accurately, and also, being truthful in our documentation.

Q. When you talk about accuracy and truthfulness, what do you say about that to the officers?

A. Well, we talk about all the different type of liability that can happen when you don't tell the truth, especially if it's in a sworn written statement or in Court, and we talk about the importance of one's reputation, so we definitely want to make sure that they don't fabricate, or embellish, or add to any of the facts; we just want them to state the facts as they remember them.

Q. Do you talk to them at all about the importance of not leaving things out?

A. Yes, yes, that is discussed in great detail, and there's

other classes, such as report-writing, that also go into detail about that.

Q. In your class, what do you say about the importance of not leaving things out?

A. I would tell them that when things are not in the report as -- it's almost as if it didn't happened, because that's the only evidence we'll have of what really occurred. So if you leave information out, it's almost like it did not happen.

MS. ALLISON: Let's go back to page 1, Ms. Richart.

BY MS. ALLISON:

Q. Generally in this class, what if anything do you say to officers about their responsibility to someone in their custody?

A. Well, I went through that list about securing their possessions and obtaining medical if they needed it, and also, making sure they know that they're responsible for that person's welfare. Once they're in custody of that officer, that officer is responsible for everything that happens to that arrestee.

Q. And you mentioned other report-writing classes. As part of this academy, are there other classes that you don't teach that are about report-writing?

A. That is correct, yes. There are a couple of classes, report-writing. It's -- it lasts many different sessions, it's ongoing, and they will write various reports of certain practicals that they perform, and then, at the very end, they will testify to one of those reports in one of my practicals,

JA788

which is courtroom testimony.

Q.   How do you know all of that?

A.   Because -- since I was on staff at the academy, I would work with the other instructors to make sure that we are communicating about what we're teaching our recruits because we wanted to be consistent in the training.

Q.   What does it mean to be on staff at the academy?

A.   I'm sorry, I'll clarify.  That means, I am a full-time permanent staff member.  What we had at the academy is, we had staff positions which were permanent, which would be, we would never rotate, we would be there as long as we wanted to be there.  I was the only instructor position that was full-time permanent staff.  The other full-time permanent staff were more administration, like directors and deputy directors and curriculum staff, and then we would have anywhere from 10 to 20 other instructors that would be on loan from their agencies, and they would be at the academy for a certain amount of time period.

         MS. ALLISON:  You can take that down, Ms. Richart.

BY MS. ALLISON:

Q.   Did you also teach a sex crimes class at the academy?

A.   Yes, ma'am, I did.

Q.   What's the group that you taught there class to, sheriffs, or law enforcement, or both?

A.   This would be both.  It's near the end of the session, so

both -- after deputy school that one month, then they're all combined after that point, but this would have been a class for everyone.

Q.   Do you also use those same materials, lesson plan, handout, PowerPoint, to teach the sex crimes class?

A.   Yes, I do, it's the same format.

MS. ALLISON:  Ms. Richart, please pull up government Exhibit 31, and please scroll through -- or actually, we've got this.

BY MS. ALLISON:

Q.   What are we looking at, Ms. Zeidan?

A.   We are looking at one of my PowerPoint slides in the sex crimes class that I taught.

Q.   Did you actually make this PowerPoint?

A.   Yes, I did.

Q.   And explain to us how you would actually teach this slide to your class.

A.   They would have the handout, and usually, I would have this filled in the blank.  So we would go over all of the crimes in detail, because I wanted to make sure they got the correct elements.  And what I told them about this slide is, carnal knowledge is a definition in Virginia which means sexual intercourse.  It can also mean forcible sodomy, and it could also mean object sexual penetration.  So it was various types of sex acts with an inmate.  And I did not specifically say

"inmate" in class; this is why it's taught to everyone. I want them to understand that when someone's in your custody and care, that person is considered like an inmate at that time, and that's why it was taught to everyone.

So I did stress the importance of consent not being a defense, as when you are in a position of authority over someone, you can never have a valid consent.

Q. How if at all do you emphasize this concept with the officers? Do you use anecdotes; what do you do?

A. I try to find real-life news stories that would try to drive this point home. So for this particular charge, it was an unfortunate incident that an Alexandria sheriff's deputy, a few years before this class, had actually committed this particular offense.

He was charged with rape and also carnal knowledge of an inmate. The rape was dismissed, and he pled guilty -- it was a guilty plea at the end -- he pled guilty to carnal knowledge of an inmate, and it was a video I showed, as well as I also went into the story, because it was a sheriff's deputy who had many years on, he wasn't a new recruit, and he actually had sexual intercourse with an inmate in a mental health unit, and he said it was consensual, but again, there's no such thing as consent with this charge. She later came forward and reported him, and once he was charged and it went through various events, he eventually pled guilty and got time to serve for this charge.

Q.   What was the takeaway from this story for your class?

A.   I wanted them to see because we teach Alexandria sheriff's deputies, and this hit close home.  It wasn't a story in another state, it was right here, one of the jurisdictions that we train, so I wanted them to see how easily this can happen and make sure they understand that there can never be a valid consent, because that was the deputy's defense, that it was consensual, and there can never be consent between someone in your care and custody when you're in a position of authority.

So I wanted them to be able to relate to this, because -- and since that time, there have been other situations that have occurred, so I wanted them to see the importance of this charge.

Q.   And I know you been talking about, there can never be consent under this law that we see at the top of the slide.  How if at all do you talk about consent outside of this specific state law?

A.   You mean, in regards to other sex crimes or just consent in general?

Q.   Consent in general.  You had mentioned earlier that you were careful not to say this is limited to an inmate, that this could be anyone in your custody; is that right?

A.   That's correct.

Q.   So how do you talk about consent when it comes to that, not in terms of what the law prohibits but more generally, if that makes sense.

A.   So I guess I define consent as someone agreeing to do a certain act, willingly, of their own free will, and not being threatened, or forced, or intimidated because of maybe your position our because of what you're having in your possession, like a firearm.  So consent is a valid agreement to do whatever they want you to do, but it has to be of your free will, you have to know what you're getting involved in.

Q.   In framing this in terms of what you tell your officers, what do you mean by, there can't be consent if someone's in custody?

A.   Because if you're in a position of authority, then that's -- well it's like an intimidation type of feeling for the person beneath you, and since you are in a position such as law enforcement, that person cannot validly give their consent; it's not intelligently, it's not freely given, because they may feel obligated to consent because you're in a higher position than them.

Q.   And that's what you tell the officers in your class?

A.   Yes, that's correct.

        MS. ALLISON:  Thank you, Ms. Richart.  You can take that down.

BY MS. ALLISON:

Q.   We're going talk about one more class.  Did you also teach class on constitutional law and civil liability?

A.   Yes, I did.

Q. Can you explain, super generally, what that class is about.

A. I believe that was in the sheriff's deputy program, and that was one of the ones I talked about earlier that would have been in the first month, before all of the class would have been together, so this would have been just the sheriff's deputies, those working in the jail. And this combined constitutional law and also civil liability, which they would get later on in the law enforcement program, but this certain class would be pertaining more to things they would do within the jail, dealing with constitutional law, like the rights of inmates and also civil liability, things they could get in trouble for mainly like in a jails type of setting.

Q. Was Mr. Vanderpool in this class, as well, of yours?

A. Yes, he was.

Q. Is this that Session 132?

A. Yes, it was.

Q. And I should be clear. For the sex crimes class, did you also personally teach Mr. Vanderpool that sex crimes class?

A. Yes, I did.

Q. With liability, to be clear, you're talking about the liability on the part of the officers?

A. Correct, the liability that the officer or the deputy could face for inappropriate actions.

Q. And staying high-level, do you cover civil liability in this class?

A.   In the one that's combined that you're talking about?

Q.   Yes, the constitutional law and civil liability course.

A.   Yes.  The first portion would be constitutional law, and then the second portion would be civil liability, correct.

Q.   What at a high level do you tell the officers civil liability means?

A.   What was the first part of your question?  I'm sorry, ma'am.

Q.   Sure.  When you're teaching this to the officers, just generally and high-level, how do you explain to them, this is what civil liability means, what do you say?

A.   We talk about the difference between criminal liability and civil liability, and I would go into detail and say, criminal liability is when you violate the law.  Like there's a code section, and usually, your crime would involve some kind of punishment like jail, or a fine, whereas civil liability would be something more, that you have violated somebody's rights. It's more personal rights.

It could fall into a constitutional civil right, or it could be something merely like a car accident, like you personally wronged me.  But I did talk about civil liability is when someone says that you personally violated a right that they had, and that usually, the reward for that would be damages, like compensation, like money.

Q.   When it comes to the criminal liability piece of that, do

you specifically cover color of law prosecutions with the officers?

A.    I do, I cover that as well.

Q.    Do you also use a handout in this class?

A.    I do, yes, that's correct.

Q.    Do you use a PowerPoint as well?

A.    I do, yes, ma'am.

        MS. ALLISON:  Ms. Richart, please put on the screen Government Exhibit 33.

        And please scroll through.

BY MS. ALLISON:

Q.    What do we see here on the screen Ms. Zeidan?

A.    It's kind of going back and forth.  Did you want me to --

        MS. ALLISON:  Let's go back to page 1.

A.    Sorry.

BY MS. ALLISON:

Q.    What are the slides that we with see on the screen?

A.    So these are slides from my -- I believe the constitutional -- I don't see the cover page, but ... I don't see the first page.

Q.    Yeah.  To be clear, does your PowerPoint have a whole bunch of slides in it?

A.    Yes, it does, and I usually have a title page, which says the class name and the session number, sometimes, but this would be the slides from that class, that's correct.

JA796

Q.   Would it be helpful for Ms. Richart to scroll through again, or do you feel confident these are the slides?

A.   No, I feel confident, thank you.

MS. ALLISON:  Let's turn now to the slide titled 18 U.S.C. 242.  I believe it's page 3.

BY MS. ALLISON:

Q.   Did you make these slides as well, Ms. Zeidan?

A.   Yes, I did.

Q.   Is this the slide you use to used to explain color of law prosecutions to the officers?

A.   Yes, as far as the criminal liability part of it, yes, I did.

MS. ALLISON:  Let's go back to the slide labeled Good Faith Defense.

And for the record, this is the third slide.

BY MS. ALLISON:

Q.   How do you teach this slide to your officers?

A.   So we talk about, good faith is a defense if the officer didn't know any better -- when I say "officer," I mean, sheriff's deputies, any law enforcement Officer.  It's a defense can that they didn't know any better, and usually, they acted in good faith.  However, this slide talks about when you would not be given good faith.  And the first one talks about clearly established right, where it's already been established in law, by case law, that this was not acceptable behavior and this

officer should have known better.

The second one is, the officer acted with malice, which would mean evil intent; they knew what they were doing was wrong, and they did it anyway. So that is when you would not be given the defense of good faith.

MS. ALLISON: Let's turn now to the last slide in this exhibit.

BY MS. ALLISON:

Q. What is the title of this slide?

A. So this is entitled Prevention.

Q. What do you mean by prevention?

A. So I wanted to leave with something that they would remember from the class, and so I went through all the different steps to help prevent you from being in a lawsuit. But if you do find yourself in a lawsuit, then these things would also be accurate.

And I stressed again the importance of documentation, following your general orders, and in that fact, following the law, as well, and then, when in doubt, ask. I went into detail and said, You can always ask your field training officer or field training deputy. You can ask a sergeant, a lieutenant. You can even call -- I call them like attorney, because I was a prosecutor, so we're on call as well. So I wanted them to realize they can also ask if they're in doubt.

And then of course, using common sense and acting

reasonably, because the courts hold us as law enforcement officers to act reasonably.

Q. I'm going to focus on that second bullet point. What specifically do you tell them about their general orders?

A. Because the Northern Virginia Criminal Justice Training Academy is a regional academy -- like I said earlier, we train 17 different agencies -- we did not cover agency policy or general orders.

So I wanted to stress to them, when they return back to their agency, that they need to make sure that they know their general orders, that they would be responsible for following what that their agency tells them that they must follow, and it's their responsibility to know them and follow them.

MS. ALLISON: Thank you, Ms. Richart. You can take that down.

BY MS. ALLISON:

Q. Did Officer Vanderpool successfully complete the academy?

A. Yes, he did.

MS. ALLISON: Please put on the screen Government Exhibit 25.

BY MS. ALLISON:

Q. What is this?

A. This is a letter from the basic training manager of the academy at the time. And it is a letter stating that Martique Vanderpool graduated from Session 132 of the academy,

and it talked about the total hours of training that was accomplished by him.

MS. ALLISON: Ms. Richart, can you please zoom in on the total hours section.

BY MS. ALLISON:

Q. What were the total hours of training that Officer Vanderpool took at the academy?

A. The total combined, from the sheriff's deputy program and the law enforcement program, was 978 hours.

MS. ALLISON: You can take that down, Ms. Richart.

Nothing further.

THE COURT: Okay, thank you.

Cross-examination?

MR. BLUESTONE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BLUESTONE:

Q. Good morning.

A. Good morning.

Q. So you spent I think you said 11 and a half years teaching at the academy?

A. That is correct.

Q. Did you ever serve in law enforcement prior to that?

A. No, I was never a law enforcement officer.

Q. Have you ever made an arrest?

A. No, sir, I haven't.

Q.    All right, thank you.

And to -- you also discussed the DCJS.  Who does that organization -- like, what is that a part of?

A.    Well, it's an agency under the Virginia government, and for an officer or sheriff's deputy to be an accredited law enforcement officer, like given the badge, and then sworn in, they must accomplish those mandates, and they are given a separate exam at the end of the academy.

Q.    Accreditation in the state of Virginia?

A.    Correct.

Q.    And it does not apply other states?

A.    No, it does not, it's only in Virginia, but I think every state has something similar.

Q.    You also discussed the importance of general orders.  What general orders have you reviewed?  Have you reviewed them before?

A.    I reviewed some general orders, but they vary from agency to agency.

Q.    And they've all been Virginia department general orders?

A.    Yes, sir, that's correct.

Q.    All right.

You did not teach Officer Vanderpool any report-writing courses.

A.    Well, I wouldn't say the title was report-writing, but all of our classes, like courtroom testimony, laws of arrest, we all

kind of had that same theor- -- that same theme about the importance of good report writing, so we all touched upon it as instructors.

Q. But there was -- but you did not teach them a class focusing on report-writing?

A. Not entitled that.

Q. All right.

MR. BLUESTONE: Could you please pull up Exhibit 28?

BY MR. BLUESTONE:

Q. You did not give this outline to students.

A. No, they did not get this, because this is my lesson plan, but they got most of the material in it in their handout.

Q. In fact, I believe I said that you taught the course separate -- differently than described in this lesson plan.

A. I'm sorry, what are you referring to?

Q. I believe it's -- on this one, you said that -- oh, sorry, it's the next one; I apologize -- the -- that you sometimes deviated from lesson plans when teaching students.

A. I don't remember saying that, I'm sorry. I think I said I try to cover all the material. Sometimes, there will be like some extra cases that we don't have time to get to, that would just be like a little bit extra, but I make sure we cover all the D.C. mandates; that's required.

Q. All right. And this lesson plan, it covers primarily the Virginia laws of arrest.

A.    Correct.

Q.    Which do not apply outside the state of Virginia.

A.    Correct.  We only taught the Virginia law at that academy.

Q.    And how many people do you remember were in Session 132 of this course?

A.    I do not remember.  Our session sizes usually went anywhere from 90 to 140.

Q.    All right.  And the laws of arrest have changed since this was written?

A.    There might have been some modification or changes, but nothing dramatic.  We always made sure.  That's why I have revised and reviewed.  We always reviewed material before we talked to the students to make sure there were no changes.

Q.    All right.  I want to talk with you a little bit about the laws of arrest.  So you --

        MR. BLUESTONE:  If you could please go to page 16?

        Thank you.

BY MR. BLUESTONE:

Q.    You discuss the discretion that an officer has, and I want to discuss with you a little bit the end of an arrest, what -- when an arrest ends.  Does an arrest end after citations are issued?

A.    Well, what kind of citation are you referring to?  Are you saying like issuing a summons?

Q.    Yes.

A.   For what kind of charge?

Q.   A misdemeanor.

A.   Is it still an arrest citation?  Because there are some citations can be just a summons, and there are some that could be more of an arrest, we just don't take them into custody.

Q.   Let's say just a summons.

A.   Okay, just like for a speeding ticket or something?

Q.   Yes, yes.

A.   Okay.  And what was your question on that?

Q.   If -- at the end of that, would an arrest be considered over?

A.   I wouldn't consider that an arrest; that's a temporary detention.

Q.   All right.  If someone is not in handcuffs, would that be a sign that an arrest -- that there's no arrest or that it has ended?

A.   If they're not in handcuffs, I wouldn't say the person's arrested, unless they've been told they're under arrest.

Q.   And if the person is released and can go anywhere at any time, they're not under arrest?

A.   Again, if there was no language that they were under arrest and there's no handcuffs, then that's correct, depending on what the officer told them at the time.

Q.   So it requires the language, You are under arrest?

A.   It requires some kind of language that a person would know

they're not free to go, or handcuffs, some kind of either verbal or nonverbal communication.

Q. All right, thank you.

And if you look at the bottom of this page, you see a section titled Discretion?

A. Yes. Yes, sir.

Q. Do officers have discretion when determining what to -- like when interacting with a member of the public?

A. Well, when we talk about discretion, I always tell them to, again, consult their agency policy, but discretion is usually for lower-level charges. I used the example drunk in public, using it as a Class 4 misdemeanor in Virginia. So for something that's more like a fine, not really a higher-level type of misdemeanor, definitely not a felony, I would say, yes you can use discretion for like a speeding ticket, a drunk in public, as long as it doesn't violate agency policy.

Q. All right, thank you.

MR. BLUESTONE: If we could please go to Exhibit 31.

BY MR. BLUESTONE:

Q. So this is what I believe you said, that your -- what you taught is different than what is on the PowerPoint. You said this Power- -- this statute, as you said, refers to an inmate. The -- but you said you did not use that term in class?

A. Well, the PowerPoint says, of an inmate, et cetera, but if you look at the lesson plan and the handout, it goes into more

detail about what an inmate is, and it does reference somebody in the custody of a law enforcement officer.

So this is just boilerplate language, but the code went into more detail. The PowerPoint was just supposed to have bullets, so that's why I wanted them to know, it's not just technically an inmate; it could be someone in your care and custody.

Q. Okay. And this law is a Virginia law?

A. That is correct.

Q. And it does not -- this law as written does not apply outside the state of Virginia.

A. That is correct.

Q. Thank you. And does this law -- as you taught on the PowerPoint, that it requires someone to be in a correctional facility or program?

A. No, it did not refer that it had to be a correctional program; I just said, in your care or custody. That's why this is taught twice. This particular charge was taught in a class for the deputies, and then it was also taught for the entire law enforcement class, because I wanted them to know it just doesn't refer to someone in like an inmate facility.

Q. But this slide itself refers to somebody who works at a correctional facility.

A. I don't remember what the other dots said, so I don't remember the code section by hand, so I don't want to respond if

JA806

I'm not sure, but it was in the LEA -- LE program, so I believe it had a more expansive definition.

Q.   All right, thank you.

MR. BLUESTONE:  You can take that down, please.

BY MR. BLUESTONE:

Q.   To clarify something you mentioned earlier, you talked about different courses.  When they are training -- when you taught these students, were they law enforcement officers at the time?

A.   Some of them were prior law enforcement, and some were not. So we had a various class.

Q.   All right, thank you.  So some were just recruits who were aspiring law enforcement?

A.   Correct, and some of them had actually worked like at their agency before coming; that's very common.

MR. BLUESTONE:  All right.  And if we could please go to --

BY MR. BLUESTONE:

Q.   So at the time, Officer Vanderpool was with the Arlington County Sheriff's department?

A.   That's correct.

Q.   That is not a -- and that is not any form of correctional officer?

A.   No, but again, are you referring to that slide?

Q.   I'm -- generally speaking.

A.    Okay, that's correct.  I mean, some people actually do refer to deputies as correctional officers, so sometimes you do hear those terms interchangeably.

MR. BLUESTONE:  And if you could please go to -- I believe it's the PowerPoints on the civil rights.  Thank you -- this slide.

BY MR. BLUESTONE:

Q.    This -- what was this course focused on?

THE COURT:  That's Government's Exhibit 33 for the record --

MR. BLUESTONE:  Yes.

THE COURT:  -- correct?

MR. BLUESTONE:  Yes, it is.

THE COURT:  All right.

MR. BLUESTONE:  Okay.

A.    And this -- you're asking why I taught about civil liability?

BY MR. BLUESTONE:

Q.    Yes.

A.    So in this slide, I would talk about how -- I guess this was in the deputy program.  So it's a harm that the law enforcement officer or deputy would commit to someone, they would say that they were harmed in some way, and it would expose the officer or the deputy to some kind of liability.  Again, this is more of a personal harm, it could be a civil rights

violation, it could be something that they just -- you know, some kind of more like an assault. I mean, there's various things. It could rise to a civil rights constitutional violation, or it could be something that they just keep it a state action.

Q. This course, though, it was focused on the jail context rather than officers in the field?

A. This one was, but civil liability is also taught to everyone.

Q. But this constitutional law course was focused on in the jail context?

A. Yes, the constitutional law and civil liability was something that deputies received a month ahead, and then we had a civil liability and constitutional law for everyone that they all attended.

There was a lot of the same material; it's just one kind of focused on the jail setting, but a lot of the material did get repeated.

Q. All right, whereas -- put very simply, this lesson that we're discussing today, that you taught this to Officer Vanderpool, you said?

A. I'm sorry, what was the first thing --

Q. You saw this course -- you taught this course to Officer Vanderpool, you said?

A. That is correct.

Q.   And it was focused solely on the jail context rather than the general one you said later?

A.   This one was just the jail context, but there was one later that everyone attended, including your client, that was focused on those on patrol, law enforcement officers.

Q.   And you also discuss the -- that one of the best methods of avoiding liability is to follow general orders.

A.   Correct.

Q.   But in -- on a -- how many general orders would you say you have read?

A.   I don't know.  I've read various ones at the request of certain agencies.  As the legal program manager, I was also there to answer any questions that our agencies had, so they may send me a policy and say, what do you think about this, but I didn't -- I haven't -- I can't say how many I've read; I've just said I reviewed some in Virginia.

Q.   All right.  That was going to be my follow-up question.

          MR. BLUESTONE:  No further questions.

          THE COURT:  Okay, thank you.

          Any redirect?

          MS. ALLISON:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MS. ALLISON:

Q.   All right, Ms. Zeidan.  Mr. Bluestone asked you questions about whether you, personally taught a report-writing course; do

you remember those questions?

A.    Yes.

Q.    And you said something like, the same theme of truthful report-writing pops up in a bunch of classes; is that right?

A.    Yes, that's correct.

Q.    Is this by happenstance, or is this intentional?

A.    This is intentional.  We wanted to make sure that our classes actually -- it's like an interwoven type of policy, because that -- that way, the students will retain information more, if we are consistent and repetitive, so that's why in all of our classes, we talked about report-writing, documentation. For instance, in evidence -- I taught an evidence class -- I would talk about the importance of everything you collect when executing a search warrant and making sure that you write that down in your report.

So every class that I taught and the other instructors did, we would make sure that we reinforced how to document it properly because they would have to document and write reports throughout the whole entire time they're with the academy.

Q.    You were asked questions about when someone is and then isn't under arrest.  Do you remember those questions?

A.    Yes, ma'am.

Q.    And I believe I said you can tell someone's under arrest if the officer says you're under arrest or if there's nonverbal communication.  Is that what you had explained?

A.   Yes.   It's -- from my understanding, someone is under arrest when an objectively reasonable person would feel they are.   So there needs to be some kind of action on the part of the law enforcement officer or some words being said that that person, a reasonable person, would know or feel that they were under arrest, so either by actions, by words would help make that person realize that they are under arrest.

Q.   And I want to focus on the actions piece of that.   Would an officer handcuffing someone, taking them away from the scene, and taking them to a police department, does that fall in the actions category of when someone would be under arrest?

A.   Yes, it most certainly would, and actually, if an officer or deputy would ever use handcuffs for something other than arrest, I tell them, Make sure you tell this person it's for officer safety only, that you are not under arrest, I'm only placing handcuffs for your safety and mine.   Otherwise, when the handcuffs come on, someone would reasonably feel that they are under arrest, and they would be correct.

Q.   I want to turn now to the slide talking about consent of a person in custody.   Do you remember being asked questions about that slide?

A.   Yes, I do.

Q.   Did you say something to the effect of, this material was covered twice?

A.   Yes, for the carnal knowledge of an inmate, that charge?

Yes, it was actually covered -- I believe it was called Code of Virginia, and that was covered in the deputy school program. And I talked about the same case of that deputy in Alexandria Sheriff's Office. And I talked about that charge and that case in the deputy school program, and then I also brought it back up again in the sex crimes class, because consent is something that an officer needs to realize is invalid if it's coming from somebody in their care and custody, such -- like a sexual act would be considered.

Q. So does that mean that those concepts would have been covered with Mr. Vanderpool twice?

A. That's correct.

Q. Mr. Bluestone asked you a few questions about discretion; do you remember those questions?

A. Yes, I do.

Q. Does an officer have discretion to handcuff someone, take them to a police station, and have sex with them?

A. Absolutely not.

Q. Does an officer have discretion to lie in a report?

A. Absolutely not.

Q. Thank you.

MS. ALLISON: Nothing further for this witness, Your Honor.

THE COURT: Okay, thank you very much.

MR. BLUESTONE: May I have a brief recross,

Your Honor?

THE COURT: Briefly.

RECROSS-EXAMINATION

BY MR. BLUESTONE:

Q. Your question -- oh, you just stated that, about reports. Do you teach officers that reports should contain the elements of the offense?

A. Yes, I do.

MR. BLUESTONE: No further questions, Your Honor.

THE COURT: Okay. Ms. Zeidan, you are excused. Thank you very much.

THE WITNESS: All right. Thank you, Your Honor.

THE COURT: Okay. While she's leaving the courtroom, let me ask the United States, we have one witness left. That's Agent Hung. How long do you expect the direct to last?

MS. BERNSTEIN: We have some audio clips.

THE COURT: Are you that cold? Ms. Bernstein, I see you're in a scarf; are you cold?

MS. BERNSTEIN: A little bit, thank you.

THE COURT: Okay.

MS. BERNSTEIN: The scarf helps.

Ms. Hung is going to -- through Ms. Hung, we're going to play some of those audio-video exhibits that you're aware of, and that might take a while, I guess, maybe an hour and change.

THE COURT: Okay.

All right.  It's now about 11:53.  Let's go for another hour, break a few minutes before 1:00, because I have a bench meeting, and then we will resume at 2:00.

So that's our plan for right now, okay?

MS. BERNSTEIN:  Very well.

THE COURT:  Does that work with our court reporter?

Yes, okay.

MS. BERNSTEIN:  The government calls Elizabeth Hung.

THE COURT:  All right.

THE COURTROOM DEPUTY:  You do solemnly swear or affirm under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Speak loudly and clearly into the microphone, state your full name for the record, and spell your first and last names.

THE WITNESS:  My name is Elizabeth Hung, E-L-I-Z-A-B-E-T-H, and H-U-N-G.

THE COURTROOM DEPUTY:  Thank you.

ELIZABETH HUNG, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.   Good morning.

JA815

A.   Good morning.

Q.   Could you please introduce yourself to Judge Boardman and tell her what you do for a living.

A.   Good morning, Your Honor.  My name is Elizabeth Hung.  I'm a special agent with the Federal Bureau of Investigation.

Q.   What's your current role with the FBI?

A.   Currently, I work as a special agent on a public corruption and civil rights squad in the Baltimore Division of the FBI.

Q.   Are you relatively new to this case, Mr. Vanderpool's case?

A.   Yes.

Q.   When were you assigned?

A.   In approximately April of this year.

Q.   Are you familiar with the WhatsApp recordings that we've heard talked about here in Court?

A.   Yes, I am.

Q.   Have you personally been to the Fairmount Heights police station?

A.   Yes.

Q.   Have you personally been to a place called Tino's tow lot?

A.   Yes, I have.

Q.   All right.  I have some questions for you I'm going to ask you about those topics, but first, I'd like you to tell Judge Boardman a little bit about yourself.

     Where did you grow up and go to college?

A.   I was born and raised in Colorado.  I went to the

University of Colorado at Boulder for my undergraduate studies.

Q. What you study?

A. Computer science.

Q. Did you -- have you ever served in the military?

A. I have.

Q. What branch?

A. The U.S. Army.

Q. Tell us about your service.

A. I served for eight years in the U.S. Army as a military police officer.

Q. When you got out, what did you do?

A. My husband and I had three kids, I completed my second master's degree, and I applied for the FBI.

Q. What year did you start with the FBI?

A. 2019.

Q. What was your first assignment with the Bureau?

A. I was assigned to this public corruption and civil rights squad.

Q. Your whole time has been on the same squad?

A. Yes.

Q. So tell us a little bit about this squad. You said public corruption and civil rights?

A. Yes.

Q. Let's talk about public corruption first. What are public corruption cases?

A.   We investigate alleged crimes that public officials commit, that can range from a police officer committing an illegal act or an elected official committing various federal violations of law.

Q.   Let's focus on the other side, civil rights.  What types of crimes do you work there?

A.   I've worked on a number of deprivation of rights under color of law, hate crimes, also destruction or damaging of religious property.

Q.   You talked about color of law crimes.  Can you tell us what that is?

A.   Deprivation under color of law is when a person who's been given authority under the color of law by the government and ultimately the American people uses that authority to deprive another person of their rights.

Q.   Is that the category that would include, say, excessive force cases?

A.   Yes.

Q.   How about cases of sexual misconduct by an officer?

A.   Yes.

Q.   How would you explain to a layperson what it means to act under color of law?

A.   So when a person has been granted authority or given authority by our government, and then they use that authority to deprive a person unlawfully of their rights.

Q.   If, as a member of the FBI's civil rights squad, you learned of an allegation that a police officer arrested somebody, took them to a police station, and had sex with them, what would you do?

A.   I would open an investigation.

Q.   What would you be looking into?

A.   Whether or not that person's rights were taken away unlawfully by the officer, whether that officer acted outside of his authority.

Q.   Would it be relevant to you if the officer was supposed to take the person to a detention center and took her instead to a deserted police station?

A.   Yes, it would.

Q.   Why would that be relevant?

A.   Because police officers should act with transparency, that their actions should be open and therefore transparent to those who -- to the public, that when they do something apart from that, that if there is an element of secrecy or hiding some sort of action, then that in my opinion is worth investigating to figure out what happened here and why was there that element of deviation from the norm, or from witnesses, or in some way hiding that -- those actions.

Q.   You don't mean to suggest, do you, that a deviation from the norm necessarily means a federal violation, do you?

A.   No.

JA819

Q.   Would it be relevant to you if you knew that the officer was supposed to call in his location to Dispatch and didn't?

A.   Yes.

Q.   Why would that be relevant to your analysis of how to investigate this or whether to investigate this?

A.   In the same way.  So as they're talking about whether or not there are -- there's a record, a proper record, or witnesses to two police actions that helps corroborate the police officer's version of events, that could help us to exonerate the officer, or finding evidence that something else happened here that we don't know about, that we needed to look into.

Q.   And the last question along these lines, would you consider it relevant if you knew that the officer told a friend of his that he found condoms in the car and started to get horny?

A.   Yes.

Q.   Why?

A.   Because that's an unprofessional response, and at that point, it's a red flag to me on maybe the allegations before me.

Q.   In this case, did the FBI open a civil rights investigation into the allegations about what happened between Mr. Vanderpool and Raynna Stewart?

A.   Yes, it did.

Q.   Okay.  I want to focus now on the report that's at the center of this case.

During your investigation, did you take some steps to prove who authored that report?

A.   Yes.

Q.   Did you have somebody pull some records for you?

A.   Yes.

Q.   Who were you mostly dealing with?

A.   Sergeant Brendan Gill.

Q.   Is that the Sergeant Gill who testified here yesterday?

A.   Yes, it is.

Q.   And the records that we saw in court, are those the records that he pulled for you?

A.   Yes, and Sergeant Tanner Fellrath pulled those for me as well.

Q.   So some the reports, you got two copies of them, right?

A.   Correct.

Q.   Now, before I ask you questions about those records, do you remember whose RMS user account was used to draft the report that's in evidence as Exhibit 1?

A.   Yes.

Q.   Whose account that?

A.   Martique Vanderpool's.

Q.   Now, when Sergeant Gill was on the stand, we saw Exhibit 23.

MS. BERNSTEIN:  Can we have that up please, Ms.Richart?

And can we highlight line 3, please.

BY MS. BERNSTEIN:

Q. All right. So remind us what line 3 on this exhibit shows us.

A. This is an audit log of Martique Vanderpool's RMS user account, and on line 3, it shows that that account accessed RMS on September 7th, 2019 at 2:42:06 a.m.

Q. Can we pop out the name of the computer -- let me ask first, this line that we're looking at, is this a line that is associated with incident No. -- with the report that is Exhibit No. 1?

A. This is all of Martique Vanderpool's log-ins, and it does not show which report was accessed at that time. This is just a log-in, log-off.

Q. And the time on -- the line that's highlighted right now is 2:42:06 a.m. on September 7th; is that right?

A. Yes.

Q. Does that correlate with the time during which the report marked as Exhibit 1 was being written?

A. Yes, it does.

Q. All right. So I want pop out right now if we would the name of the computer, and just remind us, what is the computer on which this report was written?

A. Mike-HP.

MS. BERNSTEIN: Okay, we can take that down.

Can we have Exhibit 22 up, please, and go to the last page.

BY MS. BERNSTEIN:

Q. Okay. And at 2:49:50 a.m. on September 7th, whose user account was used to create the exhibit, the report that is Exhibit No. 1?

A. Martique Vanderpool's.

Q. And you're familiar with the report that we've been talking about in court, right?

A. Yes, I am.

Q. From whose perspective is that narrative written?

A. From Martique Vanderpool's.

Q. All right. So let's just pull that --

MS. BERNSTEIN: We can take that down, ma'am.

BY MS. BERNSTEIN:

Q. So to pull it together, at 2:49, who was the author -- whose user account was the author of the report?

A. Martique Vanderpool.

Q. Whose perspective was it from?

A. Martique Vanderpool.

Q. And what computer was it being written from?

A. Mike-HP.

Q. So let's talk about mike-HP. During your investigation, did you identify what computer that was?

A. Yes, I did.

JA823

Q.   Where was it?

A.   It was -- it is inside the main room, the common room of the Fairmount Heights Police Department.

Q.   What type of computer is mike-HP?

A.   It's considered a desktop computer.

Q.   So it's not portable?

A.   Correct.

          MS. BERNSTEIN:  Can we have Exhibit 4C on the screen?

BY MS. BERNSTEIN:

Q.   What room -- while she's pulling that up, what room was mike-HP in?

A.   This room, the main room of Fairmount Heights Police Department.

Q.   To be clear for the record, we're looking at 4C right now, in the same room as the black sofa we've been talking about in this case; is that right?

A.   Yes.

Q.   Now, how did you determine -- well, first of all, let me ask you, do you see mike-HP in this photograph?

A.   I see the monitor for mike-HP, yes.

Q.   And explain why you clarified that.

A.   Well, the tower for the computer is underneath the desk, and I can't quite see it.

Q.   So a desktop computer like this actually has two parts; is that right?

JA824

A.    Yes.

Q.    And what we see is the monitor that's sitting on the desk?

A.    Yes.

Q.    How did you determine that that was mike?

A.    I looked in the computer's properties, and it has a device name, and it says "mike-HP."

        MS. BERNSTEIN:  We can take this down for a second.

BY MS. BERNSTEIN:

Q.    Do you use a computer at work?

A.    Yes.

Q.    Do you have to log on with a password?

A.    Yes.

Q.    Now, if you log on to your computer with a password and then you want to access a different application, like gmail or your bank, what do you have to do?

A.    I need to log in to that system with another user name and password.

Q.    What's your understanding of how the RMS system log-on works?

A.    My understanding is -- is the same, that you -- once you are on a computer that has that program on it, that you need to log in with a user name and password that's unique for that system.

Q.    Even once you're on a computer, you then need to use your unique user name and password to get onto RMS?

JA825

A.    Yes.

Q.    So if someone had a password, say, to get on the Fairmount Heights Police Department computer, would that be enough to get them into the RMS system?

A.    No.

MS. BERNSTEIN:    Can we go to the defense exhibit with the yellow sticky note.    I think it's 4?

So for the record, we have Defense Exhibit 6 on the screen.    Can we zoom in on the yellow sticky note in the bottom left-hand corner of the computer?

BY MS. BERNSTEIN:

Q.    And we've heard testimony about this before, but that says fhpd1935, right?

A.    Yes.

Q.    Remind us of the significance of 1935.

A.    The town of Fairmount Heights was incorporated in 1935.

Q.    Do you see anything in that password that you would associate with RMS?

A.    No.

Q.    If that were the password to get onto the fhpd computer, would that get you into the RMS system?

A.    No.

MS. BERNSTEIN:    You can take that down.

BY MS. BERNSTEIN:

Q.    All right.    I want to talk to you a little bit about what

the FBI's investigation showed about who was working when on the night that Ms. Stewart was arrested. So first of all --

MS. BERNSTEIN: If we can have Exhibit 1 back up, please, on page 4.

BY MS. BERNSTEIN:

Q. So Exhibit 1 is the report that we've been talking about. So first of all, who did the author of the report say he was working with that night?

A. Officer Dupree.

Q. In fact, who was working with Officer Dupree that night?

A. Martique Vanderpool.

Q. We've heard some questions about a Lieutenant Ivey. Was he involved in the stop with Ms. Stewart?

A. No.

Q. We've heard about Chief Watkins. Was he involved in the stop with Ms. Stewart?

A. No.

Q. Was Ivey working that night?

A. No.

Q. Was Chief Watkins working that night?

A. No.

MS. BERNSTEIN: Could we have Exhibit 7, page 2 up, please?

BY MS. BERNSTEIN:

Q. And this is already in evidence. Do you recognize what

we're looking at?

A.   Yes, I do.

Q.   What is it?

A.   This is the daily attendance sheet for Fairmount Heights.

     MS. BERNSTEIN:  Actually, let me take that down for just a second.

BY MS. BERNSTEIN:

Q.   Are you familiar with Defendant Vanderpool's testimony in a prior proceeding?  We've heard some of it here today -- I mean, yesterday.

A.   Yes, I am.

Q.   According to Defendant Vanderpool, when he and Officer Dupree took Raynna Stewart back to the station, who else was around?

A.   Officer Dupree.

Q.   Anyone else?

A.   No, he didn't see anyone else.

Q.   Was Lieutenant Ivey there?

A.   No.

Q.   Was Chief Watkins there?

A.   No.

Q.   According to Mr. Vanderpool, did he see anyone else?

A.   No.

     MS. BERNSTEIN:  Can we have Exhibit 8 up, please, page 2?

Actually, can we go to page 1.

BY MS. BERNSTEIN:

Q.    Do you recognize what we're looking at?

MS. BERNSTEIN:  This is already in evidence.

A.    Yes, I do.

BY MS. BERNSTEIN:

Q.    What's this?

A.    This is what -- something called the CAD report.  This is the Communications written report.

Q.    All right.

MS. BERNSTEIN:  And this is already in evidence as the CAD report for the traffic stop of Raynna Stewart.

Can we go to page 2, please.

BY MS. BERNSTEIN:

Q.    And I'm not sure we covered this before, but can you tell us, who does this document identify as the registered owner of the vehicle Raynna Stewart was driving that night?

MS. BERNSTEIN:  And I'm going to ask Ms. Richart to pop out for us.

A.    Delonte Samuel.

BY MS. BERNSTEIN:

Q.    Can you circle for us where you're reading?

A.    (Complying.)

Q.    And for the record, you've circled NAM/Samuel, Delonte Antonio, right?

JA829

A.   Yes.

MS. BERNSTEIN:  Okay.  We can take that down, please?

BY MS. BERNSTEIN:

Q.   All right.  I want focus now on Defendant Vanderpool's whereabouts at various times, okay?

In the prior proceeding, did Mr. Vanderpool say how Ms. Stewart got back to the tow lot?

A.   Yes.

Q.   Who took her?

A.   He did, with Officer Dupree.

Q.   Did he make any phone calls along the way?

A.   Yes.

Q.   To whom?

A.   Kevin Oshin, who worked for Tino's towing.

Q.   And is there a document that helps you figure out about what time that was, that the officers took Raynna back to the tow lot?

A.   Yes.

Q.   What's that document?

A.   It is a Cellebrite report from -- that was extracted from Martique Vanderpool's phone.

MS. BERNSTEIN:  Can we have Exhibit 44 up, please.

Can you go to page 1.  If you could highlight line 3.

BY MS. BERNSTEIN:

Q.   What does that line show, or what is the significance of

JA830

it?

A.   Yeah.  This is a call log entry in the report that at 11:23:31 p.m. on September 6th, 2019, the phone that this report's from, which is Martique Vanderpool's cell phone, called Kevin, and that's the phone number associated with Kevin Oshin.

Q.   Is that the first call from Mr. Vanderpool's phone to Kevin associated with this incident?

A.   Yes.

Q.   What time was it?

A.   11:23 p.m.

Q.   Does that correspond with anything in this case?

A.   It corresponds with the beginning of the traffic stop.

     MS. BERNSTEIN:  All right.  Can we go to page 3, line 14.

BY MS. BERNSTEIN:

Q.   What does that line show us?

A.   This is another call to Kevin from Martique Vanderpool's phone.

Q.   What time was that call made?

A.   September 7th, 2019, at 1:10:09 a.m.

     MS. BERNSTEIN:  Can we highlight line 15.

BY MS. BERNSTEIN:

Q.   What does that tell us?

A.   This is an instant message.

Q.   Oh.

A.    Incoming.

MS. BERNSTEIN:  I'm not sure 15 is what we want; we can take that down.

BY MS. BERNSTEIN:

Q.    After that call at 1:10 to Kevin Oshin, were there other calls back and forth between the two of them?

A.    Yes, several.

Q.    Do you know up until what time?

A.    Between 1:10 a.m. and the last call to somebody at Tino's Towing was at 2:19 a.m.

Q.    Explain what you mean when you say, to someone at Tino's Towing.

A.    So Martique Vanderpool's phone calls Kevin, who is the tow truck driver for Tino's Towing, and he also calls Tino, who is Valentino Hines of Tino's Towing.

Q.    And explain who Valentino Hines is?

A.    Valentino Hines is Tino, from Tino's towing.

Q.    Is he the owner?

A.    Yes.

MS. BERNSTEIN:  Can we go to page 6, line 65.

BY MS. BERNSTEIN:

Q.    You said the last of the calls back and forth with the people associated with Tino's Towing was at 2:19 a.m., right?

A.    Yes.

Q.    Is this line 65 that we're looking at, the line that tells

you that?

A.   Yes.

MS. BERNSTEIN:  Okay, we can take that down.

BY MS. BERNSTEIN:

Q.   As an investigator, when you looked at these flurry of calls here, did that tell you anything, or what did that tell you?

A.   This indicated to me that this is the time frame in which Ms. Stewart was driven back to Tino's Towing to retrieve the vehicle.

Q.   Are there any records that tell you where Defendant Vanderpool was at any point after that?

A.   Yes.

Q.   What record are you thinking of?

A.   There is a traffic warning document that we have.

MS. BERNSTEIN:  Can we have Exhibit 42 up, please?

BY MS. BERNSTEIN:

Q.   What are we looking at here?

A.   This is a traffic violation warning.

Q.   Who is it issued to?  Obviously, we don't see the full name; it's redacted.

A.   Yeah, C.C.

Q.   Who issued this traffic warning?

A.   Martique Vanderpool.

Q.   What date and time?

A.    On September 7th, 2019, at 2:22.

Q.    Can you circle for us where you're looking?

A.    (Complying.)

Q.    All right.  So for the record, you circled the top left of the left side of the sheet, you circled the date, and the top right of the left side of the sheet, you circled the time; is that right?

A.    Yes.

Q.    So how does this document tell you where Defendant Vanderpool was?

A.    It has a location for where the warning was issued.

Q.    Where is that; can you circle that?

A.    (Complying.)

Q.    So for the record, you circled "Location: Sheriff Road/Addison Road," right?

A.    Yes.

Q.    Are you familiar with that location?

A.    Yes.

Q.    Have you been there?

A.    Yes.

Q.    How far is it from Tino's Tow lot?

A.    Approximately .3 miles.

Q.    How far is it from the Fairmount Heights police station?

A.    Less than half a mile.

        MS. BERNSTEIN:  Can we have Exhibit 43 up, please, and

can you zoom in on the blue and the red part, on the right?

BY MS. BERNSTEIN:

Q. What are we looking at here, Exhibit 43?

A. That is an aerial map from -- on the top of the map is Tino's Towing location, and you have Fairmount Heights as the end location, and it has a blue line for how you could drive.

Q. Okay. And it goes through the intersection of Sheriff Road and Addison?

A. Yes.

Q. According to this, what is the total driving time from Tino's tow lot all the way Fairmount Heights Police Department?

A. Three minutes.

Q. How far is it?

A. .7 miles.

MS. BERNSTEIN: Okay, we can take that down.

BY MS. BERNSTEIN:

Q. All right. So I want to pull this together.

At approximately 2:00 a.m., give or take, where does your investigation place Defendant Vanderpool?

A. I'm sorry, can you repeat that.

Q. Yeah. At approximately 2:00 a.m., give or take, where does your investigation place Defendant Vanderpool?

A. At Tino's Towing.

Q. At exactly 2:22, where was Defendant Vanderpool?

A. At Sheriff Road and Addison Road.

Q. How far was that from the Fairmount Heights Police Department?

A. Less than half a mile.

Q. Twenty-seven minutes later, where did Defendant Vanderpool's user ID start writing this report?

A. On mike-HP at the Fairmount Heights Police Department.

Q. Okay. I want to go back talk a little bit more about the tow lot you were just talking about. You said earlier that you've personally been there?

A. Yes.

Q. When did you go there?

A. In August of this year.

Q. Was it day or night?

A. Daytime.

Q. Describe that area for us.

A. Tino's tow lot is down a dirt road. It's off of Sheriff Road, and it's -- as you progress down the road it becomes a dirt road. It's got a lot of broken-down and damaged vehicles along the side of it, it's pretty deserted, and it has woods on both sides, overgrown woods, and then, as you -- it leads back to where there are several fenced-in car lots, and one of those lots is Tino's Towing.

Q. Now, before I ask you more questions about Tino's, I want to go back to part of the transcript from the prior proceeding that we've talked about here in court. Do you have a copy of

JA836

that transcript in front of you?

A.   Yeah, I have the exhibit bind- --

Q.   I think it's under the exhibit binder, perhaps.

A.   Apologies.  Yes, I do.

Q.   I'd like you to turn to page 80.

And I'm going to ask you to read the highlighted parts on page 80 and 81, and I'm go to ask the question and ask you to give the response that Mr. Vanderpool gave, okay?

A.   Okay.

Q.   "So going back to the towing of the car, you guys drove her back to the impound lot right?"

A.   "I never drove Ms. Stewart anywhere that night."

Q.   "Okay.  Dupree and you were in the car, driving her back to the impound lot, correct?"

A.   "Yes, we were all in the vehicle."

Q.   Jumping to 81, line 11.

"Okay, but she was able get her car back at that time correct?"

A.   "I don't know.  We drove off, so we weren't there when she got back to her car -- got her car back or however the situation was worked out."

Q.   When you were at Tino's Tow lot, did you take some photographs?

A.   I did.

MS. BERNSTEIN:  Can we have Exhibit 41 up, please, and

just scroll through so Agent Hung can see them?

BY MS. BERNSTEIN:

Q.   Are those the pictures you took?

A.   Yes.

Q.   What are they of?

Just in general first, and then we'll go through.

A.   They're of the road and the lots that are down -- I think it's called Fairmount Heights Drive, where Tino's Towing is located.

MS. BERNSTEIN:  Let's start with Exhibit 41A.

BY MS. BERNSTEIN:

Q.   What do we see here?

A.   This is the entrance to where the fenced-in car lots are.

Q.   That's the dirt road you were describing?

A.   Yes.

Q.   Can we go to 41B.

BY MS. BERNSTEIN:

Q.   And just orient us if you would.  What are we looking at now?

A.   This is just past that last photo, if you kept walking down the road or driving down that road, and then it has a road that continues to the right, and to the left, and straight, where there are car lots.

MS. BERNSTEIN:  Let me go out of order here and ask you to go to 41D.

BY MS. BERNSTEIN:

Q.   Is this just a little further up that same road and looking to the left?

A.   Yes.

MS. BERNSTEIN:  Can we go to 41C.

BY MS. BERNSTEIN:

Q.   What are we looking at here?

A.   This is Tino's tow lot.

Q.   In 2019, were with there any lights at Tino's tow lot?

A.   No.

Q.   All right.  So these pictures are where the officers let Raynna off at about 2:00 in the morning.

A.   Yes.

MS. BERNSTEIN:  We can take these down.

BY MS. BERNSTEIN:

Q.   I want to ask you a question about Exhibit 9 and 9A.  Do you remember that exhibit?  It's the exhibit dealing with the Dispatch records.

A.   Yes.

Q.   And it's more specifically the Dispatch recording of this incident.  You've listened to those?

A.   Yes.

Q.   You heard them in court?

A.   Yes.

Q.   At the very end of Exhibit 9A, FA4 says he's going 10-7.

Do you know what 10-7 means?

A.   Yes.

Q.   What does 10-7 mean?

A.   10-7 means you're off duty.  It's different than being temporarily busy or going to go get lunch or something; this is when you are stopping or ending your shift.

Q.   All right.  I want to shift gears again and go to Exhibit 21, already in evidence.

Do you recognize this as a general Order for the Fairmount Heights Police Department?

A.   Yes.

Q.   Which general order is this?  Remind us, please.

A.   The subject is Conduct of Members of the Department.

Q.   All right.  We've already looked at parts of this, but I want to look at a new part.

MS. BERNSTEIN:  Can we go to page 3 and highlight section 13, please?

BY MS. BERNSTEIN:

Q.   Can you read that to us?

A.   Section 13.  Officers of the Department shall respond without delay to all calls for police assistance from citizens or other officers.  Emergency calls take precedence; however, all calls shall be answered as soon as possible, consistent with normal safety precautions and vehicle laws.  Failure to answer a call for police assistance promptly, without justification, is

misconduct and negligence of duty.  Except under the most extraordinary circumstances or when otherwise directed by competent authority, no officer shall fail to answer any telephone call or radio call directed to him.  In accordance with departmental orders, the Communications Center will be informed by the officer when leaving the air and when returning to duty status, where applicable.

MS. BERNSTEIN:  Thank you.  We can take that down.

BY MS. BERNSTEIN:

Q.  All right.  I want to turn now to what Defendant Vanderpool told a friend of his about what happened that night.  You said you're familiar with the WhatsApp recordings that we've been talking about in Court, right?

A.  Yes.

Q.  Remind us who the friend was that Mr. Vanderpool was leaving messages back and forth with?

A.  Mr. Vanderpool sent recorded audio messages to Denton Washington who is a friend of his and a former police officer.

Q.  Do you know what Denton Washington goes by, what name?

A.  Denny.

Q.  Have you listened to Government's Exhibits 34 through 40?

A.  Yes.

Q.  What are they?

A.  They are audio messages that were sent from -- with the

WhatsApp application.

Q.   Are these the ones back and forth with Mr. Washington?

A.   Yes.

Q.   Have you also listened to and watched Government Exhibits 34A through 40A?

A.   Yes.

Q.   What's the difference?

A.   34A through 40A are the same audio recording with visual captions for the words that are spoken, and it also has a photograph of the speaker.

        MS. BERNSTEIN:  Can we have 34A up, please, but don't hit Play yet?

BY MS. BERNSTEIN:

Q.   All right.  Who are we about to hear speaking on this recording?

A.   Martique Vanderpool.

Q.   And who's that a photo of that we're looking at?

A.   Martique Vanderpool.

Q.   To whom is he talking in this clip?

A.   To Denny Washington.

Q.   Do you know the date of the recording we're about to hear?

A.   Yes.

Q.   What date?

A.   September 8th, 2019.

Q.   Before we hit Play, what is Defendant Vanderpool talking

about in the clip that we're about to hear, just generally?

A.    He describes a traffic stop in which he stopped a woman, decided to arrest her, brought her back to the station, and had sex with her.

MS. BERNSTEIN:  Can we hit Play, please?

(Audio recording with video playing.)

MS. BERNSTEIN:  For the record, I've just stopped the recording 3 minutes and 25 seconds in.  What did Mr. Vanderpool just say about who decided to make an arrest?

A.    He said that he did.

Q.    That Mr. Vanderpool did.

A.    Yes.

Q.    Did he call it a temporary detention?

A.    No.

Q.    What did he call it?

A.    An arrest.

Q.    Specifically, what did he call it?

A.    A full arrest.

MS. BERNSTEIN:  Can we back up just a few seconds so then we can hear it play through uninterrupted?

Thank you.

(Audio recording with video playing.)

BY MS. BERNSTEIN:

Q.    At the end of that recording what does Mr. Vanderpool say he said to Raynna at the station?

A.    Something along the lines of, we gotta make this right.

MS. BERNSTEIN:  Can we have Exhibit 35A up, please, but don't hit Play yet?

BY MS. BERNSTEIN:

Q.    Is this just another clip from that same recording?

A.    Yes, it is.

Q.    So it's still Vanderpool we're going to hear speaking?

A.    Yes.

MS. BERNSTEIN:  Go hit Play, please.

(Audio recording with video playing.)

MS. BERNSTEIN:  Now, may I have Exhibit 36A up, please?

BY MS. BERNSTEIN:

Q.    Whose voice are we about to hear on this one?

A.    Denny Washington.

Q.    And who's that a photo of?

A.    Denny Washington.

Q.    Do you know the date of this one?

A.    This is the next day, September 9th of 2019.

Q.    What's Mr. Washington talking about in this next clip?

A.    He's responding to the audio recording that Vanderpool just sent him, and he talks about his surprise -- or he says, You can't do that.

MS. BERNSTEIN:  All right.  Let's hit Play, please.

(Audio recording with video playing.)

MS. BERNSTEIN: And for the record, I just stopped the recording 16 seconds in.

BY MS. BERNSTEIN:

Q. Mr. Washington just said, With a 10-15, Bro. Do you know what 10-15 means in police code?

A. Yes, it's a code for when you have a person under arrest, and when it's used as a noun, it's referred to as that person, as the arrestee, a 10-15.

Q. So a 10-15 refers to person under arrest?

A. Yes.

Q. All right. Let's try to back up just a couple seconds and then play it again so we can hear it uninterrupted.

(Audio recording with video playing.)

MS. BERNSTEIN: Can we have Exhibit 37A up, please.

BY MS. BERNSTEIN:

Q. Who's speaking on this one?

A. This is also Denny Washington.

Q. What's this one about?

A. This is, Denny Washington sent an audio recording to Vanderpool, and he expresses his surprise that Vanderpool still charged the woman.

MS. BERNSTEIN: Can we hit Play, please?

(Audio recording with video playing.)

MS. BERNSTEIN: Can I have Exhibit 38A up, please.

BY MS. BERNSTEIN:

Q.   Who's speaking on this one?

A.   Martique Vanderpool.

Q.   Is this also on September 9th?

A.   Yes.

Q.   What's Mr. Vanderpool about to talk about?

A.   He's going to respond to the previous message, Denny Washington's message, and give an explanation of why he still gave the woman a citation and that he wanted it to seem like any other stop.

      MS. BERNSTEIN:  Can we hit Play, please.

      (Audio recording with video playing.)

      MS. BERNSTEIN:  For the record, we've stopped the recording at 2 minutes and 8 seconds in.

BY MS. BERNSTEIN:

Q.   He just said he wasn't going to court.  Do you know if in fact Mr. Vanderpool was supposed to show up in court for a hearing for Raynna Stewart?

A.   He was.

Q.   Did he show up?

A.   No, he didn't.

Q.   He says, he's not going to court, and if she ends up being 10-35 or whatever because of it.  Do you know what 10-35 means?

A.   Yes, it means that an offense warrant has been issued for her arrest, for failure to appear.

JA846

MS. BERNSTEIN: All right. Can we go back a few seconds and then play through again?

(Audio recording with video playing.)

MS. BERNSTEIN: May I have Exhibit 39A up, please.

BY MS. BERNSTEIN:

Q. Who's speaking on this one?

A. Denny Washington.

Q. Is this a continuation of the same conversation?

A. Yes.

MS. BERNSTEIN: Can we hit Play, please?

(Audio recording with video playing.)

MS. BERNSTEIN: May I have Exhibit 40A.

BY MS. BERNSTEIN:

Q. Who's speaking on this one?

A. Martique Vanderpool.

Q. Are we still on September 9th?

A. Yes.

MS. BERNSTEIN: Let's hit Play.

(Audio recording with video playing.)

MS. BERNSTEIN: Thank you. You can take those down.

BY MS. BERNSTEIN:

Q. Before we end, I want to jump back to who was working what shifts on the night of Ms. Stewart's arrest.

MS. BERNSTEIN: Can I have Exhibit 7 up, please, page 2?

BY MS. BERNSTEIN:

Q.   You've said this before, but what are we looking at?

A.   This is the Fairmount Heights daily attendance sheet.

Q.   Okay.  So according to the schedule for the overnight shift starting on September 6th and ending on December 7th, what hours was Defendant Vanderpool scheduled to work?

A.   10:00 p.m. to 3:00 a.m.

Q.   According to Town of Fairmount Heights pay sheets, what hours was he paid for that night?

A.   10:00 p.m. to 3:30 a.m.

Q.   Not 3:00?

A.   No.

        MS. BERNSTEIN:  Can we see page 4, please, and highlight the first row?

BY MS. BERNSTEIN:

Q.   All right.  So Friday night, September 6th is on a different page; is that right?

A.   Yes.

Q.   So this starts at midnight on the 7th?

A.   Yes.

Q.   What time was he paid for on the 7th?

A.   From 12:00 a.m. to 3:30 a.m.

Q.   How many hours?

A.   Three and a half.

Q.   So he worked 30 minutes past the end of his shift.

A.   Yes.

MS. BERNSTEIN:  Can we have Exhibit 22, please, and go to page 7?

If you can highlight that row that starts with CheckIn?

BY MS. BERNSTEIN:

Q.   Remind us what time Defendant Vanderpool's user account checked that report back into the RMS system?

A.   On September 7th, 2019 at 3:23:50 a.m.

Q.   So is that 6 minutes and 10 seconds shy of 3:30?

A.   Yes.

MS. BERNSTEIN:  I tender the witness, Judge.

THE COURT:  Why don't we break for lunch early.  It's about 12:43, and let's return at 2:00 for cross-examination, okay?

MR. ZAMPOGNA:  Thank you, Your Honor.

THE COURT:  And then, Ms. Bernstein -- is it "-stine" (phonetic) or "-steen" (phonetic)?

MS. BERNSTEIN:  "-steen (phonetic)."

THE COURT:  Thank you.  Ms. Bernstein, do you have any other evidence after this witness?

MS. BERNSTEIN:  We'll want to take a few minutes just to make sure, but no, we don't expect to.

THE COURT:  Okay, all right.  Anything else before we break for lunch from the government?

MS. BERNSTEIN:  Not from us -- well, other than that to ask if we can know at this point whether the defense plans to put on a case.

THE COURT:  Well, I'll ask them, but they don't have to tell me.

So Mr. Zampogna, do you care to share that?

MR. ZAMPOGNA:  I don't -- I don't want to say anything out of turn that I don't know, but --

THE COURT:  Then don't; that's all right.

MR. ZAMPOGNA:  Sorry, yeah.  Thank you.

THE COURT:  All right, okay.

Okay, we'll see you at 2- --

Anything else from your perspective, Mr. Zampogna, before we break for lunch?

MR. ZAMPOGNA:  No, Your Honor.

THE COURT:  Okay, see you at 2:00.

All right, thanks.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

THE COURT:  Oh, one other thing.  Have a seat.

We're still back on the record.

THE COURTROOM DEPUTY:  Yes, Your Honor.

THE COURT:  If the defense is not putting on a case, I'd like to have -- people who want to give closing arguments, they may; I'd like do that today.

Ms. Bernstein?

MS. BERNSTEIN: Absolutely.

THE COURT: Mr. Zampogna?

MR. ZAMPOGNA: Yes, Your Honor.

THE COURT: Okay, all right. See you at 2:00.

THE COURTROOM DEPUTY: All rise. This Honorable Court stands in recess.

(Lunch recess taken from 12:43 p.m. - 2:12 p.m.)

THE COURTROOM DEPUTY: All rise. This Honorable Court now resumes in session.

THE COURT: Okay. Please be seated.

I'm sorry for the delay in starting.

Cross-examination?

MR. ZAMPOGNA: Yes, Your Honor, thank you.

CROSS-EXAMINATION

BY MR. ZAMPOGNA:

Q. Christopher Zampogna. I'd like to -- may it please the Court, to begin with asking a question about your experience at the FBI, Ms. Hung. You had testified on direct that you became an FBI agent about five years ago; is that correct?

A. Yes.

Q. Okay. And you just recently entered the case related to my client, Mr. Vanderpool, about six months ago; is that accurate?

A. Yes, approximately.

Q. So the three years prior to that, you were not involved in

the investigation of Mr. Vanderpool; is that accurate?

A. Yes, that's correct.

Q. Okay. And during this six-month period of time, you -- I think you testified that you did visit the Fairmount Heights police station; is that right?

A. Yes.

Q. And in addition to that, I know you did interview some witnesses. Did you familiarize yourself with Mr. Vanderpool's work history?

A. Yes.

Q. Okay. So you -- all right. That's -- when I say "work history," I mean at the Fairmount Heights police station.

A. Yes. I familiarized myself with that, and I don't know that I'm -- don't know that I know everything.

Q. Okay. So I wanted to go to one I guess statement that was brought out also on direct, where I believe -- and I'm paraphrasing -- about seeing condoms and this making Mr. Vanderpool horny. Do you recall that?

A. I do.

Q. And I think you said, in that, that this was made to another police officer on duty, or no?

A. No, it was in the WhatsApp audio recording that he sent to Denton Washington.

Q. And that was to Denton Washington, so he could -- he was talking about maybe locker room talk related to something that

had happened. Is that not a police investigation or a police matter; is that right?

A. It came up in our police investigation, but he didn't say that in the course of an investigation.

Q. He wasn't saying it to another officer at the time; he was saying it to a friend, as you said, right?

A. Yes.

Q. Okay. I'd like to, then, turn to another event, a Travis Nnamani event, which Defense Exhibit 4 deals with.

MR. ZAMPOGNA: I don't know if we can pull it up or they -- or you guys can pull it up. I think we ...

BY MR. ZAMPOGNA:

Q. Are you familiar with this report of an arrest? We had given it to your -- to the prosecution as one of our exhibits.

A. Yes. Can I see all the pages?

MR. ZAMPOGNA: I'm not in control of it, so I guess just ...

A. Yes, I'm familiar with this.

BY MR. ZAMPOGNA:

Q. Okay. And who was the arresting officer in this matter?

A. It's not listed on this page, but they listed -- the arresting officer is filled in as Earl Ivey.

MR. ZAMPOGNA: I think that's on the third page, maybe, or maybe the fourth page. There you go.

JA853

BY MR. ZAMPOGNA:

Q.   Is that the page that you were looking for?

A.   Yes.  This one lists Earl Ivey as the complainant.

Q.   Oh, okay.  Well, that's ...

A.   Okay.

MS. BERNSTEIN:  Objection.  Actually, for clarification, Judge, for the record, this exhibit that we're looking at is actually a compilation of different types of documents.  Could we ask him to have the witness walk through what these documents are for the record.

MR. ZAMPOGNA:  Sure, I'll be glad to.

BY MR. ZAMPOGNA:

Q.   So I guess we could start on page 1, and I think, that document goes from Exhibit 4, page 1 of 3, so there are three together.  Could you describe what that document is?

A.   Yes.  My understanding is that this is a call for service record within RMS, that records some Dispatch communication information regarding an incident that happened on January 15th, 2019.

Q.   And on the second page, I think towards the middle, it has -- Ivy is a name in there, and it's kind of -- it's a big para- -- well, I'll call it a paragraph.  It says Charles Richard Holm, Ivy Juniper Solomon; do you see that?

A.   Yes, I do see that.  That Ivy Juniper Solomon has come up as perhaps -- I don't know this for certain but as another

registered owner of the vehicle.

Q.   Okay, all right.   Then, as we go to the next document -- and this was -- the date and time of this, do you -- could you read that into the record so we have that?

A.   Yes.   At the end, there, it says, Date/Time January 15, 2019, at 1:05:56 p.m.

Q.   Thank you.   And the next page, is this -- as it's listed, as you said, Complainant and Defendant, is Earl Ivey's name on that page?

A.   Yes, it is.   This appears to be a District Court of Maryland for Prince George's County document for charges, Statement of Charges.

Q.   And what are the charges, if you could read them?

A.   The first charge says, TA 16-101 a1, driving/attempting drive motor vehicle on highway without required license and author.

     Count 2 --

Q.   I'm sorry, go ahead; I didn't mean to stop you.

A.   -- says TA 17-107 a1, knowingly driving uninsured vehicle.

Q.   And then it goes on, there's another -- there's a page 2 of 2, I think that it's written at the bottom.

     What is the next page?

A.   This is a continuation of the statement of charges.

Q.   And then if we flip to the next page, could you describe what that is?

JA855

A.   This looks like a continuation.  It has a statement of probably cause narrative on it.

Q.   Okay.

All right.  So the statement at the bottom, then, the next -- there is no next page; is that accurate?

A.   Not of the statement of charges document; there's a page 1 of 1.  I think there's more in your exhibit, but ...

Q.   Actually, that's all I think gave to the prosecution, so --

A.   Oh, okay.

MR. ZAMPOGNA:  So I'd like to now switch to Defense Exhibit 5.

BY MR. ZAMPOGNA:

Q.   Is and what is this document, if you know?

In general, not specifically.

A.   This is an auditing log from the RMS system.

Q.   Okay.  And in this RMS system, we -- I think we had testimony earlier, and you may have also spoken to this -- this is a system that's used by Fairmount Heights via the Prince George's County Police Department in order to enter police reports?  That's a very -- overgeneralization, probably, but --

A.   Yes.

Q.   -- if you can answer that, you're welcome to.

I'm sorry to interrupt you.

A.   That's my understanding as well.

Q. Okay. And this type of system is accessed by -- if there are computers -- well, we know at least you testified to at least one computer existing at Fairmount Heights -- they would log into a system, this system -- and I don't know if it's a cloud, I have no idea, but it goes somewhere where Prince George's County deposits the information; is that accurate?

A. Correct. My understanding is that on the computer, they would then be able to access the RMS from that computer and reenter their credentials to go into RMS.

Q. And speaking of that, I did ask -- I know you testified on direct that there was a computer called mike-HP, I believe, that was in the common area; is that right?

A. Yes.

Q. Do you know if there were other computers that Fairmount Heights had?

A. Yes, there were.

Q. And could you describe them and where they're located -- well, just describe them first, and then we'll go to the second one.

A. I know that there were other desktop computers. I also know that the police department had mobile computers. They had laptops, Toughbooks, that would be for use inside a police car.

Q. Do you know how many of both of those kinds that existed?

A. I don't have an exact number. I know I personally saw at

least three other desktop computers, and there were multiple mobile computers that were no longer in use, but I don't know how many they have that are currently in use.

Q. And were they -- well, you don't recall what kind of laptop they were, the make?

A. I know, several -- I don't know the ones -- the ones that I saw at the police station that were no longer in use, and we seized one of those, they were -- it was called a Toughbook.

Q. Do you know --

A. I don't remember the make or model; I apologize.

Q. Sorry. So when you said you seized one, when did you do that?

A. In August of this year.

Q. And where did you take it?

A. To my FBI office.

Q. Okay. You left the others there, or were there others?

A. There were others, and I did leave the other ones there.

Q. Why did you particularly seize one and not the other?

A. This one was labeled with FA3 on it, I believe, or it said -- Fairmount Heights 3 is sort of labeled on the bottom of it, so it seemed relevant to our investigation.

Q. Because of the name of the computer.

A. Yes.

Q. All right.

So back to this document, the document is -- it shows when

JA858

people go into the RMS system and enter information; is that accurate?

A.   Yes.

Q.   Or I should say, in addition, they can look at information as well?

A.   Correct.

Q.   And they can print information, to be complete?

A.   Yes.

Q.   Okay.  So if you flip to page 2 of 6, it has a list of names, and skipping the first two, if you can read -- are the names -- well, from this third entry down, are they all the same name?

A.   Yes, they are.

Q.   And what name is that?

A.   Martique Vanderpool.

Q.   And then, to the right of it, does it have a time and a date --

A.   Yes.

Q.   -- for the first entry?  I'm sorry?  Go on, the first -- yeah.

A.   Yes, it does.

Q.   And what does that say?

A.   January 16th, 2019, 1:06:46 p.m.

Q.   And then -- and this -- this goes from the most recent to the oldest; is that right?

JA859

A.    Yes.

Q.    Okay.  So then, if we flip the page to page 3 of 6, we go backwards to -- if you read the first viewing, it says Martique Vanderpool, and it has what date on it?

A.    At the bottom of the page, the first View section says -- oh, it was viewed on January 15th, 2019 at 2:48:08 p.m.

Q.    Okay, the bottom of the page, and then, the middle, it has another time more recent, right?

A.    Yes.

Q.    What is that?

A.    That was saved at 2:49:25 of January 15th, 2019.

Q.    And then, in between those two entries, there's a narr- -- it looks like it says Narrative on the left; is that right?

A.    That's right.

Q.    And does this narrative -- well, if you take some time to read it, could you tell me if it -- who was involved in the narrative?

A.    The first sentence says, I, Officer Ivey.

Q.    Okay.  And is there a car involved?

A.    Yes.

Q.    Okay.  And then, if you go to the top of this page, there's a booking number, I believe; what is that booking number?

A.    It says Booking # 143908.

Q.    Okay.  Does this also -- I'm sorry.  Does this also have -- maybe you already read this -- the time of this incident, the

date?

A. Yes. The narrative says, On January -- it says 1/15/2018 at approximately 12:20 hours.

Q. Okay. And then, if you flip the page, we continue to go backwards in time and it's two for- -- well, go ahead; what does the middle of the page indicate, the time?

A. The time says January 15, 2019, 2:47:01 p.m.

Q. Okay. So the booking number -- let's see. The incident that we first started with, of the call-in, is that the same date of that incident?

A. The RMS audit date is the same, the narrative date is ...

Q. Is different?

A. Different, yeah.

Q. Okay. Sorry; I didn't mean to finish your sentence.

So the -- and the actual description of what took place, does it track with what was stated in the second document that we describe and its narrative, which is on page 3 of that second document, that begins, On January 15, 2018 at approximately 12:20 hours?

A. Yes. Without doing a direct comparison, it seemed consistent to me.

Q. So according to this -- and if we go back to the last page of this, I guess that's page 6 of 6, this also has entries, and it has Martique Vanderpool in it as well; is that right?

A. That's correct.

Q. And is this -- if you read the first beginning narrative, does it have the same date and the same beginning as those after?

A. Yes, it does.

Q. Okay. So the ent- -- the person enter- -- well, we don't know if the person, but the -- whoever's associated with the entering information is Martique Vander- -- or is Martique Vanderpool's password; is that right?

A. Yes, Martique Vanderpool's user account for RMS entered this report.

Q. It wasn't Earl Ivey, was it?

A. It was not Earl Ivey's user account.

Q. Earl Ivey's user account, correct. Okay.

Now, speaking back to the computers that we started to talk about earlier -- oh, final question about this. I'm sorry.

This report was never, as we have, approved by Chief Watkins, or do you see an approval by him in here anywhere?

Take your time; I don't ...

A. Can I go to the second page?

Q. I can actually give it to you to -- well ...

A. I do not see Stephen Watkins' name on here as accessing the document, but I don't know whether he approved it or not.

Q. Okay. And then, you talked about -- earlier about mike-HP; do you recall that?

JA862

A.    Yes.

Q.    And you identified it as a tower computer, I think, or a desk -- it's a desktop tower, maybe --

A.    Yes.

Q.    -- is that accurate?

      And when you went -- you actually literally physically saw it; is that right?

A.    That's correct.

Q.    And I think we saw a picture of it earlier.  So it was in the common room of the police department; is that accurate?

A.    Yes.

Q.    And it was on a -- it was on a desk?

A.    The tower is underneath the desk, but --

Q.    Yeah, okay.

A.    Yes.

Q.    So the -- sorry.  So the monitor's on a desk; is that correct?

A.    That's correct.

Q.    And underneath it is the tower, which is the computer, right -- that's accurate, okay.

      So when you went to look at it, I think you talked about looking at the screen itself and looking to see how it was named mike-HP; is that right?

A.    Yes, you can look at the computer's properties, and it'll tell you that device's name.

Q.   And when you went into that property, did you have to log in somewhere?

A.   Chief Watkins logged in.

Q.   Okay.  So when you went into the properties --

A.   No --

Q.   -- I'm sorry, go ahead.

A.   Sorry, I apologize.  It was not Chief Watkins.  The current chief, Chief Moore.

Q.   So as you looked at it, this is after September 6th or 7th, 2019?

A.   Yes.

Q.   Okay.  So when you went into the property section, were you allowed to change anything in there?

A.   No.

Q.   When I say that, could you have changed it if you decided you wanted to?

A.   No.

Q.   Why do --

A.   I don't think I --

Q.   -- you say that?

A.   Because usually -- well, definitely, a computer on a network, its device name needs to be unique.  In general, if the computer is off the network, you would definitely need administrative rights to be able to make changes, but I certainly didn't have those.

Q. Did you try to change the name?

A. No.

Q. Okay. So your answer is based upon just your knowledge of computers generally; is that accurate?

A. Yes, it is.

Q. Okay.

Now, you said earlier that the mfhp1935 [sic] you didn't believe was -- well, you believed it was some type of password; is that right?

A. That's correct.

Q. Do you know my client's, Vanderpool's password information?

A. No.

Q. Do you know Ivey's password information?

A. No.

Q. Do you know Dupree's password information?

A. For RMS?

Q. For RMS, sorry. And do you know Watkins' password information for RMS?

A. No.

Q. Okay. So you really don't know what would be their password; is that accurate?

A. Correct.

Q. Okay. Now, there's a ticket that you also discussed on your direct -- I think it's Exhibit 42 of ... do you recall talking or testifying about this ticket?

A.    I do.

Q.    And do you know if this -- this was a traffic stop, you believe, on -- the date was the -- well, what is the date of it, if you know?

A.    September 7th, 2019.

Q.    And do you know if this is an electronic ticket or a handwritten ticket?

A.    I -- I think it looks like an electronic ticket.

Q.    Okay.  You see there was a signature at the bottom?

A.    Yes.

Q.    Okay.  And who signed at the bottom?

A.    It appears to be Martique Vanderpool.

Q.    Okay.  And in this stop, do you know what type of vehicle was used in this stop?

      That is, what police vehicle was used to stop this person?

A.    I do not.

Q.    Do you know what police vehicle was used that evening, for the earlier stop and arrest?

A.    Yes.

Q.    What was that?

A.    It was Phillip Dupree's vehicle.

Q.    And was that an unmarked car?

A.    Yes.

Q.    Do you know if Philip Dupree was at this stop?

A.    I don't have any documentation to say he was or was not.

Q.   Okay.  So I think Exhibit 5A is a picture of Philip Dupree's -- well, I don't want to say what it is until I open it.  Yeah, I think it's 5A?

MR. ZAMPOGNA:  If we can go to 5A, is the -- this was previously admitted by the government as an interior shot of Philip Dupree's vehicle.

BY MR. ZAMPOGNA:

Q.   Do you see that?

A.   Yes.

Q.   Is there any kind of printer in that vehicle?

A.   Not that I can see from this photo.

Q.   Okay.  One more thing on Mr. Dupree.

MR. ZAMPOGNA:  If we can go to Exhibit 7 that the government has provided us?

BY MR. ZAMPOGNA:

Q.   It's a calendar.  Do you see that?

A.   Yes.

Q.   If you look on Saturday, the 7th of September, 2019, do you see that entry?

A.   Yes, I do.

Q.   And what are the time entry -- do you see the word -- I'm sorry, do you see the name Dupree?

A.   Yes.

Q.   And after his name, what does it say there?

A.   12:00 a.m. to 5:00 a.m.

JA867

Q. Okay. Now, I'm going to change subjects to, you testified on direct about calls between a phone associated with Mr. Vanderpool and a phone associated with Tino's Towing; do you recall that?

A. Yes.

MR. ZAMPOGNA: I think that's Exhibit 44 of the government.

Okay. And I believe -- I think it's on the page Tino -- one of the -- well, all of this -- all of --

BY MR. ZAMPOGNA:

Q. Well, what are the dates for this, just in general, so we can get some background to this document?

A. This Cellebrite report was conducted with the dates September 6th, 2019 through September 7th, 2019.

Q. And then on entry --

MR. ZAMPOGNA: If we can go to 16.

BY MR. ZAMPOGNA:

Q. Do you see that entry?

A. Yes.

Q. And from reading it, what does it what do you discern from reading it?

A. This is a call log entry that says that Martique Vanderpool's phone had an outgoing call to a phone number associated with Kevin at 1:20 a.m. on September 7th, 2019.

Q.   And is Kevin preceded by another word or two?

A.   Yes, Tino Towing, Tino Tow.

MR. ZAMPOGNA:  And then if we flip to page 5 of that same document.

If you go to entry 54.

BY MR. ZAMPOGNA:

Q.   That has more information again.  Could you read the time of this call and who it was to and from, or whose phone it was to and from?

A.   This is September 7th, 2019 at 1:32 a.m.  There's an outgoing call from Martique Vanderpool's phone to again a phone number associated with Kevin.

MR. ZAMPOGNA:  And then, if we go to entry 65, there is another entry as well.

BY MR. ZAMPOGNA:

Q.   What do you discern from that entry?

A.   This is a call log entry with outgoing call from Martique Vanderpool's phone to Tino at 2:19 a.m. on September 7th, 2019.

Q.   So what I'm trying to understand, I know you spoke on direct about, the fact that there were phone calls means that Mr. Vanderpool -- Officer Vanderpool at the time was located at Tino's towing; is that what you said?

A.   Well, during the course of the investigation and figuring out the timeline, we've heard from this call log, as well as

Martique Vanderpool's prior proceeding testimony, a discerned timeline of what was happening.

Q. But he called Tino's Towing on several different times, even ending -- I think we just said it at -- sorry, at 2:19 a.m., is that right?

A. That's right.

Q. Would that lead you to believe he was next to Tino's Towing at that time?

A. There were a flurry of phone calls between 1:10 a.m. and 2:19. So at some time during that time period, I think the investigation reveals that he went with Officer Dupree and Ms. Stewart to Tino's Towing.

Q. But you're not sure of the 2:19; he might have been at Tino's Towing at 2:19, according to that analysis?

A. Yes, he could have been.

Q. Okay.

Now, I have one other set of questions here. So there was a prior exonerated suspension of Martique Vanderpool; is that right? Do you recall that?

A. I don't know that.

Q. This was between July 31st and October 11th, 2018?

A. Okay.

Q. Do you recall that?

A. I don't recall that.

Q. Can I show you something that might refresh your

recollection?

A.     Yes.

Q.     Sure.

MS. BERNSTEIN:  Your Honor, may we approach briefly?

THE COURT:  Sure.

(Discussion at sidebar, outside the presence of the witness, all counsel present.)

THE COURT:  Just one minute.

Mr. Vanderpool, can you hear me?

Can you hear me?

THE DEFENDANT:  (Shaking head.)

MR. ZAMPOGNA:  Can you hear her?

THE COURT:  No.  It's okay.

Is everyone comfortable with the temperature right now?

MS. ALLISON:  It's so much better.  Thank you, Your Honor.

THE COURT:  I didn't change it.  No, I didn't do anything.

MR. ZAMPOGNA:  Oh, it just does its own thing?

THE COURT:  Oh, yeah, mind of its own.  I can't control anything.

Mr. Vanderpool, can you hear us?  Okay.

MS. ALLISON:  This is similar to the sidebar we asked for yesterday.  If they're about to ask this witness about other

investigations into Mr. Vanderpool, that will open the door into material that they have moved to keep out of this trial. He's been investigated for a towing scheme, for --

THE COURT: I don't need to hear it, I don't need to hear it.

MR. ZAMPOGNA: What we're trying to -- what I'm trying to connect this to is, there was computer entries when he was suspended, under his name, at the office when he wasn't at the office. And the reason he's not at the office is because he was suspended.

THE COURT: Okay, well, I think it's --

MR. ZAMPOGNA: That's our point, Your Honor, so --

THE COURT: All right. It sounds like a valid point to me. I think you're attempting to undermine the evidence that simply because his user name entered something into a report doesn't necessarily mean he is the one who entered it.

So perhaps you could set that question up by just saying, at that time he was out of the office, correct, something like that.

Ms. Bernstein?

MR. ZAMPOGNA: I --

MS. BERNSTEIN: Yeah, I think he might have to show her --

MR. ZAMPOGNA: After I show her these documents?

THE COURT: One at a time.

MR. ZAMPOGNA:  I apologize.

THE COURT:  Yes.  Why don't you show her the documents and be careful not to open the door to --

MR. ZAMPOGNA:  The suspension issue.

THE COURT:  Other investigations.

MR. ZAMPOGNA:  Yes.

THE COURT:  Maybe 404(b) evidence.

MR. ZAMPOGNA:  Okay.

THE COURT:  All right, thank you.

MR. BLUESTONE:  Thank you.

MR. ZAMPOGNA:  Thank you.

(Sidebar discussion concluded.)

MR. ZAMPOGNA:  May I approach the witness?

THE COURT:  You may.

MS. BERNSTEIN:  Actually, Mr. Zampogna --

MR. ZAMPOGNA:  Oh, I'm sorry; apologize.

(Conference between Ms. Bernstein and Mr. Zampogna).

MS. BERNSTEIN:  May we approach again briefly?

THE COURT:  Yes.

(Discussion at sidebar, outside the presence of the witness, all counsel present.)

THE COURT:  Mr. Vanderpool, can you hear me?  Raise your hand if you can hear me.

Not so much?  Is there -- is there a volume button?

Okay, you can hear me now.

MS. BERNSTEIN: This looks to me, Judge, like it would open the door that I was just talking about, and I want to make sure that I don't walk through a door without the Court's blessing, but the documents I've been given are a document regarding him turning in his police badge --

MR. ZAMPOGNA: Service --

MS. BERNSTEIN: -- card.

THE COURT: How about this. Can we just stipulate that he was not in the office during the time period he is going to ask the witness about?

MS. BERNSTEIN: I don't know where he's going with this, so I'm not -- and I certainly would not stipulate from this document that he wasn't in the office. Anybody could have let him in the office. Maybe, Judge, could I ask, maybe, that we have just a couple minutes for counsel to consult so we can see if we can work this out?

THE COURT: Why don't you two consult for just a few minutes; I'm not going to leave the bench. Just consult for a few minutes, okay?

MS. BERNSTEIN: Okay, okay. Thank you, Judge.

THE COURT: All right.

MR. ZAMPOGNA: Thank you.

(Sidebar discussion concluded.)

(Conference among all counsel.)

(Discussion at sidebar, outside the presence of the

JA874

witness, all counsel present.)

MS. BERNSTEIN: Okay. We've talked about it. They are going to ask about whether he was suspended.

THE COURT: Okay. Can you hear now? Okay.

All right.

MS. BERNSTEIN: To make this easier to get through this, the government has agreed that we will not walk through the door if they open it in this manner. They are going to ask whether Mr. Vanderpool was suspended from duty from July 31st, 2018 until October 11th, 2018. And we will not --

(Reporter requesting clarification.)

MS. BERNSTEIN: The dates? Yes, that he was suspended from duty from July 31st, 2018 through October 11th, 2018, and we will not walk through that door.

THE COURT: Okay.

MR. ZAMPOGNA: Okay, I will ask that question.

THE COURT: Very good, thank you.

MR. ZAMPOGNA: May I approach?

THE COURT: You may, yes.

BY MR. ZAMPOGNA:

Q. (Handing.) I'm only going to be asking about the dates, but you're welcome to read both of the documents.

A. Okay.

Q. So was Mr. Vanderpool suspended between July 31st, 2018 and October 11th, 2018?

A.   The first document has July 31st, 2018, and it has -- it's like a receipt for firearms and equipment, which would be consistent with a suspension, but that -- it doesn't say anything about a suspension.  The second document says, October 11th, 2018, and it's a restoration of police powers.

Q.   Thank you.  So I'd like to now turn to -- let's see.  It is Government's ...

MR. ZAMPOGNA:  Hold on a second.  I'm sorry, Your Honor.

Oh, I've got it here.  I believe it's Government's 23.

BY MR. ZAMPOGNA:

Q.   Do you see this document, Officer --

A.   Yes.

Q.   -- or Agent?  I'm sorry.

So unfortunately, it skips around a bunch of dates, so I'm just going to read some dates that fall into that time period.

But before I do that, could you i- -- could you just let the Court know what this document is?

A.   This is an audit report for Martique Vanderpool's RMS account for log-ins.

Q.   And in addition to the log-ins, does it have, according to this, the device name?

A.   Yes.

Q.   Okay.  And as we go down -- and forgive me, because there's no numbers on this, but the eighth column, it has a date of

9/4/2018; is that right?

A.   Yes, I see that.

Q.   Okay.  And then if we go down to line 13, there is another date within that range?

A.   It says 9/27/2018.

Q.   Yes.  And -- I'm sorry, I'm trying to get 2018, I apologize, so maybe I didn't say the right one.  It should be 9/27/2018.

A.   Okay, I see that.

Q.   Okay, and then, if you keep going down, there's another one after the break, there, that says 9/20/2018; do you see that?

A.   Yes, I do.

Q.   And then, there's a few, thankfully, in a row that are 2018, from that one going further down.  Do you see those?

A.   Yes.

Q.   And then it skips, then it starts up again, 9/14/2018, and there's two of those in a row.

A.   Yes, 9/14 and 9/13/2018.

Q.   And then it goes again to 9/12/2018, and there's two entries for that; do you see that?

A.   Yes.

Q.   And then, I think it says 8/7/2018?

A.   Yes.

Q.   Okay.  And then, further down the page, it goes -- has a few more for 2018, 8/28, 8/28, and 8/28.  That's also on 2018?

JA877

A.   Yes.

Q.   Okay.  And then I think that's it for that page.  That's the only page.

So are all those dates within the range that I asked you if he was suspended?

A.   Yes.

Q.   Okay.

MR. ZAMPOGNA:  That's all I have at this time, Your Honor, thanks.

THE COURT:  Okay, thank you.

Any redirect?

MS. BERNSTEIN:  Yes, Judge.

May I approach, Your Honor?

THE COURT:  You may.

REDIRECT EXAMINATION

BY MS. BERNSTEIN:

Q.   (Handing.) Agent Hung, I'm showing you what's been marked for identification as Exhibit 11.  Is that the same document that Mr. Zampogna just showed you?

A.   It is.

Q.   And this is the one dated July 31st, 2018?

A.   Yes.

Q.   Now, what he showed you was a receipt for firearms and equipment that Mr. Vanderpool turned in on that day, right?

A.   Yes.

Q.   It includes a police badge, an identification card, a Glock Model 22, a Glock Model 23, a SIG Sauer, and a Mossberg.  Those are all guns, right?

A.   Yes.

Q.   And then it also included a portable radio and a body-worn camera right?

A.   Yes.

Q.   Do you know from your investigation whether any of those items is needed to log on to the RMS system?

A.   They are not needed.

Q.   Now, if Mr. Vanderpool was suspended from duty, presumably, he would not be on duty at the Fairmount Heights police station, right?

A.   Yes, presumably.

Q.   Do you know how far he lives from the station, or did at the time?

A.   I believe it's less than a mile.

Q.   Do you know whether he had access to the police station during that time?

A.   I don't know that.

        MS. BERNSTEIN:  Can we have Exhibit 44 up, please?

BY MS. BERNSTEIN:

Q.   This was an exhibit Mr. Zampogna was just showing you.  If we can go to page 6, line 65, which I think is a line we were just looking at, I'd just like you to tell us a little bit more

about this document.

Do you see the column marked To, where it says, Tino, and then in parentheses, Towing?

A. Yes.

Q. On this document, when we see a name in the To box, is that how that phone number is identified in Defendant Vanderpool's phone?

A. Yes.

Q. So does this number mean that it's ringing to a landline in the tow lot?

A. No.

Q. What does it mean?

A. It just means that this phone number is saved in Martique Vanderpool's phone with that designation, Tino (Towing).

Q. And who is Tino again?

A. Tino is the owner of Tino's Towing.

Q. You talked on direct and then a little bit again on cross about a flurry of calls between Defendant Vanderpool and people associated with tow lot. Now that they've asked about that, can you just explain what was going on during those flurry of calls?

A. So the initial phone call is to Kevin Oshin at 1:10 a.m., and then, there's another phone call to him, and 10 minutes later, you know, according to the investigation and prior court proceedings, testimony, it gives the indication that that is the

time that Kevin is called in order to drive Raynna Stewart back to the tow lot to get the vehicle.

Q.    And was there a complication?

A.    Yes.

Q.    What was that?

A.    Kevin did not have a key to that outer gate that leads them back into the car lots.

Q.    So then what did they do?

A.    They needed to get Tino to show up to unlock that gate.

Q.    So that dealing with the key is happening during that time, presumably, when those calls are going back and forth?

A.    Yes.

Q.    I want to talk to you about Travis Nnamani.  Where did you first hear that name?

A.    When you received the defense exhibits.

Q.    Those exhi- -- I'm sorry.

A.    The exhibit that was shown to me.

Q.    So you learned about his name from the defense, when they gave the government these exhibits?

A.    Yes.

Q.    Did you do some follow-up on that arrest of Mr. Nnamani?

A.    Yes, I did.

Q.    Did you pull some additional documents?

A.    Yes, I did.

        MS. BERNSTEIN:  Let me start with Defense Exhibit 3,

JA881

please, and I want to go to the last page. This is one of the exhib- -- no. I'm sorry, the Nnamani report, last page.

So I'm sorry, for the record, that's Defense Exhibit 4.

BY MS. BERNSTEIN:

Q. And just to be clear, Agent Hung, this is the -- these are -- this is the compilation of Nnamani-related documents that the defense just showed you, right?

A. Yes.

Q. All right. I've gone to the last page, and that's the narrative associated with the arrest of Mr. Nnamani, right?

A. Yes, it is.

Q. This arrest was on what date?

A. January 15th of 2019.

Q. All right. And the complainant in this case -- the arresting officer, listed at the bottom, is who?

A. Earl Ivey.

MS. BERNSTEIN: Can we zoom in on the narrative, please; I don't think we saw that before.

BY MS. BERNSTEIN:

Q. Can you do me a favor and just read the beginning of the narrative here.

A. On 1/15/2018 at approximately 12:20 hours, I, Officer Ivey, #9357, was in full uniform conducting patrols when I observed a gray Chevy Monte Carlo bearing Virginia temporary registration

61378E speeding on Jost Street, then made a left onto Balsam Tree Drive, failing to activate his left turn signal and failing to come to a complete stop at the stop sign.

BY MS. BERNSTEIN:

Q. Okay. You can stop there.

Let me actually go down a couple sentences and have you read that sentence starting there.

A. The driver was identified as Travis Osita Nnamani, via his Maryland identification card.

Q. Okay. So that narrative purports to tell the story of the arrest of Mr. Nnamani, right?

A. Yes.

Q. And according to that narrative, who was the officer who pulled Mr. Nnamani over in a gray Chevy Monte Carlo?

A. Officer Earl Ivey.

MS. BERNSTEIN: All right. We can take that down.

Can I please have Defendant's Exhibit 5 up, please.

And can we scroll through --

BY MS. BERNSTEIN:

Q. Actually, first tell us what we're looking at here. This is the auditing history for what?

A. For the booking document, #143908.

Q. Is that a booking report that was done in connection with the arrest of Mr. Nnamani?

A. Yes.

MS. BERNSTEIN: Okay. So if we can scroll all the way to the bottom, all the way to the last page.

And then I'm going to ask you to scroll back up.

BY MS. BERNSTEIN:

Q. And so what we're looking at here, as Mr. Zampogna pointed out, is that there are a bunch of entries here made by whose user account?

A. Martique Vanderpool's.

Q. In fact, all of them --

MS. BERNSTEIN: We're up to -- we're on page 2, now, the entry made -- you can go back to page 2.

BY MS. BERNSTEIN:

Q. Let me focus you right here. There are a bunch of entries made on January 15th, the day of the arrest, right?

A. Yes.

Q. And then there are two more made the next day, on the 16th, right?

A. Yes.

Q. All made by whose user account?

A. Martique Vanderpool's.

MS. BERNSTEIN: All right. Can we have Defense Exhibit 4A.

BY MS. BERNSTEIN:

Q. All right so we're back on Defense Exhibit 4, and the first three pages of that document, I think you identified them

earlier; what did you say they were?

A.    It's a call for service record within the RMS system.

Q.    Does it look a little bit like a CAD?

A.    It does.

Q.    How is it different?

A.    It doesn't contain all of the information that the CAD report does, but this is -- my understanding is that the CAD system puts some information in RMS for a record.

Q.    So you're saying, a CAD report actually has more information?

A.    Yes.

Q.    Did you pull a CAD for this incident?

A.    Yes.

        MS. BERNSTEIN:  May I have up what's been marked Government Exhibit 116 for identification purposes?

BY MS. BERNSTEIN:

Q.    Do you recognize that document?

A.    Yes, I do.

Q.    What is it?

A.    This is the CAD report for that incident.

Q.    For the arrest of Mr. Nnamani?

A.    Yes.

        MS. BERNSTEIN:  Your Honor, I'd like to offer 116 into evidence.  Or do I need to once it has ...

        MR. ZAMPOGNA:  I just want to take a look at it for a

second.

Sorry I didn't stand.

Thank you.

No objection.

THE COURT: All right, it's admitted.

MS. BERNSTEIN: Can we just scroll a little bit so she can see the whole document?

BY MS. BERNSTEIN:

Q. All right. It's only two pages, right?

A. Yes.

Q. Remind us from yesterday what kind of information we can learn from a CAD report.

A. The CAD report is sort of a written a record of the communications between Dispatch and a police officer on the scene.

Q. Does it tell you what officer or officers or are on the scene?

A. Yes, it does.

Q. Does this document tell you that?

A. Yes.

Q. All right.

MS. BERNSTEIN: Can we blow up the bottom half of this page, please?

BY MS. BERNSTEIN:

Q. So for the arrest of Mr. Nnamani, who according to that

narrative was pulled over by Earl Ivey, what units were assigned to this?

A.    FA3.

Q.    Who is that?

A.    Martique Vanderpool.

Q.    Who else was assigned?

A.    No other officers listed.

Q.    Let me look -- direct your attention right below that, where it says Personnel.  Does that identify all of the officers on a scene?

A.    Yes.

Q.    Who was on this scene?

A.    Martique Vanderpool.

Q.    I think there was some testimony yesterday that a CAD sometimes also has some police jargon in it; is that right?

A.    Yes.

Q.    So for example, let me direct your attention right here. Do you know what Gray Chevy Monte Carlo 1X means?

A.    Yes.

Q.    What does that mean?

A.    It means that the vehicle was a gray Chevy Monte Carlo, and it was occupied one time, so that's one person inside.

Q.    Okay.  So now tell me the rest of that.  Gray Chevy Monte Carlo, one time, no 78.  Do you know what no 78 means?

A.    Yes.

JA887

Q.    What does that mean?

A.    It means the police officer said no 78 to the dispatch, and the dispatch entered that as a comment.  78 means backup, so it means, no, I don't need backup, don't send another officer.

Q.    So this CAD --

        MS. BERNSTEIN:  We can take that down.

BY MS. BERNSTEIN:

Q.    -- tells you that there was one officer involved in this stop of Mr. Nnamani, and it was who?

A.    Martique Vanderpool.

Q.    The report we just looked at was entered by whose unique user name?

A.    Martique Vanderpool.

Q.    Did you pull some other documents related to this arrest?

A.    Yes.

        MS. BERNSTEIN:  Okay.  May I have Government's Exhibit 117 marked for identification.

        This might be the same as the defense exhibit already in evidence.

        Can we scroll through and have her take a look at this document?

        And then if we can go back to the front?

BY MS. BERNSTEIN:

Q.    What is this document that we're looking at?

A.    This is an audit report from RMS for Booking #143908.

Q.   Okay.   So this is -- let me back up a little bit.   In connection with the arrest of Mr. Nnamani, was some paperwork done?

A.   Yes.

Q.   Was there a booking report?

A.   Yes.

Q.   I don't know that we've talked about booking reports before; can you tell us what that is?

A.   My understanding is, also, it can be referred to as an arrest report or an incident report.

Q.   And what is -- was there also an impound report done?

A.   Yes.

Q.   When does an officer do an impound report?

A.   When the officer impounds a person's vehicle.

Q.   And for each one of those reports, can there be an audit run to show who did what to the report at any given time?

A.   Yes.

Q.   All right.   So this one that we're looking at --

        MS. BERNSTEIN:   I'd like to offer this into evidence, Government's Exhibit 117, recognizing that it might be the same as the defense exhibit, but I have not compared them.

        MR. ZAMPOGNA:   No objection from the defense.

        THE COURT:   Admitted.

BY MS. BERNSTEIN:

Q.   All right.   So what we're looking at now, Government

Exhibit 117, is an audit report for the booking report that was done in connection with Mr. Nnamani, right?

A.    Yes.

Q.    Okay.  Let's look go to page 5, please, and look at the -- the highlighted part --

MS. BERNSTEIN:  Okay.  So can we zoom in on the narrative, there?

BY MS. BERNSTEIN:

Q.    Okay.  Just to make clear, this is the same narrative -- the same incident, the same narrative we've been talking about, right?

A.    Yes.

MS. BERNSTEIN:  Can we zoom out?

BY MS. BERNSTEIN:

Q.    And that narrative, as the defense pointed out, was drafted by Defendant Vanderpool's unique user account, right?

A.    Yes.

MS. BERNSTEIN:  If we can go now to the last page, page 6?

BY MS. BERNSTEIN:

Q.    All right.  So whose user account created this document?

A.    Martique Vanderpool's.

MS. BERNSTEIN:  Can we zoom in on the bottom?

BY MS. BERNSTEIN:

Q.    At what time?  What date and time?

A.    January 15, 2019, at 2:30:03 p.m.

MS. BERNSTEIN:  All right.  Let's scroll up from there all the way to page 2.

And Ms. Richart, if you can highlight the fifth page down -- I mean, the fifth row down?

BY MS. BERNSTEIN:

Q.    At what time did Defendant Vanderpool's unique user account close out this report?

A.    On January 15th, 2019 at 3:02:41 p.m.

Q.    3:02 p.m.?

A.    Yes.

Q.    I'm going to ask you to make a mental note of that time.

MS. BERNSTEIN:  May I now have Government Exhibit 18 up, please -- I'm sorry, 118, marked for identification.

BY MS. BERNSTEIN:

Q.    This looks very similar.  Can you tell us what this is?

A.    This is an audit report from RMS for an impound report, #42865.

Q.    So this is the same type of audit document but this time, for the impound report that was done in connection with the same arrest, right?

A.    Yes.

MS. BERNSTEIN:  Your Honor, I'd like to offer 118 into evidence.

MR. ZAMPOGNA:  No objection.

THE COURT: Admitted.

MS. BERNSTEIN: And can we go to page 4 real quickly and just take a look at the narrative.

BY MS. BERNSTEIN:

Q. Can you take a quick look at the narrative; that's the same incident we've been talking about, right?

A. Yes, it is.

MS. BERNSTEIN: All right. Let's go to the last page, page 6, and we can zoom in on the bottom row.

BY MS. BERNSTEIN:

Q. I'm going ask you some similar questions, Agent Hung.

Whose user account created this document?

A. Martique Vanderpool's.

Q. At what time?

A. January 15th, 2019, at 2:51:31 p.m.

MS. BERNSTEIN: Can we scroll up to page 4, please, and highlight the fourth row down.

BY MS. BERNSTEIN:

Q. What time did Defendant Vanderpool's unique user ID close out this report on January 15th?

A. 2:54:04 p.m.

Q. So that's 6 minutes before 3:00 p.m.

A. Yes.

Q. What time was the other one finished?

A. 3:02.

Q.    2 minutes after 3:00 p.m.

A.    Yes.

Q.    Okay.

MS. BERNSTEIN:  We can take those down, please.

I'd like to see what's been marked as Government Exhibit No. 119 for identification?

BY MS. BERNSTEIN:

Q.    What are we looking at here?

A.    This is a time sheet for the Town of Fairmount Heights.

MS. BERNSTEIN:  Can we go to page 2?

BY MS. BERNSTEIN:

Q.    Is this a time sheet for Martique Vanderpool for that date?

A.    Yes, yes.

Q.    Do you see January 15th on there?

A.    Yes.

MS. BERNSTEIN:  Can we zoom in on January 15th, please?

BY MS. BERNSTEIN:

Q.    What time did Defendant Vanderpool get off work on January 15th?

A.    3:00 p.m.

MS. BERNSTEIN:  No further questions.

MR. ZAMPOGNA:  May I, Your Honor, ask within one small area of recross?

THE COURT:  Sure.

MR. ZAMPOGNA: Oh, thanks.

RECROSS-EXAMINATION

BY MR. ZAMPOGNA:

Q. You spoke just on the redirect about a CAD report in reference to what the U.S. Attorney was asking you questions to; do you recall that?

A. Yes, I do.

Q. And I think in that CAD report, it had Mr. Vanderpool's name in it; is that right?

A. Yes.

MR. ZAMPOGNA: Could I have -- I think it's Defense -- I'm sorry, People's 8, or U.S. 8?

BY MR. ZAMPOGNA:

Q. Now, if you look down at the bottom of this, this is the -- well, this CAD report is associated with the arrest we're speaking about; is that right?

A. Yes.

Q. Okay. And if you look down at the bottom of this report, there is a name, Martique Vanderpool, and then another name below that as well.

A. Yes.

Q. What's the name below his name?

A. Stephen Watkins.

Q. And would that mean he's there?

A. He's being associated with FA4, yes.

Q.    Okay.

MR. ZAMPOGNA:  All right, nothing else.  Thank you, Your Honor.

THE COURT:  Okay.

Thank you, Agent Hung.  You are excused.

Okay.  Ms. Bernstein.

MS. BERNSTEIN:  We have no more witnesses, Judge.  May we have a few minutes to check exhibits before we make any move?

THE COURT:  Sure, let's take a -- what do you need, 10, 15 minutes?

MS. BERNSTEIN:  That would be plenty.

THE COURT:  Okay.  Let's reconvene in 15 minutes, and provided -- if there's no other witnesses, there may be additional evidentiary issues, but then I will ask the defense -- the government will rest, and then it's your turn to tell me how you'd like to proceed, okay?

All right, thank you.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Recess taken from 3:12 p.m. - 3:30 p.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Okay, please be seated.

Ms. Bernstein.

MS. BERNSTEIN:  We do have a few ministerial issues.

I neglected move in Government's Exhibit 119. I'd like to do that now.

THE COURT: What is that?

MS. BERNSTEIN: Well, it's one of the documents that I just showed Agent Hung.

It was the time sheet for January 15th, Your Honor.

THE COURT: Any objection?

MR. ZAMPOGNA: No, Your Honor.

THE COURT: All right, it's admitted.

MS. BERNSTEIN: And then, we also have Exhibits 34 through 40 have not been admitted. 34A through 40A have been played, so I'd like to move the uncaptioned audio files into the record, please.

THE COURT: I thought they were already admitted; we went over that pretrial. You're just confirming -- those are the WhatsApp messages, correct?

MS. BERNSTEIN: I didn't realize they were admitted, Judge. This is same issue we had this morning with 9 and 9A, and I think Your Honor this morning took 9A, admitted 9A and kept -- I'm sorry, admitted 9 and kept 9A as a demonstrative. I assume we'll do the same thing here. We have no objection.

THE COURT: Okay, yes, from -- 34 through 40 are admitted but not 34A through 40A; is that correct?

MS. BERNSTEIN: Well, 34A through 40A are demonstratives.

THE COURT:  Correct, so --

MR. ZAMPOGNA:  That's correct.

THE COURT:  Okay.

MS. BERNSTEIN:  The government rests, Your Honor.

THE COURT:  Okay, thank you.

Mr. Zampogna, as I've said many times in this trial -- and I see Bluestone standing up -- the defense has absolutely no burden, does not have to present any witnesses, didn't even have to cross-examine anyone.

MR. BLUESTONE:  Of course.

THE COURT:  You normally do, as you did here.  So is the defense going to put on a case?

MR. BLUESTONE:  At this time, Your Honor, the defense moves for a judgment of acquittal under Rule 29.

THE COURT:  Okay.

I'm ready for your argument.  Do you have any argument on it, or are you doing this as pro forma for the record?

MR. BLUESTONE:  I do have a short argument, Your Honor.

THE COURT:  Okay.

MR. BLUESTONE:  Your Honor, coming into this trial, the government was required to prove three things, and in order to find -- even for a reasonable fact finder to find Officer Vanderpool guilty, the government has to create -- the government has to prove these things with sufficient level.

JA897

They failed.

The -- there is no -- the government failed to satisfactorily find evidence to show that a reasonable fact finder could find evidence sufficient to prove that Martique Vanderpool wrote a report that night.  The government failed to show any eyewitnesses to any report or even anybody who ever saw Officer Vanderpool use that account firsthand.

Furthermore, Your Honor, the government failed to provide facts sufficient for a reasonable fact finder to show that Officer Vanderpool intended to impede, obstruct, or influence the investigation and proper administration of a matter.

The government's proof, through the forms of locker-room WhatsApps a day later -- days later does not show that he intended to cover up, days before, an investigation.

And lastly, to keep this brief, Your Honor, the government failed to establish facts that creates any evidence sufficient for a reasonable fact finder to find that this matter existed within the jurisdiction of the FBI.

There was a lot of talk before trial in this case about the indicia of consent being important.  They failed -- indicia of nonconsent; I apologize.  They failed to establish any facts that show that, and as a result, a reasonable fact finder cannot find there to be an indicia of nonconsent in this case.

The trainers who the government brought forth, Ms. Zeidan and Ms. Collins, they testified that arrest is concluded after the citations are issued and there are no handcuffs, and especially when it was never said explicitly, you are under arrest.

That -- and as a result of all these, no reasonable fact finder can truly show that Officer Vanderpool is guilty of this charge, and as a result, this -- there should be a judgment of acquittal under Federal Rule of Criminal Procedure 29.

Thank you.

THE COURT: Okay. Thank you very much.

Ms. Allison or Ms. Bernstein.

MS. ALLISON: Yes, Judge.

Briefly, the evidence is incredibly strong in this case. As the Court knows, the standard here is whether, viewing the evidence in the light most favorable to the government, any rational fact finder could find the defendant guilty beyond a reasonable doubt. That standard is easily met here.

The evidence proving that the defendant wrote a false report includes the report itself, written in the defendant's name, from the defendant's perspective, using the defendant's unique RMS user account; the audit logs showing the defendant's unique user account; going in, creating and submitting the report the night of the incident, then going back in about a week later to make changes; the defendant's messages to his

partner, sending photos of the report and the timing of those messages; the defendant's prior state testimony and his WhatsApp statements; as well as the training evidence showing what the defendant knew about arrests, about consent, about report-writing.

This evidence shows that the defendant knew full well that what he had done was wrong, and he wrote his report to try to cover up what he had done. A rational fact finder could certainly find the defendant guilty beyond a reasonable doubt.

THE COURT: Talk to me about element 3.

MS. ALLISON: I'm sorry, Judge -- the intent?

THE COURT: No, whether the matter --

MS. ALLISON: Oh, the jurisdiction. I'm sorry, Your Honor, yes.

As Agent Hung testified and as the Court is aware, merely the facts suggesting that there was indicia of nonconsent is enough for the FBI to investigate allegations that an officer was acting under color of law and coerced someone into having sex. And so the facts suggesting that there was nonconsent, that is enough to transfer jurisdiction to the FBI here.

Those facts are abundant in this case. It includes, from the defendant's own account, that the victim was 19, said she was rushing to get to her son, was banging her head on the car, calling herself stupid, was handcuffed, transported to the police station, where the defendant had sex with her at the

police station, all of that is indicia of nonconsent, and that is why the FBI was able to have to jurisdiction to open an investigation into a possible color-of-law violation.

THE COURT: What's the difference if any between nonconsent and coercion for purposes of the third element?

MS. ALLISON: I think effectively, they boil down to the same thing, Your Honor, the fact that the victim -- the FBI has jurisdiction to investigate when there is reason to believe that a victim didn't consent, whether she wasn't able to, whether she was coerced into submitting, either avenue I think gets us to nonconsent such that the FBI can investigate.

THE COURT: Okay, thank you.

MS. ALLISON: Thank you, Your Honor.

THE COURT: Anything else, Mr. Bluestone?

MR. BLUESTONE: No, Your Honor.

THE COURT: Okay, thank you very much.

Okay. Federal Rule of Criminal Procedure 29 provides that after the government closes its evidence, or after the close of all evidence, the Court on the defendant's motion must enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction.

The Court deciding a Rule 29 motion may neither weigh the evidence nor assess the witness credibility. That's from United States v. Gallagher, 90 F.4th 182 at 190 (4th Cir. 2024). Instead, the Court asks whether any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt. United States v. Millender, M-I-L-L-E-N-D-E-R, 970 F.3d 523 at 528 (4th Cir. 2020).

Rule 29 applies to both jury and bench trials. I have to view the evidence in the light most favorable to the government, and I do that now. I find that the Rule 29 motion should be denied and is denied. The government has provided sufficient evidence to proceed to the defense case if there is one. The government has offered evidence on all three elements of the offense.

The first element is that Mr. Vanderpool knowingly falsified or made a false entry into a record or document, here, a Fairmount Heights Police Department incident report. The government has introduced evidence from which a trier of fact could conclude that Vanderpool created the incident report at issue.

Specifically -- and I'm only mentioning some evidence -- the government introduced testimony from Sergeant Gill, along with the RMS audit logs, showing that Mr. Vanderpool's RMS user account created the report around 2:00 a.m. on September 7th and checked it back into the system at 3:23 a.m. The government also introduced text messages from Mr. Vanderpool's cell phone, showing that the cell phone sent a message to Officer Dupree shortly after the incident and attached a picture of the report on a police-issued laptop.

The government also introduced evidence from which a trier of fact could find that Mr. Vanderpool knowingly falsified the report. The report omits that Mr. Vanderpool and Mr. Dupree transported Ms. Stewart to the police station, that Mr. Vanderpool had sex with her there, that they had her car towed from the scene, and that they secured the release of her car to her and not to the car's registered owner.

The government introduced testimony from people who have taught Mr. Vanderpool about elements of report-writing. He was certainly aware of how to write a report and that he should do so honestly and accurately. The government has proffered enough evidence that a reasonable fact finder could find the first element of the charge.

The second element of the charge is that the defendant acted with the intent to impede, or obstruct, or influence an actual or a contemplated investigation of the matter. The government has submitted evidence from which a trier of fact could conclude that Vanderpool acted with the intent to impede an investigation into his interactions with Ms. Stewart that night, in particular, his having sex with her at the police station after she was placed in handcuffs and transported to the police station by police.

The government introduced evidence that Mr. Vanderpool knew from his training that the government could investigate an officer having sex with someone in their care and custody and

JA903

then that could can deprive the person of their civil rights.

The government also introduced WhatsApp statements, recorded WhatsApp statements by Mr. Vanderpool, sent to his friend Denton Washington, that he issued the ticket and citation to Ms. Stewart because he likes to be consistent, and that at least, if you charge her -- he says, At least, if you charge her with some stuff, then you know it looks like, okay, she could just be mad or she could be making an allegation.

Moving on to the third element, that the matter is within the jurisdiction of an agency of the United States, in this case, the FBI, the government has introduced the testimony of Special Agent Hung, an FBI agent, that she would investigate an officer who was suspected to have sex with someone in their custody while they were on duty. She introduced -- or she testified that it's a federal crime for an officer to violate a person's civil rights while acting under color of law. Having nonconsensual sex with a suspect in their custody would violate a person's civil rights. The government has introduced indicia of the fact that Mr. Vanderpool was acting under color of law and that the sexual intercourse with Ms. Stewart was indicative of nonconsensual sex.

The government introduced evidence that Mr. Vanderpool and Mr. Dupree took Ms. Stewart to a municipal -- the police office in a municipal building, which was closed, or after hours, no one else was around. She was transported there in

handcuffs, and then he engaged in a sex act with her at the police station and drove her to the towing lot where the car was released to her.

The government has satisfied its burden at this stage, and the Rule 29 motion is denied.

Okay. Mr. Zampogna.

MR. ZAMPOGNA: We do not intend to put on a case, Your Honor.

THE COURT: Okay.

MR. ZAMPOGNA: If you wish to have my client indicate that he doesn't wish to testify, please.

THE COURT: Yes.

Mr. Vanderpool, if you could please stand.

All right. I just want to make sure you understand that you have a right under the Fifth Amendment to the United States Constitution to testify in your own defense, and you also have a right under that same amendment not to testify. Do you understand these things?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And is it your decision not to testify, to invoke your right not to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had enough time to discuss this decision with your counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Have you had enough time to discuss your defense with your counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay.

All right, thank you very much. You may be seated.

All right. So that is the close of the trial, the end of the evidence. It is now have a little bit before 4:00. Are we ready to have closing arguments now?

MS. BERNSTEIN: We are, Your Honor.

MR. ZAMPOGNA: I'd like to wait, but that's fine.

THE COURT: What would you like to do? What is your proposal, Mr. Zampogna?

MR. ZAMPOGNA: I'd like to do it in the morning, if that's possible, but if not, that's fine.

THE COURT: All right, just give me one minute.

Okay. It seems to me, that's a fair request. I certainly want to give you every opportunity to consider all the evidence and for both sides to have reasonable time for a closing argument, so let's adjourn for the day, and we will have closing arguments tomorrow.

I don't think I will need anything more than 20 minutes per side. I can't imagine I would need more than 30 minutes.

Does that work for the government?

MS. BERNSTEIN: It does, Your Honor.

THE COURT: Mr. Zampogna?

MR. ZAMPOGNA: Yes, Your Honor.

THE COURT: Okay. So let's start at 9:30, and I would really like to conclude if we can by 10:30.

MR. ZAMPOGNA: Thank you, Your Honor.

THE COURT: All right. See you in the morning. Thanks.

THE COURTROOM DEPUTY: All rise. This Honorable Court stands in recess.

(The proceedings were recessed at 3:54 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of December, 2024.

_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter

JA908

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| v. | )    Case No.  8:23-cr-000234-DLB-1 |
| | ) |
| MARTIQUE VANDERPOOL | ) |
| | ) |
| *Defendant* | ) |

**Defendant Martique Vanderpool's Notice of Requested Instructions**

Pursuant to the Court's Order dated October 22, 2024, Martique Vanderpool requests that the Court read into the record the following jury instructions (modified for a bench trial):

Instruction No. 14-A (Credibility of Law Enforcement Officials)

Dated: October 23, 2024               Respectfully Submitted,

*/s/ Christopher Zampogna*
Christopher Zampogna
Bar No. 28219
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 101
caz@zampognalaw.com

*/s/ Abraham Bluestone*
Abraham Bluestone
Bar No. 31114
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com

Counsel for Defendant Vanderpool

1

JA909

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

                              )
UNITED STATES OF AMERICA      )
                              )
     v.                       )  Case No. 8:23-cr-00234-DLB-1
                              )
MARTIQUE CABRAL VANDERPOOL,    )
                              )
             Defendant.       )
_____)

                              Greenbelt, Maryland
                              October 24, 2024
                              9:38 a.m.


                    BENCH TRIAL, VOLUME 3

        BEFORE THE HONORABLE DEBORAH L. BOARDMAN
              United States District Judge


               A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

     U.S. DEPARTMENT OF JUSTICE
     Civil Rights Division
     150 M Street, N.E.
     7th Floor
     Washington, D.C.  20002
     BY:  BARBARA S. BERNSTEIN, ASSISTANT U.S. ATTORNEY
          (202) 353-0032
          bobbi.bernstein@usdoj.gov
     BY:  TARA KNOLL ALLISON, TRIAL ATTORNEY
          (412) 779-8970
          tara.allison@usdoj.gov




                 PATRICIA KLEPP, RMR
                Official Court Reporter
              6500 Cherrywood Lane, Suite 200
               Greenbelt, Maryland  20770


        ***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA910

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

    ZAMPOGNA PC
    2101 L Street, N.W., Suite 300
    Washington, D.C.  20037
    BY:  CHRISTOPHER ADAM ZAMPOGNA, ESQUIRE
         (202) 223-6635
         caz@zampognalaw.com
    BY:  ABRAHAM BLUESTONE, ESQUIRE
         (202) 223-6635
         ab@zampognalaw.com, ESQUIRE

ALSO PRESENT:

    MARTIQUE CABRAL VANDERPOOL
    LILLY RICHART, PARALEGAL
    S.A. ELIZABETH HUNG - FBI

***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA911

<u>INDEX</u>

October 24, 2024

USA v. MARTIQUE CABRAL VANDERPOOL

PAGE

CLOSING ARGUMENT BY THE GOVERNMENT (Ms. Allison ............   5

CLOSING ARGUMENT BY THE DEFENSE (Mr. Zampogna) .............  12

REBUTTAL CLOSING ARGUMENT BY THE GOVERNMENT (Ms. Bernstein).  20

JA912

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY: All rise. This Honorable Court now resumes in session, the Honorable Deborah L. Boardman presiding.

THE COURT: Okay. Good morning, everyone. Please be seated.

(All responding: Good morning, Your Honor.)

THE COURT: Okay. I'll hear from the United States.

MS. BERNSTEIN: I was just standing for appearances.

THE COURT: Oh, yes, of course, introduce yourselves, sorry. We're so comfortable; I've seen you for three days straight. Let's introduce yourselves for the record, please.

MS. BERNSTEIN: Good morning, Judge.

Bobbi Bernstein appearing on behalf of the United States.

MS. ALLISON: Good morning, Judge.

Tara Allison on behalf of the United States, here with Special Agent Elizabeth Hung and paralegal Lilly Richart.

THE COURT: Okay. Good morning to all of you.

Gentlemen.

MR. ZAMPOGNA: Good morning, Your Honor.

Christopher Zampogna for Mr. Vanderpool.

MR. BLUESTONE: Good morning, Your Honor.

Abraham Bluestone as well for Mr. Vanderpool.

THE DEFENDANT: Martique Vanderpool, Your Honor.

THE COURT: Okay, good morning. Please be seated.

Okay. We're here for closing argument in this trial, and I'll hear from the United States.

MS. ALLISON: Thank you, Your Honor.

CLOSING ARGUMENT BY THE GOVERNMENT

MS. ALLISON: In the defendant's words, She'd slipped up and said too much. So at that point, I figured, hey, it's my word against hers. To his mind, it was the defendant's word against that of a 19-year-old girl. The 19-year-old who, by the defendant's own account, across the board, was distraught that night, banging her head on her car, calling herself stupid, the 19-year-old the defendant transported in handcuffs to a deserted police station, where he penetrated her as another officer stood nearby.

It was the defendant's word against hers, and the evidence proves that the defendant used his words to try to cover up what happened that night and make it look like they'd never even left the scene of the traffic stop.

This isn't a case where you need to guess what was going on in the defendant's mind; his own words made clear that he was trying to cover up what he'd done that night. And he thought the cover-up would be successful. As Your Honor heard on those WhatsApp messages yesterday, the defendant said, Hey, she slipped up, she said too much, said that she suffered from

depression. So the defendant decided if he made it like "normal procedure," he'd get away with what he'd done.

Now, the defendant's state of mind at the time of the sex is clear. He explained why he decided to have sex with Ms. Stewart; he found condoms as he was searching the car, and they made him horny. And he explained how he viewed the circumstances that night. In the defendant's own words, "I fucked her while she was in custody."

This case of course is about what happened after the defendant fucked her in custody. The defendant is charged with knowingly writing a false report to try to cover up what he'd done.

As Your Honor well knows, there were three elements that we had to prove to you beyond a reasonable doubt: First, that the defendant knowingly falsified a report, whether by omitting material information, affirmatively lying, or, as here, doing both; that he did so with the requisite intent to impede, or influence, or obstruct any potential investigation into what he'd done; and third, that the matter about which he was lying, the apparent abuse of authority by someone acting under color of law, happened to fall within the jurisdiction of the FBI.

And I want to start with that last piece, because it's straightforward. As Agent Hung testified and as Your Honor knows, the FBI has jurisdiction to investigate when facts merely even suggest that someone, an officer acting under color of law,

coerced someone into having sex.

The facts suggesting that are abundant here. Ms. Stewart was 19 years old. She was pulled over and said she was rushing to get to her injured son. She was distraught, banging her head on the car, calling herself stupid, running out into traffic. She was taken to the ground and cuffed, transported in handcuffs to a deserted police station, where the defendant told her something along the lines of, we've got to make this right. The defendant then penetrated her while another officer stood by, then, after that, took her back to a tow lot in the middle of the night so she could get her car back at that point.

The FBI had jurisdiction to investigate here; this was a matter within their jurisdiction.

That false report piece is straightforward too. The defendant's report completely omitted material information; it completely left out that the defendant transported Ms. Stewart anywhere that night, let alone to the deserted police station. Not only did he leave out that he took Ms. Stewart away from the scene, he also completely left out that the car she was driving was taken away from the scene because the defendant and his partner arranged for it to be towed. The defendant's report left out that once he got Ms. Stewart to that police station, he had sex with her there, and it left out that after the fact, he arranged for the car to be given back to Ms. Stewart at no

charge, even though she didn't have a driver's license.

The defendant didn't leave it at omissions; he also made an affirmatively false statement in that report. He falsely said that the registered owner of that car, who was a man, was the one who picked up the vehicle.

Anyone reading this incident report would have the false impression that there's nothing to see here, and that was exactly the point, that in the defendant's words, this was just normal procedure, standard procedure; Ms. Stewart was pulled over for a traffic stop, she was given some traffic tickets and a criminal citation after she started self-harming, the owner of the vehicle showed up and got the car, and Ms. Stewart was released and sent on her way.

There's no question that the report is false. The defendant's own account, through his prior proceeding testimony, through those WhatsApp messages, make that clear.

So the remaining questions for Your Honor are, did the defendant write the report, and did he do so with the requisite intent.

The evidence proves beyond a reasonable doubt that it was the defendant who wrote the report that night. And let's look at how we know that. The report had the defendant's name on it. It was written from the defendant's perspective. It included a lot of the very same details that we also see in the defendant's own handwritten citation. It was created and

submitted under the defendant's unique user account on RMS, that very same night.

We also know that it was the defendant who wrote the report, because almost a week later, he went back in -- and we can see that on the audit log, using his own unique user name and account -- goes back in on September 15th, adds some details about the location, adds some ministerial information. And this is huge, because this is a point when the defendant had the opportunity to say, hey boss, what is this? I didn't write this report, what's going on here? Instead, on September 15th, he doubled down on his false report.

Yet another way we know it was the defendant who wrote the report. On September 17th, the very same day that the defendant's boss reached out and asked P.G. County to investigate him, that was the same exact day that the defendant sent a photo of the report to his partner from that night. He did the same thing again a couple weeks later. This time, it was just two days after we know from those audit logs, IA was looking into that report.

When the defendant sent the photos of that report to his partner from that night, he didn't say, whoa, what is this, he didn't say, hey, may, man I didn't write this, he didn't say where did this come from, and he didn't say those things because he wrote his own incident report.

Of course, the defense has no burden here. But

Mr. Zampogna stood up during his opening and told the Court that the evidence would show that the defendant wasn't even trained on the RMS system. Not so. The evidence proves that the defendant received that training on how to use the report-writing system. He knew how to write a report, he knew how to submit a report.

Now, could the handful of Fairmount Heights officers have shared that sticky note log-in information on the computer, sure, but as Sergeant Gill made clear, logging into the computer isn't the same thing as logging into the RMS system. And the claim that someone, late that same night, snuck in, used that Post-it note to log into the computer, somehow knew Mr. Vanderpool's unique user name and password to the RMS system, logged into the RMS system, wrote a report for Defendant Vanderpool that night, and then went back in about a week later to edit the report for Mr. Vanderpool, that defies common sense.

Finally, the evidence proves beyond a reasonable doubt that the defendant wrote this report with the requisite intent to influence a possible inquiry. The defendant knew full well that what he'd done was wrong and he could get in trouble for it. In addition to it being common sense, Officers Collins and Instructor Zeidan testified that they made it crystal clear to the defendant, when they trained him, that someone who is handcuffed, arrested, and taken from the scene is in custody,

that it's wrong to have sex with someone in custody, because they can't truly consent, that you can get at trouble, at work, in a civil suit, or in a criminal prosecution for such wrongdoing, and that you need to be truthful in your reports.

The defendant received 710 hours of training through that Maryland board, and he received 978 hours of training through the Northern Virginia academy. He knew that what he'd done was wrong and he could get in trouble for it; he got it.

Second, the defendant explained in great detail his thought process in trying to cover up what happened, and Your Honor heard that detailed explanation on the WhatsApp messages yesterday. The defendant figured, well, if I write her traffic tickets, if I write her a citation, then it's going to look like nothing unusual happened. So if she comes forward and said it did, well, hey, I followed standard procedure, this was just normal procedure.

Again, it was the defendant police officer's word against a 19-year-old, and he was deliberately trying to cover that up by making it look like everything was standard procedure, just like his incident report made it look like they never even left the scene of the traffic stop.

The defendant chose to sneak a distraught young woman away from the scene, to get paid to, in his words, fuck her in custody, to ignore all those calls coming in for him on Dispatch, and then to work overtime to write the false report,

trying cover up what he had done. The defendant wrote that report, with his name on it, from his perspective, written from his user account. That report omitted all of the crucial information of what he had done that night, and it included that one bold-faced lie.

The evidence proves beyond a reasonable doubt that the defendant falsified a report as charged in Count One. We ask you to hold the defendant accountable and find him guilty as charged.

THE COURT: Thank you, Ms. Allison.

Mr. Zampogna.

CLOSING ARGUMENT BY DEFENDANT

MR. ZAMPOGNA: Good morning, Your Honor.

THE COURT: Good morning.

MR. ZAMPOGNA: Can you -- I'm sorry, I'm waiting -- I guess we have some technical thing before I start talking.

THE COURT: All right, take your time.

MR. ZAMPOGNA: All right.

Can you trust beyond a reasonable doubt technology, and the creators, and its users? There are no human witnesses to Vanderpool, entirely generated -- computer-generated evidence, just prior testimony. I said in my opening, there was no witnesses even from the Fairmount Heights Police Department.

None of the witnesses, living or not, ever saw him write the report. The computer, which is what we've focused a

lot on in this case, spoke about a CAD -- one of the computer systems is a CAD system. You heard it does not show any connection to accuracy, as you've seen that Mr. Watkins' name was at the bottom of that exhibit from September 7, 2019, indicating that Mr. Watkins was at the scene. That's Exhibit 8 of the CAD report.

Then we have an RMS system, which is also a mess. Despite the testimony that you've heard, different people may make different reports under different names. There was Exhibit 4 -- 5, our exhibit, where Travis Nnamani was indicated in our cross of Ms. Hung, and further, we showed access to these accounts in our Exhibit 23.

The prosecutors never established his password, as you recall, in the cross, nor even his ID, or stated what it was.

Fairmount Heights Police Department further is a mess, with little or no security for the computer. As you can see, and as we showed in opening and we have again here today, a computer monitor that's been testified to to be the one in the common area, which even has a date and time on it of October 4th, 2019, in the bottom right-hand corner. A corrupt computer system, with faulty people running it.

Further, there's lack of proof. We have in the background, for some purposes, Mr. Dupree, who seems to come in and out the during the prosecutor's argument. First, the government -- the government at trial said he watched the sex;

even dimming the lights -- that's E-35, 22 to 23 -- had his 235 build intimidating Ms. Stewart -- they said it had -- and was also operating a vehicle that was used in the incident. That's true. Was he at the station? Yes, but then later, there is -- I'm sorry, I'll continue on.

The incident happened at about 12:30 to 1:30 a.m., that is, the sex occurring, according to the prosecutors, on September 7th, but that according to the prosecution, Dupree, as they provided later, he said he was signed out at 12:00 a.m., which doesn't track with the 5:00 a.m. calendar entry, where he was supposed to work until that morning, early that morning, all the while he was "intimidating" her into this situation. The government's argument doesn't make sense logically in that regard to Mr. Dupree.

They did not explain further why the sheriffs were at Vanderpool's house. No one investigated the reason for that; they jumped to a conclusion that is related to a letter, but as you recall, Agent Zimmerman, he, when asked, answered, I don't know, not connecting it to the letter, as I said, to P.G. County.

I would call some of their arguments a leap of faith. This leap of faith was not -- they want you to believe that -- and there is no proof beyond a reasonable doubt that this crime occurred. Even the photos from Vanderpool's phone, which were shown, the picture of the alleged report, looked at but never

reviewed or questioned by a superior. As we have stated, they were looked at and never questioned. They claim that the letter connects to the reason to send the text, while ignoring or not investigating the real reason the officers were at Vanderpool's house, as I stated earlier.

Was Dupree the author? Again, the government claims Dupree at the scene but then later says Dupree not at the scene, or checking out, a total misrepresentation of the facts.

Jurisdiction. We don't believe this is within the jurisdiction of the FBI, because there is -- there wasn't proven an indicia of nonconsent. What was their indicia? A 235-pound Dupree, a gun, an unmarked car, handcuffs, no call after the dalliance. This tortured theory means any sex at the office between two officers, state or federal, creates jurisdiction to investigate a crime. I don't think so.

Here, when did the arrest end, if it happened? When the handcuffs, as we learned, were removed from Ms. Stewart. This according to the testimony of their own trainer, Ms. Zeidan. She was not under arrest, so thus, no jurisdiction. Their own words defeat that offense.

Elements of not writing the report. This case is about what you did not hear, not about "evidence presented." Vanderpool did not write the report, and the report according -- according to the evidence. No testimony that anyone ever saw him use the office computer was presented, which they claim is

mike-HP. There was no testimony to what his password was or other personal identifiers that was in the RMS system.

Dupree was at the scene, as well, according to the computer, was Watkins. The passwords were on the computer, as you can see, one of them is fhp1935 [sic], and then there was one crossed out called Fairmount. These are hardly secure passwords. These could be Dupree's, Ivey's, Vanderpool's, or Watkins', we don't know, because no one testified as to what they were.

We will also indicate there was not falsities of material -- of any material fact, even if this report comes forward.

Intent to obstruct or influence an investigation. There was no intent. However, in arguendo, accepting the report as written from Vanderpool, the report-writer included all material facts of the event in this discretionary report. A discretionary report, as I said. He included the handcuffed Ms. Stewart. Officers are not required further to indicate that they had sex in a report about disorderly conduct. The immaterial fact of returning a car to an owner, mistakenly written by a writer, like Watkins not being at the arrest, that didn't create any kind of investigation into the CAD operator for putting the wrong name there.

Further, there was no intent, if we do take this arguendo. Vanderpool never denied having sex when asked; he

never told anyone that it did not happen. He resigned from the force. He was caught up in a disaster of a force that never taught by example. His superiors never disciplined him while on the force. Investigators failed to know about his commendations.

WhatsApp messages. The messages to a friend, Washington, bragging about a sexual encounter, are not proof of a crime. The statements are bragging exaggerations to an older friend who wanted live vicariously through Vanderpool and must be given the appropriate weight. Washington encouraged the speaking about sex, as you recall.

Further, the investigation itself was a mess. You heard Agent Zimmerman testify, that he did not explain how they did not -- how they handled evidence improperly. He did not know Vanderpool's personnel file, he didn't know why the sheriffs were at his house, he does he not know who was behind the keyboard, as he actually said. Reasonable doubt, I would say, who was behind the keyboard? If we don't know that, how can we convict him of this crime?

The U.S. Attorney, due to poor investigations, had to piece together prior testimony, in violation of its own rules about things, to try to make a prima facie case. Why? Because the lack of direct testimony, proof of any criminal misconduct, and further, their evidence does not even prove a prima facie case, I argue, of a violation of obstruction.

Even the trainers, hand-selected by the prosecution, falsely stated, the government never provided them facts about the case. And in their inter- -- even though they did so in interviews less than a month ago. Investigators never asked who accessed Vanderpool's account during the suspension, for instance, as well. Agent Zimmerman said it best when he said, We do not know who was behind the keyboard.

Mr. Vanderpool's not guilty of this.

Considering further, there was testimony about an odometer reading, but only the driver, Dupree, could see this odometer in clear view. Dupree never provided any testimony here.

There was no direct link to the computer by the government to my client, only attempts to show a bunch of misrepresentations to a friend.

Gill, for instance, as well, the computer person, who thinks computers always tell the truth, stated that Watkins was at the scene. Gill has no knowledge of how the system works at Fairmount Heights; he didn't even go to Fairmount Heights to see how it worked.

Gill never found or even looked at the security concerns potentially at Fairmount Heights and how this might affect the system that he created. He relied on the Fairmount Heights Police Department to do their own computer security.

JA927

Gill did not know of the training and if any officers were trained at Fairmount Heights on it. Gill was not connected in any way to the officers at Fairmount Heights. There was no password security for the RMS set. For instance, we don't know if the password could be 1234. It could be, as I said earlier, fhpd1935 for RMS for all we know. Gill believed that Watkins at the scene of the -- believed that Watkins was at the scene of the event because the computer said so.

Dupree. Why was there no inquiry for him slamming a woman to the ground? Dupree had a motive to write the report? Perhaps. Dupree ordered her out of the vehicle, Dupree decided to make the arrest, Dupree was at the station. Dupree lied about leaving at midnight if that is what he did, before the sex occurred. The government has admitted he was present during the sex.

Your Honor, I'm confident that after you review the lack of evidence and the lack of evidence specifically related to jurisdiction, you will find my client not guilty of obstruction of justice, his superior -- his supervisor, not present to testify, nor anyone else from the department to support his claim. In the words of Agent Zimmerman who investigated this case for three years, we do not know who was behind the keyboard.

Thank you.

THE COURT: Thank you, Mr. Zampogna. Any rebuttal

from the government?

MS. BERNSTEIN:  Yes, Your Honor.

REBUTTAL ARGUMENT BY THE GOVERNMENT

MS. BERNSTEIN:  This case is not a whodunit.  This report, Exhibit 1, is and always has been Defendant Vanderpool's report, and that's because it's about an arrest that is and always has been Defendant Vanderpool's arrest.

Defendant Vanderpool called in the traffic stop.  Contrary to what Mr. Zampogna just told you, Defendant Vanderpool decided to make a full arrest.

(Audio recording playing.)

MS. BERNSTEIN:  "I'm like, let's just do the full arrest."

It was Defendant Vanderpool who wrote the traffic ticket.  It was Defendant Vanderpool who handwrote out the criminal citation.  And that's key, Judge, because you heard, what that means is that he arrested Raynna by citation.  He was the arresting officer, this was his arrest.

Defendant Vanderpool was the officer who was supposed to show up in court to testify against Raynna, and if he had done so, he would have testified to the evidence in his report about his arrest.

This was 100 percent Defendant Vanderpool's arrest, 100 percent Defendant Vanderpool's report.  And therefore, it makes perfect sense, Judge, that it was Defendant Vanderpool's

JA929

unique ID and password that was used to sign onto that computer in the Fairmount Heights police station and draft up this report, the report written in Vanderpool's name, with his name on it, from his perspective, about his arrest.

And it makes perfect sense that it was Defendant Vanderpool's unique user ID that went in a week later to make ministerial changes, because it was his report about his arrest, and it really makes sense that it was his unique user ID that went in on September 17th, the same day his boss referred the case for investigation. It was Defendant Vanderpool who went in just long enough to take a picture of that report and send it to Officer Dupree, to make sure that Officer Dupree would back his plan.

There is no doubt at all, let alone a reasonable one, about who wrote that report. So why, then, was Mr. Zampogna's whole closing argument as if this was a whodunit? Because the defense needs this to be a whodunit, Your Honor, because that report, Exhibit 1, is a false report. No way around it, no bones about it, no way to defend it.

And when you combine that false report with the things that Defendant Vanderpool himself said he was thinking about that night -- he was thinking about, well, maybe Raynna will make a complaint against me, and if she does, boy, I'd better have a paper trail, I'd better have these tickets and this citation, to make it look like it was a regular arrest.

And that's what he was thinking when sat down at the computer in the Fairmount Heights police station, logged in his unique user name and ID, and typed out the report, the paper trail, to make this look like it was just a regular old arrest.

So if Defendant Vanderpool -- if this isn't a whodunit, if he didn't write this report, then we're done. He's done. But it's not a whodunit.

But just for argument's sake, Judge, let's say it is, let's say this is a whodunit. There were only two people on the entire planet who could have written that report. There were only two people present at the scene who knew the facts that went into that report. So someone wrote a false report, and there are only two people on the planet it could be. So was it Defendant Vanderpool, or was it Officer Dupree?

Well, you know for all the reasons I just said that there is no question here it was Defendant Vanderpool, but you also know that for another really important reason, Judge, because this report could not be further away from Dupree's MO. What do we know about Dupree? Defendant Vanderpool tells us that Dupree does this all the time, but he doesn't give the women tickets. Why? Because he thinks that's how you get caught. He covers his tracks by lying low, by making sure there's no paper trail to be seen.

And we know from Defendant Vanderpool's helpful explanation to Mr. Washington that he and his partner don't see

JA931

eye to eye on this. Defendant Vanderpool thinks the smarter move is to create a paper trail, because that way, if the woman complains, he can just point to that paper and say, see, I did everything the just the way I was supposed to.

And we also know that that very morning, the morning that this paper trail was being written, Defendant Vanderpool was thinking, wow, this woman might complain, and I'd better have a paper trail. And it looks like Officer Dupree was thinking, uh-uh, I'm out of here.

On that radio run at 12:30, right after the sex, we have FA4, Officer Dupree, on that radio call, saying, I'm 10-7, I'm out of here, done with my shift.

So it's a reasonable inference from our evidence, Judge, that Officer Dupree agrees with what we hear Denny Washington saying on that tape, which is, why would anybody do what Defendant Vanderpool did and then give his own victim a criminal citation?

And where that leaves us, Judge, is that the only other person on the planet who could have written that report is also the very last person on the planet who ever would have.

I want to talk about the sex at the station for just a minute, just long enough to make two points. The first is that you don't have to decide whether the sex at the station was coercive or consensual.

The second point is that even though you don't have to

decide that, you have lots and lots of evidence from which you could. And the indicia, as Mr. Zampogna just talked, that that sex was completely nonconsensual, Raynna was 19 years old, worried about her injured child, she was erratic, self-harming, having a breakdown. She was running into traffic, she was trapped with no car. She was handcuffed and secretly carried away from the scene, in a police car, with two armed officers, taken to a deserted station, where in the presence of two armed officers, the defendant told her something to the effect of, we gotta make things right, and then in his words, fucked her, in that open room, with the door wide open and Officer Dupree standing nearby.

And I want to correct something Mr. Zampogna just said. It is not the government who said Officer Dupree was standing nearby; it was Defendant Vanderpool.

So you have plenty of evidence, Judge, from which you could decide that the sex was completely nonconsensual, but you don't have to. The reason all of those indicia, all of that evidence of nonconsensual sex is relevant here is because it makes each and every one of the other three elements, the three elements that you have to worry about, Judge, more obvious. It makes it abundantly clear that this was a matter within the jurisdiction of the FBI, it makes it abundantly clear that the defendant had every reason in the world to lie in that report, and it makes abundantly clear that he had every reason to intend

JA933

to interfere with any future investigation.

And talking about the defendant's motive and intent, I have to mention Travis Nnamani.  Now, you know better than anyone, Judge, that a defendant has absolutely no obligation to bring forward any evidence.  The government proudly bears the burden of proving every element beyond a reasonable doubt.  But when a defendant chooses to put on evidence, you can't ignore it; that's now part of the case.

Defendant Vanderpool chose to bring into this case the January 15th arrest of Travis Nnamani.  And it sure looks from the evidence like this defendant, charged with falsifying a police report, chose of his own free will to bring the Court's attention to yet another police report he falsified.

Look at the evidence on that arrest, Judge.  Start with the CAD report.  Are CAD reports perfect?  No, we know they're not.  But look at that CAD report for the Travis Nnamani arrest.  It makes clear that there was one officer on the scene who pulled Nnamani over, who called into Dispatch.  That was FA3, Vanderpool, and the reason you can believe that CAD is because there's actually an explanation right on the CAD for why there was only one officer there:  FA3, Defendant Vanderpool, called into Dispatch and said, I'm FA3, pulling over this car, no 78, do not send anybody else.  This is the arrest where there's a report written up like it was -- like it was Ivey who did that.  That CAD tells you that that was

Defendant Vanderpool's arrest.

And another reason you know that CAD is right is because that CAD is consistent with both of those audits and with Defendant Vanderpool's time sheet.

Defendant Vanderpool, on his own, pulled over Travis Nnamani, arrested him, then used his unique user name and ID to log onto the computer system and draft up two reports, written to look like Lieutenant Ivey had done it -- actually, Officer Ivey.

And those audits show that Defendant Vanderpool went in and did those reports just in time for him to log off at the end of his shift, just like he did in this case. It looks like Defendant Vanderpool put in his own 404(b) evidence against himself, Judge.

Why did he arrest Nnamani and then write a report making it look like Ivey did it? Who knows? Maybe Ivey needed an alibi for something, maybe Defendant Vanderpool didn't want to have to go to Court against Nnamani, who knows? All you can know, Judge, is what the documents tell you, and those documents sure seem to tell you that Defendant Vanderpool, charged with falsifying the police report, came in here and offered this Court yet another falsified police report.

If that's true, Judge, that takes gumption, that takes the same kind of gumption that it takes for an armed police officer to take an emotionally wrecked and vulnerable

19-year-old woman, in handcuffs, to an abandoned police station, in his words, fuck her, in an open room, with an open door, in front of another armed police officer, and then give his victim a criminal citation.

I have nothing further, Judge.

THE COURT: Okay, thank you very much.

All right. Here's how I'd like to proceed.

So I'm going to take this under advisement, and I'm going to bring everyone back next Wednesday at 2:00, where I will give my ruling, my decision, my verdict.

I will note, under Rule 23, which is the rule pursuant to which Mr. Vanderpool waived his right to a jury trial, it says, Rule 23(c), in a case tried without a jury, the Court must find the defendant guilty or not guilty. If a party requests, before the finding of guilty or not guilty, the Court must state its specific findings of fact in open Court or in a written decision or opinion. No party has requested before the finding of guilt or not guilty that I state my specific findings of fact, but nonetheless, I will do so.

I don't want or need any filings before Wednesday, I think it would be inappropriate, so please, no filings, on evidence, on argument, on anything. This is as if the jury was out deliberating.

Understood from the government's perspective?

MS. BERNSTEIN: Understood, Your Honor.

JA936

THE COURT: Mr. Zampogna.

MR. ZAMPOGNA: Understood, Your Honor.

THE COURT: All right. Is there anything else from the government's perspective.

MS. BERNSTEIN: No, Your Honor.

THE COURT: Okay. Mr. Zampogna.

MR. ZAMPOGNA: No, Your Honor.

THE COURT: Okay. I will see you on Wednesday at 2:00. Thank you.

THE COURTROOM DEPUTY: All rise. This Honorable Court stands adjourned.

(The proceedings were adjourned at 10:20 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of December, 2024.

_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter

JA938

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                                )
UNITED STATES OF AMERICA         )
                                )
        v.                       )   Case No. 8:23-cr-00234-DLB-1
                                )
MARTIQUE CABRAL VANDERPOOL,       )
                                )
            Defendant.           )
_____)

                                    Greenbelt, Maryland
                                    October 30, 2024
                                    2:11 p.m.


                BENCH TRIAL, VOLUME 4, VERDICT

        BEFORE THE HONORABLE DEBORAH L. BOARDMAN
               United States District Judge


                A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

        U.S. DEPARTMENT OF JUSTICE
        Civil Rights Division
        150 M Street, N.E.
        7th Floor
        Washington, D.C.  20002
        BY:  BARBARA S. BERNSTEIN, ASSISTANT U.S. ATTORNEY
             (202) 353-0032
             bobbi.bernstein@usdoj.gov
        BY:  TARA KNOLL ALLISON, TRIAL ATTORNEY
             (412) 779-8970
             tara.allison@usdoj.gov




                PATRICIA KLEPP, RMR
               Official Court Reporter
           6500 Cherrywood Lane, Suite 200
             Greenbelt, Maryland  20770


        ***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA939

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

    ZAMPOGNA PC
    2101 L Street, N.W., Suite 300
    Washington, D.C.  20037
    BY:  CHRISTOPHER ADAM ZAMPOGNA, ESQUIRE
        (202) 223-6635
        caz@zampognalaw.com
    BY:  ABRAHAM BLUESTONE, ESQUIRE
        (202) 223-6635
        ab@zampognalaw.com, ESQUIRE

ALSO PRESENT:

    MARTIQUE CABRAL VANDERPOOL
    LILLY RICHART, PARALEGAL
    S.A. ELIZABETH HUNG - FBI

***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA940

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Maryland is now in session, the Honorable Deborah L. Boardman presiding.

THE COURT:  Okay.  Please be seated.

All right.  We're here in the United States of America v. Martique Vanderpool, 23-234.  The purpose of today's hearing is for me to render my verdict and findings of fact.

Is there anything we need -- we'll have counsel introduce themselves first.

For the government, please.

MS. BERNSTEIN:  Good morning, Your Honor -- good afternoon, rather.  Bobbi Bernstein appearing on behalf the United States.  With me at counsel table, my colleague, Tara Allison, Special Agent Elizabeth Hung of the FBI, and our paralegal, Lilly Richart.

THE COURT:  Okay, good afternoon.

MS. BERNSTEIN:  Good afternoon.

MR. ZAMPOGNA:  Good afternoon, Your Honor. Christopher Zampogna.  To my right is Martique Vanderpool.

MR. BLUESTONE:  And then Abraham Bluestone, Your Honor.

THE COURT:  Okay.  Good afternoon, gentlemen.

Please be seated.

This matter came before the Court for a bench trial. Before the trial, I conducted an inquiry under Federal Rule of Criminal Procedure 23 to determine whether Martique Vanderpool's waiver of a jury trial was knowing, willful, and voluntary. I found it was. The government consented to a bench trial. I then determined in my discretion to approve Mr. Vanderpool's waiver of a jury trial and his request for a bench trial.

Trial began on October 22nd, 2024 and concluded two days later on October 24th. After consideration of the testimony, and evidence, and arguments of counsel, the Court finds that the government has proven beyond a reasonable doubt that Mr. Vanderpool is guilty of the single charge in the indictment, a violation of Title 18 of United States Code, Section 1519.

The Court now reads this memorandum of decision and findings of fact supporting the verdict into the record in accordance with Federal Rule of Criminal Procedure 23(c). Let me emphasize that even though I may not discuss every piece of evidence or address every argument, I have considered all evidence and every argument.

In September, 2019, Mr. Vanderpool was working as a police officer with the Fairmount Heights Police Department in Fairmount Heights, Maryland, which is a municipality in Prince George's County, Maryland.

Late at night on September 6th, 2019, Mr. Vanderpool

JA942

and his partner officer, Officer Philip Dupree, were patrolling in Officer Dupree's car. The car did not have the Fairmount Heights Police Department logo on it like a typical police car, but it was outfitted with lights and a siren. Inside the car was a police-issued laptop.

At around 11:20 p.m., Mr. Vanderpool and Officer Dupree pulled over a blue Mustang for speeding. One of them ran the license plate information on the car and determined that it was registered to a man named Delonte Samuel. Mr. Vanderpool alerted Dispatch that he and Officer Dupree were conducting a traffic stop. Officer Dupree and Mr. Vanderpool approached the blue Mustang. Mr. Vanderpool instructed the driver to roll down the windows and turn the vehicle off. No one else was in the car. The driver of the vehicle was a young woman named Raynna Stewart. Ms. Stewart appeared upset. Ms. Stewart told Mr. Vanderpool and Officer Dupree that she needed to leave because her son was injured.

Mr. Vanderpool asked Ms. Stewart if she knew why they had stopped her, and she replied that she did not know. Mr. Vanderpool told her that they stopped her for speeding, and he asked her for her license, registration, and proof of insurance. Ms. Stewart told him that she didn't have anything, that she had a driver's license but that she left it at home on the dresser. Mr. Vanderpool told Ms. Stewart that he understood what she was saying but that she was flying and couldn't produce

any type of documentation, which was a problem. Officer Dupree asked Ms. Stewart to get out of the vehicle.

Ms. Stewart seemed to be having a panic attack, and as Mr. Vanderpool stated, she started to "go crazy." Officer Dupree placed Ms. Stewart on the ground and handcuffed her, slamming her and scraping her knee in the process. Ms. Stewart fought Officer Dupree's efforts to detain and handcuff her. Officer Dupree is a larger man. Mr. Vanderpool stated that he weighed probably 235 pounds.

After Officer Dupree placed Ms. Stewart on the ground, she got up and continued running into the street in an apparent state of mental distress. Ms. Stewart was banging her head against the car door, saying, I'm so stupid, I'm so stupid.

While Officer Dupree was engaged with Ms. Stewart, Mr. Vanderpool searched Ms. Stewart's car. Mr. Vanderpool found her learner's permit, which said that she was 5'5" and weighed 148 pounds. It also indicated her date of birth and that she was 19 years old. Mr. Vanderpool also saw condoms in the center console area of the car. After the search of the car and because Ms. Stewart was "going crazy" and was acting disorderly and because Officer Dupree "had his hands on her," Mr. Vanderpool decided that he and Officer Dupree should place Ms. Stewart under arrest, as he stated, "do a full arrest."

At some point during the stop, one of the officers alerted a towing company, Tino's Towing, that they were

impounding the vehicle. An employee of the tow company, Kevin, picked up the blue Mustang and took it to Tino's towing lot. Mr. Vanderpool, Officer Dupree, and Ms. Stewart got into Officer Dupree's car. Dupree drove, and Ms. Stewart, handcuffed, sat in the front passenger seat. Mr. Vanderpool sat in the back seat.

Officer Dupree drove them to a Fairmount Heights municipal building. Fairmount Heights has a small police force. It had five officers, including only three full time officers at the time. It's police station is located within the municipal building.

Police officers are not supposed to take arrestees to the police station in the municipal building for processing. At the time of the incident, the municipal building did not have a holding cell or equipment necessary to fingerprint or book an arrestee. Instead, officers were supposed to take arrestees to Upper Marlboro for processing. Mr. Vanderpool and Officer Dupree never took Ms. Stewart, who was under arrest, to Upper Marlboro for processing.

The municipal building was locked when Officer Dupree, Mr. Vanderpool, and Ms. Stewart arrived. Officer Dupree told Mr. Vanderpool to open the door, so Mr. Vanderpool got out of the car and unlocked the door. He did not see anyone inside. After Mr. Vanderpool unlocked the door, Officer Dupree brought Ms. Stewart inside the building to a common area within the

police department.

One of the officers removed Ms. Stewart's handcuffs. Mr. Vanderpool told Ms. Stewart something along the lines of, we, you know, gotta make this right. Ms. Stewart then agreed to have sex with Mr. Vanderpool. Mr. Vanderpool gave Officer Dupree a condom and kept one for himself. Officer Dupree went outside the common area and dimmed the lights. Mr. Vanderpool and Ms. Stewart had sex on the couch in the police department. Mr. Vanderpool issued Ms. Stewart a traffic ticket and a criminal citation for disorderly conduct. Mr. Vanderpool did so to appear "consistent."

As he told his friend, Denton Washington, two days later, he believed that if Ms. Stewart later accused him of misconduct, the tickets would show that he just did what he was supposed to do by charging her. In his words, the tickets would show, if Ms. Stewart ever later complained of his conduct, that she may "just be mad, or she could just be making an allegation."

And Mr. Vanderpool believed, based on Ms. Stewart's conduct that evening, that Ms. Stewart was "kind of crazy" and might have "suffered from depression," so he figured if she ever told anyone that they had sex, it would be his word against hers.

After Mr. Vanderpool and Ms. Stewart had sex, Mr. Vanderpool took her to Tino's Towing to retrieve the blue

Mustang. Between 1:10 and 2:19 in the morning, Mr. Vanderpool called both Kevin and Valentino Hines, the owner of Tino's Towing, several times to discuss the release of the car that Ms. Stewart was driving. I do not know whether Officer Dupree also took Ms. Stewart to Tino's Towing, but that fact is immaterial to my findings.

Mr. Vanderpool dropped Ms. Stewart off at the tow lot. Mr. Vanderpool did not see her retrieve the vehicle. Around 2:22 a.m., Mr. Vanderpool issued a traffic citation to someone else at Sheriff Road and Addison Road, less than half a mile from the Fairmount Heights Police Department in the municipal building.

Less than 30 minutes later, Mr. Vanderpool was at the Fairmount Heights police station. There, he began writing an incident report to document the incident with Ms. Stewart. Mr. Vanderpool wrote the report on the RMS system, using his unique RMS user account on a desktop named mike-HP, which is at the Fairmount Heights police station.

Even though several officers also had access to the mike-HP desktop computer, and even though an apparent password to get into the mike-HP desktop was written on a Post-it note on the monitor, the Court finds that Mr. Vanderpool personally drafted the report. He was the officer on the scene, he wrote the report in first person, and referred to his partner, Officer Dupree. Mr. Vanderpool's RMS user account is password

protected.

Ten days after he wrote the report from the police station, Mr. Vanderpool sent a picture of the report in the RMS system to Officer Dupree, with the message, Why Tf is sheriff's at my house? And he did so again after -- one month after the incident with the message, The report for that chick, the traffic stop and detention only lasted an hour and she was sent on her way. In addition, Mr. Vanderpool's RMS user account accessed the report a week after he created the report.

The Court finds the government has proven beyond a reasonable doubt that Mr. Vanderpool personally wrote the incident report at issue.

Mr. Vanderpool's incident report stated that Ms. Stewart was stopped for speeding. Once she was stopped, she began acting erratically, including by running into the street and banging her head against the exterior of the car. Then, she was issued the appropriate traffic citations as well as a criminal citation, No. 092002253965 for disorderly conduct. Her report stated that the registered owner of the car picked it up and Ms. Stewart was released and sent on her way.

Mr. Vanderpool purposely omitted from the report that he and Officer Dupree took Ms. Stewart to the police station, that he had sex with Ms. Stewart there, that he and Officer Dupree caused the car that Ms. Stewart was driving to be towed from the scene of the traffic stop, and that he

coordinated the release of that car to Ms. Stewart. Additionally, Mr. Vanderpool purposely misstated that the registered owner of the car picked it up. Ms. Stewart was not the registered owner. The omissions and false statement in the report were material.

One of Mr. Vanderpool's teachers at his police academy, Doniese Collins, testified that a police officer needs to include in any incident report he writes that he has transported someone in custody to another location in handcuffs. The report also must include the fact that the officer impounded the suspect's car. The Court finds Ms. Collins' testimony credible.

The Court also finds that the report created the misleading impression that Mr. Vanderpool and Officer Dupree simply cited Ms. Stewart for disorderly conduct at the scene, that the registered owner of the car came to the scene of the traffic stop and picked up the car, and that Ms. Stewart went on her way. Any reader of the report would think that Mr. Vanderpool, Officer Dupree, and Ms. Stewart did not leave the scene of the traffic stop. The reader certainly would not think that Mr. Vanderpool had sex with Ms. Stewart while she was in custody.

Thus, the Court finds that Mr. Vanderpool falsified the incident report with four material omissions and one affirmative material misstatement. The Court further finds that

JA949

Mr. Vanderpool falsified the report with the intent to impede a potential future investigation into his conduct.

Mr. Vanderpool received training about the civil rights of people in custody. He also received training about police sexual misconduct.

Another one of Mr. Vanderpool's teachers, Lyla Zeidan, testified that she taught Mr. Vanderpool that under Virginia law, it is a crime for a police officer to have sex with anyone in their care and control. Though Mr. Vanderpool was not bound by Virginia law at the time of this incident, the training put him on notice that he could be investigated for having sex with Ms. Stewart while she was in custody. During the training, Ms. Zeidan also instructed Mr. Vanderpool that a person in custody is, by the nature of their detention, unable to consent to sex with an officer who is in a position of authority over the person in custody.

Mr. Vanderpool also received training about civil liability and the federal civil criminal rights statute, Title 18 of the United States Code, Section 242. That training also put Mr. Vanderpool on notice that he could be investigated for having sex with Ms. Stewart, even if he believed the sex was purely consensual. The Court finds Ms. Zeidan's testimony was credible.

Mr. Vanderpool's other actions show that he acted with the intent to impede a potential future investigation.

For example, Mr. Vanderpool issued tickets and a citation to Ms. Stewart to appear "consistent," in other words, to not call attention to his interaction with Ms. Stewart.

Several weeks after the incident, after he appeared to know he was under investigation, Mr. Vanderpool texted Officer Dupree a picture of the incident report, with the message, The report for that chick, the traffic stop and detention only lasted an hour and she was sent on her way.

In other words, Mr. Vanderpool purposely made the report sound like the traffic stop and detention only lasted an hour, even though he knew that was not true, and he purposely omitted from the report that he had sex with her at the police station while she was in his custody.

Finally, the Court finds that the investigation of the matter that Mr. Vanderpool intended to impede was within the jurisdiction of the Federal Bureau of Investigation. The FBI has jurisdiction to investigate potential civil rights violations by officers acting under color of law. Mr. Vanderpool was acting under color of law when he had sex with Ms. Stewart. He and Officer Dupree were working as police officers when they stopped the car Ms. Stewart was driving for speeding, they transported Ms. Stewart to the police station in police-issued handcuffs shortly after they pulled her car over for speeding, and as Mr. Vanderpool stated to Mr. Washington, Ms. Stewart was in custody when he had sex with her.

JA951

Even if Mr. Vanderpool and Ms. Stewart had what Mr. Vanderpool believed was purely consensual sex, the government proved beyond a reasonable doubt that the FBI would have had jurisdiction to investigate the matter as a potential civil rights violation because of the indicia that the sex was coercive.

There was evidence that Mr. Vanderpool, in his position of power as a police officer, coerced or intimidated Ms. Stewart into having sex with him. She was a teenager, slight in build, in a state of panic and mental distress, was forced to the ground by Officer Dupree to get her into handcuffs and under control. Her car was towed from the scene. She said she needed it to get to her son. She was brought to a police station in handcuffs, late at night, when no one else was there, was told by Mr. Vanderpool that, we have to make this right, and then they had sex.

These facts suggest a potential civil rights violation. Special Agent Elizabeth Hung testified that if she knew that a police officer arrested somebody, took them to a police station, and had sex with them there, she would open a civil rights investigation. The Court finds Ms. Hung's testimony credible. And the FBI did in fact conduct a civil rights investigation into Mr. Vanderpool's conduct. The government has proven beyond a reasonable doubt that the investigation of the matter that Mr. Vanderpool intended to

impede was within the jurisdiction of the FBI.

In sum, I find that the government has proven beyond a reasonable doubt that Mr. Vanderpool knowingly falsified the report with the intent to impede an investigation that was in the jurisdiction of the Federal Bureau of Investigation. Accordingly, the Court finds Mr. Vanderpool guilty of the single charge in the indictment, a charge under 18 United States Code, Section 1519.

I will enter an order and a verdict finding him guilty as to Count One, and we need to schedule a date for sentencing.

Just give me one moment.

Okay. I have three dates available, February 18th, 19th, or 20th at 10:00 a.m. or at 2:00 p.m. each day. Let me start with the United States.

MS. BERNSTEIN: Any of those days work for the government, Your Honor. I believe that it will be important to Ms. Stewart to be heard at sentencing, so I would just request permission to file something following up if by some chance those dates don't work for her, but I'm confident that they will.

THE COURT: Okay. Mr. Zampogna, you consult with your client and Mr. Bluestone; how do those dates work?

MR. ZAMPOGNA: You know, I -- thank you, Your Honor, I did. The 20th would be the best day for us.

May I ask another question before we -- or regarding

posttrial motions, I know they're due in 14 days. I was going to ask if we could have 60 days for those, given we don't have the transcript yet, and I still have another case that's coming up as well.

THE COURT: So if you're asking for 60 days, which I'm not sure I'll give, why would I -- it's going take me time to rule on your posttrial motions; we wouldn't be able to have sentencing that soon.

MR. ZAMPOGNA: I -- well, I did because -- my scheduling.

THE COURT: Okay.

MR. ZAMPOGNA: So I didn't know that it would be --

THE COURT: So I think --

MR. ZAMPOGNA: Sorry, Your Honor.

THE COURT: All right. If the request for 60 days is because of the transcript, I think that's not a problem. I think, the transcript, you can get it if you pay for it very soon.

So do you need more time because of your schedule?

MR. ZAMPOGNA: All right, that's the second reason. We -- yeah, we have ordered the transcript already, Your Honor, and it is not ready at this point, but yes, the second request is due to my scheduling, before that, because there is another mini trial that I have in a few weeks, or a month, I've been preparing for.

THE COURT: Okay. What's the government's position?

MS. BERNSTEIN: We wouldn't object to a couple extra weeks for the posttrial filings, but two months seems like an awful lot of time.

THE COURT: All right.

MS. BERNSTEIN: And we are very much in favor of a February sentencing.

THE COURT: What's the nature of your posttrial motion?

MR. ZAMPOGNA: Well, there will be different natures, depending on which one we can bring at Rule 29 on the sufficiency of evidence. We can bring a Rule 33 and a Rule 34, which is in the interests of justice. Those are all possible posttrial motions.

MS. BERNSTEIN: Judge, if I might add, and I know you already know this, but since you asked the government's position on this, I just want to point out that the entire trial was only two days, and so I think that also militates toward less time than the defense is asking for for the posttrial motions.

THE COURT: All right.

Okay. Posttrial motions will be due October -- excuse me, November -- well, that's Thanksgiving weekend. All right.

December 2nd. How long would the government would need to reply?

MS. BERNSTEIN: A week would be fine, Judge.

JA955

THE COURT: Okay. Reply is due -- or opposition is due the 9th. All right.

If I grant the motion, I will vacate the sentencing hearing. If I don't grant the motion, the sentencing hearing will be February 20th at 10:00 a.m.

And I will enter a regular scheduling order and enter the preparation of a presentence investigation report.

Okay. Anything else that we should address from the government's perspective?

MS. BERNSTEIN: Yes, Judge. I think the Court needs to address the issue of detention under Section 3143. If the defendant is not being taken into detention, the Court just needs to make findings on the record by clear and convincing evidence that he is neither a danger to the community nor a flight risk.

THE COURT: Mr. Zampogna.

MR. ZAMPOGNA: I believe the -- I think it's the -- Pretrial Services has already indicated he should not be stepped back at this point. There was a letter to that effect already, so hopefully, he shouldn't be put in custody at this time. He's not a threat to the community. He's no longer a police officer, he's no risk of flight. He has a job at this point, and as you saw him come in many times with his work garb, so I don't believe there's any reason to step him back at this point, Your Honor.

THE COURT: Okay. I find that there is clear and convincing evidence that Mr. Vanderpool is not a flight risk. He has appeared at every hearing we have had. He is here with his friends and family, he has close ties to the community, he is working. I also find by clear and convincing evidence that he is not a danger to the community. He has been released from custody in this matter for almost two years, perhaps a year and a half, I can't remember, and I'm not aware of any arrests or charges. So I will not detain Mr. Vanderpool pending sentencing.

He is to abide by the same previous conditions that he has been under.

Do you understand, Mr. Vanderpool?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay, thank you.

Anything else?

MS. BERNSTEIN: No, Judge, that was it.

THE COURT: Okay. Anything else, Mr. Bluestone?

MR. BLUESTONE: Yes, Your Honor. At your order, we have not filed anything since the closing arguments. We do have some objections that we would like to have preserved for the record, and we would like some time to be able to file those onto the record. We believe having one week to file any remaining objections would be beneficial.

THE COURT: So what are those objections to?

JA957

MR. BLUESTONE: The government's closing rebuttal statement, Your Honor.

THE COURT: You didn't make them at the trial, though.

MR. BLUESTONE: We did not have an opportunity, Your Honor. We would have done that afterwards, but we were ordered by the Court not to file anything onto the docket related to the government's closing statements or related --

THE COURT: Well, let's just clarify. My recollection -- I think the record controls, but my recollection is, I said, at the end of the trial, after we left, I didn't want any additional filings that would influence me as a finder of fact. You could have made those objections to the rebuttal argument on that day.

So nonetheless, I will let you file what you need to file to preserve -- to do what you think you need to do to preserve your client's interests within a week.

MR. BLUESTONE: Thank you, Your Honor.

THE COURT: All right.

Okay. Thank you all very much.

THE COURTROOM DEPUTY: All rise. This Honorable Court stands adjourned.

(The proceedings were adjourned at 2:43 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of December, 2024.

_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter

JA959