# United States Court of Appeals
### *for the*
## Fourth Circuit

———————◆———————

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

MARTIQUE CABRAL VANDERPOOL,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

# JOINT APPENDIX
# VOLUME 4 OF 6 (PAGES 1337-1628)

STUART A. BERMAN
LERCH, EARLY &
  BREWER, CHARTERED
760 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
(301) 657-0729

*Counsel for Appellant*

HARMEET DHILLON
MICHAEL E. GATES
BARBARA A. SCHWABAUER
U.S. DEPARTMENT OF JUSTICE
Ben Franklin Station
Post Office Box 14403
Washington, DC 20044
(202) 305-3034

*Counsel for Appellee*

CP COUNSEL PRESS   (800) 4-APPEAL • [812795]

**TABLE OF CONTENTS**

Page

**VOLUME 1 OF 6**

District Court Docket Sheet ................................................................... JA1

Indictment
     filed July 6, 2023 ............................................................. JA16

Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrants
     filed August 18, 2023 ...................................................... JA19

     Exhibit A: Initial Prince George's County Warrant
          dated December 2, 2019 ............................................... JA37

     Exhibit B: Prince George's County Warrant-Samsung Galaxy S III
          dated January 17, 2020 ................................................ JA43

     Exhibit C: Federal Search Warrant
          dated June 23, 2020 ................................................... JA49

     Proposed Order ............................................................... JA71

Defendant's Motion to Dismiss for Preindictment Delay
     filed August 18, 2023 ...................................................... JA72

Government's Response in Opposition to Defendant's Motion to Suppress
Evidence Seized Pursuant to Search Warrants
     filed September 8, 2023 .................................................... JA82

     Exhibit 1: Federal Warrant
          dated June 23, 2020 ................................................... JA113

     Exhibit 2: State Warrant
          dated December 2, 2019 ............................................... JA135

     Exhibit 3: State Warrant
          dated January 17, 2020 ................................................ JA146

Government's Response in Opposition to Defendant's Motion to Dismiss for
Preindictment Delay
     filed September 8, 2023 .................................................... JA188

Defendant's Reply to Government's Response to Motion to Suppress Evidence
>> filed November 20, 2023 ........................................................................ JA207

Government's [Proposed] Surreply Regarding Defendant's Motion to Suppress
Evidence Seized Pursuant to Search Warrants
>> filed January 26, 2024 ............................................................................ JA237

Transcript of Motions Hearing before
The Honorable Deborah L. Boardman
>> on February 12, 2024 .............................................................................. JA251

Defendant's Exhibit List
>> filed February 12, 2024 ........................................................................... JA386

Government's Exhibit List
>> filed February 12, 2024 ........................................................................... JA388

Government's Motion *in Limine* to Preclude the Defendant from Introducing
Self-Serving Hearsay Statements and for a Pretrial Ruling Regarding
the Scope of the Rule of Completeness
>> filed June 26, 2024 ................................................................................. JA389

Government's Motion *in Limine* to Preclude Reference to the Existence and
Outcome of Prior State Trial
>> filed June 26, 2024 ................................................................................. JA403

Government's Motion *in Limine* to Preclude Any Reference to the Civil Suit
Filed by R.S. Against the Defendant, Unless and Until R.S. Testifies
>> filed June 26, 2024 ................................................................................. JA412

Government's Motion *in Limine* to Preclude Reference to the Dismissed Civil
Rights Indictment
>> filed June 26, 2024 ................................................................................. JA417

Proposed Order Re:  Government's Motion *in Limine* to Preclude Introduction
of Self-Serving Hearsay
>> filed June 28, 2024 ................................................................................. JA423

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to the Prior State Trial
>> filed June 28, 2024 ................................................................................. JA424

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to the Civil Suit (Unless Victim Testifies)
    filed June 28, 2024 .................................................................... JA425

Proposed Order Re:  Government's Motion *in Limine* to Preclude Reference
to Dismissed Indictment
    filed June 28, 2024 .................................................................... JA426

Government's Motion *in Limine* to Exclude Inadmissible and Irrelevant Evidence
Re:  R.S.'s Character
    filed June 28, 2024 .................................................................... JA427

Defendant's Omnibus Response to Government's Motions *in Limine*
    filed July 22, 2024 .................................................................... JA438

Government's Response to Defendant's Omnibus Motions *in Limine*
    filed July 29, 2024 .................................................................... JA448

Government's Reply to Defendant's Omnibus Response to Government's
Motions *in Limine*
    filed July 29, 2024 .................................................................... JA460

Defendant's Memorandum in Support of Motion to Impeach Sergeant Gill
    filed October 18, 2024 ............................................................... JA467

Government's Opposition to Defendant's Motion to Impeach a Government
Witness
    filed October 19, 2024 ............................................................... JA472

Defendant's Notice of Objection
    filed October 21, 2024 ............................................................... JA477

**VOLUME 2 OF 6**

Transcript of Bench Trial, Volume 1, before
The Honorable Deborah L. Boardman
      on October 22, 2024 ..................................................................... JA479

      Testimony of Mark Zimmerman:

Direct Examination by the Government (Ms. Allison) .......................... JA511
Cross-Examination by Defense (Mr. Zampogna) ................................. JA582
Redirect Examination by the Government (Ms. Allison)....................... JA616
Recross-Examination by Defense (Mr. Zampogna).............................. JA622

      Testimony of Brendan Gill:

Direct Examination by the Government (Ms. Bernstein)........................ JA624
Cross-Examination by Defense (Mr. Zampogna) ................................. JA673
Redirect Examination by the Government (Ms. Bernstein)................... JA701
Recross-Examination by Defense (Mr. Zampogna).............................. JA704

      Testimony of Doniese Collins:

Direct Examination by the Government (Ms. Bernstein)........................ JA710

Transcript of Bench Trial, Volume 2, before
The Honorable Deborah L. Boardman
      on October 23, 2024 ..................................................................... JA726

      Testimony of Doniese Collins:

Continued Direct Examination by the Government (Ms. Bernstein)..... JA734
Cross-Examination by Defense (Mr. Bluestone).................................... JA759
Redirect Examination by the Government (Ms. Bernstein)................... JA771

      Testimony of Lyla Zeidan:

Direct Examination by the Government (Ms. Allison) .......................... JA778
Cross-Examination by Defense (Mr. Bluestone).................................... JA800
Redirect Examination by Government (Ms. Allison) ............................ JA810
Recross-Examination by Defense (Mr. Bluestone)................................ JA814

Testimony of Elizabeth Hung:

Direct Examination by the Government (Ms. Bernstein)........................ JA815
Cross-Examination by Defense (Mr. Zampogna) ................................. JA851
Redirect Examination by the Government (Ms. Bernstein)................... JA878
Recross-Examination by Defense (Mr. Zampogna)............................. JA894

Defendant's Notice of Requested Instructions
    filed October 23, 2024 ..................................................................... JA909

Transcript of Bench Trial, Volume 3, before
The Honorable Deborah L. Boardman
    on October 24, 2024 ...................................................................... JA910

Transcript of Bench Trial, Volume 4, Verdict, before
The Honorable Deborah L. Boardman
    on October 30, 2024 ...................................................................... JA939

## VOLUME 3 OF 6

Government's Admitted Trial Exhibits:

1.  Incident Report [Certified Copy] ................................................. JA960

2.  RS Traffic Summons.................................................................... JA966

3.  RS Criminal Citation ................................................................... JA968

4.  (A-H)  Photographs of Station ..................................................... JA969

5.  (A-D)  Photographs of Dupree's Car ........................................... JA977

6.  (A-B)  Photographs of Vanderpool's Car .................................... JA980

7.  Vanderpool Time Sheets .............................................................. JA982

8.  CAD Report.................................................................................. JA986

10. Vanderpool Phone Extraction Audio Files ................................. JA989

11. Vanderpool Phone Extraction Messages to and from
    Dupree 9/17 ................................................................................. JA993

12.     Vanderpool Phone Extraction Messages to and from
Dupree 10/6 ....................................................................... JA1030

13.     PGCPD Chief Referral Letter [Redacted] ............................... JA1037

14.     FHPD General Order 2-2 Oath of Office ................................. JA1038

15.     FHPD General Order 5-8 Mobile Video Recording .................. JA1039

16.     FHPD General Order 5-12 Incident Reporting ......................... JA1044

17.     FHPD General Order 5-14 Traffic Law Enforcement ............... JA1051

18.     FHPD General Order 5-15 Traffic Law Enforcement
Methods ............................................................................. JA1065

19.     FHPD General Order 5-38 Prisoner Searches and
Transportation .................................................................... JA1075

20.     FHPD General Order 5-50 Towing of Motor Vehicles ............. JA1096

21.     FHPD General Order 8-1 Conduct of Members of the
Department ......................................................................... JA1101

22.     RMS Audit for RS Report [Certified Copy] ............................. JA1115

23.     RMS Audit of Vanderpool Logons, 8.7.18-9.28.19 ................... JA1131

24.     MPCTC Police Training Records (Excerpts) ........................... JA1132

25.     NoVa Academy Diploma ...................................................... JA1135

26.     WMATA Comparative Compliance Diploma ........................... JA1137

27.     Metro Transit Rules of Arrest and Arrest Procedures Lesson
Plan ................................................................................... JA1138

28.     Laws of Arrest Lesson Plan .................................................. JA1149

29.     Laws of Arrest PowerPoint (Excerpts) .................................... JA1166

30.     WMATA Training Ethics Essay ............................................. JA1167

31.     NVCJ Sex Crimes PowerPoint (Excerpts) ............................... JA1168

32.  NVCJ Constitutional Law and Civil Liability Lesson Plan........ JA1169

33.  NVCJ Constitutional Law and Civil Liability PowerPoint (Excerpts) ................................................................................ JA1195

41.  (A-D)  Tow Lot Photographs ................................................. JA1200

42.  C.C. Traffic Ticket [Redacted]................................................ JA1204

43.  Map: Tino's to Addison/Sheriff's to FHPD............................. JA1205

44.  Vanderpool Phone Extraction Timeline 9.6-9.7 ..................... JA1206

116.  Nnamani CAD ...................................................................... JA1214

117.  Audit Log Booking 143908-19-0002936............................... JA1216

118.  Audit Log Impound 42865-19-0002936 ............................... JA1222

119.  Timesheets 01.15.2019.......................................................... JA1228

Defendant's Admitted Trial Exhibits:

1.  RMS User Manual................................................................. JA1230

2.  FHPD General Order 6-5: Uniform Crime Reporting (UCR) ... JA1303

3.  Fairmount Heights Police Calendar – September 2019 ............ JA1305

4.  Police Report – Travis Nnamani ........................................... JA1306

5.  RMS Audit – Travis Nnamani ............................................... JA1312

6.  Photograph of FHPD Desktop Monitor ................................. JA1318

7.  Photograph of FHPD Entry Door........................................... JA1319

8.  Photographs of FHPD Station 9/6/2019................................. JA1320

9.  FHPD General Order 7-1: Computer Use and Security............ JA1329

10.  FHPD Time Sheets – 1/12/2019-1/25/2020........................... JA1333

11.  Letters Re: Suspension ......................................................... JA1335

**VOLUME 4 OF 6**

Regular Sentencing Order
filed October 30, 2024 ...................................................................JA1337

Verdict
filed October 31, 2024 ...................................................................JA1340

Defendant's Motion for Arrest of Judgment or, in the Alternative, Motion for
Judgment of Acquittal and New Trial
filed December 9, 2024 ..................................................................JA1341

Exhibit A:  State Warrant
dated December 2, 2019................................................JA1377

Exhibit B:  State Warrant
dated January 17, 2020................................................JA1383

Government's Response to Defendant's Motion for Arrest of Judgment or,
in the Alternative, Motion for Judgment of Acquittal and New Trial
filed December 23, 2024 ................................................................JA1389

Defendant's Reply in Support of Omnibus Post Trial Motions
filed January 8, 2025......................................................................JA1404

Memorandum Opinion Denying Defendant's Post Trial Motions
filed February 5, 2025....................................................................JA1419

Defendant's Sentencing Memorandum
filed February 6, 2025....................................................................JA1435

Attachment:  Letter in Support ............................................JA1464

Government's Response to Defendant's Sentencing Memorandum
filed February 13, 2025 ..................................................................JA1493

Transcript of Sentencing Hearing before
The Honorable Deborah L. Boardman
on February 20, 2025.....................................................................JA1509

Judgment in a Criminal Case
filed February 21, 2025 ..................................................................JA1619

Defendant's Notice of Appeal
    filed March 3, 2025......................................................................JA1624

Order Granting Consent Motion to Partially Unseal Documents
    filed May 15, 2025......................................................................JA1628

**VOLUME 5 OF 6 (UNDER SEAL)**

Defendant's Objections to Draft Presentence Investigation Report
    filed December 23, 2024 ............................................................JA1629

**VOLUME 6 OF 6 (MEDIA)[1]**

Government's Media Exhibits:

9.    Dispatch Recording ...................................................JA1637

9A.    Dispatch Recording [Demonstrative].......................................JA1638

34A.    9.8.19 WA0003 Excerpt 1 (Vanderpool to Washington)
With Captions [Demonstrative] ...............................................JA1639

35.    9.8.19 WA0003 Excerpt 2 (Vanderpool to Washington)...........JA1640

35A.    9.8.19 WA0003 Excerpt 2 (Vanderpool to Washington)
With Captions [Demonstrative] ...............................................JA1641

36.    9-9-19 WA0002 (Washington to Vanderpool) ..........................JA1642

36A.    9-9-19 WA0002 (Washington to Vanderpool) With Captions
[Demonstrative]........................................................................JA1643

37.    9-9-19 WA0003 (Washington to Vanderpool) ..........................JA1644

37A.    9-9-19 WA0003 (Washington to Vanderpool) With Captions
[Demonstrative]........................................................................JA1645

---

[1] Exhibits are in .mp4, .ogg, and .wav file format. A virus detection program, VIPRE Endpoint Security Version 13.1.8510, was run on the electronic files and no virus was detected.

38. 9-9-19 WA0004 (Vanderpool to Washington) ........................... JA1646

38A. 9-9-19 WA0004 (Vanderpool to Washington) With Captions [Demonstrative] ..................................................................... JA1647

39. 9-9-19 WA0005 (Washington to Vanderpool) ........................... JA1648

39A. 9-9-19 WA0005 (Washington to Vanderpool) With Captions [Demonstrative] ..................................................................... JA1649

40. 9-9-19 WA0006 (Vanderpool to Washington) ........................... JA1650

40A. 9-9-19 WA0006 (Vanderpool to Washington) With Captions [Demonstrative] ..................................................................... JA1651

✓ FILED ____ ENTERED
____ LOGGED ____ RECEIVED
4:18 pm, Oct 30 2024
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____MD____ Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

United States of America       *

      v.       *       **Criminal Case No. DLB 23-cr-234**

Martique Cabral Vanderpool       *

      ******

## REGULAR SENTENCING ORDER

(1)      On or before 12/9/2024 *(not more than 40 days from the date of this order)*, the Probation Officer shall provide the initial draft of the presentence report to counsel for the Defendant for review with the Defendant. If the Defendant is in pretrial detention, defense counsel may not provide a copy of the recommendations section of the presentence report to the Defendant in advance of meeting to review the presentence report, and may not leave the recommendations section of the presentence report with the Defendant once the review has taken place. The Probation Officer shall also provide the initial draft of the presentence report to counsel for the Government.

(2)      On or before 12/23/2024 *(not less than 14 days from date in paragraph 1)*, counsel shall submit, in writing, to the Probation Officer and opposing counsel, any objections to any material information, sentencing classifications, advisory sentencing guideline ranges, or policy statements contained in or omitted from the report.

(3)      After receiving counsel's objections, the Probation Officer shall conduct any necessary further investigation and may require counsel for both parties to meet with the Probation Officer to discuss unresolved factual and legal issues. The Probation Officer shall make any revisions to the presentence report deemed proper, and, in the event that any objections

1

Sentencing Guidelines Order - Regular (Rev. 12/2019)

JA1337

made by counsel remain unresolved, the Probation Officer shall prepare an addendum setting forth those objections and any comment thereon.

(4)     On or before 1/3/2025 *(not less than 11 days from date in paragraph 2)*, the Probation Officer shall file the report (and any revisions and addendum thereto) through CM/ECF.

(5)     If counsel for either party intends to call any witnesses at the sentencing hearing, counsel shall submit, in writing, to the Court and opposing counsel, on or before 2/6/2025 *(not less than 14 days before sentencing)*, a statement containing (a) the names of the witnesses, (b) a synopsis of their anticipated testimony, and (c) an estimate of the anticipated length of the hearing.

(6)     Sentencing memoranda are not required unless a party intends to request a sentence outside the advisory guidelines range on the basis of a non-guideline factor.  If submitted, they shall be filed with the Clerk and a copy delivered to chambers on or before 2/6/2025 *(not less than 14 days before sentencing)*.  Opposing or responding memoranda are not required.  If submitted, they shall be delivered to chambers on or before 2/13/2025 *(not less than 7 days before sentencing)*.  Copies of all memoranda must be sent to the Probation Officer.  Sentencing memoranda are not sealed documents.  If the memoranda or attachments contain sensitive material, they should be filed under seal and accompanied by a motion to seal.

(7)     If the Government intends to seek restitution, a memorandum requesting restitution and all supporting documentation shall be filed on or before 2/6/2025 *(not less than 14 days before sentencing)*.  Failure to provide the restitution information or an explanation for why the restitution information is not yet ascertainable by this date may result in an order to show cause

2

**JA1338**

why the information could not have been timely provided and may result in the Court denying or delaying restitution until after a hearing not to exceed 90 days after sentencing.

(8)    Sentencing shall be on 2/20/2025 at 10:00 a.m.

(9)    The presentence report, any revisions, and any proposed findings made by the Probation Officer in the addendum to the report shall constitute the tentative findings of the Court under section 6A1.3 of the sentencing guidelines.  In resolving disputed issues of fact, the Court may consider any reliable information presented by the Probation Officer, the Defendant, or the Government, and the Court may issue its own tentative or final findings at any time before or during the sentencing hearing.

(10)   Nothing in this Order requires the disclosure of any portions of the presentence report that are not disclosable under Federal Rules of Criminal Procedure 32.

October 30, 2024
Date

Deborah L. Boardman
United States District Judge

Sentencing Guidelines Order - Regular (Rev. 12/2019)

JA1339

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Crim. No. DLB-23-0234** |
| **MARTIQUE VANDERPOOL,** | * | |
| **Defendant.** | * | |

## VERDICT

In accordance with the Court's findings of fact stated on the record on October 30, 2024, the Court finds the Defendant Martique Cabral Vanderpool GUILTY of Count One of the Indictment, a violation of 18 U.S.C. § 1519.

Date: October 31, 2024

_____
Deborah L. Boardman
United States District Judge

JA1340

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Defendant Martique Vanderpool's Motion for Arrest of Judgment or, in the
Alternative, Motion for Judgment of Acquittal and New Trial**

Defendant Martique Vanderpool, by and through undersigned counsel,

hereby moves the Court to arrest judgment pursuant to Federal Rule of Criminal

Procedure 34.  Fed. R. Crim. P. 34.  Defendant Martique Vanderpool, in the

alternative, moves the Court to enter a judgment of acquittal on the charge of

Obstruction of Justice in violation of 18 U.S.C. § 1519 pursuant to Federal Rule of

Criminal Procedure 29.  Fed. R. Crim. P. 29.  Vanderpool moves the Court to order a

new trial in the interests of justice pursuant to Federal Rule of Criminal Procedure

33.  Fed. R. Crim. P. 33.

1

JA1341

## TABLE OF CONTENTS

Introduction                                                                    3

Background                                                                      4

Argument                                                                        8

Arrest of Judgment                                                             8

   I.     Standard of Review                                         8

   II.    The Court Lacks Jurisdiction Over This Case                9

Motion for Judgment of Acquittal and New Trial                               11

   I.     Standard of Review                                        11

       a. Motion for Judgment of Acquittal Under Rule 29          11

       b. Motion for New Trial Pursuant to Rule 33                12

   II.    The Evidence at Trial Failed to Prove that Vanderpool
        Wrote the Report                                        14

   III.   The Evidence at Trial Does Not Demonstrate that any
        Omissions Were Material                                 18

   IV.   The Introduction of Improperly Obtained Evidence
        Deprived Vanderpool of his Right to a Fair Trial        21

   V.    The Government's Misconduct Necessitates a New Trial       27

   VI.   The Government Abused Its Prosecutorial Discretion by
        Basing this Charge on Consensual Sex                    31

Conclusion                                                                     33

Certificate of Service                                                         35

Order                                                                          36

JA1342

## INTRODUCTION

The government's theory of criminal liability in this case fails and deprives this Court of jurisdiction. The government failed to allege any potential civil rights violation that could possibly give rise to an investigation within the jurisdiction of the Federal Bureau of Investigation. Therefore, this prosecution exists outside the scope of the statute is ostensibly seeks to enforce and the Court must arrest judgment against Vanderpool.

The Government failed to admit sufficient evidence for a finder of fact to find Vanderpool guilty. The evidence cannot demonstrate beyond a reasonable doubt that Vanderpool wrote the incident report; the government's limited circumstantial evidence rested on predictions and theories rather than fact. Even the government's primary agent assigned to this case, who investigated Vanderpool for over three years, stated that he did not know who wrote the report. From these facts, no reasonable fact-finder could find beyond a reasonable doubt that Vanderpool wrote the report in this matter.

The government's repeated violations of Vanderpool's constitutional rights necessitate that the Court order a new trial. The majority of the circumstantial evidence in this case originated from a series of faulty search warrants that made material false statements to the Court and relied on the testimony of Philip Dupree, a person that investigators knew at the time to be untrustworthy. Law enforcement further violated chain of custody rules in the handling of this key piece of evidence.

3

JA1343

Even at the trial the government repeatedly violated Vanderpool's constitutional rights to a fair trial. The government, in blatant violation of the Federal Rules of Evidence, used evidence solely for forbidden character purposes in paint Vanderpool as untrustworthy. The government further violated Vanderpool's constitutional rights to a fair trial by repeatedly introducing unproven allegations against Vanderpool to the finder of fact despite knowing that these allegations constitute *inadmissible evidence*.

For all of these reasons, the government's prosecution of Vanderpool fails and the Court must arrest the judgment against Vanderpool, or in the alternative, order a judgment of acquittal and a new trial.

## Background

On September 6, 2019, defendant Martique Vanderpool served as a police officer with the Fairmount Heights Police Department in Fairmount Heights, Maryland. Officer Vanderpool was working with Officer Philip Dupree, another member of the Fairmount Heights Police Department. The two were in an unmarked personal vehicle owned by Mr. Dupree when they observed a blue Mustang driven by R.S. (but owned by Delonte Samuel) driven at excess speed. Mr. Dupree, driving the vehicle, then pulled over the blue Mustang.

Officers Vanderpool and Dupree then spoke with the driver and sole occupant of the vehicle, R.S.. R.S. quickly became confrontational and began fighting with Officer Dupree. R.S. was eventually handcuffed and placed on the side of the road.

4

JA1344

The officers learned from the Prince George's County dispatch that R.S. did not have a valid driver's license. Therefore, the officers allegedly had the vehicle towed from the scene.

Officers Vanderpool and Dupree then allegedly brought R.S. to the Fairmount Heights Police Station, attached to the Fairmount Heights Municipal Building, in order to issue her tickets. At the station, Officer Vanderpool allegedly issued R.S. traffic citations and a citation for Disorderly Conduct. Following the issuance of the citation, Officer Vanderpool and R.S. engaged in consensual sex. After the sex, the government alleges that Vanderpool arranged for the vehicle to be returned to R.S. without R.S. having to pay any fee.

At 2:49am on September 7, 2019, an incident report in the record management system used by Prince George's County Police Department and sub-licensed to the Fairmount Heights Police Department. Gov. Ex. 22. The narrative section of the incident report was completed by the account associated with Martique Vanderpool at 3:23am on September 7, 2019.

On December 3, 2019, Mr. Vanderpool was arrested and charged with several offenses in Prince George's County District Court based on the stop. On January 17, 2023, a jury in Prince George's County Circuit acquitted Vanderpool of all charges related to nonconsent, including second degree rape and second degree assault.[1] Vanderpool was convicted of only a single misdemeanor count of sexual

---

[1] While Vanderpool was charged with first degree rape, the charge was dismissed after the close of evidence and so the jury never ruled on that charge.

JA1345

act with a person in custody in violation of Maryland Code, Crim Law § 3-314(e).  At sentencing, Vanderpool was sentenced to time served.

Furthermore, on December 2, 2019, state law enforcement applied to the Prince George's County Circuit Court for a warrant to search Mr. Vanderpool's personal residence.  This warrant failed to identify with any particularity the items to be seized and was overbroad based on the limited facts offered to support probable cause.  Additionally, this warrant request relied exclusively on information that law enforcement knew to be unreliable and false.

On January 17, 2020, Prince George's County Detective Savoy applied for a warrant to search a Samsung Galaxy S III phone that the government claimed was taken pursuant to the December 2, 2019 search warrant.  However, Detective Savoy made materially false statements in that request for a search warrant, including that the phone was taken during the search pursuant to the December 2, 2019 warrant.  Instead, as Detective Savoy knew, the government acquired the phone from Vanderpool during his arrest on December 3, 2019.  Furthermore, Detective Savoy declined to disclose that officers mishandled the phone, including placing it in an officer's pocket rather than in an evidence bag.

Almost two years following his initial appearance in state criminal court, on September 24, 2021 Vanderpool had his initial appearance in the U.S. District Court on an indictment which alleged a federal civil rights violation pursuant to 18 U.S.C. § 242 based on the same conduct for which Vanderpool was acquitted in state

6

JA1346

Court.  On July 17, 2023, the Court dismissed this indictment, without prejudice, upon the joint motion of the parties.

On July 6, 2023, a grand jury indicted Vanderpool on the single count of obstruction of justice in violation of 18 U.S.C. § 1519 at issue in this matter.[2]

On October 22, 2024, the government began its case in chief against Martique Vanderpool, charging him with one count of Obstruction of Justice in violation of 18 U.S.C. 1519.  The Court, ruling from the bench, found Vanderpool guilty on October 30, 2024.  This Motion for Arrest of Judgment or, in the alternative, New Trial, follows

On October 24, 2022, after the government closed its case in chief, Vanderpool made an oral motion for judgment of acquittal under Federal Rule of Criminal Procedure.  At the conclusion of oral argument on the issue, the Court denied that motion.  Vanderpool hereby incorporates arguments made during his oral motion for judgment of acquittal.

---

[2] Ironically, in bringing this case against Vanderpool for an alleged violation of policy and training, the government violated its own *Petite* policy by bringing this charge based on the same facts, incident, and evidence as a charge previously brought before a state court.  Justice Manual, 9-2.031 – Dual and Successive Prosecution Policy ("Petite Policy").

JA1347

## ARGUMENT

## ARREST OF JUDGMENT FOR LACK OF JURISDICTION

### I.   Standard of Review

Federal Rule of Criminal Procedure 34 provides that "upon the defendant's motion or on its own, the court must arrest judgment if the court does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34. This rule is mandatory.

A motion for arrest of judgment serves to "give the trial judge another chance to invalidate a judgment due to a fundamental error appearing on the face of the record." 3 Charles Alan Wright & Sarah N. Welling, Federal Practice and Procedure Crim. § 601 (4th ed. 2022). For the purposes of this motion, the "record" does not include evidence introduced at trial. *U.S. v. Esposito*, 492 F.2d 6, 9-10 (7th Cir. 1973). "A judgment can be arrested only on the basis of error appearing on the 'face of the record' and not on the basis of proof offered at trial." *Id.*

A motion for arrest of judgment occurs when the Court does not have jurisdiction over the matter charged in the indictment. If the Court does not have subject matter jurisdiction over the offense charged, the judgment is void. *In re Bonner*, 151 U.S. 242, 257 (1894). Subject matter jurisdiction can never be forfeited or waived. *United States v. Cotton*, 535 U.S. 625, 630 (2002).

JA1348

## II.   The Court Lacks Jurisdiction Over This Case

To obtain a conviction under 18 U.S.C. § 1519, the government must prove beyond a reasonable doubt that:

(1) The defendant made a false entry in a record, document, or tangible object;
(2) The defendant did so knowingly; and
(3) The defendant intended to impede, obstruct, or influence the investigation or proper administration of a matter within the jurisdiction of any department or agency of the United States.

*United States v. Hassler*, 992 F.3d 242, 246-7 (4th Cir. 2021) (citing *United States v. Powell*, 68- F.3d 350, 356 (4th Cir. 2012), superseded by regulation on other grounds as stated in *United States v. Carbajal*, 717 F.App'x 234, 240 (4th Cir. 2018)(unpublished)).

The Court lacks jurisdiction over the offense provided in the Indictment because the indictment does not allege any potential federal civil rights violation and therefore the Court must arrest the judgment against Vanderpool.

The indictment in this matter provides in relevant part that "the defendant wrote a false and misleading Incident Report, intended to cover up the fact that he had sex with a woman in his custody (which, if known, could be investigated as a potential federal criminal civil rights violation, within the jurisdiction of the FBI..." Indict., at 2.

The indictment claims that Vanderpool's alleged sex with a woman in his custody created a jurisdictional hook that permitted the FBI to investigate Officer Vanderpool.  However, sex with a person in custody cannot create any potential federal civil rights violation.  Fara Gold, Special Litigation Counsel for the DOJ's

JA1349

Civil Rights division, Criminal Section, wrote in the 2018 United States Attorney's

Bulletin that:

> Regardless of which Amendment forms the basis of the Constitutional
> violation, consent is a complete defense to a violation of Section 242. It
> may seem counterintuitive that a person in custody has the ability to
> consent to sexual contact with the individual who has authority over
> her. Nonetheless, unlike some statutes, Section 242 is not a strict
> liability statute.

Gold, Fara. *Investigating and Prosecuting Law Enforcement Sexual Misconduct*

*Cases*, End Violence Against Women International,

https://evawintl.org/resource_library/investigating-and-prosecuting-law-

enforcement-sexual-misconduct-cases/, at 5. Ms. Gold then goes to describe

circumstances which cannot constitute a violation of Section 242, including

transactional circumstances where an arrestee engages in sex in exchange for being

released. *Id.*

Sex in custody does not constitute a federal civil rights violation. Therefore,

no potential federal civil rights violation existed based on the events of September

6-7, 2019.

The indictment in this matter fails to allege that any lack of consent in this

matter, a matter needed to grant this Court jurisdiction. Instead, the indictment

states that Vanderpool wrote the incident report to cover up "sex in custody," which

cannot by itself form the basis of a federal civil rights violation. Therefore, the

indictment lacks any relevant allegations of fact that create federal jurisdiction.

JA1350

The Court must arrest judgment in this action because the indictment lacks any allegations placing it within the jurisdiction of the federal courts.[3] "[I]n the national courts a judgment in a criminal case must conform strictly to the act of congress which authorizes it." *Whitworth v. U.S.*, 114 F. 302 (8th Cir. 1902).

The FBI lacked the jurisdiction to investigate this matter and therefore the facts of this case exist outside the scope of the relevant statute, 18 U.S.C. § 1519. For that reason, the Court lacks jurisdiction to impose any sentence upon Vanderpool and must grant Vanderpool's Motion for Arrest of Judgment.


## MOTION FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

The Court must enter a judgment of acquittal as the evidence at trial lacks sufficient evidence to find a verdict of guilty. The Court must, in the alternative, grant Vanderpool a new trial in the interests of justice.

### I.    Standard of Review

#### a. Motion for Judgment of Acquittal Under Rule 29

Rule 29 of the Federal Rules of Criminal Procedure states that

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction.

---

[3] The actions of law enforcement bely the facts as the government sets forth in the indictment. When questioning R.S., the government determined to not ask about the questions which would establish jurisdiction. The questions asked by the government did not concern any of the factors which, in the indictment, the government erroneously claims establish a potential federal civil rights violation.

11

JA1351

Fed. R. Crim. P. 29(a).  In conducting this review, the court must sustain a guilty verdict if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by substantial evidence.  *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006).  The Fourth Circuit defined "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (citing *United States v. Smith*, 29 F.3d 914, 917 (4th Cir.), *cert. denied*, 513 U.S. 976, 115 S.Ct. 454, 130 L.Ed.2d 363 (1994)).

### b.  Motion for New Trial Pursuant to Rule 33

Federal Rule of Criminal Procedure 33 states that "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury the court may take additional testimony and enter a new judgment."  Fed. R. Crim. P. 33(a).

When a motion for a new trial attacks the weight of the evidence, the court's authority is much broader than when deciding a motion to acquit on the ground of insufficient evidence.  *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). The court is not constrained by the requirement that it view the evidence in the light most favorable to the government, and therefore it may evaluate the credibility of the witnesses.  *Id.*  When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new

JA1352

trial. *Id* (citing *Tibbs v. Florida*, 457 U.S. 31, 38 n. 11 and 44 n. 20, 102 S.Ct. 2211, 2216 n. 11 and 2220 n.20, 72 L.ed.2d 652 (1982); *United States v. Shipp*, 409 F.2d 33, 36-37 (4th Cir. 1969); 3 Wright, Federal Practice and Procedure § 553 (1982).

The interests of justice require that the Court order a new trial because the government failed to prove that Vanderpool wrote and therefore the verdict is against the weight of evidence *Tibbs v. Florida*, 457 U.S. 31, 42 (1982) (citing *Hudson v. Louisiana*, 450 U.S. 40, 44-45, n. 5, 101 S.Ct. 970, 972-973, n. 5, 67 L.Ed.2d 30 (1981)).

When evaluating a motion for new trial in the interests of justice, the district court must "balance the alleged errors against the record as a whole and evaluate the fairness of the trial." *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988).

The Sixth Circuit described that "[t]he cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012), *cert. denied*, 568 U.S. 1256 (2013)). As such, "[t]o warrant a new trial… the cumulative effect of the errors must have deprived [the defendant] of a trial consistent with constitutional guarantees of due process." *Id*. (citing *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)). The Eighth Circuit agrees, recognizing the right of a trial court to grant a new trial in the interests of justice when "the cumulative impact of the [] errors resulted in a serios violation of [the defendant's] right to a fair trial. *McBride,* 862 F.2d at 1319.

13

JA1353

## II.  The Evidence at Trial Failed to Prove that Vanderpool Wrote the Report

The weight of the evidence admitted at trial fails to demonstrate that Vanderpool wrote the report.  In order to find Vanderpol guilty of obstruction of justice under 18 U.S.C. § 1519, the government must prove beyond a reasonable doubt that:

(1) The defendant made a false entry in a record, document, or tangible object;

(2) The defendant did so knowingly;

(3) The defendant intended to impede, obstruct, or influence the investigation or proper administration of a matter within the jurisdiction of any department or agency of the United States.

*United States v. Hassler*, 992 F.3d 242, 246-7 (4th Cir. 2021) (citing *United States v. Powell*, 68- F.3d 350, 356 (4th Cir. 2012), superseded by regulation on other grounds as stated in *United States v. Carbajal*, 717 F.App'x 234, 240 (4th Cir. 2018)(unpublished)).

The government failed to prove the first element of 18 U.S.C. § 1519 because it provided insufficient evidence to establish that Vanderpool wrote the report.  The Court must enter a judgment of acquittal or, in the alternative, order a new trial because no finder of fact could find beyond a reasonable doubt that Vanderpool wrote the incident report.

14

JA1354

The evidence at trial demonstrated that the incident report originated from an unsecured computer on an account used by multiple people. Multiple Fairmount Heights Police Officers were at the station when someone wrote the report and the contents of the report lack knowledge that Vanderpool knew such as Vanderpool's identification number.

The government presented insufficient evidence to prove that Vanderpool wrote the report. The government admitted evidence only that the report was written in Vanderpool's name despite the fact that multiple members of the Fairmount Heights Police Department had access to the account. Gov. Ex. 22; Gov. Ex. 23. This account fails to provide sufficient evidence to demonstrate Vanderpool's guilt because the government failed to provide any direct evidence or even circumstantial evidence that Vanderpool wrote the report.

Because the evidence fails to show that Vanderpool wrote the report, the Court must grant Vanderpool's motions for judgment of acquittal and new trial.

The evidence at trial demonstrated that multiple people used Vanderpool's account to access the RMS system. People besides Vanderpool accessed Vanderpool's account in September 2018 during Vanderpool's suspension from all police activities. Gov. Ex. 23. Vanderpool could not access the RMS system during that period as the Fairmount Heights Police Department barred him from entering the police station, even providing a receipt for Vanderpool's police badge and identification card in July, 2018. Trial Transcript, Oct. 23, 2024, at 151:1-5.

15

JA1355

The weight of evidence of trial further failed to attribute the use of the account on September 6-7, 2019 to Martique Vanderpool. In fact, Agent Mark Zimmerman, the F.B.I. agent who served as the primary investigator of this incident from 2020 through the April 2024, testified that he did not know who wrote the report. Transcript, Oct. 22, 2024, at 134:21-22 ("I don't know who was behind the keyboard that typed the [report]"). Mr. Zimmerman further stated he could not recall any allegation that Vanderpool wrote the report in any of the numerous interviews that Zimmerman conducted. Trial Transcript, Oct. 22, 2024, at 110:19-111:1.

The government failed to evidence any information related to the account that could prove that Vanderpool used the account. Relevant attribution information which the government failed to admit, or even discuss, included "email accounts, passwords, PIN codes, account names, user names... [or] two step verification information." *United States v. Williamson*, 2023 WL 6210841 (M.D.F.L. 2023) (cleaned up). Despite having an extended period of amount of time to investigate this matter, the government failed to produce any of this evidence at trial (or even in discovery). In fact, Agent Hung stated that she did not even know the password. Trial Transcript, Oct. 23, 2024, at 140:11-12 ("Q: Do you know my client's, Vanderpool's password information? A: No").

The government failed to present any evidence of user attribution. Instead, Sergeant Gill speculated without basis that evidence would exist in the form of a username or password, though the government declined to provide that username

16

and password at trial.  In fact, Mr. Gill failed to even testify if logging onto the Prince George's County Report Management System requires a two-factor authentication or, if it does, what authentication system was used by the account associated with Mr. Vanderpool.

Furthermore, Sergeant Gill testified that he lacked knowledge of any methods used by the Fairmount Heights Police Department to keep access to the RMS system secure.  Trial Transcript, Oct. 22, 2024, at 202:4-7.  Sergeant Gill further demonstrated his ignorance of Fairmount Heights' lax security and reliability when he stated that Chief Watkins participated in the traffic stop with Vanderpool solely because Watkins' name appeared on the CAD report of the traffic stop.  Trial Transcript, Oct. 22, 2024, at 210:23-211:1 ("Q: I understand by looking at it, that's what it literally says; but that does it mean by having his name in the report, anything?  A: He [Watkins] was on that call for service, or that traffic stop").

The narrative section of the incident report evidences that someone other than Vanderpool wrote the report.  While Ms. Hung testified that the report was written in the first person, the report lacks any unique identifiers for Mr. Vanderpool.  Specifically, the report reads that "I was conducting stationary radar as a 2 man unit with Ofc. Dupree (#9360)."  Gov. Ex. 1, at 4.  In this narrative, the report identifies the writer only by "I" while simultaneously referencing Officer Dupree with his rank and badge number.  *Id.*  The manual for the records management system (RMS) used by the Fairmount Heights Police Department states that "when entering a narrative, officers are reminded to use their rank and

17

JA1357

last name followed by '#' and ID number... [and that] officers shall refrain from using "I" as the only method of identifying themselves." Def. Ex. 1, at 37.

In this matter, the incident report improperly uses only the first person "I" rather than contain Vanderpool's ID number. A reasonable factfinder must find that Officer Dupree may have written the report and therefore that Vanderpool could not have written the report beyond a reasonable doubt. The report writer properly identifies Officer Dupree while neglecting to provide Vanderpool's identification number, which Dupree may not have known. For that reason, the narrative section of the incident report evidences that Philip Dupree, and not Vanderpool, wrote the report.

Therefore, no reasonable fact finder at trial could find sufficient evidence to show that Vanderpool wrote the incident report. Multiple Fairmount Heights Police Department members used the account, and the government failed to provide any evidence attributing the account to Vanderpool. For those reasons, the Court must grant Vanderpool's motions for judgment of acquittal and for new trial as the evidence cannot sustain a guilty verdict.

## III.   The Evidence at Trial Does Not Demonstrate that any Omissions Were Material

Assuming, *arguendo*, that the evidence showed that Vanderpool wrote the report, the weight of the evidence cannot prove that any omissions from the incident report were material to the traffic stop. The government failed to demonstrate that any of the alleged omissions were material to the incident report of a traffic stop.

18

JA1358

The four omissions alleged in the indictment were:

1) That Vanderpool and Philip Dupree took R.S. to the police station

2) That Vanderpool engaged in sexual intercourse with R.S.

3) That Vanderpool and Mr. Dupree caused the vehicle driven by R.S. to be driving from the scene of the traffic stop

4) That Vanderpool procured the release of the vehicle to R.S. from the towing company without R.S. having to pay the release fee.

Indict., at 2.

The weight of the evidence failed to show that the report writer should have included that R.S. was taken to the Fairmount Heights Police Station in an incident report. Neither of the trainers provided by the government were familiar with the Fairmount Heights Police Department general orders or, in the case of Ms. Zeidan, even the rules governing Maryland police officers. Trial Transcript, Oct. 23, 2024, at 76:17-20.

Furthermore, the evidence demonstrated that an officer possessed discretion when determining whether to write a report for a minor offense such as disorderly conduct. "A report is **discretionary** for non-serious minor or miscellaneous offenses." Def. Ex. 2., at 1 (emphasis in original). Should a Fairmount Heights Police Department officer determine to write a report, the evidence at trial proved that they must abide by the terms of the PGPD Report Manual. Def. Ex. 2, at 1; Def. Ex. 1. The report manual for the Prince George's County Police Department Records Management System (RMS) used by the Fairmount Heights Police provides

19

JA1359

only that the narrative section of the report "must support all elements of the offenses listed on the offense tab." Def. Ex. 1, at 37.

In this matter, R.S. received citations solely for disorderly conduct, meaning that whether an officer determined to write a report remained within their discretion. Should that officer write a report, that report needed to include *only* the information necessary to establish the disorderly conduct charge. Pursuant to the FHPD rules, an officer writing this report had no obligation to provide information beyond that necessary to establish the charge.

The same standard applies to the alleged omission related to Vanderpool and R.S. engaging in sexual intercourse. The evidence admitted at trial failed to demonstrate that the Fairmount Heights Police Department requires that a sexual interaction following the conclusion of a police stop be placed into an incident report about that police action. Def. Ex. 1, at 37. Therefore, an omission related to sexual intercourse cannot be considered material.

The government failed to establish that any information related to the towing of the vehicle belonged in the incident report. The RMS manual states that "stolen, seized or recovered property shall not be documented in the narrative section." Def. Ex. 1, at 37. Furthermore, "[a]n impound <u>cannot</u> go within a case report." Def. Ex. 1, at 52 (emphasis in original). Because the incident report cannot include information related to an impound or towing, the Court cannot find a failure to include this prohibited information from the incident report to be a material omission.

20

JA1360

For those reasons, the weight of the evidence introduced at trial failed to demonstrate that any material omissions occurred and therefore the Court must order a new trial.

## IV.   The Introduction of Improperly Obtained Evidence Deprived Vanderpool of his Right to a Fair Trial

On December 2, 2019, state law enforcement officials applied to the Prince George's County Circuit Court for a warrant to search Mr. Vanderpool's residence, including ten categories of items to be seized, which included any and all electronic devices and any and all electronic media.  Ex. A.  The warrant lacked probable cause, omitted significant facts, and lacked necessary particularity on the items to be seized.

As a result of that search warrant, the government claimed to seize evidence which would later be used at the trial in this matter, including a phone associated with Martique Vanderpool.  However, that phone was seized outside the scope of the warrant (though law enforcement omitted this information from a future warrant request to gain access to the phone).  Prince George's County Detective Savoy filed a follow-up request for a warrant on January 17, 2020 to search a Samsung Galaxy S III phone.  Ex. B.  This phone contained evidence including the WhatsApp message and phone records introduced as evidence by the government. Gov. Ex. 10; 11; 12; 33; 34; 35; 36; 37; 38; 39; 40; 44.

21

JA1361

Furthermore, law enforcement declined to inform the Court that it violated chain of custody rules when seizing this phone.  Mr. Washington stated that he lacked knowledge of how long the phone remained unaccounted for following the arrest, but stated that "eventually a phone will go in an evidence bag."  Trial Transcript, Oct. 22, 2024, at 109:17.  This breach of chain of custody further shows that defects of the January 2020 search warrant, as it neglected that another person besides Vanderpool possesses the phone without handling the phone to preserve chain of custody.

Federal chain of custody rules emerge from Federal Rule of Evidence 901(a). *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982).  This rule requires that prosecutors establish a "chain of custody from the time the items were taken to show that they are substantially the same condition as when they were seized."  *United States v. Turpin*, 65 F.3d 1207, 1213 (4th Cir. 1995) (internal quotation marks omitted) (motion to exclude denied because movants declined to allege that the evidence was *exactly* "what the government says it is.") (citing *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.), *cert. denied*, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991)).  The government failed to demonstrate that the phone remained in the same condition, and did not provide Vanderpool with the phone to determine if it remains in the same condition.  Instead, the evidence demonstrates only that someone "eventually" placed a phone into an evidence bag.

JA1362

Vanderpool filed a Motion to Suppress Evidence Seized Pursuant to Search Warrants in anticipation of the government's intent to use improperly obtained evidence,. The Court later denied that motion following oral argument. That decision by the Court to permit the introduction of evidence seized from the search warrants improperly prejudiced Vanderpool and deprived him of his right to a fair trial under the Sixth Amendment of the United States. U.S. Const. Amend. VI.

Notably, the affidavit in support of the January, 2020 search warrant requested to "capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details" from the phone. Ex. B, at 4. The warrant request contained only one connection between the case and the phone: that during "the investigation, it has been determined that the Defendant photographed the victim with his cell phone." Ex. B., at 3. However, no law enforcement ever questioned R.S. regarding that photograph.

This search of Vanderpool's cell phone violated his Fourth Amendment rights. U.S. Const. Amend. IV. In order to be valid, a search warrant must be specific and articulate the reasons why the government possesses probable cause to seek the items sought. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Founders intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013 (1987).

23

JA1363

The vastly overbroad search in this case originated ostensibly from the limited reason of finding a photograph that Vanderpool allegedly took from his cellular device. This included reviewing WhatsApp audio messages, which could not contain the photograph used as a pretense for the government's general search of Vanderpool's phone. As such, at minimum the government lacked probable cause to search the WhatsApp audio messages that were later used at trial.

The information provided as the justification to be seized make numerous references to a "co-conspirator," even though law enforcement based the initial subpoena on statements made by Philip Dupree. Similarly, the request for the warrant contained a material falsity that the Samsung Galaxy S III had been found in an upstairs bedroom when officers had in actuality seized the phone outside Vanderpool's residence and contrary to the warrant that provided. *Compare* Ex. B; Affid. Of Special Agent Mark Zimmerman, ECF # 71, at 6. Therefore, the government illegally seized the phone and the warrant application seeking to search that phone improperly relied on falsehoods.

The December 2019 warrant is further deficient because law enforcement based probable cause on statements made by Philip Dupree but critically failed to include that state law enforcement maintained that Mr. Dupree remained dishonest in interviews. On December 3, 2019, within a day of submitting the initial warrant request, Detective Savoy conducted an interview with Mr. Dupree where she stated that multiple witnesses made statements disagreeing with Dupree's statements to her and that she believed that Dupree was present at the Fairmount Heights Police

24

JA1364

Station, contrary to Dupree's statements.  Interview with Ofc. Dupree, Dec. 3, 2019, USAO_0099477.

However, despite knowing that Dupree made multiple material false statements to law enforcement, law enforcement continued to exclusively rely on statements made by Dupree when making applications for a search warrant against Vanderpool.  Therefore police officials applying for this search warrant purposefully used unreliable information to violate Vanderpool's Fourth Amendment rights.  "When it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (cleaned up).

The Supreme Court has since indicated that a search of a cell phone exceeds even the breaches imposed by the search of a person's home.

> In 1926, Learned Hand observed... that it is a 'totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him.'  If his pockets contain a cell phone, however, that is no longer true.  Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of the home.

*Riley v. California*, 572 U.S. 373, 396 (2014) (citing *United States v. Kirschenblatt*, 16 F.2d 202, 203 (C.A.2. 1926) (cleaned up).  The Fourth Amendment issues related to the wide breadth of information available in a phone demonstrate that an overbroad search of a phone based on unreliable information raises distinct constitutional concerns.

JA1365

However, rather than hear evidence at a *Franks* hearing on these search warrants, the Court denied Vanderpool's motion to suppress based on an affirmation written by Special Agent Mark Zimmerman, one of the government's case agents at the time.  This statement alone provides insufficient rationale for the Court to deny a *Franks* hearing.  *United States v. Lewis*, 386 F.Supp.3d 963 (Wis. D.C. 2019) (holding the Court's denial of a *Franks* hearing based on the letter provided by the government to be improper).

The Court erred by not excluding the evidence obtained from the phone.  The Court must consider "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (citing Maguire, Evidence of Guilt, 221 (1959)).  The evidence seized from the phone, including phone call records and WhatsApp voicemails, originated from the illegal seizure of the phone, ostensibly under an illegal search warrant, and accessed through another illegal search warrant.  For that reason, the evidence from the phone was "fruit of the poisonous tree" and must be excluded as derivative of an illegal search.  *United States v. Jackson*, 638 F.Supp.3d 622, 644 (E.D.V.A. 2022).

The evidence seized by the government was material to the verdict reached. The government used the WhatsApp messages, for instance, in an attempt to prove Vanderpool's intent.  The government highlighted the importance of this evidence

26

JA1366

when it quoted from a WhatsApp message at the start of its closing statement. Trial Transcript, Oct. 24, 2024, at 5:7-9.

The Court's determination not to hold a *Franks* hearing on this matter improperly prejudiced Vanderpool and allowed the admission of otherwise inadmissible evidence which helped the Court find Vanderpool guilty. For that reason, the Court must grant Vanderpool's request for a new trial.

## V.   The Government's Misconduct Necessitates a New Trial

Following the conclusion of Vanderpool's closing statement, the government engaged in a lengthy rebuttal closing that seemingly eclipsed the length of its closing statement and only tangentially discussed Vanderpool's closing.

During the government's rebuttal closing, the government improperly stated that evidence of the police report related to the arrest of Travis Nnamani was "404(b)" evidence as to Vanderpool's character. Trial Transcript, Oct. 24, 2024, at 26:12-14. However, Federal Rule of Evidence 404(b)(1) states that "evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

The evidence was not admitted to demonstrate Vanderpool's character, but rather explicitly to demonstrate that officers may use another officer's account to write a report, in turn creating doubt as to whether Mr. Vanderpool wrote the report in this matter.

27

JA1367

The government ignored the purpose of this evidence and instead used it for an explicitly incorrect purpose: to state that Vanderpool had a character for dishonesty and "gumption." The prosecuting attorney's argument contained improper insinuations and assertions calculated to mislead the finder of fact. *Berger v. United States*, 295 U.S. 78, 85, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In fact, the government stated that an item of evidence, combined with pure speculation on their part indicated that Vanderpool had a character for "gumption" that would lead Vanderpool to have sex with a woman. Trial Transcript, Oct. 24, 2024, at 26:23-27:4 ("If that's true, Judge, that takes gumption, that takes the same kind of gumption…").

The government's flagrantly incorrect use of this evidence deprived Vanderpool of a fair trial. When reading the verdict, the Court stated that it considered all evidence and arguments brought in this case, which would include the government's improper arguments claiming that this evidence served as character evidence. Trial Transcript, Oct. 30, 2024, at 4:17-24; Trial Transcript, Oct. 24, 2024, at 25:10-13. The government even improperly used this character evidence in the closing of their rebuttal argument, stating that the Nnamani report demonstrates that Vanderpool had "gumption" that would be required to commit the acts at issue in the state trial.[4] Trial Transcript, Oct. 24, 2024, at 26:23-27:4

The government's assertion that it did not have knowledge of this evidence and that, if it did, it would have sought to admit it as 404(b) evidence, is unavailing.

---

[4] Once again, the government's closing statement demonstrated that it sought to convict Vanderpool based on the same evidence at the state trial in violation of the Department of Justice's *Petite Policy*.

JA1368

Dkt. 147, at 2.  The government, through its cooperation with the Prince George's County Police Department, possessed all records related to the RMS account associated with Martique Vanderpool, including this police report.  That the government did not determine to use this evidence by the time allotted by this Court to provide any 404(b) notice does not provide them carte blanche to ignore the Federal Rules of Evidence.

Furthermore, Federal Rule of Evidence 404 requires that the government notify the defendant if it wishes to use character evidence for a *legitimate purpose* in writing before trial, or in any form during trial if the court, for good cause, excuses lack of pretrial notice.  Fed. R. Evid. 404(b)(3)(C).  The government did not provide any notice during trial that this was being used for character purposes in defiance of the Federal Rules of Evidence.

Despite the Government's argument that it can draw improper inferences from evidence, the nature of the government's use of that evidence demonstrates that the government's rebuttal deprived Vanderpool of his right to a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181-182, 106 S.Ct. 2464, 91 L.Ed. 2d 144, 54 USLW 4734 (1986) ("the question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process").

The government demonstrated its intent to prejudice the Court through improper character evidence during the sidebar during Vanderpool's cross-examination of Ms. Hung, where attorneys for the government attempted to remind

29

JA1369

the Court, on the record, of investigations that occurred for other conduct. While incorrectly stating that Vanderpool was opening the door to character evidence, the government stated "[h]e's been investigated for a towing scheme, for –" before the Court instructed the government to halt its improper statements, saying "I don't need to hear it, I don't need to hear it." Trial Transcript, Oct. 23, 2024, at 147:3-5.

Regardless of the Court's efforts to silence the government, the government's repeated attempts to incorrectly limit defendant's evidence through the improper threat of character evidence demonstrate the government's intention to deprive Vanderpool of a fair trial. Despite their claim that these questions "open the door" for character evidence by the government, the mere threat of seeking to introduce these statements and the Court's acceptance of these threats by the government, show the prejudice that Vanderpool experienced at trial.

The government's claims related to their view of character evidence fail. As the D.C. Circuit eloquently stated,

> conviction of crime must rest upon proof beyond a reasonable doubt of the elements of a crime specifically charged, and evidence of a general predisposition toward crime is taboo. The prosecutor cannot offer bad-character evidence unless the accused first introduces evidence of good character, even then, the prosecutor's proof is restricted to community reputation, and to the trait or traits to which the accused's own character evidence related.

*United States v. Lewis*, 492 F.2d 632, 637-638 (D.C. Cir. 1973). Notably, the use of character evidence requires that the defendant *first* introduce evidence of good character. Vanderpool never introduced evidence of good character, nor did he intend to at any point prior to the government's assertions that Vanderpool was

30

"opening the door." Trial Transcript, Oct. 22, 2024, at 124:15-126:16 (notably, the government listed other incidents they consider "bad conduct" but ultimately had no objection to Vanderpool's question); Trial Transcript, Oct. 23, 2024, at 146:24-148:11; Trial Transcript, Oct. 23, 2024, at 148:18-149:22; Trial Transcript, Oct. 23, 2024, at 150:2-17.

The government's assertions, and the Court's acceptance of them, served to disrupt the trial and prejudice the Court against Vanderpool and deprive Vanderpool of a fair trial. Furthermore, the government's introduction of bad character evidence, and the statements made by the government about Vanderpool's character, infringed upon Vanderpool's right to a fair trial. For that reason, the government's rebuttal argument infringed upon Vanderpool's constitutional right to a fair trial and the Court must order a new trial.

## VI.   The Government Abused Its Prosecutorial Discretion by Basing this Charge on Consensual Sex

The Government, in an attempt to scandalize this case, improperly based this charge on an attempt to "cover up" a purely consensual sexual encounter. However, no potential federal crime existed. As discussed above, the evidence provided by the government at trial failed to show even a potential federal civil rights violation based on the consensual sex between Vanderpool and R.S..

Because no possible civil rights violation occurred, the government sought to establish that the Federal Bureau of Investigations could potentially investigate the

31

JA1371

sexual interaction as a possible civil rights violation through the unreliable testimony of their special agent Hung. The government's use of Agent Hung to establish cause to investigate cannot be credited as Ms. Hung only began working on this matter in 2024, approximately 4.5 years following the incident in this case and following the issuance of the indictment. Trial Transcript Oct. 23, 2024, at 91:12.

Agent Hung could not testify as to whether the Federal Bureau of Investigation began its investigation based on certain actions, but rather whether *she* would do, despite being a new member at the F.B.I. Trial Transcript, Oct. 23, 2024, at 92:14-15; 94:1-5. That does not establish that the federal bureau of investigations had jurisdiction to investigate the sexual interaction in this matter.

Ironically, a possible civil rights violation did occur which the government failed to establish that they investigated *whatsoever*. During the traffic stop, Officer Dupree threw R.S. to the ground after she behaved in a disorderly and dangerous manner. Officer Dupree's actions constituted a potential civil rights violation that could have been investigated by the Federal Bureau of Investigation.[5]

However, in order to charge a more scandalous offense and influence the trier of fact with an emotional, rather than logical and fact-based argument, the government elected to claim that an action that could not *possibly* be a civil rights violation would be investigated as a civil rights offense.

---

[5] Notably, Philip Dupree has been found guilty of a civil rights violation in violation of 18 U.S.C. § 242 for actions he undertook as an officer for the Fairmount Heights Police Department. Furthermore, he is currently facing charges in the District of Maryland for other actions taken as a Fairmount Heights Police Officer.

JA1372

Justice Breyer wrote that one cannot act with the intent to prevent something that could not take place, writing that "we can speak of a Colorado trout fisherman who tries to prevent his trout steam from being invaded by pike or carp, but in ordinary circumstances we cannot speak about trying to *prevent* the stream's invasion by whales." *United States v. Fowler*, 563 U.S. 668, 674-75 (2011).[6]  In this case, the government determined to charge a fisherman for trying to prevent the stream's invasion by whales, relying on the sensationalism that it provides to bolster their theory of the case.

Because no civil rights violation existed, the Court must recognize that the government's theory of the case infringed upon Vanderpool's right to a fair trial and order that Vanderpool be granted a new trial.

## Conclusion

The government's indictment fails and deprives this Court of jurisdiction to sentence Vanderpool.  The failure of the indictment to provide any possible rationale for obstruction of justice under 18 U.S.C. § 1519 shows because the Court lacks jurisdiction to sentence Vanderpool, it must arrest the judgment against Vanderpool.

In the alternative, the Court must grant Vanderpool's motions for arrest of judgment under Federal Rule of Criminal Procedure 29 and for new trial under

---

[6] While this case concerned obstruction of justice under 18 U.S.C. § 1512(b)(3), the requirement that a defendant possess the intend to obstruct the investigation of a potential federal crime is consistent between that charge and the one in this matter.

JA1373

Federal Rule of Criminal Procedure 33. The government failed to establish sufficient evidence for the Court to uphold a finding of guilt. Additionally, the misconduct committed by the government in prosecuting this case requires that the Court order a new trial in the interests of justice.

For all of the foregoing reasons, the Court must arrest judgment, enter a judgment of acquittal, and order a new trial.


Dated: December 9, 2024                    Respectfully Submitted,

                                           */s/ Christopher Zampogna*
                                           Christopher Zampogna
                                           Zampogna, P.C.
                                           2101 L St NW, Ste 300
                                           Washington, DC 20037
                                           (202)223-6635
                                           caz@zampognalaw.com

                                           */s/ Abraham Bluestone*
                                           Abraham Bluestone
                                           Zampogna, P.C.
                                           2101 L St NW, Ste 300
                                           Washington, DC 20037
                                           (202)223-6635 ext. 102
                                           ab@zampognalaw.com

JA1374

<u>Certificate of Service</u>

I hereby certify that on December 9, 2024, I served a true and correct copy of Vanderpool's Motion for Arrest of Judgment, Judgment of Acquittal, and New Trial on all parties involved via Pacer, the Court's ECF system.

<div align="right">

*/s/ Abraham Bluestone*
Abraham Bluestone
Zampogna, P.C.

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Order**

Upon review of Vanderpool's Motion for Arrest of Judgment or, in the
Alternative, Motion for Judgment of Acquittal and New Trial, any opposition and
responses, and upon the entire record herein, it is on this _____ day of _____,
202__, **HEREBY ORDERED** that

Vanderpool's Motion for Arrest of Judgment or, in the Alternative, Motion for
Judgment of Acquittal and New Trial is **GRANTED**.


**SO ORDERED.**


_____
HON. DEBORAH L. BOARDMAN
United States District Court Judge

JA1376

# EXHIBIT A

JA1377

**IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

I, Lieutenant M. Ebaugh #2849, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

## 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to _D. Engel_____ a judge of the Circuit/District Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of Criminal Law Article, CR §3-304, Annotated Code of Maryland.

## 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to search the item as described below:

**Single-family home located at ▇▇▇ Duel Place, Fairmount Heights, Prince George's County, Maryland 20743**

The place is described as a two-story single-family home with beige brick and dark shutters. The numbers "5115" are placed to the left of the door on a white placard with black numbers. There are three steps that lead to the front door with a white handrail.

## 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Lieutenant M. Ebaugh, #2849, is currently employed by the Prince George's County Police Department and is assigned to the Internal Affairs Division. Your affiant has been employed by the Prince George's County Police Department since Sep 7, 2004. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, robbery, assault, narcotic investigations, sex offenses, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland, resulting in the conviction of persons violating the laws of this State.

USA_000488

JA1378

## 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this affidavit is being submitted for the limited purpose of obtaining authorization to search a specific person, your affiant has not included each and every fact known to him concerning this investigation. Your affiant has set forth the facts that he believes are essential to establish the necessary foundation for the issuance of a search warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and witness officer , both Fairmount Heights police officers, conducted a traffic stop at Sheriff Road and Cabin Branch Drive, Capitol Heights, Prince George's County, Maryland. The Defendant and the witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.

The Defendant asked the Victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer placed the Victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the victim if she was a prostitute. The Victim kept asking the officer if he could release the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle, and he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, and was unable to leave because the Defendant had her detained in the police station and unwillingly complied with the Defendant's demand.

USA_000489

JA1379

The Defendant demanded that the Victim get on top of him and forced the victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost. Once the Victim was released, she immediately reported this incident to her mother.

During the investigation, detectives learned that the Defendant took a photograph with his cellular phone during the traffic stop. Additionally, the Defendant was not in full uniform during the traffic stop but was described as wearing tan kaki pants, and an army fatigue shirt.

During the investigation it was also stated that the Defendant used condoms, taken from the Victim's car, to have sex with her. There were multiple condoms and only one was used. The Vicitm described the condoms as Magnums with a gold wrapper.

On December 2, 2019, a warrant was obtained charging the defendant with Rape First Degree. Warrant #3E00665500.

During the investigation, a search was conducted through police databases, which shows Martique Cabarl Vanderpool has provided ▇▇ Duel Place, Fairmount Heights, Prince George's County, Maryland 20743, on numerous occasions as his residence, and recently advised his employer that this is his current address.

All events occurred in Prince Georges County, Maryland.

## 5. JUSTIFICATION OF PLACE TO BE SEARCHED:

Based on your Affiant's knowledge, training, experience, and the facts contained herein, your Affiant believes that evidence of violations of CR 3-304, Annotated Code of Maryland are contained in the residence identified at ▇▇ Duel Place, Fairmount Heights, Prince George's County, Maryland 20743.

Through my training, knowledge, and experience, your affiant knows that persons who commit crimes from which they derive personal satisfaction often keep mementos, trophies, or detailed accounts of their experiences. Based on the facts provided by the witnesses, it is your affiant's belief that the Defendant took photographs of the victim.

Your affiant knows that digital media such as photos can be stored in a variety of means such as on removable USB devices like flash drives or removable hard drives, or internal storage on electronic devices such as computers, cell phones, or tablets.

Your affiant is aware that electronic media with digital transmission capabilities can be used to transmit evidence into cloud storage services. Cloud storage is remote storage

**Page 3 of 7**

**USA_000490**

used to retain files such as images, videos, or documents without retaining them locally on a specific device, and multiple devices can be used to transmit or retrieve digital files. Your affiant further knows that electronic media may be shared between electronic devices via the cloud. Your affiant also knows that digital storage media can be very small and easily concealed in a variety of locations.

Based on the facts provided by the witnesses, the Defendant wore specific clothing that was not his police-issued uniform during the time that he committed these crimes. It was stated the Defendant stole gold wrapped Magnum condoms from the Victim's car and that all were not used that day and may be contained in the residence.

Your Affiant knows that persons involved in the crimes of violence often utilize cellular telephones to communicate with witnesses and possible co-conspirators before and after the commission of the crime and maintain records of these contacts within their cellular telephones.

## 6. DESCRIPTION OF ITEMS TO BE SEIZED:

- Any and all tan Khaki pants

- Army fatigue shirts

- Any gold wrapper Magnum condoms.

- Any and all electronic media capable of retaining digital image or video files, to include, but not limited to, tablets, computers, "smart" cell phones, USB storage devices such as flash drives or external hard drives, "SD" cards, memory cards, "smart" picture frames.

- Any and all still photography media such as prints of the known victim

- Any and all video graphics media, including, but not limited to digital video recorders (DVR) and digital video files,

- Any and all electronic devices with data transmission, internet access, or cloud storage capabilities to include, but not limited to, computers, tablets, cell phones, "smart" devices.

- Any and all diaries, journals, ledgers, memorandums, or notations of evidentiary value.

- To open any locked doors, drawers, compartments, containers, outdoor sheds, safes, lockboxes, or any other storage medium capable of concealing the aforementioned items.

USA_000491

JA1381

- Any documents, mail matter, of <u>Martique Vanderpool.</u>

For all of the foregoing reasons, I respectfully request that you issue a Search and Seizure Warrant for the above-described place.

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____          _____
Affiant's Signature                                      Date

_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203, ANNOTATED CODE OF MARYLAND ON THIS _____ DAY OF _____, 2019

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

Page **5** of 7

USA_000492

JA1382

# EXHIBIT B

JA1383

# IN THE CIRCUIT/~~DISTRICT~~ COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANT

I, Detective C. Savoy #2442, of the Prince George's County Police Department, the Affiant, being duly sworn, request the issuance of a Search and Seizure Warrant and states as follows:

### 1. APPLICATION AND VIOLATIONS OF LAW:

The Affiant hereby makes application to *Sean D. Wallace* a judge of the Circuit/~~District~~ Court for Prince George's County, Maryland for a Search and Seizure Warrant on the grounds that there is probable cause, the basis of which is set forth in the following affidavit which is attached hereto and made a part hereof, to believe that there is property subject to seizure under the laws of this State and more particularly in violation of CR 3-304, Annotated Code of Maryland.

### 2. DESCRIPTION OF PLACE TO BE SEARCHED

This Application and Affidavit are made to obtain authority to cellular phone number as described below:

Samsung Galaxy S III with HEX number 990 004 700 187 55

### 3. AFFIANT'S TRAINING AND EXPERIENCE:

That your affiant, Detective C. Savoy, #2442, is currently employed by the Prince George's County Police Department, and is assigned to the Internal Affairs Division, Special Investigative Response Team, located at 6707 Groveton Drive, Clinton, Maryland. Your affiant has been employed by the Prince George's County Police Department since March 16, 1998. Your affiant has received specialized training in the criminal laws of the State of Maryland, the detection of the violation of the laws, and the apprehension and prosecution of those responsible for violations. Your affiant has participated in investigations including: homicide, Departmental Internal Investigations, robbery, assault, narcotic investigations, sex offences, stolen vehicles, and handgun violations. Your affiant has made numerous arrests for violations of the laws of this State. Your affiant has testified in the courts of the State of Maryland as well as Federal court resulting in the conviction of persons violating the laws of this State.

### 4. FACTUAL BASIS FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since this is being submitted for the limited purpose of obtaining authorization to search a specific person/place or item, your affiant has not included each and every fact known concerning this investigation. Your affiant, Detective C. Savoy#2442, has set forth the facts that she believes are essential to establish the necessary foundation for the issuance of a Search and Seizure Warrant.

On September 6, 2019, at approximately 2322 hours, the Defendant, Martique Cabral Vanderpool, and a witness officer, both Fairmount Heights police officers, conducted a traffic stop at

USA_000495

JA1384

Sheriff Road and Cabin Branch Drive, Capitol Heights, Maryland. The Defendant and witness officer stopped the Victim, R.S., in a blue Ford Mustang bearing Maryland registration.
The Defendant asked the victim to step out of the vehicle because she did not have her driver's license on her person. The Victim became upset and wanted to leave. The Defendant
then told the Victim that he was going to impound her vehicle. The Victim began to cry and started to yell. The witness officer put the victim in handcuffs. The Defendant called a tow company to have the Victim's vehicle impounded.

While doing an impound inventory of the vehicle, the Defendant noticed some condoms in the armrest and asked the Victim if she was a prostitute. The Victim kept asking the officer can we do a hook and release of the vehicle, and the Defendant replied, "I'll see what we can do." The Defendant stated that maybe we could work something out. The Victim replied, "Why do we have to see; the car is right here now, the tow truck driver is right here now." The Defendant told the tow truck driver to take the vehicle in which he did. The witness officer left the scene, and the Defendant took the Victim to the Fairmount Heights Police Station located at 6100 Jost Street, Fairmount Heights, Prince George's County, Maryland.

The witness officer returned to the police station and observed the Victim sitting in a chair. Once at the police station, the Defendant began asking the Victim, "So what are we going to do about this?" The Defendant advised that the Victim could either have sex with the Defendant or get arrested and go to jail. The Victim feared for her safety, unable to leave because the Defendant has her detained in the police station, unwillingly complied with the Defendant's demand.

The Defendant demanded that the Victim get on top of him and forced the Victim to engage in vaginal intercourse. After the vaginal intercourse, the Defendant went to the back of the office and returned with citations for the Victim. The Victim was confused and crying. The Defendant then called the tow truck driver and had him release the Victim's vehicle to her at no cost.
Once the Victim was released, she immediately reported this incident to her mother.

On December 2, 2019, an arrest warrant was issued for the Defendant and he was charged with Rape and several other charges. During the course of the investigation it has been determined that the Defendant was in constant communication with the witness officer as well as the employees from the tow company from the time of the incident until the time he was arrested. The Defendant often frequents the Ebony Inn. On December 3, 2019, the Defendant was arrested and transported to the Department of Corrections.

On December 3, 3019, a search warrant was executed at the Defendant's residence at ███ Duel Place, Fairmount Heights, Prince George's County, Maryland. A Samsung Galaxy S III with HEX number 990 004 700 187 55 recovered from the upstairs bedroom in the Defendant's residence. During the course of the investigation it has been determined that the Defendant photographed the Victim with his cell phone.

All these events did occur in Prince George's County.

USA_000496

JA1385

Your affiant will use the data recovered from this search warrant to either validate or exclude Martique Vanderpool involvement in relation to the rape of R.S...

*Your affiant knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.*

## 5.  JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED:

Your affiant knows that when crimes are committed by one or more than one person, the individuals committing the crime often communicate in advance to plan the crime.  When these communications occur, they often occur by use of cellular telephones.  Your affiant also know that persons who commit crimes may also obtain information from employees of establishments as they may have personal and close relationship to such individuals, this information is often communicated through cellular phone communication When cellular telephones are used, certain information is generated and stored by the cellular carrier, including subscriber information, call detail records, text and call history, and cellular tower information. This information can then be used by investigators to place a particular phone at a general location at a particular time.  Furthermore, the call records can create connections between co-conspirators by showing the contact and communication they have leading up to the crime and after the crime.  The subscriber information can show a connection between the phone numbers whose records are being analyzed. Your affiant further knows that cellular telephones record and store valuable information pertaining to the handset's location even during periods of inactivity. This means that even if the cellular telephone was not actively engaged in a phone call during the incident, the cellular telephone may record location information which could place the handset in the area of the crime at the time of its occurrence. This information is typically captured on the handset and reflected on the call detail records as data usage, text logs, EVDO, PCMD or RTT.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

Samsung Galaxy S III with HEX number 990 004 700 187 55

And to capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

USA_000497

JA1386

I SOLEMNLY SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE
CONTENTS OF THIS APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE
WARRANT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND
BELIEF.

_____
Affiant's Signature

_____Detective C. Savoy #2442_____
Affiant's Printed Name and ID#

SUBSCRIBED AND SWORN IN ACCORDANCE WITH CRIMINAL PROCEDURE §1-203,
ANNOTATED CODE OF MARYLAND ON THIS

___17th___ DAY OF ___January___, 2020 at __2:12__ _pm_ hours

_____
SIGNATURE OF JUDGE

_____
JUDGE'S PRINTED NAME

USA_000498

JA1387

## IN THE CIRCUIT/DISTRICT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

### SEARCH AND SEIZURE WARRANT

TO: Detective C. Savoy #2442, of the Prince George's County Police Department

Upon reviewing the Application and the accompanying Affidavit of Detective C. Savoy#2442, of the Prince George's County Police Department, which is incorporated into this Warrant, I find there exists probable cause to issue this Search and Seizure Warrant. You are therefore commanded with the necessary and proper assistants to search forthwith the following place, cellular phone account, person, and/or motor vehicle and seize the following specified items:

1. **You shall conduct a search on the place, person, and/or motor vehicle, cellular phone number located at:**

    Samsung Galaxy S III with HEX number 990 004 700 187 55

2. **You shall seize the following items, evidence, and/or contraband:**

    Capture all stored data to include but not limited to: photographs, emails, text messages, video clips, contacts, and call details.

The above records shall be mailed to Det. C. Savoy #2442 at 6707 Groveton Drive, Clinton, Maryland 20743, and a digital copy E-mailed to CMSAVOY@CO.PG.MD.US

3. Upon execution of this Warrant, you shall leave an inventory of the items seized, together with a copy of this Warrant, Application, and supporting Affidavit (unless previously sealed by court order) with the person from whom the items are seized, or with the person in charge of the premises, or if neither of those persons is present, then in a conspicuous place on the premises.

4. You shall return this Warrant to me or, if I am not available, to any judge of this Court within 10 days of the date of its execution, along with verified inventory of the items seized.

5. If this Warrant is not executed within 15 days of its issuance, it expires and shall become null and void. This Warrant may be executed at any time of the day or night.

_1/17/2/20 at 2:12pm._

**DATE/ TIME**

**JUDGE'S SIGNATURE**

_Sean D. Walla_

**JUDGE'S PRINTED NAME**

USA_000499

JA1388

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. 8:23-cr-234-DLB** |
| **v.** | * | |
| | * | |
| **MARTIQUE CABRAL VANDERPOOL,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR ARREST OF JUDGMENT AND FOR ACQUITTAL OR A NEW TRIAL

The United States of America, by and through undersigned counsel, respectfully files this response to the defendant's motion for arrest of judgment or, in the alternative, for acquittal or a new trial (Doc. 156). Because the Court had jurisdiction to hear this case, and because overwhelming evidence proved the defendant's guilt beyond a reasonable doubt, this motion must be denied.

## ARGUMENT

Overwhelming evidence at trial proved that former Fairmount Heights Police Officer Martique Vanderpool obstructed justice by writing a false police report with intent to impede any future investigation into an incident that occurred on September 6-7, 2019. On that date, defendant Vanderpool and another officer arrested a distraught 19-year-old woman, R.S., and took her in handcuffs to the locked and otherwise-empty Fairmount Heights Police Department (FHPD) station, where the officers uncuffed her and Vanderpool told her to "make this right" before having sex with her while she was in custody.[1]

---

[1] The facts contained herein are based on the notes and best memory of government counsel; the government has not yet obtained a copy of the trial transcript.

JA1389

The evidence admitted at trial included, among other things, excerpts from the defendant's testimony at a prior proceeding in state court, during which the defendant admitted that R.S. was angry, erratic, and worried about her injured child; that he and his partner, Officer Phillip Dupree, transported R.S., in handcuffs, from the scene of the traffic stop to the otherwise deserted police station and had the car she was driving towed from the scene; and that the defendant then had sex with R.S. at the station before having the car released to her at no charge.  The evidence also included, among other things: recordings of voice messages the defendant left for a friend of his, during which the defendant boasted about his conduct with the 19-year-old woman and explained his belief that, by giving R.S. traffic tickets and a criminal citation, he could put himself in a better position if she made future allegations against him; the defendant's incident report, in which he omitted at least four major facts and in which he included at least one affirmative lie; testimony about the computer system through which the defendant submitted his report, which tracks the username and actions of any user who logs onto the system to write a report; and testimony from trainers who taught the defendant at two different police academies.

## I.    The Defendant Has Made Out No Claim for an Arrest of Judgment Under Rule 34.

Because the Court has subject matter jurisdiction over the charged offense, 18 U.S.C. § 1519, the defendant's Rule 34 motion must be denied.  Rule 34 calls for a post-conviction arrest of judgment "if the court does not have jurisdiction of the charged offense."  Fed. R. Crim. P. 34(a).  Jurisdiction is governed by 18 U.S.C. § 3231, which states that a U.S. district court "shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  Thus, if an indictment alleges a violation of a valid federal criminal statute, the district court has subject matter jurisdiction to hear the case, and the Rule 34 inquiry is at an

JA1390

end.  *United States v. Willix*, No. 23-13324, 2024 WL 1231048, at \*1 (11th Cir. Mar. 22, 2024) ("[A]ll that is necessary to vest the district court with jurisdiction is for a valid indictment to charge a defendant with a federal crime."); *United States v. Mackie*, No. 16-CR-00120 CRB, 2017 WL 512787, at \*2 (N.D. Cal. Feb. 8, 2017), *aff'd*, 720 F. App'x 872 (9th Cir. 2018) ("The offense charged in the indictment determines the threshold question of whether a court has subject-matter jurisdiction.").  Rule 34 is to be used when there is no valid federal statute charged, such as when an indictment charges a violation of a criminal statute that exceeded Congress's authority.  *See, e.g., United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250, at \*8 (D. Md. Dec. 22, 2022) (considering Rule 34 relief where the defendant alleged that the charged statute was unconstitutional).  The defendant makes no such motion here.

Unsurprisingly, a successful Rule 34 motion is exceedingly rare.  *See United States v. Houston*, No. CRIM.A. 3:13-10-DCR, 2014 WL 813975, at \*2 (E.D. Tenn. Mar. 3, 2014) ("[M]otions for [Rule 34] relief are rarely made, and it is even rarer that they are granted.") (internal quotations omitted).

Misunderstanding the severe limitations of Rule 34, the defendant has essentially raises a challenge to the sufficiency of the indictment—which must be raised, *prior to trial*, under Rule 12(b)—and recasts that out-of-time motion as a Rule 34 claim.  *See United States v. Muresanu*, No. 18-CR-129-JPS, 2018 WL 6434771, at \*5–6 (E.D. Wis. Dec. 7, 2018), *aff'd as to Rule 34 motion, vacated in part, remanded, on other grounds*, 951 F.3d 833 (7th Cir. 2020) (observing that "[i]t is true that a defective indictment that fails to state an offense can be challenged, just not under Rule 34," and noting that "such a challenge must be made under Rule 12(b)"); *see also* Fed. R. Crim. P. 12(b)(3)(B)(v) (requiring that a Rule 12(b) challenge be brought prior to trial). A challenge to the sufficiency of the indictment is not a challenge to the court's jurisdiction. *United States v. Cotton*, 535 U.S. 625, 626 (2002) (noting that "indictment defects do not deprive

JA1391

a court of its power to adjudicate a case."); *United States v. Sutton*, No. CR 21-0598 (PLF), 2024 WL 278070, at *3–5 (D.D.C. Jan. 25, 2024) (noting that defects in an indictment are not jurisdictional; rejecting a Rule 34 motion, nearly identical to defendant Vanderpool's, that argued that a charge under a related obstruction statute, 18 U.S.C. § 1512, failed to allege a federal crime because the police-officer-defendant's underlying conduct could not have constituted a civil rights offense).

Prior to 2014, a defendant could raise a Rule 34 claim if the court lacked jurisdiction *or* "if the indictment … d[id] not charge an offense." Fed. R. Crim. P. 34 (prior to 2014 amendment). However, a 2014 amendment struck from the rule that reference to the indictment, in order "to conform Rule 34 to Rule 12(b) of the Federal Rules of Criminal Procedure," which had by then been amended to set time limits on a claim that an indictment failed to state an offense. *United States v. Mowen*, No. 16-CR-30025-1, 2017 WL 2213121, at *5–6 (C.D. Ill. May 19, 2017) (discussing the 2014 amendment to Rule 34, after which a motion could no longer be "based on the fact that an indictment fails to charge an offense," and noting that, as a result, the entire Rule 34 inquiry is whether the indictment charges an offense over which the court has jurisdiction). Thus, since 2014, it is clear that a defendant who wishes to challenge the sufficiency of an indictment must do so prior to trial, under Rule 12(b). *United States v. Klaustermeier*, No. 17-CR-30001, 2021 WL 196682, at *9 (C.D. Ill. Jan. 20, 2021), *vacated and remanded on other grounds*, No. 22-3002, 2022 WL 17908836 (7th Cir. Dec. 23, 2022) ("Rule 34 no longer authorizes a district court to arrest judgment based on the fact that an indictment fails to charge an offense."). Accordingly, the defendant's Rule 34 motion must be denied.[2]

---

[2] Even if the defendant had raised this challenge properly—prior to trial, under Rule 12(b)—his claim would have failed because the indictment clearly charged the defendant with committing a federal offense, and it both alleged every element of the offense and set forth sufficient facts to put the defendant on notice of the charge against him. *See Hamling v. United*

JA1392

**II.     The Defendant's Rule 29 Motion Must Be Denied.**

Because the evidence at trial, viewed in the light most favorable to the government, easily and overwhelmingly supports the Court's guilty verdict, the defendant's motion for a judgment of acquittal pursuant to Rule 29 must be denied.  Under Rule 29, a court may order an acquittal only if, viewing all evidence in the light most favorable to the government, no rational trier of fact could have found the defendant guilty.  *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024) (noting that a court must deny a Rule 29 motion if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *see also United States v. Wiley*, 93 F.4th 619,

---

*States*, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").  Nevertheless, the defendant objects because, according to him, "the indictment does not allege any potential federal civil rights violation," Doc. 156 at 9, and because, he claims, his conviction can stand only if the matter he was obstructing (his sexual conduct with a 19-year-old woman, in his custody, who was transported to an abandoned police station in handcuffs) is itself proven to be a federal crime, *Id.* at 9-10 (implying that, because purely consensual sex between an officer and a person in his custody is not a violation of 18 U.S.C. § 242, the FBI lacked jurisdiction over the matter the defendant was accused of obstructing).  The defendant is wrong on both counts.

First, as the defendant himself noted, the indictment alleged that "the defendant wrote a false and misleading Incident Report, intended to cover up the fact that he had sex with a woman in his custody (which, if known, could be investigated as a potential federal criminal civil rights violation, within the jurisdiction of the FBI…").  Doc. 156 at 9 (quoting the indictment).  The indictment also alleged that R.S. was 19 years old and that the defendant and another officer took her to an abandoned police station in handcuffs following the traffic stop and that he had sex with her there.  Even if it were necessary to plead facts justifying the possibility of a potential federal investigation that the defendant intended to influence, these allegations are more than enough to explain why the defendant's conduct could be investigated as a possible violation of § 242.

Second, a matter does not have to be a provable federal crime in order to fall within the jurisdiction of the FBI and give rise to a § 1519 charge.  *See, e.g., United States v. Yancey*, 155 F.3d 564, *4 (4th Cir. 1998) (noting that § 1519 does not require proof that "the defendant or anybody else was convicted of the underlying offense" or even that the underlying offense "could be shown to have been committed at all").  The FBI necessarily has jurisdiction to investigate matters for the very purpose of determining whether or not they constitute federal crimes.

632 (4th Cir.), *cert. denied*, 144 S. Ct. 2648 (2024) (noting that in reviewing a Rule 29 motion, the court must "review the evidence in the light most favorable to the government").

The defendant here argues that the evidence at trial was insufficient to sustain the Court's verdict. As is clear from the standard noted above, a "defendant bringing a sufficiency challenge bears a heavy burden, and reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Smith*, 21 F.4th 122, 140 (4th Cir. 2021). This is not such a case.

Here, there is no question that a rational fact-finder could find the defendant guilty (and a rational fact-finder *did* find the defendant guilty) of obstructing justice by writing a false report. To obtain a conviction under § 1519, the government had to prove beyond a reasonable doubt (1) that the defendant knowingly falsified or made a false entry in his incident report regarding his interaction with R.S; (2) that the defendant acted with the intent to impede, obstruct, or influence an actual or contemplated investigation of that matter; and (3) that the matter was within the jurisdiction of the FBI. *See* 18 U.S.C. § 1519; *United States v. Hassler*, 992 F.3d 242, 246-7 (4th Cir. 2021). During a three-day bench trial, the government presented overwhelming evidence of each of these elements.

A. The Government Proved that the Defendant Wrote the False Report.

Despite overwhelming evidence presented at trial, the defendant claims that the evidence was insufficient to support the Court's finding that the report at issue here was written by the defendant—even though it was written in the *defendant's* name, by someone using the *defendant's* unique user ID and password, and even though it purported to summarize the *defendant's* interactions with a woman the *defendant* had arrested earlier that night. In fact, the government presented overwhelming evidence on this point, any piece of which a rational fact-finder could have relied upon to conclude that the defendant wrote the report. The evidence

included, but was not limited to: evidence that the report was written from the defendant's personal Report Management System (RMS) account, which could be accessed only through the use of the defendant's unique, personal username and password combination; evidence that the report was composed on a computer in the quiet Fairmount Heights police station, moments after the defendant stopped a motorist less than half a mile away from that station and moments before the defendant clocked out at the end of his shift; and evidence that the report was written in the first-person, from the defendant's perspective, about an arrest the defendant had just made during that same shift.  Additionally, the government offered evidence that the report included details about the defendant's interaction with R.S. that matched the details that defendant Vanderpool would later provide to his friend, Mr. Washington, to whom he bragged in WhatsApp voice recordings about his sexual exploits with his 19-year-old arrestee.  For example, both the report and the defendant's voice messages to Mr. Washington note that R.S. was speeding; that she had no license; that she was driving someone else's car; that she was acting erratically and running into the street; that she was placed in handcuffs; and that she banged her head against the car while calling herself stupid.

The defendant implausibly claims that *no* rational juror could conclude, based on that evidence, that the defendant wrote the report he was accused of falsifying.  And he defies logic when he suggests that no rational juror could have drawn *any* conclusion other than that the defendant's partner that night, Officer Phillip Dupree, could have written the report in the defendant's name. Doc. 156 at 18.  Interestingly, the defense did not primarily argue at trial that Dupree wrote the report, but rather simply that *someone else* wrote it.  And that choice is unsurprising, given that the WhatsApp voice recordings admitted at trial included both a statement by the defendant that Officer Dupree regularly had sex with women in custody and declined to give them tickets, and an explanation by the defendant that he disagreed with Dupree's

approach and thought instead that leaving a paper trail would serve him better if R.S. later filed a complaint. Based on this information about Officer Dupree, a rational trier of fact would likely conclude that Officer Dupree, who thought it unwise for an officer to leave a paper trail regarding an incident in which the officer had sex with a woman in his custody, was the *least* likely person to have written a report doing precisely that.[3]

> B. The Government Proved that the Defendant Made Materially False Omissions in his Report and Made an Affirmatively False Statement.

Evidence at trial also overwhelmingly demonstrated that the defendant's report contained multiple material omissions and an affirmatively false statement that rendered the report false. The first element the government had to prove at trial was that the defendant knowingly falsified or made a false entry into a record or document. 18 U.S.C. § 1519. A false entry includes a material omission. *United States v. Underwood*, 95 F.4th 877, 889 (4th Cir. 2024) (finding a

---

[3] In his own rendition of the "facts" (Doc. 156, p. 5), the defendant entirely ignores the requirement that he view the evidence *in the light most favorable to the government*; even more, he includes claims that were not presented at trial at all. For example, the government is not aware of any evidence at trial: that the defendant and Officer Dupree took R.S. to the police station "in order to issue her tickets" (in fact, the evidence at trial was that the officers could have issued the same tickets without ever having left the scene of the traffic stop); that "after the sex," the defendant arranged for the car to be returned to R.S. (in fact, the evidence at trial, from the defendant's own prior testimony, was that the conversation about the car occurred *before* the sex); that the defendant issued his citation to R.S. prior to the sex act (the government does not believe that there was any evidence admitted regarding the timing of the issuance of the ticket); or, most importantly, that the defendant and R.S. "engaged in consensual sex" (there was no evidence at trial that the sex was consensual, and there was an abundance of evidence that, viewed in the light most favorable to the government, leads to the conclusion that the sex was in fact coercive). Additionally, the following "facts" on pages 15 and 18 are not supported by the evidence, taken in a light most favorable to the government: that "multiple members of the [FHPD] had access to [the defendant's RMS] account"; that the defendant "could not access the RMS system [in September 2018 during his suspension]"; that FHPD "barred him from entering the police station" during his suspension; or that "[m]ultiple [FHPD] members used [the defendant's RMS] account." The defense argued these points, but most were not supported—and none were established—by the evidence. Lastly, the defendant's discussion of what reports FHPD officers were and were not required to write views the evidence in the light most favorable to the *defendant*, not the government, and entirely ignores the testimony of the people who trained the defendant.

material omission in an officer's report sufficient to uphold a § 1519 conviction); *see also United States v. Singh*, 979 F.3d 697, 716 (9th Cir. 2020) ("[M]any courts, including our own, have found that an omission with the requisite mental state satisfies the element."); *United States v. Lanham*, 617 F.3d 873, 887 (6th Cir. 2010) ("Material omissions of fact can be interpreted as an attempt to 'cover up' or 'conceal' information" such that a report is false).

Here, the government proved multiple material omissions. According to the report the defendant wrote, he and Officer Dupree stopped R.S. for speeding, briefly handcuffed her at the scene, and then returned the car she had been driving to the registered owner and sent R.S. on her way. As alleged in the indictment and proved at trial, the report omitted multiple material facts, including that the officers took R.S. in handcuffs from the scene; that they had the car towed; that they transported R.S. to an empty FHPD station; that the defendant then had sex with R.S.; and that the defendant and Dupree later took R.S. to the tow lot to get back the car she had been driving (which belonged to her boyfriend).

In addition to hearing evidence about what happened during the night of R.S.'s arrest, the Court heard from two witnesses who trained the defendant at two different police academies, and from the Prince George's County police sergeant who designed the RMS system on which the defendant wrote his report. The first trainer-witness, Lyla Zeidan, testified that she taught the defendant, among other things, that a person in custody cannot consent to sex. The other trainer, Doniese Collins, taught the defendant that an officer making a traffic stop that turns into an arrest must notify dispatch of the arrest, of the officer's odometer reading, and of the officer's destination. Officer Collins also taught the defendant that reports must be complete, and must include, among other things, the fact of an arrest, the details of the arrest, the fact of an automobile impound, and the destination of a police-transport. A third witness, Sgt. Brendan Gill, introduced the dispatch recording for the incident involving R.S., which revealed that the defendant initially

JA1397

called in the traffic stop, ran the plates of the car R.S. was driving, and ran a check on R.S.'s name, before going radio-silent and failing to report that he had arrested R.S., that he and Dupree had the car towed, that they left the scene with R.S., or that they transported her to the empty FHPD station. Additionally, the government introduced the WhatsApp messages mentioned above, in which the defendant explained that he left a paper trail (of tickets and a citation) regarding his arrest of R.S. specifically so that if R.S. later filed a complaint against him, the paper trail would make his interaction with R.S. look like a normal traffic stop. Together, this evidence more than demonstrates that the defendant knew that he had engaged in improper conduct with R.S. and that his omissions were material efforts to cover up his wrongdoing.

Notably, the defendant, in his motion for acquittal or a new trial, fails to mention at all that he was charged not only with omissions, but also with an affirmatively false statement: that the car was returned to the registered owner. Even if the defendant were correct in his claim that none of the alleged omissions was material, the Court would still be required to deny his Rule 29 motion because incontrovertible evidence – including the defendant's own admissions – showed that the report's claim regarding the return of the car was affirmatively false; the car was returned to R.S., not to her boyfriend who owned the car.

For these reasons, the defendant's Rule 29 motion must be denied.[4]

### III.    The Defendant's Rule 33 Motion Must Be Denied.

Under Rule 33 – a remedy that courts should use sparingly, and "only when the evidence weighs heavily against the verdict," *United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250, at *5 (D. Md. Dec. 22, 2022) – a court may vacate a conviction and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. A new trial is warranted "only [w]hen

---

[4] For the same reasons these claims fail to justify a judgment of acquittal under Rule 29, they fail to justify a new trial under Rule 33.

the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Tejan*, No. CR DKC 21-0101, 2024 WL 263581, at *2 (D. Md. Jan. 24, 2024).

The defendant alleges that the interests of justice require a new trial here because, according to him, his due process rights were violated in three ways. The defendant claims, first, that the Court improperly admitted the WhatsApp messages that the government obtained from the defendant's phone; second, that the government made improper arguments during its rebuttal closing; and third, that the government abused its prosecutorial discretion in its charging of the case. Each of these claims is baseless.

A. The Court's Admission of Evidence from the Defendant's Phone Was Proper; and the Government Did Not Make Any Improper Argument During Rebuttal Closing.

The defendant's first two due process claims have been fully litigated elsewhere. First, before trial, the defendant filed multiple motions to suppress evidence obtained from his phone, and the government filed multiple responses. The Court held a day-long hearing focused largely on this issue and ultimately denied the defendant's motion. The government hereby incorporates its previous responses and arguments on this issue, as well as the Court's ruling, issued from the bench. Doc. 17 (Government's Response in Opposition to Defendant's Motion to Suppress); Doc. 44 (Government's Surreply in Opposition on Defendant's Motion to Suppress); Doc. 58 (Hearing on Motion to Suppress). For the reasons this Court gave in its opinion denying the defendant's suppression motion, evidence from the defendant's phone was properly admitted.

Second, following trial, the defendant filed an "objection" to the government's rebuttal closing, in which he raised substantially the same claims of improper argument that he now raises in his motion for a new trial. The government filed a response, which it hereby incorporates.

JA1399

Doc. 147. For the reasons set forth in that document, the government's rebuttal argument was entirely proper and does not warrant a new trial.[5]

B. The Government Did Not Abuse Its Prosecutorial Discretion.

Lastly, the defense claims that the government, "in an attempt to scandalize this case," "abused its prosecutorial discretion" by basing the charge against the defendant "on an attempt to 'cover up' a purely consensual encounter." Doc. 156, at 31. The government did not abuse its discretion, and the defendant has not begun to carry its "heavy burden" of proving that it did so. *See United States v. Ball*, 18 F.4th 445, 454–55 (4th Cir. 2021) (noting that a prosecutorial charging decision "is presumed to be a legitimate response to perceived criminal conduct") (quoting *United States v. Goodwin*, 457 U.S. 368, 373 (1982)).

Moreover, the defendant's allegation fails from the start because it is based on an incorrect legal premise and a false factual claim. The incorrect legal premise is that "sex with a person in custody cannot create any potential federal civil rights violation." Doc. 156, at 9. Although it is true that not *every* instance of "sex with a person in custody" violates federal law, it is equally true that many instances of sex with a person in custody involve force or coercion and therefore do constitute federal civil rights violations. The false factual claim is that the evidence at trial "failed to show even a potential federal civil rights violation based on the consensual sex between Vanderpool and R.S." *Id.* at 31. In fact, the uncontradicted evidence at trial (which came from

---

[5] In his motion for a new trial, the defendant also raises a new allegation – that the government "demonstrated its intent to prejudice the Court" during a sidebar during trial. Quite to the contrary, the government during that sidebar attempted to protect the defendant from inadvertently opening the door to evidence he had previously fought to keep out. The defendant incorrectly claims that the Court "instructed the government to halt its improper statements." The government does not believe that the Court suggested in any way that the government's statements were "improper"; rather, the Court, balancing its dual role as trier-of-fact and presiding judge responsible for ruling on matters of law, decided that it did not need to hear details about the evidence to which the defendant was arguably opening the door.

JA1400

the defendant's own prior testimony) established that the defendant arrested a 19-year-old woman who was distraught about being kept from her injured son, who was acting erratically and running into traffic, who was self-harming by banging her head on the side of a car while berating herself, and who was transported in handcuffs from the scene of a traffic stop to a deserted police station in the custody of two police officers; and that the defendant then told her something to the effect of that she had to "make things right," before he took off his pants and had sex with her in the main room of the police station, with the door wide open and the other police officer standing nearby. Those facts easily give rise to a "potential" federal civil rights violation, as there is nothing about them that suggests that this was a consensual encounter.

Because the facts of this case are based on an attempt to cover up conduct that clearly could have amounted to a federal civil rights violation, the government unquestionably had probable cause to bring a § 1519 charge against the defendant, and there was no abuse of discretion in doing so. *United States v. Mosby*, No. 22-CR-00007-LKG, 2022 WL 1120073, at *4 (D. Md. Apr. 14, 2022) ("[I]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [her] discretion.") (internal quotations omitted).

## IV. Conclusion

For the reasons set forth herein, the defendant's motion to arrest judgment, to set aside the defendant's conviction, and to order a new trial must be denied.


Respectfully submitted this 23d day of December, 2024.

Kristen Clarke
Assistant Attorney General
Civil Rights Division

*/s/ Barbara Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

JA1402

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO ARREST JUDGMENT OR FOR ACQUITTAL OR A NEW TRIAL has been served by e-filing upon counsel for the Defendant, this 23d day of December, 2024.

*/s/ Bobbi Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Defendant Martique Vanderpool's Reply in Support of
Vanderpool's Omnibus Post Trial Motions**

Martique Vanderpool, through undersigned counsel, hereby replies in
support of his motions for a judgment of acquittal, new trial, and arrest of
judgments.  Vanderpool further requests a hearing on the government's misconduct.

The Government's opposition fails and therefore the Court must grant
Vanderpool's omnibus post-trial motions.

**The Government's False Statements at Trial Necessitate a New Trial**

Notably, the government almost entirely omits arguments related to their
improper statements in the closing.  Instead, the government merely incorporated
their knowingly false arguments from their opposition to Vanderpool's Objections to
Government's Rebuttal.  Remarkably, the government's arguments in their
objection to rebuttal rely on the incorrect presumption that Vanderpool falsified the
Nnamani report.

1

JA1404

The government argues that Vanderpool falsified this report despite the fact that in a sealed letter on January 2, 2025, the government wrote that it "concedes that some of the inferences it drew at trial appear not to be accurate."

In their objection, the government states that it "would very likely have offered this evidence" in a 404(b) notice.  ECF 147, at n. 1.  This note contains the government's affirmative statement to the Court that Vanderpool falsified the Nnamani report.  That statement fails.

The Government produced to Vanderpool over 106,000 items of discovery in the spring of 2024.  Prior to that production, the government presumably had possession of these items since 2022, when it filed the initial complaint against Vanderpool for a violation of civil rights under color of law.

Despite stating that the government remained unaware of Mr. Nnamani prior to shortly before trial, the Government produced to Vanderpool the body worn camera (BWC) footage from the incident.  That BWC footage below reveals that Vanderpool stopped his vehicle to assist Ivey at a traffic stop.

2

JA1405



US0002687.

When Vanderpool arrived at the scene, Ivey had already engaged in conversations with the driver, later identified as Mr. Nnamani.  Visually, this can be determined by the fact that Ivey hands Officer Vanderpool Mr. Nnamani's drivers license, which was in Ivey's hands when Vanderpool arrives (see below).

JA1406



US0002687.

Vanderpool then engages in a conversation with Mr. Nnamani, even referring to him by name.  US0002687.  Eventually, Vanderpool engages with Ivey and Mr. Nnamani while Mr. Nnamani is handcuffed in Ivey's police vehicle and Ivey reviews documents provided by Mr. Nnamani..



US0002691.

JA1407

This information proves that the government knowingly possessed proof that Ivey led the traffic stop, and later arrest, of Mr. Nnamani.  However, despite that, the government vehemently and falsely argued that Vanderpool  engaged in falsehoods by lying about Ivey's involvement.

Ms. Bernstein stated in closing:

> Why did he arrest Nnamani and then write a report making it look like Ivey did it?  Who knows?  Maybe Ivey needed an alibi for something, maybe Defendant Vanderpool didn't want to have to go to Court against Nnamani, who knows?  All you can know, Judge, is what the documents tell you, and those documents sure seem to tell you that Defendant Vanderpool, charged with falsifying the police report, came in here and offered this Court yet another falsified police report.

Trial Transcript, Oct. 24, 2024, at 26:15-22.  These comments contain multiple untrue statements known to the government.[1]

The government knew that Ivey began the traffic stop of Mr. Nnamani because the government produced the BWC footage of the incident.  A prosecutor is "deemed to have knowledge of and access to anything in the possession, custody, or control of any federal agency participating in the same investigation of the defendant."  *U.S. v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989) (adopted by the 4th Circuit in *U.S. v. Rawle*, 927 F.2d 597 (4th Cir. 1991).  As such, because the Federal Bureau of Investigation possessed these videos as part of the investigation into Vanderpool, the prosecution knew of these videos.

---

[1] Vanderpool notes that while the government may claim that it lacked knowledge of their falsehoods, the Court can consider whether the government "should have known" the falsehood of their statements and evidence.  *United States v. Agurs*, 427 U.S. 97, 103 (1976).

5

JA1408

The government, in its letter to the Probation Office, claimed that it "had not watched, and was not aware of, the footage related to Nnamani's arrest." That argument defies the facts and logic. In order to produce these items (much less make a production log), the government must know the contents of its discovery productions. Furthermore, Vanderpool specifically drew attention to the body worn camera footage of Martique Vanderpol in his pre-trial motions *in limine*. ECF 98, at 10.

The government's response to that motion *in limine* indicated that they knew the contents of these files, stating that "the government does not intend to introduce the evidence listed by the defendant (unless the defendant in some way opens the door to the evidence)." ECF 100, at 9. This threat by the government demonstrates their knowledge of Vanderpool's body worn camera footage, as the government must know about an item in order to use it should Vanderpool "open the door."

But remarkably, the government seeks to now directly contradict its earlier statement by claiming that it "had not watched, and was not aware of, the footage." That statement, made off the record, lacks any credibility. The government's investigators, as made explicitly clear throughout the judicial process, investigated Vanderpool for alleged actions beyond September 6-7, 2019. As part of that process, those investigators, all of whom were in the room during the prosecution's false statements to the court (and one of whom was the witness used to submit false evidence), undoubtedly reviewed the body worn camera footage from Vanderpool.

6

JA1409

The government's assertions violate the prosecutorial standards highlighted by the American Bar Association. "In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts." ABA Standard 3-1.4(a). Furthermore,

> [t]he prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court, lawyer, witness, or third party, except for lawfully authorized investigative purposes. In addition... a prosecutor should correct a prosecutor's representation of material fact or law that the prosecutor reasonably believes is, or later learns was, false, and should disclose a material fact or facts when necessary to... avoid misleading a judge or factfinder.

ABA Standard 3-1.4(b).

Pursuant to the McDade Amendment, an attorney for the government shall be subject to the state ethical rules where they engage in practice. 28 U.S.C. § 530B – Ethical Standards for Attorneys for the Government. The relevant Maryland Ethical Standards state that:

> An attorney shall not knowingly:
>         (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the attorney...
>         (4) offer evidence that the attorney knows to be false. If an attorney has offered material evidence and comes to know of its falsity, the attorney shall take reasonable remedial measures.

Maryland Rule of Professional Conduct 19-303.3(a). As of the time of this filing, the prosecution continues to fail in its ethical duty to take remedial measures to correct its submission of false evidence despite admitting to the United States Probation Office that they knew their statements to be false. Furthermore, the prosecution failed its statutory ethical obligations by introducing the CAD report from the

7

JA1410

Nnamani incident for the claim that only Vanderpool conducted that stop, as the government knew that Ivey initiated the stop.

The government knew of the falsehood of their statements yet failed to correct the record. Multiple members of the Federal Bureau of Investigation's investigation into Vanderpool witnessed the government's false statements to the Court and its knowing introduction of false evidence. These members included Agent Jacelyn Bloomingdale, Agent Mark Zimmerman, and Agent Elizabeth Hung. Prior to the trial, the government even specifically requested to the Court that Agent Zimmerman be permitted to stay in the courtroom following his testimony because "he's the one with full knowledge of the case." Transcript, Sept. 18, 2024, at 64:16-17.

Agent Zimmerman, despite having "full knowledge of the case" declined to inform the Court or the prosecution that it introduced false evidence and sought the Court to draw false inferences. In fact, despite the government acknowledging in a letter to the Probation Office that "some of the inferences it drew at trial appear not to be accurate," the prosecution failed to fulfill its correct the record before the Court. As such, the government continues to flagrantly violate its duties to the Court.

JA1411

**The Government's Misconduct Directly Impacted the Verdict**

The prosecution's misconduct in the introduction of false evidence directly impacted the Court's verdict and therefore the Court must order a new trial. When reading the statement of reasons during the verdict, the Court stated that "The Court finds Ms. Hung's testimony credible." Transcript, Oct. 30, 2024, at 14:21-22.

At trial, Agent Hung further that she investigated the Nnamani incident. "Q. Did you do some follow-up on that arrest of Mr. Nnamani? A. Yes, I did. Q. Did you pull some additional documents? A. Yes, I did." Transcript, Oct. 23, 2024, at 156:21-24. Agent Hung then testified that the only officer at the scene was Martique Vanderpool. Trial Transcript, Oct. 23, 2024, at 162:9-13.

Regardless of whether Agent Hung performed her investigation into the Nnamani incident in good faith, her false statements on the stand directly impact the credibility of her testimony. Even if the Court could find that Agent Hung performed a good faith investigation, it could not find Agent Hung credible because of the failure of that investigation to even seek to learn whether any body worn camera footage existed. On the other hand, a determination that Agent Hung knowingly omitted informing the Court that Ivey participated in the traffic stop and arrest of Mr. Nnamani would similarly damage her credibility.

As discussed in Vanderpool's Rule 33 motion, the government relied solely on the unreliable testimony of Ms. Hung to establish the jurisdictional hook for this

JA1412

offense. Mot., at 31-32. The government declined to dispute this point in its opposition to Vanderpool's Omnibus Post Trial Motion.

Because the Court relied on false statements and evidence in determining that Agent Hung was credible, the Court cannot rely on that finding of credibility to uphold the verdict or deny a motion for new trial.

Furthermore, the government's repeated false claim that Vanderpool falsified the Nnamani Report negatively impacted the weight of evidence on which it relied that Vanderpool wrote the incident report in this matter.

The Nnamani Report serves as evidence that officers at the Fairmount Heights Police Department would use another person's record management system (RMS) login information. The Nnamani Report was authored in the first person from the point of view of Earl Ivey. Pursuant to Federal Rule of Evidence 804, this report serves as evidence that Earl Ivey accessed Vanderpool's user account on January 15, 2019 to write the report. Fed. R. Evid. 804. When introducing argument that Ivey was not present at the Nnamani arrest, the prosecution failed to inform the Court that Mr. Ivey is dead and thus an unavailable witness. Because Ivey is deceased, the Nnamani report, which includes the words "I Officer Ivey," must be viewed as written by Lt. Ivey.

The government's false statements and the submission of false evidence prevented the Court from determining that other people besides Vanderpool accessed his user account, as that RMS audit report states that the report was written by the account associated with Vanderpool. This in turn led the factfinder

JA1413

to the incorrect conclusion that Vanderpool possessed sole access to his user account.

For those reasons, the government's false statements and its submission of false evidence deprived Vanderpool of his right to a fair trial and necessitates that the Court order a new trial.

The Government's knowing misconduct through its introduction of false evidence related to the Nnamani incident as well as drawing false inferences and improper character evidence deprived Vanderpool of his right to a fair trial. Despite knowing that Ivey initiated the Nnamani stop, the government introduced evidence and testimony falsely claiming that Vanderpool was the sole officer on the scene.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959) (citations omitted). This principle extends to when the false evidence goes to the credibility of a witness. *Id.*

The "contrivance [of a conviction through false evidence] by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (petitioned denied on other grounds) (later extended by the Court in *Brady v. Maryland*, 373 U.S. 83 (1963)).

11

JA1414

The government in this case obtained a guilty verdict through the knowing submission of false evidence and the improper use of that evidence to cast incorrect allegations on Vanderpool's character in their rebuttal closing statement.  As such, this guilty verdict violates Vanderpool's due process rights under the Fourteenth Amendment of the United States.

This guilty verdict based on the submission and use of false evidence cannot stand, and thus the Court must grant Vanderpool's omnibus posttrial motions.

**The Government's Use of Evidence Obtained Through an Unconstitutional Search Warrant Mandates That the Court Grant Vanderpool's Motions**

The government further does not meaningfully argue related to the violations of Vanderpool's constitutional rights related to the illegal search warrants of Mr. Vanderpool's cellular phone, instead only citing to their earlier writings and an oral ruling.[2]

The prosecution failed to dispute in their opposition that the search warrant to open Vanderpool's cellular device lacked any specificity.  The Court's erroneous decision denying a *Franks* hearing on the basis of government-sponsored affirmations deprived Vanderpool of a fair trial.  *United States v. Lewis*, 386 F.Supp.3d 963 (Wis.D.C. 2019) (holding that the Court's denial of a *Franks* hearing based on a letter provided by the government to be improper).

---

[2] Vanderpool incorporates Vanderpool's Motion to Suppress Evidence Obtained by Search Warrant (ECF 13) and Vanderpool's Reply in Support of Motion to Suppress (ECF 32)

JA1415

The government's general warrant fails. The general warrant of the government included information such as historical cell-site records which The Supreme Court held to have great privacy concerns. *Carpenter v. United States*, 585 U.S. 296, 311 (2018). The records the government acquired held the "privacies of life." *Carpenter*, 585 U.S., at 311; *Riley*, 573 U.S., 373. Yet despite this, the government, months after a conversation with state investigators who had previously acquired an improper warrant, applied for their own general warrant to search Vanderpool's devices. The Courts above have further indicated that they consider this overreaching general warrant unconstitutional and likely will directly limit their use in the future.

Furthermore, the government's unreasonable delay in seeking a warrant on Vanderpool's phone deprived him of his constitutional rights. The government's claim that this case's lack of urgency and the COVID-19 epidemic prevented it from proceeding diligently fails. The government possessed the device for over two weeks prior to the declaration of the COVID emergency during which they should have sought any search warrant. Instead the government waited until June, 2020 to request a search warrant, well beyond the 31 days found unreasonable in *Pratt*. *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019).

The government further fails to argue the materiality of the items improperly seized from Vanderpool's electronic devices The items seized from Vanderpool's phone, along with the false evidence related to the Nnamani arrest, formed the

13

JA1416

basis of the government's arguments in closing. As such, the improper instruction of this evidence heavily prejudiced Vanderpool and warrants a new trial.

## Conclusion

The government introduced false evidence at trial and relied on this false evidence to draw false inferences in their rebuttal closing statement. Furthermore, the government relied on evidence it acquired through unconstitutional search warrants to prove its case. The introduction of this evidence violated Vanderpool's Due Process Rights under the United States Constitution and therefore the Court must grant Vanderpool's post trial motions.

Dated: January 8, 2025          Respectfully Submitted,

*/s/ Christopher Zampogna*
Christopher Zampogna
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635
caz@zampognalaw.com

*/s Abraham Bluestone*
Abraham Bluestone
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com

14

JA1417

<u>Certificate of Service</u>

I hereby certify that on January 8, 2025, I served a true and correct copy of Vanderpool's Reply in Support of Vanderpool's Motion for Arrest of Judgment, Judgment of Acquittal, and New Trial on all parties involved via Pacer, the Court's ECF system.

<div align="center" style="margin-left:40%">

<u>*/s/ Abraham Bluestone*</u>
Abraham Bluestone
Zampogna, P.C.

</div>

JA1418

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      *

v.                                *        Crim. No. DLB-23-0234

MARTIQUE CABRAL VANDERPOOL   *

Defendant.               *

**MEMORANDUM OPINION**

Martique Cabral Vanderpool, a former police officer for the Fairmount Heights Police Department in Prince George's County, was convicted of falsifying a police report in violation of 18 U.S.C. § 1519. Vanderpool has filed a motion for arrest of judgment or, in the alternative, a motion for judgment of acquittal and a new trial. For the reasons stated below, Vanderpool's motion is denied.

**I.    Background**

On July 6, 2023, Vanderpool was charged in an indictment with one count of falsifying a record, in violation of 18 U.S.C. § 1519. A person violates § 1519 if he "knowingly . . . falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1519. The indictment alleged that Vanderpool

> acting in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation . . . knowingly falsified and made false entries in a record and document (a Fairmount Heights Police Department Incident Report), with the intent to impede, obstruct, and influence the investigation and proper administration of that matter.

ECF 1, ¶ 3. Specifically, the indictment alleged that Vanderpool "wrote a false and misleading Incident Report" to hide the fact "that he had sex with a woman in his custody," which, "if

JA1419

known, could be investigated as a potential federal criminal civil rights violation." *Id.* It alleged that he falsified the report by omitting that "he and another officer . . . took the handcuffed victim to an abandoned police station on September 6, 2019," that "he had sex with Victim 1 on September 6, 2019," that he and the other officer "caused the vehicle that Victim 1 was driving to be towed from the scene of the traffic stop," and that "he procured the release of the vehicle to Victim 1 from the towing company without Victim 1 having to pay the release fee." *Id.* The indictment further alleged that Vanderpool made an affirmative misstatement in the incident report: He "falsely stated that the registered owner picked up the vehicle (thereby falsely implying that the owner had picked up the vehicle from the scene of the traffic stop)." *Id.*

Vanderpool filed a motion to suppress evidence, ECF 13. The Court denied that motion on February 12, 2024 for reasons stated on the record. Trial was scheduled for October 22, 2024.

Ten days before trial, Vanderpool moved to waive his right to a jury trial. ECF 124. The government did not oppose the motion. *Id.* After a hearing on the motion to waive a jury trial, the Court granted the motion. ECF 129.

Before the trial began, the parties agreed on what the government had to prove to find Vanderpool guilty. To prove a violation of 18 U.S.C. § 1519, the government had to prove beyond a reasonable doubt: (1) the defendant falsified or made a false entry in a document; (2) the defendant did so knowingly; and (3) "the defendant intended to impede, obstruct, or influence the investigation or proper administration of [a matter within the jurisdiction of any department of agency of the United States]." *See United States v. Hassler*, 992 F.3d 243, 246–27 (4th Cir. 2021) (quoting *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012), *superseded by regulation on other grounds as stated in United States v. Carbajal*, 717 F. App'x 234, 240 (4th Cir. 2018)).

2

JA1420

A three-day bench trial commenced on October 22, 2024. The government offered the testimony of five witnesses. FBI Special Agent Mark Zimmerman testified about the evidence the FBI recovered during the search of Vanderpool's phone, including text messages between Vanderpool and his partner–officer, Philip Dupree, and WhatsApp messages between Vanderpool and his friend and former colleague, Denny Washington. Sergeant Brendan P. Gill testified about the Records Management System ("RMS"), the electronic recordkeeping system that Fairmount Heights police officers use to document traffic incidents and arrests. Officer Doniese Collins testified about the report writing training she provided to Vanderpool when he was a student at the Metro Transit Police Academy. Lyla Zeidan testified about the police training she gave Vanderpool when he was a student at the Northern Virginia Criminal Justice Training Academy. FBI Special Agent Elizabeth Hung testified about the FBI's investigation of Vanderpool and matters that are within the jurisdiction of the FBI.

After the government rested its case, Vanderpool moved for judgment of acquittal under Rule 29. He argued that the government failed to prove that he wrote the incident report, that he intended to impede, obstruct, or influence the investigation of a matter, and that the matter was within the jurisdiction of the FBI. The Court denied the motion for reasons stated on the record. The parties then presented closing argument.

On October 30, 2024, the Court announced its verdict in open court. The Court found Vanderpool guilty of falsifying the incident report. Pursuant to Federal Rule of Criminal Procedure 23(c), the Court stated its findings of fact on the record.

After the verdict, Vanderpool filed a written statement objecting to the government's rebuttal closing argument. ECF 146. The government filed a response to the written objection. ECF 147.

JA1421

Vanderpool then filed the pending motion for arrest of judgment or, in the alternative, for judgment of acquittal and a new trial. ECF 156. The motion is fully briefed. *Id.*; ECF 157, 163, 164-2. No hearing is necessary. Loc. R. 105.6 & 207.1 (D. Md. 2023).[1]

## II.   Discussion

Vanderpool invokes three potential avenues for relief. First, Vanderpool argues that the Court must arrest judgment pursuant to Federal Rule of Criminal Procedure 34 because the Court does not have jurisdiction over the charged offense. Next, Vanderpool argues that he is entitled to a judgment of acquittal under Rule 29 because the government did not prove beyond a reasonable doubt that he wrote the incident report and that any omissions in the report were material. Finally, Vanderpool argues that the Court should grant a new trial under Rule 33 because the government relied on illegally seized evidence, made prejudicial statements during trial, and abused its prosecutorial discretion by bringing this charge based on consensual sex. None of these avenues affords Vanderpool relief.

### A.  Rule 34

Vanderpool argues the Court should arrest judgment because it does not have jurisdiction over the charged offense. Vanderpool is incorrect.

"Upon the defendant's motion or on its own, the court must arrest judgment if the court does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a). District courts have jurisdiction over "offenses against the laws of the United States." 18 U.S.C. § 3231. Under § 3231, "'all that is necessary to vest the district court with jurisdiction' is for a valid indictment to charge a defendant with a federal crime." *United States v. Willix*, No. 23-13324, 2024 WL

---

[1] The government filed a consent motion to file a surreply, ECF 164, which is granted. Vanderpool's motion for leave to file excess pages, ECF 155, which the government does not oppose, also is granted.

JA1422

1231048, at *1 (11th Cir. Mar. 22, 2024) (per curiam) (quoting *United States v. McLellan*, 958 F.3d 1110, 1118 (11th Cir. 2020)); *see also Huguley v. United States*, 1:19CV524, 2021 WL 4521968, at *2 (M.D.N.C. Oct. 4, 2021) ("The indictment in this case alleged Petitioner was in violation of 18 U.S.C. § 1951(a), 18 U.S.C. § 924(c)(1)(A)(III), and 18 U.S.C. § 922(g)(1). Because the indictment alleged offenses against the laws of the United States, the court had jurisdiction over Petitioner and the charged crimes."); *De La Maza v. United States*, 215 F.2d 138, 140 (9th Cir. 1954) ("[A]fter an offense of the laws of the United States was set forth and returned in the indictment, the district court had jurisdiction of . . . the subject matter . . . .").

Here, the indictment charged Vanderpool with a violation 18 U.S.C. § 1519, a federal offense. The Court has jurisdiction over the crime charged in the indictment. There is no basis to arrest judgment. That ends the inquiry under Rule 34.

Vanderpool does not dispute that the indictment charges a violation of § 1519. Instead, Vanderpool argues the Court does not have jurisdiction over the charged offense because the indictment does not allege any potential federal civil rights violation. On Vanderpool's account, the indictment alleges he had sex with the victim while she was in custody and merely having sex with someone in custody is not a federal civil rights violation and thus is not a matter within the jurisdiction of the FBI. If the allegations do not amount to a matter within the jurisdiction of the FBI, Vanderpool argues, the indictment is defective because it does not allege facts that would satisfy the jurisdictional element of a § 1519 violation. As Vanderpool sees it, if there is no potential federal civil rights violation, there is no jurisdictional hook for a federal offense, and this Court does not have jurisdiction. In his view, this defect in the indictment requires the Court to arrest the judgment against him.

5

JA1423

Vanderpool misunderstands the scope of Rule 34. The rule concerns a district court's subject matter jurisdiction. Vanderpool does not challenge the Court's subject matter jurisdiction over the offense. Vanderpool challenges the sufficiency of the allegations in the indictment. He claims the indictment is defective because it does not allege the jurisdictional element of a § 1519 offense. Even if the indictment were defective, "defects in an indictment do not deprive the court of subject-matter jurisdiction." *United States v. Muresanu*, 951 F.3d 833, 839 (7th Cir. 2020); *see United States v. Cotton*, 535 U.S. 625, 630 (2002) ("[D]efects in an indictment do not deprive a court of its power to adjudicate a case."). And a challenge to the indictment on the ground that it fails to state an offense must be filed before trial. *See* Fed. R. Crim. P. 12(b)(3)(v). The Court rejects Vanderpool's post-trial effort to dismiss the indictment for failure to state a claim under the guise of a Rule 34 motion.

The District Court for the District of Columbia recently rejected this same tactic. *See United States v. Sutton*, No. 21-0598 (PLF), 2024 WL 278070 (D.D.C. Jan. 25, 2024). There, the district court denied a nearly identical motion to arrest judgment after former police officers were convicted of obstruction of justice under 18 U.S.C. § 1512. *Id.* at *4. The defendants argued that "the indictment d[id] not allege they or any other officer 'used force against [the victim] which could constitute a federal civil rights investigation.'" *Id.* Thus, they claimed, the "allegations in the indictment [were] insufficient to establish the 'possible commission of a federal offense' element of obstruction of justice"—the jurisdictional element of the offense—so the court lacked jurisdiction over the case. *Id.* The court disagreed. *Id.* As it explained, "even if the indictment were defective because it failed to state an offense, such a defect would not deprive the Court of jurisdiction." *Id.*

JA1424

So too here. The indictment charged a federal offense. The Court has jurisdiction over it. Even if the indictment were defective for the reasons Vanderpool identifies, it would not deprive the Court of jurisdiction over the offense.

The Rule 34 motion to arrest judgment is denied.

**B. Rule 29**

Under Rule 29, after a finder of fact returns a guilty verdict, "'the court may set aside the verdict and enter an acquittal' if the court concludes that the evidence presented at trial is insufficient to sustain a conviction." *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quoting Fed. R. Crim. P. 29(c)(2)). "A defendant challenging the sufficiency of the evidence to support his conviction bears 'a heavy burden.'" *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (quoting *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995)). Accordingly, "[r]eversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Freitekh*, 114 F.4th at 308 (quoting *Beidler*, 110 F.3d at 1067).

On a Rule 29 motion, a court may not "weigh the evidence or review the credibility of the witnesses." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). Instead, the court determines whether, "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008) (quoting *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982)). In determining whether there is substantial evidence, a court "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *Tresvant*, 677 F.2d at 1021.

JA1425

While Rule 29 refers to jury verdicts, courts apply the same standard to bench trials. *See, e.g., United States v. Salman*, 378 F.3d 1266, 1267 n.3 (11th Cir. 2004); *United States v. Doe*, 136 F.3d 631, 636 (9th Cir. 1998) ("The same [Rule 29] test applies to both jury and bench trials."); *United States v. Perez*, No. 3:23CR19 (RCY), 2023 WL 7027501, at *1 (E.D. Va. Oct. 25, 2023) ("While Rule 29 specifically refers to the jury trial context, it applies with equal force to bench trials.").

Vanderpool argues the Court should set aside the guilty verdict because the evidence was insufficient to sustain a finding of guilt. Specifically, Vanderpool claims there was insufficient evidence to prove he wrote the incident report and insufficient evidence that the omissions in the report were material. Vanderpool insists that, without sufficient proof that he wrote the report and that it contained material omissions, the guilty verdict must be set aside. Vanderpool is incorrect.

Viewing the trial evidence in the light most favorable to the government, the Court finds that a rational trier of fact could have found Vanderpool wrote the report. The government introduced evidence that Vanderpool's unique user account accessed the RMS system and created the report around 3:00 a.m., hours after the incident, when no other officer was working. The report was written in the first person with Vanderpool as the narrator. The report described Vanderpool's and Dupree's interactions with the victim hours earlier. Ten days after the report was written, Vanderpool used his personal cell phone to text a picture of the report as it appeared in the RMS system to Dupree, the officer who was with Vanderpool when they stopped the victim's car, arrested her, and took her to the police station where Vanderpool had sex with her. When Vanderpool texted Dupree the picture of the report, Vanderpool also texted: "[W]hy TF is sheriff's [sic] at my house." Gov't Ex. 11, at 7. One month after the incident, Vanderpool texted

8

JA1426

another picture of the report from his personal cell phone to Dupree. Along with the picture, Vanderpool texted: "The report for that chick. The traffic stop and detention only lasted an hour and she was sent on her way." Gov't Ex. 12, at 1. This evidence, viewed in the light most favorable to the government, could cause a rational finder of fact to find that Vanderpool wrote the report.

A rational trier of fact also could find that the omissions in the report were material. A person may falsify a report or document either by making an affirmative misstatement in the document or omitting material information from the document. *See United States v. Underwood*, 95 F.4th 877, 889 (4th Cir. 2024) (affirming conviction under 18 U.S.C. § 1519 based on material omissions in report); *United States v. Moyer*, 674 F.3d 192, 207–08 (3d Cir. 2012) (holding a reasonable juror could find the defendant officer knowingly falsified documents when he omitted information in his official police report); *United States v. Lanham,* 617 F.3d 873, 887 (6th Cir. 2010) (finding a reasonable fact-finder could conclude that the defendant officer falsified his incident report based on his material omissions in the report). An omission is material if it evidences "a deliberate attempt to conceal improper police conduct." *Underwood*, 95 F.4th at 889 (holding evidence was sufficient for jury to find omissions from police report material when defendant officer omitted the fact that he seized a cell phone from private citizen during a search, did not tag or log in the seized cellphone, and lied about it in subsequent FBI interview).

The government introduced evidence that Vanderpool stopped the victim's car, arrested her, caused her car to be towed, transported her in handcuffs to the police station, had sex with her at the police station, and secured the release of her vehicle to her without her having to pay a towing fee. The incident report included none of this information.

9

JA1427

A rational trier of fact could conclude that these omissions were material. Doniese Collins testified that she teaches her students—and taught Vanderpool—that when an officer arrests someone, transports them to another location, and tows their vehicle, the officer must include those facts in their incident report. Collins testified that there was "no question" that an officer would need to include that information in any police report. ECF 152, at 47:3–4 (Oct. 23, 2024 Tr.). Lyla Zeidan testified that in her police officer trainings, which Vanderpool attended, she teaches officers "in[] great detail about the importance of writing documentation fully and accurately," including "the importance of not leaving things out." *Id.* at 62:11–63:8. This testimony could lead a rational trier of fact to conclude that Vanderpool knew it was important to document in the incident report that he handcuffed and arrested the person whose car he stopped for speeding, that he caused her car to be towed, that he transported her from the scene to the police station, and that he secured the release of the car to her. The testimony also could lead a rational trier of fact to conclude that Vanderpool intentionally omitted those facts from the report because he was deliberately attempting to conceal improper police conduct: that he had sex with a person at the police station while she was in his custody. Further evidence of the omissions' materiality is the text message that Vanderpool sent Dupree when he sent him a picture of the incident report: "The traffic stop and detention only lasted an hour and she was sent on her way." *See* Gov't Ex. 12, at 1. This evidence supports a finding that Vanderpool deliberately omitted that he arrested, handcuffed, and transported the victim to the police station to hide the fact that he had sex with her there and to mislead a reader of the report into believing that his interaction with her "only lasted an hour" and that he "sent her on her way" after the traffic stop concluded. Based on this evidence, a rational trier of fact could find that the omissions were material.

Vanderpool does not address the fact that the government also introduced evidence that he made an affirmative material misstatement in the incident report. The incident report stated the victim's car was released to its registered owner. The government presented evidence that the car was released to the victim and that she was not the registered owner. Based on this evidence, a rational trier of fact could find that Vanderpool affirmatively mispresented in the incident report that he released the vehicle to the registered owner.

The Rule 29 motion is denied.

### C. Rule 33

Vanderpool argues, in the alternative, that the Court should grant him a new trial under Rule 33. Rule 33 allows a district court to grant a new trial upon the motion of a defendant "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions may be based on either newly discovered evidence or "other grounds." Fed. R. Crim. P. 33(b). The court may grant a new trial "[w]hen the evidence weighs so heavily against a verdict that it would be unjust to enter judgment." *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (alteration in original) (quoting *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). Rule 33 motions "are highly disfavored motions that a court should grant only 'sparingly.'" *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (quoting *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017)).

Vanderpool seeks a new trial on three grounds: (1) the government introduced into evidence illegally obtained evidence; (2) the government made prejudicial comments during the trial; and (3) the government abused its prosecutorial discretion by charging Vanderpool with an offense based on consensual sex.

**JA1429**

### 1. Illegally Obtained Evidence

Vanderpool claims that his right to a fair trial was violated because the seizure and search of his cell phone was illegal and the WhatsApp text messages between him and Washington found during the search of his phone should not have been admitted into evidence. The legality of the search of his cell phone was resolved before trial. Vanderpool filed a motion to suppress evidence, including evidence seized from his cell phone, and the Court denied it. Any arguments in support of suppression of evidence that Vanderpool raised previously have been resolved, and the Court will not revisit them. Any arguments for suppression that Vanderpool did not raise before trial have been waived. Vanderpool also claims the government violated chain of custody rules when it seized his cell phone. He did not raise this issue before trial, and he cannot raise it now. Vanderpool is not entitled to a new trial on these grounds.

### 2. Counsel's Statements During Trial

Vanderpool also claims that the Court should grant a new trial because government counsel made prejudicial statements during trial. He cites *Darden v. Wainwright*, which recognized that a defendant may be entitled to a new trial if "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristcforo*, 416 U.S. 637, 643 (1974)). Nothing government counsel said during trial comes close to meeting that standard.

Vanderpool objects to comments counsel made during a sidebar while Agent Hung was on the witness stand. During cross-examination of Agent Hung, Vanderpool attempted to ask her if she recalled "a prior exonerated suspension" of Vanderpool in 2018. ECF 152, at 145:17–24 (Oct. 23, 2024 Tr.). The government asked for a brief sidebar and raised its concern that Vanderpool was trying to elicit testimony about a topic the Court excluded before trial at

12

JA1430

Vanderpool's request: his alleged participation in an unrelated towing scheme. Government counsel tried to explain the question's connection to the unrelated towing scheme, and the Court replied, "I don't need to hear it, I don't need to hear it." *Id.* at 147:4–5. Vanderpool claims that the government tried to prejudice the finder of fact by raising the previously excluded towing scheme during the sidebar. That is a patently unfair characterization. The government tried to prevent Vanderpool from inadvertently introducing evidence that *Vanderpool himself had moved to exclude. See* ECF 98, at 11 (Vanderpool's motion in limine to prevent the introduction of evidence related to "an unfounded towing scheme"). Rather than prejudice the finder of fact, the government tried to *prevent* prejudice to Vanderpool. Government counsel's comments certainly did not deprive Vanderpool of his right to a fair trial.

Next, Vanderpool objects to comments counsel made during rebuttal. These comments also were in response to evidence that Vanderpool introduced at trial. During his cross-examination of Agent Hung, Vanderpool introduced into evidence an incident report from the traffic stop of another person, Travis Nnamani, which occurred a few months after the stop of the victim in this case. The report was created by Vanderpool's unique RMS user account, but it was written in the first person from the perspective of another officer, Earl Ivey. According to Vanderpool, the Nnamani incident report showed that other officers could access his unique user account to write reports, and if Ivey used Vanderpool's user account to write the report for the Nnamani stop, another officer—perhaps Dupree—could have used Vanderpool's user account to write the report for the stop in this case. Vanderpool cited Agent Hung's testimony and the Nnamani report when he made this point during his closing argument.

In its rebuttal, the government argued that the evidence Vanderpool introduced showed he had falsified the Nnamani report too. In counsel's words: "It looks like Defendant Vanderpool

13

JA1431

put in his own 404(b) evidence against himself, Judge." ECF 153, at 26:12–14 (Oct. 23, 2024 Tr.). According to the government, it took "gumption" to introduce another false incident report into evidence. *Id.* at 26:23–24.

Now, incredulously, Vanderpool argues that the government's statements are grounds for a new trial. They are not. The government did nothing wrong. It did not admit, or even try to admit, the Nnamani report under Federal Rule of Evidence 404(b). The government responded to evidence that Vanderpool introduced at trial and arguments that Vanderpool made during closing. In its rebuttal, counsel characterized the evidence that Vanderpool introduced as self-inflicted Rule 404(b) evidence. This characterization was appropriate in light of the evidence. Just as Vanderpool could introduce the Nnamani report because he believed it showed he did not author the report for the incident in this case, the government could characterize the evidence as a prior act under Rule 404(b) because it believed the evidence showed Vanderpool did author the report. The government's characterization of Vanderpool's evidence during rebuttal and its position that it took "gumption" to introduce evidence that the government believed was incriminating were entirely appropriate.

None of the government's statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Donnelly*, 416 U.S. at 643. The government's comments were completely appropriate. They are not grounds for a new trial.

### 3. Prosecutorial Discretion

Finally, Vanderpool argues that the government abused its prosecutorial discretion by charging him with a crime based on consensual sex. On Vanderpool's account, there was no potential civil rights violation (and, therefore, no matter within the jurisdiction of the FBI) because he and the victim engaged in consensual sex and having consensual sex with someone in

14

custody is not a federal civil rights crime. Vanderpool has not established an abuse of prosecutorial discretion.

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *accord United States v. Batchelder*, 442 U.S. 114, 124 (1979). "[I]n the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)); *see also United States v. Meeks*, 357 F. App'x 550, 553 (4th Cir. 2009) (rejecting claim that prosecutor abused her discretion by using defendant's prior convictions to increase the applicable statutory mandatory minimum sentence).

Here, a grand jury found probable cause to return an indictment against Vanderpool that charged him with a violation of 18 U.S.C. § 1519. To prove that charge, the government did not have to establish that Vanderpool committed a civil rights violation. Instead, the government had to prove, among other things, that Vanderpool intended to impede the investigation of matter within the jurisdiction of a federal agency. Vanderpool insists that having consensual sex with someone in custody could not be a potential civil rights crime. Agent Hung testified otherwise. According to Agent Hung, she would open an investigation if she "learned of an allegation that a police officer arrested somebody, took them to a police station, and had sex with them." ECF 152, at 94:1–5 (Oct. 23, 2024 Tr.). Agent Hung also testified that the FBI did open a civil rights investigation into Vanderpool after it learned about the allegations. Even though, as Vanderpool argues, Agent Hung "only began working on this matter in 2024, approximately 4.5 years

JA1433

following the incident in this case and following the issuance of the indictment," ECF 156, at 32, she is an FBI agent with five years of experience on the FBI's public corruption and civil rights squad, and she knew about the scope of the FBI's jurisdiction. Moreover, the government introduced evidence that the sex in custody was not consensual. The victim was a teenager, slight in build, and in a state of panic and mental distress when Vanderpool and Dupree stopped her car. Dupree forced her to the ground so that he could handcuff her. She told the officers she needed to get to her injured son and needed her car. Vanderpool had her car towed, and he and Dupree drove her to the police station in handcuffs, late at night, when no one else was there. When they arrived, Vanderpool and she had sex. A rational trier of fact could find that the sex was not consensual.

Vanderpool's conduct could have been investigated by the FBI as a potential federal civil rights offense. The government had probable cause to charge him with a violation of § 1519. Vanderpool has not established an abuse of prosecutorial discretion.

The Rule 33 motion is denied.

## III.    Conclusion

Vanderpool's motion for arrest of judgment or, in the alternative, motion for judgment of acquittal or a new trial is denied. The government's consent motion to file a surreply is granted. Vanderpool's motion for leave to file excess pages also is granted.

A separate order follows.

Date: February 5, 2025

Deborah L. Boardman
United States District Judge

16

JA1434

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**MARTIQUE VANDERPOOL'S MEMORANDUM IN SUPPORT**
**OF SENTENCING**

The defendant, Martique Vanderpool, by and through his counsel,

Christopher Zampogna and Abraham Bluestone on behalf of Zampogna, P.C.,

respectfully represents that he has reviewed the Pre-Sentence Report (PSR) and, in

accordance with 18 **U.**S.C. § 3553(a) and the remedial scheme set forth in *United*

*States v. Booker*, 125 S.Ct. 738 (2005) and *United States v. Hughes*, 401 F.3d 540

(4th Cir. 2005), presents this memorandum and position of Vanderpool with respect

to sentencing factors to aid the Court in determining the appropriate sentence.  This

Court should sentence Vanderpool to one year probation.

I.      Vanderpool's Background

Martique Vanderpool was a law-abiding citizen with no criminal history

before the instant incident.  He was hardworking, committed to his community, and

a caring member of his family.  Even following his conviction in state court, Mr.

Vanderpool continues to serve his community, working for the Montgomery County

Department of Transportation.  Prior to his work with the Montgomery County

1

JA1435

Department of Transportation, Vanderpool drove a bus designated to serve people with disabilities.

Vanderpool has lived his entire life in the DMV area, where his family instilled in him a lifelong focus on community. Mr. Vanderpool served with multiple law enforcement organizations over the four years prior to this incident in the District of Columbia, Maryland, and Northern Virginia area ("DMV"). His mother, Flechia Jackson-Smith, works as a nurse while his step-father works for the Court Services and Offender Supervision Agency in the District of Columbia. Mr. Vanderpool's half-brother, meanwhile, works in the personal security field after retiring from the United States Secret Service as law enforcement.

Vanderpool was known at his job for his ability to calm and defuse situations. His competency at Fairmount Heights even led him to be named Officer of the Year for 2019.

On December 4, 2019, just a few days following his arrest, Vanderpool became the father to M.V.[1] At the age of three, M.V. was diagnosed with autism spectrum disorder. Vanderpool has never met his son because of this trial, as M.V. and his mother, Gabrian Popo, live between Trinidad and Tobago and Saint Lucia. However, Vanderpool continues to maintain an informal child support relationship to support his son.

---

[1] The name Martique Vanderpool's son is redacted pursuant to Fed. R. Crim. P. 49.1.

JA1436

II.    September 6-7, 2019

On September 6, 2019, Martique Vanderpool was working for the Fairmount Heights Police Department (FHPD) as an Officer patrolling the town during the evening shift.  On that shift, he worked with Philip Dupree, another officer from the FHPD who drove a personal vehicle outfitted as a police vehicle.  FHPD had no other officers on duty at the time.

The two officers observed a blue Mustang driving well above the speed limit and initiated a traffic stop.  The driver, R.S., was driving without a license and behaved erratically, including giving the officers a false name.  The officers arranged for the vehicle to be towed, during which time R.S. became increasingly erratic.  Officer Dupree tackled R.S. to the ground and placed her into handcuffs, at which point she began smashing her head against the police cruiser.

Officer Dupree, with Vanderpool in the vehicle, then brought R.S. to the Fairmount Heights Town Hall, which also houses the police station.  Officer Vanderpool issued R.S. traffic tickets as well as a citation for disorderly conduct.  Following the issuance of these citations, R.S. and Vanderpool engaged in a consensual sexual encounter.  Officer Dupre then drove his personal vehicle to Tino's Towing, which held the blue mustang, where R.S. received the car.  The government did not establish whether Vanderpool was present when the car was retrieved.

3

JA1437

Later that evening, someone accessed the unsecured computer at the FHPD station and logged onto an account associated with Vanderpool. That person then wrote an incident report which the Court found contained material omissions and misstatements related to the incident. The Court found that Vanderpool wrote the report.

On December 2, 2019, Vanderpool was arrested on an information filed in Maryland State Court based on the actions of September 6-7, 2019. On January 17, 2023, the jury in that case returned acquittals on charges of Rape First Degree, Rape Second Degree, Assault Second Degree, and Sex Offense Fourth Degree – Sexual Contact, and Misconduct in Office. Vanderpool was found guilty only of Sex in Custody, a charge to which consent is not a defense. Vanderpool was sentenced to three years incarceration, with three years and eleven days credited for time served. Vanderpool was incarcerated from December 2, 2019 through March 1, 2023, a total of 1,186 days, or three years and three months.

On September 8, 2021, the federal government charged Vanderpool with one count of Deprivation of Civil Rights Under Color of Law, in violation of 18 U.S.C. § 242, based on the same set of facts as Vanderpool's state trial. In July 6, 2023, following Vanderpool's acquittal on all charges related to sexual assault, the government dismissed the charge for a civil rights violation and filed an indictment against Vanderpool for Obstruction of Justice in violation of 18 U.S.C. § 1519, based on the same events as the state trial.

4

JA1438

On October 22, 2024, a bench trial began in this matter. On October 30, 2024, the Court found Vanderpool guilty of obstruction of justice in violation of 18 U.S.C. § 1519.

During the course of the bench trial, the government made repeated statements designed to improperly denigrate Mr. Vanderpool's character before the trier of fact. Furthermore, in closing, the Government repeatedly accused Vanderpool of falsifying evidence despite the fact that the authenticity of said evidence was proven based on the discovery provided to the defendant *by the government* related to an incident which the government's lead investigator allegedly investigated. Vanderpool's Motions for Judgment of Acquittal under Rule 29, New Trial under Rule 33, and Arrest of Judgment under Rule 34 were denied on February 5, 2025. Vanderpool further requested a hearing related to these post-trial motions and the government's misconduct; the Court did not grant that request for a hearing.

III.  Sentencing Guidelines Considerations

While the Court must consider the sentencing guidelines ranges, the ranges provided in the sentencing guidelines are not mandatory and the Court can tailor a sentence in light of other statutory concerns. *U.S. v. Booker*, 543 U.S. 220, 244-245 (2005). In fact, the Court "may not presume that the Guidelines range is reasonable." *Gall v. U.S.*, 552 U.S. 38, 50, 128 S.Ct. 586 (2007). Rather, the

JA1439

Sentencing Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. U.S.*, 552 U.S. 85, 90, 128 S.Ct. 558 (2007).

The Sixth Amendment of the United States requires that juries, not judges find the facts relevant to sentencing. *Booker*, 543 U.S., at 244, 245. For purposes of determining the maximum sentencing, a judge may impose a sentence "*solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis in original).

### A. Elements of the Charges

`In this matter, the Court found that Vanderpool committed Obstruction of Justice under 18 U.S.C. § 1519. The bench instruction stated that in order to find a guilty verdict, the government must prove the following beyond a reasonable doubt:

1. The defendant knowingly falsified or made a false entry into a record or document
2. The defendant acted with the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter
3. The matter was within the jurisdiction of an agency of the United States.

Transcript, Oct. 22, 2024, at 15:23-16:6. To find Vanderpool guilty of obstruction of justice, the Court did not have to find that any underlying civil rights violation actually occurred. In fact, the Court found merely that the evidence in this case

6

JA1440

"suggest[s] a potential civil rights violation." Transcript, Oct. 30, 2024, at 14:17-18. As such, the Court found Vanderpool guilty of obstruction of justice without finding that any civil rights violation occurred.

B. The Court Must Determine the Proper Sentencing Base Offense Level.

In their presentence investigation report, the Probation Office incorrectly found that the base level for Vanderpool's sentencing should be 28. Instead, the base level should be 14.

For a conviction of obstruction of justice, the Court must first look to §2J1.2. U.S.S.G. §2J1.1. This guideline states that the base offense level for obstruction of justice is 14. U.S.S.G. §2J1.1(a)(1). Alternatively, if the offense involved obstructing the investigation or prosecution of a criminal offense, apply the Accessory After the Fact provision of §2X3.1 in respect to that offense if the resulting offense level is greater than 14. U.S.S.G. §2J1.1(c).

Accessory After the Fact, as described in §2X3.1, states that the base offense is 6 levels lower than the offense level for the underlying offense, except that it cannot be lower than 4 or greater than 30. U.S.S.G. §2X3.1(a).

The Probation Office then stated that the underlying offense was an offense under individual rights, governed by §2H1.1. §2X3.1 n.1 states that the "underlying offense" is the "offense as top which the defendant is convicted of being an

7

JA1441

accessory." U.S.S.G. §2X3.1 n.1.  However, to find that Vanderpool was guilty of obstruction of justice, the Court did not find the existence of any underlying offense. The Court merely found Special Agent Elizabeth Hung credible in her statement that "she would open a civil rights investigation" to establish the jurisdictional element.  Transcript, Oct. 30, 2024 at 14:18-22.

Following its citation to §2H1.1, the probation office incorrectly cited to 18 U.S.C. § 2242, Sexual Abuse, as the underlying offense under the civil rights violation.  In its justification, the probation office cited to U.S.S.G. §1B1.5, Application Note 3, which in relevant part reads "such other offense includes conduct that may be a state or local offense and conduct that occurred under circumstances that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States." §1B1.5, n. 3. However, no cross reference can be justified to 18 U.S.C. § 2242 and the corresponding U.S.S.G. §2A3.1.

An "underlying offense, like any other factual finding, must be supported by the evidence." *United States v. Dickerson*, 114 F.3d 464, 469 (4th Cir. 1997).  In this matter, the evidence cannot support any finding of an underlying sexual crime.

Vanderpool's conduct cannot constitute a state or local offense.  The State of Maryland previously charged Mr. Vanderpool with Rape First Degree, Rape Second Degree, Assault Second Degree, Sex Offense Fourth Degree-Sexual Contact and Misconduct in Office.  After hearing the government's lack of evidence, the Court granted Vanderpool's motion for a directed verdict on the Rape First Degree charge.

8

JA1442

Furthermore, a jury of Vanderpool's peers found him not guilty of Rape Second Degree, Assault Second Degree, Sex Offense Fourth Degree-Sexual Contact, and Misconduct in Office. The jury found Mr. Vanderpool guilty of only Sexual Acts with a Person in Custody, a charge specifically created to prohibit such sexual actions even when both people consent to the activity. Notably, the one charge to which the jury returned a guilty verdict, sex in custody, is not classified as a "sex offense" because it explicitly includes consensual sexual encounters.

As such, a jury previously found Vanderpool not guilty of any state or local crime alleging a lack of consent, the essential requirement to a §2A3.1 cross reference. For that reason, a cross reference to §2A3.1 based on an alleged violation of state or local law cannot exist. This Court must respect the decision of the jury below and refuse to cross reference to state violations for which Vanderpool was acquitted.

Similarly, the Court cannot cross reference based on a violation of 18 U.S.C § 2242 as the evidence at trial failed to establish any violation occurred. The evidence that the government used at trial to establish the existence of a *potential* civil rights violation consisted exclusively of evidence used from Vanderpool's state trial, where the jury found in Vanderpool's favor on any and all questions regarding consent to the sexual encounter. A jury, ruling specifically on the facts presented at this trial, found that the evidence did not demonstrate any lack of consent in the sexual encounter. This Court must respect that jury's verdict.

9

JA1443

The three categories of conduct that could constitute a violation under 18 U.S.C. § 2242 are actions that:

(1) Causes another person to engage in a sexual act by threatening or placing that person in fear....

(2) Engages in a sexual act with another person if that other person is

    A. Incapable of appraising the nature of the conduct; or

    B. Physically incapable or declining participation in, or communicating unwillingness to engage in, that sexual act; or

(3) Engages in a sexual act with another person without that other person's consent, to include doing so through coercion.

18 U.S.C. § 2242. The evidence in this case does not demonstrate any of these factors. Instead, the Court merely found the existence of evidence that Vanderpool may have engaged in actions under this guideline. "There was evidence that Mr. Vanderpool, in his position of power as a police officer, coerced or intimidated Ms. Stewart into having sex with him." Transcript, Oct. 30, 2024, at 14:7-9.

Furthermore, Congress instituted 18 U.S.C. § 2422(c) in 2022, approximately three years following the incident in this matter. Because this provision did not exist at the time of the offense, the Court cannot retroactively apply this provision to institute an enhanced sentence.

The fact that R.S. was in custody is not dispositive of whether Vanderpool committed a civil rights violation. "[C]onsent is a complete defense to a violation of Section 242. It may seem counterintuitive that a person in custody has the ability to consent to sexual contact with the individual who has authority over her.

<div align="center">10</div>

<div align="center">JA1444</div>

Nonetheless, unlike some statutes, Section 242 is not a strict liability statute." Gold, Fara, *Investigating and Prosecuting Law Enforcement Sexual Misconduct Cases*, End Violence Against Women International, https://evawintl.org/resource_library/investigating-and-prosecuting-lawenforcement-sexualmisconduct-cases/, at 5.

The existence of evidence does not create a preponderance of evidence necessary for there to be an underlying offense. Nor does it create a finding of fact by a jury necessary to increase the potential sentence. The maximum sentence in a matter must be based solely on the basis of facts reflected in the verdict or admitted by the defendant. *Blakely v. Washington*, 542 U.S. 296, 303 (2004). In this matter, the verdict did not require a finding that any actual coercion even likely occurred, but instead only that a civil rights violation was *possible*. As such, the facts underlying the verdict do not establish a finding necessary for a cross reference to sexual abuse.

A cross reference to sexual abuse would further violate Congress' goals when establishing the sentencing guidelines. Congress's goal when establishing sentencing regulation "depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction." *Booker*, 543 U.S. at 250. The real, relevant conduct by Vanderpool shows that there should be no underlying offense, much less an underlying offense of sexual abuse.

11

JA1445

A jury previously determined the impact of Vanderpool's real conduct when it, based on the same evidence produced in this trial, found Vanderpool not guilty of any crime related to consent.  In this case, R.S. consented to the sexual encounter. The evidence at trial showed only that Officers Vanderpool and Dupree brought R.S. to the station, issued her tickets, and then Vanderpool and R.S. engaged in sexual activity.  The evidence did not establish that R.S. lacked consent to the sexual encounter, the essential element for a cross reference to sexual contact. The government never presented any evidence about R.S.'s state of mind prior to or during the encounter.  The Court must not punish Vanderpool with a finding of non-consent when the government brought forth no evidence to indicate whether the encounter was *actually* non-consensual.

Furthermore, the presentence investigation report erred by including a four-point enhancement for kidnapping.  None of the actions, alleged or proven, meet the definition for "kidnapping" in 18 U.S.C. § 1201, which require that the person be "willfully transported in interstate or federal commerce."  18 U.S.C. § 1201(a).  No evidence at trial showed that any actions occurred across interstate lines.  Notably, the state court previously entered a judgment of acquittal on the first degree rape charge because it determined that no trier of fact could find kidnapping, an element of that charge in Maryland.  As such, the Court cannot institute any four-level increase.

If the Court determines that Vanderpool intended to obstruct an investigation into an underlying civil rights violation, then the Court must calculate

12

JA1446

the offense level as follows.  The base level for a civil rights violation is 6, pursuant to §2H1.1(a)(4).  However, because Vanderpool was found guilty of writing the report in his capacity as a police officer under color of law, the base level is 12. U.S.S.G. §2H1.1(b)(1).  However, that level of 14 is then lowered by 6 offense levels as a result of the Accessory After the Fact provision in §2X3.1(a)(1), to an offense level of 6.  U.S.S.G. §2X3.1(a)(1).

Pursuant to §2J1.2(c)(1), the provision for obstruction of justice, the cross reference to an underlying offense cannot be applied when the resulting offense level would be below 14.  U.S.S.G. §2J1.2(c)(1).  In this case, the offense level for the underlying offense is 6.  Therefore, the base offense level must be 14 as described in §2J1.2(a).  U.S.S.G. §2J1.2(a).

Ironically, the charge for a civil rights violation under 18 U.S.C. § 242 would only provide a maximum statutory sentence of one year imprisonment. That statute reads, in relevant part, "[w]hoever, under color of any law... willfully subjects any person... to the deprivation of any rights... shall be fined under this title or imprisoned not more than one year." 18 U.S.C. § 242.  That the government seeks a discipline orders of magnitude beyond the term for the actual underlying crime seems laughable.

A cross reference to a sexual contact provision would further violate Vanderpool's constitutional rights under the Fourteenth and Sixth Amendments of the United States Constitution. *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000). At trial, the Court barred evidence related and allegations related to whether the

13

JA1447

sexual contact was *actually* coercive. The Court noted that it would "exclude any evidence at this point that the sexual encounter with R.S. was coercive. If the defense opens the door and suggests that it was consensual, then I have to revisit this ruling." Transcript, Sept. 18, 2024, at 30:17-20. While specific items of evidence were admitted, any allegations that the sexual contact was coercive were barred from the trial (despite the government's improper statement to that effect in closing). Because of the Court's ruling, Vanderpool did not admit evidence that the sexual encounter was consensual, as consent to the encounter was not a defense available to Vanderpool on an obstruction of justice charge.

If the Court cross references to a sexual contact provision under §2A3.1, Vanderpool would be sentenced based on evidence which he could not introduce at trial. This violates Vanderpool's constitutional rights to have a sentence determined by the evidence. *Apprendi*, 530 U.S., at 476. Whether or not R.S. consented to the sexual encounter was not relevant to this matter. However, in the trial where consent served as a defense and evidence could be introduced to demonstrate consent, a jury of Mr. Vanderpool's peers unanimously voted that he was not guilty of any of those crimes alleged.

Therefore, the Court must provide a base offense level of 14.

Following the guidelines calculation of a base offense level of 14, Vanderpool must be granted a two point deduction for being a certain zero-point offender. Vanderpool meets these qualifications as his prior criminal conviction concerned the same conduct as that in this case, meaning that it cannot contribute to a prior

14

JA1448

criminal history. Furthermore, contrary to the government's contentions in their late-filed "objections" to the draft presentence report, the instant offense of conviction is not a sex offense. U.S.S.G. § 4C1.1(5). The Court found Vanderpool guilty of the instant offense of obstruction of justice under 18 U.S.C. § 1519, not any sex crime.

Because Vanderpool qualifies for the two point reduction for certain zero point offenders, the appropriate offense level for Vanderpool's conduct is 12. The guideline range for that offense level is 10 months to 16 months.

## IV.    Other Sentencing Considerations

While the Court should take into consideration the sentencing guidelines, by statute the Court is required to consider the factors identified for sentencing in 18 U.S.C. § 3553(a). The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the settlement imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes by the defendant; and

JA1449

(D) to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most

effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the

Court must consider these purposes, the nature and circumstances of the offense

and the history and characteristics of the defendant, the need to avoid unwarranted

disparities, and the need to provide restitution to any victims of the offense.  18

U.S.C. § 3553(a)(1)-(7).

As the Supreme Court explained in *Gall*,

> "a district court should begin all sentencing proceedings by correctly
> calculating the applicable Guidelines range.  As a matter of
> administration and to secure nationwide consistency, the Guidelines
> should be the starting point and the initial benchmark.  The
> Guidelines are not the only consideration, however.  Accordingly, after
> giving both parties an opportunity to argue for whatever sentence they
> deem appropriate, the district judge should then consider all of the §
> 3553(a) factors to determine whether they support the sentence
> requested by a party.  In so doing, he may not presume that the
> Guidelines range is reasonable.  He must make an individualized
> assessment based on the facts presented."

*Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citations and punctuation omitted).

Therefore, the Court must consider the guidelines as "one factor among

several" to § 3553(a) requires courts to consider.  *Kimbrough v. United States*, 552

U.S. 85, 90 (2007); see also *Booker*, 543 U.S. at 260.  Additionally, the Court must

recognize "that imprisonment is not an appropriate means of promoting correction

and rehabilitation."  18 U.S.C. § 3582(a).

16

JA1450

District Courts impose a sentence below the Guidelines range through either a departure or a variance. *Izirarry v. United States*, 553 U.S. 708, 714 (2008).

> A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. If is frequently triggered by a prosecution request to reward cooperation… or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)."

*United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012).

### A. Vanderpool Must Be Granted a Downward Departure to Reflect the Nature and Circumstances of the Offense

18 U.S.C. § 3553(a)(1) provide that the sentencing official must consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). In this case, the seriousness of the offense, obstruction of justice, requires a downward variance.

This case does not exist in a vacuum. Officer Philip Dupree, currently charged with crimes of moral turpitude, maintained a presence throughout the events of September 6-7, 2019. Officer Dupree drove the car which pulled over R.S., brought her to the ground, and placed her into handcuffs. Officer Dupree drove R.S. to the police station. Officer Dupree actively watched Vanderpool and R.S. engage in consensual intercourse. Officer Dupree drove R.S. to the tow lot. Officer Dupree even was in the station when the incident report was written from an unsecured computer in the common area. Yet the government failed to provide any testimony

17

JA1451

or evidence that Vanderpool sat at the computer and wrote the police report in this matter.

In fact, the seriousness of the offense is belied by the fact that the only party that has been honest throughout this process. Philip Dupree routinely made false statements to investigators and to the grand jury in the state trial claiming that he was not present. R.S. materially changed her testimony on multiple occasions, at one point even admitting to an investigator that she lied by initially claiming that Dupree was not present during the sexual intercourse. Even the government in this prosecution lied, insisting to the Court on multiple occasions that Vanderpool falsified the Nnamani report in this trial. Transcript, Oct. 24, 2024, at 25:2-26:1; Transcript, Oct. 24, 2024, at 26:5-22; Draft PSR, at ¶¶ 25, 31 (noting the government's request for an obstruction of justice enhancement based on the government's false evidence and statements).

Only Vanderpool remained honest throughout the pendency of the cases related to September 6-7, 2019. Vanderpool further fully cooperated with FHPD when reviewing this incident. On November 22, 2019, Vanderpool engaged in an interview with the now-deceased Lieutenant Earl Ivey where he discussed the facts surrounding this incident, including the fact that he engaged in consensual sex with R.S.. On January 13, 2023, Vanderpool testified in his own defense in *Maryland v. Vanderpool*, 20-0085X, the state trial on this matter. Vanderpool's statements in that trial were later used by the government as the factual background in this case, demonstrating their honesty.

18

JA1452

Based on Vanderpool's record of honesty related to this circumstance, the Court should grant a downward departure for the nature and circumstances of the offense.

### B. Vanderpool Must be Granted a Downward Departure for Susceptibility to Abuse in Prison

The Court must grant a departure based on Vanderpool's susceptibility to abuse in prison. "The extraordinary notoriety and national media coverage of this case, couples with the defendant[]'s status as [a] police officer, make [him] unusually susceptible to prison abuse." *Koon v. United States*, 518 U.S. 81, 113 (1996). Vanderpool's case has received extensive press coverage, with multiple media outlets reporting on the status of his cases at various points. For that reason, the Court must grant a downward departure based on Vanderpool's susceptibility to abuse in prison.

### C. The Court should Grant Vanderpool a Variance Based on Poor Health.

The Sentencing Guidelines and the Court's decisions permit variances on the basis of a defendant's poor health. *U.S. v McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008). The presentence investigation report notes Vanderpool's medical and mental issues, including a fear of confinement based on his time in prison prior to his state

JA1453

criminal trial. Vanderpool continues to seek treatment for his post-traumatic stress disorder as a result of his time incarcerated.[2] Staff members at prior incarceration further purposefully exposed him to encounters with violent offenders, refused to provide Vanderpool with any assistance, and instructed him to commit suicide on at least one occasion. Of the 39 months spent incarcerated, Vanderpool spent 31 months in solitary confinement despite not committing any violations during his time in prison. These experiences indicate that a non-prison sentence would be appropriate for Vanderpool.

> D. The factors identified in 18 U.S.C. § 3553(a) indicate that a downward variance is warranted.

18 U.S.C. § 3553(a)(2)(B) provides that a sentence must afford adequate deterrence to criminal conduct. The two types of deterrence are specific and general deterrence; specific deterrence serves to prevent a defendant from committing crimes in the future, while general deterrence serves to keep others from committing the crime of which defendant was convicted. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010).

In this case, specific deterrence supports a lower sentence. In the five years since September 6-7, 2019, Vanderpool has been exposed to two criminal trials and engaged in a civil lawsuit related to the events in this matter. As a result of these

---

[2] Vanderpool's diagnosing psychologist, Dr. Kelvin Mitchell, will testify remotely at the sentencing hearing.

20

JA1454

prosecutions, Vanderpool has lost his career, his freedom for years, his finances, and any public goodwill associated with his name. These significant losses indicate that Vanderpool will already be sufficiently deterred from committing any criminal acts in the future.

Furthermore, Vanderpool poses a very low risk of recidivism. The U.S. Sentencing Commission found that individuals in criminal history category one had the lowest rearrest rates. U.S. Sentencing Commission, https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders. Vanderpool's prior trauma from his time incarcerated demonstrates that he will refrain from engaging in any criminal conduct in the future, as the three years incarcerated previously serve as sufficient deterrence. Vanderpool is not an officer, will never be a police officer again, and does not want to become an officer again, meaning that he will be unable to commit a similar criminal act in the future.

General deterrence also supports a low sentence. The mere prosecutions of this case, combined with the media attention surrounding them, serves as sufficient general deterrence for other police officers who may be in a similar situation as Vanderpool. *Wayte v. United States*, 470 I.S. 598, 607, 105 S.Ct. 1524, 85 L.Ed.2d 547 (1985) (observing that a prosecution itself as a "general deterrence value").

Furthermore, the general deterrence value is low due to the statements made by the Executive Branch of the United States government regarding policies exploited by the government in the prosecution of this case. For instance, the

21

JA1455

Department of Justice recently ordered a freeze on all litigation in the Civil Rights Division of the Department of Justice, the department which brought this case. Alanna Durkin Richer, *Trump's New Justice Department Leadership Orders a Freeze on Civil Rights Cases*, AP News (Jan. 22, 2025), *available at* https://apnews.com/article/civil-rights-division-justice-department-trump-2dcb45cca7c9c9cdaea78282d4279c35.

Similarly, the Supreme Court and the Executive Brach have expressed skepticism about the government's use of post-*Enron* obstruction of justice statutes. In a case on the use of 18 U.S.C. § 1512(c)(2), also passed as part of the Sarbanes-Oxley Act of 2002, the Supreme Court stated that "[g]iven that subsection (c)(2) was enacted to address the Enron disaster, not some further flung set of dangers, it is unlikely that Congress responded with such an unfocused and grossly incommensurate patch." *Fischer v. United States*, 603 U.S. 480, 498 (2024). Similarly, the U.S. Attorney for the District of Columbia has ordered a review of all cases brought by the District of Columbia's Office of Civil Rights related to post-Enron obstruction statutes. Ryan J. Reilly, *Trump's New D.C. Prosecutor Launches Review to Examine 'Great Failure' of Key Charge Leveled Against Jan. 6 Defendants,*" NBC News (Jan. 27, 2025), *available at* https://www.nbcnews.com/politics/justice-department/trump-dc-prosecutor-ed-martin-launches-review-jan-6-cases-rcna189503.

These policy shifts highlighted by both the executive and judicial branches show that the general deterrence value in this case is low. The chances of this

22

JA1456

statute being used to punish conduct in the future appear increasingly slim, and therefore the Court should not be pressured to impose a sentence based on any general deterrence value.

For those reasons, the Court must grant Vanderpool a downward variance.

### E. Vanderpool Should be Granted a Downward Variance To Care for His Family

The Court must grant Vanderpool a downward variance due to his father's poor health. Mr. Vanderpool's father recently experienced urgent medical issues which forced the family to prepare for the worst. Vanderpool routinely travels to visit and help his father after he undergoes targeted radiation treatments. Ex. 1. As multiple family members wrote, Vanderpool serves a family member who helps the family stay together. As such, the widespread hardship that would result from Vanderpool's imprisonment indicates that the Court should grant Vanderpool a sentence that enables him to help comfort his family and his father.

The Court should further grant a downward variation to permit Vanderpool to care for his five-year-old son. This case has already punished Vanderpool by depriving him of the opportunity to meet his son in person. However, a severe sentence would additionally deprive his son of the financial support that Vanderpool has provided following his release from incarceration in March, 2023.

23

JA1457

As such, the Court should not punish Vanderpool's five-year old son by imposing a heavy sentence.

### F.  The Court Must Grant a Downward Departure for Vanderpool's Discharged Term of Imprisonment

The sentencing guidelines state that "a downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of §5G1.3... would have provided an adjustment had the completed term of imprisonment been undischarged at the time of sentencing for the instant offense." §5K2.23.  Subsection (b) of §5G1.3 requires an adjustment for any amount of the state sentence credited by the Bureau of Prisons and that the sentence shall run concurrent with any remaining undischarged term of imprisonment.  In this matter, Vanderpool was previously incarcerated for a total of 39 months, despite a 36 month sentence.

For that reason, the Court must grant Vanderpool a downward departure of 39 months based on his prior incarceration.

JA1458

G. The Court May Look Outside the Sentencing Guidelines

18 U.S.C. § 3553(a)(6) states that a Court, when considering the sentence, must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, as noted in the presentence investigation report, there are no people in a similar situation.

When a case falls "outside the heartland" to which the sentencing guidelines were meant to apply, a district court's decision to vary from those guidelines is awarded the greatest respect. *Kimbrough v. United States*, 552 U.S. 85, 89, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). This is because the "sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission." *Rita*, 551 U.S. at 357.

This case falls outside the heartland of sentencing. Vanderpool was previously tried in state court on a number of charges related to this case but found guilty only of sex in custody, a crime to which consent serves as no defense. While the acquittals on the state judgments do not count as acquitted conduct per the sentencing guidelines, the fact that the federal government declined to pursue the similar charges against Vanderpool which rely on nonconsent demonstrate that the government could not prove nonconsent at trial.

Additionally, Vanderpool previously served three years and eleven days of incarceration prior to his state court trial. Following his conviction for sex in

25

JA1459

custody, the court sentenced Vanderpool to three years time served.  This previous trial in state court serves as a factor which makes this case unique and justifies a departure from the "heartland" of the sentencing guidelines.

V.     A Term of One Year Probation Served Concurrently with the State Term
       is Warranted

The Court should sentence Vanderpool to a term of twelve months probation. The Supreme Court recognized that a term of probation serves as a proper form of sentencing can serve as a sufficient punishment in lieu of prison.

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  See *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' "(quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)).  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3.  Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 48.  A term of probation thus serves as an adequate sentence when other factors indicate that a sentence of imprisonment is not proper for the individual defendant.  In this matter, Vanderpool's previous experience in

26

JA1460

incarceration for the underlying events in this matter warrant a term of probation rather than subjection to prison again.

Vanderpool has previously been punished for this case prior even to trial. Vanderpool experienced approximately 15 months incarceration on the federal civil rights charge that the government later dismissed. Vanderpool further was held in home confinement for an additional three months. Any sentence must incorporate this time served.

Vanderpool wishes to draw the Court's attention to *Hassler*. *United States v. Hassler*, 992 F.3d 242 (4th Cir. 2021). Gary Hassler served as the head nurse at the Rockbridge County, Virginia Regional Jail Authority when he falsified a report to cover up an assault by a group of inmates. Hassler stated to authorities that he falsified the report "to cover his butt." *Id.*, at 245 (cleaned up). The Court sentenced Hassler to twelve months and one day imprisonment followed by one year probation. *Id.* However, the Court in that matter considered the lapses in judgment and failures of others in determining the appropriate sentence. Hassler's Sentencing Memorandum, Dkt. No. 112, W.D.V.A. 6:18-cr-00010-NKM (Oct. 9, 2019).

The Court should sentence Vanderpool similarly to Hassler. Any criminal conduct in this matter did not exist in a vacuum, and the Court should sentence Vanderpool through the repeated "lapses in judgment and failures of others" in the Fairmount Height Police Department when determining an appropriate sentence. As demonstrated at trial, the Fairmount Heights Police Department failed to follow

27

any of its own general orders, left computers unsecure, and in the case of Officer Philip Dupree, committed civil rights violations.  Furthermore, much like Hassler, Vanderpool admitted to his conduct and discussed it with his superiors following the incident.  The Court must consider the environment in which Vanderpool worked and sentence Vanderpool accordingly.

VI.  Conclusion

For all of the foregoing reasons, the Court should order that Vanderpool be sentenced to a term of one year in probation.

Dated: February 6, 2025                    Respectfully submitted,

*/s/ Christopher Zampogna*
Christopher Zampogna
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635
caz@zampognalaw.com

*/s/ Abraham Bluestone*
Abraham Bluestone
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com

28

JA1462

Certificate of Service

I hereby certify that on February 6, 2025, I served a true and correct copy of the foregoing sentencing memorandum on all parties involved via Pacer, the Court's ECF system.

*/s/ Abraham Bluestone*
Abraham Bluestone
Zampogna, P.C.

JA1463

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
| | ) | |
| MARTIQUE VANDERPOOL | ) | |
| | ) | |
| *Defendant* | ) | |

**Exhibit 1: Letters in Support of Vanderpool**

Vanderpool attaches the following letters to his Memorandum in Support of Sentencing:

1. Gary Vanderpool
2. Gabrian Popo
3. Millicent Canady
4. Victoria Coates
5. Sylvia Crawford
6. Jeremiah Ford
7. Shawn Gwynn
8. Denise Henderson=Thomas
9. Charlotte Hughes
10. Lynn Jackson
11. Marcus Jackson
12. Sonia Jennings
13. Edward Lindsey
14. Carmen Milligan
15. Robert Monroe
16. Latanya Pugh
17. Michael Samuel
18. Carleena Scott
19. Charles Smith
20. Gary Tillman

JA1464

1033 College Park Blvd.

Virginia Beach, Va. 23464

52Dabronx@gmail.com

February 4th 2025

To The Honorable Deborah L. Boardman,

My name is Gary Vanderpool and I am the Father of Martique Cabral Vanderpool. From the moment that he emerged from his Mother's womb both she and I have been in his life in spite of Flechia and I eventually becoming divorced. Your Honor he almost didn't make it due to his Mom suffering a partial miscarriage, however we strongly believe that our spiritual creator came into play and thus allowed him to reach term.  This is not to say that our then infant child did not have and go through a series of life threatening medical issues that required quite a few trips to the emergency rooms at the National Children's Hospital of Washington, DC as well as three surgeries; two of them being most major. I tell you this in order to set the table for what turned out to be a miraculous recovery where we witnessed our little frail "red faced elf" as we and his older brother affectionately called him; subsequently he began to regain his health and grow into a strong, smart and loving member of our entire family. That included his late Grandparents as well as most if not all of his extended relations.

 We watched him develop into a good student as well an accomplished HS athlete at both Coolidge HS in Wash. DC and Charles Herbert Flowers in Springdale, MD. This culminated with his admittance to Millersville University on a partial athletic and academic scholarship to play Football, however we being working class folk he also had to qualify for various grants, loans; most notably the Pell Grant which was very helpful. His Mother and I raised him and his Brother to be both respectable and decent young kids while growing up. Your Honor here's the thing; both of them early on wanted to be in Law Enforcement. Neither of them had never been in any trouble with the law so it filled our family with great pride when Martique while still in High School was chosen to attend the Summer Camp program at the FBI training academy located at Marine Corps Base Quantico in Virginia. His elder brother Dalontee Edgerton after attending Howard University went on to become a member of The US Secret Service Uniformed Division and was assigned to the White House. Martique while still a student at MU joined the student internship program with The US Marshals Service, driving every Thursday night after class and football practice from Lancaster County PA. to DC in order to fulfill his commitment with the Marshals Service and then turn around at days end driving back to the university so as to be able to play with his teammates in the game on Saturday.

Judge Boardman I'm writing this letter let you know that I at age 72 am currently undergoing cancer radiation treatments that lead up to an unsuccessful operation this past December 30th 2024 to remove the malignant tumor that's attached to my liver. I can provide you with the names of my oncology team as well  as the surgeon who performed said surgery if you require them.

My reason for sharing my personal medical status with you is to illustrate the toll this ordeal from the very beginning back in November, 2019 has taken on my personal health, both physical and mental. The ensuing years of going back and forth to attend pre-trail hearings, the shock and

JA1465

shame of the alleged charges, the sensational Media headlines outlining the things that my Son the former LEO was accused of more or less broke me and Martique's Mother at the time. However we as a family and community stood by and still supported him because deep inside our spirits we felt deeply that this was not the boy and subsequent man that was raised by us. The three and a half years that he was in solitary confinement was difficult on us as a supportive family but even more so on him. If it turned out to be true my feelings for the alleged accuser and victim were that of sorrow and me wanting to beg her forgiveness.

Judge Boardman, as you are aware a sworn representative jury of fellow citizens from the community of Prince Georges County Maryland sat over the course of several days listening to testimony under oath as well as observing exhibits of evidence and arguments from both the State and the Defense. All parties took the stand including my son and after jury deliberations Martique was pronounced not guilty of ten of the most egregious counts against him and guilty of the one count that brought him before the Government and your courtroom. Following a Bench Trial he has been found guilty and I as a parent am asking for mercy from you on his behalf.

Since Martique has been released from both State and Federal custody and was given permission to travel he has been driving down here from his Mom's home in Maryland on a regular basis to both spend time with me and also to help me out now that I am physically compromised. This is really helpful to me whenever I undergo the targeted radiation treatments because it always causes me to be to be violently sick and weak afterwards for a week or more until I can recover and then the process starts over again in a month or so. I have two other adult sons who live in other states but Martique lives closet to me

This is a challenge due to him being presently gainfully employed by Montgomery County, MD. DOT. He is serving the community by repairing potholes, trimming trees and shoveling snow so the last thing anyone wants is for him to no longer be gainfully employed. We believe that toiling in this way he is making amends for his errors of judgement and trust in the past.


Respectfully,

Gary J. Vanderpool

*[signature: Gary J. Vanderpool]*

JA1466

2/2/25

To : The Judge of Martique Vanderpool's Case

From: G. Popo

Vieux Fort, Saint Lucia

I am the Mother of Martique's child. I am writing so that you understand Martique's child's situation and hopefully I can shed some light on who Martique is since I personally know him. I heard about the incident involving Martique on the news. I spoke to him December 1, 2019 before he was charged. I end up in the hospital having contractions and preparing for the birth of our son. Our son was born 12/4/2019 and I wake-up to a nightmare that has been unreal ever since. This nightmare has been plaguing us since that date. I wake up to no support and not a clue of what I am going to do as a mother with no real family support. I have been on my own since a young age. But my son McKinley needs his father. I have suffered from depression throughout this ordeal and I had accepted that I would never see Martique again because of how they made everything sound in the media and because they would not even let him out of chains. Our son has special needs and disabilities. Martique's Mother Mrs. Jackson-Smith has helped me at times while Martique was in chains. At one point she could no longer assist me because she was on the verge of becoming homeless. She was putting her home up for sale to help pay for Martique's Defense for a Civil rights charge. I spoke to Martique 1 time while he was in chains because he couldn't call long distance and they would not let him use the phone as frequent as others and he would have 45-50 minutes to do everything. When I spoke to him, he gave me strength even though I knew in my mind he was never getting out of chains. I knew he had lost everything but he still found a way to send me $1200 at a time when I did not have any food to eat and the little bit of food I had, I had to give to our son who was not getting the proper nutrition. This was at a time when Martique had 2 criminal cases over his head that carry a maximum penalty of life and his attorney had just quit on him and kept almost $30k of his money simply because he wanted to go to trial. At this time Martique had no attorney.  Martique has always been hardworking, responsible, and honest. I didn't decide to have a child with Martique because of anything superficial. I decided to have a child with him because of who he is as a man. Because of who he is underneath the uniform. Who he is when the times get rough. We anticipated Martique raising our son as a single father because I am not in a position to care for him the way Martique can. We've been in limbo and our lives have been on hold waiting for the United States Court system. Unfortunately, I don't have much understanding for why a system would want to keep putting a person in chains especially for the same thing. How does that help anything? It seems to do more damage than good. I asked Martique why are they after you so hard? He tells me because they have to justify the things that they did wrong and the assertions they made that weren't true and that the only way they can do that is with some sort of conviction. Then he showed me endless policemen in the United States where he is located and they don't face consequences like Martique has. I even asked him about the Policemen that was with him that night of the event and I was blown away that he has had no consequences and has been free,and working doing security while Martique was in chains. It is difficult to process that. Since Martique has been out of chains, he has supported our son and

JA1467

2/2/25

he buys him costumes for character day, clothes, food and Martique is big on helping our son get treatment. If it was not for Martique, I would not even know our son's diagnosis. Martique has been working 2 jobs, taking care of his father, providing and supporting our son while physically being in another country, handling issues with IRS, handling issues with Maryland comptroller, getting therapy all while fighting a Federal criminal case and a lawsuit case. Martique is silly but can also be serious when he needs to be. I apologize if I am ignorant to specific details in the case he is up for sentencing. I just struggle to understand how the writing of a report causes all of this. I ask you judge to please consider this information. Thank You!

Sincerely,

January 20, 2025

To:        The Honorable Judge Deborah Boardman

From:      Millicent Canady

           /s/ Millicent Canady

Subject :  **Request for Second Chance/Leniency for Martique Vanderpool**

I am Martique's aunt Millicent Canady, who is writing this character letter for my nephew. Martique has always been family- oriented, respectful, caring, well-mannered, helpful young boy who has always strived for excellence in childhood which carried into adulthood.

### Second chance to make it right:

Your honor Martinique Vanderpool is that nephew out of many, that always steps up to the plate to ensure that I'm OK in my aging process. Your honor I lost my only two children in 2018 and 2019 and Martiique when available steps up and looks out for me. If I need him to fill out paperwork, read something to me, fix my computer or vacuum a floor, he helps me to understand what he's done, how he got there, and the next step in the process even though I've asked him the same question a thousand times. He is a kind helpful young man.

Your honor, I am not condoning anything or any wrongdoings that Martique has done but what I am praying for is that you give him a second chance to make things right. I don't know about you, but I know once in my life someone gave me a second chance and your honor, God knows it worked.

I am pleading to you, if possible, can you show Martique Vanderpool as much leniency as you possibly can. I know I need him and hopefully one day the world will need to utilize him through his intellect.

To avoid redundancy on this Inauguration Day.  I respectfully submit this character letter hoping you will grant Martique Vanderpool a second chance.

Millicent Canady

*Millicent Canady*

JA1469

Victoria Coates

14233 Angelton Terr

Burtonsville, MD 20866

January 17, 2025

Dear Judge Deborah L. Boardman,

I am Victoria Coates, (cousin-in-law), of Martique Vanderpool. I am writing this letter to express Martique's excellent character and the wonderful impact he has had on me and the individuals around him. I recognize the gravity of this case and do not take this letter lightly. I present this with the hope that it will illustrate the genuine character of Martique.

It is difficult to put into words the devastation, confusion, and sorrow our family has experienced regarding this case. There is also the sadness of knowing that there could be a possibility that Martique is not just separated from us, but from his own potential and being an extraordinary asset to his community. I have had the luxury of knowing Martique from childhood, and during this time, I have recognized him as someone of exceptional integrity, compassion, and responsibility. I have consistently admired Martique's great endeavor to achieve excellence in all his goals.

Thank you for taking this time to read this letter. I believe that Martique is fundamentally a good and well-intentioned individual, who I am confident will continue to inspire and positively influence all who cross his path.

Sincerely,
Victoria Coates

*Victoria Coates*

JA1470

FROM THE DESK OF

# Sylvia Crawford

# 2303 Lyon St

# Gastonia,NC 28052

I am writing to provide a character reference for Martique Vanderpool whom I met in Jessup Maryland and have known for over 5 years. I am aware of the charges brought against him and the upcoming court proceedings and I believe it is important to share my perspective on his character.

I have had the privilege of witnessing Martique demonstrate unwavering integrity, compassion, and respect throughout our acquaintance. Martique has always been a person of high moral character displaying honesty and truthfulness in all interactions. Martique has consistently shown respect for others, treating, treating individuals with kindness and dignity.

Furthermore, I have observed Martique fulfill responsibilities with dedication whether it was in a professional capacity or personal. Martique has consistently displayed a strong work ethic and commitment to excellence, known for going above and beyond expectations while exhibiting reliability and dependability.

I kindly request the court's consideration of Martique Vanderpool's overall character and previous contributions to society. I'm confident he will continue to positively contribute to the community.

Thank You for taking time to review this.

Sincerely Yours,

Sylvia Crawford

Registered Rehabilitation Nurse

*Sylvia Crawford*

JA1471

Jeremiah W. Ford                                          January 20, 2024

To whom it may concern,

I would like to address the court with the most honest intent. As a close relative of Martique Vanderpool, I would like to say that it has been admirable seeing my older cousin set forth positive examples and be such a motivational influence in more ways than he could imagine. The magnitude of this situation has caused him to question how amazing of a person that he has always been. In no way does this define who he is and I know that I may be speaking as an individual but our family, as a whole, knows that his only aspirations have been for greatness and to instill that in his younger cousins, of which I was a direct recipient. Our career paths may have been different as we grew into adulthood, but my love and respect for him never waivered.The length and time of this entire process has not only challenged the strength of his character, but ours as well. My cousin is one of the most resilient individuals I can attest to, but when faced with a battle such a this; it truly hurts to know it only takes one instance or one speculatory situation, in this case, to change the trajectory of someone in our family we are all rooting for to be a key component in the progression of our family generationally.

With the deepest consideration of the matter at hand, I just want to express the amount of love we have for my cousin, Martique. Our brother, our cousin, and closest companion has always had love and pure intentions with his family and his profession. We, as a  family, stand in unicent behind Martique, with an understanding heart that this  situation is very sensitive. Spirituality is objective, but having a genuine heart of gold is who my cousin truly is. One's character is perfected over time and experience, and I can sincerely say that I wish my cousin would have never had to strengthen his character in this manner. Though it is out of our control, we pray that the love and support we have for Martique, is ever so evident.

Honestly,.

Jeremiah Ford (Cousin)

# Shawn Gwynn
*Equipment Operator I – MCDOT/Division of Highway Services*

### Contact

19535 Wootton Avenue
Poolesville, MD 20837
443.248.3633
shawngwynn@comcast.net

**To Whom It May Concern:**

I am writing this letter on behalf of Martique Vanderpool, an outstanding individual and co-worker, whose work ethic, dedication, and commitment to excellence I have had the privilege of witnessing firsthand. I have over 25 years of experience as a CDL license holder, a diesel mechanic's certification holder, and a former trucking company owner-operator. With my extensive background in the commercial vehicle industry, I can confidently attest to the exceptional caliber of Mr. Vanderpool's skills and character.

Mr. Vanderpool began his career as an equipment apprentice, demonstrating a remarkable willingness to learn and grow in a demanding field. Through hard work and perseverance, he was promoted to an equipment operator, a testament to his competence and reliability. Recently, Mr. Vanderpool achieved a major milestone by earning his Commercial Driver's License (CDL), a significant accomplishment that required both diligence and determination.

Incarceration would not only have a profound and devastating impact on Mr. Vanderpool's life but also on the Montgomery County community he serves. He has worked tirelessly to build his career, obtaining certifications that would likely be forfeited, undoing his hard work and personal development. This outcome would deprive the community of a skilled professional whose contributions are invaluable.

Moreover, I have personally observed Mr. Vanderpool's focus and persistence during his journey to obtaining his CDL. His dedication to mastering the necessary skills and his respect for safety and professionalism make him an asset in the workforce and a role model for others pursuing similar paths.

Rather than incarceration, I strongly urge consideration of alternative solutions that would allow Mr. Vanderpool to continue being a productive and responsible member of society. Rehabilitation programs, community service, or probation would provide an opportunity for accountability without derailing the promising future he has worked so hard to achieve.

Mr. Vanderpool has proven himself as a person of integrity, resilience, and commitment to both his work and his community. I respectfully ask for leniency in his case, recognizing his potential for continued positive contributions.

Thank you for your time and consideration. Please feel free to contact me at the information mentioned above if you have any questions or require additional information.

Sincerely,

Shawn Gwynn

JA1473

2/5/2025

Dear Honorable Judge Deborah Boardman,

My name is Denise Henderson-Thompson. I'm a retired Respiratory Therapist, and currently a live-in caregiver. Martique Vanderpool is my nephew.

I'm writing this letter on behalf of Martique my nephew, whom I've known since his birth.  He is a devoted son, uncle and nephew. I'm very fond of him and I often find myself calling to check up on him when he ends up encouraging me. It does me so good to know that he is doing all that he can to live as a productive member of society.

Since Martique's release he has held down a steady job working for the Department of Transportation. During this time, he has had to get permission to travel because it pertains to his job.

He helps in and around the house and outside doing yard work in the area when needed. He has made tremendous strides since his release. Martique has been attending Church, and spending quality time with his family. He's a warm natured, dependable young man.

Marteak is eager to learn new techniques and concepts and put them into action. He is resilient and strong-minded. His mind and body deteriorated from being in a jail cell over 24 hours daily with no television or activities and no visitation for over a year and a half. He is one of our good ones, please don't take him away from us "again".



Respectfully,

*Denise Henderson-Thompson*

Denise Henderson-Thompson

JA1474

Charlotte Hughes
14913 Mckisson Court
Apt F
Silver Spring MD 20906

1/8/2025

Re:  Martique Vanderpool

To:  The Honorable Judge Deborah Boardman

I have known Martique Vanderpool as a good friend for over 20 years.  We met in our freshman year of high school and spent a tremendous amount of time together throughout the years.  I was greatly troubled to hear about this case as he has always been a solid person in my life, and it is for this reason I am happy to write a letter of reference for Mr. Martique Vanderpool regarding this matter. I understand the seriousness of this case, however, I hope the court will show some leniency.

Martique Vanderpool has always been an upright character in the community, a role model, well-known football star, and lovable person to all.  He has always been well known for his charisma, playful personality, and helpful advice.  Throughout the years, he has pushed me to go after my dreams whether it be modeling, career changes, relationships, and more.  No matter the time of day or season in life, I have witnessed Martique prove his loyalty to family, friends, and significant others.  He has always been an extremely hard working, upstanding, son, brother, pet owner (to his cats), and now father.

Following Martique's release, he has proven his ability to get back to work, stay focused, and remain goal-oriented despite what has occurred.  He has expressed deep remorse for his actions, and I believe in his ability to make better decisions.  We all hold Martique to a high standard and know he is capable of great success.

It is my sincere hope the court takes this letter into consideration at the time of sentencing.  Despite the current case, I still believe Martique to be an honorable individual, a valuable member of my community, and a good human being.

Sincerely,

*C. Hughes*

Charlotte Hughes

JA1475

1/18/25

To The Honorable Judge Deborah Boardman

This letter is written on behalf of Martique C. Vanderpool in order to shine a more accurate view of his life and character as a person, father and nephew. This is a plea for leniency for his life, freedom and future as a person who has never had any encounters with the law growing up or as an adult.

Martique has always been an exemplary person who has shown promise and excellence from grade school to manhood. He is a man raised with good morals, character and integrity. He is kind, considerate and helpful to everyone. He loves his job and became a cop to help people. His awards and accommodations speak to his commitment and service to mankind.

Martique understands he made a bad choice for which he is poignantly remorseful. Our entire family regrets Martique's decision-making that night. While we cannot predict how this event may have affected the government's investigation, Martique and our family fervently pray for healing and forgiveness.

Your Honor, please search your heart to give Martique a second chance at life to redeem himself outside of the confines of incarceration. We know without a shadow of a doubt that this has taken a psychological toll on him and our family. The Martique we know and love has already made great strides to remediate this momentary lapse in judgment. I do not believe that he has been treated fairly throughout this ordeal

If Your Honor would allow Martique to return to his family and his livelihood after starting over from scratch, I believe this would be the best decision for everyone including society.

Respectfully,

Lynn S. Jackson

Lynn S. Jackson

**JA1476**

1/19/25

To the Honorable Judge Boardman,

I am Marcus Jackson the youngest uncle to Martique Vanderpool Your honor I am still in disbelief of how this young man's life has had to experience such a harsh shortcoming. I have always believed in Martique he was always a very responsible and upright young man. Thinking back on a conversation that he and I had when he first purchased a home here in Prince Gorges County, he told me uncle I don't know what to do with this I made this big purchase in an area where I hardly know anyone I don't have tools to fix anything but as long as I have you I can learn some things. My response to him was to always put God first and all things are possible. Support your community and you learn who they are. These principals, he demonstrated this during a trial in which he was fighting for his life. However, after witnessing this trial, my understanding is that this woman involved was never honest; she is a plot artist who assisted Officer DuPree in destroying my nephew's life. Your honor I know that law is order and justice is the foundation on which law is governed but through this whole case, I did not see justice reveal the truth on this matter. First, everyone seems to be avoiding the fact that there were Three people involved but only one person being charged; Martique Vanderpool. He also overcame such a highly publicized case and to be found not guilty after fighting from jail in which his health deteriorated tremendously to the point where his suit was so baggy on him, he had discoloration all over his body, he never received any treatment for his braces and his teeth and gums were damaged as a result of this. He wasn't even allowed to have floss for over 3 years. He fought these false allegations and even with all the illegal events that have taken place throughout his case(s) justice is being miscarried. There has been illegal searches of his property in which I witnessed this. He was not even afforded a hearing by this court to expose government officials false statements and omissions. It's ironic since he's being accused of making an omission and/or false statement. This case is a series of government misconduct piled on top of each other and they have covered it by bringing this prosecution. There are things constantly being uncovered about this situation to date. Just because he was a former police officer does not mean that he does not have constitutional rights and that the Government's misconduct should not be overlooked just because Martique is accused of some form of misconduct. Your Honor, However you intend to sentence Martique I humbly ask that you weigh all the things that he has accomplished in his life and after serving jail time. Pleaae know that Martique is really a good person.

"Martique, I will continue to pray for you I want you to always have faith and put God on every subject of your life and remember that he will give you not more than you can handle. I want you to continue to stay focused and positive, this too shall pass".

Your Honor Thank you
for your time

Sincerely

Marcus Jackson

JA1477

January 6, 2025

To Whom It May Concern,

I am the Great Aunt of Martique Vanderpool. I know that he made a mistake, but he has turned his life around. These past months that he has been out on bail he got himself a job, he is attending church, and he is trying to do the right things in his life now.

Please, if you can find it in your heart to please let Martique stay with his family. I am 92 years of age and I don't know how much time I have left on this earth. As I mentioned, Martique is going to church now regularly, and I know in my heart that he is a changed man. He is a better person now. I pray for him all the time...

I pray that the Almighty God will answer my prayer for Martique to be able to return home to us. I also pray that God will touch your heart as well, and may His blessings always be upon you.

Sincerely,

Mrs. Sonia Jennings

Friday, January 10, 2025

Honorable Judge Boardman
6500 Cherrywood Lane, Suite 445
Greenbelt, MD 20770
To the Honorable Judge Boardman:

I am Deneise Jennings-Houston, writing to you a Character Reference for Martique Vanderpool who is the youngest son of my only 1st Cousin, Gary Vanderpool. I am also the eldest daughter of his Great Aunt, Sonia Jennings, who is also submitting a Character Reference on his behalf.

During the 3 year period of Martique's initial incarceration, he and I kept in touch on average once a month by way of personal letters; it was over this time that I learned better the heart and mindset of my young cousin.

One thing I learned was that despite Martique's belief that he was being unjustly treated by the Penal System-- e.g. being incarcerated for 18 months without a Bail Hearing, being on Lock Down sometimes as much as 30-40 hours at a time in addition to being in Solitary Confinement, not being able to receive visits from his Lawyers, or Family Members—he was still able to maintain a respectful attitude towards those who were in charge of the Judicial Process as it related to him at that time. In his letter to Judge_____ of May 27, 2021, Martique writes: "Dear Judge _____ I want to thank you for granting me a bond hearing...it has been over a year since my Hearing in April, 2020...Many Thanks for taking the time to read this letter."

Another thing that I learned about my Young Cousin is his Faith in the Power of Good to Prevail. In a letter to me dated May, 14, 2020 Martique writes: "...Being here is a struggle, but I have been making it thru God's Grace...I am convinced that this is a training camp for when I leave this earth... Being here also makes you appreciate things and people more...As alone as I feel at times, I stop and remember that I am not alone...For once in my life I have to completely trust God..."

Perhaps what is most important is that Martique recognizes his situation is not separate from the struggles and potential victories of our world; in the same May 14th letter, he writes: "So many unexplained events have occurred in the past 5 months that it has to be God's doing. And theses unexplained events are not limited to me; they are throughout the whole world."

Your Honor, permit me to end by saying that by all accounts of both the Judicial & Penal Systems that Martique has been, and continues to be under the jurisdiction of, I believe that he has paid his debt, and therefore, it is my hope, but more importantly my prayer that this belief proves factual, and will be taken into your consideration for his further sentencing.

Respectfully Submitted,

D.Jennings-Houston

JA1479

DEPARTMENT OF THE AIR FORCE
AIR FORCE RESERVE COMMAND
459th Air Refueling Wing, Andrews AFB, MD 20762-4814

MEMORANDUM FOR REFERENCE

FROM:  TSGT EDWARD LINDSEY

   756 ARS/ SME Medical Supervisor

SUBJECT: Letter of Reference for Mr. Martique Vanderpool

1.  It is with a great deal of pleasure that I write this letter of reference for Martique Vanderpool. He worked as a Security Officer at Alutiiq for the Department of Information Systems Agency (DISA) with me. During this time I've had the distinct pleasure of working directly with him as his supervisor. He brings refined skills, considered judgment, and valuable experience to other fellow security officers and agency employees. He never hesitated to be the first to stand up when we need someone to perform a demanding duty. He served as an example to many Officers and DISA personnel alike.

2.  Martique sustained superior performance and was an inspiration to each member of our security force. The respect and admiration he received from subordinates manifests his superlative qualities of leadership, integrity, and professional knowledge. He utilized all available resources to help establish a viable and efficient training program for new officers by coordinating with supervisors assigned to DISA, resulting in a successful program that made realistic training possible for our new officer personnel.

3.  Martique represented excellence, spirit, professionalism and dedication to all Officers. His concern, involvement, and consideration for others were not limited by self-interest, or in only getting the job done. He refused to be content with merely accepting the "status quo", and always found ways and means of improving morale, team spirit, and pride. His example fostered unparalleled productivity and esprit at DISA. I believe in Martique and that he deserves a second chance.

Edward E Lindsey Sr.

EDWARD E. LINDSEY SR., TSGT, USAF
SME MEDICAL SUPERVISOR

JA1480

**Carmen J Milligan**
10 Sol Thorpe Lane
Chesapeake, Virginia 23325
carmenjmilligan@gmail.com

January 17, 2025

Hon. Judge Deborah Boardman
United States District Court  of Md.
6500 Cherry Wood Lane
Greenbelt, Maryland  20770

Honorable Judge Deborah Boardman,

I am writing on behalf of Martique Cabral Vanderpool, Case  Number 8:21-cr-354-DLB, whose case is coming before your court on the 20th of February 2025.

As a family friend for approximately the past 26 years, I have known Martique during his formative years and as a young adult. Martique has always demonstrated a serious and goal oriented personality which led him to complete his formal education with honors and to become an independent homeowner in Capitol Heights, Md. straight out of college.

Once he became a police officer, he, before long, was nominated by the chief of police and the mayor of Fairmont Heights Md. for Officer of the Year in June of 2019.

Martique has much to offer his community and society in general because of the type of individual he is, committed to self-improvement, contributing to others, and devoted son and family member.

Martique made a terrible decision in 2019 demonstrating a lapse in judgement for which he has been atoning for the past five years. He spent approximately three and a half years in solitary confinement awaiting his first trial and has been home under restrictions for approximately the past two years. During this period Martique has successfully reintegrated into his family and community and has demonstrated he deserves a meaningful second chance. He has conducted himself as law abiding and the respectful person that he is. He has obtained a job with the Montgomery County Government responding to weather emergencies and hazards, as well as numerous service requests from citizens. To qualify for this job, he had to apply himself, study, and become certified. Again, indicative of his drive for service and productivity. Martique continues to be the goal oriented, studious, hard-working person he has always been. He has within him the capacity and the drive to lead a purposeful life as a contributing member of society and to be a guiding light and support to his son.

I, hereby, make an earnest request from Your Honor, to please consider this plea for clemency for Martique C. Vanderpool, that he may be restored the opportunity to participate freely in daily life as a committed father, son, and as an upstanding member of society.

JA1481

**Carmen J Milligan**
10 Sol Thorpe Lane
Chesapeake, Virginia 23325
carmenjmilligan@gmail.com

Thank you, Your Honor. I remain...

Respectfully,

Carmen J. Milligan
Retired Educator

Robert Monroe

1408 Campbell Ave

Capital Heights MD. 20743

240-372-5142

Robert.monroe@montgomerycountymd.gov

1/13/2025

Martique Vanderpool

Dear Judge, I am writing you today to offer my support and perspective on the character of Martique Vanderpool, who is currently facing sentencing for his offense. I have known Martique for several months as his supervisor here at Montgomery County DOT. During this time, I have consistently observed Martique to be a kind, responsible, helpful, hardworking, and respectful young man. Here at work, he has demonstrated a strong work ethic and a positive attitude. I believe Martique is genuinely remorseful for his actions and deeply regrets the harm caused. He has expressed a strong desire to make any amends necessary to contribute positively to society. I am confident that he will use this experience as an opportunity for growth and positive change. I urge the court to consider Martique Vanderpool positive contributions to community and country. I'm sure if jail time is avoided, Mr. Vanderpool can continue his work started in making beneficial societal impacts. We are willing to accommodate reasonable change to Mr. Vanderpool's

JA1483

schedule in the event judgement is passed down. We are committed to keeping him employed and continuing his career here at Montgomery County DOT.

Robert Monroe
District Supervisor - Silver Spring Depot

*1/15/25*

Department of Transportation
Division of Highway Services
8710 Brookeville Road Bldg. A
Silver Spring, Maryland 20910
240-777-7662 Office
240-372-5142 Cell

**MCDOT**
Montgomery County
Department of Transportation

JA1484

1/4/2025

To: Judge Deborah L. Boardman

Throughout the time of getting to know Mr. Vanderpool and forming a true friendship with him, has been refreshing. It's rare nowadays to come across such a beautiful, humble soul such as his. He is someone who is genuine and encouraging; Also, he is a man who's transparent and walks in his truth. Mr. Vanderpool has been a great listener for me with no judgment, just engaging and empathic. Sometimes, even offering sound advice when needed. Getting to know Mr. Vanderpool as a proud father has been such a joy. He often talks about his son and looks forward to him joining him here in the States soon, so he can raise him as a single parent. Mr. Vanderpool is very focused and driven in his life to be a better version of himself every day.

No matter what's going on, Mr. Vanderpool finds the positive in things and leans on his faith to see him through. Throughout this time of knowing Mr. Vanderpool he has obtained steady employment, also have earned different certifications in his employment. He is humble and blessed to have such a great support system around him to include people that encourage, and praise with and for him.

With regards

*Latanya Pugh*

Latanya Pugh

JA1485

**Michael A Samuel**
10 Sol Thorpe Lane
Chesapeake, Virginia 23325

January 20, 2025

Hon. Judge Deborah Boardman
United States District Court of Md.
6500 Cherry Wood Lane
Greenbelt, Maryland 20770

Honorable Judge Deborah Boardman,

I am writing on behalf of Martique Cabral Vanderpool, Case Number 8:21-cr-354-DLB, whose case is coming before your court on the 20th of February 2025.

As a family member, cousin and educational professional and former principal serving in the Virginia Beach City Public Schools I have had the experience to see young adults grow into promising careers. I have known Martique all his life. Martique has always demonstrated a goal driven personality in serious pursuit of success which led him from high school to completing his college education with honors to achieving his lifelong pursuit of going into the profession of law enforcement and becoming a police officer to becoming a homeowner upon graduation from college.
He demonstrated such leadership skills as a police officer it wasn't long before he achieved Officer of the Year in June of 2019 in a very short time.

The other attributes that he possesses is that Martique loves to give to others, community and society at large because of the type of individual he is. He is also a committed father, devoted son and family member.

As a person of faith, in my tradition we state The Creator brings people into our lives for a lesson or a blessing. He has now learned in life by trying to impress others who are not traveling in the same direction as himself can be a very costly lesson to learn and in his case he lost everything which includes property, profession, and stature in the community. Martique made a terrible decision in 2019 demonstrating a lapse in judgement for which he has been atoning for the past five years. He spent approximately three and a half years in solitary confinement awaiting his first trial. When the virus hit 90% of the inmates were permitted to go home and he was not granted that opportunity. So he suffered isolation and when it was determine that the State of Maryland could not provide for the needs of the inmates at large during the pandemic he was remanded to remain.   He has been home under restrictions for approximately the past two years. He was given some dispensation during the state of Maryland trial where is was found not guilty by a jury of his peers on all accounts except for one. That account amounted to a misdemeanor.  Finally he was permitted to go home under strict monitoring and supervision while now awaiting the outcome of the federal trial. He didn't just sit around on his hands doing nothing moaning and griping.  During this period Martique successfully reintegrated himself into his family and community and has

JA1486

**Michael A Samuel**
10 Sol Thorpe Lane
Chesapeake, Virginia 23325

demonstrated he deserves a meaningful second chance. He has conducted himself as law abiding citizen and a respectful person. He has obtained a job with the Montgomery County Government in their highways and roads division responding to weather emergencies and hazards, as well as numerous service requests from citizens. To qualify for this job, he had to apply himself, study, and become certified. His goal is acquire enough financial resources to bring his son from St. Lucia to the US and provide for him with the resources that he has available to him and to be in touch with services because his son has some receptive delays and deficiencies in speech. He has within him the capacity and the drive to lead a purposeful life as a contributing member of society and to be a guiding light and support to his son.

Most important, he also acknowledges his mistake and cannot blame others for choices he has made.   Before this he has had an impeccable record and not involved on the other side of the justice system since he was a young adult.

Perhaps, and we pray that you are the person in his life that the Creator as placed there as a blessing, by showing compassion and mercy within the resolve of your authority and with tools that are available to you in his sentencing. We, hereby, make an earnest request from Your Honor, to please consider this plea for clemency for Martique C. Vanderpool and  that he may be restored the opportunity to participate freely in daily life as a committed father, son, and as an upstanding member of society. ".  I am sure that Mr. Vanderpool will continue to hold himself again to very high personal and professional standards and will be successful in his futures pursuits.

Thank you, Your Honor. I remain...

Respectfully,

Michael A Samuel
Retired School Administrator and Educator

JA1487

12/13/2024

From: Carleena "Leena" Scott


The Offices of the Honorable Judge Deborah L. Boardman

6500 Cherrywood lane

Suite 445

Greenbelt, MD 20770



Honorable Judge Boardman,


Re: Character Reference for Martique Vanderpool:


I am writing this letter as a character reference for Mr. Vanderpool who is appearing before your court. Van and I have been friends for just under a year but through our daily interactions, I am confident in expressing his judgment, integrity and character and ask that court consider this letter when determining sentencing.


Mr. Vanderpool is a considerate person who's served in many public safety positions for various people in the community and continues to currently serve the community providing highway services and completing service call requests. Every day, Mr. Vanderpool puts his life before others operating dangerous equipment and works to repair roads, and sidewalks, assisting in severe storms and other inclement weather. Mr. Vanderpool leverages his quick wit, preparation, and certifications to ensure the communities' satisfaction and that complaints are promptly addressed.


Mr. Vanderpool also has shown on numerous accounts his ability to step in and advise others when needed. He doesn't hesitate to share his knowledge and experience to help solve issues such as being available to

1

JA1488

12/13/2024

help when a wasp nest was on my property or being able to help evaluate future planning for work. Vanderpool has always been caring and supportive.

In addition, Mr. Vanderpool is a father of a young boy who needs additional support. Mr. Vanderpool is patient, and understanding and is able to be a strong representation of a positive father figure for his child. There are many examples of the system taking parents from children when they need them the most and I would like the court to consider the impact that leaves on those children and their communities.

Mr. Vanderpool was introduced to the system in the earlier portions of this incident in an earlier case and it left damaging effects on his mental state resulting in the development of the following phobias: Cleithrophobia and Agoraphobia. Prison confinement will trigger these phobias and I am concerned the system does not offer alternative methods to prevent the incidence of these phobias and may end up causing Mr. Vanderpool more harm than good.

Mr. Vanderpool uplifts people, he challenges people to be better, he guides others and just maintains a positive outlook. I recognize the case puts Mr. Vanderpool in a negative light but, the court should know that Mr. Vanderpool adds positive value to the lives he is a part of and there are people who care about him and will continue to support him to make better decisions moving forward.

We have all made decisions that we aren't proud of but, I ask that the court of The Honorable Judge Deborah Boardman to consider that everyday is an opportunity to not be a part of the problem but instead provide constructive solutions. Mr. Vanderpool is not a threat to his community, he continues his responsibilities for his family, community and is also better able to care for himself and others outside of the prison system. Putting Mr. Vanderpool into prison is an unnecessary expense of public funds and I

2

JA1489

12/13/2024

urge the court to consider the positive attributes of Mr. Vanderpool when evaluating any sentencing decisions.

Thank you for your consideration.

C. Scott

3

JA1490

To: The Honorable Judge Deborah Boardman                    2/4/25

My name is Charles R. Smith. I am Martique's stepfather. I allowed Martique to live in my residence when he was released from Federal Custody in March 2023 so that he would not remain in jail because he was homeless due to being in jail for years. To qualify for home confinement, there were requirements, one of which was having a home to live in. I watched Martique go through several phases of not being able to find a job to taking a traveling position in which he would go to different hospitals around the country and de their inventory. He sought out counseling on his own because U.S probation/Pretrial services didn't do anything to help him get counseling, or food stamps or the things he needed after reentering society. He has done very well for himself in a short amount of time with no handouts. It's refreshing to see it first-hand. I retired from the District of Columbia Department of Social Services. I'm also coming up on my 2nd retirement after 30 years of service with the Court Services and Supervision Agency (CSOSA) in Washington, DC. I supervise and counsel adult offenders for a living similar to the U.S Probation Office. I Monitor Martique and counsel him which I believe is an added incentive for him not being someone that would violate any conditions of release. He has been doing a phenomenal job despite the cards he's been dealt with this situation. He's made a lot of great decisions in his life for as long as I have known him.

We all have made a poor decision at some point. Whether it's drinking and getting behind the wheel, fighting, theft, racist comments, the list goes on and on. I can't Monday night quarterback him for something in the heat of the moment, especially when he's overpaid his debt in my opinion. The punishment he's been receiving doesn't fit the crime he's alleged to have committed. My biological son made a poor decision a while back. He got high on drugs, got behind the wheel with my grandson and granddaughter in the backseat and crashed the vehicle, ultimately killing my grandson. I say all that to say this, my son is free living his life and the pain and sorrow from that case is on a level nowhere near the case Martique just stood trial for. Martique is being blamed for everything in this case which he clearly is responsible for some things but other things are questionable. I believe I'm a prudent man and from what I heard in this case it would make me halt before I make a judgement about who did what when I don't know who all the players are. I'm not a judge and I can only imagine the tough decisions that you all make. But I'm a human being capable of making mistakes and so is Martique. I tell him all the time "You have the heart of a lion" because I don't have the courage or mental strength to go through what he's been through. I wouldn't even give him the courtesy of allowing him to stay in my home if he was some troublemaker, clearly, he is not. Meanwhile, about 1500 defendants have been pardoned or had their sentences commuted after trying to overturn the election; some with force and some with violence and possibly to overthrow the government. This good man (Martique) who I personally vouch for is sitting in federal court for a possible crime that was not sustained that the FBI investigated. I pray that the most beneficial thing is done in this case. Like I said, I'm not a Judge but I do interact with and supervise real criminals daily.

https://www.nbcwashington.com/news/local/man-indicted-in-crash-that-killed-4-year-old-son/130643/

CHARLES R. SMITH

Charles R. Smith

1/17/2025

To Whom This May Concern,

My name is Gary Tillman. I have been friends with Mr. Vanderpool for about 15 years now. I am writing this letter offering my unequivocal support of Mr. Vanderpool. In this time, I have witnessed Mr. Vanderpool's unwavering to integrity, compassion, and excellence in all areas of life.

Mr. Vanderpool is a person of extraordinary character. His ability to navigate complex situations with grace and resolve is truly commendable. Whether it's lending a helping hand to someone in need or excelling in their personal endeavors, Mr. Vanderpool consistently demonstrates a rare blend of empathy, intelligence, and true dedication.

In addition to everything Mr. Vanderpool brings to the table as a human being, he also a trusted friend and confidant. His ability to listen and offer sound and thoughtful advice while providing unwavering support has been invaluable to those fortunate enough to know him. Mr. Vanderpool approaches every relationship with the same attitude, which is with sincerity, respect, and genuine care.

I have no doubt in my mind that Mr. Vanderpool will continue to inspire and uplift those around him in every aspect of their life.

Very Respectfully,

Gary Tillman

JA1492

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 8:23-cr-234-DLB |
| v. | * | |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The government respectfully submits this response to defendant Vanderpool's Sentencing Memorandum (Doc. 168), to outline points of agreement and disagreement between the parties; to correct misapplied legal standards; to respond to factual claims made in connection with the defendant's request for leniency; and to recommend an ultimate sentence of 85 months imprisonment.

**I.   LEGAL STANDARDS**

The government agrees with several general principles outlined in the defendant's sentencing memorandum, including: that the Court must correctly calculate the U.S. Sentencing Guidelines, and must then consider the guideline recommendation as one factor, among several, in calculating an appropriate sentence, doc. 168, at 7, 16; that the Court is not bound by its guideline calculations; that the Court may depart from the recommended guideline sentence if that sentence does not adequately take into account the nature and circumstances of the offense and the history and characteristics of the defendant, *id.* at 16; and that the Court should base its punishment on "the real conduct that underlies the crime of conviction," *id.* at 11.

JA1493

But that is where the agreement of the parties ends.  The government disagrees with the defendant's calculation of the guidelines; with his assessment of the direction in which any departure should go; and with each of his claimed justifications for downward departure.

## II. GUIDELINE CALCULATIONS

U.S. Probation calculated the defendant's sentencing guideline range through use of a cross-reference to the civil rights guideline and a further cross-reference to a sex offense.  The government agrees, for the most part, with that calculation. The government has previously explained its position on the guidelines, through letters to Probation dated November 15, 2024, and January 2, 2025.   (The government, in conjunction with filing this response, will email courtesy copies of both letters to Probation and the Court, cc-ing defense counsel.).   The government hereby incorporates the arguments it set forth in those letters, and therefore will not repeat its position.  Rather, the government will use this this section of its Response to address guideline-related claims in the defendant's sentencing memorandum that are not addressed elsewhere.

### A.  Cross-Reference to the Sexual Abuse Guideline

The defendant cites numerous objections to Probation's cross-reference to the underlying offense of Sexual Abuse codified at 18 U.S.C § 2242.  The government hereby responds to those objections:

1.  <u>Misunderstanding of the Role of the State Trial</u>

First and foremost, the defendant argues that the cross-reference is inappropriate because the defendant was acquitted in state court on rape charges.   The acquittal in state court has no bearing on the federal case.  *See United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012) (noting that a sentencing court, in determining an appropriate sentence, is "entitled to consider conduct of the defendant['s] underlying charges of which [he] had been acquitted," as long as the

JA1494

Court finds, by a preponderance of the evidence, that the conduct occurred) (internal citations and quotation marks omitted); *see also United States v. Smith*, 981 F.2d 1252, 1992 WL 369904, at *3 (4th Cir. 1992) ("Evidence of a prior acquittal . . . does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime.") (internal alterations and quotation marks omitted).[1]

2.   Misunderstanding of the Application of § 2242

Next, the defendant claims that his conduct did not violate § 2242 (which prohibits, among other things, a defendant "caus[ing] another person to engage in a sexual act by threatening or placing that other person in fear").[2]  The defendant claims that § 2242 does not apply because "[t]he evidence in this case does not demonstrate any of these factors." Doc. 168 at 10.

As outlined in the government's letter to Probation, the Court need not even find that a § 2242 violation occurred, in order to find the cross-reference appropriate.  Jan. 2 Letter at 2 (collecting cases).   Additionally, a sentencing court makes findings based on a preponderance of the evidence, *United States v. Slager*, 912 F.3d 224, 232 (4th Cir. 2019), and the evidence in this case proved by far more than a preponderance that the defendant engaged in conduct that would have violated § 2242 if it had occurred in the special maritime and territorial jurisdiction of the federal government.

---

[1] Notably, since the state and the federal governments are separate sovereigns, even if the initial trial had been for the same crime as the federal trial, with all the same elements, the findings of the state jury would not have bound a federal court. *See United States v. Ball*, 18 F.4th 445, 451 (4th Cir. 2021) ("[U]nder the dual-sovereignty doctrine, the Supreme Court has long held that an offense committed under the laws of a State is *not the same offense* as an offense committed under the laws of the United States, even if the two offenses result from the same conduct and consist of the same elements.").

[2] If the threat puts the other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping, the conduct constitutes the more serious offense of 18 USC 2241.

JA1495

The government specifically requests that the Court, at sentencing, make a specific finding, on the record, that the evidence has proved, by a preponderance of the evidence, that the defendant's conduct constituted sexual abuse as defined in § 2242. The evidence supporting that finding includes evidence that when the defendant and his partner pulled R.S. over for a traffic stop, R.S. was panicked and said that she was worried about her injured son; that she became even more distraught when she learned that her car would be towed; that she was banging her head against the car and berating herself; and that the defendant and his partner nevertheless transported her, in handcuffs, from the scene of the stop, without telling anyone where they were going, taking her not to lock-up but to the otherwise-deserted Fairmount Heights Police Department, where the defendant pulled down his pants and said something to the effect of "we, you know, gotta make this right," before having sex with her on a sofa in the main room of the FHPD with the doors wide open and the defendant's partner standing nearby. See Verdict, Trial Tr. Vol. 4 at 5-8 (noting that R.S. "seemed to be having a panic attack"; that she was "in an apparent state of mental distress" and was "running into the street" and "banging her head against the car door"; that the car R.S. was driving was towed from the scene; that the defendant and his partner transported R.S. to the police station in handcuffs; that it was late at night and the police station appeared otherwise empty; that at the police station, R.S.'s handcuffs were removed and the defendant told R.S. "something along the lines of, 'we, you know, gotta make this right'"; that it was in these circumstances that R.S. agreed to have sex with the defendant; and that the defendant's approximately 235-pound partner—to whom the defendant "gave . . . a condom"— "went outside the common area and dimmed the lights"). *See, e.g., United States v. Morris*, 494 F. App'x 574, 576 (6th Cir. 2012) (finding that evidence was sufficient to support a finding of aggravated sexual abuse where a police officer, convicted of a violation 18 U.S.C. § 242, had pulled a woman over, ordered her companion to walk home, threatened her with jail, asked her

JA1496

what she would do to avoid jail, directed her to follow him to a dead-end street, and had sex with her inside his locked police car).

3. Misapplication of *Blakely*

The defendant mis-reads *Blakely v. Washington*, 542 U.S. 296 (2004), interpreting it to prohibit any cross-reference based on conduct that was not proven at trial. Doc. 168, at 11. The defendant fundamentally misunderstands *Blakely*, which in fact deals only with sentencing considerations that would lead the Court to exceed the *statutory maximum* sentence allowed by law. 542 U.S. at 303-04. Thus, *Blakely* would be relevant in this case only if the Court attempted to sentence the defendant to more than 20 years (the statutory maximum sentence under § 1519).

4. Misrepresentation of Court's Ruling Regarding Evidence of Coercion

Next, the defendant claims that it would be unfair for the Court to sentence him based on a finding that he coerced R.S. into having sex with him; in support of this claim, he alleges that the Court barred the parties from presenting evidence at trial regarding consent or lack thereof. Doc. 168, at 14. This argument is both legally misguided and factually inaccurate. First, as a legal matter, the Court is permitted to sentence a defendant based on information that was not elicited at trial; in fact, many of the considerations that are expressly *relevant* to sentencing (like a defendant's character and criminal history) are often irrelevant at trial. *See United States v. Brooks*, 523 F. App'x 992, 995 (4th Cir. 2013) ("There are no limits on the information concerning the background, character, and conduct of a convicted defendant that the district court may consider in determining an appropriate sentence.") (internal quotation marks omitted). Second, as a factual matter, the defendant's claim is inaccurate. The defendant quoted a preliminary ruling the Court made at the September 18, 2024, pretrial conference (excluding "at this point, [evidence] that the sexual encounter with R.S. was coercive"), while ignoring the Court's final, amended ruling on the matter, which the Court made on October 17, 2024, at the

final hearing before trial, when the Court expressly granted the government's motion for clarification of its prior ruling. See Doc. 130 (paperless order granting Doc. 117, the government's Motion to Clarify, for reasons stated on the record in court on October 17, 2024).[3]

5. Misunderstanding of the Sentencing Structure of § 242

The defendant also raises what appears to be a general-unfairness objection to Probation's cross-reference to the civil rights offense, arguing that, "ironically," if the defendant had been charged with and convicted of the underlying civil rights offense, in violation of § 242, he would have faced a maximum sentence of one year for that offense. Doc. 168 at 13 ("That the government seeks a discipline [sic] orders of magnitude beyond the term for the actual underlying crime seems laughable."). Again the defendant misunderstands the law. If the defendant had been charged with, and convicted of, violating R.S.'s right to bodily integrity by subjecting her to unwanted, coercive sex, he would now be facing imprisonment for "any term of years, or for life." 18 U.S.C. § 242 (noting a maximum sentence of life, or the death penalty, for any offense that involves kidnapping or attempted kidnapping); *see also United States v. Guidry*, 456 F.3d 493, 500 (5th Cir. 2006) (noting a PSIR recommendation of life in a case involving a police officer who committed a civil rights violation that involved kidnapping).

**B. Application of a Kidnapping Enhancement**

The defendant objects to application of a 4-point kidnapping enhancement because there was no proof at trial of the federal-nexus-element that the government would have had to prove if the defendant had been charged with a violation of the federal kidnapping statute. Doc. 168, at

---

[3] The government quotes only the Court's paperless order because the government has not yet obtained a transcript of the October 17 hearing. Although the government therefore cannot quote the Court's exact language, it recalls that the Court expressly ruled that the government would be permitted to present evidence (and draw reasonable inferences from that evidence) suggesting that the sexual contact between the defendant and R.S. was coercive.

12. The defendant's argument fails because no jurisdictional hook is required. *See Carroll*, 3 F.3d at 102-103; *Guidry*, 456 F.3d at 511 (holding that transportation across state lines was not required for a kidnapping enhancement; it was sufficient that "[the police officer defendant] drove [his victim] to a secluded area [and] intentionally abducted and confined [her] without her consent").

### C. Government's Objection to any Zero-Point Offender Reduction

Probation's recommended guideline calculations include a 2-point downward adjustment, pursuant to USSG § 4C1.1, based on a finding that the defendant was a "zero-point offender." The government objects to this adjustment and asks the Court to find that the defendant is not eligible for this reduction because calculation of his sentence relies on USSG § 2H1.1.

Section 4C1.1 provides for a 2-level downward adjustment if the defendant meets 11 enumerated criteria, one of which is that "the instant offense of conviction is not covered by [USSG] § 2H1.1 (Offenses Involving Individual Rights)." USSG § 4C1.1(a)(8). Here, the defendant cannot be sentenced for his "instant offense of conviction" without reference to § 2H1.1. Thus, the "instant offense of conviction" (this particular § 1519 violation) is, in fact, ultimately "covered by" § 2H1.1.

The government has found only one case addressing this issue – a case that is remarkably similar to Vanderpool's and fully supports the government's interpretation of § 4C1.1. In *United States v. Jones*, No. 2:22-CR-00180, 2024 WL 4507368 (S.D.W. Va. Oct. 16, 2024), the defendant was a supervisory parole officer who lied to investigators about alleged sexual abuse by one of his subordinate parole officers. The defendant argued, as Vanderpool does now, that he was entitled to the 2-level reduction under § 4C1.1, despite the fact that calculation of his sentence required reference to §2H1.1; he claimed that his offense of conviction was "covered by" § 2X3.1, and therefore could not be "covered by" § 2H1.1. The court rejected the defendant's

JA1499

argument, noting that (as here) § 2X3.1 required a cross-reference to the guideline for the underlying offense, which was (as here) a § 242 civil rights violation covered by § 2H1.1 (notably, in that case, as in this one, the offense required a further cross-reference to the offense underlying the civil rights violation, which was, as here, a sex offense covered by § 2A3.1). The court in *Jones* held that because § 2H1.1 was central to the determination of the sentence, the defendant's conduct was "covered by" § 2H1.1 such that § 4C1.1(a)(8) barred application of the 2-level decrease.

Probation, after considering this objection, persisted in recommending the zero-point offender adjustment, but did so without citing any contrary authority. Accordingly, the government asks this Court to adopt the reasoning in *Jones* and deny this adjustment.

### D.  Obstruction of Justice and the Nnamani Report

As noted in the PSIR, the government initially recommended a 2-point upward adjustment for obstruction of justice (based on the defendant's introduction of a report about the unrelated arrest of a man named Travis Nnamani) and the government subsequently withdrew that request. The details of those developments are set forth in the final PSIR, Doc. 162, as well as in the government's Sur-Reply to Defendant's Post Trial Motion, Doc. 164-2. The government does not object to the final PSIR but writes here simply to correct a factual misstatement in the defendant's Sentencing Memorandum. The defendant claims that "the authenticity of [the Nnamani report] was proven based on the discovery provided to the defendant by the government." Doc 168 at 5. In fact, as laid out in the government's Sur-Reply, the government maintains that the documentary evidence relating to the Nnamani arrest (including video evidence showing that the defendant transported Nnamani to lock-up and documents showing that two reports related to Nnamani's arrest were both written on Vanderpool's RMS account and were

JA1500

both finalized within minutes of the end of Vanderpool's shift) suggests that Vanderpool wrote the Nnamani report himself and then introduced it at trial claiming that someone else wrote it.

## III.    DEPARTURES AND NON-GUIDELINE CONSIDERATIONS

In addition to objecting to the guideline calculations, the defendant makes a remarkable request: he asks this Court to depart downward and sentence him to probation based on his background and character, including his dedication to his son (whom he admits he has never met, blaming the estrangement on this case) and his public service, which he claims is exemplified by his selection as Officer of the Year in 2019 (the very year in which he abused his authority as an officer to commit the federal felony offense for which he is currently being sentenced). Most stunningly, he asks the Court to forego a prison sentence and sentence him to probation based on his "record of honesty related to this circumstance." Doc. 168 at 19.

### A.  The Defendant's "Record of Honesty"

The Court, having presided over trial, is well familiar with the facts of the defendant's crime, including his "record of honesty" related to his interactions with R.S. In a nutshell, the facts that led to the defendant's conviction—*for lying about his interactions with R.S.*—are teeming with dishonesty at every turn. The defendant and his partner arrested a distraught 19-year-old woman who was rushing to get to her injured son; had her car towed; and then took her in handcuffs to the locked and otherwise-empty FHPD station, where he pulled down his pants, told her that she needed to "make this right," and had sex with her. In doing so, the defendant and his partner deceived dispatchers by disregarding the rules about reporting their destination any time they are transporting an arrestee, and deceived supervisors by disregarding rules about taking prisoners to lock-up rather than the deserted station. While at the station, the defendant wrote a criminal citation to R.S., which he later admitted to his friend, D.W., was part of an effort to cover his tracks by deceiving any future investigators into thinking that his arrest of R.S. had

JA1501

been business-as-usual. He and his partner then drove R.S. to the tow lot, where he had the car returned to her, despite the fact that she had no license and did not own the car. He then returned to the FHPD station, where he sat at a computer and typed out the false report for which he has now been charged and convicted. Next, when he learned that his conduct was under investigation, he sent copies of that same false report to his partner, underscoring the false story he apparently wanted his partner to stick with. *See* Gov. Ex. 12 at 1 ("The report for that chick. The traffic stop and detention only lasted an hour and she was sent on her way.").

In addition to asking the Court to consider his "record of honesty," the defendant, through the letters submitted on his behalf, makes a closely related request for leniency based on his alleged "remorse." The evidence in this case—including the defendant's first recorded boasts of how he "fucked" the distraught and self-harming R.S. while she was "in custody"; his comments that she had "slipped up and said too much," making it "my word against hers"; and his testimony at his state rape trial, where, when asked if he had had sex with R.S., he insisted that *he* had not had sex with her; *she* had had sex with *him*—demonstrates the very opposite of remorse. *See State of Maryland v. Martique Vanderpool*, No. 20-0085x, State Trial Tr. at E-67.

## B.  The Defendant's Record of Service

Although the government at trial scrupulously avoided presenting evidence related to other uncharged conduct (and even made efforts to prevent the defendant from accidentally opening the door to that evidence), the defendant's request for the Court to consider his record of public service when crafting a sentence makes it necessary for the government to be prepared to offer evidence at the sentencing hearing of the defendant's other bad conduct. Specifically, the government will be prepared to offer information demonstrating, by a preponderance of the evidence: that the defendant stole property (a $650 ballistic vest) from a prior police-department employer; that he appears to have participated in a towing scheme through which officers would

JA1502

take kickbacks for towing vehicle; and that he instructed his mother to fraudulently pursue a roadside assistance insurance benefit to pay for moving his motorcycles.

### C. The Defendant's Family Obligations

As a general matter, a defendant's family obligations do not justify a downward departure except under exceptional circumstances. USSG § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). Nevertheless, the defendant asks for leniency based on his need to support his family – including the 5-year-old son he has never met. Although the government has sympathy for the innocent relatives of any defendant facing a prison sentence—who unquestionably face hardships they did not bring upon themselves—the defendant has presented no circumstances that are unusual, let alone unusual enough to fall within the exceptions enumerated in § 5H1.6 Application Note 1(B)(i)-(iv).

Because (and *only* because) the defendant has specifically asked this Court to consider his family relationships when crafting a sentence, the government will be prepared to present evidence at sentencing about those relationships. Specifically, the government will be prepared to present evidence demonstrating that the defendant, when he was first arrested by the state, used his mother, who had his power of attorney (POA), to file suspicious insurance claims on his behalf. And because the defendant and some of those writing letters to the Court on his behalf specifically ask for leniency because of the defendant's important role as father to a young boy, the government will be prepared to provide to the Court excerpts of WhatsApp recordings in which the defendant talks about fatherhood. In those excerpts—from conversations with his confidante, D.W.—the defendant talks about wanting to limit the child support he has to pay; about his intent to hide assets to avoid a child support judgment; about his desire to avoid seeing

JA1503

his offspring; and about his hope that his child will be a boy, so that he can give the child advice, such as: "Hey, you see the furry gushy thing?  You stick your thing in there."[4]

### E.  Health Considerations

The defendant asks for a downward adjustment because of his allegedly poor health.  Doc. 168 at 19.  Previously, in his objections to the PSIR, the defendant made a health-related claim to which the government responded in its January letter to Probation; in his Sentencing Memorandum, the defendant now raises a new health-related claim based on alleged PTSD. Although counsel for the defendant represented to the Court during a telephonic conference on February 11, 2025, that the defendant would file a "report" from a medical expert to back up his PTSD claim, the document he actually filed (Doc. 170) was simply a half-page letter from a doctor who claims to have treated the defendant for all of one month, and whose letter consists of a list of symptoms reportedly described by the defendant.  The defendant has provided no support for his claim other than his own word, as relayed to a doctor who appears to have been consulted solely for purposes of the defendant's upcoming sentencing.  And despite the defendant's alleged health challenges, he claims to have worked multiple jobs since his release from incarceration and to have been a productive member of his community.  The Court should disregard the defendant's unsupported health-related claim.

### E. Discharged Term of Imprisonment

Finally, defendant Vanderpool argues that any sentence must be adjusted downward by the amount of time he served in the state case (and while the now-dismissed 18 U.S.C. § 242 indictment was pending). Doc. 168 at 26-27.  Probation rejected this claim, noting that USSG §

---

[4] To the extent that the defendant asks for leniency at sentencing based on sensitive medical information (as he did in his objections to the PSIR), the government will be prepared to expound on its response to Probation by playing WhatsApp messages that are relevant to that topic.

JA1504

5G1.3 addresses the credit to be given only to "undischarged" terms of imprisonment, and not to prison sentences, like the defendant's state sentence, that have already been completed. Although Probation's reading of § 5G1.3 is correct, a separate guideline provision, § 5K2.23, permits (but does not require) the sentencing Court to grant a downward departure based on a *discharged* term of imprisonment, such as the defendant's state sentence, if that term of imprisonment would have warranted a concurrent sentence if it had been undischarged. USSG § 5K2.23. This discretionary departure should be granted only if doing so would allow the Court "to achieve a reasonable punishment for the instant offense." *Id.*

Whether a departure would be reasonable in this case depends on whether the Bureau of Prisons (BOP) will credit the defendant with the time he served on his state charge. It is the government's belief that the BOP will not credit the defendant for time served, because pursuant to 18 U.S.C. § 3585(b), an inmate cannot receive credit if the time served "has . . . been credited against another sentence," 18 U.S.C. § 3585(b); in this case, the defendant received credit toward his state court sentence for his time in state custody. *See In re United States Bureau of Prisons*, 918 F.3d 431, 439 (5th Cir. 2019) ("If the court determines that the BOP will not credit a defendant's prior time served, the court can reduce the defendant's sentence under § 5G1.3(b) or § 5K2.23 of the U.S. Sentencing Guidelines.").

If the government's assumption regarding BOP's intent is correct, then the government recommends that the Court depart downward 36 months to account for the time the defendant served in the state system (based on Probation's calculation that the defendant served 36 months and 11 days on the state charge). Because the BOP decision regarding any credit for time-served will by necessity occur *after* sentencing—and because, as far as the government knows, there is no way to establish with certainty before then what BOP will do—the government recommends

JA1505

that the Court issue an alternative sentence to be imposed if BOP *does* credit the defendant with his time served in the state system.

## IV. SENTENCING RECOMMENDATION

When fashioning an appropriate sentence for a defendant, the Court must first consider the applicable Guidelines range under 18 U.S.C. § 3553(a), which serves as the "starting point and the initial benchmark" for federal sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Once the Court has determined the appropriate advisory sentencing range, it should then consider that range in light of the other relevant § 3553(a) factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *Id.* The Court must then impose a sentence sufficient to accomplish certain delineated purposes, including to: 1) reflect the seriousness of the offense; 2) promote respect for the law; 3) provide just punishment for the offense; 4) afford adequate deterrence to criminal conduct; 5) protect the public from further crimes of the defendant; and 6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2).

By the government's calculation, the defendant's sentencing guideline offense level is 30.[5] An offense level of 30 and a criminal history category of I yields a Guidelines range of 97 to 121 months' imprisonment. A sentence at the high end of that Guideline range is necessary in this case to account for the seriousness of the conduct at issue here: the defendant, a police officer endowed with the public's trust, took a handcuffed and distraught 19-year-old arrestee who had "slipped up and said too much"—who had said she suffered from depression and therefore, in his eyes, would not be believed—to an empty police station, where he had sex with her, and then wrote a false report attempting to cover up what he had done. The gravity of the defendant's

---

[5] As discussed *supra* page 7, the government disagrees with Probation that a 2-point downward zero-point offender adjustment is appropriate.

offense is aggravated not only by his abuse of a position of authority and public trust, but also by his persistent lack of remorse.

Moreover, the defendant's history and characteristics demonstrate that his conduct here was not an aberration. His own statements on his WhatsApp audio recordings demonstrate his cavalier attitude toward his treatment of R.S. and toward the truth. This is not a case where the defendant made one poor decision and then had a momentary, knee-jerk reaction to lie to cover it up. The defendant's own words on the WhatsApp audio recordings demonstrate that he gave significant thought to his lies, and more specifically to how and why those lies would protect him and discredit his young victim.

For the reasons set forth above, the United States requests that the defendant be sentenced to 121 months (the top of the guideline range), with a downward departure of 36 months for time served in state court, for a final adjusted sentence of 85 months in prison.

Respectfully submitted this 13th day of February, 2025

Kathleen Wolfe
Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice

*/s/ Barbara Bernstein*
Barbara (Bobbi) Bernstein
Deputy Chief
Bobbi.Bernstein@usdoj.gov

Tara Allison
Trial Attorney
Tara.Allison@usdoj.gov

Criminal Section, Civil Rights Division
150 M. Street, NE
Washington, DC 20002
(202) 353-0032

JA1507

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM has been served by e-filing upon counsel for the Defendant, this 13th day of February, 2025.

/s/ Bobbi Bernstein
Barbara (Bobbi) Bernstein
Deputy Chief

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                                  )
UNITED STATES OF AMERICA          )
                                  )
    v.                            ) Case No. 8:23-cr-00234-DLB-1
                                  )
MARTIQUE CABRAL VANDERPOOL,       )
                                  )
            Defendant.            )
_____ )


                              Greenbelt, Maryland
                              February 20, 2025
                              10:23 a.m.


                    SENTENCING HEARING
        BEFORE THE HONORABLE DEBORAH L. BOARDMAN
              United States District Judge


                  A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

    U.S. DEPARTMENT OF JUSTICE
    Civil Rights Division
    150 M Street, N.E.
    7th Floor
    Washington, D.C.  20002
    BY:  BARBARA S. BERNSTEIN, ASSISTANT U.S. ATTORNEY
         (202) 353-0032
         bobbi.bernstein@usdoj.gov
    BY:  TARA KNOLL ALLISON, TRIAL ATTORNEY
         (412) 779-8970
         tara.allison@usdoj.gov


                  PATRICIA KLEPP, RMR
                  Official Court Reporter
             6500 Cherrywood Lane, Suite 200
                Greenbelt, Maryland  20770


            ***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

    ZAMPOGNA PC
    2101 L Street, N.W., Suite 300
    Washington, D.C.  20037
    BY:  CHRISTOPHER ADAM ZAMPOGNA, ESQUIRE
         (202) 223-6635
         caz@zampognalaw.com
    BY:  ABRAHAM BLUESTONE, ESQUIRE
         (202) 223-6635
         ab@zampognalaw.com, ESQUIRE

ALSO PRESENT:

    MARTIQUE CABRAL VANDERPOOL
    LILLY RICHART, PARALEGAL
    S.A. ELIZABETH HUNG - FBI
    ERIK FINNEYFROCK

***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

JA1510

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Maryland is now in session, the Honorable Deborah L. Boardman presiding.

THE COURT:  All right.  Good morning, everyone. Please be seated.

I apologize to everyone for being late.  I value everyone's time; mine is not more important than yours.  I just have a lot going on.

So would the government call the case.

MS BERNSTEIN:  Good morning, Your Honor.

We're here for United States v. Martique Cabral Vanderpool.  It's Case No. 23-cr-00234.

THE COURT:  Please identify yourself -- have you done that yet?

MS. BERNSTEIN:  No, we have not.

THE COURT:  Okay.

MS BERNSTEIN:  Bobbi Bernstein, appearing on behalf of the United States, Your Honor.  Good morning.

THE COURT:  Good morning.

MS. ALLISON:  Good morning, Your Honor.  Tara Allison on behalf of the United States.

MS BERNSTEIN:  Also here with us at counsel table are Special Agent Elizabeth Hung of the FBI and Ms. Lilly Richart,

our paralegal, with Department of Justice.

THE COURT:  All right.  Good morning to all of you.
Please be seated.

For the defense.

MR. ZAMPOGNA:  Good morning, Your Honor.

Christopher Zampogna for Mr. Vanderpool, who's to my
left.

MR. BLUESTONE:  Good morning, Your Honor.

Abraham Bluestone, as well, for Mr. Vanderpool.

THE COURT:  All right.  Good morning to all of you.

Mr. Vanderpool, good morning.  Please be seated.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Okay.  So on October 31st of last year,
after a four-day bench trial, the Court entered a verdict of
guilty on Count One of the indictment, which charged
Mr. Vanderpool with falsification of a record in violation of
Title 18 of the United States Code, Section 1519.  Upon a
finding of guilt, the Court ordered the preparation of a
presentence investigation report and scheduled sentencing for
today.

So in preparation for today's sentencing, I have
reviewed the following documents:  I have reviewed the
presentence investigation report; the parties' letters to
Probation objecting to the report; I've reviewed the
government's sentencing memorandum, attached to which were two

letters that the government sent to Probation; I've also reviewed Mr. Vanderpool's sentencing memo, attached to which were letters from 20 people, including his father, his child's mother, many family friends, coworkers, supervisors.

Just give me one minute.

Is there anything that I've missed?  I think there might be; that's what I was just checking on.

Let me ask the government.

MS. BERNSTEIN:  If I may just have one moment, Your Honor.

MR. ZAMPOGNA:  Yeah, we submitted --

THE COURT:  If you could just please stand when you're talking to the Court.  It's not about me; it's just about the institution.  Thank you.

MR. ZAMPOGNA:  I apologize, Your Honor.

THE COURT:  No problem.

MR. ZAMPOGNA:  Yeah, I believe we submitted some supplemental letters that you might -- maybe you're including those in the other letters; I just wanted to make sure --

THE COURT:  Yeah, yeah, I did.  Let me just make sure; give me one minute.

I've looked, of course, at the witness list that you've submitted, the government's possible witness list.

MR. ZAMPOGNA:  And if I may speak to the witnesses, they are all here, Your Honor.

THE COURT: Okay, great, thank you.

From the government's perspective, did I miss anything?

MS. BERNSTEIN: I don't think so, Judge.

THE COURT: Okay. All right, thank you.

Okay, correct, I have reviewed these. There was a filing in ECF 170; it was the supplemental letters that were filed. I did read those, and one was a letter from a licensed clinical social worker, Kelvin Mitchell, which I have reviewed.

Okay. So with that, I think we're ready to proceed.

MR. ZAMPOGNA: Could I just speak to -- Mr. Mitchell has just raised, his -- he had -- his mother passed away -- and we clearly said that on the call last week -- and her funeral is today, so he will not be testifying today.

THE COURT: All right.

MR. ZAMPOGNA: Thank you.

THE COURT: I'm sorry to hear that, so thank you for telling me that.

MS. BERNSTEIN: May I say one thing just preliminary, Judge? There was some discussion before you came out here about a sealed portion of the sentencing, and I just wanted to say, before we get started, for everybody on the government's side, this is our first sentencing hearing in this district or this courtroom, so if there are any particular procedures you want us to follow, we just wanted to let you know that we're not

necessarily familiar with the usual process here.

THE COURT: I'll guide you through it.

MS. BERNSTEIN: Thank you. I appreciate it, Judge.

THE COURT: All right, great.

Okay. Let's start with the calculation -- well, first off, the presentence report.

From the government's perspective, did you review it, and do you have any objections to it?

MS. BERNSTEIN: We did review it, Your Honor, and the only objection we have is the one that we stated on the record, which is an objection to the zero point offender downward adjustment.

THE COURT: Okay. Mr. Zampogna, Mr. Bluestone.

MR. BLUESTONE: Yes, Your Honor.

THE COURT: So -- first question is, did you review the PSR?

MR. BLUESTONE: Yes, I did, Your Honor.

THE COURT: Okay. Mr. Vanderpool, did you review the PSR?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Did you have enough time to review it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you talked to your lawyers about it?

THE DEFENDANT: Yes, Your Honor.

JA1515

THE COURT: Okay. Mr. Bluestone, other than the objections identified in your sentencing submission and in your letters to Probation, are there any other objections?

MR. BLUESTONE: No, Your Honor.

THE COURT: Okay. All right, very good.

Okay. Let's calculate the guidelines, which is where we start in every sentencing.

So the guidelines are determined by two factors. The first is the offense level, which we will talk about in a moment, and the second is someone's criminal history category.

Let's start there, because that's the easy part. Mr. Vanderpool has no criminal history that counts, so he falls in Criminal History Category I, the lowest category.

All right. The guidelines are in dispute. Let me try to distill where I think the disputes are, and I will state for the record, I have read all of your submissions, including your letters to Probation. All of your objections identified in those papers are preserved for the record. I don't think we need to belabor those points ad nauseam here.

So here's where I think the sticking points are, and tell me if I'm wrong -- well, I'll start with where we have common ground. The calculation begins with 2J1.2, which is the guideline for obstruction of justice. Any objection to starting there?

MS. BERNSTEIN: I agree that's where to start, Judge.

MR. ZAMPOGNA: No, Your Honor.

THE COURT: The reason I ask, for those in the gallery, is because this is quite a complicated guideline calculation. It's more complicated than most, and there are about six or seven steps. So that's step 1.

Guideline 2J1.2(a) sets the base offense level at 14. However, under Guideline 2J1.2(c)(1), the Court must apply Guideline 2X3.1, which is the guideline for accessory after the fact, if the offense involved obstructing the investigation or prosecution of a criminal offense. This offense involved obstructing the investigation or prosecution of a criminal offense.

Do you agree, Ms. Bernstein, so far?

MS. BERNSTEIN: We do, Judge.

THE COURT: Mr. Zampogna -- or Mr. Bluestone.

MR. BLUESTONE: We agree, Your Honor.

THE COURT: All right.

So now, going to Guideline 2X3.1(a) --

Mr. Finneyfrock, I didn't say good morning to you. Good morning. Would you state your name for the record.

THE PROBATION OFFICER: Good morning, Your Honor.

Erik Finneyfrock with U.S. Probation and Pretrial Services.

THE COURT: All right, since this is your bailiwick, I should make sure you're acknowledged for the record.

Okay. So I'm now at Guideline 2X3.1(a), which says that the base offense level is six levels lower than the offense level for the underlying offense, except that the base offense level shall not be less than 4 or greater than 30.

So that means, the Court must determine what the underlying offense is. I believe the underlying offense is a criminal civil rights violation, a violation of Title 18 of the United States Code, Section 242.

Ms. Bernstein, do you agree?

MS. BERNSTEIN: I do, Judge.

THE COURT: Mr. Bluestone.

MR. BLUESTONE: We agree, Your Honor.

THE COURT: Okay.

Because Mr. Vanderpool's falsification of the incident report obstructed the investigation of a criminal civil rights offense, the Court next moves to the guideline for criminal civil rights offenses, which is 2H1.1, which applies to offenses involving individual rights.

Ms. Bernstein, do you agree we are now at 2H1.1?

MS. BERNSTEIN: We do.

THE COURT: Mr. Bluestone.

MR. BLUESTONE: We agree, Your Honor.

THE COURT: All right.

Under Guideline 2H1.1(a), the base offense level is the greatest of the offense level from the offense guideline

applicable to any underlying offense, two exceptions neither party claims is relevant here, or 6, otherwise.  If the offense was committed under color of law, the offense level is increased by six.

So this is where I think we have some disagreement.  The government maintains and Probation maintains that the underlying offense for this guideline, meaning 2H1.1(a), is federal -- the federal offense of criminal sexual abuse, which is covered by Guideline 2A3.1.  So let me pause there.

Is that the government's position?

MS. BERNSTEIN:  Yes, Judge.

THE COURT:  Okay.  What is the defense's position of what the underlying offense is?

MR. BLUESTONE:  Your Honor, we do not believe that there is an underlying offense, and so Court should use 2H1.1(a)(4) as the appropriate base level.

THE COURT:  Okay.  So as I understand your position, it's not necessarily that the underlying offense is the sexual assault under Title 18 of the United States Code, 2242, it's that the government hasn't -- can't prove that beyond -- by a preponderance, correct?

MR. BLUESTONE:  Your Honor, we maintain that there was -- that is correct, but we just maintain that there was no underlying offense.

THE COURT:  I understand, okay, but just to clarify,

because I'm actually curious, you aren't maintaining that there's some other possible underlying offense, correct?

MR. BLUESTONE: We are not, Your Honor.

THE COURT: Okay, all right.

Okay. I find that the underlying offense that's referred to in 2H1.1(a) is the federal offense of criminal sexual abuse. The closest federal underlying offense is Title 18 of the United States Code, Section 2242. I get there by looking at the application note and also the application note of Guideline 1B1.1 -- 5.

Okay. So now, the question is whether or not the government has proven by a preponderance of the evidence that a sexual -- that sexual abuse occurred in violation of Title 18, United States Code, Section 2242.

All right. Ms. Bernstein, is it the government's position that I have to make a finding here on the record that the government has proven by a preponderance that a sexual abuse under that statute occurred?

MS. BERNSTEIN: I don't think the Court has to make that finding on the record in order to use the cross-reference, but Judge, we would ask you to make that finding based on the evidence that we have presented.

So first of all, I think the cross-reference applies even if there was no underlying offense actually committed, and according to -- I believe it's Justice or McQueen, one of those

cases makes clear that -- I think it was Justice -- that even if the underlying offense has not been proven beyond -- by a preponderance of the evidence, the cross-reference applies.

And let me just take one second to explain why that actually makes sense.

THE COURT:  Yeah, because it doesn't make intuitive sense to me.

MS. BERNSTEIN:  So when somebody obstructs a criminal investigation, the seriousness of the obstruction depends on the seriousness of the investigation that was being obstructed.  The rule laid out by Justice is that even if the underlying offense isn't proven, the seriousness of the obstruction depends on the seriousness of the case that was being obstructed.

A contrary rule would lead to the result that if obstruction is particularly well done, really, really good obstruction, so well done that it keeps the underlying offense from ever being proven, the defendant would get a break for having done really good obstruction.

So that's why the basic rule makes sense, that if somebody, for example, is obstructing a murder investigation, that is a more significant offense than if they're obstructing a jaywalking investigation.  And that's true even if the underlying offense ultimately isn't proven.

So all of that is the rule that's laid out by Justice. I think it's important to note that rule.  I actually don't

think we need to rely on Justice in this case because it is clear that if the underlying offense is, in fact, proven by a preponderance of the evidence, then there is absolutely no question about the cross-reference.

And Judge, for all of the reasons laid out in the papers -- and I'm happy to make an argument here, but I don't want to belabor the point if you don't need to hear it -- I believe the government has proven by more than a preponderance of the evidence that the sex in this case was not consensual.

THE COURT: So are you relying on 2242(1) or (3)?

MS. BERNSTEIN: Both. So I think -- let me pull it up, Judge.

Sorry, Judge, I just want to make sure I have the exact language.

THE COURT: Mm-hmm.

MS. BERNSTEIN: Okay. So the first part is, Causing another person to engage in a sexual act by threatening or placing that other person in fear. And so we believe that we have proven that part. And then, the third part is by coercion, and I think in this case, they essentially are the same thing.

And then, two principles here. One is that sex that is not consensual is a sexual assault. The second principle that I think is really important here is that consent that is the product of coercion is not consent at all.

And here, the sex that happened at the police station

was, we believe we have proven, clearly coercive.  And may I explain?  I don't want to belabor the point, but I'm happy to explain it to Your Honor if you would like.

So you know, here, from the very beginning, we have -- the victim is a 19-year-old woman, who was distraught from the start of this interaction.  She was upset, her young child had been injured, she was speeding to get to him.  She was worried about her son.  In the defendant's words, She was at a 10 out of 10.  That's how upset she was from the very beginning.

Now, it was clear from her behavior at the scene that she was emotionally unstable in that moment.  She was beside herself when the officers told her that they were going to impound her car.  She was yelling, she was running into traffic, she was crying.  She was slammed to the ground by an officer and handcuffed.  While she was handcuffed, she banged her head against the car.  She berated herself, "I'm so stupid, I'm so stupid."

She was taken away from the scene in handcuffs.  She was essentially kidnapped.  Instead of being taken where she was supposed to be taken to be booked, she was taken to a deserted police station, where it was just her and two uniformed, armed officers, who had taken her away from the scene.  She was trapped there.  The car that she had been in was towed away.

While she was there, she was completely at their mercy.  She couldn't get to her child, she couldn't get away,

she didn't know where she was, and under those circumstances, with this emotionally distraught woman who had just been taken to this deserted police station, Defendant Vanderpool said to her, "We need to make this right," dropped his pants, and had sex with her, on a sofa, in a main open room -- you saw the pictures of that room at trial -- open room, door wide open, and his partner, in his uniform, with his badge and his gun, standing near enough that he could turn the lights off during the sexual act.

At the very, very best, for the defendant, the sex was transactional. At the very best, this was, I have your car, I have your -- I have your person, I have control of you, and you can't get away from here unless you have sex with me. That's at the very best for the defendant, this was completely transactional, and that very best situation is also coercive.

THE COURT: You're not offering any testimony from the victim?

MS. BERNSTEIN: No, Judge, she has a victim impact statement that she would like to make.

THE COURT: Okay.

All right. So Mr. Bluestone, what is your response to the government's identification of evidence that it believes shows your client committed sexual abuse under 2242(1) and (3) by a preponderance of the evidence?

MR. BLUESTONE: Your Honor, I will start with

2242(3) --

THE COURT: Okay.

MR. BLUESTONE: -- Your Honor -- actually, I'll start with (1) --

THE COURT: Okay.

MR. BLUESTONE: -- your Honor. They did not show any evidence that Vanderpool threatened her whatsoever. There's no -- nor did they show any evidence that she was ever in actual fear of the situation.

Now, they -- the evidence they excluded was that she was out of handcuffs and that this police station is in the middle of a populated area. She was not in a -- this is not a deserted, secluded location.

Furthermore, they excluded evidence related -- they did not include evidence related to the fact that multiple people knew that -- of the fact that she was with these officers, including the tow driver, who was at the scene and retrieved the vehicle earlier.

These show that she was -- that any actions were not by threat, and she was not in fear at the time. They have established no -- they have not established sufficient evidence to make that finding.

THE COURT: Do I, from your perspective, not consider her state of mind after she -- her car was pulled over?

MR. BLUESTONE: Your Honor, they established state of

JA1525

mind -- they established, you know, outward reactions by her at the --

THE COURT: You're right, maybe not state of mind, but the actions that occurred when she was pulled over, what she was doing, which a reasonable person can infer her state of mind at least at that point.

MR. BLUESTONE: But they have not established any outward reaction state of mind of her at the police station when the sex actually occurred, Your Honor. There is period of time between a car ride and at the station. The evidence seemed to show that there was a period of time at the station prior to any sexual acts.

And so they have not established her state of mind or outward reactions by her in that time period whatsoever, Your Honor.

THE COURT: Okay. Do you have any different argument for (3), 2242(3)?

MR. BLUESTONE: Yes, I do, Your Honor.

THE COURT: Okay.

MR. BLUESTONE: The government cannot -- that provision is not eligible for this matter. It was introduced by Congress in 2022, three -- almost -- a little -- approximately three years after this incident in question, and so Vanderpool should not be sentenced due to that provision, Your Honor.

THE COURT: Okay. All right, thank you.

JA1526

MR. BLUESTONE: Thank you.

THE COURT: Ms. Bernstein, what is your response to that last argument, that this would violate, I guess, maybe an ex post facto law or you can't apply it retroactively? What's your position? If it wasn't illegal at the time of this conduct, can he be punished for it under the guidelines now?

MS. BERNSTEIN: So I apologize, Judge, I don't have the case law on that and if I -- if I need to supplement, I would ask permission to supplement. This is not ex post facto because he's not being sentenced under that part, and nonconsensual sex under color of law has been a crime, you know, long before part (3) was added to 2242.

And this goes back to my argument, Judge, that I think in this case, sections (1) and section (3) really collapse. I think section (3) clarifies and maybe is broader, that it clarifies that all coercive sex is covered under 2242.

But the first part, when we talk about having sex under situations that causes another person -- sorry, causing another person to engage in a sexual act by threatening -- and we're not talking about threatening, here, but placing that other person in fear. The statute is also clear that if the fear that the person is in is fear of death or serious bodily injury or kidnapping, in other words, if it's this very, very serious fear, that's the more serious offense of 2241.

Every other remaining kind of fear comes under 2242,

and that includes fear of being taken away in the middle of the night from your car and from the place where you were stopped, being taken to a deserted station, where you're surrounded by only the officers who kidnapped you, where you are faced with an officer who says, "We need to make things right," where you can't get to your child unless you do what he says to do, because you need to get your car back and you need to get to your injured child, that is fear that is less than the fear that is a 2241 offense, but that's fear that's captured by 2242.

THE COURT: Okay. Just give me one moment, please.

Okay, all right. At sentencing, the government has the burden to prove a cross-reference defense by a preponderance of the evidence. United States v. Slager, 912 F.3d 224, 232 (4th Cir. 2019). I know the government states that I do not have to find by a preponderance that this conduct actually occurred. They cite an unpublished case, Justice. If that's the case, then so be it.

But I do find by a preponderance of the evidence that the government has proven that Mr. Vanderpool's conduct would have amounted to a violation of Title 18 of the United States Code, Section 2242(1). That statute says, Whoever knowingly causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping) shall

be fined under the title or imprisoned.

The victim in this case, R.S., was 19 years old at the time of the incident. After Mr. Vanderpool and Mr. Dupree pulled her over, she was exhibiting self-harming behavior and clearly distressed, banging her head against the car, saying, "I'm so stupid, I'm so stupid." She also told the officers that she needed to get to her young son. The officers had her car towed, so she had no easy way to leave the side of the road. The officers, Mr. Vanderpool and Mr. Dupree, transported R.S. to a police station where no one else was inside, it was late at night. She was transported in handcuffs in a police vehicle to the department's police station. With Mr. Dupree nearby and the door open, Mr. Vanderpool and R.S. had sexual intercourse on a couch in the police station.

I find that -- by preponderance of the evidence that Mr. Vanderpool caused R.S. to engage in a sex act by placing her in fear. Among the fear was that she did not have access to her car, that she could not use her car to get to her child, and that she feared what else the officers might do if she did not engage in the sex act.

The government has established by a preponderance of the evidence that the underlying offense referenced in 2H1.1 -- 1(a) applies.

Okay. Let's return to our guideline journey. We then go to Guideline 2A3.1.

JA1529

Ms. Bernstein, do you agree that's the next step?

MS. BERNSTEIN: Yes, Judge.

THE COURT: Mr. Bluestone, all of your objections with respect to what I just found are preserved, but do you agree, notwithstanding that, that the next step is 2A3.1?

MR. BLUESTONE: Yes, Your Honor.

THE COURT: All right, thank you.

Under 2A3.1, which is the guideline for criminal sexual abuse, attempted criminal sexual abuse, under that guideline, the base offense level is 38, if the defendant was convicted under Section 2241(c), or 30 otherwise. Here, Mr. Vanderpool was not convicted under 2241(c), so his base offense level is 30.

2A3.1 also has certain enhancements. There is a two-level increase if the victim was in the custody, care, or supervisory control of the defendant. I find that applies here. R.S. was in Vanderpool's custody when they had sex.

There is a four-level enhancement if the offense involved conduct described in Title 18, United States Code, Section 2241(a) or (b).

That's a kidnapping enhancement; is that correct, Ms. Bernstein?

MS. BERNSTEIN: Yes, Judge, there's a four-level kidnapping enhancement. I think it's 2A3.1(b)(5).

THE COURT: Hmm.

MS. BERNSTEIN: Is that right? Oh, sorry, (b)(1).

THE COURT: I thought were you arguing for the enhancement under (b)(1).

MS BERNSTEIN: Yes, Judge, my mistake. Thank you.

THE COURT: Okay. I make plenty of them.

So Ms. Bernstein, why do I even have to reach this question, if we are capped at 30?

MS. BERNSTEIN: I was just about to say the same thing, Judge.

THE COURT: All right.

MS. BERNSTEIN: You don't.

THE COURT: All right. I am -- I think it's under Rule 32 of the Federal Rules of Criminal Procedure -- I'm not sure if it's 32. Let's cite the right rule.

MS. BERNSTEIN: Judge, I was just going to say, I think there are a couple of other steps that end us up at 30, so the plus 6, which I know you're about to get to, and then minus 6, and we end up at 30 anyway.

THE COURT: All right, just give me one minute. Yes, that's true.

Okay. I'm going to skip the kidnapping enhancement for now. So we have an offense level of 30 under 2A3.1. We add 2 because R.S. was in the custody or control of Mr. Vanderpool, so we are at 32. We add 6 under 2H1.1 because the offense was committed under color of law. So that's at 38. We then

subtract 6 under 2X3.1(a). That brings us to a 32. However, under -- the guideline is capped at 30 under the initial guideline.

Did I do that correct, Ms. Bernstein?

MS. BERNSTEIN: Yes, Judge, 30 is where we end up.

THE COURT: Okay.

Mr. Bluestone.

MR. BLUESTONE: Preserving all objections, Your Honor, yes.

THE COURT: Absolutely, all objections are preserved.

So we are at a total offense level of 30, and for that reason, I do not need to and will not decide whether the kidnapping enhancement applies.

Okay. The next question is whether Mr. Vanderpool is entitled to a two-level reduction under 4C1.1 because he is what's considered a zero-point offender.

Ms. Bernstein, I've read your position. Would you care to add to it?

MS. BERNSTEIN: Yes, Judge. There are two provisions that I think are important here under 4C1.1. This zero-point offender adjustment is not available if the defendant has a prior criminal history, and it's not available if the offense of conviction involves 2H1.1, which is the guideline for the civil rights offense.

THE COURT: Well, it says, if it's covered.

JA1532

MS. BERNSTEIN: It is covered by, I'm sorry. You're right, Judge, yes, covered by.

That first part, though, is what I want to talk about for a minute, that he's not eligible for this downward adjustment if he has a prior criminal history. Initially, in the letter -- first letter to Probation, the government took the position that the defendant wasn't entitled because he did have a prior criminal history, which was his three-year sentence in state court. Probation determined that that was not accurate, that the state conviction doesn't count as a prior conviction because it is part of the instant offense, is the language used there. And that, I think, is -- that makes sense, Judge, that the state offense and the federal offense are so inextricably intertwined that basically, he gets the benefit of not having a prior criminal history because these two offenses are so intertwined.

I think once he gets the benefit of not having a criminal history because his state offense and his federal offense are so intertwined, that then underscores why the other provision should prevent him from getting this downward adjustment, because the other provision says that if the offense of conviction is covered by the civil rights guideline, he's not entitled to this objection.

This is a brand-new provision, the 4C1.1. There's not a lot of case law out there, but the one case that we did find

JA1533

was practically this case. It was unbelievably on point, Judge, and --

THE COURT: You think it's well reasoned?

MS. BERNSTEIN: I do. I think what the Court said there is that because you cannot sentence the defendant -- well, let me back up. So that case, like this one, was a defendant charged with obstruction, for obstructing the investigation of a civil rights sex offense. So it was practically this case. And what the Court said there is, the count of conviction, the obstruction, is covered by the civil rights offense because you can't possibly sentence the defendant for that obstruction without using the civil rights offense.

So even though you get there by way of a different provision, you get to, the civil rights offense is the guideline that covers the sentence. You know, and that's clear from the guidelines calculations, Judge, that you just, you know, walked us through. 2H1.1 is central to the guidelines calculations for this case. And once he gets the benefit of not having a criminal history because these cases are essentially the same, now it doesn't make sense to give him yet another benefit by saying, oh, well, these cases are different, so we're going to give him yet another benefit.

THE COURT: So maybe we can -- I understand the -- sort of the policy argument; I understand that. We're in an age where we have to look at the text. So let's look at the text.

MS. BERNSTEIN: Yes.

THE COURT: The instant offense of conviction. So the instant offense of conviction is 1519. Can we agree on that?

MS. BERNSTEIN: Yes, with a clarification. So the offense of conviction is 1519. The instant offense of conviction is a 1519 to cover up a sex -- a sexual civil rights offense. So in this particular offense of conviction, it is a 1519 to cover up a civil rights offense that involved sex abuse.

THE COURT: So you're saying "instant" doesn't merely refer to what the offense of conviction is writ large; it's the specific --

MS. BERNSTEIN: Right. I think it would be superfluous if it didn't add anything to offense of conviction.

THE COURT: Well, they use the same language in (a)(5), the "instant" offense of conviction. They only use, as far as I can see, the words "instant offense of conviction." They don't use "offense of conviction," as far as I can tell. So I'm not sure what the Sentencing Commission meant by "instant" and if they meant as specific as what you mean, but, okay. What does "is not covered by" -- what does -- "is not covered by," is there any guidance in the guidelines about what that means?

MS. BERNSTEIN: I'm sorry, Judge, let me come right back to that.

THE COURT: Okay.

MS. BERNSTEIN: But I just wanted to point out, section (4) refers to the offense rather than the instant offense of conviction.

THE COURT: Right, all right.

MS BERNSTEIN: I don't know if that's -- I just noticed that, looking at it.

I'm sorry, your question was what, Judge?

THE COURT: So my question is, what does "is not covered by" mean? So it doesn't say, is not, you know, cross-referenced or -- it just says "is not covered by."

MS. BERNSTEIN: I think "covered" is pretty broad. Something, you know, is not -- and if you -- if you back up and look at that list, what that list is, is a policy assessment for certain types of cases where we are not going to give this benefit to the defendant, right, and there are certain cases, cases involving sex offenses, cases -- you know, these are certain categories of cases.

One of those categories of cases is civil rights offenses, cases that are covered by the civil rights -- the civil rights guideline. And I think that's a judgment call that there are certain kinds of cases, such as cases involving police officers abusing their authority, that we want to take out of consideration for this downward departure. And as we talked about with the criminal history, the reason he doesn't have a criminal history is because that sex offense and his

obstruction offense are so intertwined.

But -- I'm sorry, your question was "covered by," and I would say -- there is very little case law out there because this is so new, but on its face, for a crime to be covered by this particular guideline provision, I think "covered by" is broad language. It could have been written much more specifically.

THE COURT: I'm glad you said that, not me.

MS. BERNSTEIN: I think "covered by" means -- means that if you cannot sentence a person for the crime without using this guideline, then the crime is covered by the guideline. So there could be a different kind of 1519. A 1519 false report to cover up something else wouldn't be covered by 2H1.1.

THE COURT: I understand.

MS. BERNSTEIN: But this instant offense can't be sentenced without going through 2H1.1.

THE COURT: Thank you.

Mr. Finneyfrock, you indicated in the presentence report somewhere that you consulted with the Sentencing Commission on this?

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: Can you tell me what you found out, or what you did, and what you heard?

THE PROBATION OFFICER: Yes. I called the Sentencing Commission, specifically in regards to 4C1.1, and

just the language, the "instant offense of conviction," is not covered. They ruled that it would apply, the zero-point offender. They indicated that if the language was "the offense" versus a -- rather than "the instant offense of conviction," that it would not apply and indicated that we applied the guidelines correctly in their opinion.

THE COURT: Okay, thank you.

THE PROBATION OFFICER: Thank you.

THE COURT: I see that in the Jones opinion that the government has cited to -- and this is United States v. Jones, 2024 WL 4507368, from the Southern District of West Virginia, October 16th, 2024. According to Judge Berger's opinion, Probation in that case said, the 4C1.1 zero-point offender -- excuse me -- yeah, zero-point offender did not apply. So I don't know if they called the Sentencing Commission in West Virginia.

All right. Mr. Bluestone, what is your argument?

MR. BLUESTONE: Your Honor, as Mr. Finneyfrock said, the instant offense of conviction in this case, the Court needs to read those terms in the literal sense, in that they are referring to 18 U.S.C. 1519. When looking at other interpretations of descriptions in the sentencing guidelines, the Court generally looks to the statute underlying versus the facts of the case, for instance, with descriptions of crimes of violence, and this -- that's U.S. v. Stoker, 706 F.3d 643 (5th

Cir. 2013), and adopted in the Fourth Circuit in Littlejohn, 1998 WL 135263.

Your Honor, in this matter, the 4C1.1 says, "instant offense of conviction." It is not covered by 2H1.1. The instant offense of conviction in this matter is 18 U.S.C. 1519, which itself does not cover -- is not a civil rights offense. Furthermore, Your Honor, it appears from the reasoning of Jones that the Court -- that the sentencing stopped at 2H1.1, initially, and said that there was an additional underlying offense potential that would have been higher, and -- because they used 2H1.1 as not just a referral but the essential item there.

And so in this case, I think this case is very distinguishable from Jones, Your Honor, and I think that the 4C1.1 two-point downward departure for zero-point offenders does apply. Thank you.

THE COURT: All right, thank you.

So Mr. Vanderpool and Probation take the position that his offense level should be reduced by 2 because he, Mr. Vanderpool, is entitled to a two-point reduction as a zero-point offender. Under Guideline 4C1.1, a defendant is entitled to a two-level reduction if the defendant did not receive any criminal history points, which is here, and the instant offense of conviction is not covered by Section 2H1.1, and that's 4C1.1(a)(8). The Government objects to the two-level

reduction because it says Mr. Vanderpool's offense is covered by the guideline, 2H1.1.

We all agree, the instant offense of conviction is a violation of Title 18, United States Code, Section 1519, obstruction of justice. It is covered by 2J1.1, not 2H1.1. Even though the calculation of Mr. Vanderpool's offense level involves a cross-reference to 2H1.1, that does not change the fact that the instant offense of conviction is a violation of 18 United States Code, Section 1519, and the guideline for that is 2J1.1.

In support of its argument, the government cites an unpublished District Court decision, the Jones case that I just referred to, which held that the defendant's conviction for witness tampering was covered by 2H1.1 because the defendant's conduct meets the underlying offense of a deprivation of rights and because 2H1.1 was not simply consulted in determining the applicable base offense level in this case; it was central to the determination.

To the extent that Jones is factually on point, the Court disagrees with it. I'm not actually certain it's completely on point, but in any event, I find that the instant offense of conviction is violation of Section 1519, which is covered by Guideline 2J1.1, not covered by 2H1.1.

The term "covered by" is vague, and it's not defined in the guidelines. There's no guidance from the Fourth Circuit

or the Supreme Court. This is a new guideline, and the Court finds that under the rule of lenity, that this guideline should not apply. I don't believe it applies for textual reasons, and it's vague and the rule of lenity applies and counsels towards adopting Vanderpool and Probation's interpretation of the guideline. See United States v. Lisbon, 276 F. Supp. 3d 456 at 458 (D. Md. 2017), applying the rule of lenity when a sentencing guideline was ambiguous. Also United States v. Cutler, 36 F.3d 406 at 408 (4th Cir. 1994).

Noting that the rule of lenity may be applied in the context of the sentencing guidelines, the Court overrules the government's objection and reduces the guideline level by 2 to a 28, and let me also just state for the record, this ruling on whether 4C1.1 applies does not affect the ultimate sentence in my case. Whether it applies or not, the sentence will be the same.

With an offense level of 28 and a criminal history category of I, the advisory guidelines range is 78 to 97 months.

Ms. Bernstein, any objection to that?

MS. BERNSTEIN: No, judge.

THE COURT: Mr. Bluestone.

MR. BLUESTONE: All other objections preserved, no, Your Honor.

THE COURT: All right. Let me first address a downward departure under Section 5K2.23, 5K2.23.

All right.  So this guideline, it's a policy statement entitled Discharge Terms of Imprisonment.  It says, A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment and (2) subsection (b) of 5G1.3 would have provided an adjustment had that completed term of imprisonment been discharged at the time of sentencing for the instant offense.  Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.

I appreciate the government raising this in their sentencing memo.  Mr. Vanderpool has previously served a 36-month sentence for a state conviction related to this offense.  He, under 5G1.3, would have received an adjustment had that completed term of imprisonment been undischarged at the time of this sentencing.  That sentence has been discharged, so he will not receive a 36-month deduction.

And so I find or I believe that a 36-month downward departure from the guidelines is appropriate, and I do not believe the Bureau of Prisons will credit him with that time.

Ms. Bernstein, do you object to a downward departure by 36 months?

MS. BERNSTEIN:  No, I think that's right, Judge, as long as we're sure that BOP won't also give him the same 36 months.

THE COURT:  Well, I can't be sure what BOP does; I'm asking if you object to a 36-month downward departure under this

guideline.

MS BERNSTEIN: I don't. And my only hesitation, Judge, is, we've made a suggestion in our papers that -- I don't honestly know if this can be done, but if the Judge can give an alternative -- if the Court can give an alternative sentence, saying that if BOP by chance does give this 36-month adjustment, then, I think this Court's sentence should be 36 months higher. Again, I don't know if that's a thing that can be done, but if it can be done, I would ask the Court to do it.

THE COURT: All right. I've never heard of that.

All right. Any objection to the 36-month downward departure under this guideline?

MR. BLUESTONE: Your Honor, we would just note that Mr. Vanderpool was incarcerated for more than 36 months; he was incarcerated for a total of 39 months, from December 2nd, 2019 through March 1st of 2023, which is exactly, to the day, 39 months.

THE COURT: Well --

MR. BLUESTONE: So we have no objection to the 36 months, but we would request a credit -- downward departure of 39, Your Honor.

THE COURT: Well, but the state -- in the state, he was sentenced to a term of 36 months because that was the statutory maximum, correct?

MR. BLUESTONE: Yes, Your Honor.

THE COURT: So the extra three months is -- well, is bankable time for any sentence in this case, correct?

MR. BLUESTONE: Yes, Your Honor.

THE COURT: All right. So there's no downward departure for that extra three months.

MR. BLUESTONE: Okay. Thank you, Your Honor.

THE COURT: Ms. Bernstein.

MS. BERNSTEIN: Yeah. For the record, I just want to say, I think that fact is not right. Mr. Vanderpool was not incarcerated continuously from December 2nd, 2019 until he was released, and I don't have the exact dates in front of me, but as the Court might recall from the pretrial conference about -- the pretrial motions regarding the search warrant, there was a time in early 2020 when Defendant Vanderpool was actually briefly released from custody. And I don't know exactly how long; I just want to, you know, make sure that that's on the record, and I trust the folks who go in and do the math and calculate the time credited Mr. Vanderpool with having served 3 years and 11 days, I believe.

And I think, Judge, looking at just the dates that we were provided by Probation, I think he served another two weeks in federal custody until March 1st. So I think the actual total time is 37 months.

Now, again, I think 36 -- crediting him 36 months with a downward departure makes sense, but I think his total time was

actually 37 months, I believe, based on the numbers that were in the PSIR.

THE COURT: Okay. I do not need to resolve that now, as I think the government agrees and I think defense agrees. The reason for the departure is to credit Mr. Vanderpool for time -- for the sentence in state custody. It was a 36-month sentence. He will get a downward departure of 36 months. Whether and how much time he served in addition to 36 months, which has not been counted towards any sentence, will be calculated by the Bureau of Prisons.

So the guidelines range is 47 to 61 months after the downward departure.

All right. We will now have a sealed portion of the proceeding that occurs in every criminal case in the District of Maryland, and I will see counsel at the bench, please.

Please give Mr. Vanderpool an earpiece for the headset.

THE COURT: All right. Can you turn the husher on.

THE COURTROOM DEPUTY: Yes.

(Conference at the Bench.)

It is the policy of this Court that every guilty plea and sentencing proceeding include a bench conference concerning whether the defendant is or is not cooperating.

(Open Court.)

THE COURT: Okay. We're back on the public record.

Let's address the financial aspects of the sentence. No one has requested a fine.

Ms. Bernstein, are you seeking a fine?

MS. BERNSTEIN: No, Judge.

THE COURT: Is there a restitution request? I have not seen that.

MS. BERNSTEIN: No, Judge.

THE COURT: All right. And no forfeiture order, correct?

MS. BERNSTEIN: Correct.

THE COURT: All right. There is a special assessment of $100. That's due in every case with a felony conviction.

Okay. Ms. Bernstein, I will start with you. My first question is, have all victims been notified, and are there any victims that wish to address the Court?

MS. BERNSTEIN: Yes, Judge. Ms. S. is here and would like address the Court. I would ask if she might be able to address the Court at the very end?

THE COURT: Okay. At the end of your presentation?

MS. BERNSTEIN: Well, she doesn't want to be in the courtroom during the defense presentation, but she does want to let the Court know how this affected her. And she would like to be here at the end, when the Court issues -- issues its sentence. So I guess what I would ask is if she can just make her impact statement at the very end of today's -- you know,

today's hearing.

THE COURT: Any objection from the defense?

MR. ZAMPOGNA: We'd like at least the defendant to end this today, if we could.

THE COURT: Well, absolutely; he does get the last word.

What I'm not understanding is, why can't we hear from her now or at the end of your presentation? Perhaps she could leave and then come back at some point?

MS. BERNSTEIN: We can do that. May I have a minute to go talk with her?

THE COURT: Sure.

(Ms. Bernstein exiting the courtroom.)

THE COURT: All right, good morning.

MS. S.: Good morning.

Okay. I honestly don't know what to say.

THE COURT: Hang on, one second.

Before you start, please state your name for the record.

MS. S.: R.S.

THE COURT: Okay, hold on; let me just finish.

Please state your name for the record, and then, when you read, please read very slowly; we all tend to read fast, including myself, and the court reporter needs to be able to take everything down, so -- all right. Please state your name

for the record. Thank you.

MS. S.: R.S.

THE COURT: Okay.

MS. S.: Awesome. I honestly don't know what to say; I always wondered to myself, what would I actually say to this man, given the chance.

First, I'd like to say, I'm not that 19-year-old little girl you preyed on anymore.

THE COURT: Hold on. Slow down, please.

MS. S.: Okay.

THE COURT: Just take -- take a deep breath between each sentence. I know it's hard.

MS. S.: In -- in so many ways, you broke her when she was already broken, but yet, here I am before you as a woman. You took an oath to protect and serve, but somewhere between the lines, you took an oath for your own personal gain.

I thought about how I was going to give you a whole speech about everything I've been through, but that would require too much energy, and I'm currently focused on healing. Instead, I will give you -- I will tell you that I'm no longer stuck on the couch, living in depression.

(The following portion is sealed by order of the Court and is contained in a sealed transcript.)

I will tell you how that same baby I was panicking over on that day turned seven this year, and this is how long

that this has been affecting him and I.  When I speak about you stealing my motherhood, it's because you -- it's because you did.  How do you tell your son the reason his mother wasn't around for the first three years of his life?  How do I ask him for his forgiveness, when you are the one who took my joy away?

I stand in front you today, though, as a full time mother whose son loves and adore her.  I stand in front of you today proud to say that you only broke me for a season of my life.  You tried every way to break my strength, but God had better plans for me.  I do pray that you ask God for forgiveness and guidance, as he has guided me through my healing journey.

Thank you.

THE COURT:  Thank you, Ms. S.

MS. S.:  All righty, thank you.

(Ms. S. exiting the courtroom.)

THE COURT:  All right.  Ms. Bernstein, I have read your sentencing memo, but if you have anything else to say on behalf of the government, now is your opportunity.

MS. BERNSTEIN:  As you know from our papers, Judge, we're asking for a sentence at the high end of the guideline range, and our main reason for asking for that is for the vulnerability of the victim Defendant Vanderpool preyed upon. And that's not just the government talking about her vulnerability; that vulnerability was something that the defendant himself noticed and was thinking about on the night of

the incident, She slipped up and said too much. You heard this at trial, judge, the quote was, "She had slipped up and said too much information, so I already know that she's kind of crazy, and I think, you know, may have tried to -- you know, she suffered from depression and different stuff. So at that point, I figured, hey, it's my word against hers."

He preyed upon Ms. S. because he could tell, at the scene of the crime -- sorry, at the scene of the stop, that she was particularly susceptible, particularly vulnerable. She was -- for all of the reasons the Court just talked about, that this was -- sex was coercive. Those are the same things that he saw at the scene and that made him think, I can get away with this. And then, when he committed the crime for which he was convicted, the false report, again, it was planned, and premeditated, and thought out about the fact that, if I write this false report, that's going to just make absolutely sure that nobody will ever believe that vulnerable victim I just did this to. He wrote the report precisely to ensure that her vulnerability would rule the day.

So the other aggravating factor, I think, is the defendant's consistent and absolute lack of remorse, so far, at least, for what happened. And Judge, you've seen the transcript from the state trial. I think the exchange at the state trial that sums it all up best was when the prosecutor asked him something about when he had sex with Ms. S., and he said, I

didn't have sex with Ms. S., she had sex with me, paraphrase, but that was his answer.

So just the gravity of the offense here that was obstructed, and the premeditation, and the -- just the forethought that went into this crime, both the sex and the crime of conviction, covering up that sex, we think warrant a sentence at the top of the guideline.

THE COURT: Let me ask you this.

MS. BERNSTEIN: Yeah.

THE COURT: Was the investigation actually obstructed, and does that matter?

MS. BERNSTEIN: Let me answer the second one first, which is, it doesn't matter except to the extent that if it were actually obstructed, we would be talking about a higher guideline sentence. So I think it matters for that guideline.

So was it actually obstructed? I mean, it is always, when the -- when the FBI investigates a civil rights offense like this, they're always going to start with the reports related to the incident. So it is -- you know, it obstructs the investigation in the sense that when they go to look for what happened, they can't find out what happened because the truth is not in the report. But I would say that is the extent of the actual obstruction. If there were actual obstruction, like I said, Judge, we would be asking for a higher guideline.

THE COURT: All right, thank you. All right.

Mr. Zampogna or Mr. Bluestone?

MR. ZAMPOGNA: Can we call our witnesses at this point, Your Honor, or -- and then give a statement?

THE COURT: You may. You can call -- they can come to the podium, state their name for the record, and they'll need to speak slowly.

MR. ZAMPOGNA: Thank you.

THE COURT: And I'd be happy to hear from them. Thank you.

MR. ZAMPOGNA: I'd like to call Mr. Gary Vanderpool.

THE COURT: All right.

MR. ZAMPOGNA: This is his father.

THE COURT: Okay.

MR. ZAMPOGNA: He may take a little while.

THE COURT: Take your time.

Good morning, Mr. Vanderpool. I read your letter, and I'd be happy to hear from you. If you could just please state your name for the record.

MR. G. VANDERPOOL: Absolutely. Good morning, Your Honor. My name is Gary Vanderpool. And of course, as you know in my letter, that I am the son [sic] of Martique Vanderpool -- you have to forgive me, I'm not a public speaker, and I know you didn't expect me to be. However, I had -- I have some statements that I wanted to -- you know, and I gave myself some notes so that I can speak as extra --

you know, extra- -- you know ...

THE COURT: Off the cuff.

MR. G. VANDERPOOL: Yeah, off the cuff, thank you. Yeah, extemporaneously.

THE COURT: I don't engage in words with more than four syllables.

MR. G. VANDERPOOL: I got you. And I shouldn't, because I don't even have my dentures in, so it don't come out right.

THE COURT: Okay.

MR. G. VANDERPOOL: But the -- unfortunately, some of the things that I've heard this morning has kind of altered, you know, what I wanted to say, and I beg that you indulge me somewhat, okay. Again, I'm grateful to be here in the United States and to be in a courtroom that allows both sides to get a fair hearing, and so I thank everyone for that. And that goes for the government as well as the defense.

However, as I'm sitting there, I'm getting the feeling as if this is a retrial of what happened on the state. And again, I don't have a law degree, I don't know all the statutes, and -- but it just comes off as if we're just trying to get another pelt on the wall, and when I say "we," I mean the government, okay. But you're the -- Judge Boardman, you're supposed to be the arbiter and to make sure that everything is fair, and I just feel that this is a being a retrial.

Again, the thing -- sex offender, a rapist, all of this came about in state court. And again, I know you're going to stop me if I venture too far into things, but these things -- people testified, you know. The young lady, I feel for her and what she's went through, but she had her -- her day in court and she testified, my son testified, there were exhibits. And it just seems, you know, that this is just a re- -- now, did he screw up? Yeah, it was a -- you know, a night of him and his partner having this, you know what I'm saying?

But it wasn't -- you know, the rape, you know, this is not the son I -- what I wrote you in the letter, this is not the person we raised, this is not the person that with -- all of these folks here, you know, are here to support him and have been supporting him from the very beginning. And I'm asking -- and I came here prepared to ask for your mercy, but I -- as a father, I'm a little disturbed, because I feel as if the government, that they're not really invested in this other than, you know, figuring out statutes and things of that nature, okay, so -- but I guess I better get back onto my primary purpose of being here.

And that is, once -- again, the day when you pronounced sentence after his bench trial, and you was kind of just running through everything, I was sitting back there and I was saying to myself, wow, you know, she's just -- you know, she's just not really caring, this is routine, but then, at the

very end, when the government demanded that he be remanded, you seemed disturbed about that, and you said absolutely not, this gentleman has been -- he hasn't missed any hearings, okay, he's come to everything, his family has been here to support them, and that's when I said, wow, okay, there's humanity here, and we're going to get a fair shake here in front of Judge Boardman.

And -- again, I'm -- I'm kind of, again, thrown off, forgive me. I don't know how much time I have, but taking Martique back behind the wall at this stage, again, he's been -- he has learned his lesson, I can tell you that for sure, you know, for the personal loss, you know, the embarrassment, the loss of his reputation, you know; he'll never be -- his life will never be the same, you know, as I'm sure the young lady who just spoke, the victim.

And I don't like to use the term "victim" because -- I want to say "alleged," because, again, in state court, there was no proof of any -- it was all consensual. But I also understand the government has its procedures, and then, under color of law and those things, of which, like I said, I don't know all the intricacies.

But what I'm asking you today is, he has a son that has special needs, that's in another -- in another island, and we've been trying -- well, he has been trying to get him here.

No one should be defined by -- you know, by their worst moment, for an entire -- you know, for an eternity. And

it's just, having him behind bars would kill his mother.

You know, I've already explained some of my issues with the -- in my letter. And I know you've probably seen hundreds of letters of people, character letters, ad infinitum, but I'm just saying, no good can come of putting him back behind bars, putting him in harm's way, as a former police officer, for which he -- him, his brothers, we all -- his family, we all took pride in that. We're not law breakers, you know -- you know, we're proud.

His brother, his oldest brother's a renowned chef in the Baltimore area. Now he's in Chicago. His other brother is a vice president of a nonprofit, the 92nd Street Y, in New York City. I'm not sure if you've heard of it, but they've been in existence for well over a hundred years. His other sibling used to be with the Secret Service, and now, you know, he's in close personal protection, executive security.

So you say, okay, well, Mr. Vanderpool, what are you trying to say? I'm trying to tell that you his siblings, his family, we will -- we guarantee that there will be no recidivism or there'll be, you know, any more breach of trust. Right now, he's digging ditches, cutting down trees, shoveling snow, being of service, you know, to his community.

Yes, it shouldn't have happened. Consensual sex, when you, you know, they took advantage, him and the other officer, who, I might add, was never on the stand. He was never -- he

never testified on behalf of the state, nor was he in the dock with Martique. There's too many discrepancies in the beginning, and there's almost like bad math. You put bad data in, something comes out wrong.

And I just want to conclude -- like I said, I had more I wanted to say, but the -- you know, the tone has, you know, taken a turn, and it's affecting me. And again, I don't want to be disrespectful to the Court, and again, I thank you for allowing us to be here, but no good will come of putting him back behind bars, you know. You know, have him serve -- give him more community service time to go in conjunction with his work, you know. If I could take his place, if it was just a pelt, and you just needed a body -- I don't mean you, personally, Judge Boardman, but I'm just saying, to satisfy the government, I would gladly, you know, submit myself, but please, I ask you, you know, give us some justice.

Also, I hope that the young lady, you know, is getting, you know, her help that she needs, because both of them were involved in something that they didn't need to be involved in. But it wasn't about force, and it wasn't about fear.

I'm going to end it right there, again, because like I said, I don't want to ramble. But I had a whole lot of stuff I wanted to say, but I just think the tone, you won't be receptive to it.

So thank you very much.

JA1557

THE COURT:  Thank you, Mr. Vanderpool.

MR. ZAMPOGNA:  Ms. Flechia Jackson-Smith, the mom.

MS. BERNSTEIN:  Judge, I'm sorry, may we approach briefly for one minute before the next witness comes up?

THE COURT:  You may.

And why don't you give Mr. Vanderpool a -- give him the earpiece so he can hear, earpiece.

MR. ZAMPOGNA:  Can you hear me now?

THE COURT:  Hold on; let's just wait for the husher.

(Discussion at sidebar.)

THE COURT:  Okay.

MR. ZAMPOGNA:  Can you hear me now?

THE COURT:  Yes.

(The following portion is sealed by order of the Court and is contained in a sealed transcript.)

(Open Court.)

MS. BERNSTEIN:  Perfect.  Thank you, Judge.

And just one other thing that I forgot when we had -- when you asked us for our presentation.  Ms. S. wrote a poem that she didn't want to read but she asked me to read.  And I know you want to end with Mr. Vanderpool, so I didn't want to wait until the end of their presentation to tell you that I had forgotten one thing.  So if there's a good point where I can do that.

MR. ZAMPOGNA:  I don't know.

JA1558

Okay. I mean, can you submit it, instead of reading it, or you want -- she wants you to read it?

Okay. I don't know.

MS. BERNSTEIN: I'd like --

MR. ZAMPOGNA: So --

MS. BERNSTEIN: It's very short.

MR. ZAMPOGNA: I don't know.

It's up to you, Your Honor.

THE COURT: How about if it's read now --

MR. ZAMPOGNA: Sure.

THE COURT: -- so that we can turn our focus back to the defense.

So let me -- how many witnesses do you have?

MR. ZAMPOGNA: There are, I think, six.

MR. BLUESTONE: Six or seven more.

MR. ZAMPOGNA: Six now.

THE COURT: Okay.

MR. ZAMPOGNA: The parents --

THE COURT: You've got to talk into the microphone.

MR. BLUESTONE: The parents should be the longest ones. So --

THE COURT: You have to talk --

MR. BLUESTONE: -- Mr. Vanderpool and Ms. Jackson-Smith should be the longest, as they are his parents. Everybody else, I think, is -- we've encouraged them

to be more expedient, Your Honor.

MR. ZAMPOGNA: Five minutes or less is what we told them.

THE COURT: Okay. I am not going to cut people off, it's not my style, but definitely not parents or children, but if people are rambling because people get nervous and like to fill air and don't know how to cut themselves off, I'm going to ask you to come in and cut them off; I don't want to have to be the one to do it.

MR. ZAMPOGNA: Sure, okay.

THE COURT: I want to hear what people have to say, but if it's getting to the point where they're rambling, it's -- as I said on the phone, it's not effective for your client.

MR. ZAMPOGNA: Right, I understand, but -- yeah, I've tried to tell them not to, but -- I've done my best, done my best with that.

THE COURT: No, I understand. I -- trust me, I've been in your shoes, I understand completely, but ...

MR. ZAMPOGNA: How are you going to tell me to --

THE COURT: You have to speak into --

MR. BLUESTONE: How are you going to let me know?

THE COURT: Listen, I have a lot of flaws, but I'm pretty patient. So I will tolerate it, but I will look over at you if it's just going on too long, okay?

MR. ZAMPOGNA: Okay. No, I just want to -- yeah, I

want to make sure I know the signal.  Thank you, Your Honor.

THE COURT:  All right.  Okay.  Let's have the poem and then return to the defense.

MS. BERNSTEIN:  Thank you.

(Sidebar discussion concluded.)

THE COURT:  Okay.  Before we continue with the defense presentation, the government forgot one thing from Ms. S., so I've allowed them to chime in.

Ms. Bernstein.

MS. BERNSTEIN:  So Judge, this is a poem that Ms. S. wrote that she didn't want to read herself.

"We are powerful females, who shouldn't be downgraded or set our goals to fail.  We have a wonderful gift that will not be traded, but instead, we should strive for it to be lifted.  It comes a time in our lives where we feel ashamed of ourselves, wondering if we would ever become worthy to be a wife.  We often think pain is the only thing on our shelves.  So we cry ourselves into a deep depression, not knowing better days will come.  This depression is the only confession to make our pain feel numb.  But we will stand tall and smile, smile for a change and for a chance, a chance to be not an inch but a mile. We are powerful females."  R.S.

THE COURT:  Thank you.

MS. BERNSTEIN:  Thanks for letting me read that, Judge.

JA1561

THE COURT:  Thank you very much.

MR. ZAMPOGNA:  We would like to call Ms. Flechia Jackson-Smith, Your Honor.

THE COURT:  All right.

MS. JACKSON-SMITH:  Good morning, Your Honor.

THE COURT:  Good morning.  If you could please state your name for the record and speak into the microphone.

MS. JACKSON-SMITH:  I'm Flechia Jackson-Smith, Martique Vanderpool's mom.

THE COURT:  All right, good morning.

MS. JACKSON-SMITH:  I thought it would be best to try to speak from the heart, but in this whole traumatic situation, I can't retain stuff like I used to.  So I'd rather just read what I have on paper.  If it doesn't come all the way out as I hoped it would, I am speaking from my heart on this piece of paper.

My name is Flechia Jackson-Smith, and I say -- first of all, to the Honorable Judge Deborah Boardman, my name is Flechia Jackson-Smith, mother of Martique Vanderpool.  I would first like to express, on behalf of my son, Martique, and to this Court, as a parent, how unfortunate it is to be here and the circumstance in which it is pertaining to.

I get a little nervous.

Also, how I never ever dreamed that my son -- that me and my son would be in a place in our lives as we are today and

have been for the past five and a half years. More than that, the injustice my son and supportive family -- me, my son, and my supportive family and what we've experienced during the ongoing litigation process in this particular case -- situation, the injustice displayed, and I'd just like to share some of the injustices, because this did not only affect my son, Martique, it affected -- affected me.

And I'm just still trying to get through and go through -- and none of this is directed to you, Your Honor -- the injustice that I -- excuse me, the injustice displayed or taken throughout this situation.

First, the incarceration of my son for three and a half years in solitary confinement for allegations that wasn't thoroughly investigated; having only to speak with him at 2:00 and 3:00 in the morning, when he was able to call or when mostly everyone else was asleep, but as a mother, I anxiously looked forward to it; the constant worry of him being harmed or put in a position to be seriously harmed by inmates and staff; not receiving the things he needed, like his medication and food; not being able to visit him for 18 months of the three and a half years of his detainment.

He's viewed stabbings and suicides, which was very traumatic for him, and me as well, hearing this, which didn't leave Martique unscathed by these events. He definitely needed the assistance of counseling, which he didn't get in jail but

immediately seeked on his own out here after being released from jail.

I've had to sell his home, car, motorcycles, things he obtained, pack and move all his belongings, pay all his debt, while seeking representation for a high-profile case, which -- with extreme hype. The stress of the debt was astronomical and fell on me.

During this, the police did an illegal second search of my son's home without a warrant, masking and disguising it as a break-in, locking me and my family out of his home in a cold, freezing rain for hours, only to take things that they did not retrieve in the first initial warrant seizure. I've seen many officers in the media who were criminally charged for extreme situations before this and after, and they were not in jail, as well as other people that were involved in this case.

And most of all, his life being threatened and a compromise of his mental stability, health and mental stability.

And here we are today, and how the government wants to allege and victimize me for a fraudulent behavior for having a roadside assistance service that we both had at the time to remove his motorcycles from his home, which I had to sell but end up using my brothers to remove the motorcycles, to assist me sooner.

What measures will this government not take? This traumatic situation has led up to extreme paranoia, of thinking

or feeling our phones are being tapped, seeing strangers and strange cars parked in front and around my house and in the neighborhood, being followed, and et cetera, just to touch on a few things.

It truly saddens me to know that the judicial system isn't compassionate or fair. This government has portrayed my son to be a monster in every way, but he isn't. He has morals -- excuse me, portrayed my son to be a monster in every way, but he isn't; he's a strong black young man with morals and principles, who's had successes and good endeavors in his life. And I share that to say, who in this courtroom who hasn't fallen short of the glory of God or does something they shouldn't have at some point in time in their life? What measures? What measures that have been taken?

If it were you -- and this is hypothetically. If it were your loved one, would you be taking the same measures? This is about a report, or have come down to be about a report, but what I've observed is a lot of nonfactual evidence and a blatant personal attack, a constant thirst to destroy and demean a useful, productive young man with great potential at any cost, for monetary gain and another notch in someone's belt.

I'd like to know how high up is this coming from. I reiterate, others were involved. It's baffling to know that the government utilized all these resources on a case like this, for one person, and neglect the facts. I can never fathom the

thought of truth and justice.

I personally feel, this is blown way out of proportion, and now it's -- and now it's, get your man at any cost. We're talking about a report. And not minimizing Martique's role in this, he's paid a huge debt, but it is clear that the government is -- is and has minimized others' roles in this matter, as if truth doesn't matter, because everything and all that was alleged wasn't true. So why are we here now for an incident report, or a report? A lot of the facts were not made until Martique spoke on them.

(Court reporter requesting clarification.)

MS. JACKSON-SMITH: Martique.

THE COURT: Spoke on them.

MS. JACKSON-SMITH: Spoke on them.

Let me finish. Okay, so let me finish up.

And the extra measures taken on my son by the government isn't justifiable, nor what we've subject- -- or what we've been subjected to throughout this whole ordeal, in saying all this.

One other thing. I don't mean to be rambling, but I had to -- this is a lot for me.

In saying this, I'm humbly requesting the Honorable Judge for great leniency for my son, Martique, who I dearly love and need here with me in my older years, as well as his father.

Martique has a son that he's never had the opportunity to hold. Martique is a positive, positive person in society and was prior to this unfortunate incident.

This has taken a lot from him. It has taken a lot from me. I've watched my son go through so much being in the household. All the mental stuff, I feel like I'm carrying it in myself as well.

But I believe he deserves a second chance. I believe he had deserved the opportunity to be in society again and be the positive, productive person that I know him to be.

So Your Honor, I just -- just requesting that you be very lenient with my son in this situation.

I'm sorry for rambling, but I'm just -- it's hard for me.

THE COURT: You didn't ramble. Thank you very much.

MR. ZAMPOGNA: Now we have Mr. Marcus Jackson.

THE COURT: All right.

MR. JACKSON: Good morning, Your Honor. How are you? It don't take long for me.

THE COURT: Good morning. Good morning, sir.

MR. JACKSON: Good morning. How are you, Your Honor?

THE COURT: I'm fine, thank you. Can you please state your name for the record?

MR. JACKSON: Marcus Jackson.

THE COURT: All right.

MR. JACKSON: I live in Prince George's County.

Martique is one of my nephews. I'm his youngest uncle. Of all of my siblings, my sister, I'm the youngest of 14.

Just to -- Your Honor, to give my story. I was younger than Martique when I witnessed one of my sisters being raped, so I know what a real rape victim goes through, of course. I was incarcerated for some years. I came home, to even watch my sister dying with HIV and AIDS, but the way I raised my nephews, who are many in here, we don't do rape. We don't do rape. That -- to me, they couldn't even come in my presence if that's the case.

And I'm sure he showed out in some kind of way in this event, but I'm also sure that I know what a real rape victim reacts like. I nurtured my sister. I watched her die because she was exposed to HIV. I was there for her. We talked -- I talked to my nephews, all of them, This is not what we do.

On Martique's character, he's a great kid, always has been. I'm not here to justify what he did wasn't wrong; I'm just here to tell you that we've experienced this situation on the real side.

Speaking about real rape victims, my sister, who died in front of me, just as I was being released from prison for serving time for murdering a guy who raped my sister, who came to me that day, crying, He done this to me, I followed him; Take

me to where he is.  A whole matter of minutes, turned myself in, stood there, went directly out of high school to Lorton prison. Not good.

But today, I'm gainfully employed, I have kids, I've been married.  I have a new grandbaby.  I own property in the county.  You're talking about thirty- -- 32 years from parole to where I am today.

So this is not something that I teach my nephews to react to or to act like, but this is a real story, and I don't know what could have gotten into Martique on that instance, but I'm almost sure, if you're using the -- the foundation of sexual assault, or rape, in this matter, when it's been pushed to your court, Your Honor, you have to consider, this kid is not a bad kid.  All of the support -- all of these are my nephews.  All of them look up to, me because I know; all of them can come and talk to me.

It's sad for me to see what my sisters are going through, watching them age and die out, because I love them -- all my family with all my heart, but to see my nephew to have to endure something that I've never expected him to have to endure, the things that I had to see, getting stabbed 17 times, almost losing my life, in a place like Lorton, for being right to what -- to my standards, because my sister's no longer here, but a real rape victim doesn't laugh, doesn't folly around.  A real rape victim isn't coerced by anyone; she knows what she's been

through.  I nurtured my sister; I watched my sister die with AIDS, because she was a real rape victim.

That's all I have to say to the court.

Your Honor.  Have a great day.

THE COURT:  All right, thank you very much.

MR. ZAMPOGNA:  Dalonte Jackson [sic].

THE COURT:  All right.  Good afternoon.  If you could please state your name for the record.

MR. EDGERTON:  Sure.  Good morning -- or good afternoon.  My name's Dalonte Edgerton.  I'm one of Martique's older brothers.  As mentioned today, he has plenty of family here that can speak to his character.  I'm going to start off kind of speaking about my character as being the closest brother to him.

THE COURT:  Why don't you make sure you're speaking into the microphone, so try not to move around as much.

MR. EDGERTON:  Okay.

Better?  Okay.

So Martique and I both come from marginalized communities, somewhat of subsidized housing.  We both made it through that, gone to college.  He's a college graduate, he's a former athlete, myself as well.  Fraternity, as well as a 32nd degree mason.

After college, we both went into law enforcement.  He went into law enforcement, I went to the federal agency of the

JA1570

United States Secret Service, where I served over ten years, mostly under presidential protective detail. In my career, I've written many reports. And after hearing some of the things that were presented today, those things that they're saying should be in reports aren't in reports, and I can speak to that because my reports are still being used in Beltsville at J.T. Rowley Training Center.

But nevertheless, more about Martique. Martique is a great young man, and behind that mask is a very infectious smile. He's a very stand-up young man. He's done a lot for this community, and me, as well. I'm a good judge of character, and I can tell you that being his older brother, I've led him in the right -- right way.

It's unfortunate that he's going through this situation, and we've all made mistakes in our life. And I don't know more of the details of the situation, but I can tell you that he is a great young man, and he deserves to be able to live his life and move on from this situation.

And I hope that both the government -- especially the government can see beyond what's on paper, that he is a young man that deserves another opportunity to prove that.

And I thank you for allowing me to speak this morning. I'm a little exhausted; I flew from Paris, so I'm a little off right now. But I thank you for your time, and I hope you all have a great day.

JA1571

THE COURT: All right. Thank you very much.

MR. ZAMPOGNA: Mr. Alfred Williams.

THE COURT: Okay.

MR. WILLIAMS: Good afternoon, Your Honor.

THE COURT: Good afternoon. Please state your name for the record.

MR. WILLIAMS: My name is Alfred Williams, Alfred Colin Williams, Jr.

THE COURT: All right. Why don't you move the microphone just slightly, towards your mouth. Down a little bit.

There we go. Okay.

MR. WILLIAMS: Okay.

THE COURT: Good.

MR. WILLIAMS: All right. Martique and -- well, where do I begin? First of all, myself, I'm a college graduate. I'm currently a facility safety manager at a power plant that generates waste to trash -- or trash to energy out to the community.

And I want to start out by saying, Martique has been a vital part of my life since we've met. We've met probably 2006 and been very close friends since then. We went to college together, went to high school together, and our families are now merged.

This situation, it's been devastating, I'm sure on

both behalfs, but I can only speak on our behalf. When Tique first served his initial sentencings and I witnessed my best friend deteriorating behind closed cells, I witnessed his mother, where he had to -- what she had to go through. It broke me to my core, it also broke my mother to her core, and my grandmother to her core.

As you can see, the support in the family that's here today to support Tique and the man that he is. Since then, we've tried to move on. Tique has come home, and he's been a very changed person, given back to the community, never missed a day of work. He often works as hard as I do, and the hours are grueling, grueling hours. He's a wonderful, upstanding person, and I really -- words can't really describe him; you just have to experience him.

While we were in college, he was fortunate enough to graduate before I did, and upon his graduation, he would often go and check on my grandmother, unbeknownst to me. My grandmother would call me and say, you know, Oh, Tique came by, he came to check on me. Tique used to take my little brothers to school when I wasn't there.

I say all this to mention about his character, and I believe that everyone makes mistakes -- He who is without sin, cast the first stone -- and I don't think any of us in here aren't blemished.

So with that being said, I just ask that you give him

JA1573

the chance to continue to make the difference. I think he has definitely learned a valuable lesson, and I think that he will continue to move better and be a better man. But he will first need to grant that opportunity from you so that he can do that.

And that's it.

THE COURT: Thank you very much.

MR. WILLIAMS: You're welcome.

MR. ZAMPOGNA: Mr. Valentine Akinlosotu.

MR. AKINLOSOTU: Good morning, Your Honor.

THE COURT: Good morning -- or good afternoon, actually; we've been here a long time.

Please state your name for the record.

MR. AKINLOSOTU: My name is Valentine Akinlosotu.

THE COURT: Can you spell your name, please.

MR. AKINLOSOTU: V-A-L-E-N-T-I-N-E, last name A-K-I-N-L-O-S-O-T-U.

I would just like to state that I've known Martique Vanderpool for almost 30 years of my life. We started at elementary school together, and ever since I've known him, he's been the top of the class. Whether it's with, you know, his grades, whether it's in sports, he's always been the captain, always been a leader, always been an inspiration to, you know, everyone who he's come into contact with.

I own a nonprofit organization within the community in Southeast D.C., where Martique is the first to always show up,

whether it's making meals for the homeless or --

THE COURT:  What's the nonprofit?

MR. AKINLOSOTU:  It's called The Creative School.

THE COURT:  What do you do?

THE WITNESS:  So we basically go around the community and provide resources for the -- the less fortunate.

Okay.  So like I said, he'll be the first to, you know, help me make the meals, help me make the hygiene kits, packaging, socks, and toothbrushes, and soap, and things of that nature.  He'll be the first one there and the last one to leave.

And I just hope that you take this into consideration, that he's a very vital part of serving his community, and that he just wants to continue to get better.

THE COURT:  Thank you very much.

MR. ZAMPOGNA:  Ms. Deangelo Coates.

MS. COATES:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. COATES:  My name is Deangelo Coates.  I'm a cousin of Martique Vanderpool.

Yeah, as -- just as like his father said, my thought process about what to bring to your attention has changed.  I'm going to start speaking on his character, as I should.

I've known him all his life, and it just seems as though that -- correct me if I'm wrong -- if there are three people involved in something, three people should be showing,

correct?  It's only two, and that would never rest with me.  And in saying that, I just feel as though that that's just not fair to him.  Nevertheless, that's what it is, and that's where we are at today.

I don't know no one in my family -- and I'll say that in front of all my family -- whose character stands out more than this guy over here.

I believe that when you are an adult, there are no mistakes that you make; they're choices.  The choice that was made wasn't the right choice.  We all have made wrong choices, nobody's perfect.  However, in saying that, it's only one person on this -- on the left of me for a choice that was made when there were three people involved.  Again, I say that and I will stress that.  That doesn't seem fair to me, and I'm pretty sure it doesn't seem fair to anybody else in this courtroom, but nevertheless, this is where we're at today.

Again, nobody's character in my family outmatches his.  I've had countless talks with him, countless situations with him, in where he has actually helped me out in getting through certain things, just in conversation, just through being there, just through being a good cousin, a good -- good family member.

And I will say that you are a judge, and you know, we judge based on -- I judge based on how a person deals with adversity in life, and this is the most adverse situation that my cousin has ever faced.  And I will say to you and I will look

JA1576

at you and say to you that his character super-exceeded his adversity; never once questioned what was going on because, like I said, he realized that it was -- it's not a mistake, it's a choice, and it was a bad choice. However, never -- never really changed for the worst. I know a lot of people that have changed for the worst with the slightest of adversity.

This -- to see him go through what he went through and still smile, when I would go and visit him, incarcerated, still smile. Of course, you know, it's a lot of things probably I won't ever know on how he really, truly felt, but to show and display to me that, hey, I'm going to be okay, irregardless, that -- that stands for something to me.

So we're all here talking to you about his character, and I will say to you that in the face of adversity, of the most adversity that's ever faced, his character never wavered. Stand-up guy. If I asked him to ride to Japan to get something for me, he'd been the first one to do it.

So to see his character try to be diminished because of a consensual situation -- I get it, you know, in the merit of being a police officer situation, where it was at, where it happened, I get all of that, but to say that it was a rape or anything like that, I just don't believe that, and it was found that it was consensual.

And I believe -- and like I said, my tone has changed concerning this, because I believe -- I believe that my cousin's

JA1577

character just super-exceeds him, in many ways, and like I said, if you want to judge someone, you judge someone on how they deal with adversity. And the way how he has dealt with it, Judge, bar none, I stamp it, as far as him being a great individual.

And I just ask that you just can find grace in the matter, and thanks for your time.

That's it.

THE COURT: Thank you very much.

MR. ZAMPOGNA: I just have one last witness besides for the defense, Mr. Hernandez.

THE COURT: Okay.

All right, good afternoon.

MR. HERNANDEZ: Good afternoon, Your Honor.

THE COURT: If you could please state your name for the record.

MR. HERNANDEZ: José Hernandez. They call me George.

THE COURT: All right.

MR. HERNANDEZ: I been knowing Mr. -- my friend, Vanderpool, for many years, since he was little, and the parents, Flechia, Mr. Gary; we've been friends. Every time we see each other, you know, we talk about different stuff.

Again, I'm not here to talk about the victim; I'm here to support him as a friend. And -- well, throughout the years, I've known him -- like I said, it's a very long time. He used to go to the school. Later on, he went to academy for -- to be

a police officer. He was very excited about it.

All -- after that, all this happens, but when he get out from jail, right, I -- I asked him -- well, I told him that it's been very hard for him, and -- but even all that happened to him, he still tried being -- getting a job and moving forward.

And -- well, I also pray for your mercy for him. And may the Lord give you wisdom for every case you face.

Thank you.

THE COURT: Thank you very much.

Any more witnesses?

MR. ZAMPOGNA: Just my client himself.

THE COURT: Okay. Well --

MR. ZAMPOGNA: I'll take a break.

THE COURT: -- I assume you are going to have a presentation on his behalf, correct?

MR. ZAMPOGNA: I'll give some words, and I know we're here for a long time. You mean, a presentation as in argument?

THE COURT: Sure, argument, presentation. I would provide you with an opportunity to speak to the Court as well, but --

MR. ZAMPOGNA: Sure. Yeah, we can do that first or after, Your Honor.

THE COURT: So why don't we do that; the lawyer first, the last word is Mr. Vanderpool.

JA1579

MR. ZAMPOGNA: Okay.

THE COURT: Let's take a ten-minute comfort break; we've been going for over two hours. Let's come back in about ten minutes. Thank you.

MR. ZAMPOGNA: Thank you.

THE COURTROOM DEPUTY: All rise. This Honorable Court stands in recess.

(Recess taken from 12:23 p.m. - 12:31 p.m.)

THE COURTROOM DEPUTY: All rise. This Honorable Court now resumes in session.

THE COURT: All right. Why don't you get the government. Can you get your lawyers, please?

MR. ZAMPOGNA: Your Honor, I won't be more than -- probably less than five minutes.

THE COURT: All right, let's wait for the government to come in.

MR. ZAMPOGNA: Okay. I didn't mean to ...

THE COURT: All right.

Okay, Mr. Zampogna.

MR. ZAMPOGNA: Thank you, Your Honor. I just have a few comments. And thank you for our time today; I know we had quite a few witnesses.

I just want at this point to focus on what Mr. Vanderpool has done since this event has happened, and I'd like you to focus on that.

As you know, there's cases that have said, you know -- and I'm not saying you don't do this -- that the duty of the Court is to look at his life since this tragic event that has happened, and I would submit to you that he has done many things of a positive nature. He's worked helping others, he hasn't done anything untoward. He has a very good family support group, as you can see today. And for those reasons, I am asking you depart even lower from the minor -- the low end of the sentencing guidelines.

And with that, Your Honor, I'd like him to have the last word.

THE COURT: I have some questions for you.

MR. ZAMPOGNA: Oh, I'm sorry. Go ahead, Your Honor; I apologize.

THE COURT: I understand he's working for the Montgomery County Department of Transportation; is that correct?

MR. ZAMPOGNA: Yes, Your Honor.

THE COURT: What are his hours?

MR. ZAMPOGNA: I believe it's 40 hours a week. I'm not sure.

THE COURT: Why don't you consult with your client. Not just the number of hours, but the hours; Monday from 9:00 to 6:00, for example.

(Consult between Mr. Zampogna and the defendant.)

MR. ZAMPOGNA: Sorry for the delay, Your Honor. He is

essential personnel.  He works from 8:00 to 3:00 five days a --

(Conference between Mr. Zampogna and the defendant.)

MR. ZAMPOGNA:  I'm sorry, 6:00 to 3:00; I apologize, Your Honor.  And --

THE COURT:  Monday through Friday?

MR. ZAMPOGNA:  Yes, Your Honor.  And he also is on call for extra duty when there is a need for his services, given his -- well, his classification.

THE COURT:  Okay.  Where does he live?  I don't need to know an address, but who is he living with; what's the living situation?

(Consult between Mr. Zampogna and the defendant.)

MR. ZAMPOGNA:  I just wanted to be sure that -- he lives with his mother and his stepfather.

THE COURT:  All right.  And he was released from state custody -- was it in February of 2023; is that correct?

MR. ZAMPOGNA:  I believe so, yes.

Yes, Your Honor.

THE COURT:  February of 2023, mm-hmm.

MR. ZAMPOGNA:  Yes, Your Honor.

THE COURT:  Okay.  You say in your sentencing memo that -- I think you said, 31 months of that was in solitary confinement.  Is that true, and tell me more about that.

MR. ZAMPOGNA:  I believe --

(Consult between Mr. Zampogna and the defendant.)

JA1582

MR. ZAMPOGNA: He's informed me it was 18 months. I think you heard from his mom that there was no visitors, there was poor lighting, he wasn't allowed to leave, sometimes for several days, to even get out of the cell, to get fresh air.

Yeah, it took a toll on him, so it did occur, Your Honor.

THE COURT: His mother said that she had to sell his home. Tell me about -- and I think his car. What can you tell me about that? Was that as a result of the incarceration?

MR. ZAMPOGNA: Yeah; he did not have any income.

THE COURT: All right. So he was -- he previously owned a home, and it had to be sold; is that correct?

MR. ZAMPOGNA: Yes, Your Honor, and all his vehicles.

THE COURT: Well, how many vehicles?

MR. ZAMPOGNA: I think there were a motorcycle and a car?

THE DEFENDANT: (Indicating.)

MR. ZAMPOGNA: Yes.

THE COURT: All right.

Okay, I think that's the end of my questions, thank you.

MR. ZAMPOGNA: I just -- okay. We do have -- he has some pictures he'd to show when he's up here. I don't know if you want me to show -- they're just pictures of his son and things of that nature.

THE COURT: Well, we have to share them with the government if they're going to be shared with the Court.

MR. ZAMPOGNA: Okay. Can we do that now, Your Honor?

THE COURT: Yes. Usually, Mr. Vanderpool just speaks from the table and not from the podium.

MR. ZAMPOGNA: Okay. We'll do that, Your Honor, thank you.

THE COURT: All right. So how do you wish to share the pictures?

MR. ZAMPOGNA: Is it all right if he brings the computer to the government and shows them to them?

THE COURT: Sure, sure.

(Photos being published.)

THE COURT: Okay. So Mr. Vanderpool, good afternoon. You have the absolute right to speak to the Court, you have the right not to speak to the Court. So if you have something to say, I'd be happy to hear from you, but if you don't have anything to say, I will not hold that against you.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay.

THE DEFENDANT: So I don't have a speech, but I'll say some words to the Court. There's one thing that's really evident about this situation, and it's something that should have never happened. I have never alleged that. I think everyone is in agreeance, and everyone should be in agreeance.

JA1584

And I'm speaking specifically about the sex in the workplace. It wasn't appropriate, it wasn't professional, and I've acknowledged that multiple times, Your Honor. I'm doing it again for this Court.

It's -- every day, I got to think about this. It controls my whole life. I constantly got to think about it. I constantly got to think about my family and the toll it's taken on them, and I feel like I let everybody down.

This situation, it's frustrating. It's frustrating for me. As you can see, it's frustrating for other people. This situation, this incident, is over five years old. So I ask for the Court's forgiveness. You know, you have people who have been here not just for what's been termed as a prior proceeding, but you have people who have been here since the very beginning. My counsel, they haven't been here since the beginning. The government hasn't been. This Court hasn't been. So you have people, they've seen things, they've heard things, and it is very frustrating.

This situation is -- it is an embarrassment. And maybe I did violate my trust and my oath to the community, but I have regained that, in my belief. And maybe not as a police officer but in different ways. A police officer is -- it's a job title. And I get it, and I've worn many hats, and I've just tried to move on with my life.

I'm not a bad person. You have people who have known

me since elementary school. You have people who have watched me grow up. My mechanic is here. He watched me grow up like from when I first started driving.

I ask the Court to -- and I'm sorry for -- about what occurred. I don't have anything against Ms. S. I don't have no ill will toward anybody. I'm a human being, and I make mistakes. And I don't want to get into the thing, but I told what happened, I spoke on it.

I ask the Court to consider the financial burden on me. I've been through multiple prosecutions. This is the third instance -- I'm sorry, this is the fourth incident, fourth case involving that one incident. And even this case, I came up to this case, I was technically indigent. I had public defenders at the time. And I've had to take on this case. I've lost years of income. Even things I would have been able to do to even put towards my defense, experts and things like that, and how to defend against all this stuff, and I can't.

I'm trying -- I've been trying to rebuild my life. I've lost everything. I've lost everything. Like, the mental -- the best way I can put it -- I don't know, Your Honor or anybody here, imagine being taken from your home today, whatever your home is; imagine never seeing that again. Imagine just little things, like some cream or something that's on the dresser that you utilize, like you don't have access, and then you're put into a cage and that's your life, like the shock

value.

I never saw myself like this; I followed my brother, I follow good role models. Even some of my uncles that made mistakes, I followed the good things about them and watched certain adversity that they've been through, and I never saw myself in a position like this.

You don't -- if you just look at things that I've done throughout my life, I've even worked with the Department of Justice before. I've worked as a -- for the U.S. Marshals Service. I've joined and been a part of -- as a kid, as a young high school student, joining just academies, things where they teach you little things.

And it was -- it was a horrible decision, and you know, sometimes, it's an influence. And I'm not justifying it, I'm not making it up, but I've lost everything. I have tried -- like all my accounts, everything has -- was wiped clean. And a lot of this falls on my mother, and I'm even trying to coach her through this in the midst of just everything that I'm going through.

And I ask the Court to look at -- look at my entire life. Look at me from growing up. I didn't grow up with much. Growing up, going to school. I went to college. I've done a lot of good things. I've made a lot of good decisions, if I have to say. And I have made a bad decision. And I have acknowledged that, and I've been penalized for it, hefty, hefty

penalized for it. I have life-long complications now because of this situation, life-long.

And I ask the Court to also consider, even being incarcerated, I didn't have not one infraction. Even after that, I complied with everything, everything the Court says, Pretrial Services, everything. It's been really tough to do all of that.

I understand some things, and I understand the Court has to go on its findings. I understand that. I mean, they're asking you to put me back into a cage. That doesn't serve no viable purpose. What good has come out of it? And they're still asking for it, so what good has come out of it? They're asking you to sentence me for crimes of violence.

And I can't speak on things. I had a lot of stuff that I would have liked to say or that I want to say, but I just can't because of the formality and everything, but I ask the Court to consider those things. I ask the Court to understand that I am a human being. Yes, I was a police officer. I was -- I haven't been a police officer in years. I have moved on, and I think I've showed that I'm somebody that can be trusted.

I didn't -- I came on this sort of counseling myself. I didn't have no money, I didn't have anything, and I wanted to get help and get better and be there for my family. I mean, it's scary to be sitting somewhere in a cage and not knowing -- your father's already sick; am I going to be able to hug my

father one last time?  It's hard to be tough and be strong over the phone and you know your mother's hurting and stuff, but you gotta be tough and let her know that it's going to be okay, Mom, and you're sitting somewhere with two cases of life over your head?

I apologize to the community, and I've tried to do everything to make things right.  And I want the Court to look at that.  Like, I be put back into a cage, I lose everything.  I lose everything.  I've lost everything, and I'll lose everything all over again.  Everything, all certifications.  I'm a city boy.  I now know how to work loaders, forklifts, backhoes, bobcats, all types of special utility vehicles.  And I've invested in that; I've invested in that cost.  That costs money to do those things.  I've invested in getting just licenses, and work equipment.

And I still have aspirations.  I have aspirations to still do things.  I want to go back to school.  Yeah, I have a degree, but all my certifications are moot now.  Everything that I've got, certifications and things, they serve no purpose now.  So yeah, I want to go back to school.  I want to get my Occupational Safety and Health Administrative degree and things to just better my future, to help take care of my family, to help take care of myself.

To be sitting here, waiting for people to tell you when you can eat, tell you just anything.  Wintertime, this

weather, freezing cold, don't turn the heat on, don't -- the shower water's cold at times.

I have -- have done the things that I could do to live right, and I think I've shown people even from start. I ended up getting -- I got off of the ankle monitor because I obtained a job -- which was really hard. I've been all over, the media; it's really hard. You know how difficult it is to have to explain to employers -- well, first of all, You have a good résumé, where have you been this whole time? And you have to tell them you've been in jail? I've had to explain to employers, No, this woman, you know, she actually was an adult; they just put teenager, but she wasn't a minor.

And I got off the ankle monitor to take a traveling job. I've traveled to different -- different places within the country, working at hospitals and doing their inventory for them. That's -- and that's kind of why my counseling has stopped at that point, because I -- first of all, I needed money, but then, the scheduling and things like that. I even went on ahead to then drive a bus with people with disabilities. Even coming to this very courthouse, you know how that feels, to come to this very courthouse and pick up CHIMES employees -- I think that's the name of it -- and just taking them to where they need to go.

And I'm -- I'm truly sorry about what happened. I am sorry about what happened. And sometimes, people hit points in

their life, and maybe they just -- they need to be grounded differently or around the right things. Maybe they've got away from their spiritual connection with God. And sometimes, things happen for a reason, to show you. Maybe I could have been headed on the path and this was to show me.

But I ask the Court to look at the path that I'm on now, look at me after all of that. And I think people, even support people, who know the things that I've been through, and they still look at, like, wow, man, this is a stand-up man. This is a man, he comes out here to work hard. I work two jobs; it ain't just 6:00 to 3:00. I work FedEx; I work more than that.

On top of trying to be there for my family, be a father. I had never even seen my son before. I didn't become a father -- I became a father in jail. I found out I was a father in jail. And that's hard. My mother sends me pictures, and I'm like, Mom, please, don't send me that, because I'm like, I can't do nothing for him. I can't even get -- I can't even do nothing for myself. I can't even get some toilet paper if I need it.

I know the Court -- I've been advised the Court has another hearing, and I just --

THE COURT: No, no, no, you are under -- you should not feel any pressure or worry about another hearing; I don't have a hearing until later, so don't -- I'm patient, and I will listen to you, and I'm happy to hear from you.

JA1591

THE DEFENDANT: I understand, the Court doesn't know me, and when people see things, they just see a police officer. I'm a human being. I wasn't born into law enforcement, and like I said, I've worked many hats. I've been a cashier, I've been a revenue officer, I've been an investigator, I've been an armed security officer on a military installation, campus police officer. I've been a police officer, I've been an apprentice, I've been an equipment operator, I've been a bus driver. And I've done different things, and I get it, I was a police officer, and that's part of what aids all of this stuff, but that's not who I am; that doesn't make me who I am, a job title.

So I know the Court doesn't know me, so I just -- I just put together a few pictures. It was late last night, and I figured, hey, maybe the Court can just see me. And I had printed some things. I don't know if the Court -- if I turn -- I didn't know if there was going to be a bailiff.

MR. ZAMPOGNA: Show them to the prosecution.

THE DEFENDANT: Oh, for the -- okay.

THE COURT: Why don't -- your lawyers can show it to the government and then bring it to me.

THE DEFENDANT: So this was just -- I guess that goes with that. That's just an instructor certification. And let's do not act like a felony isn't a punishment in and of itself. Like, this is something that I will be able to do, to even make

revenue and things like that, that I can't do that because of this case, because of that. And --

THE COURT: So -- hold on one second. So if there are more things you'd like to show me, let's do it all at once.

THE DEFENDANT: I don't think there's anything, Your Honor -- well, there's one other thing, I think, that I would like to show, and I guess I can just give it --

MR. ZAMPOGNA: We're going to show it to them. That's it, you got three copies?

THE DEFENDANT: Yeah, I just made copies, just in case.

THE COURT: If you have an extra copy, leave it with the government.

All right. Counsel, you can approach, and I'll take a look at everything you have.

THE DEFENDANT: So --

THE COURT: Thank you.

THE DEFENDANT: -- this is -- all of this was taken away from me.

And I even asked the Court to -- and I mean, even on the certification, you look at the date of that, that was shortly before this incident. I was doing things, I was on a good path, and people don't get sent to be instructors. I was on a good path, and shortly before that, a bad mistake ended up occurring, and -- so -- I'm sorry. I -- so like I said, I was

up -- this mouse isn't working.

I was up at night, and I just put together some stuff briefly and -- just to show the Court because I know the Court doesn't know me.

THE COURT: You're going -- you need to speak into the microphone. So why don't your lawyers help you with the computer.

THE DEFENDANT: And I know the Court doesn't know me, so this is just me being honored as a good officer and the officer of the year while I was at the department. And I just wanted to share that.

Okay. This is me, this is just me. That's my mother, there, and she's there for the good times and the bad times.

This is me -- this is me just on the daily. This is me in the performance of my duties, responding to calls, responding to citizens, helping people throughout the community, and you know, I'm proud of that; I've worked hard to be that.

You know, I'm still in a trusted role. I still operate government vehicles, equipment, things like that, and I'm providing a service, and it makes me feel good because I'm a human being again. I wasn't a human being for that time. It was so dehumanizing. I'm a human being. I get acknowledged as a human being. People are thankful. They come out, they bring me water, things like that, thank you for that. I can go into a restaurant or somewhere, and I'm a human being, and that's how

I'm looked at. And that's so important to me, and I had lost -- I've lost all of that.

And I believe I can show that I can be a human being, and I want the Court to truly understand that.

How do --

Same thing, me. And this is all -- this is all me now. This is me out on the side of the road, working, providing service. This is all me now.

I ask the Court to consider the me now, not things like locker room talk before I lost everything, before I became a father, before I served time and being -- and being incarcerated and things like that. The me -- this is the me now. This is the me. That is what I do. This is me, daily. This is me just yesterday, picking up large trees that have fell on houses and things like that.

And I'm happy being a person. I have to do so many different things now to just meet with people, and have to get counseling, things like that, because of this situation, and it's taken a long, hard toll on me.

And some of my friends can even tell you, he has to carry a device around his neck, he has to carry -- because he has really bad -- I don't know if -- I'm not going speak more about it, but I have to carry certain things to help me with certain situations.

Next.

This is the same thing. This is me, snowstorm, inclement weather. I've worked hard to be -- to utilize commercial vehicles. This is me plowing snow. This is all recent stuff. This is me. This is what I'm doing. This is what I'm doing with my life. I ask the Court to look at what I'm doing, not continue to judge me for something that I've been penalized for, punished for, for over five years ago.

This is me currently, now. This is me going to go visit my sick father, in Virginia Beach, which I'm ever grateful and thankful for the Court to even allow that to happen as one my conditions of release. This is me going to visit him, to be there for him, to handle his affairs, to help get him home health aides, to help just with anything. As he -- my father is going to run out of rope soon. You know, I mean, he said it. I wasn't going to say it, but that's going to happen soon. And I'm just being there for my father as he was there for me, as a kid, when I was young, as growing up, being there. And I just want be there for his remaining years.

This all real stuff. This isn't old. This is new. This is after, since all of this stuff. On top of still going back working two jobs, on top of still going to be there for friends, helping them within the community, on top of still going to Bible study on Wednesdays, on top of still going to get counseling, self-initiated counseling for myself, that I'm fortunate that my job allows, that has given me the benefit to

be able to receive things like counseling, that they cover, things like -- I have a retirement now. I've worked hard to be able to have a retirement. I didn't even have a retirement when I worked for Fairmount Heights Police Department.

This -- these are just moments. This is my son. Just being able to watch him, to be there for this moment. I've lost all of this time. Just to watch it. It might not mean nothing to nobody else, but just to see my son eating a burger, eating a hamburger, watching him drool. Like, those are priceless moments I could never get back. Like my father says, there's no dress rehearsal for life; you get one chance. And I've lost these moments.

These are things that are truly painful for me. I don't know how much pain -- how much pain is wanted out of me. I don't know what -- if the goal is for me to just be mentally defective? I never even got to meet -- I never got -- because of this situation, because of this case, every day I have to think about this decision. I have to think about why my son has certain needs and disabilities for me not being able to be there, for me not being able to give him certain things. This is my son just learning how to walk. I missed this. I missed all of this. Just seeing him just being able -- when he first started being able to walk.

And I just want -- I want the Court -- I want people to see that. This is my son. And I don't share this with

people.  This is my son with a bacteria affecting his eyes, and he can't -- his mother can't take him to a hospital because she can't -- she doesn't have the means, the financial means. That's where dad comes into play.  And I can't even be there for my son.  This is my son.  His eyelids are pretty much swollen; he can't even open them.

And I'm sorry, I don't want the Court to feel like I'm attacking the Court.  I mean, this is coming from years -- this is coming from years of -- years back.  This isn't a today thing.  This isn't, well -- this is coming from at the time we charged and indicted.  This is coming from all of this stuff. This isn't just this day, February 20th, 2025; this stems back from a lot longer.

And I'm not attacking the Court.  I don't want the Court to feel like I'm attacking it; I'm just -- I'm hurting. I'm hurt that my family's here, I'm hurt that people have to be here and that we have to go through this.

How do you switch to the next one?

MR. ZAMPOGNA:  Right here.

THE DEFENDANT:  This is me, just trying help my son with one of his disabilities.  This is me being part of a Zoom call, where I've hired a therapist just to try to help him.  And I didn't have to be a part of that, but just me wanting to be a dad and be involved as a parent, things like being able to go to the parent-teacher things, things that like my parents did for

me and stuff. This is me just trying to get him help. And the picture reflects the therapist, my child's mother, my son, and that's me. Not the best pictures of me; I never intended to show any of this stuff.

This is my son just trying to bath. He can't get fresh water all the time, so sometimes he have to use recycled water, and this is him just trying to bathe.

You can change that one.

This is just me trying to bond with my son.

(Video playing with audio.)

THE DEFENDANT: This is me, almost like just looking through a window at my son, like as if he was playing, but I can't ...

(Video playing with audio.)

THE DEFENDANT: This is me and my brother. Me and my brother, we didn't grow up with much. We lived in a one-bedroom apartment. And -- you know, this is just us as kids, and this is -- I think that was -- those skates is from -- it might have been some Christmas. We didn't have much. And this is just us now, being -- and him being there for me, when we graduated from college.

And we always had the plan to be able to have our sons like be raised together and -- so they could be close like us, and not only did I become a father while I was locked up, I became a uncle too, and I have never even seen my nephew. So --

JA1599

You can change that, man.

That's my nephew. That's my mother holding my newborn nephew, who I haven't even got a chance to meet or anything. That's my brother, Dalonte. He came up here and spoke. I got another brother.

That's him now. He's big. He loves Spiderman.

So this is me just seeing him for the first time, just trying to bond with him.

(Video playing with audio.)

THE DEFENDANT: That's -- that was me trying to just make them bond, let them see each other, because that was one of our plans, for them to always be able to see each other.

This is -- I bought my son a costume, just so he could feel like a kid, so he could be, like -- you know, he could be whatever he wanted to be, so I bought him that. He likes that.

(Video playing with audio.)

THE DEFENDANT: That's him from the treatment and stuff. It's helping. He's actually able to say certain things, so there's been progress.

There was another one that I was -- I couldn't find it, and it was at a really, you know, hard time for me. It was during this period of incarceration. And I'm a firm believer that you -- you have a bond with your parents, your kids; you can feel things. Like my mother, she can sense when something is wrong, something ain't right, something ain't right, or my

father. And I can sense those things too.

So I had something that I was going to share. Like I said, I couldn't find it.

And this was at a time where I'm sitting in jail, I've lost everything at this point. I got two cases of life, that carry life over my head, and my attorney, he quits on me. He takes maybe like 30,000 of the money. So I don't -- I needed an attorney. I don't have no extra money, nothing, and I get a notification, my son, he needs to eat. And I never even met him. He ain't never met me. I've never seen him in the flesh.

So I have to make a decision. Well, if this the last good deed I do, just so my son can eat, whether it's just for a few weeks, a few more weeks, I'm going to send you some of my attorney money, send that, send the attorney, just so he can eat. And I never saw -- I didn't see this at the time. My mother had told me about it. I saw it when I later came home, but the food that he got, he -- he's eating the food, and he -- he knows his dad, he can feel -- it's his dad, something is going on. He takes the food and he goes and started feeding my picture. He couldn't even say anything. He couldn't say no words. He'd say, Eat, eat. No, Dad, you eat. I know you're in a dark place right now. I know you eat and gruel right now. I know you sent this for me.

And you know, it's just -- this whole thing has been -- it's just been traumatic for everybody. People here

have spoke.  I know who I am.  You can't tell me nothing different.  I know who I am.  And yes, I did make a mistake.  There's certain things -- and my family know -- we don't tolerate.

And I just want to let the Court know, like, I have every reason to do right.  I have every reason to be successful.  I have so many different things to keep me grounded.  I have essentially a probation officer in my house.  My stepfather works for CSOSA.  He counsels me all the time.  He makes sure I stay on track.  And I have every reason to just continue to do right, to do well and to continue to be an upstanding citizen, make things in my life, and just make people proud, and those are the things I want to do.

I share this -- this picture, this is from -- one of my IDs from one of the facilities I was in, and I keep this picture to remind me of where I was at, to remind me -- I don't even look like myself -- to remind me of where I was at, where I never want to be, and what I'm going to do to make sure that never happens.

It's also sort of triggering, you know, so I don't -- I don't keep it on me, but I keep it nearby, to remind me, you remember this, you remember this time, you remember everything going on in your life, you remember you sitting here, you don't have no attorney, all of that.  These are these moments that make sure I stay grounded.

JA1602

I've always held myself to a standard. And sometimes people fall short, and I did fall short. I never said I didn't fall short. I've never denied, oh, this never ... I haven't.

And I just want the Court to know that, and ... I want the Court to know that and understand, I'm a human being.

I'll end it at that. Thank you.

THE COURT: Thank you very much, Mr. Vanderpool.

Just give me a few minutes, okay? Thanks.

Okay. First off, I want to thank counsel for both sides for their excellent lawyering in this case. So thank you, both, very much.

When I first started this job, one of my colleagues told me that sentencing was the hardest thing that I would do, and that person is a hundred percent right. That remains true, and I don't have to speculate that it will remain true for the rest of my career.

Today is very difficult. That's my job. I have to apply the law, which is Title 18 of the United States Code, Section 3553(a). I have to consider the factors in that statute to determine what sentence is sufficient, but not greater than necessary, to meet the goals of sentencing in that statute in Section (2)(A) through (D). I do that now.

I first start with Mr. Vanderpool's history and characteristics. He is 35 years old. He was born in Cheverly, Maryland, to his parents, Gary Vanderpool and Flechia Smith, who

are here today.

Thank you very much for being here and for speaking to me.

He was raised by his parents in working class neighborhoods. He went to school regularly. He was a good student. He played football, basketball, and tennis. He graduated high school and attended Millersville University, where he graduated with a bachelor's degree in arts and sociology and where he played football. With the exception of living in Pennsylvania when he was in college, Mr. Vanderpool has lived in the Washington, D.C. area his whole life.

His brothers are accomplished professionally. His childhood friends, many of whom are here, as well as his extended family and friend at work that's here and has been supporting him, certainly was here during the trial.

As his father wrote to me, Mr. Vanderpool dreamed of working in law enforcement since he was a child. His cousin, Michael Samuel, reported the same. He attended summer camp at the FBI training academy while in high school and while in college, he interned with the U.S. Marshals Service, juggling class and football practice.

Mr. Vanderpool became a law enforcement officer in December of 2017 with the Fairmount Heights Police Department. He was named officer of the year in 2019. During that year, he also worked as a revenue officer for the Internal Revenue

Service. Before this offense, he had a very significant employment history.

Since his release from prison, Mr. Vanderpool has worked hard to turn his life around. Several of his relatives, including those today, have remarked how he now attends church regularly.

He works as an equipment operator for the Montgomery County, Maryland Department of Transportation. His supervisor, Robert Monroe, reports that DOT is eager to keep him employed and is willing to accommodate changes in his schedule if required by any sentence.

Mr. Vanderpool has earned certificates, including a commercial driver's license. He's also worked and I think is currently working at FedEx, and he's had other jobs since his release from prison.

Mr. Vanderpool had a son when he was incarcerated. He has never met his son. His son lives out of the country.

I appreciated seeing the pictures and the videos today. Thank you, Mr. Vanderpool.

I understand that he supports his son financially and emotionally. He is five years old. He is diagnosed on the autism spectrum disorder.

I've read the letter of his child's mother. I believe her name is Gabrian Popo. She reported that it was difficult to communicate with Mr. Vanderpool while he was incarcerated and

since his release, he has financially supported his son by buying him clothing and food. She also reports that he advocated for his son's treatment. As Ms. Popo writes, "If it was not for Mr. Vanderpool, I would not even know our son's diagnosis."

Mr. Vanderpool's relatives wrote to me that he wishes to bring his son to the United States so he can have better access to resources and services.

As is apparent from the showing today, from the letters I received, and from the showing during the trial and other hearings, Mr. Vanderpool has an extremely strong family and community network and support. Mr. Vanderpool's father, Gary Vanderpool, who I heard from today, has a very serious medical condition. Mr. Vanderpool visits his father regularly, and his father reports that he helps him during his -- and after his treatments.

Mr. Vanderpool's aunt, Millicent Canady, also wrote to me that her nephew helps her, including by filling out paperwork, reading things to her, fixing her computer, and vacuuming her floors. Her children passed away fairly recently, and Mr. Vanderpool has stepped up to look out for her. Mr. Vanderpool's other aunt, Denise Henderson-Thompson, wrote to me that he helps around the house and outside, doing yard work in the area when needed.

I reviewed the other letters from his friends and

extended relatives, all of whom emphasize the love they have for him and their belief that he will contribute positively to the community. I thank all of them for their letters, and I thank everyone here who spoke for speaking.

I consider the fact, as I must, that until this offense, Mr. Vanderpool had no criminal history, and he had an extensive employment history. I also consider the collateral consequences of this prosecution in the state, in the federal system, and they include loss of a job, loss of home, loss of reputation, and embarrassment.

A very important consideration for me, which I will discuss more in a moment, is that Mr. Vanderpool was convicted in the state for having sex with someone in custody, based on the very facts that form the basis for this offense of conviction. He served 36 months for that offense, the statutory maximum. He was sentenced to that offense after he spent more than 36 months in jail. As I understand it, as I learned today, he was in solitary confinement for 18 months of that period.

I next consider the nature and circumstances of the offense. They have been repeated several times throughout this hearing. I presided over a bench trial in which I was the finder of fact. I found Mr. Vanderpool guilty. I will not reiterate the nature and circumstances of the offense yet another time.

The offense of conviction was Title 18 of the

JA1607

United States Code, Section 1519. Less than a half an hour after Mr. Vanderpool returned to the police station from taking Ms. S. to the tow company to pick up her car, after he had sex with her in -- while she was in his custody, he wrote a police report documenting his encounter with her. He purposely omitted the fact that he placed her under arrest, that he had her car towed, that he transported her to the police station, that they had sex there, and that he procured the release of her car without paying the release fee. He also falsely stated in the report that he released the car to its true owner, her boyfriend.

As he confirmed later to Mr. Dupree, he wanted the report to reflect that the traffic stop and detention lasted only an hour and she was sent on her way. Mr. Vanderpool knew that statement was not true and knew that the omissions were material and should have been included.

Mr. Vanderpool served as a police officer for two years. He, as much as anyone, should understand the immense trust and responsibility that comes with being a police officer. He certainly understood that a police officer needs to act ethically. In an essay he wrote at the police academy, he explained that morality principles such as being honest and trustworthy serve as a reflection of your character. He knew that, as he wrote, "Ethics is doing the right thing when no one is watching you," and the ethical behavior is very important in

law enforcement.

What Mr. Vanderpool did was not only unethical, it was unlawful. We trust our police officers to be honest and follow the law. That did not happen here. He was dishonest and did not follow the law. He lied in a police report about a sexual encounter with a teenage driver, who he pulled over, handcuffed, brought to the police station, and had sex with. He drafted the false incident report so that any investigation into his actions would be thwarted and obstructed.

I've considered the government's position about the vulnerability of the victim as I consider the nature and seriousness of the offense.

I have to consider the goals of sentencing, and I do that now. I start with the seriousness of the offense, the need to promote respect for the law, the need to provide just punishment. These factors weigh in favor of a period of incarceration.

This offense is extremely serious. Law enforcement officers, of all people, must respect the law, and those that don't should be punished significantly. The abuse of power deserves to be punished with incarceration.

I also have to consider the need for deterrence. I start with specific deterrence. Mr. Vanderpool has been under investigation or indictment for five years. He was charged stateside and federally. He was convicted of a state

misdemeanor and served three years, and more, in state custody, beyond the statutory maximum sentence of three years, on related state charges.

The federal government charged him with a civil rights violation, dismissed that charge after the state conviction, and then charged him with 1519. He was convicted of that crime in this Court.

The prosecution and convictions ensure that Mr. Vanderpool will never be a police officer again. This Court, I do not believe additional prison time is necessary to deter Mr. Vanderpool from reoffending. The need for specific deterrence is not met with additional prison time.

I have to consider general deterrence and the need for it. This factor is important in a case that involves a police officer, because I believe a deterrent message can be sent and received by other police officers. Here, though, I do not think an additional period of incarceration on top of the 36 months that he has already served is necessary to achieve the goal of general deterrence.

Mr. Vanderpool has been investigated, prosecuted, and convicted by two sovereigns. He has -- his name has been in the news. A message that police officers who commit crimes like this one will be prosecuted and punished has been sent. No additional period of incarceration is necessary to achieve the goal of general deterrence.

I have to consider the need to protect the public. I do not think Mr. Vanderpool currently possess a danger to the public. Based on his conduct in this and the state case, one could argue he posed a danger when he was a police officer, but now that he is no longer wearing a badge, he can never -- and he can never work in law enforcement again, he does not have the power to abuse anymore.

My conclusion that Mr. Vanderpool does not currently pose a danger to the public is supported by the additional facts that this is his first offense. He's never been charged with any kind of violent offense before. I believe there was a dated theft charge that was nol-prossed or dismissed. And since he has committed this offense, he has not been convicted of or charged with another criminal offense, including during the two years since his release from state custody. During that time, he's maintained stable, full-time employment, takes care of his parents when needed, and as the government says in its sentencing memo, has been a productive member of society. He has complied fully with his release conditions. The need to protect the public does not warrant any additional incarceration.

I have to consider the kinds of sentences available. Incarceration and probation with conditions are the kinds of sentences available. I must consider the need to avoid unwarranted sentencing disparities among defendants with similar

records and culpability. This factor is not really applicable here, because I have no comparators with similar records and culpability before me. And the fact that Mr. Vanderpool was convicted in state court on related charges for the conduct at issue here makes this case somewhat unique.

I have to consider the need to provide him with training or correctional treatment. Any training or correctional treatment that he may need can occur in the community. He's certainly demonstrated that he is interested, and wants treatment, and wants and can obtain training.

There is no need to provide restitution. Restitution has not been requested.

I of course have to consider the federal sentencing guidelines. I think they are too high for this case, for this individual. Even though I granted a 36-month downward departure to account for the fact that Mr. Vanderpool served 36 months on a related state charge, that does not mean, in my estimation, that a 47 to 61-month sentence is sufficient, but not greater than necessary.

I have carefully considered all of the goals of sentencing in Title 18 of the United States Code, Section 3553(a)(2). Some of them, those in (2)(A), which include the seriousness of the offense, the need to promote respect for the law, the need to provide just punishment, look backward, or retrospectively, at the crime. They warrant incarceration.

But the reason they warrant incarceration is not solely because Mr. Vanderpool obstructed justice but because he did so in connection with a sex offense with someone in custody. For that conduct, he has been punished by incarceration already, and not an insignificant period. A 36-month sentence with no credit for good time is a long time, and the conditions of confinement were difficult, including 18 months of solitary. That is real punishment.

The other goals of sentencing in 3553(a)(2) -- those are in (B), (C), and (D) -- they look forward. They ask, what sentence is necessary to deter Mr. Vanderpool and others in the future? What sentence is necessary to protect the public in the future? What sentence is necessary to provide him with treatment in the most effective manner? These goals of sentencing will not be met with an additional period of incarceration. To meet those goals, any additional incarceration would be more than necessary.

On balance, I find that no additional incarceration is necessary to meet the goals of sentencing; therefore, I find that under Title 18 of the United States Code, Section 3553(a), the sentence that is sufficient, but not greater than necessary to meet the goals of sentencing, is three years' probation on Count One with a condition of six months of a curfew from 10:00 p.m. to 5:00 a.m. and 100 hours of community service.

Probation is more of a sanction than, for instance,

time served followed by supervised release. If Mr. Vanderpool violates his probation, he can be sentenced up to the maximum period of incarceration for the underlying offense, which is 20 years.

Three years of probation will ensure that Mr. Vanderpool is held accountable, that he does not commit another crime again, and that if he does, he will be punished, and it will serve as a reminder to him and the community that he is under Court supervision.

Let's go over the conditions of probation.

So the conditions of supervised release, which mirror the conditions of probation, are found on page 24 through 26 of the presentence report.

Do you have that in front of you, Counsel and Mr. Vanderpool?

MR. ZAMPOGNA: Yes, Your Honor.

THE COURT: Okay. So the Fourth Circuit, I think appropriately, wants to confirm that every defendant understands the conditions of probation and supervised release.

Have you been over these conditions with your client, Mr. Zampogna?

MR. ZAMPOGNA: Yes, Your Honor.

THE COURT: You have.

MR. ZAMPOGNA: Yes. We'll go over them again. Yes, we did read them to him.

THE COURT:  Okay.

Most importantly, Mr. Vanderpool, have you reviewed what's entitled the Conditions of Supervised Release, the mandatory conditions, the standard conditions that are on pages 24 through 26 of the PSR?

THE DEFENDANT:  Yes, Your Honor, I've seen them more than once.

THE COURT:  Do you need me to read them into the record now, or do you understand them?

THE DEFENDANT:  I understand them, Your Honor.

THE COURT:  All right.  Do you need me to read them?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.

So I will impose the mandatory conditions.  There is no restitution, though.  There's no sex offender registration requirement, and I will not impose the domestic violence condition.

I will impose all of the standard conditions, and I incorporate all of those by reference and adopt them.

The additional recommended condition of supervision, there's one that Probation has recommended, it's on page 26, and I will impose that.  It's the following:  You must participate in a mental health treatment program and follow the rules and regulations of that program.  The probation officer, in consultation with the treatment provider, will supervise your

participation in the program (provider, location, modality, duration, intensity, et cetera).

Do you understand that condition?

THE DEFENDANT: Yes, Your Honor.

THE COURT: The additional condition on probation that's not in here is a six-month curfew from 10:00 a.m. to 5:00 a.m. -- excuse me, 10:00 p.m. to 5:00 a.m., and I will defer to Probation in how they monitor that.

Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: There is also a $100 special assessment.

Let me just state for the record --

THE PROBATION OFFICER: Your Honor, did you also mention 100 hours' community service?

THE COURT: I did. Thank you very much.

Yes, another special condition of probation is a 100-hour community service requirement.

Let me just state for the record that the conditions of probation must comply with the requirements of Title 18 of the United States Code, Section 3583(d). I have read that, of course, and I am aware of it, and I find that the conditions that I have imposed are reasonably related to the nature and circumstance of the offense, Mr. Vanderpool's history and characteristics, and the statutory goals of deterrence, protection of the public, and rehabilitation. I also find that

they involve no greater deprivation of liberty than is reasonably necessary to achieve those purposes and that they align with any pertinent Sentencing Commission policy statements.

Is there anything else from the government's perspective?

MS. BERNSTEIN: Nothing else, Your Honor.

THE COURT: All right. Thank you very much.

Anything else from the defense's perspective?

MR. ZAMPOGNA: No, Your Honor. Thank you.

THE COURT: All right. Mr. Vanderpool, you have 14 days from the date of judgment to notice an appeal. You have all of your appellate rights. You did not plead guilty, you went to trial, you were convicted, you've been sentenced. If you'd like to notice an appeal, you should consult with your lawyers and do that. I wish you the best of luck. Thank you.

THE COURTROOM DEPUTY: All rise. This Honorable Court now stands in recess. Thank you.

(The proceedings were adjourned at 1:37 p.m.)

*       *       *

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of May, 2025.

_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter

JA1618

# United States District Court
## District of Maryland

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Offenses Committed on or After November 1, 1987) |
| v. | |
| | Case Number: DLB-8-23-CR-00234-001 |
| **MARTIQUE CABRAL VANDERPOOL** | USM Number: N/A |
| | Defendant's Attorney: Christopher Adam Zampogna |
| | |
| | Assistant U.S. Attorney: Barbara Bernstein |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.

☒ was found guilty on count(s) 1 of the Indictment after a Bench Trial.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1519 | Falsification Of Record | 02/19/2025 | 1 |

The defendant is adjudged guilty of the offense(s) listed above and sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by United States v. Booker, 543 U.S. 220 (2005).

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

February 20, 2025
Date of Imposition of Judgment

Deborah L. Boardman                                   2/21/25
United States District Judge                          Date

Name of Court Reporter: Patricia Klepp

JA1619

Sheet 2 - Judgment in a Criminal Case with Probation (Rev. 12/2019)                                     Judgment Page 2 of 5

**DEFENDANT: MARTIQUE CABRAL VANDERPOOL**              CASE NUMBER: DLB-8-23-CR-00234-001

## PROBATION

The defendant is hereby placed on probation for a term of **3 years as to Count 1 of the Indictment.**

## A.   MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) You must cooperate in the collection of DNA as directed by the probation officer.
5) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7) ☐ You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8) You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9) If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10) You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

## B.   STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

JA1620

Sheet 2.01 - Judgment in a Criminal Case with Probation (Rev. 12/2019)                              Judgment Page 3 of 5

**DEFENDANT: MARTIQUE CABRAL VANDERPOOL**          CASE NUMBER: DLB-8-23-CR-00234-001

10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13) You must follow the instructions of the probation officer related to the conditions of supervision.

# C.  PROBATION
# ADDITIONAL CONDITIONS

### ☒ MENTAL HEALTH TREATMENT
You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

### ☒ CURFEW
You are restricted to your residence every day from <u>10:00pm</u> to <u>5:00am</u>. You will be monitored by the form of location monitoring technology indicated below for a period of <u>6</u> months, and you must follow the rules and regulations of the location monitoring program. You must pay the costs of the program as directed by the probation officer.
    ☒ Location monitoring at the discretion of the probation officer.

### ☒ COMMUNITY SERVICE – HOURS
You must complete <u>100</u> hours of community service within <u>36</u> months. The probation officer will supervise the participation in the program by approving the program (agency, location, frequency of participation, etc.). You must provide written verification of completed hours to the probation officer.

### ☒ SPECIAL ASSESSMENT
Pay special assessment of $100.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

JA1621

Sheet 3, Part A - Judgment in a Criminal Case with Probation (Rev. 12/2019)

Judgment Page 4 of 5

**DEFENDANT: MARTIQUE CABRAL VANDERPOOL**          CASE NUMBER: DLB-8-23-CR-00234-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 3B.

|  | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ N/A | $ Waived | $ N/A | $ N/A |

☐  CVB Processing Fee $30.00

☐  The determination of restitution is deferred until <u>Click here to enter a date.</u>.          An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|

**TOTALS**          $ _____          $ _____

☐  Restitution amount ordered pursuant to plea agreement     $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the  ☐ fine    ☐ restitution

    ☐  the interest requirement for the  ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

JA1622

Sheet 3, Part B - Judgment in a Criminal Case with Probation (Rev. 12/2019)                                    Judgment Page 5 of 5

**DEFENDANT: MARTIQUE CABRAL VANDERPOOL**                              CASE NUMBER: DLB-8-23-CR-00234-001

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A ☒ $100 Special assessment to be paid In full immediately;

B ☐ $_____ immediately, balance due (in accordance with C, D, or E); or

C ☐ Not later than _____; or

D ☐ Installments to commence _____ day(s) after the date of this judgment. In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. probation officer shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate; or

E ☐ In _____ (e.g. equal weekly, monthly, quarterly) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on probation.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐ **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of probation, the balance shall be paid:

☐ in equal monthly installments during the term of probation; or

☐ on a nominal payment schedule of $_____ per month during the term of probation.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:
☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant<br>Names (including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

JA1623

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES | ) | HD |
|  | ) | Rcv'd by: _____ |
| v. | ) | Case No.  8:23-cr-000234-DLB-1 |
|  | ) |  |
| MARTIQUE VANDERPOOL | ) | USDC- GREENBELT |
|  | ) | '25 MAR 3 PM 4:01 |
| *Defendant* | ) |  |

### Defendant Martique Vanderpool's Notice of Appeal

Notice is hereby given that Martique Vanderpool, defendant in the above captioned case, hereby appeals to the United States Court of Appeals for the Fourth Circuit the judgment entered in this case on February 21, 2025 (ECF No. 179), Statement of Reason (ECF No. 180), and all previous rulings, opinions, and orders in this case.

Dated:                                  Respectfully submitted,

Martique Vanderpool

2701 Cheverly avenue
Cheverly, MD 20785

JA1624

Page 1/1

# U.S. District Court

## Maryland - Greenbelt

Receipt Date: Feb 21, 2025 4:10PM

Martique Vanderpool

| Rcpt. No: 2668 | | Trans. Date: Feb 21, 2025 4:10PM | | | Cashier ID: #JH (6S36) | |
|---|---|---|---|---|---|---|
| **CD** | **Purpose** | **Case/Party/Defendant** | **Qty** | **Price** | **Amt** |
| 700 | Criminal Debt | DMDX823CR000234 /001<br>MARTIQUE CABRAL VANDERPOOL | 1 | 100.00 | 100.00 |

| **CD** | **Tender** | | **Amt** |
|---|---|---|---|
| CC | Credit Card | | $100.00 |
| | | Total Due Prior to Payment: | $100.00 |
| | | Total Tendered: | $100.00 |
| | | Total Cash Received: | $0.00 |

A $53 fee will be charged for NSF checks. Criminal Debt Payments can be made on-line at https://www.pay.gov/public/form/start/741690530. Payment must be made by money order, check, or debit card only. For questions call 410-962-2613.

JA1625

Bank of America deposit products.

**FDIC** *FDIC-Insured - Backed by the full faith and credit of the U.S. Government*

Martique C Vanderpool    Profile & Settings    Saved Items    **Log Out**

Online Banking

Accounts    Pay & Transfer    Rewards & Deals    Tools & Investing    Security Center    Open an Account    Help & Support

## Hello, Martique    Update Profile | Security Center

It's been some time since you updated your personal information. Please review your info now.

### Personal accounts[a]

| | |
|---|---|
| Adv SafeBalance Banking - 8018 | **$18.23** |
| Quick View        Low balance | |
| Customized Cash Rewards Visa Signature - 2934 | **$4,852.88** |
| Quick View        Payment due | |

### Investment accounts

Invest in your future. **Get up to $600** when you invest in a new Merrill account.

See more >>

Open a new account

For checking, savings, and money market accounts, the balance may reflect transactions that have not yet posted to your account. For credit card, Gold Option Gold Reserve and personal line of credit accounts. the balance may not reflect recent transactions or pending payments.
The balance may reflect transactions that have not yet posted to your account. SafeBalance Banking accounts do not count towards the checking account requirement or the balance requirement for relationship pricing programs such as Platinum Privileges, Preferred Rewards, and Banking Rewards for Wealth Management. The SafeBalance Banking account does not receive fee waivers and other benefits associated with the Platinum Privileges and Preferred Rewards programs.

Last sign in 03/01/2025 at 03:10 PM ET

Secure Area                                                           En español | Log Out

Locations | Contact Us | Help & Support | Browse with Specialist | Accessible Banking | Privacy | Children's Privacy | Security | Online Banking
Service Agreement | Advertising Practices | Site Map | Careers | Share Your Feedback |

Investment and insurance products:

https://secure.bankofamerica.com/myaccounts/brain/redirect.go?target=accountsoverview&request_locale=en-us          1/2

JA1626

Case 8:23-cr-00234-DLB    Document 181    Filed 03/03/25    Page 4 of 4

| | | |
|---|---|---|
| **Are Not FDIC Insured** | **Are Not Bank Guaranteed** | **May Lose Value** |
| **Are Not Deposits** | **Are Not Insured By Any Federal Government Agency** | **Are Not a Condition to Any Banking Service or Activity** |

Investing involves risk. It's possible to lose money by investing in securities. You should review any planned financial transactions that may have tax or legal implications with your personal tax or legal advisor.

Merrill Lynch. Pierce, Fenner & Smith Incorporated (also referred to as "MLPF&S" or "Merrill") makes available certain investment products sponsored, managed, distributed or provided by companies that are affiliates of Bank of America Corporation ("BofA Corp."). MLPF&S is a registered broker-dealer, registered investment adviser, Member SIPC, and a wholly owned subsidiary of BofA Corp.

Bank of America Private Bank is a division of Bank of America, N.A., Member FDIC and a wholly owned subsidiary of Bank of America Corporation. Trust and fiduciary services are provided by Bank of America, N.A. and U.S. Trust Company of Delaware. Both are indirect subsidiaries of Bank of America Corporation.

Insurance Products are offered through Merrill Lynch Life Agency Inc. (MLLA) and/or Banc of America Insurance Services, Inc., both of which are licensed insurance agencies and wholly-owned subsidiaries of Bank of America Corporation.

Banking, credit card, automobile loans, mortgage and home equity products are provided by Bank of America, N.A. and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation. Credit and collateral are subject to approval. Terms and conditions apply. This is not a commitment to lend. Programs, rates, terms and conditions are subject to change without notice.

Bank of America, N.A. Member FDIC.  Equal Housing Lender

©2025 Bank of America Corporation. All rights reserved.

Patent: patents.bankofamerica.com

JA1627

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | CRIMINAL NO. DLB-23-00234 |
| | * | |
| MARTIQUE CABRAL VANDERPOOL, | * | |
| | * | |
| Defendant | * | |

## ORDER

Upon consideration of the unopposed Motion filed by Stuart A. Berman as appellate counsel for defendant Martique Cabral Vanderpool, and good cause being shown,

IT IS ORDERED that the motion is GRANTED. The federal search warrant docketed at ECF 13-3 and ECF 17-1 is partially unsealed for the purpose of providing copies to defendant's appellate counsel. The Clerk is directed to transmit copies of these documents to Mr. Berman.

_____
Deborah L. Boardman
United States District Judge

Dated:  May 15, 2025

JA1628